

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FILED

JUL 11 2008 RC

Jul 11, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| MINTEL INTERNATIONAL GROUP, LTD, a United Kingdom corporation, ) ) ) | |
| Plaintiff, ) ) | Case No.: 08CV3939 |
| v. ) ) ) | |
| MEESHAM NEERGHEEN, an individual, ) ) | JUDGE DOW |
| Defendant, ) ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

Plaintiff MINTEL INTERNATION GROUP, LTD. ("Mintel"), a United Kingdom corporation, submits this Memorandum in Support of Plaintiff's Emergency Motion for Temporary Restraining Order and Injunctive Relief:

### INTRODUCTION

This is an action brought against Defendant Meesham Neergheen ("Neergheen") for violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1330, *et seq.*, the Illinois Trade Secret Act ("ITSA"), 765 ILCS 1065/1, *et seq.*, and the common law doctrine of breach of contract. Neergheen worked for Mintel's marketing department from June 30, 1997 until April 30, 2008. In order to allow Neergheen to effectively carry out his employment duties, Mintel entrusted Neergheen with client and marketing files and materials. Since Neergheen's resignation on April 30, 2008, Mintel has discovered that Neergheen e-mailed, copied and/or printed Mintel's confidential and proprietary trade secrets for Neergheen's own benefit and gain on April 29, 2008. Furthermore, Neergheen is currently working for Datamonitor, Inc., a direct competitor of Mintel, which is in violation

of the terms of Neergheen's Contract of Employment and Employee Non-Compete/Non-Solicitation Agreement ("Non-Compete Agreement"). Neergheen's employment with a competitor and the actual and inevitable disclosure of Mintel's confidential and proprietary trade secrets will have devastating and irreparable consequences to Mintel. This Court should not permit Neergheen to flagrantly violate the CFAA, ITSA and common law and should grant the injunctive relief requested herein by Mintel.

## BACKGROUND[1]

Mintel is headquartered in London, England and provides consumer, product and market research to its clients. Cmplt., ¶¶ 2, 6. Mintel was formed over three decades ago and now has a global presence with offices in Australia, China, Japan and Chicago. Cmplt., ¶¶ 2, 6. Mintel's analysts are experts in diverse areas such as leisure, consumer goods, retail, financial services, sales promotion and social trends.

Since its inception, Mintel has collected and developed, at its own expense, significant and critical information on marketing, products, project forecasts, pricing, costs, customer needs, client contacts and other data. Cmplt., ¶ 6; Carr Affdt., ¶ 2, attached hereto and incorporated herein as "Exhibit 2." Mintel provides "need to know" limited access to its marketing documents and customer files, wherein only certain employees in trusted positions have access to such information. Cmplt., ¶ 7; Thomson Affdt., ¶ 2, attached hereto and incorporated herein as "Exhibit 3." By reason of Neergheen's employment and position with Mintel, Neergheen had access to such confidential and proprietary trade secrets and became familiar with Mintel's computer system. Cmplt., ¶ 8; Thomson Affdt., ¶ 5.

---

[1] The following facts were taken from Mintel's Complaint, which is attached hereto and incorporated herein as "Exhibit 1."

2

On or about June 24, 1998, Neergheen signed a Contract of Employment with Mintel. Cmplt., ¶ 12; Carr Affdt., ¶ 8. The Contract of Employment expressly stated that Neergheen could not directly or indirectly compete with Mintel for the first twelve months after the end of Neergheen's employment with Mintel. Cmplt., ¶ 13; Carr Affdt., ¶ 8. The Contract of Employment also stated that Neergheen must refrain from using or disclosing any of Mintel's trade secrets and other proprietary or confidential information. Cmplt., ¶ 14; Carr Affdt., ¶ 8. The Contract of Employment expressly provided for the confidential treatment of Mintel's confidential, proprietary and trade secret information with restrictions on disclosure, use and dissemination. Cmplt., ¶ 14.

Subsequently, on or about August 4, 2003, Neergheen signed an Employee Non-Compete/Non-Solicitation Agreement ("Non-Compete Agreement"). Cmplt., ¶ 9; Carr Affdt., ¶ 9. The Non-Compete Agreement stated that Neergheen agreed not to compete with the business of Mintel or any of its subsidiaries for a period of one year. Cmplt., ¶ 10; Carr Affdt., ¶ 9. The Non-Compete Agreement also included a confidentiality provision that made clear that Neergheen was not to disclose any information of a confidential or proprietary nature. Cmplt., ¶ 11; Carr Affdt., ¶ 9.

On or about April 23, 2008, Neergheen provided written notice to Mintel that Neergheen would be resigning from Mintel effective April 30, 2008. Cmplt., ¶ 16; Carr Affdt., ¶ 10. Neergheen commenced employment with Datamonitor, Inc., a competitor of Mintel, immediately after Neergheen's resignation from Mintel. Cmplt., ¶ 17; Carr Affdt., ¶ 14. In fact, Neergheen had been in negotiations with Datamonitor and other competitors of Mintel, seeking employment with these competitors prior to Neergheen's resignation from Mintel. Cmplt., ¶ 18; Thomson Affdt., ¶ 10. Neergheen's employment with Datamonitor is

in direct violation of the restrictive covenants contained in Neergheen's Contract of Employment and Non-Compete Agreement. Cmplt., ¶¶ 38, 49.

After Neergheen's written notification on April 23, 2008 that he would be resigning, Mintel began searching and monitoring Neergheen's work computer. Cmplt., ¶ 21; Thomson Affdt., ¶ 6. Mintel discovered that Neergheen had copied, e-mailed and/or printed confidential and proprietary trade secret information from his work computer on April 29, 2008 – the day before his last day of employment with Mintel. Cmplt., ¶ 21; Thomson Affdt., ¶ 7. These files included, but are not necessarily limited to, the following: (1) 2008_04_07_Mintel project priorities; (2) marketing activities – current, future direction – for SP; (3) 2008_04_18_Marketing_Exec_Update; (4) Marcomm Approved Expenses; (5) 2008 shows- Apr 8; (6) Final Attendee list.csv; (7) Claritas Comperemedia Web-Seminar.pds; (8) COMPEREMEDIA – Revenue by Client and Product.xls. Cmplt., ¶ 21; Thomson Affdt., ¶ 7.

These files contained Mintel's confidential and proprietary trade secret information, including, but not limited to, the following: client accounts and budgets; potential client lists; information regarding Mintel's group projects; vendor lists; trade show lists, including budget and marketing strategies; marketing strategies and overall objectives; individual client cost data; specialized research on clients; client proposals; marketing expenses for various vendors; information regarding the status of all marketing projects and initiatives; and marketing analysis and information regarding customer interactions. Cmplt., ¶ 15; Carr Affdt., ¶ 13.

Mintel has exercised diligent and reasonable efforts to safeguard and keep the subject confidential, proprietary and trade secret information secret and confidential.

Cmplt., ¶¶ 7, 61; Thomson Affdt., ¶ 2. Mintel has a secure computer network and secure server system that is carefully configured and managed to prevent unauthorized access. Thomson Affdt., ¶ 3. Files containing confidential, proprietary and trade secret information are stored on file servers with restricted access right. Thomson Affdt., ¶ 3. Individual users are issued their own personal username and password. Thomson Affdt., ¶ 3. This username and password only allow the user access to the information they require to perform their job functions. Thomson Affdt., ¶ 3.

It is the practice of Mintel to keep such information closely guarded and confidential such that it is not disclosed to competitors. Cmplt., ¶¶ 7, 61. If disclosed to competitors, use of said information would be of considerable value to them and extremely injurious to the business and goodwill of Mintel. Cmplt., ¶¶ 7, 54. Mintel also protects and safeguards its confidential, proprietary and trade secret information through non-disclosure, trade secret and confidentiality agreements. Carr Affdt., ¶¶ 8, 9. Neergheen signed two such non-disclosure/confidentiality agreements on June 24, 1998 and August 4, 2003 respectively. Cmplt., ¶¶ 9, 12; Carr Affdt., ¶¶ 8, 9.

Mintel will be irreparably harmed should this Court fail to enter the injunctive relief sought by Mintel. Cmplt., ¶ 42; Carr Affdt., ¶ 16. Specifically, Mintel will be unable to repair the damage done to its business relations with its existing customers and will lose the competitive advantage Mintel has worked hard to establish. Cmplt., ¶ 42; Carr Affdt., ¶ 16. Mintel respectfully requests that its Motion for Temporary Restraining Order and Injunctive Relief be granted. Mintel also requests that this matter be set for hearing on Mintel's request for a preliminary injunction at this Court's earliest convenience.

## LEGAL STANDARD

The elements for a temporary retraining order and a preliminary injunction are the same. *YourNetDating, LLC v. Mitchell*, 88 F. Supp. 2d 870, 871 (N.D. Ill. 2000). A preliminary injunction should be issued if a plaintiff can demonstrate that: (1) there is a likelihood of success on the merits; (2) plaintiff does not have an adequate remedy at law and will likely suffer irreparable harm should an injunction not be issued; (3) the harm to the plaintiff if injunctive relief is denied is greater than the harm, if any, to the defendants if injunctive relief is granted; and (4) the public interest weighs in favor of injunctive relief. *Pepsico, Inc. v. Redmond*, 54 F.3d 1262, 1267 (7th Cir. 1995).

## ARGUMENT

**I.     AN INJUNCTION SHOULD BE ISSUED TO PREVENT NEERGHEEN FROM USING AND DISCLOSING MINTEL'S CONFIDENTIAL, PROPRIETARY AND TRADE SECRET INFORMATION AND TO PREVENT NEERGHEEN FROM WORKING FOR A COMPETITOR OF MINTEL.**

### A.     Mintel Has a Likelihood of Success on the Merits

A low threshold exists for demonstrating a likelihood of success on the merits. *Frullati Franchise Sys., Inc. v. Dana Areece & Co., Inc.*, No. 01 C 4703, 2001 WL 743427, at *2 (N.D. Ill. June 28, 2001) (stating that for purposes of a TRO or preliminary injunction, a plaintiff need only establish a "trivial chance of succeeding on the merits") (citing *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 361 (7th Cir. 1993)). In the present case, Mintel has a likelihood of success on its claim for relief against Neergheen.

### 1.    Violation of the Computer Fraud and Abuse Act

The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, provides for the entry of civil injunctive relief as well as the recovery of money damages for a violation of its provisions. *See* 18 U.S.C. § 1030(g) (providing that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief").

