**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MINTEL INTERNATIONAL GROUP, LTD., a United Kingdom corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO.: 08-CV-3939 |
| MEESHAM NEERGHEEN, an individual, | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

On July 11, 2008, Plaintiff Mintel International Group, Ltd. ("Mintel"), filed a seven-count complaint against Defendant Meesham Neergheen ("Neergheen") alleging a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*, a violation of a non-compete agreement, a breach of Neergheen's employment contract with Mintel, and misappropriation of trade secrets pursuant to the Illinois Trade Secret Act ("ITSA"), 765 ILCS 1065/1, *et seq*. Plaintiff seeks injunctive relief, restitution, and compensatory and punitive damages. Also on July 11, 2008, Plaintiff filed an emergency motion for a temporary restraining order and preliminary injunction.

On July 15, 2008, the Court conducted a hearing on Plaintiff's request for a temporary restraining order ("TRO"). At the hearing, Defendant Neergheen was represented by counsel who, despite not having sufficient time to file a written response to the motion for a TRO, articulated Defendant's position with respect to the relief requested by Plaintiff. Having considered the relevant legal standards governing TROs, as well as Plaintiff's motion, memorandum, and supporting materials and defense counsel's comments at the hearing, the Court grants in part and denies in part Plaintiff's emergency motion.

**I.    Background**

Mintel is headquartered in London, England and provides consumer, product, and market research to its clients around the world. Cmplt., ¶¶ 2, 6. Neergheen worked for Mintel's marketing department from June 30, 1997 until April 30, 2008. During that time, Neergheen had access to client and marketing files and materials. On or about June 24, 1998, Neergheen signed a Contract of Employment with Mintel. Carr Affdt., ¶ 8. The Contract of Employment contained a clause stating that Neergheen could not directly or indirectly compete with Mintel for the first twelve months after the end of Neergheen's employment with Mintel. *Id*. The Contract of Employment also stated that Neergheen must refrain from using or disclosing any of Mintel's trade secrets and other proprietary or confidential information. *Id*.

In August 2003, Neergheen signed an Employee Non-Compete/Non-Solicitation Agreement ("Non-Compete Agreement"). Carr Affdt., ¶ 9. The Non-Compete Agreement stated that Neergheen agreed not to compete with the business of Mintel or any of its subsidiaries for a period of one year. *Id*. The Non-Compete Agreement also included a confidentiality provision that stated that Neergheen was not to disclose any information of a confidential or proprietary nature. *Id*.

Mintel avers that it has a secure computer network and secure server system that is configured and managed to prevent unauthorized access. Thomson Affdt., ¶ 3. Mintel also states that as a result of Neergheen's employment and position with Mintel, he had access to such confidential information and became familiar with Mintel's computer system. *Id*., ¶ 5.

On or about April 23, 2008, Neergheen provided written notice to Mintel that he would be resigning from Mintel effective April 30, 2008. Carr Affdt., ¶ 10. After receiving Neergheen's written notification, Mintel began searching and monitoring Neergheen's work computer. Thomson Affdt., ¶ 6. Mintel subsequently discovered that Neergheen had copied, e-mailed and/or printed certain confidential and proprietary files – including client lists, vendor lists, and strategic

documents – from his work computer on April 29, 2008, the day before his departure from Mintel. Thomson Affdt., ¶ 7.

In its complaint, Mintel alleged that Neergheen commenced employment with Datamonitor, Inc., a competitor of Mintel, immediately after Neergheen's resignation from Mintel. Cmplt., ¶ 17; Carr Affdt., ¶ 14. Based on additional information provided during and after the hearing on July 15, 2008, it appears that Neergheen started his new job at the end of May and that he was told not to come to work on July 14 or 15 or until the Court issues an order on the TRO.

