**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MINTEL INTERNATIONAL GROUP, | ) | |
| LTD., a United Kingdom corporation, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 08-cv-3939 |
| | ) | |
| v. | ) | Hon. Robert M. Dow, Jr. |
| MEESHAM NEERGHEEN, an individual, | ) | |
| Defendant. | ) | **JURY TRIAL DEMANDED** |
| | ) | |

<u>**ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM**</u>

Defendant Meesham Neergheen ("Neergheen"), an individual, by his attorneys and for

his Answer and Affirmative Defenses to Plaintiff's Complaint, and for his Counterclaim, states

as follows:

<u>**NATURE OF THE ACTION**</u>

1. Mintel brings this suit against Neergheen for willful violation of the
Computer Fraud and Abuse Act, 18 U.S.C. § 1330, *et seq.,* and the Illinois Trade Secret Act,
765 ILCS 1065/1, *et seq.,* in connection with Neergheen's unlawful taking of Mintel's
confidential and proprietary trade secret information.  Mintel also brings suit against
Neergheen for violation of the terms of the Contract of Employment and Employee Non-
Compete/Non-Solicitation Agreement Neergheen entered into with Mintel.  As a result of
Neergheen's unlawful behavior, Mintel has suffered damages and will continue to suffer
damages.  As such, Mintel seeks injunctive relief as well as compensatory and exemplary
damages.

**Answer:**        Neergheen admits that Mintel filed the present action against Neergheen.

Neergheen denies the remaining allegations of Paragraph 1.

<u>**THE PARTIES**</u>

2.        Plaintiff Mintel is a corporation formed under the laws of the United Kingdom
with its principal place of business in London, England. Mintel has a global presence with
offices in Australia, China, Japan and Chicago. Mintel is registered to do business in the State of
Illinois.

**Answer:**        Neergheen lacks knowledge or information sufficient to form a

belief as to the truth of Paragraph 2.

3.        Defendant Neergheen is an alien residing in Cook County, Illinois.  Neergheen
is a former employee of Mintel and worked in Mintel's Chicago office location.

**Answer:**        Neergheen admits that he resides in Cook County, Illinois, that he is

a former employee of Mintel, and that he worked for Mintel in Chicago.  Neergheen denies

the remaining allegations of Paragrah 3.

## JURISDICTION AND VENUE

4.        This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because
the acts of Neergheen constitute violations of federal law, the Computer Fraud and Abuse Act, 18
U.S.C. § 1030, *et seq.* over which this Court has original jurisdiction.  Venue is proper in this
district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Neergheen resides in the Northern
District of Illinois and a substantial part of the events giving rise to this cause of action occurred
in the Northern District of Illinois.

**Answer:**        Neergheen admits that this Court has subject matter jurisdiction pursuant

to 28 U.S.C. §1331 and venue is proper within this Court.  Neergheen denies the remaining

allegations of Paragraph 4.

5.        This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because
this is a civil action in which the amount in controversy exceeds the sum of $75,000.00
exclusive of costs and interest and there is complete diversity jurisdiction between Mintel and
Neergheen.

**Answer:**        Neergheen denies the allegations of Paragraph 5.

## FACTS

6.        From its inception in the year 1972 to the present, Mintel has provided
consumer, product and market research to its clients.  Consequently, Mintel has collected and
developed, at its own expense, significant and critical information on marketing, products,
project forecasts, pricing, costs, customer needs, client contacts and other data.

**Answer:**        Neergheen lacks knowledge or information sufficient to form a

belief as to the truth of Paragraph 6.

       7.     Mintel provides "need to know" limited access to its marketing documents and customer files, wherein only certain employees in trusted positions have access to such information. Neergheen had such access as a trusted employee within Mintel's marketing department.

     **Answer:**     Neergheen lacks knowledge or information sufficient to form a

belief as to the truth of Paragraph 7.

       8.     By reason of Neergheen's employment position with Mintel in the marketing department, Neergheen had access to and became familiar with Mintel's computer system, which contained subject confidential, proprietary and trade secret information. But for Neergheen's position at Mintel, Neergheen would not have come into contact with the subject confidential, proprietary and trade secret information.

     **Answer:**     Neergheen admits that, through his employment at Mintel, he was in

contact with information Mintel claims to be confidential.  Neergheen avers that the allegations

call for a legal conclusion and denies the remaining allegations of Paragraph 8.

       9.     Neergheen commenced employment with Mintel in its London office on or about June 30, 1997; Neergheen transferred to Mintel's Chicago office on or about August 1, 2003. As a condition of his continued employment with Mintel in Chicago, Neergheen agreed to and signed an Employee Non-Compete/Non-Solicitation Agreement ("Non-Compete Agreement") on August 4, 2003. A copy of the Non-Compete Agreement signed by Neergheen is attached hereto *as* "Exhibit 1-A."

     **Answer:**     Neergheen admits that he commenced employment with Mintel in

London on or about June 30, 1997.  Neergheen further admits that he took a position with

Mintel in Chicago on or about August 1, 2003.  Neergheen admits that he signed a

document provided by Mintel on or about August 4, 2003 and that a copy of that document

is attached to Mintel's Complaint as Exhibit 1-A.  Neergheen denies the remaining

allegations of Paragraph 9.

      10.     The Non-Compete Agreement signed by Neergheen states as follows:

The undersigned Employee hereby agrees not to compete, either directly or indirectly, with the business of Mintel or any of its subsidiaries, branches or divisions, at any location worldwide at any time during the Employee's term of employment, and for a period of one (1) year following his termination of employment with Mintel, regardless of the reason or cause for such termination.

*See* Non-Compete Agreement, Ex. 1-A, at § 1.