Neergheen violated the CFAA.  The day prior to Neergheen's resignation, Neergheen copied, e-mailed to his personal e-mail address and/or printed confidential and proprietary trade secret information from his work computer. *See* Thomson Affdt., ¶ 7. More specifically, Neergheen e-mailed the following confidential files to his personal e-mail address: (1) 2008_04_07_Mintel project priorities; (2) marketing activities – current, future direction – for SP; (3) 2008_04_18_Marketing_Exec_Update; (4) Marcomm Approved Expenses; (5) 2008 shows- Apr 8; (6) Final Attendee list.csv; (7) Claritas Comperemedia Web-Seminar.pdf; and (8) COMPEREMEDIA – Revenue by Client and Product.xls. *See* Thomson Affdt., ¶ 7. These files contained confidential and proprietary information regarding client accounts and budgets, potential client lists, vendor lists, marketing strategies and overall objectives, individual client cost data and the like. Carr Affdt., ¶ 13. Neergheen's actions in e-mailing Mintel's confidential and proprietary trade secret information to his personal e-mail address in the days leading up to his resignation clearly "exceeded authorized access" as that term is defined in 18 U.S.C. § 1030(e)(6).

Courts have upheld the use of the CFAA in granting injunctive relief against former employees and their new employers who have attempted to obtain a competitive

edge by purloining information from a former employer's computers. *See e.g.*, *Pacific Aerospace & Elec., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1196 (E.D. Wash. 2003) (granting injunction and noting that "employers ... are increasingly taking advantage of the CFAA's civil remedies to sue former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system"); *YourNetDating, LLC*, 88 F. Supp. 2d at 872 (granting TRO under CFAA claim against former employee); *see also Charles Schwab & Co., Inc. v. Carter*, No. 04 C 7071, 2005 WL 351929, at *3 (N.D. Ill. Feb. 11, 2005) (denying motion to dismiss claim under CFAA); *George S. May Int'l Co. v. Hostetler*, No. 04 C 1606, 2004 WL 1197395, at *3 (N.D. Ill. May 28, 2004).

## 2. Violation of the Illinois Trade Secret Act

The Illinois Trade Secret Act, 765 ILCS 1065/1, *et seq.*, defines a "trade secret" as information that:

(i) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

*See* 765 ILCS 1065/2(d).

The various files copied, e-mailed and/or printed by Neergheen in the days leading up to his resignation contained highly sensitive information not disseminated into the public domain. More specifically, the file names and the confidential and proprietary trade secrets contained within each are as follows:

1. **2008_04_07_Mintel project priorities**: This file contains information about Mintel's group projects, the priority of each from a strategic perspective, and

8

the priority for Mintel's departments working on these core initiatives. This file was provided to members of the marketing team only in order to provide each member with an overview of the project focus from a general business perspective.

2. **marketing activities – current, future direction – for SP**: This file was created for exclusive use by the marketing team to help the members understand the emphasis Mintel's marketing department puts on the listed marketing channels and means. This internal file represents an important part of Mintel's marketing strategy, outlining Mintel's overall marketing objectives. This file was provided to Mintel's marketing team only.

3. **2008_04_18_Marketing_Exec Update**: This file represents a complete overview of all marketing projects and initiatives and was distributed to a distinct group of Mintel's executives and marketing team. All such individuals were required to feed their input into the file data.

4. **Marcomm Approved Expenses**: This file contains a list of key vendors Mintel uses for different business purposes, such as public relations tracking, public relations distribution, printing, market data providers and merchandise. Only the marketing team and a select group of others, as determined by the Global Marketing Director, have access to this file.

5. **2008 shows-Apr 8**: This file contains a complete overview of all trade shows Mintel has had a presence at between October 2007 and April 8, 2008, including budgeted and detailed actual costs. This file displays important information about Mintel's marketing strategy and activity and

shows the exclusively agreed upon price with trade show partners. Only the marketing team and a select group of others, as determined by the Global Marketing Director, have access to this file.

6.     **Final Attendee list.csv**: This file contains address data of prospective clients created from a co-produced and promoted webinar of Mintel Comperemedia and Mintel's partner Claritas, Inc. held on April 22, 2008. The potential clients listed within this file have provided their address data to Mintel Comperemedia and Claritas, establishing a business relationship to obtain access to the webinar. Claritas and Mintel agreed only to share the prospective client list with each other. Neergheen obtained access to this file because he was working on the project with Mintel's Claritas contact.

7.     **Claritas Comperemedia Web-Seminar.pdf**: This file contains the actual content of the webinar and, therefore, is marked as confidential. This information was only made available to potential clients in exchange for their address details and to employees of Claritas and Mintel who worked on the project.

8.     **COMPEREMEDIA – Revenue by Client and Product.xls**: The data in this file was created by Mintel's sales manager and marked as confidential. The file contains analysis done by the marketing manager to show the revenue ranking of Mintel's product Comperemedia by client sector. This file also lists Mintel's specific clients and the individually agreed upon price each client made with Mintel for a Comperemedia subscription. The clients

and information listed within this file total over fifteen (15) pages in length.

This file was provided to some of Mintel's marketing team.

Carr Affdt., ¶ 13.

The ITSA defines "misappropriation" in several ways. For example, one can misappropriate trade secrets by "acquiring" them through improper means such as the breach of a confidential relationship. 765 ILCS 1065(b)(1).[2] Misappropriation also occurs when a defendant breaches a duty owed to protect the secrecy of its information or induces another party to do so. 765 ILCS 1065(b)(2)(B). Thus, the definition of "misappropriation" includes the precise conduct engaged in by Neergheen.

It is important to note that misappropriation can rarely be proven by direct evidence, rather, plaintiffs must frequently introduce only circumstantial evidence. *Ferroline Corp. v. General Aniline & Film Corp.*, 207 F.2d 912 (7th Cir. 1953) (emphasizing that use or disclosure is difficult to establish since it is usually proven through circumstantial evidence). In addition, Courts have also recognized that the disclosure of confidential information is inevitable. *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995); *Strata Marketing, Inc. v. Murphy*, 317 Ill. App. 3d 1054 (2000). As such, Mintel has sufficiently shown a likelihood of success in proving Neergheen's violation of the ITSA.

### 3.    Violation of restrictive covenants within Non-Compete Agreement and Contract of Employment

"The basic test applied by Illinois courts in determining the enforceability of restrictive covenants is 'whether the terms of the agreement are reasonable and necessary

---

[2] As defined in the Act, "improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means. 765 ILCS 1065(a).

to protect a legitimate business interest of the employer.'" *Outsource Int'l, Inc. v. Barton*, 192 F.3d 662, 666 (7th Cir. 1999). Such a determination necessarily turns on the facts and circumstances of each case. *Id.* "A restrictive covenant is enforceable when an employee obtains confidential information through his employment and later attempts to use it for his own benefit." *Lyle R. Jager Agency, Inc. v. Steward*, 253 Ill. App. 3d 631, 636 (1993).

Neergheen commenced employment with Mintel in its London office on or about June 30, 1997. Carr Affdt., ¶ 6. As a condition of his continued employment, Neergheen signed and executed a United Kingdom Contract of Employment with Mintel on or about June 24, 1998. Carr Affdt., ¶ 8. The Contract of Employment included the following restrictive covenant:

> You will not for the first twelve months at the end of your employment with us, either on your own account or on behalf of any other legal person and in competition with the Company, or any subsidiary directly or indirectly engage in, or be connected with, trade or business carried on by us or any of our associates at the end of your employment. ... You will not, for the first twelve months after the end of your employment with us, solicit away from us or our associates any person who is and was, when your employment ended, employed by us or an associate as a director, senior manager or sales person for whom you were responsible, or who was a member of any department/project/team in which you worked during the last twelve months of your employment.

Cmplt., ¶ 13.

On or about August 1, 2003, Neergheen transferred to Mintel's Chicago office. Carr Affdt., ¶ 6. As a condition of his continued employment with Mintel in Chicago, Neergheen agreed to and signed an Employee Non-Compete/Non-Solicitation Agreement ("Non-Compete Agreement") on August 4, 2003. Carr Affdt., ¶ 9. The Non-Compete Agreement signed by Neergheen stated as follows:

> The undersigned Employee hereby agrees not to compete, either directly or indirectly, with the business of Mintel or any of its subsidiaries, branches or divisions, at any location worldwide at any time during the Employee's term of employment, and for a period of one (1) year following his termination of employment with Mintel, regardless of the reason or cause for such termination.

Cmplt., ¶ 10.

The above restrictive covenants are both reasonable as to time and geography. Mintel has taken appropriate measures to ensure that it will not lose its employees or its confidential information to its competitors. Neergheen is seeking to undermine and undo Mintel's precautionary measures. The consequence is a potentially disastrous effect on Mintel's business and competitive position in the marketplace. Carr Affdt., ¶ 16. Neergheen must be enjoined from his continued employment with Datamonitor and from exploiting Mintel's confidential and proprietary trade secrets for his own advantage and the benefit of Mintel's competitors.

### B.    Mintel Does Not Have an Adequate Remedy at Law and Will Suffer Irreparable Harm Should an Injunction Not be Issued

Equity may not refuse to exercise jurisdiction unless there exists an adequate remedy at law. None exists here. An injury is "irreparable" when it is of such a nature that the injured party cannot be adequately compensated in damages or when damages cannot be measured by any pecuniary standard. *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997); *see also Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) ("showing injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages"). The loss of clients and sales, as well as the continuing threat of further loss due to the distribution of Mintel's client lists and marketing data, is sufficient to

13

constitute irreparable injury. *See Meridian Mut. Ins. Co.*, 128 F.3d at 1120; *see also Illinois Sporting Goods Assoc. v. County of Cook*, 845 F. Supp. 582, 585 (N.D. Ill. 1994) (finding irreparable harm because of threat to the existence of plaintiff's business).

Money damages would be an inadequate remedy in the present case for several reasons. First, the patronage of Mintel's clients and the development of its confidential information have been secured since Mintel's inception in 1972 through the expenditure of enormous financial resources and tremendous amounts of time. Mintel is facing the threat of lost sales as long as Neergheen is not enjoined from engaging in his wrongful conduct. In awarding protection, these factors have been routinely considered by the courts. *Id.*

Second, it is impossible, at this time, to ascertain with any certainty the degree of financial loss Mintel will suffer by virtue of Neergheen's conduct. It is well recognized that in circumstances like the present, irreparable harm includes the impossibility of ascertaining with any accuracy the extent of the loss.

It is also impossible to determine at this time the extent to which Mintel's confidential information will be "pirated away" by Neergheen and Datamonitor, the competitor Neergheen is presently working for. It is difficult to know the long-term ramifications of Neergheen's conduct. Accordingly, Neergheen's conduct requires the issuance of an injunction to protect Mintel from irreparable harm.

### C. The Irreparable Harm Mintel Will Suffer Should An Injunction Not Be Issued is Greater than Any Potential Injury To Others Should an Injunction Be Granted

Balancing the irreparable harm to the moving party if an injunction is not entered against the harm to the non-moving party if an injunction is granted requires the court to

14

use a "sliding-scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *In re Aimster Copyright Litigation*, 252 F. Supp. 2d 634, 648 (N.D. Ill. 2002).

The injunctive relief sought by Mintel will only prohibit Neergheen from using and exploiting the illegally obtained information from Mintel and require him to return all such information. In addition, Mintel seeks to have Neergheen alone abide by the terms of the restrictive covenants he agreed to and signed. The requested injunctive relief merely seeks to ensure that Neergheen abides by what he is already legally obligated to do. Neergheen's potential interest in skirting his legal obligations pales in comparison to Mintel's interests in preserving its customer relations and the confidentiality of its trade secret information.