**II.    Discussion**

A party seeking a temporary restraining order must demonstrate as a threshold matter that (1) its case has some likelihood of succeeding on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if preliminary relief is denied. *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 11 (7th Cir. 1992). If the moving party meets this burden, the court weighs these factors along with any irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied. *Id.* Finally, the court considers the public interest served by granting or denying the injunction, including the effects of the injunction on non-parties. *Id.*; see also *Credit Suisse First Boston, LLC v. Vender*, 2004 WL 2806191, at *1 (N.D. Ill. December 3, 2004).

**A.    Likelihood of Success**

The party seeking the TRO or preliminary injunction must demonstrate "some likelihood of succeeding on the merits." *Abbott Laboratories*, 971 F.2d at 11; see also *Frullati Franchise Sys., Inc. v. Dana Areece & Co., Inc.*, 2001 WL 743427, at *2 (N.D. Ill. June 28, 2001) (stating that for purposes of a TRO or preliminary injunction, a plaintiff need only establish a "trivial chance of succeeding on the merits") (citing *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 361 (7th Cir. 1993)).

3

*1.     Violation of the Computer Fraud and Abuse Act*

The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, provides for the entry of civil injunctive relief as well as the recovery of money damages for a violation of its provisions. See 18 U.S.C. § 1030(g) (providing that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief"). Courts have upheld the use of the CFAA in granting injunctive relief against former employees and their new employers who have attempted to obtain a competitive edge by removing information from a former employer's computers. See, *e.g.*, *YourNetDating, LLC v. Mitchell*, 88 F. Supp. 2d 870, 872 (N.D. Ill. 2000) (granting TRO under CFAA claim against former employee); see also *Charles Schwab & Co., Inc. v. Carter*, 2005 WL 351929, at *3 (N.D. Ill. Feb. 11, 2005) (denying motion to dismiss claim under CFAA); *George S. May Int'l Co. v. Hostetler*, 2004 WL 1197395, at *3 (N.D. Ill. May 28, 2004).

The day before Neergheen's resignation, Neergheen copied, e-mailed to his personal e-mail address and/or printed information from his work computer. See Thomson Affdt., ¶ 7. According to Mintel's supporting affidavits, those files contained confidential and proprietary information regarding client accounts and budgets, potential client lists, vendor lists, marketing strategies and overall objectives, and individual client cost data. Carr Affdt., ¶ 13. Neergheen's actions in e-mailing such information to his personal e-mail address in the days leading up to his resignation could be found to have "exceeded authorized access" as that term is defined in 18 U.S.C. § 1030(e)(6). Because Mintel's allegations, if proven, appear to be sufficient to give rise to liability for a violation of the CFAA, the Court finds that Plaintiff has demonstrated some likelihood of success on the merits of its CFAA claim. See *YourNetDating, LLC*, 88 F. Supp. 2d at 872.

*2.     Violation of the Illinois Trade Secret Act*

The Illinois Trade Secret Act, 765 ILCS 1065/1, *et seq.*, defines a "trade secret" as information that:

(i)     is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(ii)    is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

See 765 ILCS 1065/2(d). The ITSA defines "misappropriation" in several ways. For example, one can misappropriate trade secrets by "acquiring" them through improper means such as the breach of a confidential relationship. 765 ILCS 1065(b)(1).[1] Misappropriation also occurs when a defendant breaches a duty owed to protect the secrecy of its information or induces another party to do so. 765 ILCS 1065(b)(2)(B).

Mintel alleges that the various files copied, e-mailed and/or printed by Neergheen in the days leading up to his resignation contained highly sensitive information not disseminated into the public domain. Carr Affdt., ¶ 13. As with its CFAA claim, if Mintel is able to prove its allegations, then Neergheen may well have violated the ITSA. At this stage, that is sufficient to meet the threshold requirement of showing some likelihood of success on the merits.

*3.     Violation of restrictive covenants within Non-Compete Agreement and Contract of Employment*

Based on the Court's preliminary research, it appears that Illinois courts disfavor and closely scrutinize restrictive covenants because they are "repugnant to the public policy encouraging an open and competitive marketplace." *Roberge v. Qualiteck Int'l, Inc.,* 2002 WL

---

[1] As defined in the Act, "improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means. 765 ILCS 1065(a).