**Answer:**     Neergheen admits that the above language is found in the document attached as Ex. 1-A to Mintel's Complaint. Neergheen denies that the language is accurately quoted and further denies the remaining allegations of Paragraph 10.

11.     The Non-Compete Agreement also provides, in relevant part, as follows:

The undersigned Employee acknowledges that Mintel may, in reliance upon the terms of this Agreement, supply or provide the undersigned Employee with access to Mintel's trade secrets, customer lists or other information of a confidential or proprietary nature. In consideration for his employment with Mintel, the undersigned Employee agrees to keep confidential all such information, and not to use such information for his own benefit or to disclose same to any third party.

*See* Non-Compete Agreement, Ex. 1-A, at § 3.

**Answer:**     Neergheen admits that the above language is found in the document attached as Ex. 1-A to Mintel's Complaint. Neergheen denies that the language is completely or accurately quoted and further denies the remaining allegations of Paragraph 11.

12.     On or about June 24, 1998, Neergheen signed and executed a United Kingdom Contract of Employment with Mintel. A copy of the Contract of Employment is attached hereto as "Exhibit 1-B."

**Answer:**     Neergheen admits that he signed a document provided by Mintel on or about June 24, 1998 and that a copy of that document is attached to Mintel's Complaint as Exhibit 1-B. Neergheen denies the remaining allegations of Paragraph 12.

13.     The Contract of Employment states *as* follows:

You will not for the first twelve months at the end of your employment with us, either on your own account or on behalf of any other legal person and in competition with the Company, or any subsidiary directly or indirectly engage in, or be connected with, trade or business carried on by us or any of our associates at the end of your employment. ... You will not, for the first twelve months after the end of your employment with us, solicit away from us or our associates any person who is and was, when your employment ended, employed by us or an associate as a director, senior manager or sales person for whom you were responsible, or who was a member of any department/project/team in which you worked during the last twelve months of your employment.

*See* Exhibit 1-B, p. 8, at §§ 3, 5.

**Answer:**     Neergheen admits that the above language is found in the document attached as Ex. 1-B to Mintel's Complaint.  Neergheen denies that the language is completely or accurately quoted and further denies the remaining allegations of Paragraph 13.


14.     The Contract of Employment also states, in relevant part, as follows:

Mintel has expended and will continue to expend substantial effort and monies in acquiring knowledge and expertise in developing goodwill in the business of Mintel. In the course of your employment you will have access to certain of Mintel's trade secrets and other proprietary or confidential information of Mintel . You agree that all such records, methods, lists, materials, names and information, as well as any information and documents provided to, generated by or received by you in the course of your employment and the contents thereof, is confidential and is and will remain the sole property of Mintel. Such confidential information will not be used or disclosed by you other than in connection with your performance of services for Mintel or such confidential information shall be returned to Mintel upon the cessation of your employment.

*See* Exhibit 1-B, p. 9, at §§ 4, 7.

**Answer:**     Neergheen admits that the above language is found in the document attached as Ex. 1-B to Mintel's Complaint.  Neergheen denies that the language is completely or accurately quoted and further denies the remaining allegations of Paragraph 14.


15.     In order to allow Neergheen to effectively carry out his employment duties,

Mintel entrusted Neergheen with client and marketing files and materials. The client and marketing files and materials contained confidential and proprietary information, including, but not limited to, some or all of the following:

      A.      Client accounts and budgets;

      B.      Potential client lists;

      C.      Information regarding Mintel's group projects;

      D.      Vendor lists;

      E.      Trade show lists, including budget and marketing strategies;

      F.      Marketing strategies and overall objectives;

      G.      Individual client cost data;

      H.      Specialized research on clients;

      I.      Client proposals;

      J.      Marketing expenses for various vendors;

      K.      Information regarding the status of all marketing projects; and

      L.      Marketing analysis and information regarding customer interactions.

**Answer:**     Neergheen admits that, as part of his employment with Mintel, he was provided with certain files and information. Neergheen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 15.

16.    On or about April 23, 2008, Neergheen provided written notice to Mintel that Neergheen would be leaving the employment of Mintel at the conclusion of his contract, effective April 30, 2008. A copy of Neergheen's written resignation letter is attached hereto as "Exhibit 1-C."

**Answer:**     Neergheen admits that on or about April 23, 2008 he provided to Mintel a document, a copy of which is attached to Mintel's Complaint at Exhibit 1-C, which was

requested of him by Mintel.  Neergheen denies the remaining allegations of Paragraph 16.

17.    Upon information and belief, Neergheen immediately thereafter commenced employment with Datamonitor, Inc., a direct competitor of Mintel.

**Answer:**    Neergheen denies the allegations of Paragraph 17.

18.    Unknown to Mintel, Neergheen had been in negotiations with Datamonitor, Inc. and other competitors of Mintel, seeking employment with these competitors prior to Neergheen's resignation from Mintel.

**Answer:**    Neergheen lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 18.

19.    By reason of Neergheen's employment position at Mintel in the marketing department, Neergheen had access to Mintel's confidential, proprietary and trade secret information.

**Answer:**    Neergheen admits that he was employed by Mintel in the marketing department and that, while employed there, he had access to certain information of the company.  Neergheen avers that the allegations call for a legal conclusion and denies the remaining allegations of Paragraph 19.

20.    Specifically, Neergheen had a desktop computer that was connected to Mintel's secure electronic network and Mintel's secure server network.  At all times relevant hereto, Mintel owned the computer and subject proprietary, confidential and trade secret information, which was entrusted to Neergheen in his capacity as a key employee of Mintel.

**Answer:**    Neergheen admits that, while employed by Mintel, he utilized a desktop computer that was, upon information and belief, connected to an electronic network and/or server and further upon information and belief, was owned by Mintel.  Neergheen avers that the

allegations call for a legal conclusion and lacks knowledge or information sufficient to form a

belief as to the truth of the remaining allegations of Paragraph 20.