Mintel is simply attempting to preserve the *status quo*, which existed at the time Neergheen terminated his employment relationship, by requiring Neergheen to terminate his employment relationship with Datamonitor and return all confidential data he wrongfully diverted from Mintel. A return to the *status quo* further requires the imposition of injunctive relief prohibiting Neergheen from engaging in any other conduct that may unlawfully interfere with Mintel's current and prospective business relationships. An injunction order from this court directing Neergheen to comply with his obligations under federal and state law and pursuant to the terms of the Contract of Employment and Non-Compete Agreement is necessary.

### D.    The Public Interest Will Be Served By Issuing the Injunctive Relief Mintel Seeks

The public's interest in preventing unfair competition and the destruction of confidential business information and trade secrets is unparalleled. There is no public

15

interest in rewarding theft and encouraging unethical business behavior. *IDS Life Ins. Co. v. SunAmerica, Inc.*, 958 F. Supp. 1258, 1281 (N.D. Ill. 1997). Further, Neergheen has engaged in a course of conduct that has violated federal and state statutes and Illinois common law. The public has a strong interest in seeing statutes and common law enforced by the courts.

### CONCLUSION

For the reasons stated above, Mintel has raised a fair question as to the existence of its rights, has shown that it will suffer irreparable harm and that Mintel is without an adequate remedy at law. Accordingly, Mintel respectfully seeks the equitable relief of a temporary restraining order, preliminary injunction and permanent injunction, together with such other further relief this court deems proper.

WHEREFORE Plaintiff MINTEL INTERNATIONAL GROUP, LTD. respectfully requests that its Emergency Motion for Temporary Restraining Order and Preliminary Injunction be granted and for any further relief deemed appropriate.

Respectfully submitted,

MINTEL INTENTIONAL GROUP, LTD.

By: *Joseph Marconi*
One of Their Attorneys

Joseph R. Marconi
Victor Pioli
JOHNSON & BELL, LTD.
Attorneys for Plaintiff
33 W. Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 372-0770
Doc. No.: 1897534

16

## Complaints
1:07-cv-99999 Plaintiff v. Defendant

### United States District Court

### Northern District of Illinois - CM/ECF LIVE, Ver 3.2.1

**Notice of Electronic Filing**

The following transaction was entered by Marconi, Joseph on 7/11/2008 at 8:39 AM CDT and filed on 7/11/2008
**Case Name:**       Plaintiff v. Defendant
**Case Number:**     1:07-cv-99999
**Filer:**           Plaintiff
**Document Number:** 4260

**Docket Text:**
**COMPLAINT** *for Injunctive and Other Relief* **filed by Plaintiff; Filing fee $ 350, receipt number 0752000000002925345. (Attachments: # (1) Exhibit 1A thru 1 C, # (2) Civil Cover Sheet, # (3) Summons, # (4) Appearance Joseph R. Marconi, # (5) Appearance Victor J. Pioli)(Marconi, Joseph)**

**1:07-cv-99999 Notice has been electronically mailed to:**

**1:07-cv-99999 Notice has been delivered by other means to:**

Plaintiff

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1040059490 [Date=7/11/2008] [FileNumber=4994900-0
] [73df20331d46e25a61e0e4901ab4bc3430a011e6e34978dcc3c45410c8b3410bf6c
692d003d24fbb7511314dc1b7a569aa8179b27f3cba44224d35966d833fba]]
**Document description:**Exhibit 1A thru 1 C
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1040059490 [Date=7/11/2008] [FileNumber=4994900-1
] [54ec13dcb77ab03c90019cab205d9911d17610e6ededcda4b9e2062d77954812fc8
00aaad8828c9d51f35b7d7e9e42b0f33fd729725828d325263b5129e5d7a6]]
**Document description:**Civil Cover Sheet
**Original filename:**n/a
**Electronic document Stamp:**



## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MINTEL INTERNATIONAL GROUP,      )
LTD., a United Kingdom corporation,     )
                                     )
        Plaintiff,                  )        Case No.:_____
                                       )
v.                                      )
                                       )
MEESHAM NEERGHEEN, an individual,    )
                                       )
        Defendant,              )
                                       )

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff MINTEL INTERNATION GROUP, LTD. ("Mintel"), a United Kingdom corporation, complains of Defendant Meesham Neergheen ("Neergheen") and alleges as follows:

### NATURE OF THE ACTION

1.      Mintel brings this suit against Neergheen for willful violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1330, *et seq.*, and the Illinois Trade Secret Act, 765 ILCS 1065/1, *et seq.*, in connection with Neergheen's unlawful taking of Mintel's confidential and proprietary trade secret information. Mintel also brings suit against Neergheen for violation of the terms of the Contract of Employment and Employee Non-Compete/Non-Solicitation Agreement Neergheen entered into with Mintel. As a result of Neergheen's unlawful behavior, Mintel has suffered damages and will continue to suffer damages. As such, Mintel seeks injunctive relief as well as compensatory and exemplary damages.

1

## THE PARTIES

2.      Plaintiff Mintel is a corporation formed under the laws of the United Kingdom with its principal place of business in London, England.  Mintel has a global presence with offices in Australia, China, Japan and Chicago.  Mintel is registered to do business in the State of Illinois.

3.      Defendant Neergheen is an alien residing in Cook County, Illinois. Neergheen is a former employee of Mintel and worked in Mintel's Chicago office location.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the acts of Neergheen constitute violations of federal law, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* over which this Court has original jurisdiction.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Neergheen resides in the Northern District of Illinois and a substantial part of the events giving rise to this cause of action occurred in the Northern District of Illinois.

5.      This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because this is a civil action in which the amount in controversy exceeds the sum of $75,000.00 exclusive of costs and interest and there is complete diversity jurisdiction between Mintel and Neergheen.

## FACTS

*Mintel's Confidential, Proprietary and Trade Secret Information*

6.      From its inception in the year 1972 to the present, Mintel has provided consumer, product and market research to its clients.  Consequently, Mintel has collected

2

and developed, at its own expense, significant and critical information on marketing, products, project forecasts, pricing, costs, customer needs, client contacts and other data.

7.    Mintel provides "need to know" limited access to its marketing documents and customer files, wherein only certain employees in trusted positions have access to such information. Neergheen had such access as a trusted employee within Mintel's marketing department.

8.    By reason of Neergheen's employment position with Mintel in the marketing department, Neergheen had access to and became familiar with Mintel's computer system, which contained subject confidential, proprietary and trade secret information. But for Neergheen's position at Mintel, Neergheen would not have come into contact with the subject confidential, proprietary and trade secret information.

### Neergheen's Employment Relationship with Mintel

9.    Neergheen commenced employment with Mintel in its London office on or about June 30, 1997; Neergheen transferred to Mintel's Chicago office on or about August 1, 2003. As a condition of his continued employment with Mintel in Chicago, Neergheen agreed to and signed an Employee Non-Compete/Non-Solicitation Agreement ("Non-Compete Agreement") on August 4, 2003. A copy of the Non-Compete Agreement signed by Neergheen is attached hereto as "Exhibit 1-A."

10.    The Non-Compete Agreement signed by Neergheen states as follows:

> The undersigned Employee hereby agrees not to compete, either directly or indirectly, with the business of Mintel or any of its subsidiaries, branches or divisions, at any location worldwide at any time during the Employee's term of employment, and for a period of one (1) year following his termination of employment with Mintel, regardless of the reason or cause for such termination.

*See* Non-Compete Agreement, Ex. 1-A, at § 1.

11.     The Non-Compete Agreement also provides, in relevant part, as follows:

The undersigned Employee acknowledges that Mintel may, in reliance upon the terms of this Agreement, supply or provide the undersigned Employee with access to Mintel's trade secrets, customer lists or other information of a confidential or proprietary nature. In consideration for his employment with Mintel, the undersigned Employee agrees to keep confidential all such information, and not to use such information for his own benefit or to disclose same to any third party.

*See* Non-Compete Agreement, Ex. 1-A, at § 3.

12.     On or about June 24, 1998, Neergheen signed and executed a United Kingdom Contract of Employment with Mintel. A copy of the Contract of Employment is attached hereto as "Exhibit 1-B."

13.     The Contract of Employment states as follows:

You will not for the first twelve months at the end of your employment with us, either on your own account or on behalf of any other legal person and in competition with the Company, or any subsidiary directly or indirectly engage in, or be connected with, trade or business carried on by us or any of our associates at the end of your employment. ... You will not, for the first twelve months after the end of your employment with us, solicit away from us or our associates any person who is and was, when your employment ended, employed by us or an associate as a director, senior manager or sales person for whom you were responsible, or who was a member of any department/project/team in which you worked during the last twelve months of your employment.

*See* Exhibit 1-B, p. 8, at §§ 3, 5.

14.     The Contract of Employment also states, in relevant part, as follows:

Mintel has expended and will continue to expend substantial effort and monies in acquiring knowledge and expertise in developing goodwill in the business of Mintel. In the course of your employment you will have access to certain of Mintel's trade secrets and other proprietary or confidential information of Mintel ... . You agree that all such records, methods, lists, materials, names and information, as well as any information and documents provided to, generated by or received by you in the course of your employment and the contents thereof, is confidential and is and will remain the sole property of Mintel. Such confidential information will not be used or disclosed by you other than in connection with your performance of

4

services for Mintel or such confidential information shall be returned to Mintel upon the cessation of your employment.

*See* Exhibit 1-B, p. 9, at §§ 4, 7.

15.    In order to allow Neergheen to effectively carry out his employment duties, Mintel entrusted Neergheen with client and marketing files and materials. The client and marketing files and materials contained confidential and proprietary information, including, but not limited to, some or all of the following:

A.    Client accounts and budgets;

B.    Potential client lists;

C.    Information regarding Mintel's group projects;

D.    Vendor lists;

E.    Trade show lists, including budget and marketing strategies;

F.    Marketing strategies and overall objectives;

G.    Individual client cost data;

H.    Specialized research on clients;

I.    Client proposals;

J.    Marketing expenses for various vendors;

K.    Information regarding the status of all marketing projects; and

L.    Marketing analysis and information regarding customer interactions.

16.    On or about April 23, 2008, Neergheen provided written notice to Mintel that Neergheen would be leaving the employment of Mintel at the conclusion of his contract, effective April 30, 2008. A copy of Neergheen's written resignation letter is attached hereto as "Exhibit 1-C."

17.     Upon information and belief, Neergheen immediately thereafter commenced employment with Datamonitor, Inc., a direct competitor of Mintel.

18.     Unknown to Mintel, Neergheen had been in negotiations with Datamonitor, Inc. and other competitors of Mintel, seeking employment with these competitors prior to Neergheen's resignation from Mintel.

### Neergheen's Unlawful Taking of Mintel's Information

19.     By reason of Neergheen's employment position at Mintel in the marketing department, Neergheen had access to Mintel's confidential, proprietary and trade secret information.