109360, at *4 (N.D. Ill. Jan. 28, 2002) (citing *Bishop v. Lakeland Animal Hosp.,* 268 Ill.App.3d 114, 644 N.E.2d 33, 36 (Ill. App. Ct. 1994)). The basic test applied by Illinois courts in determining the enforceability of a restrictive covenant is "whether the terms of the agreement are reasonable and necessary to protect a legitimate business interest of the employer." *Outsource Intern., Inc. v. Barton*, 192 F.3d 662, 666 (7th Cir. 1999) (quoting *Office Mates 5, North Shore, Inc. v. Hazen*, 234 Ill. App. 3d 557, 599 N.E.2d 1072, 1080 (1992)). This determination "necessarily turns on the facts and circumstances of each case." *Id*. Illinois law requires that in order be enforceable, a covenant not to compete must secure a "protectable interest" of the employer. *Curtis 1000, Inc. v. Suess,* 24 F.3d 941, 944 (7th Cir. 1994). Illinois courts recognize at least two such protectable interests: (1) where the customer relationships are near-permanent and but for the employee's association with the employer the employee would not have had contact with the customers; and (2) where the former employee acquired trade secrets or other confidential information through his employment and subsequently tried to use it for his own benefit. *Outsource Int'l, Inc. v. Barton,* 192 F.3d 662, 666 (7th Cir. 1999).

　　Restrictive covenants should be narrowly tailored so as only to protect the protectable interest of the employer. *Id.* at 669; *Lawrence and Allen, Inc. v. Cambridge Human Resource Group, Inc.,* 292 Ill.App.3d 131, 138, 685 N.E.2d 434, 441 (Ill. App. Ct. 1997). In particular, the time and geographic limitations must be reasonably necessary to protect a legitimate business interest of the employer. *Roberge,* 2002 WL 109360, at *4. A restrictive covenant that does not contain a geographic limitation may still be enforceable if the covenant instead includes an "activity restraint." *Id.* at *6. The most common type of activity restraint is a prohibition against soliciting the former employer's customers. *Eichman v. Nat'l Hosp. and Health Care Servs.., Inc.,* 308 Ill.App.3d 337, 719 N.E.2d 1141, 1147 (Ill. App. Ct. 1999).

Neergheen commenced employment with Mintel in its London office on or about June 30, 1997. Carr Affdt., ¶ 6. As a condition of his continued employment, Neergheen signed and executed a United Kingdom Contract of Employment with Mintel on or about June 24, 1998. Carr Affdt., ¶ 8. The Contract of Employment included the following restrictive covenant:

> You will not for the first twelve months at the end of your employment with us, either on your own account or on behalf of any other legal person and in competition with the Company, or any subsidiary directly or indirectly engage in, or be connected with, trade or business carried on by us or any of our associates at the end of your employment. … You will not, for the first twelve months after the end of your employment with us, solicit away from us or our associates any person who is and was, when your employment ended, employed by us or an associate as a director, senior manager or sales person for whom you were responsible, or who was a member of any department/project/team in which you worked during the last twelve months of your employment.

Cmplt., ¶ 13.

On or about August 1, 2003, Neergheen transferred to Mintel's Chicago office. Carr Affdt., ¶ 6. As a condition of his continued employment with Mintel in Chicago, Neergheen agreed to and signed an Employee Non-Compete/Non-Solicitation Agreement ("Non-Compete Agreement") on August 4, 2003. Carr Affdt., ¶ 9. The Non-Compete Agreement signed by Neergheen stated as follows:

> The undersigned Employee hereby agrees not to compete, either directly or indirectly, with the business of Mintel or any of its subsidiaries, branches or divisions, at any location worldwide at any time during the Employee's term of employment, and for a period of one (1) year following his termination of employment with Mintel, regardless of the reason or cause for such termination.

Cmplt., ¶ 10.