21.    After Mintel received Neergheen's written notice of resignation on April 23, 2008, Mintel began monitoring and searching Neergheen's work computer. Mintel discovered that Neergheen had copied, e-mailed to his personal e-mail address and/or printed confidential and proprietary trade secret information from his work computer on April 29, 2008 – the day prior to his last day of employment with Mintel. These files included, but are not necessarily limited to, the following: (1) 2008_04_07Mintel project priorities; (2) marketing activities – current, future direction – for SP; (3) 2008_04_18_Marketing_Exec_Update; (4) Marcomm Approved Expenses; (5) 2008 shows-Apr 8; (6) Final Attendee list.csv; (7) Claritas Comperemedia Web-Seminar.pdf; and (8) COMPEREMEDIA – Revenue by Client and Product.xls. The files downloaded by Neergheen contained the following confidential and proprietary trade secrets:

A.    **2008 04 07 Mintel project priorities:** This file contains information about Mintel's group projects, the priority of each from a strategic perspective, and the priority for Mintel's departments working on these core initiatives. This file was provided to members of the marketing team only in order to provide each member with an overview of the project focus from a general business perspective.

B.    **marketing activities – current, future direction – for SP:** This file was created for exclusive use by the marketing team to help the members understand the emphasis Mintel's marketing department puts on the listed marketing channels and means. This internal file represents an important part of Mintel's marketing strategy, outlining Mintel's overall marketing objectives. This file was provided to Mintel's marketing team only.

C.    **2008_04_18_Marketing_Exec Update:** This file represents a complete overview of all marketing projects and initiatives and was distributed to a distinct group of Mintel's executives and marketing team. All such individuals were required to feed their input into the file data.

D.    **Marcomm Approved Expenses:** This file contains a list of key vendors and budgets Mintel uses for different business purposes, such as public relations tracking, public relations distribution, printing, market data providers and merchandise. Only the marketing team and a select group of others, as determined by the Global Marketing Director, have access to this file.

E.    **2008 shows-Apr 8:** This file contains a complete overview of all trade shows Mintel has had a presence at between October 2007 and April 8, 2008, including budgeted and detailed actual costs. This file displays important information about Mintel's marketing strategy and activity and shows the exclusively agreed upon price with trade show partners. Only the marketing team and a select group of others, as determined by the Global Marketing Director, have access to this file.

F.  **Final Attendee list.csv:** This file contains address data of prospective clients created from a co-produced and promoted webinar of Mintel Comperemedia and Mintel's partner Claritas, Inc. held on April 22, 2008. The potential clients listed within this file have provided their address data to Mintel Comperemedia and Claritas, establishing a business relationship to obtain access to the webinar. Claritas and Mintel agreed only to share the prospective client list with each other. Neergheen obtained access to this file because he was working on the project with Mintel's Claritas contact.

G.  **Claritas Comperemedia Web-Seminar.pdf:** This file contains the actual content of the webinar and, therefore, is marked as confidential. This information was only made available to potential clients in exchange for their address details and to employees of Claritas and Mintel who worked on the project.

H.  **COMPEREMEDIA — Revenue by Client and Product.xls:** The data in this file was created by Mintel's sales manager and marked as confidential. The file contains analysis done by the marketing manager to show the revenue ranking of Mintel's product Comperemedia by client sector. This file also lists Mintel's specific clients and the individually agreed upon price each client made with Mintel for a Comperemedia subscription. The clients and information listed within this file total over fifteen (15) pages in length. This file was provided to some of Mintel's marketing team.

**Answer:**    Neergheen lacks knowledge or information sufficient to form a belief as to the truth of whether or when Mintel began monitoring and/or searching his work computer. Neergheen admits that, while employed by Mintel, he e-mailed certain documents from his work email account to his personal email account. Neergheen avers that the allegations call for a legal conclusion and denies the remaining allegations of Paragraph 21.

## COUNT I – COMPUTER FRAUD AND ABUSE ACT

22.    Mintel re-alleges and incorporates by reference paragraphs 1 through 21 as though fully set forth herein.

**Answer:**    Neergheen repeats and reaffirms his responses to Paragraphs 1 through 21 as if fully restated herein.

23.    At all times relevant herein, there existed a statute entitled the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq., ("CFAA")*. Among other things, Section 1330(g) of the CFAA provides that any person who suffers damage or loss by reason of a violation of

9

this act may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. *See* 18 U.S.C. § 1330(g).

**Answer:**        Neergheen admits that 18 U.S.C. § 1030, *et seq.* is commonly referred to as the Computer Fraud and Abuse Act.  Neergheen lacks sufficient information to form a belief as to the "relevant times" of Mintel's Complaint.  Neergheen avers that the allegations call for a legal conclusion and denies the remaining allegations of Paragraph 23.

24.        After he had already decided to leave Mintel and join a competitor, Neergheen knowingly and with intent to defraud accessed a protected computer without authorization and as a result has obtained Mintel's valuable confidential and proprietary trade secret information.

**Answer:**        Neergheen denies the allegations of Paragraph 24.

25.        Obtaining and using such information for any person or entity's benefit other than Mintel exceeded Neergheen's authority to use Mintel's business computers, websites and networks, and was in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*

**Answer:**        Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 25.

26.        Neergheen's acts were intentional and without Mintel's knowledge, permission or authorization.

**Answer:**        Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 26.

27.        Neergheen's intentional access to Mintel's business computers, websites and networks provided Neergheen with access to Mintel's confidential and proprietary trade secret information exceeding $5,000.00 in value.

**Answer:**        Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 27.

28.    Neergheen's acts of exceeding authorized levels of access to Mintel's business computers, websites and networks provided Neergheen with access to Mintel's confidential and proprietary trade secret information exceeding $5,000.00 in value.