20.     Specifically, Neergheen had a desktop computer that was connected to Mintel's secure electronic network and Mintel's secure server network. At all times relevant hereto, Mintel owned the computer and subject proprietary, confidential and trade secret information, which was entrusted to Neergheen in his capacity as a key employee of Mintel.

21.     After Mintel received Neergheen's written notice of resignation on April 23, 2008, Mintel began monitoring and searching Neergheen's work computer.   Mintel discovered that Neergheen had copied, e-mailed to his personal e-mail address and/or printed confidential and proprietary trade secret information from his work computer on April 29, 2008 – the day prior to his last day of employment with Mintel.   These files included, but are not necessarily limited to, the following: (1) 2008_04_07_Mintel project priorities;   (2)   marketing   activities   –   current,   future   direction   –   for   SP;   (3) 2008_04_18_Marketing_Exec_Update; (4) Marcomm Approved Expenses; (5) 2008 shows-Apr 8; (6) Final Attendee list.csv; (7) Claritas Comperemedia Web-Seminar.pdf; and (8)

6

COMPEREMEDIA – Revenue by Client and Product.xls.   The files downloaded by Neergheen contained the following confidential and proprietary trade secrets:

A.   **2008_04_07_Mintel project priorities**: This file contains information about Mintel's group projects, the priority of each from a strategic perspective, and the priority for Mintel's departments working on these core initiatives.  This file was provided to members of the marketing team only in order to provide each member with an overview of the project focus from a general business perspective.

B.   **marketing activities – current, future direction – for SP**: This file was created for exclusive use by the marketing team to help the members understand the emphasis Mintel's marketing department puts on the listed marketing channels and means.  This internal file represents an important part of Mintel's marketing strategy, outlining Mintel's overall marketing objectives.  This file was provided to Mintel's marketing team only.

C.   **2008_04_18_Marketing_Exec Update**: This file represents a complete overview of all marketing projects and initiatives and was distributed to a distinct group of Mintel's executives and marketing team.   All such individuals were required to feed their input into the file data.

D.   **Marcomm Approved Expenses**: This file contains a list of key vendors and budgets Mintel uses for different business purposes, such as public relations tracking, public relations distribution, printing, market data providers and merchandise.  Only the marketing team and a select group of others, as determined by the Global Marketing Director, have access to this file.

E.  **2008 shows-Apr 8**: This file contains a complete overview of all trade shows Mintel has had a presence at between October 2007 and April 8, 2008, including budgeted and detailed actual costs.  This file displays important information about Mintel's marketing strategy and activity and shows the exclusively agreed upon price with trade show partners.  Only the marketing team and a select group of others, as determined by the Global Marketing Director, have access to this file.

F.  **Final Attendee list.csv**: This file contains address data of prospective clients created from a co-produced and promoted webinar of Mintel Comperemedia and Mintel's partner Claritas, Inc. held on April 22, 2008.  The potential clients listed within this file have provided their address data to Mintel Comperemedia and Claritas, establishing a business relationship to obtain access to the webinar.  Claritas and Mintel agreed only to share the prospective client list with each other.  Neergheen obtained access to this file because he was working on the project with Mintel's Claritas contact.

G.  **Claritas Comperemedia Web-Seminar.pdf**: This file contains the actual content of the webinar and, therefore, is marked as confidential.  This information was only made available to potential clients in exchange for their address details and to employees of Claritas and Mintel who worked on the project.

H.  **COMPEREMEDIA – Revenue by Client and Product.xls**: The data in this file was created by Mintel's sales manager and marked as confidential. The file contains analysis done by the marketing manager to show the

8

revenue ranking of Mintel's product Comperemedia by client sector. This file also lists Mintel's specific clients and the individually agreed upon price each client made with Mintel for a Comperemedia subscription. The clients and information listed within this file total over fifteen (15) pages in length. This file was provided to some of Mintel's marketing team.

### COUNT I – COMPUTER FRAUD AND ABUSE ACT

22.     Mintel re-alleges and incorporates by reference paragraphs 1 through 21 as though fully set forth herein.

23.     At all times relevant herein, there existed a statute entitled the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*, ("CFAA"). Among other things, Section 1330(g) of the CFAA provides that any person who suffers damage or loss by reason of a violation of this act may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. *See* 18 U.S.C. § 1330(g).

24.     After he had already decided to leave Mintel and join a competitor, Neergheen knowingly and with intent to defraud accessed a protected computer without authorization and as a result has obtained Mintel's valuable confidential and proprietary trade secret information.

25.     Obtaining and using such information for any person or entity's benefit other than Mintel exceeded Neergheen's authority to use Mintel's business computers, websites and networks, and was in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*

9

26. Neergheen's acts were intentional and without Mintel's knowledge, permission or authorization.

27. Neergheen's intentional access to Mintel's business computers, websites and networks provided Neergheen with access to Mintel's confidential and proprietary trade secret information exceeding $5,000.00 in value.

28. Neergheen's acts of exceeding authorized levels of access to Mintel's business computers, websites and networks provided Neergheen with access to Mintel's confidential and proprietary trade secret information exceeding $5,000.00 in value.

29. Neergheen's acts constitute computer fraud and abuse in violation of 18 U.S.C. § 1030(a)(4), § 1030(a)(2)(C), § 1030(a)(5)(A)(iii) and § 1030(a)(5)(B)(i).

30. As a direct and proximate result of Neergheen's unlawful taking of Mintel's confidential, proprietary and trade secret information, Mintel has suffered damages in an amount yet to be determined but certainly in excess of $5,000.00, and Neergheen has been unjustly enriched through his use of such information. Furthermore, it is inevitable that Neergheen will use such unlawfully gained information to benefit Datamonitor and/or other competitors of Mintel unless this Court prevents Neergheen from using and disseminating such information in the future.

31. By reason of these facts, Mintel does not have an adequate remedy at law and, unless the Court grants injunctive relief, Mintel will suffer irreparable injury.

WHEREFORE Plaintiff Mintel International Group, Ltd. respectfully requests the following relief for Neergheen's violation of the Computer Fraud and Abuse Act:

A. That a temporary restraining order and, thereafter, a preliminary injunction be entered restraining and enjoining Neergheen from working for Datamonitor, Inc. or any other competitor of Mintel.

B.    That a temporary restraining order and, thereafter, a preliminary injunction be entered restraining and enjoining Neergheen from contacting any clients whose information Neergheen accessed and downloaded in violation of the Computer Fraud and Abuse Act;

C.    That a preliminary and permanent injunction be entered enjoining and restraining Neergheen from misappropriating and using the confidential, proprietary and trade secret information alleged herein;

D.    That a mandatory injunction order be issued requiring Neergheen to return to Mintel any and all written materials, including copies thereof, and/or computer disks, diskettes, databases and/or other retrievable data (whether encoded, taped, or coded electronically, electromagnetically, or otherwise) which reflect, refer or relate to the subject confidential, proprietary and trade secret information, and any copies thereof that may be in Neergheen's possession;

E.    The judgment be entered in favor of Mintel and against Neergheen in an amount to be determined by the evidence to compensate Mintel for its actual losses and damages and Neergheen's unjust enrichment, as provided for under 18 U.S.C. § 1330(g);

F.    That judgment be entered in favor of Mintel and against Neergheen for exemplary damages;

G.    That Mintel be awarded its costs and reasonable attorney fees; and

H.    That such other and further relief be awarded as this Court determines to be just and proper.

## COUNT II – INJUNCTIVE RELIEF: NON-COMPETE AGREEMENT

32.    Mintel re-alleges and incorporates by reference paragraphs 1 through 31 as though fully set forth herein.

33.    The Non-Compete Agreement signed by Neergheen contains a one-year restriction that prohibits Neergheen from working for any competitor of Mintel following the termination of Neergheen's employment with Mintel. *See* Exhibit 1-A, at § 1.

34.    The Non-Compete Agreement signed by Neergheen also contains a one-year restriction that prohibits Neergheen from soliciting or contacting any Mintel

customer that Neergheen had contact with while employed at Mintel. *See* Exhibit 1-A, at § 5.

35.    Pursuant to the terms of the Non-Compete Agreement, Neergheen also agreed to keep confidential all of Mintel's trade secrets, customer lists or other information of a confidential or proprietary nature. *See* Exhibit 1-A, at § 3.

36.    All terms and provisions within the Non-Compete Agreement are valid and enforceable.

37.    Upon information and belief, Neergheen is currently working for Datamonitor, a competitor of Mintel, which is in direct violation of the terms of the Non-Compete Agreement.

38.    Furthermore, Neergheen violated the terms of the Non-Compete Agreement by copying, e-mailing and/or printing Mintel's confidential, proprietary and trade secret information in the days leading up to his resignation and has used such information for his own benefit and gain.

39.    Mintel has an ascertainable and protectable interest in enforcing the restrictive covenant and confidentiality clause.

40.    Mintel does not have an adequate remedy at law.  A remedy at law will not prevent Neergheen from improperly competing with Mintel and disclosing confidential and proprietary information in violation of the restrictions stated within the Non-Compete Agreement.

41.    Mintel has established, based upon the allegations and exhibits attached hereto, that it is likely to succeed on the merits of its claim.

42.     Mintel will be irreparably harmed should this Court fail to enter the injunctive relief sought by Mintel.  Specifically, Mintel will be unable to repair the damage done to its business relations with its existing customers and will lose the competitive advantage Mintel has worked hard to establish.

43.     A balance of harms favors Mintel.  Mintel has expended considerable time and effort in building its customer base and competitive advantage, both of which stand in jeopardy should an injunction not be issued in this case.

44.     An injunction can be narrowly drawn so that it is solely for the purposes sought herein.

WHEREFORE Plaintiff Mintel International Group, Ltd. respectfully requests that the Court enter judgment on Count II in its favor and against Defendant Meesham Neergheen, for the following:

A.     That a temporary restraining order and, thereafter, a preliminary injunction be entered restraining and enjoining Neergheen from working for Datamonitor, Inc. or any other competitor of Mintel for a period of one year.

B.     That a temporary restraining order and, thereafter, a preliminary injunction be entered restraining and enjoining Neergheen from contacting any clients whose information Neergheen accessed and downloaded from Mintel for a period of one year;

C.     That a preliminary and permanent injunction be entered enjoining and restraining Neergheen from misappropriating and using the confidential, proprietary and trade secret information alleged herein;

D.     That a mandatory injunction order be issued requiring Neergheen to return to Mintel any and all written materials, including copies thereof, and/or computer disks, diskettes, databases and/or other retrievable data (whether encoded, taped, or coded electronically, electromagnetically, or otherwise) which reflect, refer or relate to the subject confidential, proprietary and trade secret information, and any copies thereof that may be in Neergheen's possession; and

13

E.     That such other and further relief be awarded as this Court determines to be just and proper.

## COUNT III – INJUNCTIVE RELIEF: CONTRACT OF EMPLOYMENT

45.     Mintel re-alleges and incorporates by reference paragraphs 1 through 44 as though fully set forth herein.

46.     The Contract of Employment signed by Neergheen on or about June 24, 1998 contains a one-year restrictive covenant that prohibits Neergheen from working in competition with Mintel and prohibits Neergheen from soliciting any of Mintel's customers that Neergheen had contact with during his employment with Mintel. *See* Exhibit 1-B, p. 8, §§ 3, 5.