At this stage, based on the record before the Court, it appears that Mintel has a strong likelihood of success on its claim that Neergheen violated at least some of the terms of his non-compete agreement and employment contract. However, in order for the Court to uphold the provisions at issue, those provisions must be enforceable under Illinois law. Although Mintel

7

asserts that these restrictive covenants are both reasonable as to time and geography, the Court does not have before it at this early stage of the case either the factual record or the legal support grounded in Illinois cases to be convinced that every provision that Mintel seeks to enforce ultimately can be sustained as a matter of law. Among other things, the Court lacks sufficient information concerning (1) the circumstances of Defendant's departure from Mintel; (2) the circumstances of Defendant's hiring by Datamonitor; and (3) Defendant's new position and responsibilities at Datamonitor.

Despite the limited record, the Court concludes that Mintel has "some" likelihood of successfully demonstrating that some, if not all, provisions of its restrictive covenants are reasonable under the law of Illinois. The Court further finds that Plaintiff has satisfied its burden of demonstrating "some likelihood of succeeding on the merits" of its claim that Neergheen violated at least some, if not all, of the restrictive covenants in the non-compete agreement and his employment contract.

### B.    Adequate Remedy at Law and Irreparable Harm

The other two threshold elements that Mintel must prove to support the issuance of a TRO or a preliminary injunction are that it (1) has no adequate remedy at law and (2) will suffer irreparable harm if the injunction is not issued. These two requirements – irreparable harm and no adequate remedy at law – tend to merge. See *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). "The question is then whether the plaintiff will be made whole if he prevails on the merits and is awarded damages." *Id*. An injury is "irreparable" when it is of such a nature that the injured party cannot be adequately compensated in damages or when damages cannot be measured by any pecuniary standard. *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997); see also *Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) ("showing injury to

goodwill can constitute irreparable harm that is not compensable by an award of money damages").

Here, Mintel contends that it will be unable to repair the damage done to its business relations with its existing customers and will lose the competitive advantage that it has worked to establish. Carr Affdt., ¶ 16. The loss of clients and sales and the continuing threat of further loss due to the distribution of Mintel's client lists and marketing data are sufficient to constitute irreparable injury. See *Meridian Mut. Ins. Co.*, 128 F.3d at 1120; see also *Illinois Sporting Goods Assoc. v. County of Cook*, 845 F. Supp. 582, 585 (N.D. Ill. 1994) (finding irreparable harm because of threat to the existence of plaintiff's business).

Moreover, money damages likely would not be an adequate remedy in the present case. First, Mintel could face the threat of lost sales and clients if Neergheen does use the information he removed from Mintel's computer system prior to leaving his employment. Second, it is difficult, at this time, to ascertain with any certainty the degree of financial loss Mintel may suffer by virtue of Neergheen's conduct. It is well recognized that in circumstances like the present, irreparable harm includes the impossibility of ascertaining with any accuracy the extent of the loss. It is also difficult to determine at this time the extent to which Mintel's confidential information could (or would) be utilized by Neergheen and Datamonitor. Given these circumstances, the Court finds that Plaintiff has demonstrated that money damages would be an inadequate remedy, at least for the duration of the TRO.

### C.    Balancing the Harms and Public Interest

Balancing the irreparable harm to the moving party if an injunction is not entered against the harm to the non-moving party if an injunction is granted requires the court to use a "sliding-scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *In re Aimster Copyright Litigation*, 252 F.

9

Supp. 2d 634, 648 (N.D. Ill. 2002). Most of the injunctive relief sought by Mintel relates to the confidential information that Neergheen is alleged to have removed from Mintel's computers. Granting the requested relief to that extent only would prohibit Neergheen from using material that it appears he should not have taken in the first place. Therefore, any harm that he may suffer for the brief duration of the TRO would be in large part a consequence of his own conduct in the days leading up to his departure from Mintel.