**Answer:**    Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 28.

29.    Neergheen's acts constitute computer fraud and abuse in violation of 18 U.S.C. § 1030(a)(4), § 1030(a)(2)(C), § 1030(a)(5)(A)(iii) and § 1030(a)(5)(B)(i).

**Answer:**    Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 29.

30.    As a direct and proximate result of Neergheen's unlawful taking of Mintel's confidential, proprietary and trade secret information, Mintel has suffered damages in an amount yet to be determined but certainly in excess of $5,000.00, and Neergheen has been unjustly enriched through his use of such information. Furthermore, it is inevitable that Neergheen will use such unlawfully gained information to benefit Datamonitor and/or other competitors of Mintel unless this Court prevents Neergheen from using and disseminating such information in the future.

**Answer:**    Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 30.

31.    By reason of these facts, Mintel does not have an adequate remedy at law and, unless the Court grants injunctive relief, Mintel will suffer irreparable injury.

**Answer:**    Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 31.

## COUNT II – INJUNCTIVE RELIEF: NON-COMPETE AGREEMENT

32.    Mintel re-alleges and incorporates by reference paragraphs 1 through 31 as though fully set forth herein.

**Answer:**       Neergheen repeats and reaffirms his responses to Paragraphs 1 through 31 as if fully restated herein.

33.    The Non-Compete Agreement signed by Neergheen contains a one-year restriction that prohibits Neergheen from working for any competitor of Mintel following the termination of Neergheen's employment with Mintel. *See* Exhibit 1-A, at § 1.

**Answer:**       Neergheen denies the allegations of Paragraph 33 to the extent they are inconsistent with the "Non-Compete Agreement" and denies the validity and enforceability of the "Non-Compete Agreement."

34.    The Non-Compete Agreement signed by Neergheen also contains a one-year restriction that prohibits Neergheen from soliciting or contacting any Mintel customer that Neergheen had contact with while employed at Mintel. *See* Exhibit 1-A, at § 5.

**Answer:**       Neergheen denies the allegations of Paragraph 34 to the extent they are inconsistent with the "Non-Compete Agreement" and denies the validity and enforceability of the "Non-Compete Agreement."

35.    Pursuant to the terms of the Non-Compete Agreement, Neergheen also agreed to keep confidential all of Mintel's trade secrets, customer lists or other information of a confidential or proprietary nature. *See* Exhibit 1-A, at § 3.

**Answer:**       Neergheen denies the allegations of Paragraph 35 to the extent they are inconsistent with the "Non-Compete Agreement" and denies the validity and enforceability of the "Non-Compete Agreement."

36.    All terms and provisions within the Non-Compete Agreement are valid and enforceable.

**Answer:**     Neergheen denies the allegations of Paragraph 36.

37.     Upon information and belief, Neergheen is currently working for Datamonitor, a competitor of Mintel, which is in direct violation of the terms of the Non-Compete Agreement.

**Answer:**     Neergheen admits that he is currently employed by Datamonitor. Neergheen denies the remaining allegations of Paragraph 37.

38.     Furthermore, Neergheen violated the terms of the Non-Compete Agreement by copying, e-mailing and/or printing Mintel's confidential, proprietary and trade secret information in the days leading up to his resignation and has used such information for his own benefit and gain.

**Answer:**     Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 38.

39.     Mintel has an ascertainable and protectable interest in enforcing the restrictive covenant and confidentiality clause.

**Answer:**     Neergheen avers that the allegations call for a legal conclusion and further that he lacks knowledge or information sufficient to form a belief as to the truth of Paragraph 39.

40.     Mintel does not have an adequate remedy at law. A remedy at law will not prevent Neergheen from improperly competing with Mintel and disclosing confidential and proprietary information in violation of the restrictions stated within the Non-Compete Agreement.

**Answer:**     Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 40.

41.    Mintel has established, based upon the allegations and exhibits attached hereto, that it is likely to succeed on the merits of its claim.

**Answer:**    Neergheen denies the allegations of Paragraph 41.


42.    Mintel will be irreparably harmed should this Court fail to enter the injunctive relief sought by Mintel. Specifically, Mintel will be unable to repair the damage done to its business relations with its existing customers and will lose the competitive advantage Mintel has worked hard to establish.

**Answer:**    Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 42.


43.    A balance of harms favors Mintel. Mintel has expended considerable time and effort in building its customer base and competitive advantage, both of which stand in jeopardy should an injunction not be issued in this case.

**Answer:**    Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 43.


44.    An injunction can be narrowly drawn so that it is solely for the purposes sought herein.

**Answer:**    Neergheen denies the allegations of Paragraph 44.


**COUNT III – INJUNCTIVE RELIEF: CONTRACT OF EMPLOYMENT**


45.    Mintel re-alleges and incorporates by reference paragraphs 1 through 44 as though fully set forth herein.

**Answer:**    Neergheen repeats and reaffirms his responses to Paragraphs 1 through 44 as if fully restated herein.

46.    The Contract of Employment signed by Neergheen on or about June 24, 1998 contains a one-year restrictive covenant that prohibits Neergheen from working in competition with Mintel and prohibits Neergheen from soliciting any of Mintel's customers that Neergheen had contact with during his employment with Mintel. *See* Exhibit 1-B, p. 8**, §§ 3, 5.**

**Answer:**    Neergheen avers that the allegations of Paragraph 46 call for a legal

conclusion and denies the allegations of Paragraph 46.

47.    The Contract of Employment also prohibits Neergheen from using or disclosing any of Mintel's trade secrets and other proprietary or confidential information. *See* Exhibit 1-B, p. 9, §§ 4, 7.

**Answer:**    Neergheen avers that the allegations of Paragraph 47 call for a legal

conclusion and denies the allegations of Paragraph 47.