47.     The Contract of Employment also prohibits Neergheen from using or disclosing any of Mintel's trade secrets and other proprietary or confidential information. *See* Exhibit 1-B, p. 9, §§ 4, 7.

48.     The restrictive covenant and confidentiality clause are valid and enforceable.

49.     Upon information and belief, Neergheen is currently working for Datamonitor, a competitor of Mintel, which is in direct violation of the terms of the restrictive covenant contained within the Contract of Employment.

50.     Furthermore, Neergheen violated the terms of the Contract of Employment by copying, using and disclosing Mintel's confidential, proprietary and trade secret information for his own benefit and gain.

51.     Mintel has an ascertainable and protectable interest in enforcing the restrictive covenant and confidentiality clause.

14

52.     Mintel does not have an adequate remedy at law. A remedy at law will not prevent Neergheen from improperly competing with Mintel and disclosing confidential and proprietary information in violation of the terms of the Contract of Employment.

53.     Mintel has established, based upon the allegations and exhibits attached hereto, that it is likely to succeed on the merits of its claim.

54.     Mintel will be irreparably harmed should this Court fail to enter the injunctive relief sought by Mintel. Specifically, Mintel will be unable to repair the damage done to its business relations with its existing customers and will lose the competitive advantage Mintel has worked hard to establish.

55.     A balance of harms favors Mintel. Mintel has expended considerable time and effort in building its customer base and competitive advantage, both of which stand in jeopardy should an injunction not be issued in this case.

56.     An injunction can be narrowly drawn so that it is solely for the purposes sought herein.

WHEREFORE Plaintiff Mintel International Group, Ltd. respectfully requests that the Court enter judgment on Count III in its favor and against Defendant Meesham Neergheen, for the following:

A.      That a temporary restraining order and, thereafter, a preliminary injunction be entered restraining and enjoining Neergheen from working for Datamonitor, Inc. or any other competitor of Mintel for a period of one year.

B.      That a temporary restraining order and, thereafter, a preliminary injunction be entered restraining and enjoining Neergheen from contacting any clients whose information Neergheen accessed and downloaded from Mintel for a period of one year;

15

C.  That a preliminary and permanent injunction be entered enjoining and restraining Neergheen from misappropriating and using the confidential, proprietary and trade secret information alleged herein;

D.  That a mandatory injunction order be issued requiring Neergheen to return to Mintel any and all written materials, including copies thereof, and/or computer disks, diskettes, databases and/or other retrievable data (whether encoded, taped, or coded electronically, electromagnetically, or otherwise) which reflect, refer or relate to the subject confidential, proprietary and trade secret information, and any copies thereof that may be in Neergheen's possession;

E.  That such other and further relief be awarded as this Court determines to be just and proper.

## COUNT IV – MISAPPROPRIATION OF TRADE SECRETS

57.  Mintel re-alleges and incorporates by reference paragraphs 1 through 56 as though fully set forth herein.

58.  At all relevant times herein, there existed as part of the laws of the State of Illinois the Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq.*, ("ITSA"). Among other things, section 3 of the ITSA provides for the enjoinder of either actual or threatened misappropriation of trade secrets. *See* 765 ILCS 1065/3.

59.  Section 2(d) of the ITSA defines a "trade secret" as:

[I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1)  is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2)  is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

*See* 765 ILCS 1065/2(d).

60. The confidential customer lists and marketing documents provided to Neergheen by Mintel constitute trade secrets under the ITSA, whose actual and threatened misappropriation may be enjoined.

61. Mintel took affirmative measures to keep its confidential and proprietary information secret, including internal and external physical security. The trade secrets were available to limited employees only, and these employees were aware of the highly confidential and secret nature of the trade secrets.

62. By virtue of his prior employment with Mintel and pursuant to the ITSA, Neergheen is under a continuing duty to maintain the confidentiality of Mintel's trade secrets, including, but not limited to, Mintel's confidential customer lists and marketing materials.

63. Despite the statutory obligation to maintain the confidentiality of such trade secrets, Neergheen has maliciously misappropriated such trade secrets in violation of the ITSA.

64. Sections 2 and 3 of the ITSA allow for an injunction to be issued enjoining the actual or threatened misappropriation of trade secrets.

65. Mintel has no adequate remedy at law to protect against the illegal misappropriate and use of its trade secrets by Neergheen. Injunctive relief is, therefore, necessary and appropriate to restrain the illegal misappropriation and use of such information pursuant to section 3 of the ITSA. *See* 765 ILCS 1065/3.

66. Unless Neergheen is restrained and enjoined from using the subject confidential, proprietary and trade secret information, Mintel will suffer immediate and

irreparable injury in that Neerghen will continue to have access and the ability to make use of Mintel's trade secrets.

67.    As a direct and proximate result of Neergheen's misappropriation of Mintel's trade secrets, Mintel has suffered damages in an amount yet to be determined, and Neergheen has been unjustly enriched through his use of such information. Therefore, pursuant to section 4 of the ITSA, Mintel is entitled to recover damages. *See* 765 ILCS 1065/4.

68.    By reason of Neergheen's willful and malicious misappropriation of Mintel's trade secrets, Mintel is entitled to an award of exemplary damages from Neergheen in such amount as the ITSA requires to punish Neergheen and defer him from the commission of like acts and, in addition, reasonable attorney's fees pursuant to section 5 of the ITSA. *See* 765 ILCS 1065/5.

WHEREFORE Plaintiff Mintel International Group, Ltd. respectfully requests that the Court enter judgment on Count IV in its favor and against Defendant Meesham Neergheen, for the following:

A.    That a preliminary and permanent injunction be entered enjoining and restraining Neergheen from misappropriating and using Mintel's trade secrets as alleged herein;

B.    That a mandatory injunction order be issued requiring Neergheen to return to Mintel any and all written materials, including copies thereof, and/or computer disks, diskettes, databases and/or other retrievable data (whether encoded, taped, or coded electronically, electromagnetically, or otherwise) which reflect, refer or relate to the subject confidential, proprietary and trade secret information, and any copies thereof that may be in Neergheen's possession;

C.    For compensatory damages for Mintel's actual losses and damages and Neergheen's unjust enrichment, as provided for under 765 ILCS 1065/4(a);

18

D.    For exemplary damages as provided for under 765 ILCS 1065/4(b);

E.    For costs and reasonable attorney fees as provided by 765 ILCS 1065/5; and

F.    For such other and further relief this Court determines to be just and proper.

## COUNT V – BREACH OF CONTRACT: NON-COMPETE AGREEMENT

69.    Mintel re-alleges and incorporates by reference paragraphs 1 through 68 as though fully set forth herein.

70.    Mintel and Neergheen entered into the Non-Compete Agreement whereby Neergheen agreed upon termination of his employment with Mintel that he would refrain from working with or for a competitor of Mintel for a period of one year. Neergheen also agreed to keep confidential all of Mintel's trade secrets, customer lists or other information of a confidential or proprietary nature.

71.    Neergheen breached his obligations under the Non-Compete Agreement.

72.    Specifically, upon information and belief, Neergheen is currently employed at Datamonitor, Inc., a competitor of Mintel, and commenced working for Datamonitor immediately upon his resignation from Mintel.

73.    In addition, in the days leading up to his resignation, Neergheen copied, e-mailed and/or printed Mintel's confidential and proprietary trade secrets for his own benefit and gain.

74.    Mintel has performed all of its obligations under the Non-Compete Agreement, including the payment of Neergheen's salary and all applicable benefits.

75.    As a consequence of Neergheen's unlawful breach of the Non-Compete Agreement, Mintel has suffered damages in an amount exceeding $75,000.00.

WHEREFORE Plaintiff Mintel International Group, Ltd. respectfully requests that the Court enter judgment on Count V in its favor and against Defendant Meesham Neergheen, for the following:

A.   For compensatory damages in an amount to be proven at trial, which Mintel believes will materially exceed $75,000.00; and

B.   For such other relief the Court deems just and proper.

## COUNT VI – BREACH OF CONTRACT: CONTRACT OF EMPLOYMENT

76.   Mintel re-alleges and incorporates by reference paragraphs 1 through 75 as though fully set forth herein.

77.   Mintel and Neergheen entered into a Contract of Employment on or about June 24, 1998, whereby Neergheen agreed upon termination of his employment with Mintel that he would refrain from working with or for a competitor of Mintel for a period of one year. Neergheen also agreed not to use or disclose any of Mintel's trade secrets and other proprietary or confidential information.

78.   Neergheen breached his obligations under the Contract of Employment.

79.   Specifically, upon information and belief, Neergheen is currently employed at Datamonitor, Inc., a competitor of Mintel, and commenced working for Datamonitor immediately upon his resignation from Mintel.

80.   In addition, in the days leading up to his resignation, Neergheen copied, e-mailed and/or printed Mintel's confidential and proprietary trade secrets for his own benefit and gain.

81.   Mintel has performed all of its obligations under the Contract of Employment, including the payment of Neergheen's salary and all applicable benefits.

20

82.    As a consequence of Neergheen's unlawful breach of the Contract of Employment, Mintel has suffered damages in an amount exceeding $75,000.00.

WHEREFORE Plaintiff Mintel International Group, Ltd. respectfully requests that the Court enter judgment on Count VI in its favor and against Defendant Meesham Neergheen, for the following:

A.    For compensatory damages in an amount to be proven at trial, which Mintel believes will materially exceed $75,000.00; and

B.    For such other relief the Court deems just and proper.

## COUNT VII – RESTITUTION

83.    Mintel re-alleges and incorporates by reference paragraphs 1 through 82 as though fully set forth herein.

84.    Neergheen has been unjustly enriched by his unlawful conduct described above.

85.    As a consequence of the foregoing, Mintel has suffered financial loss.

86.    As a result of the willful, intentional and malicious acts of Neergheen, Mintel is entitled to restitution and punitive damages.

WHEREFORE Plaintiff Mintel International Group, Ltd. respectfully requests that the Court enter judgment on Count VII in its favor and against Defendant Meesham Neergheen, for the following:

A.    For compensatory damages in an amount to be proven at trial, which Mintel believes will materially exceed $75,000.00;

B.    For an award of punitive damages; and

C.    For such other relief the Court deems just and proper.

21

interest in rewarding theft and encouraging unethical business behavior. *IDS Life Ins. Co. v. SunAmerica, Inc.*, 958 F. Supp. 1258, 1281 (N.D. Ill. 1997). Further, Neergheen has engaged in a course of conduct that has violated federal and state statutes and Illinois common law. The public has a strong interest in seeing statutes and common law enforced by the courts.