The other injunctive relief that Mintel seeks pertains to the non-solicitation and non-compete provisions of Neergheen's employment agreements. As to the former, the Court finds that the balance of the harms weighs in favor of granting the requested relief. However, at this stage of the case and based on the current record, the Court cannot conclude that the balance of harms militates in favor of entering temporary injunctive relief on the non-compete provisions. Nor can the Court say with any degree of confidence that Mintel has a likelihood of success with respect to those provisions. In reaching that conclusion, the Court is guided by the settled propositions that a TRO is an extraordinary remedy and that it is Plaintiff's burden to show a clear entitlement to relief. Given those propositions, the Court cannot conclude that Defendant should be enjoined from working in his new position, at least during the short time period between the entry of the TRO and the hearing date on the motion for preliminary injunction. See *Credit Suisse First Boston, LLC v. Vender*, 2004 WL 2806191, at *4 (N.D. Ill. December 3, 2004). That conclusion in no way prejudges the Court's ultimate ruling on the enforceability of the non-compete provisions once the Court has a more complete factual record and the benefit of additional briefing from both parties.

### D. Public Interest

Finally, the Court concludes that the public interest cuts both ways in this case. On the one hand, the public has a significant interest in enforcing contracts and preventing violations of

statutes. Yet, as noted above, there is a countervailing interest in an open and competitive marketplace and in enforcing only reasonable terms of non-compete agreements. At this stage of the case, the Court views these competing public interest considerations to be in equipoise.

### III.    Conclusion

Based on the foregoing, the Court grants in part and denies in part Plaintiff's emergency motion for a temporary restraining order and preliminary injunction and orders as follows:

1. Based upon the pleadings and affidavits filed by Plaintiff and the arguments of counsel in open court, the Court finds that Plaintiff has sustained its burden and demonstrated some likelihood of success on the merits of its claims. The Court also finds that Plaintiff likely does not possess an adequate remedy at law and will suffer irreparable harm should a temporary restraining order not be issued. Finally, the balance of harms and public interest also are served by the issuance of a temporary restraining order as to certain of Plaintiff's requests as identified above.

2. Pursuant to Federal Rule of Civil Procedure 65(b), a ten (10) day temporary restraining order, commencing at 2:30 p.m. on July 16, 2008 and expiring at 2:30 p.m. on July 30, 2008, is entered upon the following terms and conditions:

   A.   Defendant, his agents, servants, employees, officers, attorneys, successors and assigns, and all persons, firms, and corporations acting in connection or participation with him or on his behalf, are enjoined from using, referencing, evaluating, or copying all originals and copies of information or documents misappropriated from Mintel in hard copy or electronically stored;

   B.   Defendant, his agents, servants, employees, officers, attorneys, successors and assigns, and all persons, firms, and corporations acting in connection or participation with him or on his behalf, are enjoined from revealing or disclosing in any manner information and documents misappropriated from Mintel in hard copy or electronically stored;

   C. Defendant is required to return to Mintel all copied, printed, and/or downloaded files, materials, and information taken from Mintel;[2]

   D. Defendant is required to produce forensic copies of all personal desktop and/or laptop computers;

   E. Defendant, his agents, servants, employees, officers, attorneys, successors and assigns, and all persons, firms, and corporations acting in connection or participation with him or on his behalf, are prohibited from deleting any files from Defendant's personal desktop and/or laptop computer related to or taken from Mintel;

   F. Defendant is prohibited from contacting or soliciting any Mintel customer or client that Defendant had contact with during the last twelve (12) months of his respective employments with Mintel;

   G. Defendant is prohibited from soliciting or contacting any Mintel employee for purposes of working at Datamonitor or any other competitor of Mintel.

  3. Plaintiff's request for expedited discovery is granted. The parties may commence discovery at once. Written discovery responses are due within seven (7) days of service. Defendant shall appear for his deposition within ten (10) days.

  4. This matter is set for a preliminary injunction hearing on Monday, August 4, 2008 at 10:30 a.m. in Room 1919. Further details on briefing and other scheduling matters are addressed in a separate minute order.

Dated: July 16, 2008        _____
                  Robert M. Dow, Jr.
                  United States District Judge

---

[2] As discussed at the July 15 hearing, counsel for Defendant may keep a copy of these materials for purposes of this litigation only.