48.    The restrictive covenant and confidentiality clause are valid and enforceable.

**Answer:**    Neergheen denies the allegations of Paragraph 48.

49.    Upon information and belief, Neergheen is currently working for Datamonitor, a competitor of Mintel, which is in direct violation of the terms of the restrictive covenant contained within the Contract of Employment.

**Answer:**    Neergheen admits that he is currently employed by Datamonitor.

Neergheen denies the remaining allegations of Paragraph 49.

50.    Furthermore, Neergheen violated the terms of the Contract of Employment by copying, using and disclosing Mintel's confidential, proprietary and trade secret information for his own benefit and gain.

**Answer:**    Neergheen avers that the allegations call for a legal conclusion and denies

the allegations of Paragraph 50.

51.    Mintel has an ascertainable and protectable interest in enforcing the restrictive covenant and confidentiality clause.

**Answer:**    Neergheen avers that the allegations call for a legal conclusion and denies

the allegations of Paragraph 51.

52.    Mintel does not have an adequate remedy at law. A remedy at law will not prevent Neergheen from improperly competing with Mintel and disclosing confidential and proprietary information in violation of the terms of the Contract of Employment.

**Answer:**    Neergheen avers that the allegations call for a legal conclusion and denies

the allegations of Paragraph 52.

53.    Mintel has established, based upon the allegations and exhibits attached hereto, that it is likely to succeed on the merits of its claim.

**Answer:**    Neergheen denies the allegations of Paragraph 53.

54.    Mintel will be irreparably harmed should this Court fail to enter the injunctive relief sought by Mintel. Specifically, Mintel will be unable to repair the damage done to its business relations with its existing customers and will lose the competitive advantage Mintel has worked hard to establish.

**Answer:**    Neergheen avers that the allegations call for a legal conclusion and denies

the allegations of Paragraph 54.

55.    A balance of harms favors Mintel. Mintel has expended considerable time and effort in building its customer base and competitive advantage, both of which stand in

jeopardy should an injunction not be issued in this case.

**Answer:**     Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 55.

56.     An injunction can be narrowly drawn so that it is solely for the purposes sought herein.

**Answer:**     Neergheen denies the allegations of Paragraph 56.

### COUNT IV — MISAPPROPRIATION OF TRADE SECRETS

57.     Mintel re-alleges and incorporates by reference paragraphs 1 through 56 as though fully set forth herein.

**Answer:**     Neergheen repeats and reaffirms his responses to Paragraphs 1 through 56 as if fully restated herein.

58.     At all relevant times herein, there existed as part of the laws of the State of Illinois the Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq., ("ITSA").* Among other things, section 3 of the ITSA provides for the enjoinder of either actual or threatened misappropriation of trade secrets. *See* 765 ILCS 1065/3.

**Answer:**     Neergheen lacks sufficient information to form a belief as to the "relevant times" suggested by Mintel's Complaint.  Neergheen admits that 765 ILCS 1065/1, *et seq.* is commonly referred to as the Illinois Trade Secrets Act.  Neergheen avers that the allegations call for a legal conclusion and denies the remaining allegations of Paragraph 58.

59.     Section 2(d) of the ITSA defines a "trade secret" as:

[I]nformation, including but not limited to, technical or non-technical data, a formula,

pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1)     is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2)     is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

See 765 ILCS 1065/2(d).

**Answer:**     Neergheen admits that 765 ILCS 1065/2(d) contains the above language but denies that it is accurately or completely quoted.

60.     The confidential customer lists and marketing documents provided to Neergheen by Mintel constitute trade secrets under the ITSA, whose actual and threatened misappropriation may be enjoined.

**Answer:**     Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 60.

61.     Mintel took affirmative measures to keep its confidential and proprietary information secret, including internal and external physical security. The trade secrets were available to limited employees only, and these employees were aware of the highly confidential and secret nature of the trade secrets.

**Answer:**     Neergheen lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 61.

62.     By virtue of his prior employment with Mintel and pursuant to the ITSA, Neergheen is under a continuing duty to maintain the confidentiality of Mintel's trade secrets, including, but not limited to, Mintel's confidential customer lists and marketing materials.

**Answer:**     Neergheen avers that the allegations call for a legal conclusion and denies

the allegations of Paragraph 62.

63.    Despite the statutory obligation to maintain the confidentiality of such trade secrets, Neergheen has maliciously misappropriated such trade secrets in violation of the ITSA.

**Answer:**    Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 63.

64.    Sections 2 and 3 of the ITSA allow for an injunction to be issued enjoining the actual or threatened misappropriation of trade secrets.

**Answer:**    Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 64.

65.    Mintel has no adequate remedy at law to protect against the illegal misappropriate and use of its trade secrets by Neergheen. Injunctive relief is, therefore, necessary and appropriate to restrain the illegal misappropriation and use of such information pursuant to section 3 of the ITSA. *See* 765 ILCS 1065/3.

**Answer:**    Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 65.

66.    Unless Neergheen is restrained and enjoined from using the subject confidential, proprietary and trade secret information, Mintel will suffer immediate and irreparable injury in that Neerghen will continue to have access and the ability to make use of Mintel's trade secrets.

**Answer:**    Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 66.

67.    As a direct and proximate result of Neergheen's misappropriation of Mintel's trade secrets, Mintel has suffered damages in an amount yet to be determined, and Neergheen has been unjustly enriched through his use of such information. Therefore, pursuant to section 4 of the ITSA, Mintel is entitled to recover damages. *See* 765 ILCS 1065/4.

**Answer:**    Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 67.

68.    By reason of Neergheen's willful and malicious misappropriation of Mintel's trade secrets, Mintel is entitled to an award of exemplary damages from Neergheen in such amount as the ITSA requires to punish Neergheen and defer him from the commission of like acts and, in addition, reasonable attorney's fees pursuant to section 5 of the ITSA. *See* 765 ILCS 1065/5.