## CONCLUSION

For the reasons stated above, Mintel has raised a fair question as to the existence of its rights, has shown that it will suffer irreparable harm and that Mintel is without an adequate remedy at law. Accordingly, Mintel respectfully seeks the equitable relief of a temporary restraining order, preliminary injunction and permanent injunction, together with such other further relief this court deems proper.

WHEREFORE Plaintiff MINTEL INTERNATIONAL GROUP, LTD. respectfully requests that its Emergency Motion for Temporary Restraining Order and Preliminary Injunction be granted and for any further relief deemed appropriate.

Respectfully submitted,

MINTEL INTENTIONAL GROUP, LTD.

By: _____/s/Joseph R. Marconi
One of Their Attorneys

Joseph R. Marconi
Victor Pioli
JOHNSON & BELL, LTD.
Attorneys for Plaintiff
33 W. Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 372-0770
Doc. No.: 1897534

## Employee Non-Compete/Non-Solicitation Agreement

For good and valuable consideration, and as an inducement for Mintel International Group, Ltd. or any of its U.S. subsidiaries (hereinafter collectively referred to as "Mintel") to either employ or to continue the present employment of Meesham Neergheen ("Employee"), the undersigned Employee hereby agrees not to compete, either directly or indirectly, with the business of Mintel or any of its subsidiaries, branches or divisions, at any location worldwide at any time during the Employee's term of employment, and for a period of one (1) year following his termination of employment with Mintel, regardless of the reason or cause for such termination.

The term "not to compete" as used in this Agreement means that the undersigned Employee shall not own, manage, operate, consult with or be employed by a business substantially similar to, or in competition with, the present business of Mintel or such other business activities in which Mintel may hereafter substantially engage during the term of the undersigned Employee's employment with Mintel.

The undersigned Employee acknowledges that Mintel may, in reliance upon the terms of this Agreement, supply or provide the undersigned Employee with access to Mintel's trade secrets, customer lists or other information of a confidential or proprietary nature. In consideration for his employment with Mintel, the undersigned Employee agrees to keep confidential all such information, and not to use such information for his own benefit or to disclose same to any third party.

In further consideration of the undersigned Employee's employment with Mintel, the undersigned Employee further agrees that in the event of his termination of employment with Mintel, regardless of the reason or cause for such termination, he will not solicit or recruit any of Mintel's employees to undertake alternative employment, including any competitive employment, for a period of one (1) year after the undersigned Employee's termination date with Mintel without the express written consent of Mintel's CEO or U.S. General Manager.

The undersigned Employee further agrees that in the event of his termination of employment with Mintel, regardless of the reason or cause for such termination, he will not solicit any of Mintel's customers for a period of one (1) year after the undersigned Employee's termination date with Mintel.

It is agreed and understood that any claims or controversies relative to the enforcement of this employee non-compete/non-solicitation agreement will be governed by the laws of the State of Illinois.

Signed this _____4ᵀᴴ_____ day of _August_ , 2003

_____                    _____
Employee                                          For Mintel

EXHIBIT
1-A

# CONTRACT OF EMPLOYMENT

1.  ## INTRODUCTION

From:   Mintel International Group Limited

To:        Meesham Neergham *Neergheen*

The following particulars are given to you in accordance with the terms of the Employments Rights Act 1996.

Your period of continuous employment with us began on the 30 June 1997.

No employment with a previous employer counts as part of your period of continuous employment. In accepting your appointment it shall be deemed that you have accepted all the terms and conditions set up in these Particulars of Employment.

These Particulars of Appointment annul any previous agreement whether verbal or written given to you at any time.

Your place of work will be Mintel International Group Ltd, 18-19 Long Lane, London EC1A 9HE.

You are employed as a NPD Assistant / Marketing Executive and will be responsible to the Publications Manager.

You will be paid monthly by credit transfer to your bank account in arrears at the rate of £14,000 gross per annum. Commission for some sales functions is payable and where payable, is discretionary, non-contractual and details are made available as and when appropriate by your line manager.

Your normal working hours are between 9.00am and 5.30pm Mondays to Thursday and between 9.00am and 5.00pm Fridays inclusive with one hour for lunch.

In certain circumstances it may be necessary to adjust or exceed the hours in order to ensure that your duties in accordance with the Terms of Employment are properly performed. Overtime is not payable.

2.  ## SICK LEAVE AND SICK PAY

2.1    ### Notification and Certification

Absence occasioned by sickness must be notified by telephone to the Chief Executive on the first morning of your absence (if you are unable to contact the Chief Executive you must contact a member of the Executive, failing that, your line manager).

Your first day of sickness must be confirmed so that your eligibility to statutory sick pay can be calculated.

During your illness, you should keep in regular contact with, in the first instance, your Head of Department, another member of the Executive or lastly, your line manager by telephone. You must not leave a message with reception. It is your responsibility to ensure that your current telephone number is kept by personnel.

EXHIBIT
1-B



You should observe the following procedures during any illnesses:

(i)     A company sickness form must be completed for any period of sickness. This should be handed to your Head of Department for signature.

(ii)    For absences lasting between four and seven days (including Saturdays, Sundays and Public Holidays), a Self Certification Form (SC2) should be completed and handed to the Office Manager. These are available from the Head of Personnel only.

(iii)   Sickness which continues for eight days or more (including Saturdays, Sundays and Public Holidays), must be covered by a doctor's Certificate. When sickness continues beyond the span of the first Certificate issued, it is the individual's responsibility to ensure that subsequent Certificates are forwarded by post to the Head of Department.

(iv)    After three separate episodes of sickness in any 12 month period, the Company has the right to ask you to provide a full doctor's Certificate for any further period of sickness taken. As doctors do not issue full Certificates before seven days of sickness, there may be a charge for periods less than this and it will be the individual's responsibility to pay any fee levied.

(v)     If any employee is absent due to sickness for more than five days during any 12 months period, the Company may at its own expense, ask the employee to attend the Company's doctor.

After incapacity of six months in any continuous period of 365 days duration Mintel shall be entitled, entirely at the discretion of Mintel, to treat this contract as having been terminated forthwith on the grounds that you shall be incapable of performing the employee's obligations hereunder. Any delay by Mintel in exercising its discretion shall not be deemed a waiver of Mintel's entitlement to termination under this paragraph.

2.2     **Sick Pay**

(i)     **Occupational Sick Pay**

There is no entitlement to Occupational Sick Pay. In the event that you are incapacitated through illness or injury from performing your duties any payment made by the Company to you during such absence shall be determined by the Company in its absolute discretion.

(ii)    **Statutory Sick Pay**

(a)     The company is responsible for paying Statutory Sick Pay to its employees for up to 28 weeks in any one "linked" period of incapacity to work.

(b)     Statutory Sick Pay becomes payable when there is a spell of four or more days sickness in a row and is payable for qualifying days only. Qualifying days are Monday to Friday inclusive. There is a waiting period of three qualifying days in each period of incapacity to work before Statutory Sick Pay is payable, except where there are two or more periods of incapacity separated by fewer than 57 calendar days.



(c)    In certain circumstances you may be excluded from Statutory Sick Pay. In those cases, the Company will give you an "exclusion form" explaining the reasons why SSP cannot be paid. You should then claim for State Sickness Benefit by completing the claim section of the form and sending it to your local DSS office.

(d)    Before the Company's liability for Statutory Sick Pay ends (ie 28 weeks), you will be given a "transfer form" which will enable you to continue claiming benefit from your local DSS.

### 3.    COMPASSIONATE LEAVE

In the event of the Employee suffering a bereavement, compassionate leave will be granted as follows:

Up to ten working days for the death of a partner/husband/wife/child.

Up to five working days for the death of a parent.

Time granted for the death of other relations will be at the discretion of Departmental Heads.

### 4.    MATERNITY LEAVE AND PAY

The Company follows statutory guidelines with regard to Maternity Leave and Pay.

(i)    Confirming your Pregnancy

As soon as you can (usually at least 21 week before the commencement of maternity leave) you must obtain a Maternity Certificate (MAT B1) from your GP (not a midwife), which will confirm your pregnancy, state your expected week of confinement (EWC) and allow us to pay your statutory maternity pay. Without your Certificate we cannot pay you.

You must also give written notice at least 21 days before your maternity leave commences, of the date of which you intend to commence your leave. If you cannot practicably give 21 days notice then you must give the notice "as soon as is reasonably practicable".

If you are absent from work wholly or partly because of your pregnancy/childbirth before your maternity leave date has been notified/reached but after the beginning of the sixth week before the EWC, you must notify us of absence as soon as is reasonably practicable. If you have the baby before you have had an opportunity to give the required notice then you must inform us of the date the baby was born.

Maternity leave may not be commenced more than 11 weeks before the EWC.



(ii)    Maternity Leave

### Employees with Less than Two Years Continuous Service

You have the right to fourteen weeks maternity leave or until the child's birth if later.

If you wish to return from maternity leave early you must give us at least one week's notice.

### Employees with Two or More Years Continuous Service

There is a separate right to return to work for those employees who have the right of maternity leave and who also have continuous employment of at least two years at the beginning of the 11th week before EWC. You are entitled to a extended leave period which goes up to the end of the 29th week after the beginning of the week in which you child is born.

You may lose the right to return to work after your extended maternity leave unless you give written intention to return to work at the same time as giving the notices mentioned above.

It may be that due to unforseen circumstances the Company needs to know your anticipated date of return (or your intention not to return) sooner than expected and we may write to you no more than 21 days before the end of your 14 week period of maternity leave, asking for written confirmation or whether or not you intend to return to work. You may lose the right to return if you do not respond if you do not respond to such a request within 14 days or, if this is not reasonably practicable, as soon as is reasonably practicable.

Once you have decided when you are going to return to work, you must notify us in writing of the day you will return, 21 days in advance. This is obviously a minimum requirement if you let us know your plans any sooner this would be appreciated.

We may extend your return date by four weeks by giving written notice of this postponement.

You may postpone your notified date of return by up to four weeks, providing you give us a full doctors certificate before the notified day, stating that you unfit.

Only one postponement is allowed, and if you are still unfit after four weeks, you lose the right to return.

iii)    Statutory Maternity Pay

To be eligible for SMP, an employee must have been continuously employed for at least 26 weeks ending with the week immediately preceding the 14th week before the expected week when the baby is due. This week is known as the qualifying week. SMP is paid at two rates and eligibility to either rate is based on length of service. All SMP will be paid into your bank account in the normal way on a monthly basis, on the last Thursday of each month.



*Employees with 2 or more years continuous service:*

The Company will pay you SMP for a maximum of 18 weeks. The first 6 weeks are at 90% of your salary and the remaining 12 weeks are at £54.55.

*Employees with less than 2 years continuous service, but more than 26 weeks:*

The Company will pay you SMP for a maximum of 18 weeks.

5. **PATERNITY LEAVE**

The Company does not grant Paternity Leave.

6. **LIFE ASSURANCE**

Free life assurance cover commences immediately upon permanent employment with Mintel and is a benefit enjoyed by all staff.