**Answer:**    Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 68.

## COUNT V – BREACH OF CONTRACT: NON-COMPETE AGREEMENT

69.    Mintel re-alleges and incorporates by reference paragraphs 1 through 68 as though fully set forth herein.

**Answer:**    Neergheen repeats and reaffirms his responses to Paragraphs 1 through 68 as if fully restated herein.

70.    Mintel and Neergheen entered into the Non-Compete Agreement whereby Neergheen agreed upon termination of his employment with Mintel that he would refrain from working with or for a competitor of Mintel for a period of one year. Neergheen also agreed to keep confidential all of Mintel's trade secrets, customer lists or other information of a confidential or proprietary nature.

**Answer:**    Neergheen denies the allegations of Paragraph 70 to the extent they are inconsistent with the "Non-Compete Agreement" and denies the validity and enforceability of the "Non-Compete Agreement."

71.     Neergheen breached his obligations under the Non-Compete Agreement.

**Answer:**     Neergheen denies the allegations of Paragraph 71.


72.     Specifically, upon information and belief, Neergheen is currently employed at Datamonitor, Inc., a competitor of Mintel, and commenced working for Datamonitor immediately upon his resignation from Mintel.

**Answer:**     Neergheen admits that he is currently employed by Datamonitor.

Neergheen denies the remaining allegations of Paragraph 72.


73.     In addition, in the days leading up to his resignation, Neergheen copied, e-mailed and/or printed Mintel's confidential and proprietary trade secrets for his own benefit and gain.

**Answer:**     Neergheen admits that, while employed by Mintel, he e-mailed

information to himself.  Neergheen avers that the allegations call for a legal conclusion and

denies the remaining allegations of Paragraph 73.


74.     Mintel has performed all of its obligations under the Non-Compete Agreement, including the payment of Neergheen's salary and all applicable benefits.

**Answer:**     Neergheen denies the allegations of Paragraph 74.


75.     As a consequence of Neergheen's unlawful breach of the Non-Compete Agreement, Mintel has suffered damages in an amount exceeding $75,000.00.

**Answer:**     Neergheen denies the allegations of Paragraph 75.


**COUNT VI – BREACH OF CONTRACT: CONTRACT OF EMPLOYMENT**


76.     Mintel re-alleges and incorporates by reference paragraphs 1 through 75 as though fully set forth herein.

**Answer:**       Neergheen repeats and reaffirms his responses to Paragraphs 1 through 75 as if fully restated herein.

77.     Mintel and Neergheen entered into a Contract of Employment on or about June 24, 1998, whereby Neergheen agreed upon termination of his employment with Mintel that he would refrain from working with or for a competitor of Mintel for a period of one year. Neergheen also agreed not to use or disclose any of Mintel's trade secrets and other proprietary or confidential information.

**Answer:**       Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 77.

78.     Neergheen breached his obligations under the Contract of Employment.

**Answer:**       Neergheen denies the allegations of Paragraph 78.

79.     Specifically, upon information and belief, Neergheen is currently employed at Datamonitor, Inc., a competitor of Mintel, and commenced working for Datamonitor immediately upon his resignation from Mintel.

**Answer:**       Neergheen admits that he is currently employed by Datamonitor. Neergheen denies the remaining allegations of Paragraph 79.

80.     In addition, in the days leading up to his resignation, Neergheen copied, e-mailed and/or printed Mintel's confidential and proprietary trade secrets for his own benefit and gain.

**Answer:**       Neergheen admits that, while employed by Mintel, he e-mailed information to himself.  Neergheen avers that the allegations call for a legal conclusion and denies the remaining allegations of Paragraph 80.

81.     Mintel has performed all of its obligations under the Contract of Employment, including the payment of Neergheen's salary and all applicable benefits.

**Answer:**     Neergheen denies the allegations of Paragraph 81.

82.     As a consequence of Neergheen's unlawful breach of the Contract of Employment, Mintel has suffered damages in an amount exceeding $75,000.00.

**Answer:**     Neergheen denies the allegations of Paragraph 82.

## COUNT VII – RESTITUTION

83.     Mintel re-alleges and incorporates by reference paragraphs 1 through 82 as though fully set forth herein.

**Answer:**     Neergheen repeats and reaffirms his responses to Paragraphs 1 through 82 as if fully restated herein.

84.     Neergheen has been unjustly enriched by his unlawful conduct described above.

**Answer:**     Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 84.

85.     As a consequence of the foregoing, Mintel has suffered financial loss.

**Answer:**     Neergheen denies the allegations of Paragraph 85.

86.     As a result of the willful, intentional and malicious acts of Neergheen, Mintel is entitled to restitution and punitive damages.

**Answer:**     Neergheen avers that the allegations call for a legal conclusion and denies the allegations of Paragraph 86.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

One or more claims of the Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

Mintel is not entitled to monetary relief under any of its alleged counts.

### Third Affirmative Defense

Mintel is not entitled to re-write its employment documents with Neergheen. In this regard, pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, Neergheen places Mintel on notice of the presence of foreign law claims.

### Fourth Affirmative Defense

The documents upon which Mintel bases its counts are invalid and/or unenforceable.

### Fifth Affirmative Defense

Mintel's claims are barred by laches, acquiescence, estoppel, fraud, unclean hands and/or the applicable statute of limitations.

Neergheen reserves the right to assert additional defenses or affirmative defenses that may arise as discovery progresses or that it otherwise becomes aware of during the course of this litigation.

## COUNTERCLAIMS

Counter-Plaintiff, Meesham Neergheen ("Neergheen"), as his counterclaims against Counter-Defendant, Mintel International Group, Ltd. ("Mintel"), avers as follows

1.      Neergheen is an individual currently residing in Cook County, Illinois. Neergheen is a citizen of the United Kingdom, and is residing and working in the United States by virtue of a U.S. visa.