Cover is as follows:
Up to age 25            2 x annual salary
Age 25-34              3 x annual salary
Age 35 and over  4 x annual salary

7. **SEASON TICKET LOAN**

Following the satisfactory completion of your probationary period, you will become eligible to apply for a Season Ticket Loan. Such a loan would be interest free and deducted from your salary in twelve monthly instalments. Application forms are available from the Accounts Department.

8. **EXPENSES**

The Company will reimburse you for all reasonable expenses incurred wholly, necessarily and exclusively on Company business. Such expenses should be supported by receipts, included on the monthly expense forms and authorised by your Head of Department.

9. **COMPANY CARS**

If you need a company vehicle in furtherance of being able to perform your duties as an employee, then this will be arranged directly with your Line Manager/Head of Department. A separate list outlining responsibilities will be issued to each employee who uses a company vehicle.

10. **TERMINATION OF EMPLOYMENT**

The Company can terminate your employment at any time by giving you, in writing, the following periods of notice:

i)      If you have less than two years continuous employment : one week, or else the period stated in your offer letter, whichever is the greatest.

ii)     If you have more than two years continuous employment: one week for every year of such continuous employment up to a maximum of 12 weeks, or else the period stated in your offer letter, whichever is the greatest.



iii)    You may terminate your employment by giving the Company, in writing, four weeks notice or your current notice period, whichever is the greater.

iv)    The Company's ability to terminate your employment by service of notice at any time is not fettered by the Company's disciplinary procedure which is a policy document only and does not have a contractual effect.

## 11.    IMMEDIATE TERMINATION

The Company is entitled to terminate your employment with immediate effect and without service of any notice in the following circumstances;

i)    You are guilty of gross misconduct.

ii)    You are convicted of a criminal offence other than a road traffic offence for which you are not sentenced to a term of imprisonment whether immediate or suspended.

iii)    You commit any serious breach or persistent breach of the terms of your contract of employment.

iv)    You become bankrupt or make any arrangement or composition with or for the benefit of your creditors.

## 12.    HOLIDAY ENTITLEMENT

Our holiday year is the calendar year from January to December.  Your annual holiday entitlement will be 25 working days in addition to the normal English bank and public holidays.  Your holiday must be taken during the holiday year and your holiday dates agreed in advance.  Employees who start during the calendar year will be entitled to two days holiday for each complete month left in the holiday year.

If you leave during your holiday year, your holiday entitlement will be re-calculated as two days holiday for each compete month worked in the year.  If you have taken less holiday than this you will be paid in lieu.  If you have taken more holiday than this you will have to repay the excess holiday pay.

Any money which you owe the Company on account of having taken more than your holiday entitlement may be deducted from your final payment from the Company.

## 13.    DISCIPLINARY PROCEDURE

Disciplinary procedures are essential to protect the interests of both the Employee and the Company.  The procedures are designed to ensure that arrangements for dealing with disciplinary matters are fair, simple and effective.  (The procedure is not contractual.)



The procedure is as follows:

i)   Minor matters will be dealt with by means of a verbal warning, a note of which will be kept on your file for a specified period of time.

ii)  Matters of a more serious nature will merit one or more written warnings, which if not complied with may result in dismissal.  For each warning a specified period of time will be given for behaviour to improve.  Under these circumstances, the Company reserves the right to suspend you whilst the matter is investigated further.

iii) Matters which are considered to be gross misconduct will result in instant dismissal.

In matters of serious misconduct, it may be appropriate for an impartial third party to be present during the disciplinary interview to make notes and ensure that an accurate record of proceedings is kept.  During your interview you may make a statement, either verbally or in writing, in your defence. You may also make reasonable requests for witnesses or for evidence to be produced, such requests not to be unreasonably denied.

If you wish to appeal against any disciplinary action taken against you, you may do so in writing to a member of the Executive Committee nominated by you.

If dismissed, in compliance with the law, the Company will issue you with a written statement detailing the reasons for your dismissal.

The disciplinary procedure will be instigated for certain actions.  The list below, which is not exhaustive, gives an indication of such offences:

- unreasonable and unruly behaviour
- conduct or actions likely to endanger people or property
- persistent poor attendance/time keeping
- abuse of the sickness rules/procedures
- drunkenness, drug taking, gambling on company premises
- refusal or failure to obey reasonable instructions
- unauthorised possession of company property
- disregard of office rules
- persistent failure to achieve adequate work standards
- disregard of technical rules and procedures
- conduct likely to discredit the Company or damage its reputation
- breach of professional confidence or professional ethics
- commercial indiscretion

Any other act of behaviour which, by custom and practice is considered to be highly undesirable and socially unacceptable will, if persistent, result in disciplinary proceedings.

Any two employees who are in a reporting line within the company must avoid romantic involvement with each other in the interests of efficient and harmonious working relationships.

Failure to comply with this will lead to disciplinary action being taken.



### GRIEVANCE AND DISPUTES PROCEDURE

The size and structure of the Company prevents adherence to a detailed grievance/disputes procedure such as would be found in larger organisations. However, the Company acknowledges the need for a formal system within which employees can raise any grievances or disputes arising from their own position or the Company in general, and as such has laid down the following guidelines.

If you have a grievance arising from your work, it should in the first instance be addressed to your Line Manager or Head of Department. If no satisfactory conclusion is reached, the matter may then be passed to a member of the Executive Committee nominated by the Employee who will seek to investigate the matter further and offer advice to the Line Manager/Head of Department on possible solutions.

### 15.    RESTRICTIVE COVENANTS

You will not for the first twelve months at the end of your employment with us, either on your own account or on behalf of any other legal person and in competition with the Company, or any subsidiary directly or indirectly engage in, or be connected with, trade or business carried on by us or any of our associates at the end of your employment.

You will not for the first twelve months after at the end of your employment with us solicit or accept orders for products, services, competitive with ours from any of our customers with whom you dealt during the last twelve months of your employment with us.

You will not, for the first twelve months after the end of your employment with us, solicit away from us or our associates any person who is and was, when your employment ended, employed by us or an associate as a director, senior manager or sales person for whom you were responsible, or who was a member of any department/project/team in which you worked during the last twelve months of your employment.

Each of the above restrictions is separate and severable from the other if one is unenforceable for any reason, but would be enforceable if some of its wording were deleted, it shall apply with such deletions as are necessary to make it enforceable. Any period of notice served by you in accordance with clause 16 below, shall reduce the period of each of the above restrictions.

### 16.    PLACE OF WORK HAVING GIVEN NOTICE

If either you or the Company serves notice on the other to terminate your Contract of Employment the Company may require you to work away from the office for all or part of the remaining period of your employment. If you are asked to do this:

i)      You may not attend your place of work or any other premises of the Company or any associated company;

ii)     You may be asked to resign immediately from any offices you hold in the company or any associated company;

iii)    You may not be required to carry out duties during the remaining period of your employment;

iv)    You must return to the Company all documents and other materials (including copies) belonging to the Company or associated companies containing confidential information;

v)    You may not without the written permission of the Company contact or attempt to contact any client, customer, supplier, agent, professional advisor, broker or banker of the Company or any associated company or any employee of the company or any associated company;

During any such period you would continue to receive your full salary and benefits.

17.   **CONFIDENTIALITY**

Mintel has expended and will continue to expend substantial effort and monies in acquiring knowledge and expertise in developing goodwill in the business of Mintel. In the course of your employment you will have access to certain of Mintel's trade secrets and other proprietary or confidential information of Mintel, including without limitation, procedures, processes, information related to design, production, marketing or distribution, data, databases, computer software, source codes, all methods and means of design, drawing, recording, reproducing information or storing information (including but not limited to electronic or computerised methods or means), supply sources or potential supply sources, customer lists or potential customer lists, bidding policies or procedures or any information concerning pricing or financing policies or procedures, including without limitation:

a)   Information regarding contracts with clients of Mintel, design, pricing, methods of operation, financial conditions, market plans and master plans;

and

b)   Information relating to Mintel's clients and concerning their financial condition, construction or planned development, product results and methods, master plans and business strategies.

You agree that all such records, methods, lists, materials, names and information, as well as any information and documents provided to, generated by or received by you in the course of your employment and the contents thereof, is confidential and is and will remain the sole property of Mintel. Such confidential information will not be used or disclosed by you other than in connection with your performance of services for Mintel or such confidential information shall be returned to Mintel upon the cessation of your employment.

All work on clients' business is confidential. Information obtained in the course of this work must not be disclosed to any outside party (including the clients' employees), or to fellow members of staff other than is necessary in the course of carrying out the work.

Confidential information about clients' affairs must not be discussed with third parties, relatives, friends or in public places.



## SECURITY

The Company is not responsible for employees' personal belongings.

Individual employees must ensure that personal belongings of value are placed in a drawer or cabinet, preferably locked, especially when the office is unoccupied.

You may need to work in the office outside of normal working hours. On such occasions you should enter the building through the front door using the security cards which are available from your Head of Department. If you do work out of hours, it is your responsibility to ensure that the building is secure upon your departure.

Briefcases and bags are not to be taken into the library under any circumstances. All visitors to the library must leave their briefcases with reception.

19.  **OTHER ETHICAL CONSIDERATIONS**

During the continuance of your employment with the company you shall unless prevented by incapacity devote your full time and attention to the business of Mintel and shall not without the prior consent of the company :

(i)     Engage in any other business; or

(ii)    Be concerned or interested in any other business of a similar nature to or competitive with that carried on by the company or any of its associated companies provided that nothing shall preclude you from undertaking work in respect of a recognised charity or from holding or being otherwise interested in any shares or other securities of any company which are for the time being quoted on any recognised Stock Exchange so as long your interest in such shares or other securities does not extend to more than 5% of the total amount of such shares or securities.

If consent is granted the work must be done out of working hours and you must not use company facilities or offices.

Such work must not be carried out in the name of the Company or its subsidiaries.

If consent is granted, it must be made clear that you are acting in a private capacity and that you are not representing or acting on behalf of the Company or its subsidiaries.

If involved in any outside professional activity which might result in the Company's name being mentioned in the press or other media you should obtain the prior approval of a Director or the Chief Executive of Mintel International Group Limited.

20.  **HEALTH AND SAFETY AT WORK**

In compliance with the Health and Safety at Work Act 1974, the Company endeavours to provide a safe working environment for all employees.

The Company has produced a General Policy Statement on Health and Safety at Work. You are advised to read this document which is available from the Head of Production.

In accordance with the Company's statutory obligations, there are two trained First Aiders in the building:

Emma Stocker - Reception
Michelle Strutton - MIC

A full first aid box is located in MIC.

21. **NOTE**

Notwithstanding the above, any statutory minimum requirement provided by law is deemed to be included in your contract of employment.

Signed for and on behalf of the Employer
**MINTEL INTERNATIONAL GROUP LIMITED**

.................................................

Signed for and on behalf of the Employee
Meesham Neerghan- Naernghean

.................................................

Date: ..... 24/06/98 .....

**Amy Mieding**
**HR Director**
**Mintel**
**351 W Hubbard Street, Floor 8**
**Chicago, IL 60610**

Wednesday, April 23rd 2008

Re: Leaving Mintel

Amy,

This is to inform you that I shall be leaving the employment of Mintel at the conclusion of my temporary contract, effective Wednesday, April 30th, 2008.