2.      Upon information and belief, Mintel is a United Kingdom company that conducts business and maintains an office in the state of Illinois.

3.      The counterclaims arise in part under 28 U.S.C. §1928 and Illinois common law.

4.      This Court has jurisdiction over the counterclaims pursuant to 28 U.S.C. §1332. This Court also has supplemental jurisdiction over the counterclaims pursuant to 28 U.S.C. § 1367.

5.      Venue and personal jurisdiction are proper in this District pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the activities giving rise to the counterclaims alleged herein occurred in this District and Mintel can be found in this district.

### Neergheen's Career with Mintel

6.      In June 1997, Neergheen began working for Mintel International's main office in London, United Kingdom.

7.      Upon commencing employment with Mintel, Neergheen signed a contract of employment.  This contract was made between a United Kingdom company and a resident and citizen of the United Kingdom.  The contract failed to provide a choice of law provision and further failed to otherwise indicate the laws under which it was to be interpreted.

8.      In approximately August 2003, Neergheen transferred from Mintel's UK office to its Chicago, Illinois branch.

9.      Neergheen's transfer to the U.S. arm of Mintel was simply a transfer.  His duties at the time remained the same, and he did not sign a new employment contract with the company.  Mintel did require, however, that Neergheen sign what it titled a "non-compete agreement."  Neergheen was not provided any additional compensation or other consideration for signing the new document.

10.      Over the course of his employment with Mintel, Neergheen held several positions with the company.  During the decade-long employment, Neergheen worked his way from data-input type positions to a member of the marketing team.

11.      Ultimately, Neergheen was given the position of leveraging trade organizations for Mintel.  Neergheen's duties included setting up sponsorships at trade shows, providing speakers, and organizing lists of associations in particular fields.  Neergeen was slated with the task of working with organizations in the consumer packaged goods ("CPG") area.

12.      As part of the regular course of business, Neergheen frequently brought his work home.  This included e-mailing projects to his personal email account from his work account.

**Mintel's Termination of Neergheen**

13.      In late 2007, Neergheen interviewed for the Product Marketing Manager position at Mintel.  Not only was he not selected for the position, Neergheen was informed that the position he did hold would be made redundant by the company.  Neergheen was told he would have to find another job.

14.      Because Neergheen had made his life in the United States, he wanted to stay in Chicago.  He first attempted to find another position within Mintel that would allow him to do

so.  Mintel's only offer was a data-input job — a large step down from his then-position with the company.  Neergheen chose to turn down the position.

15.     Growing increasingly concerned about the deadlines that would require him to return to the United Kingdom, Neergheen requested of Mintel the ability to stay on with the company until he found a new position elsewhere.  Mintel worked with Mr. Neergheen to create a temporary role that would end April 30, 2008.  This role was created in order to allow Neergheen to remain in the United States while he found a new job.

16.     Starting in approximately mid-December 2007, Neergheen began looking for a new job.  Because of his citizenship, Neergheen sought work with companies based in the United Kingdom, but which had branches in Chicago.  These companies would allow Neergheen to remain by virtue of a particular type of U.S. visa.

17.     Neergheen sought employment through placement agencies, Internet postings, friends and colleagues, and cold-calls.

18.     As part of his efforts to find a new position, Neergheen communicated via his Mintel-issued e-mail account.  As Mintel had made Neergheen's position redundant and left him without a job, the company was aware Neergheen would be seeking employment elsewhere.

19.     Neergheen began interviews with United Kingdom-based companies with Chicago offices.  In early spring 2008 Neergheen accepted employment with Datamonitor Inc. Datamonitor is a United Kingdom company that was seeking a U.S.-based employee to fill a recently open position.  Datamonitor's U.S. employee had decided to return to Europe and the company needed someone with experience working with trade associations.  When Neergheen's personal friend notified Neergheen of the position, Neergheen sought — and obtained — an interview with the company.  Several weeks later, Neergheen was offered the position.

20.     Although Datamonitor and Mintel both collect public information and provide services marketing to and with trade associations, they work in primarily different industries. Nonetheless, Mintel considers Datamonitor to be a competitor.   As a result, Datamonitor carefully screened the position Neergheen was seeking, to ensure there was no conflict with his new job.

**Mintel's Change-of-Mind**

21.     Mintel was aware of, and encouraged, Neergheen's attempts to find employment elsewhere.  Nonetheless, in approximately March 2008, months after informing Neergheen that it would be making his position redundant, Mintel suddenly became concerned that Neergheen would have a basis for challenging the termination of his employment.

22.     The company began formally monitoring Neergheen's e-mail account and began having internal communications about the fastest way to return Neergheen to the United Kingdom.

23.     Knowing that the non-compete clauses of the documents signed by Neergheen would not be valid, Mintel asked Neergheen to sign a new non-compete agreement.  This new agreement provided that United States law would govern the document and more narrowly restricted Neergheen's ability to work.   Additionally, Mintel offered a $2,000 (two thousand dollar) severance in exchange for signing the new agreement and to thank him for his ten years of service to the company.  Neergheen refused the new agreement and the $2,000.

**The Present Lawsuit**

24.     In late July 2008, Mintel brought the present lawsuit before the Court.  At that time, Mintel claimed that the matter was of such urgency, it was entitled to immediately prevent Neergheen from working for Datamonitor.   Mintel claimed that it had just discovered that

Neergheen had emailed what it deemed "proprietary and trade secret" information from his work to his email account and, as a result, it would suffer irreparable damage unless Neergheen were required to cease working immediately.

25.     However, nearly three months prior to filing the present "emergency" action, Mintel was aware of the e-mails and was unconcerned about them.