Regards,

Meesham Neergheen



EXHIBIT
1-C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MINTEL INTERNATIONAL GROUP, )
LTD., a United Kingdom corporation, )
           )
        Plaintiff, )       Case No.:_____
           )
v. )
           )
MEESHAM NEERGHEEN, an individual, )
           )
        Defendant, )
           )

## AFFIDAVIT OF JASON THOMSON

I, Jason Thomson, declare under penalty of perjury that the following is true, accurate and within my personal knowledge, and that I will competently testify to the statements contained herein if called to do so:

1.      At all times relevant hereto, I have been the Director of the Information Technology Department for Mintel International Group, Ltd. ("Mintel"). My job duties include oversight of Mintel's IT activities globally, including ultimate responsibility for IT security, business continuity and policies.

2.      Mintel exercises diligent and reasonable efforts to safeguard and keep Mintel's confidential, proprietary and trade secret information confidential. Very limited access to Mintel's confidential, proprietary and trade secret information is entrusted to employees, who are only given access to such information on a "need to know" limited basis.

3.      Mintel has a secure computer network and secure server system that is carefully configured and managed to prevent unauthorized access. Files containing confidential, proprietary and trade secret information are stored on file servers with restricted access rights.

EXHIBIT
2

Individual users are issued their own personal username and password. This username and password only allow the user access to the information they require to perform their job functions.

4.    Users are informed of and required to sign security policies outlining their responsibilities with respect to the use of their passwords, Mintel's systems and proprietary information. Each time a user logs on, they are reminded that their use of Mintel's systems is subject to these policies. These policies clearly state that Mintel's computer equipment and services are provided for business purposes only and may be monitored for business or legal purposes.

5.    Because Meesham Neergheen ("Neergheen") was employed in the marketing department of Mintel, Neegheen was provided with access to Mintel's confidential and proprietary trade secret information so that Neergheen could effectively execute his necessary job duties and responsibilities.

6.    On or about April, 23 2008, I was asked by Mintel executives to search and monitor Neergheen's activity to determine whether Neergheen had copied, e-mailed and/or printed any confidential or proprietary trade secrets of Mintel. I set up appropriate rules on Mintel's e-mail filtering system to monitor and preserve e-mail sent by Neergheen from his Mintel e-mail account to external e-mail addresses.

7.    During the course of monitoring Neergheen's activity, I discovered that Neergheen had e-mailed the following Mintel files from his work e-mail address to his personal e-mail address: (1) 2008_04_07_Mintel project priorities; (2) marketing activities – current, future direction – for SP; (3) 2008_04_18_Marketing_Exec_Update; (4) Marcomm Approved Expenses;

(5) 2008 shows- Apr 8; (6) Final Attendee list.csv; (7) Claritas Comperemedia Web-Seminar.pds; (8) COMPEREMEDIA – Revenue by Client and Product.xls.

8.    Neergheen accessed and e-mailed the above-listed files to his personal e-mail address on the April 29, 2008.

9.    All of the above files are confidential and are provided to a limited number of employees on a "need to know" basis only. Mintel safeguards these files by only providing access to authorized employees via their personal username and password, limiting the group of employees authorized to access such information and informing and reminding employees of their responsibilities to keep Mintel's information secure.

10.    During subsequent investigations, I discovered e-mail discussions on Mintel's e-mail servers relating to Neergheen's attempts to find employment with competitors during the months preceding his departure from Mintel. Specifically, there is an e-mail dated March 20, 2008 sent by Alex Demetriou, another Mintel employee, discussing Neergheen's attempt to find employment at Euromonitor.

11.    A discussion on another e-mail sent by Alex Demetriou dated June 5, 2008 confirmed that Neergheen was hired by Datamonitor, Inc.

I, Jason Thomson, under penalties as provided by law pursuant to the Code of Civil Procedure, certify that the statements set forth in the foregoing Affidavit are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes same to be true.

Jason Thomson
Director of Information Technologies

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MINTEL INTERNATIONAL GROUP, LTD., a United Kingdom corporation, ) ) ) | |
| Plaintiff, ) ) | Case No.:_____ |
| v. ) ) ) | |
| MEESHAM NEERGHEEN, an individual, ) ) | |
| Defendant, ) ) ) | |

### AFFIDAVIT OF RICHARD CARR

I, Richard Carr, declare under penalty of perjury that the following is true, accurate and within my personal knowledge and I will competently testify to the statements contained herein if called to do so:

1. I am Finance Director for Mintel International Group, Ltd. ("Mintel"). My job duties and responsibilities include oversight of the Finance and Accounting functions and of the Company as a whole from a financial perspective.

2. Since its inception in the year 1972, Mintel has collected and developed, at its own expense, significant and critical information on marketing strategies, project forecasts, pricing, costs, customer needs, vendor lists, client contacts and budgets, and other data.

3. Specifically, Mintel's confidential and proprietary trade secret information contains highly sensitive information related to the names of clients and Mintel's marketing strategies and overall objectives for each such client. This information is not widely known and is not disseminated into the public domain. This information is kept in the ordinary course of Mintel's business, is highly specialized and cannot be easily duplicated.

**EXHIBIT
3**

4.    Mintel exercises diligent and reasonable efforts to safeguard and keep Mintel's confidential, proprietary and trade secret information confidential. Very limited access to Mintel's confidential, proprietary and trade secret information is entrusted to employees, who are only given access to such information on a "need to know" limited basis.

5.    Mintel has a secure computer network and secure server system that is carefully configured and managed to prevent unauthorized access.

6.    Meesham Neergheen ("Neergheen") commenced employment with Mintel in its London office on or about June 30, 1997. Neergheen transferred to Mintel's Chicago office on or about August 1, 2003.

7.    By reason of Neergheen's employment position with Mintel in the marketing department, Neergheen had access to and became familiar with Mintel's computer system, which contained confidential, proprietary and trade secret information. But for Neergheen's position at Mintel, Neergheen would not have come into contact with the subject confidential and proprietary trade secret information.

8.    Neergheen signed and executed a Contract of Employment with Mintel on or about June 24, 1998, which included a one-year restrictive covenant and a confidentiality clause.

9.    Neergheen signed and executed an Employee Non-Compete/Non-Solicitation Agreement on or about August 4, 2003, which also included a one-year restrictive covenant and a confidentiality clause.

10.    On April 23, 2008, Mintel received written notification from Neergheen that he was resigning from Mintel effective April 30, 2008.

11.    After receiving Neergheen's written notice, I asked Jason Thomson, Mintel's Director of Information Technologies, to search and monitor Neergheen's activity to determine

2

whether Neergheen had copied, e-mailed and/or printed any confidential or proprietary trade secrets of Mintel.

12.     Thomson informed me that Neergheen copied, e-mailed to his personal e-mail address and/or printed confidential and proprietary trade secret information from his work computer in the days leading up to his resignation. These files included the following: (1) 2008_04_07_Mintel project priorities; (2) marketing activities – current, future direction – for SP; (3) 2008_04_18_Marketing_Exec_Update; (4) Marcomm Approved Expenses; (5) 2008 shows- Apr 8; (6) Final Attendee list.csv; (7) Claritas Comperemedia Web-Seminar.pdf; and (8) COMPEREMEDIA – Revenue by Client and Product.xls.

13.     The files downloaded by Neergheen contained the following confidential and proprietary trade secrets:

A.     **2008_04_07_Mintel project priorities**: This file contains information about Mintel's group projects, the priority of each from a strategic perspective, and the priority for Mintel's departments working on these core initiatives. This file was provided to members of the marketing team only in order to provide each member with an overview of the project focus from a general business perspective.

B.     **marketing activities – current, future direction – for SP**: This file was created for exclusive use by the marketing team to help the members understand the emphasis Mintel's marketing department puts on the listed marketing channels and means. This internal file represents an important part of Mintel's marketing strategy, outlining Mintel's overall marketing objectives. This file was provided to Mintel's marketing team only.

3

C.    **2008_04_18_Marketing_Exec Update**: This file represents a complete overview of all marketing projects and initiatives and was distributed to a distinct group of Mintel's executives and marketing team. All such individuals were required to feed their input into the file data.

D.    **Marcomm Approved Expenses**: This file contains a list of key vendors Mintel uses for different business purposes, such as public relations tracking, public relations distribution, printing, market data providers and merchandise. Only the marketing team and a select group of others, as determined by the Global Marketing Director, have access to this file.

E.    **2008 shows-Apr 8**: This file contains a complete overview of all trade shows Mintel has had a presence at between October 2007 and April 8, 2008, including budgeted and detailed actual costs. This file displays important information about Mintel's marketing strategy and activity and shows the exclusively agreed upon price with trade show partners. Only the marketing team and a select group of others, as determined by the Global Marketing Director, have access to this file.

F.    **Final Attendee list.csv**: This file contains address data of prospective clients created from a co-produced and promoted webinar of Mintel Comperemedia and Mintel's partner Claritas, Inc. held on April 22, 2008. The potential clients listed within this file have provided their address data to Mintel Comperemedia and Claritas, establishing a business relationship to obtain access to the webinar. Claritas and Mintel agreed only to share the prospective client list with each other. Neergheen obtained access to this file because he was working on the project with Mintel's Claritas contact.

4

G.    **Claritas Comperemedia Web-Seminar.pdf**: This file contains the actual content of the webinar and, therefore, is marked as confidential. This information was only made available to potential clients in exchange for their address details and to employees of Claritas and Mintel who worked on the project.

H.    **COMPEREMEDIA – Revenue by Client and Product.xls**: The data in this file was created by Mintel's sales manager and marked as confidential. The file contains analysis done by the marketing manager to show the revenue ranking of Mintel's product Comperemedia by client sector. This file also lists Mintel's specific clients and the individually agreed upon price each client made with Mintel for a Comperemedia subscription. The clients and information listed within this file total over fifteen (15) pages in length. This file was provided to some of Mintel's marketing team.

14.    Upon information and belief, Neergheen commenced employment with Datamonitor, Inc., a direct competitor of Mintel, immediately after his resignation from Mintel and is currently still employed by Datamonitor.

15.    Thomson also informed me that he uncovered e-mail discussions on Mintel's e-mail servers relating to Neergheen's attempts to find employment with competitors during the months preceding his departure from Mintel.

16.    As a result of Neergheen's purloining Mintel's trade secrets and working for a competitor, Mintel will suffer loss of current and potential business, loss of profit revenue, and unfair competitive and sales advantage at the hands of competitors.

17.    I certify that the statements set forth in the Complaint for Injunctive and Other Relief are true and correct to the best of my knowledge and belief, except as to matters therein

5

stated to be on information and belief, and as to such matters I certify as aforesaid that I verily believe same to be true.

I, Richard Carr, under penalties as provided by law pursuant to the Code of Civil Procedure, certify that the statements set forth in the foregoing Affidavit are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes same to be true.

Richard Carr
Finance Director

6