26.     Moreover, as Mintel is now aware, Neergheen had no bad intent in emailing the documents to himself.  He was employed by Mintel at the time, deleted a number of the documents without even opening the emails, and never opened the one email that remained. Nonetheless, Mintel pressed forward with the present lawsuit.

### COUNT I
### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

27.     Neergheen reasserts and realleges the allegations made in paragraphs 1-26 above as if fully set forth herein.

28.     Neergheen has valid business expectancies with Datamonitor.

29.     Mintel's attempts to entice Datamonitor to terminate Neergheen's employment, including but not limited to the filing of the present lawsuit and its maintenance without basis, consititutes a knowing, intentional interference with Neergheen's business relations.

30.     Mintel required Neergheen to enter into two documents purporting to restrict his ability to seek employment outside of Mintel.  Mintel did so knowing that the documents were invalid and improperly and unreasonably attempted to prevent Neergheen from practicing his trade.

31.     These acts constitute restraint of trade and are against public policy, making the documents legally unenforceable.

32.     Mintel has acted with malice in interfering with this relationship and lacks any legally cognizable justification for this interference.

33.     As a direct and proximate result of Mintel's misconduct, Neergheen is being irreparably injured and will continue to be irreparably injured in his business and reputation, resulting in loss of goodwill.   Unless restrained by the Court, Mintel will continue its misconduct.

34.     Neergheen has no adequate remedy at law which will afford him complete relief and will be irreparably harmed unless Mintel's wrongful conduct is enjoined by the Court, in that monetary damages alone cannot fully compensate Neergheen for injuries caused by Mintel's misconduct.

35.     Neergheen has been damaged in an amount exceeding $75,000 but to be determined at trial.

36.     Additionally, Neergheen is entitled to punitive damages on account of Mintel's egregious conduct, as well as damages under 28 U.S.C. §1927.

## COUNT II
### DECLARATORY JUDGMENT-"NON-COMPETE AGREEMENT"

37.     Neergheen reasserts and realleges the allegations made in paragraphs 1-36 above as if fully set forth herein.

38.     In its Complaint, Mintel asserts counts based on purported violations of the document it terms the "Non-Compete Agreement."   This document, attached to Mintel's Complaint at Exhibit 1-A, purports to restrict Neergheen, for a one year time period, from employment with any entity in the world that Mintel considers to directly or indirectly compete with Mintel.

39.     The document referred to by Mintel in its Complaint as the "Non-Compete Agreement" is invalid and/or unenforceable as a matter of law.  At a minimum, the document is unreasonable in scope and duration and is against public policy.

40.     Accordingly, Neergheen is entitled to judgment that the "Non-Compete Agreement" is invalid and/or unenforceable.

**COUNT III**
**DECLARATORY JUDGMENT- CONTRACT OF EMPLOYMENT"**

41.     Neergheen reasserts and realleges the allegations made in paragraphs 1-40 above as if fully set forth herein.

42.     In its Complaint, Mintel asserts counts based on purported violations of the restrictive covenant provision of the document it terms the "Contract of Employment."  This document, attached to Mintel's Complaint at Exhibit 1-B, purports to restrict Neergheen, for a one year time period, from employment with any entity in the world that Mintel considers to directly or indirectly compete with Mintel.

43.     The restrictive covenant provision of the document referred to by Mintel in its Complaint as the "Contract of Employment" is invalid and/or unenforceable as a matter of law. At a minimum, the provision is unreasonable in scope and duration and is against public policy.

44.     Accordingly, Neergheen is entitled to judgment that the "Non-Compete Agreement" is invalid and/or unenforceable.


WHEREFORE Counter-Plaintiff Meesham Neergheen respectfully requests that the Court enter judgment on Counts I, II and III of his counter-claims in his favor and against Counter-Defendant Mintel International, Inc., and award the following:

A. Entry of a preliminary and permanent injunction enjoining and restraining Mintel from its acts of improperly interfering with Neergheen's business relations as alleged herein;

B. Finding the document referred to by Mintel in its Complaint as the "Non-Compete Agreement" invalid and/or unenforceable;

C. Finding one or more provisions of the document referred to by Mintel in its Complaint as the "Contract of Employment" invalid and/or unenforceable;

D. Awarding to Neergheen his damages incurred by reason of Mintel's tortious interference with business relations;

E. Awarding to Neergheen punitive damages and/or damages under 28 U.S.C. §1927 on account of Mintel's egregious conduct and vexatious litigation; and

F. For such other and further relief this Court determines to be just and proper.


A jury trial is respectfully demanded.


Respectfully submitted,

By: __/s/ Jeana R. Lervick_____
    One of His Attorneys

    John T. Roache
    Jeana R. Lervick
    Joel C. Griswold
    BELL, BOYD & LLOYD LLP
    70 West Madison Street
    Suite 3100
    Chicago, Illinois  60602
    312.807.4339
    312.827.1266 (facsimile)

## VERIFICATION

I, Meesham Neergheen, pursuant to 28 U.S.C. § 1746 and the laws of the United States, declare under penalty of perjury that according to my knowledge, information and belief, the contents of the foregoing are true and correct.

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that a true and correct copy of Defendant's Answer and Affirmative Defenses and Counterclaim have been served this 11th day of August, 2008 via ECF filing, confirmation via U.S. Mail to:

> Joseph Marconi
> Victor Pioli
> Katherine J. Pronk
> JOHNSON & BELL, LTD.
> 33 West Monroe Street
> Suite 2700
> Chicago, Illinois 60603

> _/s/ Jeana R. Lervick_
> Jeana R. Lervick
> BELL, BOYD & LLOYD LLP
> 70 West Madison Street
> Suite 3100
> Chicago, IL 60602
> (312) 373-1121