**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MINTEL INTERNATIONAL GROUP, LTD, a United Kingdom corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No.: 08 CV 3939 |
| v. | ) ) | Judge Robert M. Dow |
| MEESHAM NEERGHEEN, an individual, | ) ) | Magistrate Judge Maria Valdez |
| Defendant. | ) ) ) | |

## MOTION FOR RULE TO SHOW CAUSE, FOR DISCOVERY SANCTIONS AND FOR SANCTIONS BECAUSE OF EVIDENCE SPOLIATION

Plaintiff MINTEL INTERNATIONAL GROUP, LTD. ("Mintel") hereby moves this court for rule for the entry of an order requiring the Defendant to show cause as to why he should not be held in contempt of this court. In addition, Plaintiff seeks sanctions by reason of Defendant's intentional spoliation of evidence. Due to the severity of Defendant's willful spoliation, the only appropriate and just sanctions would be the striking of defendant's answer, dismissing his counterclaim and entry of default judgment or the imposition of severe evidentiary limits on Defendant. In addition, Mintel seeks monetary sanctions. In support of its motion, Mintel states as follows:

### FACTS

1.      On or about July 11, 2008, Mintel filed a Complaint for Injunctive and Other Relief against Defendant Meesham Neergheen ("Defendant"), alleging violation of the Illinois Trade Secret Act, Computer Fraud and Abuse Act, and violation of various terms of Defendant's employment contract and non-compete agreement. It is Mintel's contention that Defendant is in violation of his non-compete agreement because Defendant is currently working for Datamonitor, a direct competitor of Mintel.

2.      The causes of action in the Complaint are based on allegations that Defendant had computer access to Plaintiff's confidential electrically stored information ("ESI"), which he

1

improperly copied and took possession of prior to leaving Mintel's employment. It is further alleged that Plaintiff fears Defendant shared Mintel's confidential ESI with his new employer, Datamonitor and/or other parties unknown. Consequently, the core critical evidence for all causes of action is certain to be Defendant's computer activities both prior to and after leaving Mintel, as recorded on any and all hard drives he was using during that period. The only source of this evidence is Defendant's hard drives on all devices he has accessed from prior to his leaving Mintel until today.

3. Defendant was hand served the Complaint in this action on July 11, 2008. On July 15, 2008, opposing counsel filed an appearance on behalf of Defendant. In addition, on that date, the Court conducted an emergency hearing on Mintel's request for a temporary restraining order. During that hearing, Defendant's computer was discussed at length.

4. On July 16, 2008, the Court issued an order stating as follows:

C. Defendant is required to return to Mintel all copied, printed, and/or downloaded files, materials, and information taken from Mintel; D. Defendant is required to produce forensic copies of all personal desktop and/or laptop computers; E. Defendant, his agents, servants, employees, officers, attorneys, successors and assigns, and all persons, firms, and corporations acting in connection or participation with him or on his behalf, are prohibited from deleting any files from Defendant's personal desktop and/or laptop computer related to or taken from Mintel.

*See* July 16, 2008 Order, Exhibit 1, at 12.

5. In addition to the TRO, the parties entered into an Agreed Order on July 25, 2008 which provided in pertinent part:

3. Defendant shall provide to Plaintiff's expert on or before July 25, 2008 a forensic copy of Defendant's hard drive(s). Defendant's expert shall certify that the forensic copy given in an exact copy of Defendant's hard drive(s) and shall provide a copy of the intake document including the hash verification...6. Defendant shall take no action to delete, modify, scrub or otherwise alter or diminish any data related to or contained on the hard drive(s), including metadata.

Agreed Order, Exhibit 2, ¶ 3.

6. Consequently, in addition to Defendant's hard drives being core evidence regarding the original Complaint, they are also core evidence with regard to issues surrounding Defendant's compliance with the TRO and likely evidence spoliation.

7. Defendant continued to use his computer despite having knowledge on July 11, 2008 of the pending litigation when Defendant received notice of the emergency hearing and received a copy of the Complaint for Injunctive and Other Relief. Although the Temporary

Restraining Order was entered by the Court on July 16, 2008, Defendant did not turn over his computer to his counsel and/or forensic expert until July 18, 2008. In fact, Defendant continued using his computer through the morning of July 18, 2008.

8.      The core evidence of this matter was deliberately destroyed by Defendant through the following acts: the continued usage of the computer even after Defendant was notified on July 11, 2008 of the present litigation; the creation and deletion of files and folders, including Windows registry data, after notice of active litigation; the deletion of Internet history data for much of the time period prior to July 14, 2008; the usage of utilities to further obscure dates and times related to files such as antivirus software; and the usage of the Windows defragmentation utility on July 14, 2008 to make deleted file data evidence unrecoverable. *See* Jones Affidavit, ¶ 3, "Exhibit 3."

9.      More specifically, Defendant deleted approximately 98 file entries following his receipt of the Complaint until as recently as July 18, 2008. *See* Exhibit 3, ¶ 11. Defendant also created 3,900 new file entries on or after July 13, 2008. *See* Exhibit 3, ¶ 11. Until such a time that deleted file data is overwritten by new file data, it is generally recoverable and available for review. *See* Exhibit 3, ¶ 11. Therefore, creating new file entries after deleting files is commonly done by users to destroy evidence of past activities, including the existence or usage of files and to render the deleted data unrecoverable. *See* Exhibit 3, ¶ 11.[1] Remarkably, Defendant testified during his deposition that he did not delete any documents; however, it is clear that Defendant deleted file data from his computer after receiving notification of active litigation. *See* Exhibit 3, ¶ 11; *see* Neergheen Deposition, p. 48:17-21, attached hereto as "Exhibit 4 ."

10.     Furthermore, Defendant's McAfee antivirus program continued to run on Defendant's computer through July 18, 2008. *See* Exhibit 3, ¶ 13. This action obscured the dates and times when file entries were accessed and further destroyed evidence related to dates and times which would exist if not for the usage of the antivirus software. *See* Exhibit 3, ¶ 13. If Defendant

---

[1]  As explained in Ill. Inst. for Cont. Legal Ed., *E-Discovery,* 2006 Ed., Ch. 1.35 "Deleted Data.":

> At the heart of computer forensics is the idea that within the electronic realm of evidence, "delete" does not really mean "delete." Deleting a computer file can be compared to removing a card from a library's card catalog system...When a computer file is deleted, several behind-the-scenes processes occur. For a file allocation table (FAT) based file system, the first character of the file's name is replaced with a special character that tells the computer system that the file has been deleted...Also, the file's mapping of the FAT and its associated sectors of the drive are marked as available to store new data. This available space is now deemed "unallocated space." Until new data, stored in a random fashion on the drive, is written to each and every sector marked as available, portions of that data are recoverable.

would have left his computer alone starting on July 11, 2008, the antivirus software would not have been able to alter time and date metadata for any of the file entries. *See* Exhibit 3, ¶ 13.

11.     Defendant's spoliation of evidence does not end there. On July 17, 2008 Defendant searched Microsoft's support website for information related to deleting file data. *See* Exhibit 3, ¶ 18. Defendant admitted to visiting this website during his deposition. *See* Exhibit 4, p. 145:12-16. A simplified version of the query text entered by Defendant while at Microsoft's support website is included within Table Three in the Jones Affidavit. *See* Exhibit 3, p. 9. Furthermore, "Exhibit B" to the Jones Affidavit shows all the various topics Defendant could choose from when visiting Microsoft's support website, including the deletion of registry keys, the deletion of files and folders, and the deletion of internet files. *See* Exhibit 3, ¶ 22; *see also* Exhibit B to Exhibit 3. Not surprisingly, the information Defendant actively sought on July 17, 2008 regarding the destruction of evidence closely aligns to the evidence destruction found by Jones. *See* Exhibit 3, ¶ 22. Therefore, not only was Defendant's computer still being used on July 17, 2008, but Defendant was using the computer to search for information about how to not only delete data but hide his tracks while rendering the deleted data unrecoverable. And, Defendant was both searching for information on how to delete data and deleting data on July 17, 2008 in direct violation of the temporary restraining order entered on July 16, 2008.

12.     As the Jones Affidavit makes clear, Defendant also purposefully deleted his internet history. Defendant's computer is missing internet history data that would report activity from the time period prior to Defendant's resignation from Mintel until after active litigation was filed. *See* Exhibit 3, ¶ 24. Not only are there gaps in Defendant's daily internet history, but there is no weekly internet history data for Defendant from January 23, 2008 through the date the computer was forensically imaged. *See* Exhibit 3, ¶ 24. Not surprisingly, it is common in misappropriation cases for a user to delete Internet history data, which would reflect notable actions such as the continued access and usage of emailed file data following one's departure from a company and after beginning employment with a competitor. *See* Exhibit 3, ¶ 27.

13.     The Jones Affidavit also contains Windows Registry information related to storage devices that have been connected to Defendant's computer via the Universal Serial Bus ("USB"). *See* Exhibit 3, ¶ 28. On July 17, 2008, Defendant connected two separate devices to his computer. *See* Exhibit 3, ¶ 28. These devices can typically be used to both transfer and/or store file data. *See* Exhibit 3, ¶ 28. Not only did Defendant attach these two separate devices to his computer, but

Defendant then deleted the information that is stored on the devices from Defendant's hard drive. *See* Exhibit 3, ¶ 34.  Given the fact that Defendant deleted the USBSTOR registry report, it is impossible to determine from the forensic computer image the information stored on these devices. *See* Exhibit 3, ¶ 37.  However, this leads to the inescapable conclusion that Defendant attempted to destroy evidence regarding storage locations to which Defendant likely copied and/or stored Mintel file data. *See* Exhibit 3, ¶ 32.  That the USBSTOR file entries report as being updated on the same day that Defendant searched for technical documentation on how to access registry settings and delete data further is hardly an innocent coincidence. *See* Exhibit 3, ¶ 32.

14.     It is also important to note that Mintel has requested within its written discovery that Defendant produce all devices that Defendant connected to his personal computer, for these devices may also contain Mintel's confidential information as well.  Although Defendant responded by stating he would produce all responsive items, Mintel has received no such devices to date.  It is clear that Defendant has connected numerous devices to his computer, which directly contradicts Defendant's testimony that he has only used two such devices. *See* Exhibit 3, ¶ 37; *see also* Exhibit 4, pp. 96:3-97:9.  Given the fact that Defendant deleted the USBSTOR registry report, it is impossible to determine from the forensic image the information stored on these devices. *See* Exhibit 3, ¶ 32.

15.     On July 14, 2008, the Windows defragmentation utility was run on Defendant's computer. *See* Exhibit 3, ¶ 45.  Again, this utility was used well after Defendant was served notice of the present litigation.  The use of the defrag utility after deleting file data is a commonly-employed means of rendering deleted file data forever unrecoverable in the file data's original native format. *See* Exhibit 3, ¶ 45.  Once a deleted file is overwritten with new data, it is generally no longer recoverable or available for review in its original native format. *See* Exhibit 3, ¶ 46. Besides the usage of defrag to destroy evidence, other prefetch file entries report creation and/or being last written on July 17, 2008. *See* Exhibit 3, ¶ 48.  This further file entry creation necessarily overwrites previously unallocated space which contained evidence. *See* Exhibit 3, ¶ 48.  If not for the file creation activities which destroyed evidence, this previously-deleted file data would have been available for review. *See* Exhibit 3, ¶ 48.  Therefore, Defendant destroyed additional evidence by using the defrag utility and creating prefetch file entries.

# ARGUMENT

## I.

### There is Clear and Convincing Evidence That Neergheen Destroyed Vital Evidence and Failed to Comply With the Court's TRO

#### A. Defendant Was Obligated To Preserve All Relevant Evidence As Of July 11, 2008

Any use of Defendant's computer on and after July 11, 2008 without previously creating a forensic image is clearly inconsistent with Defendant's duty to preserve evidence – such duty arising upon Defendant's notification of the litigation in question. This Court has made clear that a formal discovery request is not necessary to trigger the duty to preserve evidence. *Danis v. USN Communs., Inc.*, 2000 U.S. Dist. LEXIS 16900, at * 33 (N.D. Ill. 2000). Instead, the filing of a complaint alerts a party that certain information is relevant and likely to be sought in discovery. *Cohn v. Taco Bell Corp.*, 1995 U.S. Dist. LEXIS 12645, at * 5 (N.D. Ill. 1995).

Therefore, after receiving a copy of the Complaint on July 11, 2008, Defendant was alerted to the fact that the contents of his personal computer would likely be relevant evidence in the legal action against him. Furthermore, after receiving a copy of the Complaint Defendant had a duty not to alter, destroy or modify the contents of his personal computer. The revelation that Defendant did, in fact, engage in a substantial number of computer activities with the sole or main purpose to destroy evidence of the data contained or transferred through that computer indicates that Defendant fully understood the importance of that evidence to the claims in the Complaint.

Even if Defendant pleads ignorance and claims Defendant was not aware of his duty to preserve all relevant evidence, opposing counsel filed an appearance on behalf of Defendant on July 15, 2008. Furthermore, the Temporary Restraining Order was entered on July 16, 2008, which made clear that Defendant was to provide forensic images of all personal computers and refrain from deleting any files related to or taken from Mintel. Therefore, any argument by Defendant that he was unaware of his duty to preserve evidence on or after July 15, 2008 is completely without merit and should be disregarded by the Court.

B. **Defendant's Duty Required the Preservation of His Hard Drives Without Alteration of Any Kind**

The duty to preserve ESI is set forth in the widely cited *Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 217-218; 2003 U.S. Dist. LEXIS 18771 (S.D.N.Y. 2003):

> ...anyone who anticipates being a party...to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary. "While a litigant is under no duty to keep or retain every document in its possession...it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request...The broad contours of the duty to preserve are relatively clear. That duty should certainly extend to any documents or tangible things...made by individuals "likely to have discoverable information that the disclosing party may use to support its claims or defenses."...The duty also extends to information that is relevant to the claims or defenses of *any* party, or which is "relevant to the subject matter involved in the action."...

The Seventh Circuit has instructed likewise in *Danis v. USN Comm., Inc.*, 2000 U.S. Dist. LEXIS 16900 at **96-98 ("The duty to preserve documents in the face of pending litigation is not a passive obligation. Rather, it must be discharged actively.") A party has a duty to preserve evidence, including any relevant evidence over which the party has control and reasonably knew or could reasonably foresee is material to a potential legal action. *China Ocean Shipping Co. v. Simone Metals*, 1999 U.S. Dist. LEXIS 16229, at * 2 (N.D. Ill. 1999); *see also Boyd v. Travelers Ins. Co.*, 166 Ill. 2d 188 (Ill. 1995). This is an objective standard.

Spoliation of evidence occurs when one party destroys evidence relevant to an issue in the case. *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002) (citing *Crabtree v. Natl. Steel Corp.*, 261 F.3d 715, 721 (7th Cir. 2001)). Fault may be evidenced by negligent actions or a flagrant disregard of the duty to preserve potentially relevant evidence. *Diersen v. Walker*, 2003 U.S. Dist. LEXIS 9538, at * 5 (N.D. Ill. 2003). "Once a party is on notice that files or documents in their possession are relevant to pending litigation, the failure to prevent the destruction of relevant documents crosses the line between negligence and bad faith, even where the documents are destroyed according to a routine document retention policy." *Siginton v. CB Richard Ellis*, 2003 U.S. Dist. LEXIS 19128, at *7 (N.D. Ill. 2003).

## C. **Defendant Acted Willfully and Purposefully To Destroy Core Evidence**

Based upon the evidence found by Jones, it is clear that Defendant acted willfully and in bad faith when he continued to alter, modify and destroy evidence after July 11, 2008. Defendant's computer experienced a spike in activity between July 11, 2008 and July 18, 2008, which resulted in the alteration, modification and/or destruction of thousands of potentially relevant files and their metadata. Particularly troubling is Defendant's continued use of the computer after Defendant's counsel filed an appearance on July 15, 2008 and his installation of thousands of other files with no other discernible purpose than to overwrite his drive memory and render the prior deleted files unrecoverable.

Furthermore, Defendant violated the express terms of the temporary restraining order by deleting and defragmenting his computer after the entry of the order on July 16, 2008. "Defragmentation is a method to cover up deletions of data by eliminating all traces of deleted data." *RKI, Inc. v. Grimes*, 177 F. Sup. 2d 859, 875 (N.D. Ill. 2001).

In fact, it appears that Defendant worked until 10:40 p.m. on July 17, 2008 in order to complete as many file transfers, alterations and deletions as possible before relinquishing control of the computer. Defendant conceded during his deposition that no other individuals, excluding his attorneys, had access to his computer on or after July 11, 2008. *See* Exhibit 2, pp. 93:22-94:4. Therefore, all activity that occurred on Defendant's computer was initiated and completed by Defendant himself.

The courts generally have recognized that "[e]-mails and other electronic documents are discoverable as are deleted documents still located in a computer's hard drive." *Kucala Enterprises, Ltd. v. Auto Wax Co., Inc.*, 2003 U.S. Dist. LEXIS 8833, *15, No. 02 C 1403 (N.D. Ill. 2003) By taking the further, willful steps of not only deleting ESI but also defragging the drive, wiping the registries, obscuring the use of external USB devices, Defendant engaged in a double dose of spoliation—not only altering his drives by deleting files, but depriving Plaintiff of discovering what files had been deleted and their contents.

Defendant's actions were clearly directed toward eliminating the available objective evidence of his misappropriation, transportation leaving only his own empirically unreliable testimony. Yet, despite Defendant's deposition testimony that he has not used any of Mintel's confidential information, his behavior from July 11, 2008 until July 18, 2008 speaks to the contrary. Defendant has clearly demonstrated a lack of candor and, therefore, he should be barred from so

testifying at time of trial or in dispositive motions. In other words, Defendant cannot "be trusted to act with the necessary sensitivity and good faith under the circumstances in which the only practical verification that he was not using plaintiff's secrets would be [defendant's] word to that effect." *Pepsico, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995).

As a result of Defendant's spoliation of evidence, and the altered, modified and deleted metadata on Defendant's computer, it is impossible for Mintel or the trier of fact to conduct a proper trial on the merits. In fact, unknown numbers of files have been deliberately deleted and overwritten and, consequently, are no longer recoverable. Even more concerning is Defendant's blatant and purposeful disregard of the Court's temporary restraining order, which required Defendant to refrain from deleting any files from the computer. Mintel acted promptly to specifically address this potential spoliation because it anticipated exactly this sort of behavior from Defendant and understood that Defendant's computer drives would be the key evidence in this action.

Clearly, Defendant is not a trustworthy individual. Therefore, in order for Mintel to prove whether Defendant has passed along Mintel's confidential information to Datamonitor or is using the information to the detriment of Mintel, Mintel needed to have full access to all ESI storage and transfer devices (hard drives and external drives). The prospect of getting authentic and un-spoliated internal and external USB drives is now virtually nil.

Furthermore, Mintel's ability to proceed with this matter is materially impaired. *Metropolitan Opera Association, Inc. v. Local 100, Hotel Employees and Restaurant Employees Int'l. Union*, 212 F.R.D. 178, 229-230, 2003 U.S. Dist. LEXIS 1077 (S.D.N.Y. 2003) ("All of these obstructions prevented the Met from adequately planning and preparing its case; it was forced to proceed with depositions before relevant documents were produced, it was no doubt hampered in opposing summary judgment and, ultimately, in preparing for trial.") Consequently, Mintel's right to a trial on the merits is irreparably damaged—it has lost the best and most objective evidence of Defendant's wrongdoing and any later production of his drives would be tainted with the expectation that they were scrubbed or inauthentic. Moreover, Mintel is impaired in conducting this litigation in a planned, knowledgeable fashion because Defendant knowingly deprived it of critical information up front.

## II.
## Rule 37 Remedies

The purpose of discovery rules is to produce evidence for speedy determination of trial. Robison v Transamerica Ins. Co. 368 F2d 37, 10 FR Serv 2d 1038 (10th Cir. 1966). The purpose of Rule 37 is to provide mechanism by which Rules 26 to 36 can be made effective. Fisher v Marubeni Cotton Corp. 526 F2d 1338, 21 FR Serv 2d 1148 (8th Cir. 1975). A court need not have issued an order barring evidence destruction for sanctions to be imposed. *Lawrence v. Harley-Davidson Motor Co.*, 1999 U.S. Dist. LEXIS 12908, *5, No.99 C 2609 at *6 (N.D. Ill. 1999).

In determining whether sanctions are appropriate for spoliation, the court is guided by whether (1) there was a duty to preserve the specific documents; (2) that duty or obligation was breached; (3) there was willfulness, bad faith, or fault; (4) Plaintiff was prejudiced; and (5) an appropriate sanction can ameliorate the prejudice from the breach. *Wells v. Berger, Newmark & Fenchel, P.C.*, 2008 U.S. Dist. LEXIS 21608, *18, No. 07 C 3061 (N.D. Ill. 2008)

Sanctions [under F.R.C.P. 37] for spoliation of evidence include awarding reasonable expenses, attorney fees, barring evidence or arguments, permitting adverse inferences, and dismissing claims. *Krumwiede v. Brighton Assoc., L.L.C.*, 2006 U.S. Dist. LEXIS 31669, at **24-25, No. 05 C 3003 (N.D. Ill. 2006). Where the defendant shows that plaintiff is responsible for spoliation of evidence, the court must determine the degree of prejudice to the defendant caused by the spoliation before it fashions a remedy. *Lekkas v. Mitsubishi Motors Corp.*, 2000 U.S. Dist. LEXIS 12016, **10-11, No. 97 C 6070 (N.D. Ill. 2000) ("The test for prejudice is whether there is a reasonable possibility, based on concrete evidence, that access to the evidence which was destroyed or altered, and which was not otherwise obtainable, would produce evidence favorable to the objecting party." [citation omitted] The court's inquiry into prejudice in the spoliation context is "unavoidably imperfect, inasmuch as, the absence of the destroyed evidence, [the court] can only venture guesses with varying degrees of confidence as to what that missing evidence may have revealed." )

Plaintiff's inability to determine with precision the content of the destroyed evidence does not hamper its claim of prejudice. *Leon v. IDX Systems Corp.*, 464 F.3d 951, 959, 2006 U.S. Dist. LEXIS 23820 (9th Cir. 2006) ("Moreover, because 'the relevance of…[destroyed] documents cannot be clearly ascertained because the documents no longer exist,' a party 'can hardly assert any presumption of irrelevance as to the destroyed documents.'")

If the court determines that the plaintiff has destroyed evidence and that the destruction was prejudicial to the defendant in some way, the court then has broad discretion in fashioning a remedy

for the spoliation considering the prophylactic, punitive and remedial values of the proposed remedy. *Lekkas v. Mitsubishi Motors Corp.*, 2000 U.S. Dist. LEXIS 12016 at *13. "The sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *Id.* at *13.

In addition, the court is allowed to factor deterrence value into the sanction. *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S. Ct. 2778 (1976) ("But here, as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.")

III.
## Neergheen's Spoliation Deserve The Most Extreme Sanctions

A. **Default Judgment or Evidentiary Sanctions**

Striking of Defendant's answer or portions thereof, dismissing his counterclaim and entry of default is justified if there is at least some finding of contumacious conduct, dilatory tactics, the failure of less drastic sanctions, bad faith, willfulness, or fault. *China Ocean Shipping Co. v. Simone Metals Inc.*, 1999 U.S. Lexis 16264, *9, No. 97 C 2694 (N.D. Ill. 1999). Prior, less drastic sanctions, however, are not a prerequisite for entry of default or dismissal. Id., at *9. A default judgment is an appropriate sanction if the sanctioned party acted with willfulness, bad faith or fault. The Seventh Circuit finds 'fault' in the context of sanctions if the violative conduct is unreasonable—it does not rely on the party's subjective motivation for the violative action. "Fault" could also entail "gross negligence" or "a flagrant disregard" of the duty to "preserve and monitor the condition of material evidence." *Kucala Enterprises, Ltd. v. Auto Wax Co., Inc.*, 2003 U.S. Dist. LEXIS 8833, *9, No. 02 C 1403 (N.D. Ill. 2003). See also, *Cohn v. Taco Bell Corp.*, 1995 U.S. Dist. LEXIS 12645, *23, No. 92 C 5852 (N.D. Ill. 1995).

The Seventh Circuit has defined these measures of culpability in *Marrocco v. General Motors Corp.*, 966 F.2d 220, 224, 1992 U.S. App. LEXIS 13328 (7th Cir. 1992) ("Bad faith" for instance, is characterized by conduct which is either intentional or in reckless disregard of a party's obligations to comply with a court order. "Fault" by contrast doesn't speak to the noncomplying

party's disposition at all, but rather only describes the reasonableness of the conduct—or lack thereof—which eventually culminated in the violation of the court's TRO.)

"A party's destruction of evidence qualifies as willful spoliation if the party 'has some notice that the documents were *potentially* relevant to the litigation before they were destroyed." *Leon v. IDX Systems Corp.*, 464 F.3d at 959. A party demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order. Id. at 961.

Defendant's spoliation undertaken after the issuance of the TRO was simply a continuation of his wrongful behavior that began when he first decided to take plaintiffs property. He has shown utter contempt for legal process and the good faith necessary in preserving evidence and complying with court orders designed to obtain a fair trial on the merits. His behavior at all times was willful and his actions after the TRO (and in light of the Agreed Order) was clearly contumacious. He has, therefore, disqualified himself from obtaining a trial on the merits and a default judgment should be entered now.

Falsehoods uttered by defendants as to simple but material factual matters also constitute willfulness and bad faith requiring severe sanctions. *Metropolitan Opera Association, Inc. v. Local 100, Hotel Employees and Restaurant Employees Int'l. Union*, 212 F.R.D. 178, 225, 2003 U.S. Dist. LEXIS 1077 (S.D.N.Y. 2003) In this case, Neergheen lied with regard to the number of external USB devices he had used on his computer. See Exhibit 4, pp. 96:3-97:9. ("Q: How many flash drives do you currently own? A: Two; Q: Did you previously own more? A: No.") Yet, Plaintiff's expert found records of at least five separate data storage devices having been used, four of which since July 8, 2008.See, Exhibit 3, ¶ 38. Neergheen's lie is clearly an attempt to hide the very vehicles by which he made off with Plaintiff's property—no lie would be a better justification for termination of his claims and entry of default against him.

Neergheen lied, under oath, regarding laptop usage after being notified of the lawsuit. See, Exhibit 4, p.48:2-11. ("Q: Did you stop using [your laptop upon receiving the summons and complaint?...A: Yes….Q: Did you keep using your computer? A: No. No.") To the contrary, Neergheen's activity on the laptop spiked after service of the Complaint and continued until hours before the laptop was turned over in litigation. See, Exhibit 3, inter alia, ¶¶ 11 and 45. This is perjury with regard to spoliation.

Neergheen also testified that he did not delete any documents from his computer from July 11, 2008 until he surrendered it. See, Exhibit A, pp. 48:17-21. (Q:Did you delete any documents

from your computer from the time you received the complaint until the time you turned it over to counsel? A: No.") Yet, 98 files were in fact deleted by him and him alone. This again was a calculated lie. See, Exhibit 3, ¶¶ 11 and 45.

It is further apparent that he has dishonestly minimized his understanding of computers and the processes by which data can be obtained, transferred, deleted and the trace of their deletion destroyed. These statements were again made under oath and proven to be, at best, highly misleading. After first testifying that only he, Neergheen, had access to his computer prior to turning it over to counsel (See, Exhibit 4, p. 144:16-145: 11), made the following disingenuous statements:

Q: Do you know what a defrag program is?
A: No.
Q: Are you aware that a defrag program was run on our computer on July 14th?
A: I don't know.
Q: Do you have any explanation as to why it would have been run on your computer on July 14th?
A: I don't know.
Q: Would it surprise you if a defrag program had been run on your computer on July 14th?
A: I don't know what a defrag program is....
Q: Your ware that once you had notice of this lawsuit you weren't supposed to be using your computer?
A:...I don't know.
Q: Nobody ever informed you about a duty to preserve evidence in this case?
A: I don't know.

Defragging drives does not occur by happenstance. Anyone who has done it know that the program requires several affirmative steps in order to run. Nothing makes the need and justice of terminating sanctions as clear as this calculated, intentional perjury. By hiding USB devices, deleting files and wiping drives, Defendant has rigged the evidence so that his testimony under oath becomes the primary evidence regarding what he did with Plaintiff's property. Yet, he is plainly a perjurer. The trier of fact should not be required to tip toe through the perjury to find whatever nuggets of truth might remain. Mr. Neergheen has jettisoned his right to give testimony and for a trial on the merits.

Additionally, the Agreed Order was a representation to Plaintiff and the Court that Defendant would preserve his hard drives so that the forensic copy he agreed to provide would be a true and correct copy as of July 11, 2008, when Defendant had first notice of the lawsuit and became obligated to preserve that critical piece of evidence. Providing instead a forensic copy of a scrubbed and sanitized hard drive is nothing less than a fraud upon the Court and the Plaintiff.

With facts startlingly similar to those found here, the court in *Krumwiede v. Brighton Assoc., L.L.C.* found that:

> Krumwiede...continued to delete, alter, modify, and access thousands of files after being put on notice that the contents of the laptop computer were the subject of litigation. The deletion, alteration, and modification of these documents continued at least until 7 p.m. the night before Krumwiede turned Brighton's laptop computer over to Forensicon...Clear and convincing evidence establishes that Krumwiede acted willfully and in bad faith when he continued to alter, modify, and destroy evidence after August 25, 2005...Despite this duty to preserve evidence, Brighton's laptop experienced a spike in activity between August 25, 2005 and September 16, 2005, that resulted in the alteration, modification, or destruction of thousands of potentially relevant files and their metadata. Particularly troubling is the tremendous  increase in activity immediately following Krumwiede's receipt of the August 25, 2005 letter (especially from August 25 to August 28, 2005) and the September 15, 2005 order. In fact, it appears that Krumwiede worked late on September 15, 2005, in order to complete as many file transfers, alterations, and modifications as possible before relinquishing control of the laptop computer on September 16, 2005...
>
> For the reasons stated above, the Court enters default judgment in favor of Brighton on Counts I, II, III, and IV of its counterclaim against Krumwiede...Furthermore, Brighton is awarded its reasonable costs and fees, including attorneys' fees and the fees billed to Brighton by Forensicon.

*Krumwiede v. Brighton Associates, LLC*, Id. at ** 23, 26-27, 33.

The same exact result should occur here. All of the factors set forth above as justification for the imposition of a default judgment, or in the alternative, severe evidentiary sanctions, are present in this case. Like Krumwiede, Neergheen's computer showed a spike of activity immediately following the service of the Complaint upon him. Neergheen embarked on a complex, multi-step scheme to ensure not only that relevant files of Mintel's confidential ESI could not be returned or their non-dissemination ensured, he consciously acted to destroy the evidence that he had done so. Because his hard drives were the core evidence of his misappropriation (and of the spoliation itself), a trial on the merits is no longer possible. Mintel is irreparably damaged in its ability to not only prove its claims but to properly and fairly proceed with the preparation of its case including the pursuit of other evidence.

B. **Monetary Sanctions**

By requiring plaintiffs to file motions to compel in order to obtain documents that should have been voluntarily produced, plaintiff has engaged in conduct sanctionable under Rule 37(a)(4)(A). "That provision allows the 'party who brought a motion to compel to recover the 'reasonable' expenses incurred in making the motion, including attorneys' fees if the court grants the motion.'"*Illinois Tool Works, Inc.v. Metro Mark Products, Ltd.*, 43 F. Supp.2d 951, 960, 1999 U.S. Dist. LEXIS 6579 (N.D. Ill. 1999).

## CONCLUSION

WHEREFORE Plaintiff Mintel International Group, Ltd. respectfully requests that this Court grant its Motion to Show Cause and enter a default judgment against the Defendant. In the alternative, the court should impose severe evidentiary sanctions against Defendant, insofar as he shall not be permitted to testify that he did not improperly access, copy and transfer to Datamonitor and/or parties unknown. In addition to either of those sanctions, Mintel requests monetary sanctions amounting to all of its costs and attorney's fees generated with regard to its pursuit of the TRO and the instant motion. Mintel further requests any other such relief that the Court may deem just and proper.

Respectfully submitted,

MINTEL INTENTIONAL GROUP, LTD.


By:  /s/ Joseph R. Marconi
       One of Their Attorneys

Joseph R. Marconi
Katherine J. Pronk
JOHNSON & BELL, LTD.
Attorneys for Plaintiff
33 W. Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 372-0770
Doc. No.: 1920000

## CERTIFICATE OF SERVICE

The undersigned, an attorney of record, upon oath states that a true and complete copy of the foregoing **Motion for Rule to Show Cause, For Discovery Sanctions and for Sanctions Because of Evidence Spoliation** was filed and served electronically on the 29th day of August 2008.

_/s/ Joseph R. Marconi_
Its Attorneys

16

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MINTEL INTERNATIONAL GROUP,            )
LTD., a United Kingdom corporation,    )
                                       )
        Plaintiff,                     )
                                       )
    v.                                 )        CASE NO.: 08-CV-3939
                                       )
MEESHAM NEERGHEEN, an individual,      )
                                       )
        Defendant.                     )

## MEMORANDUM OPINION AND ORDER

On July 11, 2008, Plaintiff Mintel International Group, Ltd. ("Mintel"), filed a seven-count complaint against Defendant Meesham Neergheen ("Neergheen") alleging a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*, a violation of a non-compete agreement, a breach of Neergheen's employment contract with Mintel, and misappropriation of trade secrets pursuant to the Illinois Trade Secret Act ("ITSA"), 765 ILCS 1065/1, *et seq.* Plaintiff seeks injunctive relief, restitution, and compensatory and punitive damages. Also on July 11, 2008, Plaintiff filed an emergency motion for a temporary restraining order and preliminary injunction.

On July 15, 2008, the Court conducted a hearing on Plaintiff's request for a temporary restraining order ("TRO"). At the hearing, Defendant Neergheen was represented by counsel who, despite not having sufficient time to file a written response to the motion for a TRO, articulated Defendant's position with respect to the relief requested by Plaintiff. Having considered the relevant legal standards governing TROs, as well as Plaintiff's motion, memorandum, and supporting materials and defense counsel's comments at the hearing, the Court grants in part and denies in part Plaintiff's emergency motion.

EXHIBIT

tabbies

1

## I.    Background

Mintel is headquartered in London, England and provides consumer, product, and market research to its clients around the world. Cmplt., ¶¶ 2, 6. Neergheen worked for Mintel's marketing department from June 30, 1997 until April 30, 2008. During that time, Neergheen had access to client and marketing files and materials. On or about June 24, 1998, Neergheen signed a Contract of Employment with Mintel. Carr Affdt., ¶ 8. The Contract of Employment contained a clause stating that Neergheen could not directly or indirectly compete with Mintel for the first twelve months after the end of Neergheen's employment with Mintel. *Id.* The Contract of Employment also stated that Neergheen must refrain from using or disclosing any of Mintel's trade secrets and other proprietary or confidential information. *Id.*

In August 2003, Neergheen signed an Employee Non-Compete/Non-Solicitation Agreement ("Non-Compete Agreement"). Carr Affdt., ¶ 9. The Non-Compete Agreement stated that Neergheen agreed not to compete with the business of Mintel or any of its subsidiaries for a period of one year. *Id.* The Non-Compete Agreement also included a confidentiality provision that stated that Neergheen was not to disclose any information of a confidential or proprietary nature. *Id.*

Mintel avers that it has a secure computer network and secure server system that is configured and managed to prevent unauthorized access. Thomson Affdt., ¶ 3. Mintel also states that as a result of Neergheen's employment and position with Mintel, he had access to such confidential information and became familiar with Mintel's computer system. *Id.*, ¶ 5.

On or about April 23, 2008, Neergheen provided written notice to Mintel that he would be resigning from Mintel effective April 30, 2008. Carr Affdt., ¶ 10. After receiving Neergheen's written notification, Mintel began searching and monitoring Neergheen's work computer. Thomson Affdt., ¶ 6. Mintel subsequently discovered that Neergheen had copied, e-mailed and/or printed certain confidential and proprietary files – including client lists, vendor lists, and strategic

documents – from his work computer on April 29, 2008, the day before his departure from Mintel. Thomson Affdt., ¶ 7.

In its complaint, Mintel alleged that Neergheen commenced employment with Datamonitor, Inc., a competitor of Mintel, immediately after Neergheen's resignation from Mintel. Cmplt., ¶ 17; Carr Affdt., ¶ 14. Based on additional information provided during and after the hearing on July 15, 2008, it appears that Neergheen started his new job at the end of May and that he was told not to come to work on July 14 or 15 or until the Court issues an order on the TRO.

## II.    Discussion

A party seeking a temporary restraining order must demonstrate as a threshold matter that (1) its case has some likelihood of succeeding on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if preliminary relief is denied. *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If the moving party meets this burden, the court weighs these factors along with any irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied. *Id.* Finally, the court considers the public interest served by granting or denying the injunction, including the effects of the injunction on non-parties. *Id.*; see also *Credit Suisse First Boston, LLC v. Vender*, 2004 WL 2806191, at *1 (N.D. Ill. December 3, 2004).

### A.    Likelihood of Success

The party seeking the TRO or preliminary injunction must demonstrate "some likelihood of succeeding on the merits." *Abbott Laboratories*, 971 F.2d at 11; see also *Frullati Franchise Sys., Inc. v. Dana Areece & Co., Inc.*, 2001 WL 743427, at *2 (N.D. Ill. June 28, 2001) (stating that for purposes of a TRO or preliminary injunction, a plaintiff need only establish a "trivial chance of succeeding on the merits") (citing *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 361 (7th Cir. 1993)).

3

*1.     Violation of the Computer Fraud and Abuse Act*

The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, provides for the entry of civil injunctive relief as well as the recovery of money damages for a violation of its provisions. See 18 U.S.C. § 1030(g) (providing that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief"). Courts have upheld the use of the CFAA in granting injunctive relief against former employees and their new employers who have attempted to obtain a competitive edge by removing information from a former employer's computers. See, *e.g.*, *YourNetDating, LLC v. Mitchell*, 88 F. Supp. 2d 870, 872 (N.D. Ill. 2000) (granting TRO under CFAA claim against former employee); see also *Charles Schwab & Co., Inc. v. Carter*, 2005 WL 351929, at *3 (N.D. Ill. Feb. 11, 2005) (denying motion to dismiss claim under CFAA); *George S. May Int'l Co. v. Hostetler*, 2004 WL 1197395, at *3 (N.D. Ill. May 28, 2004).

The day before Neergheen's resignation, Neergheen copied, e-mailed to his personal e-mail address and/or printed information from his work computer. See Thomson Affdt., ¶ 7. According to Mintel's supporting affidavits, those files contained confidential and proprietary information regarding client accounts and budgets, potential client lists, vendor lists, marketing strategies and overall objectives, and individual client cost data. Carr Affdt., ¶ 13. Neergheen's actions in e-mailing such information to his personal e-mail address in the days leading up to his resignation could be found to have "exceeded authorized access" as that term is defined in 18 U.S.C. § 1030(e)(6). Because Mintel's allegations, if proven, appear to be sufficient to give rise to liability for a violation of the CFAA, the Court finds that Plaintiff has demonstrated some likelihood of success on the merits of its CFAA claim. See *YourNetDating, LLC*, 88 F. Supp. 2d at 872.

4

    2.    *Violation of the Illinois Trade Secret Act*

The Illinois Trade Secret Act, 765 ILCS 1065/1, *et seq.*, defines a "trade secret" as information that:

    (i)    is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

    (ii)    is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

See 765 ILCS 1065/2(d). The ITSA defines "misappropriation" in several ways. For example, one can misappropriate trade secrets by "acquiring" them through improper means such as the breach of a confidential relationship. 765 ILCS 1065(b)(1).[1] Misappropriation also occurs when a defendant breaches a duty owed to protect the secrecy of its information or induces another party to do so. 765 ILCS 1065(b)(2)(B).

Mintel alleges that the various files copied, e-mailed and/or printed by Neergheen in the days leading up to his resignation contained highly sensitive information not disseminated into the public domain. Carr Affdt., ¶ 13. As with its CFAA claim, if Mintel is able to prove its allegations, then Neergheen may well have violated the ITSA. At this stage, that is sufficient to meet the threshold requirement of showing some likelihood of success on the merits.

    3.    *Violation of restrictive covenants within Non-Compete*
            *Agreement and Contract of Employment*

Based on the Court's preliminary research, it appears that Illinois courts disfavor and closely scrutinize restrictive covenants because they are "repugnant to the public policy encouraging an open and competitive marketplace." *Roberge v. Qualiteck Int'l, Inc.*, 2002 WL

---

[1] As defined in the Act, "improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means. 765 ILCS 1065(a).

109360, at *4 (N.D. Ill. Jan. 28, 2002) (citing *Bishop v. Lakeland Animal Hosp.,* 268 Ill.App.3d 114, 644 N.E.2d 33, 36 (Ill. App. Ct. 1994)). The basic test applied by Illinois courts in determining the enforceability of a restrictive covenant is "whether the terms of the agreement are reasonable and necessary to protect a legitimate business interest of the employer." *Outsource Intern., Inc. v. Barton,* 192 F.3d 662, 666 (7th Cir. 1999) (quoting *Office Mates 5, North Shore, Inc. v. Hazen,* 234 Ill. App. 3d 557, 599 N.E.2d 1072, 1080 (1992)). This determination "necessarily turns on the facts and circumstances of each case." *Id.* Illinois law requires that in order be enforceable, a covenant not to compete must secure a "protectable interest" of the employer. *Curtis 1000, Inc. v. Suess,* 24 F.3d 941, 944 (7th Cir. 1994). Illinois courts recognize at least two such protectable interests: (1) where the customer relationships are near-permanent and but for the employee's association with the employer the employee would not have had contact with the customers; and (2) where the former employee acquired trade secrets or other confidential information through his employment and subsequently tried to use it for his own benefit. *Outsource Int'l, Inc. v. Barton,* 192 F.3d 662, 666 (7th Cir. 1999).

Restrictive covenants should be narrowly tailored so as only to protect the protectable interest of the employer. *Id.* at 669; *Lawrence and Allen, Inc. v. Cambridge Human Resource Group, Inc.,* 292 Ill.App.3d 131, 138, 685 N.E.2d 434, 441 (Ill. App. Ct. 1997). In particular, the time and geographic limitations must be reasonably necessary to protect a legitimate business interest of the employer. *Roberge,* 2002 WL 109360, at *4. A restrictive covenant that does not contain a geographic limitation may still be enforceable if the covenant instead includes an "activity restraint." *Id.* at *6. The most common type of activity restraint is a prohibition against soliciting the former employer's customers. *Eichman v. Nat'l Hosp. and Health Care Servs..,  Inc.,* 308 Ill.App.3d 337, 719 N.E.2d 1141, 1147 (Ill. App. Ct. 1999).

6

Neergheen commenced employment with Mintel in its London office on or about June 30,

1997. Carr Affdt., ¶ 6. As a condition of his continued employment, Neergheen signed and

executed a United Kingdom Contract of Employment with Mintel on or about June 24, 1998. Carr

Affdt., ¶ 8. The Contract of Employment included the following restrictive covenant:

> You will not for the first twelve months at the end of your employment with us,
> either on your own account or on behalf of any other legal person and in competition
> with the Company, or any subsidiary directly or indirectly engage in, or be
> connected with, trade or business carried on by us or any of our associates at the end
> of your employment. … You will not, for the first twelve months after the end of
> your employment with us, solicit away from us or our associates any person who is
> and was, when your employment ended, employed by us or an associate as a
> director, senior manager or sales person for whom you were responsible, or who was
> a member of any department/project/team in which you worked during the last
> twelve months of your employment.

Cmplt., ¶ 13.

On or about August 1, 2003, Neergheen transferred to Mintel's Chicago office. Carr Affdt.,

¶ 6. As a condition of his continued employment with Mintel in Chicago, Neergheen agreed to and

signed an Employee Non-Compete/Non-Solicitation Agreement ("Non-Compete Agreement") on

August 4, 2003. Carr Affdt., ¶ 9. The Non-Compete Agreement signed by Neergheen stated as

follows:

> The undersigned Employee hereby agrees not to compete, either directly or
> indirectly, with the business of Mintel or any of its subsidiaries, branches or
> divisions, at any location worldwide at any time during the Employee's term of
> employment, and for a period of one (1) year following his termination of
> employment with Mintel, regardless of the reason or cause for such termination.

Cmplt., ¶ 10.

At this stage, based on the record before the Court, it appears that Mintel has a strong

likelihood of success on its claim that Neergheen violated at least some of the terms of his non-

compete agreement and employment contract. However, in order for the Court to uphold the

provisions at issue, those provisions must be enforceable under Illinois law. Although Mintel

asserts that these restrictive covenants are both reasonable as to time and geography, the Court does not have before it at this early stage of the case either the factual record or the legal support grounded in Illinois cases to be convinced that every provision that Mintel seeks to enforce ultimately can be sustained as a matter of law. Among other things, the Court lacks sufficient information concerning (1) the circumstances of Defendant's departure from Mintel; (2) the circumstances of Defendant's hiring by Datamonitor; and (3) Defendant's new position and responsibilities at Datamonitor.

Despite the limited record, the Court concludes that Mintel has "some" likelihood of successfully demonstrating that some, if not all, provisions of its restrictive covenants are reasonable under the law of Illinois. The Court further finds that Plaintiff has satisfied its burden of demonstrating "some likelihood of succeeding on the merits" of its claim that Neergheen violated at least some, if not all, of the restrictive covenants in the non-compete agreement and his employment contract.

### B.    Adequate Remedy at Law and Irreparable Harm

The other two threshold elements that Mintel must prove to support the issuance of a TRO or a preliminary injunction are that it (1) has no adequate remedy at law and (2) will suffer irreparable harm if the injunction is not issued. These two requirements – irreparable harm and no adequate remedy at law – tend to merge. See *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). "The question is then whether the plaintiff will be made whole if he prevails on the merits and is awarded damages." *Id.* An injury is "irreparable" when it is of such a nature that the injured party cannot be adequately compensated in damages or when damages cannot be measured by any pecuniary standard. *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997); see also *Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) ("showing injury to

goodwill can constitute irreparable harm that is not compensable by an award of money damages").

Here, Mintel contends that it will be unable to repair the damage done to its business relations with its existing customers and will lose the competitive advantage that it has worked to establish. Carr Affdt., ¶ 16. The loss of clients and sales and the continuing threat of further loss due to the distribution of Mintel's client lists and marketing data are sufficient to constitute irreparable injury. See *Meridian Mut. Ins. Co.*, 128 F.3d at 1120; see also *Illinois Sporting Goods Assoc. v. County of Cook*, 845 F. Supp. 582, 585 (N.D. Ill. 1994) (finding irreparable harm because of threat to the existence of plaintiff's business).

Moreover, money damages likely would not be an adequate remedy in the present case. First, Mintel could face the threat of lost sales and clients if Neergheen does use the information he removed from Mintel's computer system prior to leaving his employment. Second, it is difficult, at this time, to ascertain with any certainty the degree of financial loss Mintel may suffer by virtue of Neergheen's conduct. It is well recognized that in circumstances like the present, irreparable harm includes the impossibility of ascertaining with any accuracy the extent of the loss. It is also difficult to determine at this time the extent to which Mintel's confidential information could (or would) be utilized by Neergheen and Datamonitor. Given these circumstances, the Court finds that Plaintiff has demonstrated that money damages would be an inadequate remedy, at least for the duration of the TRO.

**C.    Balancing the Harms and Public Interest**

Balancing the irreparable harm to the moving party if an injunction is not entered against the harm to the non-moving party if an injunction is granted requires the court to use a "sliding-scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *In re Aimster Copyright Litigation*, 252 F.

9

Supp. 2d 634, 648 (N.D. Ill. 2002). Most of the injunctive relief sought by Mintel relates to the confidential information that Neergheen is alleged to have removed from Mintel's computers. Granting the requested relief to that extent only would prohibit Neergheen from using material that it appears he should not have taken in the first place. Therefore, any harm that he may suffer for the brief duration of the TRO would be in large part a consequence of his own conduct in the days leading up to his departure from Mintel.

The other injunctive relief that Mintel seeks pertains to the non-solicitation and non-compete provisions of Neergheen's employment agreements. As to the former, the Court finds that the balance of the harms weighs in favor of granting the requested relief. However, at this stage of the case and based on the current record, the Court cannot conclude that the balance of harms militates in favor of entering temporary injunctive relief on the non-compete provisions. Nor can the Court say with any degree of confidence that Mintel has a likelihood of success with respect to those provisions. In reaching that conclusion, the Court is guided by the settled propositions that a TRO is an extraordinary remedy and that it is Plaintiff's burden to show a clear entitlement to relief. Given those propositions, the Court cannot conclude that Defendant should be enjoined from working in his new position, at least during the short time period between the entry of the TRO and the hearing date on the motion for preliminary injunction. See *Credit Suisse First Boston, LLC v. Vender*, 2004 WL 2806191, at *4 (N.D. Ill. December 3, 2004). That conclusion in no way prejudges the Court's ultimate ruling on the enforceability of the non-compete provisions once the Court has a more complete factual record and the benefit of additional briefing from both parties.

**D.    Public Interest**

Finally, the Court concludes that the public interest cuts both ways in this case. On the one hand, the public has a significant interest in enforcing contracts and preventing violations of

statutes. Yet, as noted above, there is a countervailing interest in an open and competitive marketplace and in enforcing only reasonable terms of non-compete agreements. At this stage of the case, the Court views these competing public interest considerations to be in equipoise.

## III.    Conclusion

Based on the foregoing, the Court grants in part and denies in part Plaintiff's emergency motion for a temporary restraining order and preliminary injunction and orders as follows:

1.    Based upon the pleadings and affidavits filed by Plaintiff and the arguments of counsel in open court, the Court finds that Plaintiff has sustained its burden and demonstrated some likelihood of success on the merits of its claims. The Court also finds that Plaintiff likely does not possess an adequate remedy at law and will suffer irreparable harm should a temporary restraining order not be issued. Finally, the balance of harms and public interest also are served by the issuance of a temporary restraining order as to certain of Plaintiff's requests as identified above.

2.    Pursuant to Federal Rule of Civil Procedure 65(b), a ten (10) day temporary restraining order, commencing at 2:30 p.m. on July 16, 2008 and expiring at 2:30 p.m. on July 30, 2008, is entered upon the following terms and conditions:

A.    Defendant, his agents, servants, employees, officers, attorneys, successors and assigns, and all persons, firms, and corporations acting in connection or participation with him or on his behalf, are enjoined from using, referencing, evaluating, or copying all originals and copies of information or documents misappropriated from Mintel in hard copy or electronically stored;

B.    Defendant, his agents, servants, employees, officers, attorneys, successors and assigns, and all persons, firms, and corporations acting in connection or participation with him or on his behalf, are enjoined from revealing or disclosing in any manner information and documents misappropriated from Mintel in hard copy or electronically stored;

11

C.     Defendant is required to return to Mintel all copied, printed, and/or downloaded files, materials, and information taken from Mintel;[2]

D.     Defendant is required to produce forensic copies of all personal desktop and/or laptop computers;

E.     Defendant, his agents, servants, employees, officers, attorneys, successors and assigns, and all persons, firms, and corporations acting in connection or participation with him or on his behalf, are prohibited from deleting any files from Defendant's personal desktop and/or laptop computer related to or taken from Mintel;

F.     Defendant is prohibited from contacting or soliciting any Mintel customer or client that Defendant had contact with during the last twelve (12) months of his respective employments with Mintel;

G.     Defendant is prohibited from soliciting or contacting any Mintel employee for purposes of working at Datamonitor or any other competitor of Mintel.

3.     Plaintiff's request for expedited discovery is granted. The parties may commence discovery at once. Written discovery responses are due within seven (7) days of service. Defendant shall appear for his deposition within ten (10) days.

4.     This matter is set for a preliminary injunction hearing on Monday, August 4, 2008 at 10:30 a.m. in Room 1919. Further details on briefing and other scheduling matters are addressed in a separate minute order.

Dated: July 16, 2008

_____
Robert M. Dow, Jr.
United States District Judge

---

[2] As discussed at the July 15 hearing, counsel for Defendant may keep a copy of these materials for purposes of this litigation only.

12

*MHN*

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MINTEL INTERNATIONAL GROUP,      )
LTD., a United Kingdom corporation,      )
     )
         Plaintiff,      )     Case No.: 08CV3939
     )
v.      )     Judge Robert Dow, Jr.
     )
MEESHAM NEERGHEEN, an individual,      )
     )
         Defendant.      )
     )

### AGREED ORDER

This cause having been heard before the Court during the hearing taking place Thursday

July 24, 2008, the parties seeking clarification of the terms of the temporary restraining order

entered by the Court on July 16, 2008, IT IS HEREBY ORDERED:

     1.      Per agreement of the parties, the temporary restraining order entered by the Court
on July 16, 2008 is hereby extended until the date the Court renders a ruling following the
preliminary injunction hearing.

     2.      The preliminary injunction hearing currently scheduled for August 4, 2008 is
hereby continued until September 4, 2008 at 1:30 p.m. Accordingly, Plaintiff's supplemental
brief and Defendant's initial brief are extended to be due on August 21, 2008. Both parties'
reply briefs are extended to be due on August 28, 2008.

     3.      Defendant shall provide to Plaintiff's expert on or before July 25, 2008 a forensic
copy of Defendant's hard drive(s). Defendant's expert shall certify that the forensic copy given
is an exact copy of Defendant's hard drive(s) and shall provide a copy of the intake
documentation including the hash verification.

     4.      Plaintiff's expert may conduct an inspection of the forensic copy, which may
include the performance of any and all searches desired by the Plaintiff. Plaintiff's expert shall
not provide or reveal to Plaintiff or Plaintiff's counsel any content of defendant generated
documents obtained from the inspection of Defendant's hard drive. This shall not preclude
Plaintiff's expert from discussing anything not directly related to the content of the defendant

1

**EXHIBIT**
2

generated documents. The Plaintiff's expert will release to both parties simultaneously a round one activity listing report that details the universe of file and folder names on the computer as well as other system activity events, subject to the requirements of Paragraph 7. This round one listing shall not include any contents of defendant generated documents that are subject to the agreed privilege review protocol. Plaintiff's expert may retain a copy of the forensic image and the results of the inspection until such time that the Court may order them produced (in whole or in part) or destroyed.

5.     On a rolling basis as discovered, Plaintiff's expert shall provide to Defendant's counsel all defendant generated documents responsive to any searches performed. Plaintiff's expert will create an index listing of any items produced and will release such index to both parties simultaneously, subject to the requirements of Paragraph 7. All defendant generated documents will be produced only to Defendant's counsel. Defendant's counsel will then have the opportunity to review the results and, thereafter, shall produce the results to Plaintiff, to the extent they are not privileged or subject to objection. Within three (3) business days of receiving the documents, Defendant will produce a privilege log and all non-privileged documents.

6.     Defendant shall take no action to delete, modify, scrub or otherwise alter or diminish any data related to or contained on the hard drive(s), including metadata.

7.     Any index described above will not reveal the subject line of e-mails and will not reveal the preview field or any other information that reveals the content of the documents.

Dated:  July 25, 2008

Hon. Robert M. Dow

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MINTEL INTERNATIONAL GROUP,  )
LTD., a United Kingdom corporation,  )
                                              )
                    Plaintiff,  )     Civil Action No. 08-cv-3939
                                              )
         v.                 )     Hon. Robert M. Dow, Jr.
                                              )
MEESHAM NEERGHEEN, an individual  )
                                              )
                    Defendant.  )
                                            )
_____ )

## <u>AFFIDAVIT OF SCOTT R. JONES</u>

I, Scott R. Jones, due testify from my own personal knowledge as follows:

1.     I am employed by Forensicon, Inc. ("Forensicon") as a Senior Forensic Examiner. I also have taught computer forensics at Wilbur Wright College in Chicago, Illinois to both public and private sector students. I possess both a formal education in computer science as well as multiple computer certifications. I have been qualified and have testified as an expert witness in computer forensics before the United States District Court for the Northern District of Illinois, Eastern Division in the matter of Charles A. Krumwiede v. Brighton Associates, L.L.C., and Ismael C. Reyes (Case No. 05 C 3003). Attached as Exhibit A is my curriculum vitae.

2.     Forensicon has been retained by counsel for Mintel International Group, LTD. ("Mintel") to provide expert consulting services in the field of computer forensics and electronic discovery.

3.     Per the court-approved protocol, an initial Round One set of reports was provided to both parties. The information provided herein is derived from the Round One report set unless otherwise noted. The Round One reports were created for the Item 004 computer ("Item 004"),

1



which is the computer imaged by Elijah Technologies and reportedly obtained from the Defendant, Meesham Neergheen ("Neergheen"). In addition to the forensic image received from Defense experts, I was also provided a copy of the deposition testimony of Meesham Neergheen as taken on August 13, 2008 ("Neergheen Dep.").

4.      Within the Round One reports there is clear evidence of both active and passive efforts to destroy evidence within Item 004. There is also evidence which contradicts Neergheen's deposition testimony of August 13, 2008. The core of evidence destruction and misappropriation activities includes:

- Maintaining custody and continued usage of the Item 004 computer even though he was fully aware that it was the property of Mintel long after departing from Mintel

- Emailing Mintel files to Neergheen's personal Internet-based email account

- The creation and deletion of files and folders, including Windows registry data, well after receiving notice of active litigation

- The deletion of Internet history data for much of the time period prior to July 14, 2008

- The usage of utilities to further obscure dates and times related to files such as antivirus software

- The usage of the Windows defragmentation utility ("defrag") on July 14, 2008 to make deleted file data evidence unrecoverable

- Accessing Microsoft Office and Adobe files after departure from Mintel from both the Internet and from external storage locations as recently as July 17, 2008

5.      Neergheen testified that he sent Mintel file data to his personal Internet-based email accounts (Neergheen dep. 42:2-3). Without access to the personal email account(s) used by Neergheen, I cannot verify if any Mintel data still resides therein or if it may have been emailed

to other web-based email accounts. Without examining every computer that Neergheen has used to access his personal web-based email accounts since his departure from Mintel, I may not be able to determine the full extent to which Mintel data has been misappropriated.

6.    Defense Expert chain of custody documentation reports that Defense experts received Item 004 from Defense counsel on July 18, 2008. I have seen no written documentation regarding who had physical possession of Item 004 prior to July 18, 2008.

## File Entry Activity After July 11, 2008

7.    Upon information and belief, active litigation was filed on July 11, 2008. Neergheen was served notice by 6PM that same day (Neergheen Dep. 42:21-22). Neergheen knew that the Item 004 laptop was not his property, but rather, the property of Mintel (Neergheen dep. 27:12-17). Therefore, use of Item 004 thereafter would be inconsistent with a duty to preserve evidence which he had from this approximate time forward.

8.    Computers save file data by storing it in segments on a hard drive known as "sectors". The portion of the hard drive that is available and awaiting to receive new file data constitutes "unallocated space". When new file data is created and saved, it is put into those sectors which were formerly unallocated, therefore causing them to become "allocated".

9.    By default, when a file is deleted, the computer does not remove the data from the hard drive. Instead, it re-designates those sectors which contain the deleted file data as unallocated space, and those sectors are thereafter available to receive new file data.

10.    As long as new data does not overwrite the previously deleted data, it is generally recoverable and available for review. However, the receipt of new file data in a sector causes the

3

previous file data to become "overwritten". Once the old data has been overwritten, it becomes
unrecoverable.

11.    The EnCase forensic image of Item 004 reports that over 3,900 file entries were created
on or after July 13, 2008. Multiple file entries also report as deleted and having been Last
Accessed on or after July 13, 2008. As this is two calendar days after the start of active litigation,
Neergheen should not have been using Item 004 and causing data to become deleted. The
creation of new file entries has eliinated at least some evidence which I otherwise would have
been able to inspect if not for its destruction. As shall be detailed further, the evidence for
spoliation within Item 004 goes much deeper than this surface-level review of file activities, but
even such a minimal review demonstrates a failure to preserve evidence on the part of
Neergheen. Neergheen testified that he did not delete any documents from Item 004 following
his receipt of the complaint until the time he surrendered it (Neergheen dep. 48:17–21).
Neergheen fails to account for how approximately 98 file entries were deleted following his
receipt of the complaint until as recently as July 18, 2008. Some of these file entries report being
created as early as May 2008, well before the active litigation was filed, and include Windows
system file entries such as restore points and file entries related to the Skype communications
tool. Contrary to Neergheen's deposition testimony, file data was deleted from Item 004 well
after Neergheen received notice of active litigation.


**Neergheen's Level of Expertise**

12.    Neergheen testified that he received a bachelors degree related to engineering, and that
part of that curriculum included electrical and computer engineering (Neergheen dep. 10:11-17).
Neergheen also testified that he was educated in computer programming (Neergheen dep. 11:3-

4

8). Neergheen testified that he began performing database work for Mintel (Neergheen dep. 14:16-19) and further testified that "...it was marketing's role to make sure that contacts were put into the database." (Neergheen dep. 24:5-7) Neergheen concedes that he sent himself Mintel documents via email (Neergheen dep. 42:2–3), so he possesses this computer knowledge as well. Therefore, while the exact level of computer understanding Neergheen possesses is unclear, given his formal education in computer and electrical engineering, and given his several years experience using and learning Mintel's database tools and other computer network resources, and given his admitted understanding of how to transfer Mintel file data via email, I am disinclined to accept at face value Neergheen's deposition testimony that he is "...not a computer savvy person." (Neergheen dep. 12: 10-11) As shall be detailed further herein, information which is not generally accessible to a novice computer user was deleted from the Item 004 computer following July 11, 2008 18:00. It is my opinion that either Neergheen has more computer knowledge than he admits to having, or Neergheen is able to follow documentation and instructions as would be found from websites like "support.microsoft.com", or finally, that there is at least one undisclosed entity who may have aided in the destruction of evidence within the Item 004 laptop computer.

## Use of Antivirus Software to Obscure Date and Time Metadata

13.    McAfee antivirus software was used on Item 004, and I found that file entries related to the McAfee software within Item 004 reported file activity on July 18, 2008 at 06:46:08, less than 12 hours before Item 004 was forensically preserved. I also found McAfee Antivirus log files reporting updating activity on July 17, 2007. When programs such as antivirus software scan the file entries within a computer, they can alter the time/date metadata for file entries,

thereby obscuring to some degree the patterns of activity that could be found by performing time and date analysis. Such a review looks at the times and dates reported by file entries to locate patterns or trends, and the continued usage of antivirus software up until the date of forensic imaging can obscure previous dates and times of file access. In short, this further destroys evidence related to dates and times which would exist if not for the usage of antivirus software within Item 004. Were the computer turned off and left alone starting on July 11, 2008, as it should have been following receipt of notice of active litigation, the antivirus software would not have been able to alter time and date metadata for any file entries.

14.    Table One contains a subset of the Item 004 All Files Present information from within the Round One report production. It reflects Last Access times for a subset of antivirus software file entries.

**TABLE ONE**

| Name | Last Accessed | Full Path |
|---|---|---|
| vscan.bof | 7/18/2008 6:44:36 AM | MINTELIGROUP_004v611\1393_Meesham_Neerghee n_Sony_PCG-641R_SN_28397627\C\Program Files\McAfee\VirusScan Enterprise\vscan.bof |
| naisign.dll | 7/18/2008 6:44:36 AM | MINTELIGROUP_004v611\1393_Meesham_Neerghee n_Sony_PCG-641R_SN_28397627\C\Program Files\McAfee\Common Framework\naisign.dll |
| FrameworkService.exe | 7/18/2008 6:44:36 AM | MINTELIGROUP_004v611\1393_Meesham_Neerghee n_Sony_PCG-641R_SN_28397627\C\Program Files\McAfee\Common Framework\FrameworkService.exe |
| graphics.dll | 7/18/2008 6:44:36 AM | MINTELIGROUP_004v611\1393_Meesham_Neerghee n_Sony_PCG-641R_SN_28397627\C\Program Files\McAfee\VirusScan Enterprise\graphics.dll |
| ScriptCl.dll | 7/18/2008 6:46:08 AM | MINTELIGROUP_004v611\1393_Meesham_Neerghee n_Sony_PCG-641R_SN_28397627\C\Program Files\McAfee\VirusScan Enterprise\ScriptCl.dll |

15.    Both active and passive efforts of evidence destruction took place within Item 004. Not only was Item 004 actively used after Neergheen received notice of litigation, causing new file entries to be created and thereby overwriting unallocated space, but Neergheen also failed to stop automated system utilities from running that would destroy and/or alter evidence as recently as the very day in which Item 004 was forensically preserved. Stopping any automated processes

from running was as simple as removing both the battery and power cord from the laptop, and very little technical knowledge would be required to do this. Certainly a person having a formal education in computer and electrical engineering (Neergheen dep. 10:11-17) could accomplish this task if s/he so desired and were directed to do so by counsel.

## Spoliation Noted Within Item 004 Internet History

16.    A common convention with Microsoft Windows is that a user's name is reflected by their user profile. For example, within Item 004, the user profile "Meesham Neergheen" is logically tied to the Defendant, and was likely used by the Defendant within Item 004. It is possible for persons to use profiles that do not clearly denote their actual name. There are multiple user profiles which do appear to denote the names of persons who have used the Item 004 computer. Upon information and belief, many of the names reflected by the user profiles within Item 004 are current or former employees of Mintel.

17.    Neergheen testified that from July 11, 2008 at 18:00, only he and his counsel had access to his username and password information used within Item 004 (Neergheen dep. 93:22 – 94:4), and only he and his counsel had access to Item 004 since that time (Neergheen dep. 143:16-19). Activities reflecting Neergheen's user profile after this time logically were caused by those who possessed this requisite information, or others to whom were granted physical access to Item 004 after the username and password information was entered.

18.    Item 004 Internet history data reports that on July 17, 2008, the user profile "Meesham Neergheen" visited the website "http://support.microsoft.com" around 6:41 AM. Neergheen's profile searched Microsoft's website for information related to deleting file data as is detailed

within Tables Two and Three. Neergheen admitted to visiting this website during his deposition

testimony (Neergheen dep. 145:12-16).

19.    Table Two contains a subset of the data within the original Item 004 Internet History

information previously released to all parties per the agreed protocol.

**TABLE TWO**

| ID | Profile Name | Url Name | Last Accessed |
|---|---|---|---|
| 2368 | meesham neergheen | http://support.microsoft.com/ | 7/17/2008 6:41:17 AM |
| 2315 | | http://autocomplete.support.microsoft.com/ACSearchSuggest. aspx?lcid=1033&query=how%20d | 7/17/2008 6:41:37 AM |
| 2311 | | http://autocomplete.support.microsoft.com/ACSearchSuggest. aspx?lcid=1033&query=how%20do | 7/17/2008 6:41:38 AM |
| 2313 | | http://autocomplete.support.microsoft.com/ACSearchSuggest. aspx?lcid=1033&query=how%20do%20i | 7/17/2008 6:41:38 AM |
| 2308 | | http://autocomplete.support.microsoft.com/ACSearchSuggest. aspx?lcid=1033&query=how%20do%20i%20a | 7/17/2008 6:41:40 AM |
| 2305 | | http://autocomplete.support.microsoft.com/ACSearchSuggest. aspx?lcid=1033&query=how%20do%20i%20acess | 7/17/2008 6:41:41 AM |
| 2300 | | http://autocomplete.support.microsoft.com/ACSearchSuggest. aspx?lcid=1033&query=how%20do%20i%20aces | 7/17/2008 6:41:42 AM |
| 2301 | | http://autocomplete.support.microsoft.com/ACSearchSuggest. aspx?lcid=1033&query=how%20do%20i%20ace | 7/17/2008 6:41:42 AM |
| 2302 | | http://autocomplete.support.microsoft.com/ACSearchSuggest. aspx?lcid=1033&query=how%20do%20i%20ac | 7/17/2008 6:41:42 AM |
| 2294 | | http://autocomplete.support.microsoft.com/ACSearchSuggest. aspx?lcid=1033&query=how%20do%20i%20acc | 7/17/2008 6:41:43 AM |
| 2296 | | http://autocomplete.support.microsoft.com/ACSearchSuggest. aspx?lcid=1033&query=how%20do%20i%20access | 7/17/2008 6:41:43 AM |
| 2297 | | http://autocomplete.support.microsoft.com/ACSearchSuggest. aspx?lcid=1033&query=how%20do%20i%20acce | 7/17/2008 6:41:43 AM |
| 2293 | | http://autocomplete.support.microsoft.com/ACSearchSuggest. aspx?lcid=1033&query=dele | 7/17/2008 6:41:50 AM |
| 2291 | | http://autocomplete.support.microsoft.com/ACSearchSuggest. aspx?lcid=1033&query=deleted | 7/17/2008 6:41:50 AM |

20.    Within Table Two, the column "Url Name" reports the web address that was visited at

the reported time of last access. For most of the rows in Table Two, the information reports that

Microsoft's support website was queried for specific information related to accessing and/or

deleting information from within the Item 004 computer. Neergheen admits to visiting this

website and looking for information (Neergheen dep. 145:12-16). Following the "query=" text in

this column is displayed the text that Neergheen typed into Microsoft's search bar while he

8

visited Microsoft's support website. For a simplified view of the query text, see Table Three following.

**TABLE THREE**

| ID | Query Text Clarified |
|---|---|
| 2368 | http://support.microsoft.com/ |
| 2315 | query=how d |
| 2311 | query=how do |
| 2313 | query=how do i |
| 2308 | query=how do i a |
| 2305 | query=how do i acess |
| 2300 | query=how do i aces |
| 2301 | query=how do i ace |
| 2302 | query=how do i ac |
| 2294 | query=how do i acc |
| 2296 | query=how do i access |
| 2297 | query=how do i acce |
| 2293 | query=dele |
| 2291 | query=deleted |

*NOTE: "ID" aligns both to TABLE TWO and the original Item 004 Internet History report already produced to the parties.*

21.     In order to obtain a better understanding of the information that Neergheen saw when he typed the above queries into Microsoft's support website, I entered the same queries that Neergheen entered on July 17, 2008 into my Internet Explorer browser. Exhibit B contains partial screenshots showing what information I found when I approximated his actions.

22.     When I visited the website "http://support.microsoft.com" and typed in the same queries that Neergheen entered on July 17, 2008, I found references to information on how to delete data from a Microsoft Windows computer. As displayed within the Exhibit B screenshot using query data from ID 2293, the topics listed include the deletion of registry keys, partitions, files and folders, temporary internet files and more. As has already been mentioned, and shall be detailed further herein, I found deleted registry data and other Windows operating system artifacts,

9

deleted Internet history data, and deleted file entries of various types. The Microsoft support information that Neergheen's profile actively sought closely aligns to the evidence destruction I found within Item 004.

23.    Item 004 was likely used on July 17, 2008 to obtain information from Microsoft on how to delete information from within a computer running a Microsoft operating system. As litigation was filed on July 11, 2008, and since Neergheen had legal representation since at least July 15, 2008, Neergheen should not have been using the computer and thereby destroying evidence on July 17, 2008. Simply powering up a computer can cause file data to be created and/or altered, which destroys evidence that would otherwise have been available for review had Item 004 not been in use. What is further disturbing is that Item 004 appears to have been used to search for information about how to delete data from within Item 004. Continued usage of Item 004 after notice of active litigation is incompatible with good-faith efforts to preserve evidence, and searching for information about how to delete data from Item 004 suggests the intent to destroy evidence.

24.    Without inspecting the forensic image for the unproduced Dell desktop computer that Neergheen testified to having used for several months (Neergheen dep. 29:8-30:7), or other computers which he has used since his departure from Mintel, I will not be able to determine if Neergheen performed similar searches on those computers for information related to deleting file data from a computer as I believe he did using Item 004.


**Missing Internet History Data**

25.    The user profile Meesham Neergheen is missing Internet history data which would report activity from the time period prior to his termination from Mintel until just after the time when

active litigation was filed. The gaps in daily Internet history appear to be selective in that there are existing daily records for specific dates with gaps in between. Alternatively, there does not appear to be weekly Internet history data for Neergheen's profile for the time period between the earliest known daily Internet history date, January 23, 2008, and June 23, 2008, which strongly suggests that the data was purged. Finally, one deleted file entry related to daily Internet history from the period following Neergheen's termination from Mintel was found, which further supports that the time period following Neergheen's departure from Mintel until about July 14, 2008 was selected for deletion.

26.    The Windows operating system employed by Item 004 creates file entries for both weekly and daily Internet history data. The names of these file entries generally denote the time periods of data which they store. The file entry's name can be segmented for better understanding as follows:

"MSHist01" + [START DATE] + [END DATE]

For example, the file entry "MSHist012008071420080715" would contain daily Internet usage information for July 14, 2008 to July 15, 2008. There are also gaps in daily internet history for the time periods between February 27, 2008 to May 3, 2008 and January 24, 2008 to February 26, 2008. The Internet history data for May 3, 2008 to May 4, 2008 was also deleted, but did not report as being overwritten. Were it deleted and overwritten, the missing Internet history data would have spanned the time period from February 27, 2008 to July 14, 2008.

27.    Table Four contains a subset of data derived from the Item 004 All Files reports provided to all parties according to the protocol. It reflects Internet history data only related to the user profile "Meesham Neergheen".

11

**TABLE FOUR**

| Daily | Weekly |
|---|---|
| MSHist012008012320080124 | Where is the missing Weekly Internet Data from 2008/01/23 - 2008/06/23? |
| GAP | |
| MSHist012008022620080227 | |
| GAP | |
| MSHist012008050320080504** | MSHist012008062320080630 |
| GAP - covers time before & right after notification | MSHist012008063020080707 |
| MSHist012008071420080715 | MSHist012008070720080714 |
| MSHist012008071520080716 | Device likely imaged prior to creation of further weekly history |
| MSHist012008071620080717 | |
| MSHist012008071720080718 | |
| MSHist012008071820080719 | |
| ** NOTE: Reports as Deleted, but not as overwritten | |

28.     Note the missing time periods for daily Internet history information in Table Four. The Internet history data for the time period of May 3, 2008 to May 4, 2008 reported as having been deleted, but not overwritten. Therefore, it appears as though somebody targeted the Neergheen Internet history data covering the time period following Neergheen's reported departure from Mintel on April 30, 2008 until July 14, 2008 for deletion. If there is existing daily Internet history data from January 2008, there should also be the weekly corollary data from January 2008 forward. The daily information appears to have been selectively deleted while the weekly information prior to June 23, 2008 was deleted en masse. In misappropriation cases, it is common for a user to delete Internet history data which would reflect notable actions such as the continued access and usage of emailed file data following their departure from one company and after beginning employment with another.

**Spoliation Noted Within The Registry – Reported By The Item 004 USBSTOR Report**

29.     The Item 004 USBSTOR report contains further evidence of data deletion from the Item 004 computer. This particular Round One report contains Windows Registry information related

12

to storage devices that have been connected to Item 004 via the Universal Serial Bus ("USB"). As such, it would normally contain targets for further discovery because the devices listed therein are regularly involved with cases of data misappropriation or trade secret theft. These devices are typically used to both transfer and/or store file data.

30.     The non-savvy computer user likely is unable to access the Windows registry or even specifically target a single portion of the Windows registry for deletion. Such an advanced act of data deletion denotes elevated computer knowledge on the part of the person who carried out the action. Neergheen testified that only he and his counsel had access to Item 004 following July 11, 2008 18:00 (Neergheen dep. 143:16-19). An advanced action such as accessing and then deleting portions of the Windows registry contradicts Neergheen's testimony that he is not "computer savvy" (Neergheen dep. 12: 10-11). Alternatively, it suggests that Neergheen had help which to date he has not disclosed or that he was able to follow technical information obtained from the Internet on how to access and delete Windows registry data (see Exhibit B).

31.     In reviewing the USBSTOR information for Item 004, it is highly notable that on July 17, 2008, there are two USB storage devices which not only report having their settings updated, thereby supporting connection to Item 004, but also report as being deleted sometime thereafter. Table Five contains a subset of the Item 004 USBSTOR data previously provided to all parties per the protocol. Neergheen admits to possessing and using two USB storage devices (Neergheen dep. 96:22–97:9).

32.     Neergheen admitted to visiting Microsoft's support website and performing Internet searches at approximately 6:41 AM on July 17, 2008 (Neergheen dep. 145:12-16), where it appears that he searched for technical instructions from Microsoft's website about how to access and/or delete data from Item 004. Sometime after 13:15, multiple entries within the Windows

13

USBSTOR registry report as being both last written and also deleted. In order for the file entries to be last written, they must have existed at the time they were last written. Therefore, they were deleted sometime after their reported last written time.

33.    I have inspected many Windows computers which contained data within their USBSTOR registry settings. Many of these computers had data therein that were years old and yet not deleted. The Windows operating system itself would not need to delete the USBSTOR information in order to function optimally, and to my knowledge, there is no system-performance-based reason for this information to have been deleted from Item 004. Given the fact that it occurred after litigation was filed and notice served to Neergheen, and also given its proximity to Neergheen's profile searching Microsoft's website for technical instructions on how to access and delete data, it is my opinion that this activity was an attempt at destroying evidence regarding devices by which Neergheen transferred, stored, and/or used Mintel file data (Neergheen dep. 96:19-21). Only after the Defense expert turns over the forensic images for the devices listed within the Item 004 USBSTOR report will I be able to review them and determine if they contain Mintel trade secrets or intellectual property, as well as determine if spoliation also occurred within those devices.

34.    If one filters the Item 004 USBSTOR report from within the Round One reports such that it only shows entries that report as "Deleted, Registry Entry", they will see multiple pages of printed output reflecting hundreds of file entries and multiple devices that may contain misappropriated data or trade secrets. If there were no Mintel trade secret or intellectual property therein, there would be no need to purge the data reporting the existence of the devices well after the defendant had a duty to preserve evidence. Such purging is consistent with efforts to obscure user activities and eliminate evidence from within the Item 004 computer.

14

35.   The fact that Windows registry entries relating to USB storage devices which were attached to Item 004 on July 17, 2008 were deleted sometime after Neergheen searched Microsoft's website for information related to accessing and/or deleting data strongly suggests that the deletion of the USBSTOR Windows registry data was deliberate.

36.   The root folder of Neergheen's profile reports a creation date of June 14, 2006. Therefore, if Neergheen used Item 004 after this time period, USB storage devices connected on or after this date could have been used to misappropriate Mintel data other than what Neergheen has already admitted to taking (Neergheen dep. 42:2-3 and 45:10-15).

37.   Table Five contains a subset of the Item 004 USBSTOR report data. It denotes devices named "USB007 mini-USB2BU", "USB Flash_Disk" (named twice but with different serial numbers), "Apple iPod", and "LEXAR JD_EXPRESSION".

**TABLE FIVE**

| ID # | Description | Is Deleted | Last Written | Full Path |
|---|---|---|---|---|
| 2 | Folder, Deleted, Registry Entry | Yes | 7/17/2008 1:46:55 PM | MINTELIGROUP_v67_004\1393_Meesham_Neergheen_Sony_PCG-641R_SN_28397627\C\WINDOWS\system32\config\system\NTRegistry\$$$PROTO.HIV\ControlSet001\Enum\USBSTOR\Disk&Ven_USB007&Prod_mini-USB2BU&Rev_0.00\000000000000A9&0 |
| 11 | Folder, Deleted, Registry Entry | Yes | 7/17/2008 1:15:18 PM | MINTELIGROUP_v67_004\1393_Meesham_Neergheen_Sony_PCG-641R_SN_28397627\C\WINDOWS\system32\config\system\NTRegistry\$$$PROTO.HIV\ControlSet001\Enum\USBSTOR\Disk&Ven_USB&Prod_Flash_Disk&Rev_5.00\2007062000000072&0 |
| 21 | Folder, Deleted, Registry Entry | Yes | 7/15/2008 3:54:43 PM | MINTELIGROUP_v67_004\1393_Meesham_Neergheen_Sony_PCG-641R_SN_28397627\C\WINDOWS\system32\config\system\NTRegistry\$$$PROTO.HIV\ControlSet001\Enum\USBSTOR\Disk&Ven_USB&Prod_Flash_Disk&Rev_5.00\2007062800000616&0 |
| 28 | Folder, Deleted, Registry Entry | Yes | 7/8/2008 9:11:23 PM | MINTELIGROUP_v67_004\1393_Meesham_Neergheen_Sony_PCG-641R_SN_28397627\C\WINDOWS\system32\config\system\NTRegistry\$$$PROTO.HIV\ControlSet001\Enum\USBSTOR\Disk&Ven_Apple&Prod_iPod&Rev_1.62\000A27001BB74888&0 |
| 63 | Folder, Deleted, Registry Entry | Yes | 11/24/2007 10:49:55 AM | MINTELIGROUP_v67_004\1393_Meesham_Neergheen_Sony_PCG-641R_SN_28397627\C\WINDOWS\system32\config\system\NTRegistry\$$$PROTO.HIV\ControlSet001\Enum\USBSTOR\Disk&Ven_LEXAR&Prod_JD_EXPRESSION&Rev_1.00\302AC2070729262&0 |

38.     Contrary to Neergheen's testimony that he only possessed and connected two USB

storage devices to Item 004 (Neergheen dep. 96:3-97:9), the deleted file entries related to the

Windows USBSTOR registry show that in the time since June 14, 2006, at least five USB

storage devices have been connected. Furthermore, four USB devices reporting unique serial

numbers have been connected since July 8, 2008. It is unclear which two of the five devices

Neergheen testified to connecting to Item 004 or why Neergheen did not disclose all four storage

devices connected in July 2008. Only Neergheen can explain the omissions in his testimony.

39.     I do not know if the devices listed within Table Five were also preserved forensically so

that they can be examined. Once Defense experts do so, I can review the forensic images to

better determine if evidence was destroyed therein as has occurred in Item 004. Furthermore,

were I to receive forensic images for other computers to which these devices have been

connected, I could compare the forensic images with Item 004 to confirm similarities of USB

device connectivity and discover the extent to which Mintel data migrated to any other locations.

Neergheen testified to having and using only two devices, but the evidence reports four distinct

serial numbers for devices connected in July 2008. My forensics training and professional

experience leads me to believe that such omissions are consistent with efforts to conceal the

existence of two or three USB storage devices which likely contained Mintel trade secret file

data and were likely connected to other computers since Neergheen's departure from Mintel.


## Link Files Show Access of File Data Within USB Storage Devices & the Internet

40.     Within the Round One reports there is a report entitled "Item004_LinkFileReport". This

report contains information related to link files found within Item 004. Link files are simply

shortcuts or pointers to other files. For example, when someone opens a Microsoft Word file that

they emailed and/or stored within a web-based email account, that action creates one or more link files on their Windows computer. Although they may not have saved the file locally to their computer, one or more shortcuts to that file which contain some of the file metadata from the original file would typically have been created. By examining the data within link files, one can determine much about the files someone has accessed even if they have taken steps to delete the original file. It is common in misappropriation cases that a person deletes an original file, but fails to delete all link file references to file data.

41.     In examining the link files within Item 004, I found evidence that Neergheen accessed file data stored within removable storage devices as recently as July 17, 2008 around 13:50. This closely aligns to the USB storage device information reported formerly within Table Five, which reports that on July 17, 2008 after 13:15, Neergheen connected at least two USB storage devices. At around 13:50, Neergheen accessed an Adobe PDF file named "show_temp 1.pdf" from a USB storage device.

42.     I also found information that establishes that following Neergheen's departure from Mintel, multiple Microsoft Office type files were accessed via the Internet on various dates and times. Link file creation generally denotes file access because accessing a file is what frequently causes the link file to be created. The link files within Item 004 suggest that beyond checking email for new messages, the Internet was used to access actual file data of like kinds to the types of file data which Neergheen admits to having sent himself via email (Neergheen dep. 42:2-3).

43.     Table Six contains a subset of the Item 004 link files data. Table Six reports Internet usage data which occurred within the time period of the purged Internet history file entries (see Table Four). This further suggests that the deletion of the Internet history data prior to July 14,

17

2008 occurred in order to conceal the usage of common file types, such as the Mintel file data

which Neergheen admitted to emailing to his personal email (Neergheen dep. 42:2-3).

## TABLE SIX

| ID | Link File | Created Date | Modified Date | Last Accessed | Drive Type | Serial | Base Path |
|---|---|---|---|---|---|---|---|
| 29 | MINTELIGROUP_v67_004\1393_Meesha m_Neergheen_Sony_PCG-641R_SN_28397627\C\Documents and Settings\Meesham Neergheen\Application Data\Microsoft\Office\Recent\Datamonitor Document.LNK | 3/2/2008 8:16:22 PM | 3/2/2008 8:16:26 PM | 3/02/2008 | Removable | 00 0B 5C DF | D:\Datamonitor Document.doc |
| 3 | MINTELIGROUP_v67_004\1393_Meesha m_Neergheen_Sony_PCG-641R_SN_28397627\C\Documents and Settings\Meesham Neergheen\Recent\show_temp 1.lnk | 7/17/2008 1:50:12 PM | 7/17/2008 1:50:14 PM | 7/17/2008 | Removable | B8 72 42 FD | D:\show_temp 1.pdf |
| 8 | MINTELIGROUP_v67_004\1393_Meesha m_Neergheen_Sony_PCG-641R_SN_28397627\C\Documents and Settings\Meesham Neergheen\Application Data\Microsoft\Office\Recent\Intro to FS 20080327[1].LNK | 5/23/2008 10:18:40 AM | 5/23/2008 10:19:03 AM | 5/23/2008 10:19:07 AM | Fixed | 5C 71 5A EF | C:\Documents and Settings\Meesham Neergheen\Local Settings\Temporary Internet Files\Content.IE5\47DBAM3P\ Intro to FS 20080327[1].ppt |
| 9 | MINTELIGROUP_v67_004\1393_Meesha m_Neergheen_Sony_PCG-641R_SN_28397627\C\Documents and Settings\Meesham Neergheen\Application Data\Microsoft\Office\Recent\Meesham Neergheen[1].LNK | 5/7/2008 1:31:43 PM | 5/7/2008 1:31:46 PM | 5/7/2008 1:31:47 PM | Fixed | 5C 71 5A EF | C:\Documents and Settings\Meesham Neergheen\Local Settings\Temporary Internet Files\Content.IE5\S9EN0P23\ Meesham Neergheen[1].doc |
| 13 | MINTELIGROUP_v67_004\1393_Meesha m_Neergheen_Sony_PCG-641R_SN_28397627\C\Documents and Settings\Meesham Neergheen\Application Data\Microsoft\Office\Recent\Meesham Neergheen - Confidentiality letter[1].LNK | 5/7/2008 1:23:02 PM | 5/7/2008 1:23:13 PM | 5/7/2008 1:23:19 PM | Fixed | 5C 71 5A EF | C:\Documents and Settings\Meesham Neergheen\Local Settings\Temporary Internet Files\Content.IE5\APST69CJ\ Meesham Neergheen - Confidentiality letter[1].doc |

## Spoliation Noted Within The Item 004 Windows Prefetch File Entries

44.    Windows caches information in multiple places throughout the operating system. One of

the places that Windows stores information for programs run on the computer - executable files

(.EXE) - is commonly known as the Windows Prefetch ("prefetch") Folder. When an .EXE file

is run, Windows often creates a file entry within the prefetch which stores information related to

the use of the .EXE file. Therefore the creation date of the prefetch file entry is a strong indicator

that a particular executable file (.EXE) was used to run a program on a given date.

45.     Besides the creation date of a prefetch file entry, the date that the prefetch file entry reports last written is another indicator of the most recent time that an .EXE file was run. This is because Windows updates the information within the prefetch file entry to catalog the number of times it has been run since the creation of the prefetch entry. By considering both the creation and last written dates for a prefetch entry, one can surmise the earliest known and most recent usage of an .EXE file to run a program.

46.     The Item 004 prefetch file entries report the use of the Windows defragmentation utility ("defrag"), on or about July 14, 2008 at 18:39. This usage was well after Neergheen received notice of the active litigation on July 11, 2008 (Neergheen dep. 42:21-22). The use of the defrag utility after deleting file data is a commonly-employed means of rendering deleted file data forever unrecoverable in the file data's original native format, if at all.

47.     As noted previously in paragraph 8, file data is stored in sectors, and these sectors of data related to the same file can become scattered across a hard drive or storage medium. This causes the computer to operate more slowly when accessing that data. The defrag utility is a tool that can improve system performance by reordering the scattered file data into a contiguous group of sectors, thereby allowing for faster read times by the computer.  The down side to this process is that in moving the sectors of file data about the hard drive or storage medium, existing file data often overwrites previously-deleted file data which was recoverable prior to the defrag process. Once a deleted file is overwritten with new data, it is generally no longer recoverable or available for review in its original native format, if at all.

48.     I found no indication that defrag was run as part of an automated system process, which suggests that someone ran this utility deliberately on July 14, 2008.

19

49.     In addition to the usage of defrag to destroy evidence within Item 004, other prefetch file entries report creation and/or being last written on July 17, 2008. This further file entry creation necessarily overwrites previously unallocated space which contained evidence. If not for the file creation activities which destroyed evidence within Item 004, this previously-deleted file data would have been available for review. The prefetch file entries report file activity as recently as July 18, 2008 around 07:23:27.

50.     The prefetch file entries alone show that contrary to Neergheen's testimony that after he received the complaint he only used the Internet (Neergheen dep. 48:22-49:2), Neergheen used both the Skype utility around 17:58 and defrag around 18:39 on July 14, 2008. Furthermore, prefetch file entries report that a Skype installation .EXE file was run on May 1, 2008 around 16:11. This seems to contradict Neergheen's testimony that he used Skype while employed for Mintel, "…but I don't use it now." (Neergheen dep. 98:17-18) Neergheen testified that Skype "allows you to communicate with other colleagues within a company and also anywhere around the world." (Neergheen dep. 98:13-15). Neergheen clearly used Skype after his departure from Mintel on April 30, 2008. As Skype uses the Internet, this further implicates that the deletion of Internet history information prior to July 14, 2008 is even more suspicious. It also notes another layer of "computer savvy" possessed by Neergheen.

51.     Table Seven contains a subset of the Windows Prefetch data from within the Item 004 All Files Present report that was contained within the Round One production set. In addition to the admitted usage of the Internet, Table Seven reports the use of multiple applications, such as Skype, defrag, Microsoft Calculator, Adobe Acrobat Reader, Microsoft PowerPoint, McAfee Antivirus software, and more. This usage is in direct contradiction to Neergheen's testimony that

aside from using the Internet, he did not run any other programs on Item 004 (Neergheen dep. 48:22-49:2).


**TABLE SEVEN**

| Name | File Created | Last Written | Full Path |
|---|---|---|---|
| SKYPE.EXE-1C7D242A.pf | 5/1/2008 4:12:36 PM | 7/14/2008 5:58:47 PM | MINTELIGROUP_004v611\1393_Meesham _Neergheen_Sony_PCG- 641R_SN_28397627\C\WINDOWS\Prefetc h\SKYPE.EXE-1C7D242A.pf |
| DEFRAG.EXE-273F131E.pf | 4/2/2007 9:46:38 AM | 7/14/2008 6:39:05 PM | MINTELIGROUP_004v611\1393_Meesham _Neergheen_Sony_PCG- 641R_SN_28397627\C\WINDOWS\Prefetc h\DEFRAG.EXE-273F131E.pf |
| DFRGNTFS.EXE-269967DF.pf | 4/2/2007 9:46:38 AM | 7/14/2008 6:39:05 PM | MINTELIGROUP_004v611\1393_Meesham _Neergheen_Sony_PCG- 641R_SN_28397627\C\WINDOWS\Prefetc h\DFRGNTFS.EXE-269967DF.pf |
| CALC.EXE-02CD573A.pf | 1/1/2008 8:12:52 PM | 7/17/2008 11:13:03 AM | MINTELIGROUP_004v611\1393_Meesham _Neergheen_Sony_PCG- 641R_SN_28397627\C\WINDOWS\Prefetc h\CALC.EXE-02CD573A.pf |
| ACRORD32.EXE-13285B88.pf | 12/7/2007 10:15:11 PM | 7/17/2008 1:07:30 PM | MINTELIGROUP_004v611\1393_Meesham _Neergheen_Sony_PCG- 641R_SN_28397627\C\WINDOWS\Prefetc h\ACRORD32.EXE-13285B88.pf |
| POWERPNT.EXE-17CE3F4E.pf | 1/25/2008 8:08:08 PM | 7/17/2008 1:14:38 PM | MINTELIGROUP_004v611\1393_Meesham _Neergheen_Sony_PCG- 641R_SN_28397627\C\WINDOWS\Prefetc h\POWERPNT.EXE-17CE3F4E.pf |
| ACRORD32INFO.EXE-013EA364.pf | 2/2/2008 9:00:22 PM | 7/17/2008 1:46:09 PM | MINTELIGROUP_004v611\1393_Meesham _Neergheen_Sony_PCG- 641R_SN_28397627\C\WINDOWS\Prefetc h\ACRORD32INFO.EXE-013EA364.pf |
| MCUPDATE.EXE-1D0E3EC0.pf | 9/14/2007 10:03:27 AM | 7/17/2008 5:31:14 PM | MINTELIGROUP_004v611\1393_Meesham _Neergheen_Sony_PCG- 641R_SN_28397627\C\WINDOWS\Prefetc h\MCUPDATE.EXE-1D0E3EC0.pf |
| USERINIT.EXE-30B18140.pf | 4/21/2006 9:12:21 AM | 7/18/2008 6:44:49 AM | MINTELIGROUP_004v611\1393_Meesham _Neergheen_Sony_PCG- 641R_SN_28397627\C\WINDOWS\Prefetc h\USERINIT.EXE-30B18140.pf |
| WUAUCLT.EXE-399A8E72.pf | 4/21/2006 9:12:37 AM | 7/18/2008 6:44:50 AM | MINTELIGROUP_004v611\1393_Meesham _Neergheen_Sony_PCG- 641R_SN_28397627\C\WINDOWS\Prefetc h\WUAUCLT.EXE-399A8E72.pf |
| IEXPLORE.EXE-27122324.pf | 10/5/2007 9:01:17 AM | 7/18/2008 6:46:18 AM | MINTELIGROUP_004v611\1393_Meesham _Neergheen_Sony_PCG- 641R_SN_28397627\C\WINDOWS\Prefetc h\IEXPLORE.EXE-27122324.pf |
| LOGON.SCR-151EFAEA.pf | 4/21/2006 11:58:19 AM | 7/18/2008 7:23:27 AM | MINTELIGROUP_004v611\1393_Meesham _Neergheen_Sony_PCG- 641R_SN_28397627\C\WINDOWS\Prefetc h\LOGON.SCR-151EFAEA.pf |

**Conclusion**

52.     Neergheen confirmed that the allegations in the complaint were true (Neergheen dep.
45:10-15). Neergheen concedes that he maintained possession of Mintel's property after he was
no longer employed by Mintel even though he knew the Item 004 laptop to be Mintel's property
(Neergheen dep. 26:23-27:17). Neergheen testified to being served notice of the active litigation
on July 11, 2008 (Neergheen dep. 42:21-22). His continued usage of Item 004 was inconsistent
with efforts to preserve evidence within Item 004. Simply using the computer will cause new
data to be created which will overwrite previously-deleted file data and thereby ruin evidence
within a computer.

53.     Given that Neergheen testified that the allegations in the complaint were true (Neergheen
dep. 45:10-15) it is questionable why Neergheen took such advanced steps to delete evidence
from Item 004. From the pieces of evidence and testimony that I have seen thus far, it is clear
that Neergheen tried to hide the details of his activities from the time period around his departure
from Mintel until around July 14, 2008, after he was employed by his present employer and after
he was served notice of litigation.

54.     Internet history data for Neergheen's profile for specific time periods before July 14,
2008 were deleted. With the exception of a single deleted file entry, the daily Internet history file
entries were purged from Item 004 for the time period of February 27, 2008 until July 14, 2008.
The Item004_LinkFileReport data within the Round One reports show that Neergheen accessed
common file data types such as Microsoft Word (DOC) and Microsoft PowerPoint (PPT) files
via the Internet during the time period covered by the purged Internet history file entries. I
believe that Neergheen tried to hide his access of common business file data types from the
Internet because he likely accessed the Mintel file data that he sent to his personal email after he

22

began working at his current job. Neergheen concedes that on Friday, April 25, 2008, after he already accepted the employment offer with his present employer, he sent Mintel file data to his personal email (Neergheen dep. 137:21-138:6). People who misappropriate company file data often take file data that they think will benefit them in some way at their new job by emailing it to a personal email account.

55.    Neergheen testified to visiting Microsoft's support website and searching it for information on July 17, 2008 (Neergheen dep. 145:12-16). The available Item 004 Internet history data for Neergheen's profile supports that he searched a Microsoft website for information related to data deletion. Subsequent to that searching activity on July 17, 2008, sometime after 13:46, portions of the Windows registry were deleted which contained evidence of attached storage devices which are targets for further discovery. Neergheen's actions suggest elevated computer knowledge and/or the ability to follow directions when desired. Alternatively, Neergheen may have also had assistance in deleting evidence such as the Windows registry data.

56.    With regard to USB storage devices, Neergheen's testimony was that he only owns two devices (Neergheen dep. 96:22-97:2) and that he has only used two USB storage devices (Neergheen dep. 97:3-9). The evidence within Item 004 reports that in July 2008, at least four USB storage devices with unique serial numbers were attached to Item 004. Neergheen may not own them all, but if only he or his counsel had access to Item 004 after July 11, 2008 (Neergheen dep. 143:16-19), it is imperative to identify who owns or possesses the devices now, and who used them during July 2008.

57.    Since Neergheen testified that he has used flash drives to transport Mintel data (Neergheen dep. 96:19-97:9), I would need to examine the forensic images for each of the USB storage devices listed within Table Five. After Defense experts create the forensic images as they

23

did for Item 004, I will be able to review the devices and determine if they contained Mintel file data at the time of imaging, or if steps were taken to destroy evidence from within the USB storage devices as has occurred within Item 004.

58.     I do not know if or when Neergheen's counsel instructed him that he had a duty to preserve evidence and he should stop using Item 004. The evidence reflects that Item 004 was in use up to July 18, 2008, the very day it was forensically imaged, and that both active and passive steps were employed to destroy evidence from the Item 004 laptop computer.

Further Affiant Saith Not.

Scott R. Jones, EnCE, CompTIA A+
Paraben Certified PDA Examiner

Subscribed and Sworn to before me
this 21 st day of August, 2008.

NOTARY PUBLIC

OFFICIAL SEAL
LEE M NEUBECKER
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:05/18/09

24

# EXHIBIT A



Computer Forensics Specialists

Internal Investigations ◆ Trade Secrets ◆ Employment Litigation

**EXHIBIT A**          **CURRICULUM VITAE**          **EXHIBIT A**

# Scott Jones

Scott Jones is a Senior Forensic Examiner for Forensicon, Inc. Mr. Jones provides consulting services in the areas of computer forensics, electronic discovery, data recovery, expert witness testimony and litigation support for clients spanning many areas of industry, from small businesses to large corporations. Mr. Jones has worked in support of both Plaintiff and Defense counsels, and has additionally served in a third-party neutral expert capacity for civil litigation cases. Mr. Jones has testified as an expert witness in computer forensics before the United States District Court for the Northern District of Illinois, Eastern Division, and has offered written and verbal testimony for the Circuit Court of Cook County, Illinois, before the Financial Industry Regulatory Authority ("FINRA", formerly "NASD") and the Occupational Safety and Health Administration ("OSHA").

Mr. Jones possesses critical computer and forensics certifications from organizations such as CompTIA, Guidance Software, and Paraben Software. He possesses the CompTIA A+ certification, Guidance Software's EnCE (EnCase Certified Examiner) designation, and has completed requirements for Paraben Software Corporation's Certified PDA Examiner designation.

In addition to Mr. Jones's various certifications, his professional experience in computer forensics and computer science has enabled him to be accepted as an instructor at Wilbur Wright College in Chicago, Illinois. Mr. Jones has taught computer forensics for the Computer Security & Forensic Investigations program to students from both civilian and government/law enforcement populations.

On multiple occasions, Mr. Jones has been consulted by local media outlets due to his technical understanding and professional reputation. He has been interviewed both WGN-TV and WCIU-TV.

Prior to teaching computer forensics at Wright College, and also prior to working for Forensicon, Inc., Mr. Jones worked for Sprint PCS. While at Sprint PCS, Mr. Jones provided technical support for customers needing to integrate Sprint PCS cellular devices and services with their existing computer(s). Mr. Jones also initiated fraud investigations based upon client activities and also assisted with both device repair and inventory control procedures.

Prior to Sprint PCS, Mr. Jones was employed as a Senior Computer Repair Technician for a publicly-traded retail chain. His years of experience in computer repair and technical support, along with his ability to train others helped him attain the "Tech Bench MVP" award in November 2001.

Mr. Jones graduated *cum laude* from DeVry Institute of Technology with a Bachelor of Science in Information Technology. Mr. Jones has also earned a Bachelor of Science of Administrative Management degree with a Minor in Music from Eastern Illinois University. He is presently pursuing a Masters of Science in Information Technology Law degree from The John Marshall Law School in Chicago, Illinois.

## ▪▪ Forensicon

**EXHIBIT A**

---

## AFFIDAVITS  -  DEPOSITIONS  -  EXPERT TESTIMONY - CONSULTING

**Civil Action No. 05 C 3003**
> *Charles A. Krumwiede v. Brighton Associates, LLC & Ismael Reyes*
> United States District Court
> Northern District of Illinois, Eastern Division
> cited at <u>2006 WL 1308629 (N. Dist. Ill. 05 C 3003)</u>, <u>2006 U.S. Dist. LEXIS 70535</u>

**Civil Action No. 06 C 2709**
> *Valuepart, Inc. v. Brett Clemens, Shannon Murphy, and ITR North America*
> United States District Court
> Northern District of Illinois, Eastern Division
> Online reference at http://www.duanemorris.com/attorneys/johntschriver.html

**Civil Action No. 04 CV 1873**
> *S.C. Johnson & Son, Inc. v. Milton E Morris, et al.*
> Circuit Court of Racine County
> Racine, Wisconsin

**Civil Action No. 03 C 8708**
> *Patrick Mudron v. Brown & Brown, Inc.*
> United States District Court
> Northern District of Illinois, Eastern Division

**Civil Action No. 03 C 4769**
> *Lorillard Tobacco Co., et al. v.Canstar (USA) Inc, et al.*
> United States District Court
> Northern District of Illinois, Eastern Division

**Civil Action No. 07 CV 001679**
> *Terrence O'Malley v. Village of Oak Brook, et al.*
> United States District Court
> Northern District of Illinois, Eastern Division

**Civil Action No. 05 L 50500**
> *PCS Administration (USA), Inc. v. Karen Bishop*
> Circuit Court Of Cook County, Illinois
> County Department, Law Division

**Civil Action No. 05 CH 289**
> *The Agency, Inc, d/b/a The Agency Staffing v. Janet Grove*
> Circuit Court of the 19th Judicial Circuit
> McHenry County, Illinois
> County Department, Chancery Division

⬧⬛ Forensicon

**EXHIBIT A**

## PROFESSIONAL DEVELOPMENT

- **EnCase Certified Examiner** (EnCE), Guidance Software, Inc. Obtained February 2005
- **Certified PDA Examiner**, Paraben Corporation, Obtained June 2005
- **CompTIA A+ Certified Professional**, Validation Date: 11/6/2004, ID No. COMP001003247176
- **Associate Member**, Association of Certified Fraud Examiners, Member No. 139286
- **EnCase & Vericept Corporation Seminar**, Implementing an Effective Incident Management System, October 28, 2005 – Oakbrook, Illinois
- **EnCase v5 Briefings Seminar**, April 26, 2005 – Chicago, Illinois, CPE Credits: 4
- **Intermediate Computer Forensics**, May 17-19, 2004 – RCFL, AccessData Corporation – 24 Hours classroom instruction, Chicago, Illinois
- **EnCase Intermediate Analysis & Reporting**, July 30, 2004 – Sterling, Virginia, CPE Credits: 32
- **PDA Seizure & Analysis**, Paraben Corporation – Two days of classroom instruction, June 21-22, 2005, Chicago, Illinois
- **EnCase Incident Response, Forensic Analysis & Discovery**, April 16, 2004 – Sterling, Virginia, CPE Credits: 40

## FORMAL EDUCATION

- **Masters of Science in Information Technology Law**, GPA: 3.83/4.0, John Marshall Law School, Chicago, Illinois, In process as of Spring 2007
- **Bachelor of Science in Information Technology**, GPA: 3.67/4.0, Cum Laude & Dean's List, DeVry Institute of Technology, Tinley Park, Illinois, Graduated March 2002
- **Bachelor of Science of Administrative Management**, Music Violin, Minor, Eastern Illinois University Charleston, Illinois, Graduated May 1995

## PROFESSIONAL EXPERIENCE

**FORENSICON, INC. - Chicago, Illinois (3/04 – Present)**
Senior Forensic Examiner
- Perform forensic investigations & analysis of client electronic media including hard drives, floppy disks, CDs/DVDs, & other forms of electronic media. Analysis performed with software tools such as EnCase, FTK, Paraben Device Seizure, & others.
- Train Associate Examiners and support staff as needed
- Create expert written reports for both active litigation and internal investigations.
- Research new technologies & products for use in forensic electronic investigations.
- Work with clients to review discovery requests, case strategies, and design solutions to meet case-specific requirements.
- Participate in & attend professional training classes, seminars, & conferences related to computer forensics & litigation support.
- Promoted to Senior Forensic Examiner in April 2005

**WILBUR WRIGHT COLLEGE - Chicago, Illinois (8/05 – 12/06)**
Adjunct Instructor, Computer Security & Forensic Investigation Program
- Taught computer forensics to both law enforcement/government and civilian students
- Created & modified curriculum, class assignments, lab projects & lectures as needed
- Assisted with student workshops related to Computer Security & Forensic Investigations

■■■ Forensicon

**SPRINT PCS – Bolingbrook, Illinois & Downers Grove, Illinois (11/02 to 3/04)**
Inventory Support Specialist – Downers Grove, Illinois (11/03 to 3/04)
- Oversaw all aspects of inventory control for retail location including shipping & receiving, physical inventory & store audits, & reporting for Downers Grove Store # 899.
- Reporting included weekly & monthly semi-automated reports using RMS Back Office & Sprint-proprietary systems.
- Researched discrepancies & report results to corporate audit staff.
- Served as on-site technician & technical systems contact for customer & store phone & computer troubleshooting needs.

Level III Tier I Data Specialist – Bolingbrook, Illinois (11/02 – 11/03)
- Provided over-the-phone troubleshooting, programming, & debugging services for clients using Sprint PCS handsets & wireless internet connectivity devices for laptop computers, personal digital assistants, cell phones & other specialty devices.
- Assisted customers with the installation & configuration of Sprint & Sprint-approved software for Windows versions 95 thru XP, & limited support for Mac OS & Linux.
- Researched errors & defects to resolve customer technical issues.
- Initiated fraud investigations for client accounts upon discovery of questionable activities of retail store employees, call center or other employees, or the clients themselves.
- Developed & share innovative problem-solving techniques.
- Accepted customer service overflow from other tiers as needed during peak periods.
- Transferred to Store #899 due to position being outsourced to India.

**BEST BUY CORPORATION – Lansing, Illinois & Orland Park, Illinois (8/01 to 11/02)**
Senior Computer Repair Technician
- Repaired & maintained customer PCs running various Windows OS platforms.
- Installed peripherals such as disk drives, video cards, sound cards, hard-drives, network cards, & other devices in client computers.
- Provided in-store technical support for over 30 IBM NT4.0 workstations used for Point-Of-Sale & internal reporting as well as thermal printers and HP laser printers within store.
- Trained part-time technicians in new technologies & procedures for computer repair, software troubleshooting, & overall standard operating platform for the tech bench.
- Named "Tech Bench MVP" in November 2001 for customer service & technical leadership.
- Promoted to Senior Computer Repair Technician at Lansing location in July 2002.

# EXHIBIT B

**Jones Affidavit – EXHIBIT B - Civil Action No. 08-cv-3939**

**Website:**     http://support.microsoft.com



**ID 2293          query = dele**



**ID 2291          query = deleted**



**Jones Affidavit – EXHIBIT B - Civil Action No. 08-cv-3939**

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 1

# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MINTEL INTERNATIONAL GROUP,      )
LTD., a United Kingdom           )
corporation,                     )
                                 )
              Plaintiff,          )
                                 )
      -vs -                       )      No.  08 CV 3939
                                 )
MEESHAM NEERGHEEN, an            )
individual                       )
                                 )
              Defendant.          )

The videotaped deposition of
MEESHAM NEERGHEEN, called for examination
pursuant to notice and the Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken
before Allison D. Weber, CSR, a notary public
within and for the County of Cook and State of
Illinois, at 33 West Monroe Street, Suite 2700,
Chicago, Illinois, on the 13th day of August,
2008, at the hour of 9:44 o'clock a.m.


Reported by:  Allison D. Weber, CSR
License No.:  084-002238

Marlo Reporting & Video Services, Inc.
(312) 578-0041

EXHIBIT
2

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 46

1  returned home?
2     A.   I did.
3     Q.   You're being represented by counsel
4  here today; is that right?
5     A.   Yes.
6     Q.   And when did you -- when were you
7  first represented by counsel in this matter?
8     A.   I can't recall the date.
9     Q.   Would it have been on that Monday,
10  the 14th?
11     A.   I don't know.  I was told to go home
12  and we'll get back in touch with you as to when
13  you can come back into the office.
14     ·Q.   When did you first hear from any of
15  the lawyers at Bell, Boyd and Lloyd?
16     A.   I believe -- oh, that's a very good
17  question.  I can't remember.  I guess it probably
18  was the Tuesday.  It might have been the
19  Wednesday.
20     Q.   You know that there was a court hearing
21  on the 16th, which was the Wednesday; is that
22  right?
23     A.   Yes.
24     Q.   And I assume you spoke to your lawyers

Page 47

1  before that?
2     A.   Okay.  So it would have been either
3  Monday afternoon or maybe Tuesday.
4     Q.   Aside from -- and I'll caution you,
5  I don't want to know the content of any
6  conversations that you had with counsel or when
7  counsel was present.
8          Besides your conversation with
9  Mr. Howard, did you have any conversations with
10  anyone else at Datamonitor regarding this lawsuit
11  on the 14th or 15th?
12     A.   No.
13     Q.   Any conversations with anyone at
14  Datamonitor prior to the court hearing on the
15  16th?
16     A.   No.
17     Q.   So it was just the one conversation with
18  Mr. Howard on the 14th; is that right?
19     A.   Yes, the Monday -- oh, I first spoke
20  with him on the Saturday and then...
21     Q.   Understood.
22          Did you do anything with your laptop
23  computer upon receiving a copy of the summons and
24  complaint?

Page 48

1     A.   Did I do anything?
2     Q.   Did you stop using it?
3     A.   My laptop?
4     Q.   Yes.
5     A.   I think I may have printed out the
6  documents just so that I could have a copy,
7  because when I brought the copy that was
8  delivered by messenger into the office, I left it
9  with Richard Watkins.
10     Q.   Did you keep using your computer?
11     A.   No.  No.
12     Q.   You stopped using it entirely after --
13     A.   Well, I was checking e-mails, yes,
14  but -- I was using the internet to check e-mails
15  because we -- I was liaisoning with -- I was
16  liaisoning with my attorneys.
17     Q.   Did you delete any documents from
18  your computer from the time you received the
19  complaint until the time you turned it over to
20  counsel?
21     A.   No.
22     Q.   Aside from accessing the internet --
23  using the internet to access your e-mail, did you
24  do anything else with the computer, run any other

Page 49

1  programs, anything like that?
2     A.   No.
3     Q.   I assume that Datamonitor -- someone
4  at Datamonitor is the one that put you in touch
5  with Bell, Boyd and Lloyd; is that right?
6     A.   Yes.
7     Q.   And who is paying Bell, Boyd and Lloyd's
8  fees for this litigation?
9     MR. ROACHE:  Objection, relevance.
10          You can answer.
11     THE WITNESS:  I guess Datamonitor.
12  BY MR. PIOLI:
13     Q.   Do you have an agreement with
14  Datamonitor that they're going to pay the fees in
15  this case?
16     A.   No.  No, I -- I don't recall signing
17  anything that says that they're going to pay the
18  fees.
19     Q.   But that's your understanding?
20     A.   That's -- I have been told that it's
21  going to be handled, so...
22     Q.   Who told you that?
23     A.   My attorneys.
24     Q.   So you're not worried at all that you're

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 142

1    A.   Can you define conversation?
2    Q.   Sure. Let's start, have you had any
3  oral communications with Mr. Cooper?
4    A.   Yes, we have spoken, yes.
5    Q.   Since you started at Datamonitor?
6    A.   We have spoken, yes.
7    Q.   What -- I'm sorry.
8    A.   On a social basis, hi, hello, how are
9  you.
10    Q.   Did you have any discussions about
11  Mintel with Mr. Cooper since you started at
12  Datamonitor?
13    A.   No.
14    Q.   You previously testified that you did
15  not know how to partition a hard drive; is that
16  correct?
17    A.   That's true.
18    Q.   Do you know how big the hard drive is
19  on your Sony computer?
20    A.   I don't know.
21    Q.   Does 30 gigabytes sound about right?
22    A.   I don't know.
23    Q.   Do you have any explanation as to why
24  the hard drive on your computer is partitioned so

Page 143

1  that only 10.3 gigabytes is being used?
2    A.   I don't know.
3    Q.   Do you have any explanation as to why
4  there's so many hard drives partitioned so that
5  17 gigabytes of unused space was deleted?
6    A.   I don't know.
7    Q.   You previously testified that only you
8  and your attorneys had access to your computer
9  since the time that this lawsuit was filed; is
10  that correct?
11    MR. ROACHE:  Objection, mischaracterizes his
12  testimony.
13        He can answer.
14    THE WITNESS:  Yes.
15  BY MR. PIOLI:
16    Q.   Is that true, only you and your
17  attorneys have access to your computer since this
18  lawsuit was filed?
19    A.   Yes.
20    Q.   You previously testified that you
21  only -- since the time the lawsuit was filed you
22  only used the computer to access e-mail via the
23  internet; is that right?
24    A.   Yes.

Page 144

1    Q.   Do you know what a defrag program
2  is?
3    A.   No.
4    Q.   Are you aware that a defrag program was
5  run on your computer on July 14th?
6    A.   I don't know.
7    Q.   Do you have any explanation as to why it
8  would have been run on your computer on
9  July 14th?
10    A.   I don't know.
11    Q.   Would it surprise you if a defrag
12  program had been run on your computer on
13  July 14th?
14    A.   I don't know what a defrag program is.
15    Q.   You're aware that an antivirus program
16  ran on your computer on July 17th?
17    A.   I don't know.
18    Q.   You're aware that that would write over
19  files?
20    A.   I don't know.
21    Q.   Are you aware of your duty to preserve
22  evidence in this case?
23    A.   I'm sorry?
24    Q.   Are you aware of your duty to preserve

Page 145

1  evidence in this case?
2    A.   Can you explain that?
3    Q.   You're aware that once you had notice of
4  this lawsuit you weren't supposed to be using
5  your computer?
6    MR. ROACHE:  Object to the form.
7    THE WITNESS:  Um, I don't know.
8  BY MR. PIOLI:
9    Q.   Nobody ever informed you about a
10  duty to preserve evidence in this case?
11    A.   I don't know.
12    Q.   Isn't it true, sir, that on July 17th
13  you accessed the Microsoft help and support
14  website and entered queries about how to delete
15  data from your computer?
16    A.   Oh, I know exactly. Yes.
17    Q.   Why did you --
18    A.   It wasn't how to delete. I was trying
19  to look for the files that I had sent over to
20  my -- from my Mintel account, and I was trying to
21  find out how to retrieve files from my Hotmail
22  that had been deleted.
23    Q.   What searches did you enter?
24    A.   I can't remember.

37 (Pages 142 to 145)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 94

1  today?
2      A.  My attorneys.
3      Q.  Anyone besides your attorneys?
4      A.  No.
5      Q.  With regard to the -- we talked about
6  the Dell computer that you had purchased from
7  Mintel.  Do you recall that?
8      A.  Yes.
9      Q.  When you sent it to your relative in
10  Mauritius, did you receive any compensation for
11  that?
12      A.  No.
13      Q.  Is it possible that that computer had
14  Mintel information on it when you sent it to
15  Mauritius?
16      MR. ROACHE:  Objection, calls for
17  speculation.
18          You can answer.
19      THE WITNESS:  No.
20  BY MR. PIOLI:
21      Q.  Why do you say it's not possible?
22      A.  It was a home -- I wasn't using it.  It
23  was handed over as a gift.
24      Q.  Am I right, I thought you previously

Page 95

1  testified that you had used it for some time.
2      A.  Yes, for some time, but strictly just,
3  you know, looking for my e-mails and just for
4  general use, basically.
5      Q.  You never did any work on that
6  computer?
7      A.  No.
8      Q.  Never brought documents home to work
9  on?
10      A.  On that computer, no.
11      Q.  Never accessed e-mail containing Mintel
12  documents using that computer?
13      A.  No.
14      Q.  You're certain of that as you sit here
15  today?
16      A.  I'm certain.  If ever I was doing any
17  work, I take a loaner laptop from Mintel and I
18  would work using the loaner Mintel laptop.
19      Q.  And I apologize for being repetitive,
20  but other than the Dell computer and the Sony
21  laptop and the desktop computer you used at
22  Mintel, did you use any other computers during
23  your employment at Mintel?
24      A.  No.

Page 96

1      Q.  Do you know what a thumb drive is?
2      A.  No.  Thumb drive?
3      Q.  Are you familiar with memory devices
4  that you can connect through a USB port?
5      A.  Yes.
6      Q.  Okay.  You're not aware that they're
7  commonly called thumb drives?
8      A.  No.
9      Q.  What do you call them?
10      A.  A flash drive.
11      Q.  That's probably the better moniker for
12  it.
13          During the time that you worked for
14  Mintel, did you use flash drives to transport
15  data between your work computer and your laptop?
16      A.  Between my work computer and my
17  laptop I don't know.
18      Q.  It's possible that you did?
19      A.  I once -- I guess I would -- I guess
20  if the file was large enough, then, yes, I would
21  transfer it to the flash drive.
22      Q.  How many flash drives do you currently
23  own?
24      A.  Two.

Page 97

1      Q.  Did you previously own more?
2      A.  No.
3      Q.  So is it your testimony that from the
4  time you began work at Mintel's Chicago office
5  until today you have only used two flash drives?
6      MR. ROACHE:  Objection, mischaracterizes
7  his testimony.
8          You can answer.
9      THE WITNESS:  Yes.
10  BY MR. PIOLI:
11      Q.  Did you ever use any CDs to transport
12  documents from your work computer at Mintel to
13  your laptop?
14      A.  Yes.  There was -- there were times
15  when I would have presentations loaded up on to
16  CDs as a backup, yes.
17      Q.  Do you currently possess any CDs with
18  Mintel's files or information on them?
19      A.  No.
20      Q.  Did you turn those in when you ceased
21  your employment with Mintel?
22      A.  They were left at work, so...
23      Q.  You didn't have any at home?
24      A.  No.

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 90

1    Q.    When did you receive your first
2  paycheck from Datamonitor?
3    A.    I don't -- sometime in June, I believe.
4    Q.    What did you do between April 30th and
5  May 27th?
6    MR. ROACHE:  Object to the form.
7      You can answer.
8    THE WITNESS:  I was enjoying the summer.
9  BY MR. PIOLI:
10    Q.    Did you do any work on behalf of
11  Datamonitor between April 30th, 2008 and
12  May 27th, 2008?
13    A.    No.
14    Q.    Did you work daily for Datamonitor
15  between May 27th, 2008 and July 14th, 2008 when
16  Mr. Howard instructed you to go home?
17    A.    Did I work daily?
18    Q.    Yes.
19    A.    Yes.
20    Q.    After you went home on July 14th, 2008,
21  did you do any work on behalf of Datamonitor?
22    A.    No.
23    Q.    Have you resumed your work for
24  Datamonitor?

Page 91

1    A.    Yes.
2    Q.    When did you resume working for
3  Datamonitor?
4    A.    I can't remember.  Towards the end
5  of -- I really can't remember.
6    Q.    Was it during the month of July?
7    A.    Yes.
8    Q.    Was it more than a week that you were
9  out of work?
10    A.    Yes.
11    Q.    Was it more than two weeks?
12    A.    No.
13    Q.    Who fulfilled your job responsibilities
14  while you were out of work?
15    A.    I don't know.
16    Q.    When did your work visa with Mintel
17  expire?
18    A.    I think it's still valid, so it was
19  still valid when I was still at Mintel.
20    Q.    Was it your understanding that your
21  Mintel work visa was transferable?
22    MR. ROACHE:  Objection to the extent it
23  calls for a legal conclusion.
24    THE WITNESS:  I don't know.

Page 92

1  BY MR. PIOLI:
2    Q.    You previously testified that you had
3  turned over your Sony -- Mintel Sony laptop
4  computer to counsel; is that correct?
5    A.    Yes.
6    Q.    When did you do that?
7    A.    I'm not sure of the exact date.
8    Q.    Was it prior to the TRO hearing on
9  July 16th?
10    A.    I can't remember.
11    Q.    Was it more than a week after you
12  were served with a summons and complaint in the
13  case?
14    MR. ROACHE:  Objection, asked and
15  answered.
16      You can answer.
17    THE WITNESS:  I don't know.  I don't know
18  the exact date.
19  BY MR. PIOLI:
20    Q.    Was it a matter of days or weeks that
21  you turned it over to counsel?
22    A.    I don't know.
23    Q.    Was it a month before you turned it over
24  to counsel?

Page 93

1    A.    No, it was most definitely less than a
2  month.
3    Q.    Was it more than three weeks?
4    A.    No.
5    Q.    Was it more than two weeks?
6    A.    I don't think so.
7    Q.    Was it less than a week?
8    A.    It could have been a week.  It could
9  have been less than a week.  I know for sure it
10  was not two, three or four weeks after.
11    Q.    From the time that you were served
12  with the lawsuit on July 11th until today, has
13  anyone had possession and control over your
14  computer other than either yourself or counsel?
15    A.    No.
16    Q.    And when you log on to your computer,
17  you have a user name; is that right?
18    A.    Yes.
19    Q.    And you have to type in a password as
20  well?
21    A.    Yes.
22    Q.    And did anyone have access to your user
23  name and password from the time you were served
24  with a copy of the summons and complaint until

24 (Pages 90 to 93)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 94

1  today?
2      A.  My attorneys.
3      Q.  Anyone besides your attorneys?
4      A.  No.
5      Q.  With regard to the -- we talked about
6  the Dell computer that you had purchased from
7  Mintel.  Do you recall that?
8      A.  Yes.
9      Q.  When you sent it to your relative in
10 Mauritius, did you receive any compensation for
11 that?
12     A.  No.
13     Q.  Is it possible that that computer had
14 Mintel information on it when you sent it to
15 Mauritius?
16     MR. ROACHE:  Objection, calls for
17 speculation.
18         You can answer.
19     THE WITNESS:  No.
20 BY MR. PIOLI:
21     Q.  Why do you say it's not possible?
22     A.  It was a home -- I wasn't using it.  It
23 was handed over as a gift.
24     Q.  Am I right, I thought you previously

Page 95

1  testified that you had used it for some time.
2      A.  Yes, for some time, but strictly just,
3  you know, looking for my e-mails and just for
4  general use, basically.
5      Q.  You never did any work on that
6  computer?
7      A.  No.
8      Q.  Never brought documents home to work
9  on?
10     A.  On that computer, no.
11     Q.  Never accessed e-mail containing Mintel
12 documents using that computer?
13     A.  No.
14     Q.  You're certain of that as you sit here
15 today?
16     A.  I'm certain.  If ever I was doing any
17 work, I take a loaner laptop from Mintel and I
18 would work using the loaner Mintel laptop.
19     Q.  And I apologize for being repetitive,
20 but other than the Dell computer and the Sony
21 laptop and the desktop computer you used at
22 Mintel, did you use any other computers during
23 your employment at Mintel?
24     A.  No.

Page 96

1      Q.  Do you know what a thumb drive is?
2      A.  No.  Thumb drive?
3      Q.  Are you familiar with memory devices
4  that you can connect through a USB port?
5      A.  Yes.
6      Q.  Okay.  You're not aware that they're
7  commonly called thumb drives?
8      A.  No.
9      Q.  What do you call them?
10     A.  A flash drive.
11     Q.  That's probably the better moniker for
12 it.
13         During the time that you worked for
14 Mintel, did you use flash drives to transport
15 data between your work computer and your laptop?
16     A.  Between my work computer and my
17 laptop I don't know.
18     Q.  It's possible that you did?
19     A.  I once -- I guess I would -- I guess
20 if the file was large enough, then, yes, I would
21 transfer it to the flash drive.
22     Q.  How many flash drives do you currently
23 own?
24     A.  Two.

Page 97

1      Q.  Did you previously own more?
2      A.  No.
3      Q.  So is it your testimony that from the
4  time you began work at Mintel's Chicago office
5  until today you have only used two flash drives?
6      MR. ROACHE:  Objection, mischaracterizes
7  his testimony.
8         You can answer.
9      THE WITNESS:  Yes.
10 BY MR. PIOLI:
11     Q.  Did you ever use any CDs to transport
12 documents from your work computer at Mintel to
13 your laptop?
14     A.  Yes.  There was -- there were times
15 when I would have presentations loaded up on to
16 CDs as a backup, yes.
17     Q.  Do you currently possess any CDs with
18 Mintel's files or information on them?
19     A.  No.
20     Q.  Did you turn those in when you ceased
21 your employment with Mintel?
22     A.  They were left at work, so...
23     Q.  You didn't have any at home?
24     A.  No.

AO88  (Rev. 12/06) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

NORTHERN                DISTRICT OF            ILLINOIS

MINTEL INTERNATIONAL GROUP, LTD.

V.                                        **SUBPOENA IN A CIVIL CASE**

MEESHAM NEERGHEEN

Case Number:[1]  08 CV 3939

TO:   Richard Watkins
      Datamonitor
      200 West Monroe Street
      Chicago, IL  60606

☐   YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
SEE ATTACHED RIDER

| PLACE   Katherine J.Pronk, JOHNSON & BELL, LTD. 33 W. Monroe St., Suite 2700, Chicago, IL  60603 | DATE AND TIME  7/23/2008 5:00 pm |
|---|---|

☐   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Joseph R. Marconi (by:KJP)* | 7/21/08 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Joseph R. Marconi, JOHNSON & BELL, LTD.
33 W. Monroe St., Suite 2700, Chicago, IL  60603                312/984-0211

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

EXHIBIT
3

AO88  (Rev.  12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | 7/21/2008 | Datamonitor<br>200 West Monroe Street, Chicago, Illinois 60606 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| Richard Watkins | Messenger Delivery |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | Messenger    _Demetrius Witt_ |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ___7/21/2008___
DATE

_Demetrius Witt_
SIGNATURE OF SERVER

Johnson & Bell, Ltd.
ADDRESS OF SERVER

33 W. Monroe St., Suite 2700, Chicago, IL  60603

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend and produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

## RIDER

Plaintiff Mintel International Group, Ltd. ("Mintel"), pursuant to Federal Rule of Civil Procedure 45, hereby requests that Datamonitor produce the following documents in its possession, custody or control, in accordance with the terms of the attached subpoena.

## Definitions and Instructions

1.    As used herein, "document" means any writing, graphic matter or other tangible thing, whether printed, electronically stored, recorded, produced by any process, or written or produced by hand, including, but not limited to checks, drawings, invoices, letters, reports, other written communications, correspondence, e-mails, telegrams, internal and external memoranda, summaries, records or oral conversations, original or preliminary notes, diaries, calendars, analyses, projections, ledgers, work papers, photographs, tape recordings, video tapes, computer hard drivers or disks, statistical statements, logs, graphs, charts, schedules, notebooks, minutes or records of meetings, minutes or records of conferences, lists of persons attending meetings or conferences, reports and/or summaries of investigations, opinions or reports of investigators, accountants or consultants, studies, appraisals, evaluations, or copies of any of the foregoing if the copy is in any way different from the original now in your possession, custody or control, or the possession, custody or control of your counsel, evaluation consultants, agents, employees and/or persons acting on your behalf.

2.    If information or a document is withheld for any reason, identify the information or document and the reason for withholding the responsive information or document as follows:

(a)    The reason for withholding the document, including an explanation of any privilege which is claimed;

(b)    The date(s) of the document(s);

(c)    The name and address of the author(s) of the document(s);

(d)    The name and address of each person to whom a copy of the document(s) was sent and each person known to have seen or participated in communication about the document(s);

(e)    The title, nature and subject matter of the information or document(s);

(f)    The name, address and job title of each person who has possession, custody or control of such information or document(s);

1

(g)    The present or last known location and custodian of the document(s); and

(h)    All other information necessary to assess a claim of privilege.

3.    In construing these requests:

(a)    The singular form of a word includes the plural form and vice versa; and

(b)    "And" and "or" are to be construed either disjunctively or conjunctively as is necessary to bring within the scope of each request any matter, information or document that might otherwise be construed as outside its scope.

4.    As used herein, "Datamonitor" shall include all employees, directors, officers, agents, and individuals subject to Datamonitor's direction and control. In addition, "Datamonitor" shall include all parents companies, affiliates and subsidiaries.

## Documents and Objects

1.    Produce all documents representing, containing, reflecting or referencing any oral or written communications and/or correspondence between Datamonitor and Meesham Neergheen.

2.    Produce all documents representing, containing, reflecting or referencing Meesham Neergheen's interview(s) with Datamonitor prior to Datamonitor's offer of employment.

3.    Produce Meesham Neergheen's entire personnel file.

4.    Produce any and all documents within Datamonitor's possession pertaining or relating to or otherwise referencing in any manner Meesham Neergheen.

5.    Produce all documents, including correspondence, that refer to, relate to or otherwise constitute Meesham Neergheen's authorization to work in the United States of America.

6.    Produce all documents, including correspondence, that refer to Meesham Neergheen's status as an immigrant in the United State of America.

7.    Produce all documents, including correspondence, that refer to, relate to or constitute the means of Meesham Neergheen's entry into the United States of America.

8.    Permit the forensic imaging and/or copying of all of Datamonitor's desktop and/or laptop computers used at any time by Meesham Neergheen.

2

9.     Permit the forensic imaging and/or copying of Meesham Neergheen's electronic mail account at Datamonitor.

# Search results

*You can support Wikipedia by making a tax-deductible donation.*

From Wikipedia, the free encyclopedia

You searched for **computer hard drive** [Index]

## No article title matches

**There is no page titled "computer hard drive".**

For more information about searching Wikipedia, see Wikipedia:Searching.

| computer hard drive | MediaWiki search | Search |

Showing below results **1 - 20** of **4191**

View (previous 20) (next 20) (20 | 50 | 100 | 250 | 500)

---

- Hybrid drive
  ... es4|the computer hard disk|the automobile propulsion system|Hybrid Synergy Drive}} ...
  ays+flash+drive+boosts+speed+of+Windows+Vista.htm|title=Samsung says flash drive boosts speed of Windows
  Vista|publisher=Electronics Weekly|date=[[26 July] ...
  10 KB (1542 words) - 20:53, 20 July 2008
- Disk enclosure
  ... Image:Usb firewire hard disk enclosure.jpg|thumb|right|A 3.5" USB/FireWire hard disk enclosure]] ... models built
  around 2.5" & 3.5" hard drives and full-height 5.25" DVD-ROM drives use enclosures that are often nearly identical to
  OEM enclosures.
  8 KB (1193 words) - 05:26, 31 July 2008
- External hard disk drive
  ... B.jpg|thumb|[[Seagate Technology|Seagate]] FreeAgent Go external hard disk drive.]] ... s compatible with [[Small
  Computer System Interface]] (SCSI), [[Integrated Drive Electronics]] (IDE), [[Universal Serial Bus]] (USB), [[IEEE
  1394]] ([[Fire ...
  6 KB (902 words) - 03:31, 25 August 2008
- Drive letter assignment
  ... mespace, drive letter assignment allows multiple highest-level namespaces. Drive letter assignment is thus a process of
  using letters to name the roots of ... The concept of drive letters, as used today, presumably owes its origins to [[IBM]]'s
  [[VM (ope ...
  11 KB (1692 words) - 02:52, 3 July 2008
- USB flash drive
  {{Redirect|JumpDrive|the fictional propulsion system|Jump drive}} [[Image:USB Flash Drive.png|thumb|right|A 16GB
  USB flash drive.]]
  47 KB (7283 words) - 06:23, 27 August 2008
- Quiet PC
  A '''quiet PC''' is a [[personal computer]] that makes little [[noise]]. Common uses for quiet PCs include video edi ... ...
  ound will be noticed or [[Psychoacoustics#Masking effects | masked]], so a computer may be quiet with relation to a
  particular environment or set of users.[ht ...
  32 KB (4991 words) - 18:50, 24 August 2008
- IBM Personal Computer
  {{ infobox computer | Type = [[Personal computer]]
  35 KB (5449 words) - 13:29, 26 August 2008
- Eagle Computer
  ... f clones, including a portable. The Eagle PCs were always rated highly in computer magazines. ... rt. This led to the
  founding of third-party companies that sold BIOSes to computer manufacturers.
  24 KB (4055 words) - 10:27, 23 July 2008
- Hard disk drive
  {{ infobox computer hardware generic | name = Hard Disk Drive
  59 KB (8988 words) - 03:29, 26 August 2008
- Advanced Technology Attachment
  ... d disk]]s, [[solid-state drive]]s, and [[CD-ROM]] drives inside [[personal computer]]s. ... volved in several stages from

[[Western Digital]]'s original '''Integrated Drive Electronics''' interface. As a result, many near-synonyms for ATA/ATAPI an ...
37 KB (5931 words) - 16:30, 25 August 2008

- History of personal computers
  ... . Move content not related to personal computer to [[History of computing hardware]].}} {{main|Personal computer}}
  59 KB (8857 words) - 20:17, 26 August 2008

- Computer hardware
  ... of software that rarely, if ever, needs to be changed and so is stored on hardware devices such as [[read-only memory]] (ROM) where it is not readily cha ... ... ost people, form only a small minority of computers (about 0.2% of all new computers produced in 2003). See [[Microprocessor#Market statistics|Market statist ...
  11 KB (1638 words) - 19:17, 27 August 2008

- Solid-state drive
  {{Mergefrom|Flash drive|date=June 2008}} ... other flash-based solid-state storage, see [[flash drive]] and [[USB flash drive]].}}
  31 KB (4478 words) - 05:40, 27 August 2008

- LaCie
  industry = [[Computer peripheral]]s | products = [[Data storage]], [[computer display]]s |
  11 KB (1666 words) - 11:41, 3 July 2008

- Floppy disk
  {{Infobox Computer Hardware Generic | name = Floppy Disk Drive
  66 KB (10432 words) - 19:23, 25 August 2008

- Computer
  {{redirect|Computer technology|the company|Computer Technology Limited}} ... lity.jpg|right|thumb|The [[NASA]] [[Columbia (supercomputer)|Columbia Supercomputer]]]]]
  57 KB (8117 words) - 06:50, 21 August 2008

- Personal computer
  ... ch is intended to be operated directly by an end user, with no intervening computer operator. ... iad of personal productivity and special-purpose software. Modern personal computers often have high-speed or dial-up connections to the Internet, allowing ac ...
  44 KB (6533 words) - 12:30, 25 August 2008

- Tandy 1000
  ... 00'" was the first in a line of more or less [[IBM PC compatible]] [[home computer]] systems produced by the [[Tandy Corporation]] for sale in its [[Radio Sh ... ... many software packages of the era listed their support for Tandy standard hardware on the package.
  16 KB (2573 words) - 00:27, 28 July 2008

- History of hard disk drives
  The commercial usage of '''[[hard disk drives]]''' began in 1956 with the shipment of an [[IBM 305 RAMAC]] system inclu ... ... [[Seagate Technology]] introduced the [[ST-506]], the first 5.25-inch hard drives, with a formatted capacity of 5 megabytes.
  7 KB (1113 words) - 13:43, 14 August 2008

- Seagate Technology
  ... vigation systems. In addition, Seagate designs highly rugged 2.5-inch hard drives optimized for extreme temperatures, shock and vibration - - ideal for aut ... ... -inch form factor of the (by then famous) Shugart "mini-floppy" drive. The hard disc was a hit, and was later released in a 10-megabyte version, the ST-41 ...
  16 KB (2036 words) - 16:53, 27 August 2008

View (previous 20) (next 20) (20 | 50 | 100 | 250 | 500)

---

Advanced search

Search in namespaces:

☑ (Main)  ☐ Talk  ☐ User  ☐ User talk  ☐ Wikipedia  ☐ Wikipedia talk  ☐ Image  ☐ Image talk  ☐ MediaWiki
☐ MediaWiki talk  ☐ Template  ☐ Template talk  ☐ Help  ☐ Help talk  ☐ Category  ☐ Category talk  ☐ Portal
☐ Portal talk

☐ List redirects

Search for  computer hard drive          [ Advanced search ]

---

Retrieved from "http://en.wikipedia.org/wiki/Special:Search"

Page 1

1           IN THE DISTRICT COURT OF THE UNITED STATES
2             FOR THE NORTHERN DISTRICT OF ILLINOIS
3                        EASTERN DIVISION
4

MINTEL INTERNATIONAL GROUP,    )
5   LTD., a United Kingdom         )
    corporation,                   )           **CONFIDENTIAL**
6                                  )
                Plaintiff,         )
7                                  )
       -vs -                       )   No. 08 CV 3939
8                                  )
MEESHAM NEERGHEEN, an              )
9   individual                     )
                                   )
10              Defendant.         )
11
12          The videotaped deposition of
13   MEESHAM NEERGHEEN, called for examination
14   pursuant to notice and the Rules of Civil
15   Procedure for the United States District Courts
16   pertaining to the taking of depositions, taken
17   before Allison D. Weber, CSR, a notary public
18   within and for the County of Cook and State of
19   Illinois, at 33 West Monroe Street, Suite 2700,
20   Chicago, Illinois, on the 13th day of August,
21   2008, at the hour of 9:44 o'clock a.m.
22
23

     Reported by:  Allison D. Weber, CSR
24   License No.:  084-002238

EXHIBIT
4

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

| | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | JOHNSON & BELL, LTD. |
| 4 | BY:  MR. VICTOR J. PIOLI |
| 5 | MR. JOSEPH R. MARCONI |
| 6 | MS. KATHERINE J. PRONK |
| 7 | 33 WEST MONROE STREET, SUITE 2700 |
| 8 | CHICAGO, ILLINOIS  60603 |
| 9 | (312) 372-0770 |
| 10 | Representing the Plaintiff; |
| 11 | |
| 12 | BELL, BOYD & LLOYD, LLP |
| 13 | BY:  MR. JOHN J. ROACHE |
| 14 | MS. JEANA R. LERVICK |
| 15 | 70 WEST MADISON STREET, SUITE 3100 |
| 16 | CHICAGO, ILLINOIS  60602 |
| 17 | (312) 372-1121 |
| 18 | Representing the Defendant. |
| 19 | |
| 20 | ALSO PRESENT: |
| 21 | RICHARD RODRIGUEZ, Videographer |
| 22 | MR. JOHN BUTCHER |
| 23 | |
| 24 | |

| | Page 4 |
|---|---|
| 1 | THE VIDEOGRAPHER:  Today is August 13, 2008. |
| 2 | This is the videotaped deposition of |
| 3 | Meesham Neergheen taken on behalf of Johnson and |
| 4 | Bell, Limited. |
| 5 | This case is captioned Mintel versus |
| 6 | Neergheen, Case No. 08 CV 3939.  We are at |
| 7 | 33 West Monroe, Chicago, Illinois. |
| 8 | I am Richard Rodriguez, the |
| 9 | videographer; the court reporter is |
| 10 | Allison Weber.  We are both from the firm of |
| 11 | Marlo Reporting and Video Services, Inc. located |
| 12 | at 105 West Madison, Suite 1101, Chicago, |
| 13 | Illinois. |
| 14 | We are now going on the record at |
| 15 | 9:44 a.m. |
| 16 | Will the attorneys please state their |
| 17 | appearances for the record? |
| 18 | MR. PIOLI:  Victor Pioli of Johnson and Bell |
| 19 | on behalf of the plaintiff, Mintel International |
| 20 | Group. |
| 21 | MR. ROACHE:  John Roache and Jeana Lervick |
| 22 | on behalf of the defendant, Meesham Neergheen. |
| 23 | THE VIDEOGRAPHER:  And will the court |
| 24 | reporter please swear in the witness? |

| | Page 3 |
|---|---|
| 1 | I N D E X |
| 2 | WITNESS                    EXAMINATION |
| 3 | MEESHAM NEERGHEEN |
| 4 | By Mr. Pioli                5, 173 |
| 5 | By Mr. Roache               157 |
| 6 | |
| 7 | |
| 8 | E X H I B I T S |
| 9 | NUMBER                   MARKED FOR ID |
| 10 | Neergheen Exhibit |
| 11 | No. 1                        31 |
| 12 | No. 2                        38 |
| 13 | No. 3                        101 |
| 14 | No. 4                        104 |
| 15 | No. 5                        108 |
| 16 | No. 6                        110 |
| 17 | No. 7                        112 |
| 18 | No. 8                        114 |
| 19 | No. 9                        119 |
| 20 | No. 10                       122 |
| 21 | No. 11                       124 |
| 22 | No. 12                       133 |
| 23 | No. 13                       136 |
| 24 | No. 14                       153 |

| | Page 5 |
|---|---|
| 1 | (Witness sworn.) |
| 2 | THE VIDEOGRAPHER:  Please proceed. |
| 3 | MEESHAM NEERGHEEN, |
| 4 | called as a witness herein, having been first |
| 5 | duly sworn, was examined and testified as |
| 6 | follows: |
| 7 | EXAMINATION |
| 8 | BY MR. PIOLI: |
| 9 | Q.  Good morning, Mr. Neergheen.  My name |
| 10 | is Victor Pioli, and I'm one of the attorneys |
| 11 | representing Mintel International Group in this |
| 12 | litigation. |
| 13 | Mr. Neergheen, would you, first of all, |
| 14 | please state your name and spell it for the |
| 15 | record? |
| 16 | A.  Yeah, my name is Meesham Neergheen. |
| 17 | That's M-e-e-s-h-a-m, last name spelled |
| 18 | N-e-e-r-g-h-e-e-n. |
| 19 | Q.  I'll apologize ahead of time if I |
| 20 | mispronounce your name at any point. |
| 21 | A.  That's fine. |
| 22 | Q.  I'll assure you it's not intentional. |
| 23 | Mr. Neergheen, have you ever been |
| 24 | deposed before? |

2 (Pages 2 to 5)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 6

1    A.    No.
2    Q.    So before we get started, I'm just going
3    to go over a few of what we call the guidelines
4    as to how things are going to proceed today.
5          I'm going to be asking you a series of
6    questions.  Our court reporter is going to be
7    taking down my questions and your answers; and
8    because she's going to be taking down everything
9    that's said today, I would ask you to extend me
10   the courtesy of allowing me to finish my question
11   before starting your answer and I'll try to do --
12   extend you the same courtesy of not asking my
13   next question before you are done with your
14   answer, understood?
15   A.    Sure.
16   Q.    Also, because the court reporter is
17   taking down everything that's being said, I'll
18   need you to respond audibly to all of my
19   questions as opposed to a shrug of the shoulders
20   or a nod of the head, understood?
21   A.    Uh-hum.  Yes.
22   Q.    Next, if any of my questions are vague
23   and you don't understand them, please feel free
24   to tell me that and I'll try to do my best to

Page 7

1    clarify my question for you.
2    A.    I will.
3    Q.    Finally, if at any point during the day
4    you feel the need to take a break to use the
5    facilities or for any other reason, you should
6    feel free to tell me that and we will take a
7    break.  I would only ask that you not ask to take
8    a break while there's a question pending,
9    understood?
10   A.    Absolutely.
11   Q.    Mr. Neergheen, how old are you?
12   A.    I'm 34.
13   Q.    And are you single or married?
14   A.    I'm single.
15   Q.    Have you ever been married?
16   A.    No.
17   Q.    Where do you currently reside?
18   A.    I reside at 420 West Surf,
19   Apartment 610, Chicago, Illinois, 60657.
20   Q.    How long have you been at that
21   address?
22   A.    I believe three-and-a-half years.
23   Q.    And where did you reside prior to
24   that?

Page 8

1    A.    I lived at 3515 North Seeley,
2    Apartment 2, Chicago, Illinois, 60618.
3    Q.    How long were you there?
4    A.    A year and a half.
5    Q.    Now I understand you're a -- you
6    are not a United States citizen; is that correct?
7    A.    That's correct.
8    Q.    And are you -- where are you a citizen
9    of?
10   A.    Great Britain, United Kingdom.
11   Q.    How long have you been in the United
12   States?
13   A.    Coming up to five years now.
14   Q.    Have you spent the entire time in
15   Chicago?
16   A.    Working, yes.
17   Q.    And you resided at the two addresses
18   you have already given?
19   A.    Yes.
20   Q.    Those are the only two addresses you
21   resided at while in the states?
22   A.    Yes.  I also reside -- when I first
23   moved over for a couple of months I resided at --
24   address I can't remember, but it was -- I -- it's

Page 9

1    actually on my ID card.
2    Q.    That's okay.  Do you have citizenship
3    in any other countries besides the
4    United Kingdom?
5    A.    The UK and Mauritius.
6    Q.    Were you born in the United Kingdom?
7    A.    Yes.
8    Q.    How did you attain citizenship in
9    Mauritius?
10   A.    My parents are from Mauritius.
11   Q.    What's the highest level of education
12   that you obtained?
13   A.    I believe it's classified as a post-grad
14   over here in the States.
15   Q.    What did you study in your postgraduate
16   work?
17   A.    Marketing management.
18   Q.    Did you attain a degree in your
19   postgraduate studies?
20   A.    Yes.
21   Q.    What was that degree?
22   A.    It was an M.A. in marketing management.
23   Q.    And where was it from?
24   A.    It's from the University of Middlesex in

3 (Pages 6 to 9)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 10

1   London.
2       Q.   What year did you attain that?
3       A.   I believe it was '97.
4       Q.   And prior to your studies at University
5   of Middlesex, were you working or were you in
6   school?
7       A.   Prior to that?
8       Q.   Yes.
9       A.   I had just completed my first degree.
10      Q.   And what was that degree?
11      A.   That degree was in -- was a Bachelor of
12  Arts in engineering and business management.
13      Q.   Any specific type of engineering?
14      A.   It was -- it basically encompassed
15  everything from computer engineering to
16  electronics engineering to mechanical
17  engineering.
18      Q.   What school was that at?
19      A.   That was at the University of Greenwich
20  in London.
21      Q.   What years did you attend the University
22  of Greenwich?
23      A.   '92 to '95, I believe.
24      Q.   What type of class work did you get in

Page 11

1   computer engineering at the University of
2   Greenwich?
3       A.   Just basic programming.
4       Q.   Any languages that you learned
5   programming in?
6       A.   Yeah, it was very, very -- I think it
7   was called 64 base at the time.  It was a very,
8   very, very, very basic computer language.
9       Q.   And any other computer class work at
10  the University of Greenwich?
11      A.   Computer class work?
12      Q.   Any other courses that you took --
13      A.   Yeah.
14      Q.   -- besides programming classes?
15      A.   Oh, I did statistics.  I did
16  organizational behavior.  I did marketing.  I did
17  finance.  I did -- that's what I can recall.
18      Q.   But you know how to program a
19  computer?
20      A.   Program a computer?  I wouldn't say I
21  know how to program a computer, no.
22      Q.   Well, you know how to format a
23  computer?
24      A.   No.  I know how to format a disc if

Page 12

1   that's what you're asking.
2       Q.   Format a hard drive?
3       A.   I don't think I have ever had to do
4   that.
5       Q.   You would not know how to partition a
6   hard drive either?
7       A.   No.
8       MR. ROACHE:  Object to the form.
9           You can answer.
10      THE WITNESS:  I'm not a computer savvy
11  person.
12  BY MR. PIOLI:
13      Q.   Aside from what we have already
14  talked about, did you have any other education
15  beyond high school or secondary school education,
16  any other university work?
17      A.   No.
18      Q.   Following your graduation from the
19  University of Middlesex, did you begin work at
20  that point?
21      A.   Yes.  I worked very briefly for three
22  months for a telecommunications company.
23      Q.   What was the name of that company?
24      A.   I can't recall actually.  I think it

Page 13

1   begins with the letter T.  I was there for two
2   months.
3       Q.   What did you do for the
4   telecommunications company?
5       A.   I was predominantly in a sales role.
6       Q.   Why did you leave there?
7       A.   Because I discovered that sales wasn't
8   my cup of tea.
9       Q.   What didn't you like about sales?
10      A.   The fact that you had targets to reach
11  and numbers to meet.
12      Q.   What did you do after leaving the
13  telecommunications company?
14      A.   I spent some time unemployed and I got
15  an internship with Mintel.
16      Q.   Did you leave the telecommunications
17  company of your own volition?
18      A.   I was asked whether I wanted to continue
19  and I said no.
20      Q.   Was there any disciplinary action taken
21  against you at the telecommunications company?
22      A.   No.
23      Q.   Why did they ask you if you wanted to
24  continue?

Marlo Reporting & Video Services, Inc.
(312) 578-0041

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 14

1    MR. ROACHE:  Objection, calls for
2  speculation.
3         You can answer.
4     THE WITNESS:  I can't recall at this stage.
5  It was probably because I wasn't enjoying it and
6  I didn't like it, I guess.  I wasn't showing
7  enough enthusiasm.
8  BY MR. PIOLI:
9     Q.    How did you come to get an internship
10 at Mintel?
11    A.    I went through a program.  It was a
12 program that was looking specifically after
13 people that were unemployed for six months and
14 beyond, and I went for that program, and Mintel
15 decided to take me on as a -- on a voluntary
16 basis, so I went there for three months
17 specifically just doing database work, just
18 inputting contacts into the then CRM system that
19 Mintel had.
20    Q.    You said that was for three months?
21    A.    I did that voluntarily for three months,
22 yes.
23    Q.    Were you paid for your work there?
24    A.    No.  I was compensated.  My travel was

Page 15

1  paid.
2     Q.    And what happened following the three
3  months?
4     A.    I was given a job within the
5  international department of Mintel.
6     Q.    What does the international department
7  do at Mintel?
8     A.    Well, it has since become -- it was
9  structured differently back then.  It was
10 structured into two separate divisions.
11        The division that I worked for was an
12 organization called IIS, it is still part of
13 Mintel, I think it stands for international
14 information services, and they dealt
15 predominantly with the services divisions and
16 also the production of the then international new
17 products database, the North American new
18 products database and also the Japanese new
19 products database.
20 BY MR. PIOLI:
21    Q.    What was your position in the
22 international group?
23    A.    Just a junior editor.  I used to edit
24 the Japanese new products database.  I was a

Page 16

1  junior editor.  I edited the Japanese new
2  products database.
3     Q.    Aside from editing the new products
4  database, did you do anything else in the
5  international group?
6     A.    Not during -- not for, I guess, about a
7  year, maybe 15 months.
8     Q.    Did you get a promotion at that point?
9     A.    No.  No.
10    Q.    Did you switch positions at that point?
11    A.    I was doing -- I was also doing some
12 marketing work on the side whilst doing my --
13 while still in my junior editing position that
14 entailed generating lists, doing some research on
15 companies and doing some campaigns.
16    Q.    Following the year to 15 months as a
17 junior editor, did you then focus on the
18 marketing work?
19    A.    I was doing that in conjunction with my
20 junior editor work.
21    Q.    Did you then stop being a junior editor
22 at that point?
23    A.    Well, after 18 months I was put into
24 the marketing department at Mintel, and I believe

Page 17

1  at that time as well IIS became part of the
2  Mintel group itself.  I believe that was in '98.
3     Q.    Once again you had a -- you were
4  basically just doing marketing work at that
5  point?
6     A.    Yeah, it was basic, basic marketing,
7  and it was a combination of inputting contacts
8  and leads on to databases and just -- it was very
9  much a junior marketing role at the time.
10    Q.    Did you have a title or position?
11    A.    I think I was a marketing executive or
12 something.
13    Q.    How long were you a marketing
14 executive?
15    A.    I think it was probably about 18 months.
16    Q.    And what did you move on to from there?
17    A.    Senior marketing executive.
18    Q.    How did your responsibilities change
19 from being a marketing executive to a senior
20 marketing executive?
21    A.    I had to -- I was in contact with the
22 executives at Mintel.  I produced the first
23 company newsletter.  I also initiated a customer
24 questionnaire that went out to all Mintel

5 (Pages 14 to 17)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 18

1 clients.
2      I was also tracking sales activities
3 from a single-copy perspective and providing
4 analysis and direction where we should be
5 focusing marketing efforts on.
6      Q.  And how long were you a senior marketing
7 executive for?
8      A.  I believe it was about a year.
9      Q.  Does that take us to about the year
10 2000?
11     A.  Yeah, I guess so, yeah.
12     Q.  And what did you do after you were
13 senior marketing executive?
14     A.  I started -- I identified a niche within
15 the company -- I'm sorry, I identified a niche
16 within marketing as a whole and identified
17 associations -- trade associations as being great
18 organizations to actually leverage the Mintel
19 brand and promote reports to them to their
20 membership base.
21     Q.  Did you assume a new title at that
22 point?
23     A.  I don't know whether or not the title
24 was given to me then and there, but I know before

Page 19

1 coming out to the States in 2003 I had the
2 marketing operations manager title.
3      Q.  Did you say you had that position until
4 2003?
5      A.  Before I came out here, so I can't
6 remember when I received that title between --
7 from 2000 and 2003.
8      Q.  Prior to your identifying trade
9 associations as a niche market, did Mintel deal
10 with trade associations at all?
11     A.  They dealt with them from a research
12 perspective.  The analysts would usually contact
13 trade associations to bet (Sic.) the reports that
14 they were working on.
15     Q.  And what new role did you see for trade
16 associations?
17     A.  Well, it's a perfect channel for Mintel
18 to gain further exposure, so from a branding
19 perspective, exposure in magazines, exposure in
20 newsletters, the acquisition of membership lists
21 that get passed on to sales, to our sales team
22 for follow up.
23     Q.  Did you see it more as a situation
24 where Mintel could advertise with the trade

Page 20

1 associations?
2      A.  Yes.  The way I would do that was I
3 would offer a free copy of a Mintel report and we
4 would barter and receive free promotions, we
5 would get access to their membership lists, we
6 could do mailings to their membership lists,
7 offer their members a discount on the one
8 particular report that was being promoted.
9      Q.  Okay.  You stated that you had the
10 position of marketing operations manager until
11 2003; is that correct?
12     A.  Yes.
13     Q.  And following that what position did you
14 hold?
15     A.  I moved out to Chicago, the Chicago
16 office, and I still maintained that title.
17     Q.  What was your title in the Chicago
18 office?
19     A.  To start off with, marketing operations
20 manager.
21     Q.  Why did you move to Chicago?
22     A.  Why?
23     Q.  Yes.
24     A.  Because I was actually working -- I

Page 21

1 was doing a lot of association work for the
2 States whilst I was in the UK, and predominantly
3 I would be spending a lot of time contacting the
4 associations in the States and I didn't have many
5 hours in the day to play with in terms of
6 contacting the U.S. associations.
7      So I knew at that time that the office
8 was growing, and I asked if there would be an
9 opportunity to be transferred to the marketing
10 department in the U.S.
11     Q.  So you approached the higher ups and
12 said I want to move to Chicago?
13     A.  Yeah.
14     Q.  And who did you approach about that?
15     A.  Steve Charlton.
16     Q.  What was Mr. Charlton's position?
17     A.  He was the marketing director at the
18 time.
19     Q.  I assume he immediately granted your
20 approval to make that move?
21     A.  Well -- sorry.
22     MR. ROACHE:  Object to the form.
23     You can answer.
24     THE WITNESS:  I can answer?

6 (Pages 18 to 21)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 22

1    MR. ROACHE: You can answer.
2    THE WITNESS: I can't?
3    MR. ROACHE: You can.
4    THE WITNESS: Okay.
5        I'm sorry, what was the question?
6  BY MR. PIOLI:
7    Q.  Did Mr. Charlton, did he -- he granted
8  your request to move to Chicago?
9    A.  Well, he needed to seek approval first
10 from the chief exec.
11   Q.  And you made the move to Chicago in
12 2003; is that right?
13   A.  Yes.
14   Q.  Aside from the marketing operations
15 manager, did you hold any other titles at Mintel?
16   A.  For the last three months I was the PR
17 executive for CPG, and that was a temporary
18 position.
19   Q.  What did you -- while you were the
20 marketing operations manager, what were your
21 day-to-day activities?
22   A.  Day-to-day activities were to contact
23 trade associations, to leverage our research, to
24 try and see whether or not we can -- basically,

Page 23

1  you know, to obtain brand exposure to seek
2  speaking opportunities, see whether or not we can
3  get free advertising, complimentary booth space,
4  membership lists.
5    Q.  And you performed those -- those were
6  your daily activities from 2003 up until three
7  months prior to leaving Mintel?
8    A.  I also helped out. We were -- we were
9  a small team, so at the moment everyone helped
10 out, so I attended trade shows, I helped set up
11 trade shows and I was present at trade shows.
12       I also made sure that any contacts, any
13 lists that we had, whether they be delegate
14 lists, they were put on to the CRM system.
15   Q.  I'm sorry, you lost me there.
16   A.  Lists. So salespeople would regularly
17 attend trade shows and we would get lists, a list
18 of delegates, a list of attendees and I would put
19 that on to the CRM system for them to follow up
20 on.
21   Q.  That's where you lost me.
22       What is a CRM system?
23   A.  It's a sales management database.
24   Q.  Now those lists that you generated,

Page 24

1  were those lists that were distributed throughout
2  Mintel to all employees?
3    A.  No, they were distributed directly to
4  the marketing department because at the time it
5  was the marketing -- it was marketing's role to
6  make sure that contacts were put on to the
7  database.
8    Q.  Now while you were working at Mintel, I
9  assume you had a computer that was issued to you;
10 is that correct?
11   A.  Yes.
12   Q.  And did you need a password to access
13 that computer?
14   A.  Yes.
15   Q.  And were certain documents on the
16 Mintel database system only available to people
17 with certain passwords?
18   A.  Not to my knowledge.
19   Q.  So as far as you know, anyone with a
20 Mintel password could access any document in
21 Mintel's database; is that correct?
22   A.  Yes, because we were all part of a
23 network.
24   Q.  But there weren't restrictions put on

Page 25

1  any documents that, let's say, only the, for
2  instance, the marketing group could get ahold of?
3    A.  I really -- I don't know, actually.
4  Because I worked in the marketing department, I
5  had access to the marketing drive. I had access
6  to other drives as well.
7    Q.  Would you know, let's say, if a
8  secretary in the London office, would she have
9  access to the same documents that you had?
10       MR. ROACHE: Objection, calls for
11 speculation.
12       You can answer.
13       THE WITNESS: Don't know.
14 BY MR. PIOLI:
15   Q.  I assume from your testimony you
16 don't have any knowledge regarding any
17 restrictions that Mintel may have placed on
18 access to certain documents; is that correct?
19       MR. ROACHE: Objection, calls for
20 speculation.
21       You can answer.
22       THE WITNESS: I don't know.
23 BY MR. PIOLI:
24   Q.  How many computers did you use while

7 (Pages 22 to 25)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 26

1    you were at Mintel? Let me see if I can clarify.
2            Were you given a laptop computer to work
3    with while you were at Mintel?
4        A.   I was given a laptop computer when I was
5    travelling and when I was at trade shows, but I
6    had a desktop that probably -- probably had the
7    same desktop for the past five years. It had
8    been rebuilt several times.
9        Q.   So Mintel gave you -- Mintel issued you
10   a desktop for your use while you were working
11   there, correct?
12       A.   Yes.
13       Q.   And you also used a laptop whenever you
14   went to a trade show?
15       A.   Yes.
16       Q.   Did you, aside from the desktop and the
17   occasional use of a laptop, did you have a
18   personal computer that you used while you were
19   working at Mintel?
20       A.   No.
21       Q.   And that would be true up until the time
22   that this lawsuit was filed?
23       A.   I had a laptop that belonged to Mintel,
24   and I still had that prior to the lawsuit being

Page 27

1    filed. That laptop now is in the hands of --
2    obviously I had to give that laptop back in.
3        Q.   Was there any reason why that laptop
4    wasn't returned to Mintel when you left
5    employment?
6        A.   I don't know. I don't know. I guess
7    I had it for the -- I guess I must have had it
8    for the past and completely forgotten to
9    take it back and I was using it as a personal
10   computer for the past -- for the past, I don't
11   know, seven, eight months.
12       Q.   Did you believe it was your own
13   computer?
14       A.   No.
15       Q.   So you knew that it belonged to Mintel;
16   is that right?
17       A.   Yes.
18       Q.   Is there any reason why you haven't
19   given that computer back even now to Mintel?
20       A.   Because it's in the hands -- it's
21   with -- it's with my attorneys.
22       Q.   You didn't think to give the computer
23   back at the time that you left Mintel?
24       A.   I had completely forgotten that the

Page 28

1    laptop was Mintel's.
2        MR. ROACHE:  Whenever is a good time for
3    you to take a short break, if you want to finish
4    this line of questioning or...
5        MR. PIOLI:  We can take a break right now.
6        MR. ROACHE:  Okay.
7        THE VIDEOGRAPHER:  Going off the record at
8    10:14 p.m. (Sic.)
9            (Discussion off the record.)
10       THE VIDEOGRAPHER:  Back on the video record
11   at 10:20 a.m.
12   BY MR. PIOLI:
13       Q.   Mr. Neergheen, did you -- was there also
14   a Dell computer that you purchased from Mintel at
15   some point?
16       A.   Yes, there was, yes. I purchased that
17   and it was a gift to someone else. I had paid it
18   off completely, so...
19       Q.   To whom did you give the computer?
20       A.   To a relative.
21       Q.   Do you recall what relative offhand?
22       A.   I can't remember, no. It was --
23   father was going to Mauritius, so it was a gift
24   that he passed on to someone else.

Page 29

1        Q.   Your relative then passed it on to
2    someone else?
3        A.   Yes.
4        Q.   Do you recall when you sent it down to
5    Mauritius?
6        A.   Shortly after I purchased it. I don't
7    recall.
8        Q.   Did you ever use the computer
9    yourself?
10       A.   I mean, I put it on to check to see
11   whether or not it was working, yes.
12       Q.   Aside from just turning it on, did you
13   use it for any other purpose?
14       A.   I guess I logged on and, you know,
15   checked e-mails, but, I mean, that was it.
16       Q.   When did you -- for how long did you
17   use the computer personally before you sent it to
18   Mauritius?
19       A.   Oh, I'm -- I don't know, a few months.
20       Q.   You said that you received -- you
21   ordered the Dell computer in January of '06.
22   Does that sound right?
23       A.   That sounds about right, yes.
24       Q.   And your testimony is that you used it

8 (Pages 26 to 29)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 30

1   for a few months following your receipt of it?
2       A.   Yes.
3       Q.   Do you recall if it was six months, more
4   than six months?
5       A.   I can't -- I don't know.
6       Q.   Could it be more than six months?
7       A.   Possibly. I really can't remember.
8       Q.   Could it have been a year?
9       A.   I don't think it would have been a
10  year.
11      Q.   Do you know the whereabouts of that
12  computer today?
13      A.   No.
14      Q.   Would you have any means of tracking
15  where that computer is today?
16      A.   No.
17      Q.   You couldn't ask your cousin -- I mean
18  your relative in Mauritius?
19      A.   Could, I guess.
20      Q.   You don't remember what relative you
21  sent it to?
22      A.   No.
23      Q.   I'm going to ask you to look at what
24  we're going to mark as Neergheen Exhibit No. 1.

Page 31

1                (Whereupon, Neergheen Exhibit
2                 No. 1 was marked for
3                 identification.)
4   BY MR. PIOLI:
5       Q.   I'd just ask you to identify what that
6   document is.
7       A.   It's a non-compete, non-solicitation
8   document.
9       Q.   And is that your signature at the
10  bottom?
11      A.   Yes, it is.
12      Q.   And you signed this document on or about
13  August 4th, 2003; is that right?
14      A.   Yes.
15      Q.   And did you understand that you were
16  signing this document in exchange for your
17  continued employment at Mintel?
18      MR. ROACHE:  I object to the form.
19          You can answer.
20      THE WITNESS:  My continued employment
21  to Mintel, yes.
22  BY MR. PIOLI:
23      Q.   And did you understand this document
24  to impose certain restrictions on your employment

Page 32

1   options after you left Mintel?
2       MR. ROACHE:  Object to the form.
3           You can answer.
4       THE WITNESS:  Yes, but I wasn't aware that
5   it would be applicable after, you know, my role
6   was terminated.
7           My role was terminated at Mintel. My
8   role was made redundant. My temporary contract
9   ended.
10  BY MR. PIOLI:
11      Q.   You had an opportunity to review this
12  document before you signed it; is that right?
13      A.   Very, very briefly.
14      Q.   Did you review this document with
15  counsel prior to signing it?
16      A.   Counsel being?
17      Q.   An attorney.
18      A.   No.
19      Q.   Did you review it with anyone prior to
20  signing it?
21      A.   I was told to read -- I read it and I
22  signed it, so within the space of five minutes.
23      Q.   I direct your attention -- it says
24  the -- in Paragraph 1 -- the undersigned employee

Page 33

1   hereby agrees not to compete either directly or
2   indirectly with the business of Mintel or any of
3   its subsidiaries, branches or divisions at any
4   location worldwide any time during employee's
5   term of employment and for a period of one year
6   following his termination of employment with
7   Mintel regardless of the reason or cause for
8   such termination.
9           You read that to mean that because
10  your role became redundant that that clause did
11  not apply?
12      A.   Well, I read this five years ago, and I
13  was under the impression that Mintel eliminating
14  my role and making my role redundant I -- that
15  able -- I would have been able at that -- that
16  would not come in to play regarding, you know, me
17  seeking employment with other types of
18  organizations.
19      Q.   Was that your understanding five years
20  ago?
21      A.   It was still my understanding up until I
22  left.
23      Q.   Is it your understanding today that
24  that's what that clause means?

9 (Pages 30 to 33)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 34

1      MR. ROACHE: I object to the form and to the
2  extent it calls for a legal conclusion.
3         You can answer.
4      THE WITNESS: I don't know.
5  BY MR. PIOLI:
6      Q.   When you read the clause, regardless of
7  the reason or cause for such termination, what
8  does that mean to you?
9      A.   That means whatever happens I'm not
10 supposed to work for any competitors or any
11 competitors for a period of a year.
12     Q.   That would include if your position
13 became redundant; isn't that right?
14     MR. ROACHE: Objection to the extent it calls
15 for a legal conclusion.
16        You can answer.
17     THE WITNESS: I guess so, yes.
18 BY MR. PIOLI:
19     Q.   The second paragraph says the term not
20 to compete as used in this agreement means that
21 the undersigned employee shall not own, manage,
22 operate, consult with or be employed by a
23 business substantially similar to or in
24 competition with the present business of Mintel.

Page 35

1         Is it your understanding that
2  Datamonitor is in competition with Mintel?
3      A.   Yes.
4      Q.   The third paragraph states that the
5  undersigned employee acknowledges that Mintel may
6  in reliance upon the terms of this agreement
7  supply or provide the undersigned employee with
8  access to Mintel's trade secrets, customer lists
9  or other information of a confidential or
10 proprietary nature.
11        Did you understand that you were being
12 given access during your employment with Mintel,
13 you were being given access to trade secrets,
14 customer lists and confidential information?
15     MR. ROACHE: Object to the form and to the
16 extent it calls for legal conclusions.
17        You can answer.
18     THE WITNESS: It all depends what you define
19 to be a trade secret.
20 BY MR. PIOLI:
21     Q.   Were you given access to customer lists?
22     A.   Yes.
23     Q.   Were you given access to cost data?
24     A.   I guess so, yes.

Page 36

1      Q.   Were you given access to pricing
2  information?
3      A.   Yes, pricing of our reports, yes.
4      Q.   When you were given access to customer
5  lists, pricing information and cost data, that
6  was not information that Mintel would want shared
7  with its competitors; is that right?
8      MR. ROACHE: Objection, calls for
9  speculation.
10        You can answer.
11     THE WITNESS: That's right. I haven't
12 shared anything.
13 BY MR. PIOLI:
14     Q.   The fourth paragraph, I won't bother to
15 recite, but it deals with recruiting, soliciting
16 or recruiting any of Mintel's employees to work
17 for a competitor.
18        Have you, since you have left Mintel,
19 have you contacted any of Mintel's employees?
20     A.   Absolutely not.
21     Q.   I don't mean in an effort to solicit,
22 have you contacted any in a social setting or any
23 purpose whatsoever?
24     A.   From a social setting?

Page 37

1      Q.   Sure.
2      A.   Yes, I still have friends at Mintel.
3      Q.   Who have you contacted?
4      A.   I have contacted Paul Phillips. I
5  contacted Josh Motz.
6      Q.   Anyone else?
7      A.   Well, when you say contacted, I have
8  spoken with them. I have spoken with Amy Wessel.
9  Who else have I spoken with? Um, I have spoken
10 with Anthony Hughes.
11     Q.   Is that all?
12     A.   Kevin Maier.
13     Q.   These are all since you left; is that
14 right?
15     A.   Yes. They're my friends, so I speak
16 with them, yes.
17     Q.   And they're just friendly phone calls,
18 hey, how you doing, that sort of thing?
19     A.   Yeah, and I have had face-to-face
20 meetings with them as well in a social setting.
21     Q.   Let me ask you to take a look at what
22 we're going to mark as Neergheen Exhibit No. 2.
23
24

10 (Pages 34 to 37)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 38

```
 1                (Whereupon, Neergheen Exhibit
 2                No. 2 was marked for
 3                identification.)
 4   BY MR. PIOLI:
 5        Q.   I ask you to take a look at that.  Can
 6   you identify what that document is?
 7        A.   It's a contract of employment.
 8        Q.   Between yourself and Mintel; is that
 9   correct?
10        A.   Yes.
11        Q.   And is that your signature on Page 11 of
12   that document?
13        A.   Yes.
14        Q.   And did you sign this document on or
15   about June 24, 1998?
16        A.   Yes.
17        Q.   And was this signed after your
18   internship with Mintel?
19        A.   I started my job towards the end of
20   June, '97, so that this is my first -- so I
21   worked without a contract at Mintel for a year
22   before I was issued this.
23        Q.   Okay.  You worked without a contract
24   after your internship and before signing this; is
```

Page 39

```
 1   that right?
 2        A.   My internship was only for three months.
 3   I joined Mintel permanently as a paid staff in
 4   June, '97.
 5        Q.   Okay.  So you worked approximately a
 6   year before this document was signed?
 7        A.   Yes.
 8        Q.   Turning to Page 8 of that document --
 9   let me backtrack.
10             Did you have an opportunity to review
11   this document before you signed it?
12        A.   I guess I was given, you know, 10, 15
13   minutes.  It was a long time ago.
14        Q.   Did you understand that you -- a
15   condition of your employment was signing this
16   document?
17        MR. ROACHE:  Object to the form.
18        THE WITNESS:  Yes.
19   BY MR. PIOLI:
20        Q.   Turning to Paragraph 15, did you
21   understand that your agreement to abide by
22   the terms and conditions contained in this
23   document were a condition of your employment
24   with Mintel?
```

Page 40

```
 1        MR. ROACHE:  Object to the form,
 2   foundation.
 3             You can answer.
 4        THE WITNESS:  Yes, but, as I mentioned,
 5   I was under the impression that my position being
 6   eliminated, my role being made redundant, I was
 7   free to speak to any organizations.
 8   BY MR. PIOLI:
 9        Q.   I assume you're alluding to
10   Paragraph 15.  That's your understanding of
11   Paragraph 15?
12        A.   That was my understanding up until --
13   I have seen these documents over the past couple
14   of weeks, but that was my understanding up until
15   a few weeks, well, maybe three months ago.
16        Q.   At any time when you interviewed with
17   Datamonitor, did they ask you whether or not you
18   had a non-compete agreement with Mintel?
19        A.   Yes.
20        Q.   Did they ask you whether or not you had
21   a contract of employment with Mintel?
22        A.   No.
23        Q.   Did you furnish them copies of the
24   non-compete agreement prior to your starting
```

Page 41

```
 1   employment there?
 2        A.   Yes.
 3        Q.   So before you began work at
 4   Datamonitor, they had a copy of the document we
 5   marked as Exhibit 1, the non-compete agreement;
 6   is that correct?
 7        A.   Yes.
 8        Q.   Did anyone at Datamonitor tell you their
 9   interpretation of the non-compete agreement?
10        A.   I don't know.  I was asked to give them
11   a copy and they would talk to their lawyers and
12   that was it.
13        Q.   You were served with a copy of the
14   summons and complaint in this case on July 11th;
15   is that right?
16        A.   Yes.
17        Q.   What did -- upon receiving the summons
18   and complaint, did you read those documents?
19        A.   Yes.
20        Q.   And did you understand what Mintel was
21   alleging that you did wrong?  Did you have an
22   understanding at that point?
23        A.   Yes.
24        Q.   And what did you -- what was your
```

11 (Pages 38 to 41)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 42

1   understanding at that point?
2       A.   My understanding was it was due to the
3   files that I had sent to myself prior to leaving.
4       Q.   Upon receiving and reviewing the
5   summons and complaint, what did you do at that
6   point? Did you inform anyone at Datamonitor?
7       A.   Yes.
8       Q.   Who did you inform?
9       A.   I informed Jeff Howard.
10      Q.   And you contacted Mr. Howard by
11  telephone?
12      A.   Yes.
13      Q.   Did you fax him a copy of the complaint
14  and the summons?
15      A.   I forwarded the e-mail that I received.
16      Q.   And did you do that on July 11th?
17      A.   July the 12th. I spoke to him first,
18  then I e-mailed him.
19      Q.   Did you speak to him on the 11th or the
20  12th?
21      A.   The 12th. I received the document at
22  about 6:00 p.m. It was too late to contact him,
23  so I contacted him on the 12th.
24      Q.   What did you tell Mr. Howard?

Page 43

1       A.   I basically told him that I had received
2   a document from Mintel's lawyers and he asked me
3   to pass it on to him.
4       Q.   Anything else?
5   .   A.   No.
6       Q.   What did Mr. Howard respond to?
7       A.   Just he asked me to leave it with him
8   and we would speak on Monday. The document
9   was also -- it also had Richard Watkin's name on
10  it as well, so I met with Richard on Monday and
11  he said to leave it with him and...
12      Q.   Who is Mr. Watkins?
13      A.   Richard Watkins. He runs the Chicago
14  office, Datamonitor.
15      Q.   Did you inform Mr. Howard on the
16  12th regarding what the allegations against you
17  were?
18      A.   No.
19      Q.   Did you have any contact -- if I recall
20  correctly, July 11th was a Friday; is that
21  correct?
22      A.   Yes.
23      Q.   Did you have any conversations with
24  Mr. Howard over the weekend regarding the

Page 44

1   complaint?
2       A.   Yes, I called him on the Saturday.
3       Q.   Did you have any conversations with him
4   on the Sunday, the 14th?
5       A.   No.
6       Q.   Did you -- the next time you spoke to
7   him would have been Monday, the 14th; is that
8   right?
9       A.   Yes.
10      Q.   What time was that conversation?
11      A.   About -- I guess it was eight o'clock
12  in the morning.
13      Q.   When you say in the morning, eight in
14  the morning Chicago time?
15      A.   Yes.
16      Q.   And were you at -- were you at work
17  in Datamonitor's offices here in Chicago at that
18  time?
19      A.   Yeah, briefly, yes.
20      Q.   During the phone call?
21      A.   Yes.
22      Q.   And what was the -- what did you say
23  to Mr. Howard, and what did he say to you during
24  that conversation on the 14th?

Page 45

1       A.   Mr. Howard informed me that they would
2   look into it, they would take care of it and I
3   should leave the office and not come back until
4   further notice.
5       Q.   Did he express any displeasure with
6   you?
7       MR. ROACHE:  I object to the form.
8       THE WITNESS:  I can't recall.
9   BY MR. PIOLI:
10      Q.   Did you discuss with him whether or not
11  the allegations in the complaint were true during
12  that conversation?
13      A.   Yes.
14      Q.   And what did you say?
15      A.   I said yes.
16      Q.   And did Mr. Howard have any response to
17  that?
18      A.   Yeah, he was -- I guess he was shocked
19  and he was displeased.
20      Q.   And then he told you that they would
21  look into it and he told you to leave the office
22  and not come back?
23      A.   Yes.
24      Q.   And did you -- I assume then you

12 (Pages 42 to 45)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 46

```
1    returned home?
2        A.   I did.
3        Q.   You're being represented by counsel
4    here today; is that right?
5        A.   Yes.
6        Q.   And when did you -- when were you
7    first represented by counsel in this matter?
8        A.   I can't recall the date.
9        Q.   Would it have been on that Monday,
10   the 14th?
11       A.   I don't know.  I was told to go home
12   and we'll get back in touch with you as to when
13   you can come back into the office.
14       Q.   When did you first hear from any of
15   the lawyers at Bell, Boyd and Lloyd?
16       A.   I believe -- oh, that's a very good
17   question.  I can't remember.  I guess it probably
18   was the Tuesday.  It might have been the
19   Wednesday.
20       Q.   You know that there was a court hearing
21   on the 16th, which was the Wednesday; is that
22   right?
23       A.   Yes.
24       Q.   And I assume you spoke to your lawyers
```

Page 47

```
1    before that?
2        A.   Okay.  So it would have been either
3    Monday afternoon or maybe Tuesday.
4        Q.   Aside from -- and I'll caution you,
5    I don't want to know the content of any
6    conversations that you had with counsel or when
7    counsel was present.
8             Besides your conversation with
9    Mr. Howard, did you have any conversations with
10   anyone else at Datamonitor regarding this lawsuit
11   on the 14th or 15th?
12       A.   No.
13       Q.   Any conversations with anyone at
14   Datamonitor prior to the court hearing on the
15   16th?
16       A.   No.
17       Q.   So it was just the one conversation with
18   Mr. Howard on the 14th; is that right?
19       A.   Yes, the Monday -- oh, I first spoke
20   with him on the Saturday and then...
21       Q.   Understood.
22            Did you do anything with your laptop
23   computer upon receiving a copy of the summons and
24   complaint?
```

Page 48

```
1        A.   Did I do anything?
2        Q.   Did you stop using it?
3        A.   My laptop?
4        Q.   Yes.
5        A.   I think I may have printed out the
6    documents just so that I could have a copy,
7    because when I brought the copy that was
8    delivered by messenger into the office, I left it
9    with Richard Watkins.
10       Q.   Did you keep using your computer?
11       A.   No.  No.
12       Q.   You stopped using it entirely after --
13       A.   Well, I was checking e-mails, yes,
14   but -- I was using the internet to check e-mails
15   because we -- I was liaisoning with -- I was
16   liaisoning with my attorneys.
17       Q.   Did you delete any documents from
18   your computer from the time you received the
19   complaint until the time you turned it over to
20   counsel?
21       A.   No.
22       Q.   Aside from accessing the internet --
23   using the internet to access your e-mail, did you
24   do anything else with the computer, run any other
```

Page 49

```
1    programs, anything like that?
2        A.   No.
3        Q.   I assume that Datamonitor -- someone
4    at Datamonitor is the one that put you in touch
5    with Bell, Boyd and Lloyd; is that right?
6        A.   Yes.
7        Q.   And who is paying Bell, Boyd and Lloyd's
8    fees for this litigation?
9        MR. ROACHE:  Objection, relevance.
10            You can answer.
11       THE WITNESS:  I guess Datamonitor.
12   BY MR. PIOLI:
13       Q.   Do you have an agreement with
14   Datamonitor that they're going to pay the fees in
15   this case?
16       A.   No.  No, I -- I don't recall signing
17   anything that says that they're going to pay the
18   fees.
19       Q.   But that's your understanding?
20       A.   That's -- I have been told that it's
21   going to be handled, so...
22       Q.   Who told you that?
23       A.   My attorneys.
24       Q.   So you're not worried at all that you're
```

13 (Pages 46 to 49)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 50

```
1    going to get stuck with a big legal bill?
2         A.   I'm sorry?
3         Q.   You're not worried that you're going to
4    get stuck at the end of this with a big legal
5    bill, are you?
6         MR. ROACHE:  Object to the form.
7              You can answer.
8         THE WITNESS:  I am worried, yes.
9    BY MR. PIOLI:
10        Q.   But you have gotten assurances that
11   you're not going to have to pay them, the legal
12   fees?
13        A.   I have done -- from -- I have done
14   nothing wrong.  I have -- sure, I sent a few
15   e-mails to my Hotmail.
16        MR. ROACHE:  Just answer his questions.
17   BY MR. PIOLI:
18        Q.   Do you understand that if you -- if
19   Mintel is not successful in its claims that
20   you're not going to have to pay any attorney's
21   fees?
22        MR. ROACHE:  Object to the form.
23              You can answer if you understand it.
24        THE WITNESS:  I don't really understand
```

Page 51

```
1    that, sorry.
2    BY MR. PIOLI:
3         Q.   Aside from the assurances received by
4    counsel, has anyone else given you assurances
5    that you're not going to have to pay your
6    attorney's fees?
7         MR. ROACHE:  Objection, relevance.
8              You can answer.
9         THE WITNESS:  I don't recall, no.
10   BY MR. PIOLI:
11        Q.   Have you had discussions with anyone
12   at Datamonitor regarding attorney's fees?
13        A.   No.
14        Q.   Was the possibility of litigation
15   discussed prior to your being -- of litigation by
16   Mintel discussed prior to your being hired by
17   Datamonitor?
18        A.   I don't understand the question.
19        Q.   Sure.  You previously testified that
20   you gave a copy of your non-compete agreement to
21   Datamonitor before you started working there; is
22   that right?
23        A.   Yes.
24        Q.   Did you discuss with anyone at
```

Page 52

```
1    Datamonitor the possibility that Mintel might
2    sue --
3         A.   No.
4         Q.   -- you?
5         A.   No.
6         Q.   Prior to your being hired, did anyone at
7    Datamonitor give you -- tell you that they would
8    indemnify you for any fees associated with any
9    suit by Mintel?
10        A.   Prior to starting?
11        Q.   Yes.
12        Q.   Could you simplify that, the question?
13   Sorry.
14        Q.   Sure.  Prior to the time that you were
15   hired by Datamonitor, did they give you
16   assurances that they would indemnify you for any
17   fees in any suit by Mintel?
18        A.   You mean that they would protect me
19   or --
20        Q.   That they would pay any judgment that
21   may be rendered against you.
22        A.   No.  No.
23        Q.   That they would pay the legal fees
24   associated with any suit by Mintel.
```

Page 53

```
1         A.   No.
2         Q.   When you were given assurances that
3    you wouldn't have to pay your attorney's fees in
4    this matter, was there any condition put on that?
5         A.   I don't -- I don't recall.
6         Q.   Any condition that you testify a certain
7    way?
8         A.   I don't know.
9         Q.   You testified that your position at
10   Mintel became redundant; is that right?
11        A.   Yes.
12        Q.   When were you informed of that?
13        A.   I was informed of that towards the
14   middle of November of 2007.
15        Q.   And how did you find that out?
16        A.   I applied for a product marketing
17   manager position within CPG, and I thought the
18   interview went well; and I was told that I wasn't
19   successful and that I would need to find -- my
20   role would be made redundant and I would have to
21   find a new job.
22             I was sent an e-mail by Sabine Popp
23   informing me that because you weren't successful
24   in this product marketing manager job, we'll have
```

14 (Pages 50 to 53)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 54

1    to look at exit strategies for you.
2        Q.    Can you spell that person's name,
3    Sabine Popp?
4        A.    S-a-b-i-n-e, first name, P-o-p-p, last
5    name.
6        Q.    So once you interviewed for the product
7    manager position and you weren't successful in
8    that, then Mintel told you that you needed to
9    look at exit strategies; is that right?
10       A.    Need to -- your job is being made
11   redundant.
12       Q.    I understand that.
13             But did they offer you a different
14   position within Mintel?
15       A.    Between the end of November and,
16   let's say, the end of my -- my role finished on
17   January the 31st, yes, they did offer me a
18   position.  It was a junior position within the
19   services team.
20       Q.    Was that with Paul Phillips?
21       A.    Yes.
22       Q.    He's a friend of yours, right?
23       A.    Yes.
24       Q.    Did Mintel offer you the same

Page 55

1    compensation even though it was a junior
2    position?
3        A.    Yes, the same base, yes.
4        Q.    Yes.  Was the bonus structure
5    different?
6        A.    We didn't discuss the bonus structure,
7    it was just the base.  The base was the only
8    thing that was talked about.
9        Q.    What was your salary at Mintel
10   incidentally?
11       A.    It was 4800 base, and then depending
12   on --
13       Q.    I'm sorry, 4800 per --
14       A.    Basic per year.  40,800 per year, and I
15   was compensated on report sales based off the
16   relationships that I set up with trade
17   associations.
18       Q.    About how much would that compromise
19   in a given year?
20       A.    About 20 to maybe 25.
21       Q.    So you rejected the position with
22   working under Paul Phillips; is that right?
23       A.    Yes.
24       Q.    And when -- when did you do that?

Page 56

1        A.    I believe it may have been towards the
2    middle of December or maybe early January.  I'm
3    not too sure.
4        Q.    And did you ask Mintel if there were any
5    other positions that you may be suitable for?
6        A.    Constantly, yes.  I spent the entire
7    three months speaking with the likes of
8    Jon Butcher, Peter Haigh, Steve about any
9    potential developments within the company.
10             But at the time there weren't that
11   many new roles, and I was getting really, really
12   worried, so I had to -- that's when I started
13   seeking alternative routes.
14       Q.    Okay.  What did you do to look for
15   employment outside of Mintel?
16       A.    I joined CareerBuilder,
17   MetroChicagoJobs.  I joined a couple of agencies.
18   I sent out applications by looking at, you know,
19   websites and, you know, company websites as well,
20   looking at their job sections.
21       Q.    What companies did you send applications
22   to?
23       A.    Oh, a number, Dyson, Mellon Publishing,
24   SPSS.  There were a few other companies as well

Page 57

1    that I really can't remember at this time.
2        Q.    When you say said you went to agencies,
3    are these placement agencies?
4        A.    Yes.
5        Q.    And how many of those did you go to?
6        A.    I went to two.
7        Q.    Were they successful in getting you
8    interviews?
9        A.    They got me interviews, but I'd always
10   walked into a brick wall when I mentioned the
11   fact that I would need a visa to work for them.
12       Q.    Were those the same companies, Dyson,
13   Mellon and SPSS?
14       A.    I'm sorry?
15       Q.    I'll backtrack.
16             Dyson, Mellon Publishing, SPSS, were
17   those interviews that you got through the
18   agencies?
19       A.    No, those were -- SPSS was through --
20   was through -- it was through CareerBuilder, and
21   -- but Mellon was through CareerBuilder.  Dyson
22   was through CareerBuilder as well.
23       Q.    Those two companies, are they -- would
24   they be considered competitors in the same market

15 (Pages 54 to 57)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 58

```
 1  as Datamonitor and Mintel?
 2      A.   No.
 3      Q.   How did you come to apply for a position
 4  at Datamonitor?
 5      A.   I had a -- I have a friend who works at
 6  Datamonitor, and I wouldn't say he's a friend, I
 7  haven't spoken with him for about six, five or
 8  six years, but I e-mailed -- I knew that
 9  Datamonitor had a Chicago office, and I e-mailed
10  him and said, "Well, hey could you potentially
11  pass me on the guy who manages the Chicago
12  office's details?  And I will e-mail him."
13      Q.   You don't remember when you sent that
14  e-mail?
15      A.   I think it was either towards the middle
16  or maybe the end of January.
17      Q.   Who was the gentleman that you knew at
18  Datamonitor?
19      A.   Mas, M-a-s, Hussain, H-u-s-s-a-i-n.
20      Q.   And at the time that you sent that
21  e-mail along to Mr. Hussain, you knew that
22  Datamonitor was a competitor of Mintel; is that
23  right?
24      A.   Yes.
```

Page 59

```
 1      Q.   What happened after you sent the --
 2  well, let me backtrack.
 3           Did you call Mr. Hussain first before
 4  sending him the e-mail?
 5      A.   (No audible response.)
 6      Q.   You just sent him an e-mail?
 7      A.   (No audible response.)
 8      Q.   You need to answer.
 9      A.   Yes.  Sorry.
10      Q.   After you sent the e-mail, did
11  Mr. Hussain respond?
12      A.   He responded after a couple of days,
13  yes.  Not instantly.
14      Q.   What was his response?
15      A.   Yeah, he passed me on the --
16  Richard Watkins' details, and I made -- I sent
17  Richard an e-mail and before I dropped by a
18  phone call.
19      Q.   When you sent the e-mail to
20  Mr. Hussain, did you know that there was an
21  opening at Datamonitor?
22      A.   No.
23      Q.   To your knowledge, did Datamonitor
24  publish that there was an opening?
```

Page 60

```
 1      A.   No.  It was strictly speculative.
 2      Q.   So Mr. Hussain passed your resume
 3  on to Mr. Watkins; is that right?
 4      A.   Uh-hum.  Yes.
 5      Q.   He didn't tell you at that point that
 6  yes, there was an opening?
 7      A.   No.
 8      Q.   And what happened next?  What was your
 9  next contact with Datamonitor?
10      A.   Well, I tried to get in contact with
11  Richard Watkins, and I sent him my resume and I
12  sent him -- I sent my resume by e-mail and I
13  contacted him, left him a voicemail message.
14      Q.   And what happened next?
15      A.   I didn't hear back from Richard for
16  three or four days, and I left another voicemail
17  message, and eventually he got back to me by
18  e-mail and we had set up a time for me to come
19  into the office.
20      Q.   And when was that?  I assume then you
21  went in for an interview with Mr. Watkins?
22      A.   Yes, that's right.  I can't remember
23  when it was.  But I think it was most probably
24  towards the beginning of February.
```

Page 61

```
 1      Q.   And what did you discuss during that
 2  interview with Mr. Watkins?
 3      A.   Just basically went through my resume
 4  and what were my achievements, what I, you know,
 5  what I like doing, and, I mean, that was it
 6  basically.
 7      Q.   I assume that you discussed your
 8  experiences at Mintel during the interview?
 9      MR. ROACHE:  I object to the form.
10           You can answer.
11      THE WITNESS:  I was told not to talk about
12  Mintel, so...
13  BY MR. PIOLI:
14      Q.   Who told you that?
15      A.   Richard Watkins.
16      Q.   You testified that you talked about your
17  accomplishments.
18      A.   Yeah, my accomplishments, but did
19  not -- he mentioned to me not to delve too much
20  into some proprietary stuff that, you know, that
21  would eventually feature in my achievements, so
22  trying to shy away from talking about certain
23  clients.
24      Q.   Okay.  Following the interview with
```

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 62

1  Mr. Watkins, what happened next?
2      A.   After I interviewed with Richard,
3  Richard wasn't too sure -- Richard wasn't too
4  sure where there would be a potential opening for
5  me within the company; and he spoke with -- I
6  guess he spoke with Jeff Howard, and I had an
7  interview with Jeff Howard, a phone interview.
8      Q.   So at the time that you interviewed
9  with Mr. Watkins, there was no position open at
10  Datamonitor; is that right?
11     A.   Yes.
12     THE VIDEOGRAPHER:  We need to go off the
13  record and change tapes.
14     MR. PIOLI:  Sure.
15     THE VIDEOGRAPHER:  Going off the record at
16  11:09 a.m.  This is the end of Tape 1.
17              (A short break was taken.)
18     THE VIDEOGRAPHER:  On the record at
19  11:19 a.m.
20  BY MR. PIOLI:
21     Q.   Mr. Neergheen, when we left off we
22  were talking about the interview you had with
23  Mr. Watkins in Chicago.
24     Do you recall that?

Page 63

1      A.   Yes.
2      Q.   And following that interview what was
3  your next contact with Datamonitor?
4      A.   The next contact was probably -- I got
5  a call back from Richard.
6      Q.   And what did Mr. Watkins tell you during
7  that callback?
8      A.   Basically the call was set up, a second
9  interview.
10     Q.   Did he tell you that there was a
11  position open at that time?
12     A.   I don't -- I don't know.
13     Q.   With whom was the second interview?
14     A.   It was with Jeff Howard.
15     Q.   And when was that set up for?
16     A.   I -- sometime towards the middle of
17  February, third week of February.  I'm not too
18  sure.
19     Q.   When you interviewed with Mr. Howard,
20  did you understand you were interviewing for a
21  specific position?
22     A.   I don't know.
23     Q.   Briefly relate to me the interview you
24  had with Mr. Howard, what he said to you and what

Page 64

1  you said to him.
2      A.   I was asked to do -- I wasn't able to
3  talk about Mintel.  I was given a scenario, and I
4  focused, I believe, on -- I can't remember what
5  vertical it was, it was either technology or
6  pharmaceuticals, and I was asked to give my take
7  on how I would go about setting up partnerships.
8      Q.   So he basically gave you some
9  hypotheticals?
10     A.   Yes.
11     Q.   Did you inform Mr. Howard regarding
12  what industries you worked in at Mintel?
13     A.   Yes.
14     Q.   And what did you tell him?
15     A.   Consumer goods -- CPG -- well, consumer
16  package goods.
17     Q.   That was it?  Is there anything else you
18  discussed with Mr. Howard regarding your
19  employment at Mintel?
20     A.   I really can't remember now.  It was
21  awhile ago.
22     Q.   Did you discuss the fact that you had
23  the non-compete agreement with Mintel during that
24  interview, that second interview?

Page 65

1      A.   I believe so, yes.
2      Q.   And what did you tell him during that
3  interview about the non-compete?
4      A.   I had one.  I signed one, and I didn't
5  really know what was on there.
6      Q.   Mr. Howard ask you for a copy of it?
7      A.   Yes.
8      Q.   And did you provide it to him following
9  the interview?
10     A.   Yes, I sent it to -- I sent it to
11  Richard Watkins, yes.
12     Q.   Did you believe that your work at Mintel
13  would benefit you at Datamonitor?
14     A.   I'm sorry?
15     Q.   Did you believe that your experience at
16  Mintel would benefit you at Datamonitor?
17     MR. ROACHE:  Object to the form.
18     THE WITNESS:  I don't know.  I really don't
19  know.
20  BY MR. PIOLI:
21     Q.   Did you believe that any of the
22  information that you gathered that you had
23  exposure to at Mintel would be of use to you if
24  you went to work for Datamonitor?

17 (Pages 62 to 65)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 66

```
1        MR. ROACHE:  Object to the form.
2        THE WITNESS:  I don't know.
3              (Mr. Marconi entered.)
4   BY MR. PIOLI:
5        Q.   Aside from the second interview
6   when you discussed the non-compete with
7   Mr. Howard, did you have discussions with anyone
8   else at Datamonitor regarding a non-compete with
9   Mintel?
10       A.   I don't recall.
11       Q.   Did you ever discuss it with Mr. Grey?
12       A.   Mr. Grey?
13       Q.   Dylan Grey.
14       A.   I don't recall -- I don't know.
15       Q.   Do you know who Mr. Grey is?
16       A.   I believe he's an HR director.
17       Q.   Did you have any -- did you have any
18  discussions with counsel for Datamonitor
19  regarding the non-compete agreement prior to your
20  being hired?
21       A.   I don't know.
22       Q.   Did you have discussions with counsel
23  for Datamonitor about anything prior to being
24  hired?
```

Page 67

```
1        A.   Not to my knowledge, no.
2        Q.   Did you discuss with either Mr. --
3   strike that.
4        Did you discuss with Mr. Howard the
5   possibility that Mintel might sue you prior to
6   your being hired?
7        MR. ROACHE:  Objection, asked and answered.
8        THE WITNESS:  No.
9   BY MR. PIOLI:
10       Q.   Not even when you brought up the
11  non-compete agreement?
12       MR. ROACHE:  Objection, asked and
13  answered.
14       THE WITNESS:  No.
15  BY MR. PIOLI:
16       Q.   Following the -- during the second
17  interview that you had with Mr. Howard, did he
18  inform you that there was actually a position
19  open at that point?
20       A.   I was not aware that there was a
21  position.
22       Q.   Okay.  Following the interview then with
23  Mr. Howard, what was your next contact with
24  Datamonitor?
```

Page 68

```
1        A.   My next contact, I guess I mean I got a
2   call from Jeff.
3              (Mr. Marconi and
4              Mr. Butcher exited.)
5   BY MR. PIOLI:
6        Q.   And how far -- how long after the
7   interview did you get that call?
8        A.   I can't remember.  I don't know.
9   Maybe -- I really don't know.
10       Q.   Was it more than a week?
11       A.   I really don't know.
12       Q.   What was the content of the phone
13  call?
14       A.   The content was Jeff was basically
15  offering me a position.
16       Q.   What position did he offer you at that
17  point?
18       A.   The same.  The position to work on his
19  team.
20       Q.   And was that the first point that you
21  knew what position you were interviewing for?
22       A.   I'm sorry, could you repeat that?
23       Q.   Was that the first time that you knew
24  what position you were interviewing and being
```

Page 69

```
1   hired for?
2        A.   No.  I had no idea what role that there
3   was.  It was strictly speculative.
4        Q.   Even at that point when he offered you a
5   job to work at Datamonitor?
6        A.   Well, at that time I would have
7   suspected that, yes, that there was a role open
8   now, yes.
9        Q.   Did they tell you -- did Mr. Howard
10  tell you during that phone call what your title
11  would be?
12       A.   I can't remember.
13       Q.   What is your current title with
14  Datamonitor?
15       A.   Partnerships and alliances manager.
16       Q.   I'm sorry, can you repeat that?
17       A.   Partnerships and alliances manager.
18       Q.   Do you know who held that position
19  before you did?
20       A.   No.
21       Q.   When did you first learn what you
22  were going to be doing at Datamonitor?
23       A.   What I would be doing at
24  Datamonitor?
```

18 (Pages 66 to 69)

Marlo Reporting & Video Services, Inc.
(312) 578-0041

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 70

1    Q.   Was it the day you were hired?
2    A.   Yes.
3    Q.   I'm sorry, was it the day you started
4  working there or the day you were hired?
5    A.   Sorry, the day I started working
6  there.
7    Q.   And what do you do as a partnership
8  and alliance manager?
9    A.   I set up strategically and commercially
10 beneficial relationships with organizations,
11 predominantly within pharmaceutical and health
12 care and technology.
13   Q.   Do you work in the financial sector at
14 all?
15   A.   I haven't, no.
16   Q.   Are you prohibited from working in any
17 sector at Datamonitor?
18   A.   Yes.
19   Q.   What sectors are those?
20   A.   Consumer package goods.
21   Q.   Anything else?
22      MR. ROACHE:  Object to the form.
23         You can answer.
24      THE WITNESS:  I don't -- I mean, I don't

Page 71

1  know.
2  BY MR. PIOLI:
3    Q.   That's the only one that you're aware
4  of that you are prohibited from working on?
5    A.   Yes.
6    Q.   And if I recall from Mr. Howard, there
7  are seven sectors at Datamonitor; is that right?
8    A.   Uh-hum.
9    Q.   And you can work on the other six, just
10 not consumer package goods?
11   A.   Uh-hum.
12   Q.   I'm sorry, is that yes?
13   A.   Yes, sorry, yes.
14         (Mr. Butcher entered.)
15 BY MR. PIOLI:
16   Q.   When Mr. Howard called you to offer
17 you a position did you immediately accept?
18   A.   I can't remember.  I may have called
19 him back.  I'm not too sure.
20   Q.   Did you accept within a day or two after
21 he extended that offer?
22   A.   I can't recall.
23   Q.   Was it within a week?
24   A.   I guess it was probably within a week,

Page 72

1  yes.
2    Q.   Did you have any other -- strike that.
3         At the time the offer was extended by
4  Mr. Howard on behalf of Datamonitor, did you have
5  any other offers of employment outstanding?
6    A.   No.
7    Q.   Do you recall approximately what the
8  date was that you accepted the position at
9  Datamonitor?
10   A.   I don't -- I can't remember.  It was
11 probably towards the middle -- I'm sorry, towards
12 the end of March.  I'm not too -- I can't give
13 you an exact date.
14   Q.   Now when you accepted the position at
15 Datamonitor, you were still employed by Mintel;
16 is that right?
17   A.   Yes.
18   Q.   And, in fact, if I remember correctly,
19 you handed in your letter of resignation
20 April 23rd; is that right?
21      MR. ROACHE:  Object to the form.
22         You can answer.
23      THE WITNESS:  It wasn't a letter of
24 resignation, it was stating the fact that I was

Page 73

1  asked to give -- to write that letter as well.
2  BY MR. PIOLI:
3    Q.   You were asked by whom?
4    A.   Sabine Popp to produce a document for
5  HR.
6    Q.   Why -- did Miss Popp indicate why she
7  wanted you to produce that letter?
8    A.   I don't know, but the letter clearly
9  states that I am working from to my -- 'til
10 the end of my temporary contract which ends
11 April the 30th.
12   Q.   Did you intend to stay longer?
13   A.   I'm sorry?
14   Q.   Did you intend to stay at Mintel longer
15 than April 30th, 2008?
16      MR. ROACHE:  Object to the form.
17      THE WITNESS:  I don't -- I don't know.
18 BY MR. PIOLI:
19   Q.   If I understand your testimony -- feel
20 free to correct me if I'm wrong -- but you're
21 saying you would never have sent this letter in
22 unless Miss Popp had asked you to?
23   A.   Yeah, Miss Popp had told me, you know,
24 I was advised to give a letter to HR.

19 (Pages 70 to 73)

Marlo Reporting & Video Services, Inc.
(312) 578-0041

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 74

1    Q.   Did you want to stay at Mintel after
2  April 30th?
3    A.   I don't know.  I really don't know.
4    Q.   Well, you had already accepted the job
5  at Datamonitor; isn't that right?
6    A.   Yes.
7    Q.   Did you give Datamonitor a date when
8  you would start?
9    A.   No.
10   Q.   They didn't ask for one?
11   A.   No.
12   Q.   Were they just going to leave your
13 position open indefinitely until you decided to
14 start?
15   MR. ROACHE:  Objection, calls for
16 speculation.
17   THE WITNESS:  I don't know.  I guess it
18 was probably because I was -- they had applied
19 for a visa for me, and I had to wait upon that
20 coming through to determine the start date.
21 BY MR. PIOLI:
22   Q.   So as of late March you had accepted
23 the position at Datamonitor and they had applied
24 for a work visa for you; is that right?

Page 75

1    A.   Yes.
2    Q.   And you still continued to work at
3  Mintel during that time frame; is that right?
4    A.   Yes.
5    Q.   Did you tell anyone at Mintel that you
6  had accepted a position with Datamonitor?
7    A.   No.
8    Q.   Did you think that would be something
9  they would want to know?
10   MR. ROACHE:  Objection, calls for
11 speculation.
12     You can answer.
13   THE WITNESS:  I don't know.
14 BY MR. PIOLI:
15   Q.   When did the -- when did you begin
16 work at Datamonitor?
17   A.   I believe it was May the 27th.
18   Q.   What were the terms of your employment
19 with Datamonitor -- let me clarify.
20     What was your salary?  What is your
21 salary at Datamonitor?
22   THE WITNESS:  Can I answer that?
23   MS. LERVICK:  Are you going to have a whole
24 line of questions?

Page 76

1    MR. ROACHE:  About his role at Datamonitor?
2    MS. LERVICK:  At Datamonitor.
3    MR. PIOLI:  About his role?
4    MS. LERVICK:  Yes.
5    MR. PIOLI:  Yes.
6    MR. ROACHE:  We're going to designate that as
7  attorneys' eyes only, confidential.
8    MR. PIOLI:  Sure.
9    MS. LERVICK:  We'll de-designate if necessary
10 later.
11   MR. PIOLI:  That's fine.
12     (Mr. Butcher exited.)
13 BY MR. PIOLI:
14   Q.   What is your salary at Datamonitor?
15   A.   It's $65,000 per year base.
16   Q.   And is there bonus compensation with
17 that?
18   A.   Yes.  It's to the value of $18,000.
19   Q.   That's the maximum bonus?
20   A.   Yes.
21   Q.   Did Datamonitor make you sign an
22 employment agreement when you started working
23 there?
24   A.   Yes.

Page 77

1    Q.   Did they make you sign a non-compete
2  agreement when you started working there?
3    A.   Yes.
4    Q.   What are the terms of that
5  non-compete?
6    A.   I can't recall exactly what it says,
7  but...
8    Q.   Does it prohibit you from working for
9  a competitor after your employment with
10 Datamonitor ends?
11   MR. ROACHE:  Objection, asked and answered.
12     You can answer.
13   THE WITNESS:  I really don't know.
14 BY MR. PIOLI:
15   Q.   You reviewed the document before you
16 signed it -- well, you did sign the document?
17   A.   Yes.
18   Q.   And you reviewed that document before
19 you signed it?
20   A.   I reviewed -- I'm sorry?
21   Q.   You reviewed the non-compete agreement
22 before you signed it?
23   A.   Yes.
24   Q.   Does your employment contract with

20 (Pages 74 to 77)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 78

1 Datamonitor contain a provision regarding the
2 disclosure of confidential information?
3    A.    I don't know.
4    Q.    Do you have a copy of your
5 non-compete agreement with Datamonitor in your
6 possession?
7    A.    No.
8    Q.    Datamonitor didn't give you a copy
9 after you signed it?
10    A.    In -- sorry, in my possession now?
11 Yes, I do.  Not now, but I have it at home, yes.
12    Q.    And the same is true of your
13 employment agreement?
14    A.    Yes.
15    Q.    As a partnerships and alliances manager,
16 what do you do at Datamonitor?  I apologize if
17 that's being redundant here.
18    A.    Okay.  It's a role that is aimed at
19 securing strategic partnerships with the likes of
20 technology-based associations and pharmaceutical
21 and health-care-based associations and basically
22 pitching the idea that we at Datamonitor we sell
23 our reports, we're a reseller program, and try to
24 get them on board as a partner to resell our

Page 79

1 reports.
2    Q.    Are you working with trade associations
3 again?
4    A.    Yes.
5    Q.    And is that similar to what you did at
6 Mintel as well?
7    MR. ROACHE:  Object to the form.
8    THE WITNESS:  Absolutely not.
9 BY MR. PIOLI:
10    Q.    How is it different?
11    A.    I was leveraging at Mintel.  It was
12 strictly leveraging research for free
13 advertising, free booth space, free, you know,
14 pushing -- free -- basically anything to do with
15 increasing brand awareness levels.
16    Q.    Isn't that what you're doing when
17 you're trying to secure strategic alliances as
18 well?
19    MR. ROACHE:  Object to the form and
20 asked and answered.
21        You can answer.
22    THE WITNESS:  Yeah, I have a different
23 offering to go by at Datamonitor.
24

Page 80

1 BY MR. PIOLI:
2    Q.    What do you mean by a different
3 offering?
4    A.    Well, for example, we offer a reseller
5 program which is mutually beneficial to both
6 parties and they can sell our reports; and based
7 off how many reports they sell, they get some
8 revenue and Datamonitor will receive some revenue
9 as well.
10    Q.    So you have a different product with
11 Datamonitor than you did at Mintel; is that
12 right?
13    A.    It's still reports, yeah, but they
14 are -- they are more industry-based reports as
15 opposed to consumer, market research reports.
16    Q.    But aside from the offerings being
17 different, I mean your day-to-day activities are
18 similar between what you did at Mintel and what
19 you do at Datamonitor; isn't that right?
20    MR. ROACHE:  Object to the form and asked
21 and answered.
22        You can answer.
23    THE WITNESS:  I don't think so.
24

Page 81

1 BY MR. PIOLI:
2    Q.    Who do you report to at Datamonitor?
3    A.    I report to Jeff Howard.
4    Q.    What's Mr. Howard's title?
5    A.    I'm not sure.
6    Q.    Who does Mr. Howard report to?
7    MR. ROACHE:  Objection, calls for
8 speculation.
9    THE WITNESS:  I have -- I -- I don't know.
10 BY MR. PIOLI:
11    Q.    Do you know anyone else that reports to
12 Mr. Howard besides you?
13    MR. ROACHE:  Objection, calls for
14 speculation.
15        You can answer.
16    THE WITNESS:  I believe so, yes.
17 BY MR. PIOLI:
18    Q.    And who are those people?
19    MR. ROACHE:  Same objection.
20        You can answer.
21    THE WITNESS:  They're based out of the
22 Manchester office, I believe.
23 BY MR. PIOLI:
24    Q.    And do they fulfill similar functions to

21 (Pages 78 to 81)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 82

1  the roles that you serve?
2      MR. ROACHE:  Objection, calls for
3  speculation.
4      THE WITNESS:  I don't know.
5  BY MR. PIOLI:
6      Q.   You testified previously that you can't
7  work in the consumer package goods sector; is
8  that right?
9      A.   That's what I, you know -- that's
10  what -- I was told when I started at Datamonitor
11  so not to -- and also not to contact any other
12  associations that I may have had some contact
13  with at Mintel.
14      Q.   Who does handle the consumer package
15  goods sector?
16      A.   I don't know.
17      Q.   Do you work with anyone in the Chicago
18  office?
19      A.   No.
20      Q.   Who else is in the Chicago office?  Let
21  me backtrack.  How big is the Chicago office?
22  How many people work there?
23      A.   15, 20 people.
24      Q.   And none of them do the type of work

Page 83

1  that you do?
2      A.   No.
3      Q.   You testified previously for doing the
4  work that you do it's very advantageous to be in
5  the United States; is that right?
6      MR. ROACHE:  Object to the form.
7      You can answer.
8      THE WITNESS:  I'm sorry?  What was that?
9  BY MR. PIOLI:
10      Q.   For doing the type of work that you do,
11  it's better to be in the United States; isn't
12  that right?
13      A.   I don't know.  I --
14      Q.   I'm sorry, I thought you testified that
15  that's why you came to the United States back in
16  2003 was because it was -- you were constantly
17  trying to contact people in the States.
18      A.   Yeah.
19      MR. ROACHE:  Object to the form and
20  mischaracterizes his testimony.
21      But you can answer.
22      THE WITNESS:  I'm not sure I really
23  understand your question, but the reason I came
24  to the States was -- when I mentioned the time

Page 84

1  difference with respect to contacting the U.S.
2  associations from the UK, that was because of the
3  time difference.
4  BY MR. PIOLI:
5      Q.   Would you be able to perform your job
6  equally as well if you were in Europe right now?
7      MR. ROACHE:  Object to the form and calls
8  for speculation.
9      THE WITNESS:  I don't know.
10      MR. PIOLI:  We can get Mr. Butcher back in.
11      MR. ROACHE:  All right.  We'll stop the
12  designation as attorneys' eyes only at this
13  point.
14      Do you want to take a short break?
15      MR. PIOLI:  Go off the record.
16      THE VIDEOGRAPHER:  Going off the record at
17  11:49 p.m. (Sic.)
18          (Whereupon, the deposition in
19          the above-entitled cause was
20          continued to August 13, 2008
21          at 1:02 o'clock p.m.)
22
23
24

Page 85

1          (Ms. Pronk entered.)
2      THE VIDEOGRAPHER:  Back on the record at
3  1:02 p.m.
4          AFTERNOON SESSION
5          MEESHAM NEERGHEEN,
6  having been previously duly sworn, was examined
7  and testified further as follows:
8          EXAMINATION (Continued)
9  BY MR. PIOLI:
10      Q.   Mr. Neergheen, before we broke for
11  lunch, we were talking about the fact that you
12  had an offer of employment from Datamonitor but
13  you did not have a definite start date.
14      Do you recall that?
15      A.   Yes.
16      Q.   And was the reason that you did not
17  have a definite start date because you were
18  trying to work out your visa issues?
19      A.   Yes.
20      Q.   Do you know when -- let me backtrack.
21      Did Datamonitor submit an application
22  for a visa on your behalf?
23      A.   Yes.
24      Q.   Do you know when they submitted that

22 (Pages 82 to 85)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 86

1  application?
2      A.  I don't know.
3      Q.  Was it contemporaneous with your
4  acceptance of their offer of employment?
5      MR. ROACHE:  Objection, calls for speculation
6  and asked and answered.
7          You can answer.
8      THE WITNESS:  I'm sorry, could you repeat
9  that?
10 BY MR. PIOLI:
11     Q.  Did they submit it shortly after or
12 contemporaneous with your acceptance of their
13 offer of employment?
14     MR. ROACHE:  The same objections.
15     THE WITNESS:  I don't know.
16 BY MR. PIOLI:
17     Q.  Is it your understanding that because
18 you're a British citizen you can only work in the
19 U.S. -- you can only stay in the U.S. with a work
20 visa?
21     MR. ROACHE:  Object to the extent it calls
22 for a legal conclusion.
23          You can answer.
24     THE WITNESS:  I'm not sure I understand

Page 87

1  your question.
2  BY MR. PIOLI:
3      Q.  In order for you to live in the United
4  States, is it your understanding that you need a
5  work visa?
6      MR. ROACHE:  Same objection.
7      THE WITNESS:  I believe so, yes.
8  BY MR. PIOLI:
9      Q.  Is it your understanding that the work
10 visa you had through Mintel was only good while
11 you were working for Mintel?
12     A.  That's what I -- yeah, I believe that.
13     Q.  And is that why you did not quit your
14 position with Mintel even upon accepting
15 Datamonitor's offer of employment?
16     MR. ROACHE:  Object to the form.
17          You can answer.
18     THE WITNESS:  I don't know.
19 BY MR. PIOLI:
20     Q.  Well, let me ask you, why did you stay
21 at Mintel even after you accepted the offer of
22 employment from Datamonitor?
23     MR. ROACHE:  Objection, asked and answered.
24          You can answer.

Page 88

1      THE WITNESS:  I don't know.
2  BY MR. PIOLI:
3      Q.  Did you think it would be a problem
4  working for Mintel and having already accepted
5  the offer of employment from Datamonitor?
6      MR. ROACHE:  I object to the form.
7      THE WITNESS:  I don't know.
8  BY MR. PIOLI:
9      Q.  Did you think you could work for
10 Datamonitor and Mintel simultaneously?
11     MR. ROACHE:  Object to the form, calls
12 for speculation.
13          You can answer.
14     THE WITNESS:  No.
15 BY MR. PIOLI:
16     Q.  So you knew you could only be working
17 for one company at a time; is that right?
18     MR. ROACHE:  Objection, asked and
19 answered.
20          You can answer.
21     THE WITNESS:  Yes.
22 BY MR. PIOLI:
23     Q.  When did you obtain your work visa
24 through Datamonitor?

Page 89

1      A.  I'm not so sure of the exact date.
2      Q.  Was it prior to your start date of
3  May 27th?
4      A.  I believe so.
5      Q.  Was it a week before?
6      A.  I'm not sure.  I don't know.
7      Q.  Did you obtain any type of a signing
8  bonus upon accepting the offer of employment from
9  Datamonitor?
10     A.  No.
11     Q.  From the time that you -- let me
12 backtrack.
13          Your employment with Mintel ceased as
14 of April 30th, 2008; is that right?
15     A.  Uh-hum.  Yes.
16     Q.  Between April 30th, 2008 and May 27,
17 2008, did you receive any compensation --
18     MR. ROACHE:  Object to the form.
19 BY MR. PIOLI:
20     Q.  -- from any source?
21     A.  No.
22     Q.  You were living off of savings at that
23 point?
24     A.  Yes.

23 (Pages 86 to 89)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 90

1    Q.  When did you receive your first
2  paycheck from Datamonitor?
3    A.  I don't -- sometime in June, I believe.
4    Q.  What did you do between April 30th and
5  May 27th?
6    MR. ROACHE:  Object to the form.
7       You can answer.
8    THE WITNESS:  I was enjoying the summer.
9  BY MR. PIOLI:
10   Q.  Did you do any work on behalf of
11 Datamonitor between April 30th, 2008 and
12 May 27th, 2008?
13   A.  No.
14   Q.  Did you work daily for Datamonitor
15 between May 27th, 2008 and July 14th, 2008 when
16 Mr. Howard instructed you to go home?
17   A.  Did I work daily?
18   Q.  Yes.
19   A.  Yes.
20   Q.  After you went home on July 14th, 2008,
21 did you do any work on behalf of Datamonitor?
22   A.  No.
23   Q.  Have you resumed your work for
24 Datamonitor?

Page 91

1    A.  Yes.
2    Q.  When did you resume working for
3  Datamonitor?
4    A.  I can't remember.  Towards the end
5  of -- I really can't remember.
6    Q.  Was it during the month of July?
7    A.  Yes.
8    Q.  Was it more than a week that you were
9  out of work?
10   A.  Yes.
11   Q.  Was it more than two weeks?
12   A.  No.
13   Q.  Who fulfilled your job responsibilities
14 while you were out of work?
15   A.  I don't know.
16   Q.  When did your work visa with Mintel
17 expire?
18   A.  I think it's still valid, so it was
19 still valid when I was still at Mintel.
20   Q.  Was it your understanding that your
21 Mintel work visa was transferable?
22   MR. ROACHE:  Objection to the extent it
23 calls for a legal conclusion.
24   THE WITNESS:  I don't know.

Page 92

1  BY MR. PIOLI:
2    Q.  You previously testified that you had
3  turned over your Sony -- Mintel Sony laptop
4  computer to counsel; is that correct?
5    A.  Yes.
6    Q.  When did you do that?
7    A.  I'm not sure of the exact date.
8    Q.  Was it prior to the TRO hearing on
9  July 16th?
10   A.  I can't remember.
11   Q.  Was it more than a week after you
12 were served with a summons and complaint in the
13 case?
14   MR. ROACHE:  Objection, asked and
15 answered.
16      You can answer.
17   THE WITNESS:  I don't know.  I don't know
18 the exact date.
19 BY MR. PIOLI:
20   Q.  Was it a matter of days or weeks that
21 you turned it over to counsel?
22   A.  I don't know.
23   Q.  Was it a month before you turned it over
24 to counsel?

Page 93

1    A.  No, it was most definitely less than a
2  month.
3    Q.  Was it more than three weeks?
4    A.  No.
5    Q.  Was it more than two weeks?
6    A.  I don't think so.
7    Q.  Was it less than a week?
8    A.  It could have been a week.  It could
9  have been less than a week.  I know for sure it
10 was not two, three or four weeks after.
11   Q.  From the time that you were served
12 with the lawsuit on July 11th until today, has
13 anyone had possession and control over your
14 computer other than either yourself or counsel?
15   A.  No.
16   Q.  And when you log on to your computer,
17 you have a user name; is that right?
18   A.  Yes.
19   Q.  And you have to type in a password as
20 well?
21   A.  Yes.
22   Q.  And did anyone have access to your user
23 name and password from the time you were served
24 with a copy of the summons and complaint until

24 (Pages 90 to 93)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 94

1  today?
2     A.   My attorneys.
3     Q.   Anyone besides your attorneys?
4     A.   No.
5     Q.   With regard to the -- we talked about
6  the Dell computer that you had purchased from
7  Mintel.  Do you recall that?
8     A.   Yes.
9     Q.   When you sent it to your relative in
10  Mauritius, did you receive any compensation for
11  that?
12     A.   No.
13     Q.   Is it possible that that computer had
14  Mintel information on it when you sent it to
15  Mauritius?
16     MR. ROACHE:  Objection, calls for
17  speculation.
18          You can answer.
19     THE WITNESS:  No.
20  BY MR. PIOLI:
21     Q.   Why do you say it's not possible?
22     A.   It was a home -- I wasn't using it.  It
23  was handed over as a gift.
24     Q.   Am I right, I thought you previously

Page 95

1  testified that you had used it for some time.
2     A.   Yes, for some time, but strictly just,
3  you know, looking for my e-mails and just for
4  general use, basically.
5     Q.   You never did any work on that
6  computer?
7     A.   No.
8     Q.   Never brought documents home to work
9  on?
10     A.   On that computer, no.
11     Q.   Never accessed e-mail containing Mintel
12  documents using that computer?
13     A.   No.
14     Q.   You're certain of that as you sit here
15  today?
16     A.   I'm certain.  If ever I was doing any
17  work, I take a loaner laptop from Mintel and I
18  would work using the loaner Mintel laptop.
19     Q.   And I apologize for being repetitive,
20  but other than the Dell computer and the Sony
21  laptop and the desktop computer you used at
22  Mintel, did you use any other computers during
23  your employment at Mintel?
24     A.   No.

Page 96

1     Q.   Do you know what a thumb drive is?
2     A.   No.  Thumb drive?
3     Q.   Are you familiar with memory devices
4  that you can connect through a USB port?
5     A.   Yes.
6     Q.   Okay.  You're not aware that they're
7  commonly called thumb drives?
8     A.   No.
9     Q.   What do you call them?
10     A.   A flash drive.
11     Q.   That's probably the better moniker for
12  it.
13          During the time that you worked for
14  Mintel, did you use flash drives to transport
15  data between your work computer and your laptop?
16     A.   Between my work computer and my
17  laptop I don't know.
18     Q.   It's possible that you did?
19     A.   I once -- I guess I would -- I guess
20  if the file was large enough, then, yes, I would
21  transfer it to the flash drive.
22     Q.   How many flash drives do you currently
23  own?
24     A.   Two.

Page 97

1     Q.   Did you previously own more?
2     A.   No.
3     Q.   So is it your testimony that from the
4  time you began work at Mintel's Chicago office
5  until today you have only used two flash drives?
6     MR. ROACHE:  Objection, mischaracterizes
7  his testimony.
8          You can answer.
9     THE WITNESS:  Yes.
10  BY MR. PIOLI:
11     Q.   Did you ever use any CDs to transport
12  documents from your work computer at Mintel to
13  your laptop?
14     A.   Yes.  There was -- there were times
15  when I would have presentations loaded up on to
16  CDs as a backup, yes.
17     Q.   Do you currently possess any CDs with
18  Mintel's files or information on them?
19     A.   No.
20     Q.   Did you turn those in when you ceased
21  your employment with Mintel?
22     A.   They were left at work, so...
23     Q.   You didn't have any at home?
24     A.   No.

25 (Pages 94 to 97)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 98

1    Q.    What about the two flash drives that
2   you currently own, do those have any Mintel data
3   or information on them?
4    A.    I don't know.
5    Q.    Have you made a search of those thumb
6   drives to discern that?
7    A.    I don't -- I -- I haven't looked, no.
8    Q.    Do you know what Skype is?
9    A.    Yes.
10   Q.    What is Skype?
11   A.    Skype is office communicator.
12   Q.    What does that mean?
13   A.    It allows you to communicate with other
14  colleagues within a company and also anywhere
15  around the world.
16   Q.    Do you use Skype?
17   A.    I used it when I was at Mintel, but I
18  don't use it now.
19   Q.    Is it possible to retrieve data
20  information -- data and information using Skype?
21   A.    I don't know.
22   Q.    Now we had previously established that
23  you submitted I call it a letter of resignation
24  on April 23rd; is that right?

Page 99

1    MR. ROACHE:  Object to the form,
2   mischaracterizes the document.
3         You can answer.
4    THE WITNESS:  It wasn't a letter of
5   resignation.
6   BY MR. PIOLI:
7    Q.    Well, a notification that you were
8   leaving employment as of April 30th.
9    A.    I was leaving, and I was leaving and I
10  was working 'til the end of my temporary
11  contract.
12   Q.    You previously testified that your role
13  over the last few months you were at Mintel was
14  working in the consumer products group; is that
15  right?
16   MR. ROACHE:  Object to the form.
17   THE WITNESS:  No.
18  BY MR. PIOLI:
19   Q.    What were you doing the last few months
20  you were at Mintel?
21   A.    I was asked to fill in for a position, a
22  product marketing manager position for
23  Comperemedia.
24   Q.    And that's in the financial sector;

Page 100

1   isn't that right?
2    A.    Yes.
3    Q.    You did that for the last how many
4   months that you were there?
5    A.    I guess two-and-a-half months.
6    Q.    And were you filling in for Sri Gururaj?
7    A.    No.  No.
8    Q.    Why were you working on the
9   Comperemedia sector or business?
10   A.    I was filling in for someone else.
11   Q.    Who were you filling in for?
12   A.    Lynn Olson.
13   Q.    What position did -- is it Miss Olson?
14   A.    I believe so.  I don't know.
15   Q.    What position did Miss Olson have?
16   A.    Product marketing manager for
17  Comperemedia.
18   Q.    Now on April 29th, 2008 you sent an
19  e-mail from your Mintel work account to your
20  personal Hotmail account; is that correct?
21   A.    I don't know which -- what I sent.
22   Q.    I'm going to ask you to take a look at
23  what we're going to mark as Neergheen
24  Exhibit No. 3.

Page 101

1         (Whereupon, Neergheen Exhibit
2          No. 3 was marked for
3          identification.)
4    MR. ROACHE:  One question before you ask
5   him.  Has this document been produced in
6   litigation?  I don't see any Bates numbers on it.
7    MR. PIOLI:  I'm not sure to be honest with
8   you.  I assume it's been produced in some form or
9   another.  It's the e-mail which is referenced in
10  the complaint.
11  BY MR. PIOLI:
12   Q.    Does that document refresh your
13  recollection as to whether or not you sent an
14  e-mail from your Mintel e-mail account to your
15  personal Hotmail account?
16   A.    Yes.
17   Q.    Why did you send this e-mail to
18  yourself?
19   A.    I don't know.  I regret it now.
20   Q.    You didn't have any purpose in sending
21  it to yourself?
22   A.    Right.
23   Q.    You didn't think that this was
24  information that would benefit you within your

26 (Pages 98 to 101)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 102

1  new employment with Datamonitor?
2      A.    Absolutely not.
3      Q.    You went through and you specifically
4  chose these files to e-mail to yourself, didn't
5  you?
6      A.    I guess they were -- I don't know.  I
7  don't know how I made the judgment, no.
8      Q.    It was random?
9      A.    Like I said, I don't know, and it was
10  something that I regretted a few days later.
11      Q.    I understand you regret it.
12      A.    It was done in the heat of the moment
13  as well.
14      Q.    Now when you sent it, it was your
15  intention to use this information, wasn't it, at
16  some point?
17      MR. ROACHE:  Object to the form.
18          You can answer.
19      THE WITNESS:  No.
20  BY MR. PIOLI:
21      Q.    Did you send it to yourself for
22  posterity?
23      A.    I don't know.
24      Q.    When you sent this e-mail to yourself,

Page 103

1  did you alert people at Datamonitor that you were
2  doing it?
3      A.    No.
4      Q.    No one at Datamonitor had any idea to
5  your knowledge?
6      A.    No.
7      Q.    I'm going to ask you to take a look at
8  what we're going to mark as Neergheen Exhibit 4.
9          I'm going to label these as
10  confidential, or highly confidential.
11      MR. ROACHE:  I'm sorry, I didn't hear what
12  you said.
13      MR. PIOLI:  I'm going to label these, and I'm
14  not sure what the designation is of the
15  protective order, confidential or highly
16  confidential.
17      MR. ROACHE:  Did you want that designation
18  on 3 as well or just 4?
19      MR. PIOLI:  You know what, just to be safe,
20  sure, but I think it's just a transmittal e-mail.
21  I don't think it has anything.  But just to be
22  safe, let's do it.
23
24

Page 104

1          (Whereupon, Neergheen Exhibit
2          No. 4 was marked for
3          identification.)
4  BY MR. PIOLI:
5      Q.    Can you identify what this document
6  is?
7      A.    Now that I see it, it's a trade show
8  list.
9      Q.    And this is one of the documents that
10  you forwarded to yourself on April 29th; is that
11  right?
12      MR. ROACHE:  Object to the form,
13  foundation.
14          You can answer.
15      THE WITNESS:  I don't know if it was one
16  of them.
17  BY MR. PIOLI:
18      Q.    Well, isn't this -- if you turn back to
19  Exhibit 3, is this not the Document 2008 shows
20  dash April 8.xls?
21      A.    I believe so.
22      Q.    Now why did you choose this particular
23  document to forward to yourself on April 29th?
24      A.    I don't know.

Page 105

1      Q.    What's the data that's reflect on this
2  document?
3      A.    From what I can see in front of me right
4  now, it's a trade show list.
5      Q.    And it contains budget information,
6  doesn't it?
7      A.    Yes.
8      Q.    And did you not think this was something
9  that would benefit you in your work over at
10  Datamonitor?
11      A.    No.
12      Q.    So you had no reason for forwarding this
13  to yourself on April 29th?
14      A.    I had no intentions -- I had no
15  intentions to use it.
16      Q.    Why did you send it to yourself?
17      A.    It was done in the heat of a moment, and
18  I totally regretted it a few days later.
19      Q.    Is doing it in the heat of the moment,
20  is that a reason?
21      A.    I don't know.  I guess I was -- my last
22  week at Mintel I guess I was really upset with
23  them for not having looked after me properly,
24  especially after being there for ten years, but

27 (Pages 102 to 105)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 106

1  it was done in the heat of a moment.
2      Q.   Well, you took it with the intent of
3  harming Mintel; is that right?
4      MR. ROACHE: Object to the form.
5          You can answer.
6      THE WITNESS: I don't know.
7  BY MR. PIOLI:
8      Q.   Well, you just said you were angry with
9  them. Did you want to hurt them?
10     MR. ROACHE: Object to the form,
11 mischaracterizes his testimony.
12         You can answer.
13     THE WITNESS: No.
14 BY MR. PIOLI:
15     Q.   Well, what does your being angry with
16 Mintel have to do with your e-mailing these
17 documents to yourself?
18     A.   I don't know. I don't know. It was
19 done in the heat of a moment, and I don't know
20 why I did it.
21     Q.   Your testimony is you have no idea why
22 you did it?
23     A.   No.
24     Q.   You didn't think this was something that

Page 107

1  would be beneficial to Datamonitor?
2      A.   Absolutely not.
3      Q.   It wouldn't help Datamonitor to see all
4  of Mintel's budget information --
5      A.   No.
6      Q.   -- for its trade shows?
7      A.   I don't know.
8      Q.   You think Mintel wants Datamonitor to
9  see this information?
10     A.   No.
11     Q.   Why do you think they don't want
12 Datamonitor to see it?
13     MR. ROACHE: Objection, calls for
14 speculation.
15         You can answer.
16     THE WITNESS: I guess competitors.
17 BY MR. PIOLI:
18     Q.   This would be harmful if one of your
19 competitors saw this, wouldn't it?
20     MR. ROACHE: Objection, calls for
21 speculation.
22         You can answer.
23     THE WITNESS: Yes.
24

Page 108

1  BY MR. PIOLI:
2      Q.   This document, Neergheen Exhibit 4,
3  this spreadsheet, is this something that was
4  shown to -- that all Mintel employees had access
5  to?
6      A.   I don't know if all Mintel employees had
7  access to it.
8      Q.   Do you know if it was only people in the
9  marketing group that had access to it?
10     A.   I believe so.
11     Q.   I'm going to show you what we're going
12 to mark as Neergheen Exhibit 5 and ask you to
13 take a look at it.
14         (Whereupon, Neergheen Exhibit
15          No. 5 was marked for
16          identification.)
17 BY MR. PIOLI:
18     Q.   Can you identify what the document
19 labelled Neergheen Exhibit 5 is?
20     A.   It's marketing expenses.
21     Q.   Is it the document referenced as Marcomm
22 approved expenses.xls?
23     A.   It could be. I don't know.
24     Q.   What is Marcomm?

Page 109

1      A.   Marcomm Communications.
2      Q.   Is this one of the documents that you
3  e-mailed to yourself on April 29, 2008?
4      A.   If it's on the initial list that I sent
5  to myself, then yes.
6      Q.   And is this, once again, costing data,
7  Mintel's costing data?
8      MR. ROACHE: Object to the form.
9          You can answer.
10     THE WITNESS: I don't know.
11 BY MR. PIOLI:
12     Q.   Well, what's reflected on this
13 document?
14     A.   It's marketing costs.
15     Q.   And do you think, once again, this is
16 something Mintel would want its competitors to
17 see?
18     MR. ROACHE: Objection, calls for
19 speculation.
20         You can answer.
21     THE WITNESS: I don't know.
22 BY MR. PIOLI:
23     Q.   Was this, once again, one of those
24 documents that you sent to yourself because you

28 (Pages 106 to 109)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 110

1  were angry with Mintel?
2      A.   Yes.
3      Q.   And you knew that Mintel would not
4  want Datamonitor to see this document; isn't that
5  right?
6      MR. ROACHE:  Object to the form,
7  speculation.
8          You can answer.
9      THE WITNESS:  I -- I don't know.
10  Datamonitor has not seen any of this
11  information.
12  BY MR. PIOLI:
13      Q.   This isn't something that Mintel goes
14  around publishing to its competitors, is it?
15      A.   I would hope not.
16      Q.   And is this another document that is
17  not -- that is only available to those on the
18  marketing committee?
19      A.   I believe so.
20      Q.   I'm going to ask you to take a look at
21  what we're going to mark as Neergheen Exhibit 6.
22          (Whereupon, Neergheen Exhibit
23              No. 6 was marked for
24              identification.)

Page 111

1  BY MR. PIOLI:
2      Q.   Can you identify what this document is
3  that we have marked as Neergheen Exhibit 6?
4      A.   It's just from -- from what it's titled,
5  it's marketing activities and marketing schedule,
6  I guess.
7      Q.   Do you think it's common for competitors
8  to share their marketing of their objectives with
9  one another?
10     MR. ROACHE:  Object to the form, speculation.
11         You can answer.
12     THE WITNESS:  No.
13  BY MR. PIOLI:
14     Q.   Do you think Mintel would want
15  Datamonitor to know what its marketing objectives
16  are?
17     MR. ROACHE:  Same objections.
18         You can answer.
19     THE WITNESS:  No.
20  BY MR. PIOLI:
21     Q.   This isn't a document that Mintel goes
22  around publishing to its competitor, is it?
23     A.   No.  I don't know.
24     Q.   Do you have reason to believe that

Page 112

1  Mintel does go around publishing this document to
2  its competitors?
3      A.   I should hope not.
4      Q.   Once again, is this a document that was
5  only available to those in the marketing group?
6      A.   Yes.
7          (Whereupon, Neergheen Exhibit
8              No. 7 was marked for
9              identification.)
10  BY MR. PIOLI:
11      Q.   I'm going to hand you what we have
12  marked as Neergheen Exhibit 7.
13          Can you identify what the document is
14  that we have marked as Neergheen Exhibit 7?
15      A.   Yes, it's a weekly update on tasks
16  specifically geared to the execs, executives.
17      Q.   And it directs the activities of what
18  those executives are going to do; is that
19  correct?
20      A.   No.  It's what, I believe, what the
21  marketing team is doing on behalf of for the
22  execs.
23      Q.   It lays out specific actions for the
24  marketing committee; is that right?

Page 113

1      A.   It looks like it.
2      Q.   Once again, is this a document that you
3  would expect Mintel to share with its
4  competitors?
5      MR. ROACHE:  Object to the form.  It calls
6  for speculation.
7      THE WITNESS:  I don't know.
8  BY MR. PIOLI:
9      Q.   Is this a document that during your time
10  with Mintel they would share with competitors?
11      A.   I don't know.
12      Q.   To your knowledge, did Mintel ever share
13  a document like this with a competitor?
14      A.   I don't know.
15      Q.   Is this a document that was only
16  available to those in the marketing committee --
17  marketing group?  Excuse me.
18      A.   I believe so.
19      Q.   In your work at Datamonitor, do they
20  share documents like this with their competitors?
21      A.   I don't know.
22      MR. ROACHE:  Object to the form.
23      THE WITNESS:  Sorry.
24      MR. ROACHE:  Go ahead.

29 (Pages 110 to 113)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 114

1    THE WITNESS: I don't know.
2 BY MR. PIOLI:
3    Q. If you were the head of Mintel's
4 marketing group, would you want this document
5 circulating amongst your competitors?
6    MR. ROACHE: Objection, calls for
7 speculation.
8       You can answer.
9    THE WITNESS: I don't know.
10 BY MR. PIOLI:
11   Q. You don't have any opinion?
12   A. I don't know.
13   Q. I'm going to ask you to take a look
14 at a document that we're marking as Neergheen
15 Exhibit 8.
16             (Whereupon, Neergheen Exhibit
17             No. 8 was marked for
18             identification.)
19   MR. PIOLI: Once again, all these exhibits
20 are highly confidential, for attorney's eyes
21 only, whatever the designation is.
22 BY MR. PIOLI:
23   Q. Mr. Neergheen, can you identify what
24 the document that we have marked as Neergheen

Page 115

1 Exhibit 8 is?
2    A. It's a client list.
3    Q. Specifically it's a client list for?
4    A. Comperemedia.
5    Q. Which is part of the finance sector for
6 Mintel; is that right?
7    A. Yes.
8    Q. And it is a document that you e-mailed
9 to yourself on April 29th, 2008; is that right?
10   A. If it was on the list, yes.
11   Q. And this document doesn't just have
12 the names of Mintel's customers, it also has the
13 total amounts that they spend for services with
14 Mintel also; is that right?
15   A. I don't know. I haven't -- I have
16 just quickly gone through it. That would be the
17 case.
18   Q. Now if you look through it on the
19 second page it has an account name and it lists
20 the customer names; is that right, then has a
21 column called total price?
22   A. Yes.
23   Q. And that lists the various amounts that
24 each customer spent with Mintel; is that right?

Page 116

1    A. Yes.
2    Q. It contains all Mintel's pricing
3 information for these customers; is that right?
4    A. I don't know what you mean by pricing,
5 but --
6    Q. Well, this is what Mintel charges to
7 each of these customers; is that correct?
8    MR. ROACHE: Object to the form.
9       You can answer.
10   THE WITNESS: Yes.
11 BY MR. PIOLI:
12   Q. The time that you were at Mintel, did
13 Mintel share its customer lists and pricing
14 information with its competitors?
15   A. I don't know.
16   Q. To your knowledge, did they?
17   A. I'm sorry?
18   Q. To your knowledge, did they, yes or
19 no?
20   MR. ROACHE: Object to the form.
21       You can answer.
22   THE WITNESS: No.
23 BY MR. PIOLI:
24   Q. In your years of experience with Mintel

Page 117

1 and Datamonitor and otherwise, have you ever
2 experienced a company in this business taking its
3 customer lists and its pricing information and
4 sharing it with a competitor?
5    MR. ROACHE: Object to the form and
6 foundation.
7       You can answer. Go ahead.
8    THE WITNESS: No.
9 BY MR. PIOLI:
10   Q. That's something that would be pretty
11 harmful to a company, wouldn't it, if its
12 competitor had its pricing information, its
13 customer list?
14   MR. ROACHE: Object to the form, foundation,
15 speculation.
16       Go ahead.
17   THE WITNESS: Yes.
18 BY MR. PIOLI:
19   Q. Once again, this was a document that
20 was not -- that was only available to those in
21 the marketing group; is that correct?
22   MR. ROACHE: Objection, speculation.
23       You can answer.
24   THE WITNESS: I don't know regarding this

30 (Pages 114 to 117)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 118

1  particular document, no.
2  BY MR. PIOLI:
3     Q.   You knew as to the other documents, but
4  not this one?
5     A.   I think I -- client lists can be gained
6  from any department, I guess.
7     Q.   To your knowledge, did every employee at
8  Mintel have access to this customer list that we
9  have labelled as Neergheen Exhibit 8?
10    A.   I don't know.
11    Q.   You just have no knowledge; is that
12  right?
13    A.   I have no knowledge, yes.
14    Q.   Going back to Exhibit 8, Mintel spends
15  a great deal of money obtaining their customers
16  and developing their customer lists; isn't that
17  right?
18    MR. ROACHE:  Object to the form,
19  speculation, foundation.
20        You can answer.
21    THE WITNESS:  I don't know.
22  BY MR. PIOLI:
23    Q.   I would like to show you what we'll mark
24  as Neergheen Exhibit 9.

Page 119

1              (Whereupon, Neergheen Exhibit
2               No. 9 was marked for
3               identification.)
4     MS. LERVICK:  Counsel, I don't think you
5  meant the last page.
6     MR. PIOLI:  Off the record for a second.
7     THE VIDEOGRAPHER:  I'm going to change tapes
8  too.
9     MR. PIOLI:  Okay.
10    THE VIDEOGRAPHER:  Going off the record at
11  1:48 p.m.
12              (Ms. Lervick and Ms. Pronk
13               exited.)
14              (Discussion off the record.)
15    THE VIDEOGRAPHER:  We're on the record at
16  1:50 p.m.
17  BY MR. PIOLI:
18    Q.   Mr. Neergheen, can you identify what the
19  document is that we have labelled Neergheen
20  Exhibit 9?
21    A.   It seems to be a trade show list.
22    Q.   And the first page of Exhibit 9 would
23  indicate that this is a document that you
24  e-mailed to your personal Hotmail account on

Page 120

1  February 6, 2008; is that correct?
2     A.   Uh-hum.  Yes.
3     Q.   And why did you e-mail this to yourself
4  on February 6, 2008?
5              (Ms. Lervick entered.)
6     THE WITNESS:  I must have been working
7  on a specific project at the time, that's why I
8  e-mailed it to my Hotmail account.
9  BY MR. PIOLI:
10    Q.   Did you access this when you were at
11  home?
12    A.   I guess so.
13    Q.   Now there's a document that you turned
14  over in this litigation; is that correct?
15    A.   I'm sorry?
16    Q.   This is a document that you turned over
17  in this litigation; is that right?
18    A.   Yes.
19    Q.   So this was a document that was in your
20  possession as of the time that this lawsuit is
21  filed; is that right?
22    A.   I -- yes.
23    Q.   And it was a document that was in your
24  possession as of the time that you began

Page 121

1  employment with Datamonitor; is that right?
2     A.   Yes.
3     Q.   And turning to the third page of this
4  document, is this, once again, similar to the
5  exhibit we saw earlier which reflects Mintel's
6  budget and cost information?
7     MR. ROACHE:  Object to the form.
8  BY MR. PIOLI:
9     Q.   Does this document contain Mintel's
10  budget and cost information?
11    MR. ROACHE:  Object to the form.
12    THE WITNESS:  The document looks like it
13  provides that.
14  BY MR. PIOLI:
15    Q.   Once again, is this something that
16  Mintel shared with its competitors?
17    A.   I don't know, but I actually sent this
18  to my Hotmail because I was working on a
19  particular project.
20    Q.   But as of the time that you left
21  Mintel's employment on April 30th, this document
22  was still in your possession, right, you hadn't
23  deleted it from your Hotmail account?
24    A.   I don't know.  I...

31 (Pages 118 to 121)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 122

1    Q.   Well, if you produced it in this
2  litigation, doesn't that indicate to you that you
3  had it as of the time you started employment at
4  Datamonitor?
5    A.   Yes, but it's something that I have
6  never gone back to, so...
7            (Whereupon, Neergheen Exhibit
8            No. 10 was marked for
9            identification.)
10 BY MR. PIOLI:
11   Q.   I'm going to hand you what we have
12 marked as Neergheen Exhibit 10 and ask you to
13 take a look at it.
14         Can you identify what the document is
15 that we have marked Neergheen Exhibit 10?
16   A.   It's, as it says, it's a master plan
17 outline for consumer e-mail.
18   Q.   And the first page of this document
19 indicates that you e-mailed it to your Hotmail
20 account on January 15, 2008; is that correct?
21   A.   Yes.
22   Q.   And why did you send this document to
23 yourself on that date?
24   A.   I don't know.  I must have been helping

Page 123

1  out on a specific project.
2    Q.   Did you draft any of this document?
3    A.   Not that I can recall.
4    Q.   Once again, this was a document that
5  was in your possession as of the time that you
6  began work with Datamonitor; is that correct?
7    A.   I have -- this is news to me, and, yes,
8  I have never seen this document ever since I have
9  sent it.
10   Q.   Do you regularly delete e-mail from your
11 account?
12   MR. ROACHE:  Object to the form.
13   THE WITNESS:  I don't know.  I don't know
14 how often I delete.
15 BY MR. PIOLI:
16   Q.   Again, is this a document, to your
17 knowledge, that Mintel ever shared this
18 document with any of its competitors, including
19 Datamonitor?
20   A.   I don't know.
21   Q.   Is this a document you think Mintel
22 would want in the possession of its competitors?
23   A.   I don't know.
24

Page 124

1            (Whereupon, Neergheen Exhibit
2            No. 11 was marked for
3            identification.)
4  BY MR. PIOLI:
5    Q.   I'm going to ask you to take a look at a
6  document that has been marked Neergheen
7  Exhibit 11 and ask you to look at it.
8            Can you identify what that document is
9  that we have marked Neergheen Exhibit 11?
10   A.   Yes.  It's a trade association master
11 spreadsheet.
12   Q.   Did you have any hand in preparing this
13 document?
14   A.   I built this document.
15   Q.   And did you do so while you were
16 employed by Mintel?
17   A.   Yes.
18   Q.   And does the first page of this document
19 indicate that you e-mailed it to your personal
20 Hotmail account on March 25, 2008?
21   A.   Yes.
22   Q.   And why did you do that on March 25th,
23 2008?
24   A.   I don't know.

Page 125

1    Q.   Had you already accepted your -- the
2  offer of employment with Datamonitor on
3  March 25th, 2008?
4    A.   I don't know.
5    Q.   Was it about that time that you did?
6    MR. ROACHE:  I object to the form, asked and
7  answered.
8    THE WITNESS:  I don't know.
9  BY MR. PIOLI:
10   Q.   When did you accept your offer of
11 employment with Datamonitor?
12   MR. ROACHE:  Objection, asked and answered.
13         You can answer.
14   THE WITNESS:  I'm not so sure when.  I
15 can't remember the exact date.
16 BY MR. PIOLI:
17   Q.   Was it before April, 2008?
18   MR. ROACHE:  Same objection.
19         You can answer.
20   THE WITNESS:  I don't know.
21 BY MR. PIOLI:
22   Q.   Was it prior to March, 2008?
23   A.   I don't know.
24   Q.   Was it prior to February, 2008?

32 (Pages 122 to 125)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 126

1    MR. ROACHE: The same objection.
2        Go ahead.
3    THE WITNESS: I -- I don't know.
4 BY MR. PIOLI:
5    Q.    Now in your work at Datamonitor you
6 deal with trade associations; is that right?
7    A.    That's right.
8    Q.    You seek to establish partnerships with
9 them?
10    A.    Yes, but I have -- I am not able to
11 contact any of the associations that I had
12 previous contact with at Mintel.
13    Q.    And why is that?
14    A.    I guess it's from a -- because that's
15 what I have been told.
16    Q.    Who told you that?
17    A.    My superiors.
18    Q.    Which superiors?
19    A.    Jeff Howard.
20    Q.    What did Mr. Howard tell you
21 specifically?
22    A.    Not to contact any CPG base
23 associations or associations that you have had
24 previous contact with in the past.

Page 127

1    Q.    So it's just CPG and any that you had
2 contact with previously; is that right?
3    A.    Yes.
4    Q.    Other ones you can go ahead and be in
5 touch with?
6    A.    Yes.
7    Q.    Mr. Howard ever reduce that to writing?
8    A.    I don't know.
9    Q.    But your communication with him is just
10 oral; is that right?
11    A.    It's -- I believe it -- I don't know.
12 There might be an e-mail. I'm not too sure.
13    Q.    Was it spelled out in your contract of
14 employment with Datamonitor?
15    A.    I don't know.
16    Q.    Was it spelled out in your non-compete
17 agreement with Datamonitor?
18    A.    I don't know.
19    Q.    If someone at Datamonitor were working
20 in the CPG sector, this document labelled
21 Neergheen Exhibit 11, this would be pretty
22 beneficial to them, wouldn't it?
23    MR. ROACHE: Object to the form, calls for
24 speculation.

Page 128

1        You can answer.
2    THE WITNESS: I don't know.
3 BY MR. PIOLI:
4    Q.    Well, if you're trying to build
5 partnerships with trade associations, if you had
6 a list of trade associations with their contact
7 information, don't you think that would be
8 helpful?
9    MR. ROACHE: The same objection. You can
10 answer.
11    THE WITNESS: I don't know.
12 BY MR. PIOLI:
13    Q.    Well, you're working in the financial
14 sector, aren't you?
15    MR. ROACHE: Objection, mischaracterizes
16 his testimony.
17        But you can answer.
18    THE WITNESS: No.
19 BY MR. PIOLI:
20    Q.    You're not working at all in financial?
21    A.    No, I -- no.
22    Q.    You're prohibited from working in
23 financial?
24    MR. ROACHE: Objection, mischaracterizes his

Page 129

1 testimony.
2        You can answer.
3    THE WITNESS: I don't know.
4 BY MR. PIOLI:
5    Q.    You don't know whether or not you're
6 prohibited from working in the financial sector?
7    A.    Well, at the moment my paper says -- my
8 agreement says allergy -- sorry, technology and
9 pharmaceutical and health care.
10    Q.    Has anyone told you you can't work in
11 the financial sector?
12    A.    No.
13    Q.    So what would prohibit you from working
14 in the financial sector?
15    A.    I -- that's why I said I don't know.
16 Nothing is prohibited -- nothing is prohibiting
17 me from working in the financial services sector.
18    Q.    Well, what sector are you working in
19 right now?
20    A.    Health care, pharmaceutical and
21 technology.
22    Q.    Okay. Suppose you had a list of trade
23 associations in the health care sector, would
24 that not be beneficial to you in carrying out

33 (Pages 126 to 129)

Marlo Reporting & Video Services, Inc.
(312) 578-0041

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 130

1  your duties at Datamonitor?
2      A.   This is all consumer related.
3      Q.   I understand that.  I'm asking if you
4  had a list of trade associations in the health
5  care sector, would that not be beneficial to you
6  in carrying out your duties at Datamonitor?
7      A.   No.
8      Q.   Not at all?
9      A.   No.
10     Q.   That's something you would just discard,
11  get rid of?
12     A.   Yes.
13     Q.   No value to you?
14     A.   Personally, yes.
15     Q.   Then why did you e-mail it to yourself?
16     A.   Don't know.
17     Q.   Once again you have no reason for doing
18  it, you just did it?
19     A.   I have no idea.  I must have been
20  working on something.  I don't know.
21     Q.   Well, why would you e-mail something to
22  yourself that had absolutely no value to you?
23     MR. ROACHE:  Object to the form,
24  mischaracterizes his testimony.

Page 131

1      THE WITNESS:  I don't know.
2      MR. ROACHE:  You can answer.
3      THE WITNESS:  I don't know.
4  BY MR. PIOLI:
5      Q.   So there's no reason -- there was no
6  reason for you to e-mail this to yourself, there
7  was no reason for you to e-mail the April 29th,
8  2008 e-mail with those documents to yourself; is
9  that right?
10     MR. ROACHE:  Object to the form, compound,
11  mischaracterizes his testimony.
12         You can answer.
13     THE WITNESS:  I don't know.
14  BY MR. PIOLI:
15     Q.   I'll break it down if you want.
16         There was no reason for you to e-mail
17  this document, Neergheen Exhibit 11, to yourself
18  on March 28th, 2008; is that right?
19     MR. ROACHE:  Objection, asked and answered.
20         Go ahead.
21     THE WITNESS:  I don't know.
22  BY MR. PIOLI:
23     Q.   There was no reason for you to e-mail
24  the April 29, 2008 documents to yourself either;

Page 132

1  is that right?
2      MR. ROACHE:  Objection, asked and answered.
3      THE WITNESS:  I don't know.
4  BY MR. PIOLI:
5      Q.   Do you often do a lot of things that you
6  don't know why you do them?
7      MR. ROACHE:  Object to the form.
8          You can answer.
9      THE WITNESS:  I guess.
10  BY MR. PIOLI:
11     Q.   All the time?
12     A.   I don't know.
13     Q.   During the course of a day how many
14  e-mails do you send to yourself that you have no
15  idea why you do it?
16     MR. ROACHE:  Object to the form.
17         Go ahead and answer.
18     THE WITNESS:  I have no idea.
19  BY MR. PIOLI:
20     Q.   But you do it quite often; is that
21  right?
22     A.   It's -- depending on my -- whether
23  there's a project that I'm working on.  It's all
24  dependent on, you know, what I'm working on.

Page 133

1      Q.   Well, on April 29th, 2008 were you
2  working on any projects for Mintel?
3      A.   No.
4      Q.   So it couldn't have been for a project
5  that you sent that e-mail; is that right?
6      A.   No.
7      Q.   But you have no other idea as to why
8  you sent it?
9      A.   I have no idea.
10     Q.   I'm going to ask you to take a look at
11  what we're marking as Neergheen Exhibit 12.  I'm
12  going to ask you to look at it.
13              (Whereupon, Neergheen Exhibit
14               No. 12 was marked for
15               identification.)
16  BY MR. PIOLI:
17     Q.   Can you identify the document that we
18  have marked as Neergheen Exhibit 12?
19     A.   It's an e-mail.
20     Q.   And what's attached to the e-mail?
21     A.   It's a spreadsheet.
22     Q.   What's contained in the spreadsheet?
23     A.   From what I can see, it's commissions.
24     Q.   Whose commissions are included in the

34 (Pages 130 to 133)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 134

1    spreadsheet?
2        A.    Salespeople.  I don't know.
3        Q.    Mintel salespeople; is that right?
4        A.    Yes.
5        Q.    This is a document that you e-mailed to
6    yourself on December 28, 2007; is that right?
7        A.    Yes.  I don't remember e-mailing it,
8    but I did.
9        Q.    Do you recall why you would e-mail --
10    why you e-mailed this to yourself?
11        A.    I don't know.
12        Q.    Did you often work on these commission
13    spreadsheets?
14        A.    No.
15        Q.    Did you ever work on these commission
16    spreadsheets?
17        A.    No.
18        Q.    This is a document that you would keep
19    in some sort of personal file that you had at
20    home?
21        A.    I don't know.
22    MR. PIOLI:  Could we take five minutes?
23    MR. ROACHE:  Absolutely.
24    THE VIDEOGRAPHER:  Going off the record at

Page 135

1    2:11 p.m.
2                    (Discussion off the record.)
3    THE VIDEOGRAPHER:  Back on the record at
4    2:18 p.m.
5    BY MR. PIOLI:
6        Q.    Mr. Neergheen, from the time you
7    submitted your letter informing Mintel that you
8    would not continue your employment past
9    April 30th, were you doing any work for Mintel
10    between April 23rd and April 30th?
11        A.    Yes, I believe I was.  I can't remember
12    what I was working on.
13        Q.    You testified earlier that you tried to
14    work relationships with trade associations; is
15    that right, and that they would -- you would do
16    favors for them, they would do favors for you; is
17    that correct?
18    MR. ROACHE:  Object to the form.
19            You can answer.
20    THE WITNESS:  Yes, at Mintel, yes.
21    BY MR. PIOLI:
22        Q.    And was one of the favors that the
23    trade association would do would give you a list
24    of attendees at their conferences?

Page 136

1        A.    Yes.
2        Q.    And that's something that would be
3    beneficial at Mintel that they could use to their
4    advantage?
5        A.    Yes.
6                    (Whereupon, Neergheen Exhibit
7                    No. 13 was marked for
8                    identification.)
9    BY MR. PIOLI:
10        Q.    I'm going to ask you to take a look at
11    what we have marked as Neergheen Exhibit 13.
12            Can you identify what the document is
13    that we have marked Neergheen Exhibit 13?
14        A.    Yes, it's a delegate list from a show.
15        Q.    It's a -- there's an e-mail on the first
16    page of the document, and it states the subject
17    matter is 2008 Life Insurance Conference,
18    Post-Conference Attendee List; is that correct?
19        A.    Yes.
20        Q.    And the list that's attached to this
21    e-mail, is that one of those lists that we were
22    just talking about that the trade association
23    would give to Mintel?
24        A.    That's based on -- yes.  Yes.

Page 137

1        Q.    And this is something that had value to
2    Mintel; is that right?
3    MR. ROACHE:  Object to the form, foundation,
4    speculation.
5            You can answer.
6    THE WITNESS:  I don't know.
7    BY MR. PIOLI:
8        Q.    Didn't you just testify that these lists
9    that the trade associations would provide had
10    some benefit to Mintel?
11        A.    I don't know if this list had any
12    particular value to Mintel.
13        Q.    But this is one of those lists, is it
14    not?
15        A.    Yes.
16        Q.    And you submitted that letter stating
17    that your last day at Mintel would be April 30th.
18    You submitted that letter on April 23rd; is that
19    right?
20        A.    Yes.
21        Q.    And this, Neergheen Exhibit 13, is
22    an e-mail where you forwarded the list of
23    conference attendees to your home, your personal
24    e-mail address on Friday, April 25th; is that

35 (Pages 134 to 137)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 138

1    correct?
2        A.    Yes.
3        Q.    And at this time you had already
4    accepted your position with Datamonitor; is that
5    right?
6        A.    Yes.
7        Q.    So at the time that you began your
8    employment with Datamonitor, this was a document
9    that you had in your possession; is that correct?
10       MR. ROACHE:  Object to the form and
11   foundation.
12           You can answer.
13       THE WITNESS:  In my possession at work, no.
14   BY MR. PIOLI:
15       Q.    Well, you began employment with
16   Datamonitor on May 27th, 2008; is that right?
17       A.    Yes.
18       Q.    And this is a document that you turned
19   over in this litigation; is that correct?
20       A.    Yes.
21       Q.    And this litigation was not instituted
22   until July 11, 2008; is that right?
23       A.    Yes.
24       Q.    So you had this document in your

Page 139

1    possession on July 11th, 2008; is that right?
2        A.    Yes.
3        Q.    So you also had this document in your
4    possession when you began employment with
5    Datamonitor on March 27, 2008; is that right?
6        A.    Yes.
7        Q.    Why do you believe you were hired by
8    Datamonitor?
9        MR. ROACHE:  Object to the form,
10   speculation.
11           You can answer.
12       THE WITNESS:  I don't know.
13   BY MR. PIOLI:
14       Q.    Was it because of your previous
15   experience?
16       MR. ROACHE:  Object to the form,
17   speculation.
18           You can answer.
19       THE WITNESS:  I don't know.
20   BY MR. PIOLI:
21       Q.    Was it because of all the information
22   you gathered over your years of working at Mintel
23   regarding trade associations?
24       MR. ROACHE:  Object to the form, foundation,

Page 140

1    speculation.
2            You can answer.
3        THE WITNESS:  I don't know.
4    BY MR. PIOLI:
5        Q.    Do you think that was one of the
6    factors?
7        MR. ROACHE:  Same objections.
8            You can answer.
9        THE WITNESS:  I don't know.
10   BY MR. PIOLI:
11       Q.    Since the time that you left Mintel's
12   employment, have you been in touch with any of
13   the trade associations that you dealt with while
14   you were at Mintel?
15       A.    No.
16       Q.    Have you provided the names of any
17   of the trade associations to anyone at
18   Datamonitor?
19       MR. ROACHE:  Object to the form.
20       THE WITNESS:  No.
21   BY MR. PIOLI:
22       Q.    Did you provide the names of any of
23   the trade associations that you dealt with at
24   Mintel to anyone at Datamonitor?

Page 141

1        A.    No.
2        Q.    Do you know of anybody else that
3    Datamonitor interviewed for your position?
4        A.    I don't know.
5        Q.    Do you know of any other former Mintel
6    employees who currently work for Datamonitor?
7        A.    Yes.
8        Q.    Who would those be?
9        MR. ROACHE:  Objection, relevance.
10           You can answer to the extent you know.
11       THE WITNESS:  Ruon Cooper.
12   BY MR. PIOLI:
13       Q.    Anyone else?
14       A.    That's it now.
15       Q.    What's Mr. Cooper's position at
16   Datamonitor?
17       MR. ROACHE:  Can I have a standing objection
18   to relevance?
19       MR. PIOLI:  Sure.
20       MR. ROACHE:  Go ahead.
21       THE WITNESS:  I don't know.
22   BY MR. PIOLI:
23       Q.    Have you had any conversations with him
24   since you started at Datamonitor?

36 (Pages 138 to 141)

Marlo Reporting & Video Services, Inc.
(312) 578-0041

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 142

1    A.    Can you define conversation?
2    Q.    Sure. Let's start, have you had any
3  oral communications with Mr. Cooper?
4    A.    Yes, we have spoken, yes.
5    Q.    Since you started at Datamonitor?
6    A.    We have spoken, yes.
7    Q.    What -- I'm sorry.
8    A.    On a social basis, hi, hello, how are
9  you.
10    Q.    Did you have any discussions about
11  Mintel with Mr. Cooper since you started at
12  Datamonitor?
13    A.    No.
14    Q.    You previously testified that you did
15  not know how to partition a hard drive; is that
16  correct?
17    A.    That's true.
18    Q.    Do you know how big the hard drive is
19  on your Sony computer?
20    A.    I don't know.
21    Q.    Does 30 gigabytes sound about right?
22    A.    I don't know.
23    Q.    Do you have any explanation as to why
24  the hard drive on your computer is partitioned so

Page 143

1  that only 10.3 gigabytes is being used?
2    A.    I don't know.
3    Q.    Do you have any explanation as to why
4  there's so many hard drives partitioned so that
5  17 gigabytes of unused space was deleted?
6    A.    I don't know.
7    Q.    You previously testified that only you
8  and your attorneys had access to your computer
9  since the time that this lawsuit was filed; is
10  that correct?
11    MR. ROACHE:  Objection, mischaracterizes his
12  testimony.
13            He can answer.
14    THE WITNESS:  Yes.
15  BY MR. PIOLI:
16    Q.    Is that true, only you and your
17  attorneys have access to your computer since this
18  lawsuit was filed?
19    A.    Yes.
20    Q.    You previously testified that you
21  only -- since the time the lawsuit was filed you
22  only used the computer to access e-mail via the
23  internet; is that right?
24    A.    Yes.

Page 144

1    Q.    Do you know what a defrag program
2  is?
3    A.    No.
4    Q.    Are you aware that a defrag program was
5  run on your computer on July 14th?
6    A.    I don't know.
7    Q.    Do you have any explanation as to why it
8  would have been run on your computer on
9  July 14th?
10    A.    I don't know.
11    Q.    Would it surprise you if a defrag
12  program had been run on your computer on
13  July 14th?
14    A.    I don't know what a defrag program is.
15    Q.    You're aware that an antivirus program
16  ran on your computer on July 17th?
17    A.    I don't know.
18    Q.    You're aware that that would write over
19  files?
20    A.    I don't know.
21    Q.    Are you aware of your duty to preserve
22  evidence in this case?
23    A.    I'm sorry?
24    Q.    Are you aware of your duty to preserve

Page 145

1  evidence in this case?
2    A.    Can you explain that?
3    Q.    You're aware that once you had notice of
4  this lawsuit you weren't supposed to be using
5  your computer?
6    MR. ROACHE:  Object to the form.
7    THE WITNESS:  Um, I don't know.
8  BY MR. PIOLI:
9    Q.    Nobody ever informed you about a
10  duty to preserve evidence in this case?
11    A.    I don't know.
12    Q.    Isn't it true, sir, that on July 17th
13  you accessed the Microsoft help and support
14  website and entered queries about how to delete
15  data from your computer?
16    A.    Oh, I know exactly.  Yes.
17    Q.    Why did you --
18    A.    It wasn't how to delete.  I was trying
19  to look for the files that I had sent over to
20  my -- from my Mintel account, and I was trying to
21  find out how to retrieve files from my Hotmail
22  that had been deleted.
23    Q.    What searches did you enter?
24    A.    I can't remember.

37 (Pages 142 to 145)

Marlo Reporting & Video Services, Inc.
(312) 578-0041

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 146

1    Q.  Isn't it true that you entered searches
2  about how to access and delete data?
3    MR. ROACHE:  I'm going to object, instruct
4  the witness not to answer.
5       And I have a question for counsel.  Have
6  you received a report from your expert on the
7  content of his hard drive?
8    MR. PIOLI:  No.
9    MR. ROACHE:  Okay.
10       You can read the question to him and he
11  can answer it.
12    THE WITNESS:  I don't know.
13    MR. ROACHE:  Have you received any
14  information from your expert on the hard drive
15  other than the list that was given to both of us?
16    MR. PIOLI:  I'm not going to get into my
17  conversations.
18    MR. ROACHE:  Well, he's subject to a court
19  order, I guess.
20    MS. LERVICK:  Yeah.
21    MR. PIOLI:  I'm not being deposed here.
22    MS. LERVICK:  Then we're going to instruct
23  him not to answer until we figure out this.
24    MR. ROACHE:  Go ahead and ask your next

Page 147

1  question.
2  BY MR. PIOLI:
3    Q.  Isn't it true that after you searched
4  for how to delete data on July 17th you then
5  deleted the USB registry on your computer?
6    A.  USB --
7    MR. ROACHE:  I'm going to object and instruct
8  the witness not to answer.
9    THE WITNESS:  I don't know.
10    MR. ROACHE:  When I instruct you not to
11  answer, you don't answer.
12    THE WITNESS:  Okay.
13    MR. ROACHE:  Go ahead.
14    MR. PIOLI:  Give me two minutes.  I may be
15  done.
16    THE VIDEOGRAPHER:  Going off the record at
17  2:34 p.m.
18       (Discussion off the record.)
19    THE VIDEOGRAPHER:  On the record at
20  2:44 p.m.
21  BY MR. PIOLI:
22    Q.  Mr. Neergheen, there were -- before
23  we broke, I asked you a couple of questions
24  regarding deletion of files, and your counsel

Page 148

1  instructed you not to answer those questions.
2       Are you going to heed your counsel's
3  advice and not answer those questions?
4    MR. ROACHE:  I believe he did.  We can go
5  back and look, but I think he answered them even
6  though I instructed him not to.
7    MR. PIOLI:  Are you claiming privilege with
8  regard to those answers?
9    MR. ROACHE:  I'm not.
10    MR. PIOLI:  You're not?
11    MR. ROACHE:  No.
12    MR. PIOLI:  I'd like those questions
13  certified, the two questions that he refused to
14  answer on the advice of counsel.
15    MR. ROACHE:  Which two did he refuse to
16  answer?
17    MR. PIOLI:  Let's go back.
18    MR. ROACHE:  Off the record.
19    THE VIDEOGRAPHER:  Off the record at
20  2:45 p.m.
21       (Discussion off the record.)
22    THE VIDEOGRAPHER:  On the record at
23  2:46 p.m.
24

Page 149

1  BY MR. PIOLI:
2    Q.  Mr. Neergheen, when I asked you about
3  whether or not you deleted the USB registry on
4  your laptop computer, you said you didn't know,
5  was that correct?
6    A.  Yes.  I don't know what that is.
7    Q.  If you didn't do it, do you have any
8  explanation for how such a deletion would have
9  occurred?
10    A.  I don't know.
11    Q.  Now you -- when I asked you about
12  whether or not you searched the Microsoft help
13  and support website, you indicated that you had,
14  in fact, performed some searches; is that right?
15    A.  Yes.
16    Q.  What were you trying to accomplish with
17  those searches?
18    A.  I was trying to retrieve the e-mails
19  that I had deleted.
20    Q.  And did you do that?
21    A.  No, I wasn't able to find out anything.
22    Q.  When did you delete those e-mails?
23    A.  Shortly after leaving Mintel.
24    Q.  You deleted them from your Hotmail

38 (Pages 146 to 149)

Marlo Reporting & Video Services, Inc.
(312) 578-0041

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 150

1  account?
2      A.   Yes.
3      Q.   Aside from the two flash drives that
4  you alluded to earlier, do you have any other
5  data storage devices that have at any time been
6  used to hold Mintel data or information?
7      A.   No.
8      Q.   Have you actually received your work
9  visa?
10     A.   Um, I have confirmation that I have my
11  visa.  I still need to pick it up.
12     Q.   You don't actually have it in your hand,
13  in your possession?
14     A.   No.  I have a new INS number.
15     Q.   I know I have asked you whether or not
16  you have shared any Mintel data or documents with
17  anyone at Datamonitor and you have responded no;
18  is that correct?
19     A.   Yes.
20     Q.   Have you shared it with any other third
21  parties?
22     A.   No.
23     Q.   When you handed your laptop over to
24  counsel, did you think that it contained any of

Page 151

1  Mintel's confidential documents and information?
2      A.   I don't know.
3      Q.   Do you remember way back when we
4  looked at your employment agreement with Mintel
5  there was a provision regarding confidential
6  information, do you recall that?
7      A.   Somewhat.
8      Q.   The documents that you e-mailed to
9  yourself on April 29th, 2008, did you think that
10  they contained that con- -- confidential
11  information?
12     MR. ROACHE:  Object to the form.
13         You can answer.
14     THE WITNESS:  I don't know.
15  BY MR. PIOLI:
16     Q.   Do you have an understanding as to what
17  the confidential information referred to in your
18  employment with Mintel is?
19     A.   I can't remember.
20     Q.   Can you tell me what Mintel reports
21  are?
22     A.   Mintel reports are quick snapshots of
23  what is actually happening in the industry, in
24  the market.  It contains consumer -- unique

Page 152

1  consumer research.
2      Q.   Does Datamonitor make a competing
3  product?
4      A.   Not to my knowledge.
5      Q.   Do you know for sure or you just have no
6  knowledge?
7      MR. ROACHE:  Objection, asked and answered.
8         Go ahead.
9      THE WITNESS:  I don't know.  I don't work
10  on the consumer side.
11  BY MR. PIOLI:
12     Q.   Even though you don't work on that side,
13  you're not familiar with Mintel's products on the
14  consumer side?
15     A.   I am familiar with Mintel's --
16     Q.   I'm sorry, with Datamonitor's products
17  on the consumer side?
18     A.   No, not very much.  I have seen the
19  products, but I don't delve into it.
20     Q.   Is it possible that a consumer products
21  customer could reach you at Datamonitor?
22     MR. ROACHE:  Object to the form,
23  speculation.
24         Go ahead.

Page 153

1      THE WITNESS:  No.  I had no dealings with
2  clients when I was at Mintel, and I have no
3  dealings with clients at Datamonitor.
4      MR. PIOLI:  Quick break.
5      THE VIDEOGRAPHER:  Off the record at
6  2:52 p.m.
7             (A short break was taken.)
8      THE VIDEOGRAPHER:  On the record at
9  2:54 p.m.
10  BY MR. PIOLI:
11     Q.   I'm going to hand you a document we're
12  going to mark as Neergheen Exhibit 14 and ask you
13  to take a look at it.
14             (Whereupon, Neergheen Exhibit
15             No. 14 was marked for
16             identification.)
17  BY MR. PIOLI:
18     Q.   Can you identify what that document is
19  that we have marked as Neergheen Exhibit 14?
20     A.   Essentially a presentation from the
21  breakfast club.
22     Q.   And what is the breakfast club?
23     A.   The breakfast club is a way that certain
24  departments at Mintel can actually promote their

39 (Pages 150 to 153)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 154

1  departments and talk a little bit about what each
2  of their departments actually do and what they do
3  and how they're successful.
4      Q.   And did this presentation concern Mintel
5  report?
6      A.   Yes.
7      Q.   And this presentation, you forwarded it
8  from your Mintel work account to your personal
9  e-mail account on April 11th, 2008; is that
10 correct?
11     A.   Yes.
12     Q.   And do you recall why you did that?
13     A.   I missed the presentation, and I just
14 wanted to -- I believe I may just wanted to have
15 sifted through the presentation.
16     Q.   And April 11th, 2008, that is after you
17 accepted your offer of employment with
18 Datamonitor; is that correct?
19     A.   I don't know exactly when I accepted.
20     Q.   But it was prior to April, 2008; isn't
21 that right?
22     MR. ROACHE:  Objection, mischaracterizes
23 his testimony.
24         You can answer.

Page 155

1      THE WITNESS:  I don't know.
2  BY MR. PIOLI:
3      Q.   This again was a document that you had
4  in your possession when you began your employment
5  with Datamonitor; is that correct?
6      MR. ROACHE:  Object to the form.
7         You can answer.
8      THE WITNESS:  I believe so, yes.
9  BY MR. PIOLI:
10     Q.   You testified earlier that when you
11 performed the search on Microsoft help and
12 support, you were looking to access e-mails that
13 you deleted; is that right?
14     A.   Yes.
15     Q.   And you said that those were e-mails you
16 deleted after you left Mintel; is that correct?
17     A.   Yes.
18     Q.   Why were you -- why did you delete
19 e-mails after you left Mintel?
20     A.   Because I had -- I had realized
21 what -- what a, you know, what a stupid thing I
22 had done and I just wanted to delete them, and
23 I had regretted what I had done by sending
24 those files to my -- to my Hotmail account and I

Page 156

1  just wanted to delete them.
2      Q.   You only wanted to delete them after
3  you knew about this lawsuit; isn't that right?
4      A.   Absolutely not.  It was deleted a few
5  days or maybe a week after I had left Mintel.
6      Q.   If you had deleted your e-mails that you
7  had sent to yourself from Mintel, how is it that
8  all the documents that we have looked at today,
9  many of them were e-mails that you had sent to
10 yourself?
11     A.   It was specifically the e-mails towards
12 the last -- the last week that I had forwarded it
13 to myself, the last week before I had left.
14     Q.   Why did you want to locate those deleted
15 e-mails on July 17th?
16     A.   Because, according to my attorneys, my
17 attorneys thought it would be a good idea to
18 potentially have those --
19     MR. ROACHE:  I would instruct him not to
20 answer any communications he's had with his
21 attorneys.
22 BY MR. PIOLI:
23     Q.   You should heed your counsel's advice.
24     A.   Okay.

Page 157

1      Q.   Aside from what you have produced in
2  this case, are there any other Mintel documents
3  that are currently in your possession?
4      A.   No.
5      MR. PIOLI:  That's all I have.  Thank you.
6      MR. ROACHE:  I have just a few follow-up
7  questions.
8             EXAMINATION
9  BY MR. ROACHE:
10     Q.   Mr. Neergheen, if you would turn back to
11 what was marked as Exhibit No. 1?
12         Prior to August of 2003, where were you
13 working for Mintel?
14     A.   I was in the London office.
15     Q.   While you were in the London office,
16 did anyone tell you that you were going to need
17 to sign a non-compete agreement when you
18 relocated to the United States?
19     A.   No.
20     Q.   When did you relocate to the United
21 States?
22     A.   The end of July, 2003.
23     Q.   After you relocated to the United States
24 and started working at the Chicago office for

40 (Pages 154 to 157)

Marlo Reporting & Video Services, Inc.
(312) 578-0041

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 158

1  Mintel, is that the first time you found out
2  about what has been marked as Neergheen
3  Exhibit No. 1?
4      A.   Yes.
5      Q.   How was that document presented to
6  you?
7      A.   It was presented to me by the then HR
8  manager, and it was presented as -- in the
9  following manner, everyone that commands a senior
10  role within the company is asked to sign one of
11  these.
12      Q.   Did Mintel pay you a relocation expense
13  to come to the United States?
14      A.   They paid for my flight, but there
15  wasn't any relocation expenses.
16      Q.   There was no bonus for relocating to the
17  United States; is that correct?
18      A.   No.  Correct.
19      Q.   Has anyone told you that you had to
20  testify in a certain manner in this case in order
21  for your legal fees to be paid or reimbursed by
22  Datamonitor?
23      A.   No.
24      Q.   And I want to ask you just a couple of

Page 159

1  questions on the visa issue because I'm not real
2  clear on it.
3           But in order to remain in the United
4  States, are you required to work for a company
5  that is based in the United Kingdom?
6      A.   Not necessarily.
7      Q.   Okay.  In order for you to continue to
8  work in the United States, is it beneficial for
9  you to work for a company that's based in the
10  United Kingdom?
11      A.   Yes.  It's a lot easier to get a visa, a
12  work visa?
13      Q.   So your job search was limited to some
14  extent to companies that were located in the
15  United Kingdom but had offices in the Chicago
16  area; is that correct?
17      A.   That's correct.
18      Q.   And you mentioned the name of a number
19  of companies that you had sent applications to or
20  interviewed.
21           Did you also send one to Euromonitor?
22      A.   Yes.  I applied at Euromonitor.
23      Q.   Did you interview with them as well?
24      A.   Yes.

Page 160

1      Q.   There was some discussion, I believe,
2  about the Sony Mintel computer.
3           Do you recall discussing that before?
4      A.   Yes.
5      Q.   Okay.  When you were leaving Mintel, did
6  anyone ask you to return that computer?
7      A.   No.
8      Q.   Did you have meetings or an exit
9  interview with anyone from HR when you were
10  leaving Mintel?
11      A.   It happened the week before I left.
12      Q.   Who was that with?
13      A.   Kristen Storey.
14      Q.   And at any point during that interview
15  were you asked to return the Mintel Sony
16  computer?
17      A.   No.
18      Q.   Did anyone from -- does Mintel have an
19  IT department?
20      A.   Yes.
21      Q.   Did anyone from the IT department ask
22  you to return the Sony Mintel computer?
23      A.   No.
24      Q.   Do you know a Paul Phillips?

Page 161

1      A.   Yes.
2      Q.   Did you receive a call from him shortly
3  after you had left Mintel?
4      A.   Yes.
5      Q.   Do you recall when that call was?
6      A.   It was probably two or three days after
7  I had left, maybe four days.
8      Q.   I apologize, Mr. Phillips, where is he
9  located?
10      A.   He's located in the Chicago office.
11      Q.   And was this meeting in person or over
12  the telephone?
13      A.   Over the telephone.
14      Q.   Did he call you, or did you call him?
15      A.   He called me.
16      Q.   What do you recall being said during
17  this conversation?
18      A.   He had been speaking with, I don't know,
19  someone from the IT department, and the IT
20  department had told him to -- I don't know,
21  contact me and let me know not to do anything
22  with the files -- do not open them -- that I had
23  sent over the week prior to me leaving Mintel.
24      Q.   What did you tell him?

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 162

1  A.  I didn't tell him anything.  I -- that's
2  when I made my own judgment and that's when I
3  deleted it.  I deleted those files.
4  Q.  Do you recall anything else being said
5  during that conversation?
6  A.  No.
7  Q.  Do you know who he said he talked to in
8  the IT department at Mintel?
9  A.  I can't remember.
10  Q.  The e-mails that you sent to yourself
11  before you left Mintel, have you shared any of
12  the information in those e-mails with anyone at
13  Datamonitor?
14  A.  No.
15  Q.  Have you shared that information with
16  anyone else?
17  A.  No.
18  Q.  Did you print out any of that
19  information?
20  A.  No.
21  Q.  Did you transfer any of that information
22  to either a flash drive or any other electronic
23  recording device?
24  A.  No.

Page 163

1  Q.  If you would turn to Neergheen
2  Exhibit No. 3?
3  That's an e-mail you sent from your
4  work e-mail address at Mintel to your Hotmail
5  address on April 29th of 2008; is that correct?
6  A.  Yes.
7  Q.  It lists a number of files that were
8  attached to that e-mail.
9  A.  Yes.
10  Q.  Did you share any of the information in
11  any of those files with anyone at Datamonitor?
12  A.  No.
13  Q.  Did you share that information with
14  anyone else?
15  A.  No.
16  Q.  Did you print out any of that
17  information?
18  A.  No.
19  Q.  Did you copy any of that information on
20  to a flash drive or any other electronic
21  recording device?
22  A.  No.
23  Q.  For Exhibit No. 4 did you share any
24  information contained in Exhibit 4 with anyone

Page 164

1  from Datamonitor?
2  A.  No.
3  Q.  Did you share any of the information
4  contained in Exhibit 4 with anyone else?
5  A.  No.
6  Q.  Did you print out that information?
7  A.  No.
8  Q.  Did you put that information on any
9  other form of electronic recording device?
10  A.  No.
11  Q.  Exhibit No. 5, did you share any of the
12  information contained in Exhibit No. 5 with
13  anyone from Datamonitor?
14  A.  No.
15  Q.  Did you share any of the information
16  contained in Exhibit 5 with anyone else?
17  A.  No.
18  Q.  Did you print out the information
19  contained in Exhibit No. 5?
20  A.  No.
21  Q.  Did you transfer any of the information
22  contained in Exhibit No. 5 to an electronic
23  recording device?
24  A.  No.

Page 165

1  Q.  Exhibit No. 6, did you share any of the
2  information contained in Exhibit No. 6 with
3  anyone from Datamonitor?
4  A.  No.
5  Q.  Did you share any of the information
6  contained in Exhibit 6 with anyone else?
7  A.  No.
8  Q.  Did you print out the information
9  contained in Exhibit 6?
10  A.  No.
11  Q.  Did you transfer any of the information
12  contained in Exhibit 6 to an electronic recording
13  device?
14  A.  No.
15  Q.  Exhibit No. 7, did you share any of the
16  information contained in Exhibit No. 7 with
17  anyone from Datamonitor?
18  A.  No.
19  Q.  Did you share any of the information
20  contained in Exhibit No. 7 with anyone else?
21  A.  No.
22  Q.  Did you print out the information
23  contained in Exhibit No. 7?
24  A.  No.

42 (Pages 162 to 165)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 166

1      Q.    Did you transfer any of the information
2  contained on Exhibit 7 to an electronic recording
3  device?
4      A.    No.
5      Q.    Exhibit No. 8, did you share any of the
6  information contained in Exhibit No. 8 with
7  anyone from Datamonitor?
8      A.    No.
9      Q.    Did you share any of the information
10 contained in Exhibit No. 8 with anyone else?
11     A.    No.
12     Q.    Did you print out the information
13 contained in Exhibit No. 8?
14     A.    No.
15     Q.    Did you transfer any of the information
16 contained in Exhibit 8 to an electronic recording
17 device?
18     A.    No.
19     Q.    Exhibit No. 9, do you share any of the
20 information contained in Exhibit 9 with anyone
21 from Datamonitor?
22     A.    No.
23     Q.    Did you share any of the information
24 contained in Exhibit 9 with anyone else?

Page 167

1      A.    No.
2      Q.    Did you print out any of the information
3  from Exhibit No. 9?
4      A.    No.
5      Q.    Did you transfer any of the information
6  contained in Exhibit 9 to an electronic recording
7  device?
8      A.    No.
9      Q.    Exhibit No. 10, did you share any of the
10 information contained in Exhibit No. 10 with
11 anyone from Datamonitor?
12     A.    No.
13     Q.    Did you share any of the information
14 contained in Exhibit 10 with anyone else?
15     A.    No.
16     Q.    Did you print out any of the information
17 contained in Exhibit No. 10?
18     A.    No.
19     Q.    Did you transfer any of the information
20 contained in Exhibit No. 10 to an electronic
21 recording device?
22     A.    No.
23     Q.    Exhibit No. 11, did you share any of the
24 information contained in Exhibit No. 11 with

Page 168

1  anyone from Datamonitor?
2      A.    No.
3      Q.    Did you share any of the information
4  contained in Exhibit 11 with anyone else?
5      A.    No.
6      Q.    Did you print out any of the information
7  contained in Exhibit No. 11?
8      A.    No.
9      Q.    Did you transfer any of the information
10 contained in Exhibit No. 11 with anyone else?
11     A.    No.
12     Q.    And there's an attachment to -- I'm
13 sorry, strike that.
14          There's a list called trade
15 associations that starts at MN 675 and goes
16 through MN 690.
17          Do you see that portion of that exhibit
18 I'm referring to?
19     A.    Yes.
20     Q.    And I believe you said you created this
21 list; is that correct?
22     A.    Yes.
23     Q.    Where did you obtain the information to
24 put in to this trade association list?

Page 169

1      A.    Just researching Google and also
2  utilizing websites such as Hoovers and Dunn and
3  Bradstreet.
4      Q.    Based on your research of those public
5  databases is how you compiled the name of these
6  associations contained in this exhibit; is that
7  correct?
8      A.    Yes.
9      Q.    If you would turn to Neergheen Exhibit
10 No. 12, did you share any of the information
11 contained in Exhibit No. 12 with anyone from
12 Datamonitor?
13     A.    No.
14     Q.    Did you share the information contained
15 in Exhibit 12 with anyone else?
16     A.    No.
17     Q.    Did you print out a copy of the
18 information contained in Exhibit No. 12?
19     A.    No.
20     Q.    Did you transfer any of the information
21 contained in Exhibit No. 12 to an electronic
22 recording device?
23     A.    No.
24     Q.    Exhibit No. 13, did you share any of

43 (Pages 166 to 169)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 170

1  the information contained in Exhibit No. 13 with
2  anyone from Datamonitor?
3     A.   No.
4     Q.   Did you share any of the information
5  contained in Exhibit 13 with anyone else?
6     A.   No.
7     Q.   Did you print out any of the information
8  contained in Exhibit No. 13?
9     A.   No.
10    Q.   Did you transfer any of the information
11 contained in Exhibit 13 to an electronic
12 recording device?
13    A.   No.
14    Q.   Exhibit No. 14, did you share any of the
15 information contained in Exhibit No. 14 with
16 anyone from Datamonitor?
17    A.   No.
18    Q.   Did you share any of the information
19 contained in Exhibit No. 14 with anyone else?
20    A.   No.
21    Q.   Did you print out any of the information
22 contained in Exhibit No. 14?
23    A.   No.
24    Q.   Did you transfer any of the information

Page 171

1  contained in Exhibit No. 14 to anyone else?
2     A.   No.
3     MR. ROACHE:  We could go off the record for
4  just a few minutes.
5     THE VIDEOGRAPHER:  Going off the record at
6  3:13 p.m.
7              (Discussion off the record.)
8     THE VIDEOGRAPHER:  On the record at
9  3:16 p.m.
10 BY MR. ROACHE:
11    Q.   Prior to the filing of the lawsuit in
12 this matter, no one from Mintel asked you to
13 return the Sony computer; is that correct?
14    A.   No.
15    Q.   When you spoke with Mr. Phillips, he
16 didn't ask you to return any of the files; is
17 that correct?
18    A.   No, he didn't.
19    Q.   And I just want to make clear, prior to
20 your relocation no one mentioned to you that you
21 would be required to sign the non-compete
22 agreement that is identified as Exhibit No. 1; is
23 that correct?
24    A.   That's true.

Page 172

1     Q.   In your employment with Datamonitor,
2  have you used any of the Mintel information that
3  you e-mailed to yourself?
4     A.   No.
5     Q.   Do you intend to use any of the
6  information that you e-mailed the Mintel --
7  strike it.
8          Do you intend to use any of the
9  information, the Mintel information that you
10 e-mailed to yourself in your position at
11 Datamonitor?
12    A.   No.
13    Q.   When you left Mintel, did Mintel offer
14 you any form of reimbursement for a return trip
15 to the United Kingdom?
16    A.   No.  They offered me a severance
17 package.
18    Q.   How much did they offer you?
19    A.   $2,000.
20    Q.   As part of that offer, was there a
21 condition that you had to sign an agreement?
22    A.   Yes.
23    Q.   Was that another non-compete
24 agreement?

Page 173

1     A.   Yes.
2     Q.   Did you sign that agreement?
3     A.   No.
4     Q.   Did Mintel offer you any other form
5  of severance payment?
6     A.   No.
7     Q.   They didn't offer you 11 weeks of
8  salary?
9     A.   No.
10    MR. ROACHE:  I don't have any further
11 questions.
12    MR. PIOLI:  I have a few follow-up questions.
13              FURTHER EXAMINATION
14 BY MR. PIOLI:
15    Q.   Turning your attention back to
16 Exhibit 2.  That's your employment agreement with
17 Mintel, isn't it?
18    A.   Yes.
19    Q.   And you signed that back in 1998; is
20 that right?
21    A.   Yes.
22    Q.   And Paragraph 15, that contains a
23 12-month non-compete agreement, doesn't it,
24 following your termination from Mintel?

44 (Pages 170 to 173)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 174

```
1     A.  Yes.
2     Q.  That was signed long before you came to
3  the United States, isn't it?
4     A.  I'm sorry?
5     Q.  That was signed long before you came to
6  the United States?
7     A.  Yes.
8     Q.  Turn back to Exhibit 1.  No one forced
9  you to sign that document, did they?
10    MR. ROACHE:  Object to the form and asked and
11 answered.
12        You can answer.
13    THE WITNESS:  I --
14 BY MR. PIOLI:
15    Q.  Did anyone threaten you with physical
16 force if you signed it?
17    A.  No.
18    Q.  If you didn't sign it?  Excuse me.
19    A.  No.
20    Q.  You signed it of your own volition?
21    MR. ROACHE:  Object to the form.
22    THE WITNESS:  I signed it.
23 BY MR. PIOLI:
24    Q.  Nobody threatened your loved ones if you
```

Page 175

```
1  didn't sign it, nothing like that?
2     A.  No.
3     Q.  You relocated to the United States.
4  That was your decision, wasn't it?
5     A.  Yes.
6     Q.  Mintel didn't say you were going to lose
7  your job if you don't go to United States; is
8  that right?
9     A.  I'm sorry?
10    Q.  No one from Mintel told you that you
11 were going to lose your job if you didn't go to
12 the United States, did they?
13    A.  No.
14    Q.  The companies that you submitted
15 applications to, Dyson, Heller (Sic.) Publishing,
16 SPSS, those aren't English companies, are
17 they?
18    A.  Dyson is an English-based company.
19 Mellon is an English company.  Reuters,
20 Thompson -- Thompson -- I don't know if you
21 caught that, but that's another organization I
22 applied to, they're English-based organizations.
23    Q.  But what about SPSS?
24    A.  SPSS is a U.S. based organization.
```

Page 176

```
1     Q.  Did you give special instructions to
2  placement agencies that you would only work for
3  English companies?
4     A.  Yes.
5     Q.  You gave them that instruction?
6     A.  Yes.
7     Q.  You didn't reply to one non-English
8  company?
9     MR. ROACHE:  Objection, that mischaracterizes
10 his testimony.
11        You can answer.
12    THE WITNESS:  I did.
13 BY MR. PIOLI:
14    Q.  You said it wasn't just limited to
15 English companies then, was it?
16    A.  I just wanted to get some interview
17 practice under my belt.
18    Q.  You weren't limited to just English
19 companies; is that right?
20    MR. ROACHE:  Object to the form.
21        You can answer.
22    THE WITNESS:  No.
23 BY MR. PIOLI:
24    Q.  If a non-English company made you an
```

Page 177

```
1  offer, you would certainly consider it, wouldn't
2  you?
3     MR. ROACHE:  Objection, speculation.
4        You can answer.
5     THE WITNESS:  I don't know.
6  BY MR. PIOLI:
7     Q.  You didn't apply to companies that you
8  didn't want to work at; is that right?
9     A.  I'm sorry?
10    Q.  You didn't apply for jobs at companies
11 that you didn't have -- you didn't want to work
12 at; is that right?
13    MR. ROACHE:  Object to the form.
14        You can answer it.
15    THE WITNESS:  Could you repeat that,
16 please?
17 BY MR. PIOLI:
18    Q.  Did you apply to any companies that you
19 had absolutely no intention of ever working at?
20    A.  No.
21    Q.  Regarding your conversation with
22 Paul Phillips, you said that occurred two days
23 after you left Mintel?
24    A.  I don't know how many days after I
```

45 (Pages 174 to 177)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 178

1  left Mintel it could have been. I know it was
2  less than a week.
3        Q.   Did he call you on a cell phone?
4        A.   He called me on my cell phone, yes.
5        Q.   Who is your cell phone carrier?
6        A.   AT&T, Cingular.
7        Q.   You can get your cell phone records,
8  can't you?
9        A.   I don't know if I can get people calling
10  me. I don't know if you can get incoming --
11  incoming calls itemized. I'm not too sure.
12        Q.   And you testified that you deleted that
13  e-mail two days after -- shortly after you spoke
14  to Mr. Phillips; is that right?
15        A.   Yes.
16        Q.   Did you tell Mr. Phillips you did that?
17        A.   I don't know.
18        Q.   Did you have any other conversations
19  with Mr. Phillips regarding the e-mail?
20        A.   I don't know.
21        Q.   Did you tell anybody from Mintel that
22  you deleted the e-mail?
23        A.   No.
24        Q.   So we'll just have to take your word

Page 179

1  for it; is that right?
2        MR. ROACHE:  Object to the form.
3            You can answer.
4        THE WITNESS:  I guess so.
5        MR. PIOLI:  That's all I have.
6            Thank you.
7        MR. ROACHE:  I have no further questions.
8  We'll reserve signature.
9        THE VIDEOGRAPHER:  This is the end of the
10  deposition. We are going off the record at
11  3:25 p.m.
12            This is the end of Tape 3 of 3.
13            (FURTHER DEPONENT SAITH NOT.)
14
15
16
17
18
19
20
21
22
23
24

Page 180

1                DEPONENT'S CERTIFICATE
2      IN THE DISTRICT COURT OF THE UNITED STATES
       FOR THE NORTHERN DISTRICT OF ILLINOIS
3                   EASTERN DIVISION
   MINTEL INTERNATIONAL GROUP, )
4           Plaintiff,         )
   vs.                         )  No. 08 CV 3939
5  MEESHAM NEERGHEEN,          )
           Defendant.          )
6
7      I, MEESHAM NEERGHEEN, having been first
   duly sworn, on oath, state that I have read the
8  foregoing transcript of the testimony given by me
   at my deposition on the 13th day of August, 2008,
9  and that said transcript constitutes a true and
   correct record of the testimony given by me at
10  said deposition except as I have so indicated on
   the errata sheets provided herein for such.
11
12
13
14      _____
        MEESHAM NEERGHEEN
15
16
   No corrections (please initial):_____.
17  Number of errata sheets submitted:_____ pgs.
18
19  SUBSCRIBED AND SWORN TO
20  before me this _____ day
   of _____ 2008.
21
22
23      _____
        Notary Public
24

Page 181

1  STATE OF ILLINOIS )
2                    )  SS:
3  COUNTY OF C O O K )
4      I, Allison D. Weber, a notary public within
5  and for the County of Cook County and State of
6  Illinois, do hereby certify that heretofore,
7  to-wit, on the 13th day of August, 2008,
8  personally appeared before me, at 33 West Monroe
9  Street, Suite 2700, Chicago, Illinois,
10  MEESHAM NEERGHEEN, in a cause now pending and
11  undetermined in the United States District Court
12  wherein MINTEL INTERNATIONAL GROUP is the
13  Plaintiff, and MEESHAM NEERGHEEN, is the
14  Defendant.
15      I further certify that the said witness was
16  first duly sworn to testify the truth, the whole
17  truth and nothing but the truth in the cause
18  aforesaid; that the testimony then given by said
19  witness was reported stenographically by me in
20  the presence of the said witness, and afterwards
21  reduced to typewriting by Computer-Aided
22  Transcription, and the foregoing is a true and
23  correct transcript of the testimony so given by
24  said witness as aforesaid.

46 (Pages 178 to 181)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 182

```
1        I further certify that the signature to the
2   foregoing deposition was reserved by counsel for
3   the respective parties.
4        I further certify that the taking of this
5   deposition was pursuant to notice, and that there
6   were present at the deposition the attorneys
7   hereinbefore mentioned.
8        I further certify that I am not counsel for
9   nor in any way related to the parties to this
10  suit, nor am I in any way interested in the
11  outcome thereof.
12       IN TESTIMONY WHEREOF:  I have hereunto set my
13  hand and affixed my notarial seal this 15th day
14  of August, 2008.
15
16
17
18
19  _____
20        NOTARY PUBLIC, COOK COUNTY, ILLINOIS
21
22
23
24
```

Marlo Reporting & Video Services, Inc.
(312) 578-0041

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 1

**A**

abide 39:21
able 33:15,15 64:2 84:5
126:10 149:21
about 12:14 13:9 16:6
17:15 18:8,9 21:14
29:23 31:12 38:15
42:22 44:11 55:8,18
55:20 56:8 58:7
61:11,16,22 62:22
64:3,7 65:3 66:23
76:1,3 85:11 94:5
98:1 125:5 136:22
142:10,21 145:9,14
146:2 149:2,11 154:1
156:3 158:2 160:2
175:23
above-entitled 84:19
absolutely 7:10 36:20
79:8 102:2 107:2
130:22 134:23 156:4
177:19
accept 71:17,20 125:10
acceptance 86:4,12
accepted 72:8,14 74:4
74:22 75:6 87:21
88:4 125:1 138:4
154:17,19
accepting 87:14 89:8
access 20:5 24:12,20
25:5,5,9,18 35:8,12
35:13,21,23 36:1,4
48:23 93:22 108:4,7
108:9 118:8 120:10
143:8,17,22 146:2
155:12
accessed 95:11 145:13
accessing 48:22
accomplish 149:16
accomplishments
61:17,18
according 156:16
account 100:19,20
101:14,15 115:19
119:24 120:8 121:23
122:20 123:11
124:20 145:20 150:1
154:8,9 155:24
achievements 61:4,21
acknowledges 35:5
acquisition 19:20
action 13:20
actions 112:23
activities 18:2 22:21,22
23:6 80:17 111:5
112:17

actually 9:1 12:24
18:18 20:24 25:3
67:18 121:17 150:8
150:12 151:23
153:24 154:2
address 7:21 8:24
137:24 163:4,5
addresses 8:17,20
advantage 136:4
advantageous 83:4
advertise 19:24
advertising 23:3 79:13
advice 148:3,14 156:23
advised 73:24
affixed 182:13
aforesaid 181:18,24
after 13:12 14:12 16:23
18:12 29:6 32:1,5
38:17,24 48:12 59:1
59:10,12 62:2 68:6
71:20 74:1 77:9 78:9
86:11 87:21 90:20
92:11 93:10 105:23
105:24 147:3 149:23
154:16 155:16,19
156:2,5 157:23 161:3
161:6 177:23,24
178:13,13
afternoon 47:3 85:4
afterwards 181:20
again 71:3 79:3 109:6
109:15,23 112:4
113:2 114:19 117:19
121:4,15 123:4,16
130:17 155:3
against 13:21 43:16
52:21
agencies 56:17 57:2,3
57:18 176:2
ago 33:12,20 39:13
40:15 64:21
agreement 34:20 35:6
39:21 40:18,24 41:5
41:9 49:13 51:20
64:23 66:19 67:11
76:22 77:2,21 78:5
78:13 127:17 129:8
151:4 157:17 171:22
172:21,24 173:2,16
173:23
agrees 33:1
ahead 5:19 113:24
117:7,16 126:2 127:4
131:20 132:17
141:20 146:24
147:13 152:8,24

ahold 25:2
aimed 78:18
alert 103:1
allegations 43:16 45:11
alleging 41:21
allergy 129:8
alliance 70:8
alliances 69:15,17
78:15 79:17
Allison 1:17,23 4:10
181:4
allowing 6:10
allows 98:13
alluded 150:4
alluding 40:9
along 58:21
already 8:18 12:13
74:4 88:4 125:1
138:3
alternative 56:13
always 57:9
American 15:17
amongst 114:5
amounts 115:13,23
Amy 37:8
analysis 18:4
analysts 19:12
angry 106:8,15 110:1
another 60:16 101:9
110:16 111:9 172:23
175:21
answer 6:11,14 12:9
14:3 21:23,24 22:1
25:12,21 31:19 32:3
34:3,16 35:17 36:10
40:3 49:10 50:7,16
50:23 51:8 59:8
61:10 70:23 72:22
75:12,22 77:12 79:21
80:22 81:15,20 83:7
83:21 86:7,23 87:17
87:24 88:13,20 90:7
92:16 94:18 97:8
99:3 102:18 104:14
106:5,12 107:15,22
109:9,20 110:8
111:11,18 114:8
116:9,21 117:7,23
118:20 125:13,19
128:1,10,17 129:2
131:2,12 132:8,17
135:19 137:5 138:12
139:11,18 140:2,8
141:10 143:13 146:4
146:11,23 147:8,11
147:11 148:1,3,14,16

151:13 154:24 155:7
156:20 174:12
176:11,21 177:4,14
179:3
answered 67:7,13
77:11 79:20 80:21
86:6 87:23 88:19
92:15 125:7,12
131:19 132:2 148:5
152:7 174:11
answers 6:7 148:8
Anthony 37:10
antivirus 144:15
anybody 141:2 178:21
anyone 24:19 32:19
37:6 41:8 42:6 47:10
47:13 51:4,11,24
52:6 66:7 75:5 81:11
82:17 93:13,22 94:3
129:10 140:17,24
141:13 150:17
157:16 158:19 160:6
160:9,18,21 162:12
162:16 163:11,14,24
164:4,13,16 165:3,6
165:17,20 166:7,10
166:20,24 167:11,14
168:1,4,10 169:11,15
170:2,5,16,19 171:1
174:15
anything 16:4 36:12
43:4 47:22 48:1,24
49:1,17 64:17 66:23
70:21 79:14 103:21
149:21 161:21 162:1
162:4
anywhere 98:14
Apartment 7:19 8:2
apologize 5:19 78:16
95:19 161:8
appearances 2:1 4:17
appeared 181:8
applicable 32:5
application 85:21 86:1
applications 56:18,21
159:19 175:15
applied 53:16 74:18,23
159:22 175:22
apply 33:11 58:3 177:7
177:10,18
approach 21:14
approached 21:11
approval 21:20 22:9
approved 108:22
approximately 39:5
72:7

April 72:20 73:11,15
74:2 89:14,16 90:4
90:11 98:24 99:8
100:18 104:10,20,23
105:13 109:3 115:9
121:21 125:17 131:7
131:24 133:1 135:9
135:10,10 137:17,18
137:24 151:9 154:9
154:16,20 163:5
area 159:16
around 98:15 110:14
111:22 112:1
Arts 10:12
aside 12:13 16:3 22:14
26:16 29:12 47:4
48:22 51:3 66:5
80:16 150:3 157:1
asked 13:18 21:8 41:10
43:2,7 64:2,6 67:7,12
73:1,3,22 77:11
79:20 80:20 86:6
87:23 88:18 92:14
99:21 125:6,12
131:19 132:2 147:23
149:2,11 150:15
152:7 158:10 160:15
171:12 174:10
asking 6:5,12 12:1
130:3
associated 52:8,24
association 21:1 124:10
135:23 136:22
168:24
associations 18:17,17
19:9,10,13,16 20:1
21:4,6 22:23 55:17
78:20,21 79:2 82:12
84:2 126:6,11,23,23
128:5,6 129:23 130:4
135:14 137:9 139:23
140:13,17,23 168:15
169:6
assume 18:21 21:19
24:9 25:15 40:9
45:24 46:24 49:3
60:20 61:7 101:8
assurances 50:10 51:3
51:4 52:16 53:2
assure 5:22
attached 133:20 136:20
163:8
attachment 168:12
attain 9:8,18 10:2
attend 10:21 23:17
attended 23:10

Marlo Reporting & Video Services, Inc.
(312) 578-0041

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

| | | | | |
|---|---|---|---|---|
| **Attendee** 136:18 | **basis** 14:16 142:8 | 101:24 105:9 137:10 | 15:12 44:2 71:16,18 | 44:17 58:9,11 62:23 |
| **attendees** 23:18 135:24 | **Bates** 101:6 | **besides** 9:3 11:14 47:8 | 96:7 115:21 161:15 | 82:17,20,21 97:4 |
| 137:23 | **became** 17:1 33:10 | 81:12 94:3 | 168:14 178:4 | 157:24 159:15 |
| **attention** 32:23 173:15 | 34:13 53:10 | **best** 6:24 | **calling** 178:9 | 161:10 181:9 |
| **attorney** 32:17 | **become** 15:8 | **bet** 19:13 | **calls** 14:1 25:10,19 34:2 | **chief** 22:10 |
| **attorneys** 4:16 5:10 | **before** 1:17 5:24 6:2,11 | **better** 83:11 96:11 | 34:14 35:16 36:8 | **choose** 104:22 |
| 27:21 48:16 49:23 | 6:13 18:24 19:5 | **between** 19:6 38:8 | 37:17 74:15 75:10 | **chose** 102:4 |
| 76:7 84:12 94:2,3 | 29:17 32:12 38:22,24 | 54:15 80:18 89:16 | 81:7,13 82:2 84:7 | **Cingular** 178:6 |
| 143:8,17 156:16,17 | 39:6,11 41:3 47:1 | 90:4,11,15 96:15,16 | 86:5,21 88:11 91:23 | **circulating** 114:5 |
| 156:21 182:6 | 51:21 59:3,17 69:19 | 135:10 | 94:16 107:13,20 | **citizen** 8:6,8 86:18 |
| **attorney's** 50:20 51:6 | 77:15,18,22 85:10 | **beyond** 12:5 14:14 | 109:18 113:5 114:6 | **citizenship** 9:2,8 |
| 51:12 53:3 114:20 | 89:5 92:23 101:4 | **big** 50:1,4 82:21 142:18 | 127:23 178:11 | **Civil** 1:14 |
| **AT&T** 178:6 | 125:17 147:22 | **bill** 50:1,5 | **came** 19:5 83:15,23 | **claiming** 148:7 |
| **audible** 59:5,7 | 156:13 160:3,11 | **bit** 154:1 | 174:2,5 | **claims** 50:19 |
| **audibly** 6:18 | 162:11 174:2,5 | **board** 78:24 | **campaigns** 16:15 | **clarify** 7:1 26:1 75:19 |
| **August** 1:20 4:1 31:13 | 180:20 181:8 | **bonus** 55:4,6 76:16,19 | **captioned** 4:5 | **class** 10:24 11:9,11 |
| 84:20 157:12 180:9 | **began** 41:3 97:4 120:24 | 89:8 158:16 | **card** 9:1 | **classes** 11:14 |
| 181:7 182:14 | 123:6 138:7,15 139:4 | **booth** 23:3 79:13 | **care** 45:2 70:12 129:9 | **classified** 9:13 |
| **available** 24:16 110:17 | 155:4 | **born** 9:6 | 129:20,23 130:5 | **clause** 33:10,24 34:6 |
| 112:5 113:16 117:20 | **begin** 12:19 75:15 | **both** 4:10 80:5 146:15 | **CareerBuilder** 56:16 | **clear** 159:2 171:19 |
| **aware** 32:4 67:20 71:3 | **beginning** 60:24 | **bother** 36:14 | 57:20,21,22 | **clearly** 73:8 |
| 96:6 144:4,15,18,21 | **begins** 13:1 | **bottom** 31:10 | **carrier** 178:5 | **client** 115:2,3 118:5 |
| 144:24 145:3 | **behalf** 4:3,19,22 72:4 | **Boyd** 2:12 46:15 49:5,7 | **carrying** 129:24 130:6 | **clients** 18:1 61:23 |
| **awareness** 79:15 | 85:22 90:10,21 | **Bradstreet** 169:3 | **case** 4:5,6 41:14 49:15 | 153:2,3 |
| **away** 61:22 | 112:21 | **branches** 33:3 | 92:13 115:17 144:22 | **club** 153:21,22,23 |
| **awhile** 64:21 | **behavior** 11:16 | **brand** 18:19 23:1 79:15 | 145:1,10 157:2 | **colleagues** 98:14 |
| **a.m** 1:21 4:15 28:11 | **being** 6:17 16:21 17:19 | **branding** 19:18 | 158:20 | **column** 115:21 |
| 62:16,19 | 18:17 20:8 26:24 | **break** 7:4,7,8 28:3,5 | **caught** 175:21 | **combination** 17:7 |
| | 32:16 35:11,13 40:5 | 62:17 84:14 131:15 | **cause** 33:7 34:7 84:19 | **come** 14:9 33:16 45:3 |
| ——————— | 40:6 46:3 51:15,16 | 153:4,7 | 181:10,17 | 45:22 46:13 58:3 |
| **B** | 52:6 54:10 66:20,23 | **breakfast** 153:21,22,23 | **caution** 47:4 | 60:18 158:13 |
| **B** 3:8 | 67:6 68:24 78:17 | **brick** 57:10 | **CDs** 97:11,16,17 | **coming** 8:13 19:1 74:20 |
| **Bachelor** 10:11 | 80:16 95:19 105:24 | **briefly** 12:21 32:13 | **ceased** 89:13 97:20 | **commands** 158:9 |
| **back** 15:9 27:2,9,19,23 | 106:15 143:1 146:21 | 44:19 63:23 | **cell** 178:3,4,5,7 | **commercially** 70:9 |
| 28:10 45:3,22 46:12 | 161:16 162:4 | **Britain** 8:10 | **certain** 24:15,17 25:18 | **commission** 134:12,15 |
| 46:13 60:15,17 63:5 | **believe** 7:22 9:13 10:3 | **British** 86:18 | 31:24 53:6 61:22 | **commissions** 133:23,24 |
| 71:19 83:15 84:10 | 10:23 16:24 17:2 | **broke** 85:10 147:23 | 95:14,16 153:23 | **committee** 110:18 |
| 85:2 104:18 118:14 | 18:8 27:12 46:16 | **brought** 48:7 67:10 | 158:20 | 112:24 113:16 |
| 122:6 135:3 148:5,17 | 56:1 64:4 65:1,12,15 | 95:8 | **certainly** 177:1 | **common** 111:7 |
| 151:3 157:10 173:15 | 65:21 66:16 75:17 | **budget** 105:5 107:4 | **CERTIFICATE** 180:1 | **commonly** 96:7 |
| 173:19 174:8 | 81:16,22 87:7,12 | 121:6,10 | **certified** 148:13 | **communicate** 98:13 |
| **backtrack** 39:9 57:15 | 89:4 90:3 100:14 | **build** 128:4 | **certify** 181:6,15 182:1 | **communication** 127:9 |
| 59:2 82:21 85:20 | 104:21 108:10 | **built** 124:14 | 182:4,8 | **communications** 109:1 |
| 89:12 | 110:19 111:24 | **business** 10:12 33:2 | **change** 17:18 62:13 | 142:3 156:20 |
| **backup** 97:16 | 112:20 113:18 | 34:23,24 100:9 117:2 | 119:7 | **communicator** 98:11 |
| **barter** 20:4 | 127:11 135:11 139:7 | **Butcher** 2:22 56:8 68:4 | **channel** 19:17 | **companies** 16:15 56:21 |
| **base** 11:7 18:20 55:3,7 | 148:4 154:14 155:8 | 71:14 76:12 84:10 | **charges** 116:6 | 56:24 57:12,23 |
| 55:7,11 76:15 126:22 | 160:1 168:20 | | **Charlton** 21:15 22:7 | 159:14,19 175:14,16 |
| **based** 55:15 80:6 81:21 | **Bell** 2:3,12 4:4,18 | ——————— | **Charlton's** 21:16 | 176:3,15,19 177:7,10 |
| 136:24 159:5,9 169:4 | 46:15 49:5,7 | **C** | **check** 29:10 48:14 | 177:18 |
| 175:24 | **belonged** 26:23 27:15 | **C** 181:3 | **checked** 29:15 | **company** 12:22,23 13:4 |
| **basic** 11:3,8 17:6,6 | **belt** 176:17 | **call** 6:3 44:20 59:3,18 | **checking** 48:13 | 13:13,17,21 17:23 |
| 55:14 | **beneficial** 70:10 80:5 | 63:5,8 68:2,7,13 | **Chicago** 1:20 2:8,16 | 18:15 56:9,19 62:5 |
| **basically** 10:14 17:4 | 107:1 127:22 129:24 | 69:10 96:9 98:23 | 4:7,12 7:19 8:2,15 | 88:17 98:14 117:2,11 |
| 22:24 43:1 61:3,6 | 130:5 136:3 159:8 | 161:2,5,14,14 178:3 | 20:15,15,17,21 21:12 | 158:10 159:4,9 |
| 63:8 64:8 68:14 | **benefit** 65:13,16 | **callback** 63:7 | 22:8,11 43:13 44:14 | 175:18,19 176:8,24 |
| 78:21 79:14 95:4 | | **called** 1:13 5:4 11:7 | | |

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 3

compensated 14:24
  55:15
compensation 55:1
  76:16 89:17 94:10
Comperemedia 99:23
  100:9,17 115:4
compete 33:1 34:20
competing 152:2
competition 34:24 35:2
competitor 36:17 58:22
  77:9 111:22 113:13
  117:4,12
competitors 34:10,11
  36:7 57:24 107:16,19
  109:16 110:14 111:7
  112:2 113:4,10,20
  114:5 116:14 121:16
  123:18,22
compiled 169:5
complaint 41:14,18
  42:5,13 44:1 45:11
  47:24 48:19 92:12
  93:24 101:10
completed 10:9
completely 27:8,24
  28:18
complimentary 23:3
compound 131:10
compromise 55:18
computer 10:15 11:1,8
  11:9,11,19,20,21,23
  12:10 24:9,13 26:2,4
  26:18 27:10,13,19,22
  28:14,19 29:8,17,21
  30:12,15 47:23 48:10
  48:18,24 92:4 93:14
  93:16 94:6,13 95:6
  95:10,12,20,21 96:15
  96:16 97:12 142:19
  142:24 143:8,17,22
  144:5,8,12,16 145:5
  145:15 147:5 149:4
  160:2,6,16,22 171:13
computers 25:24 95:22
Computer-Aided
  181:21
con 151:10
concern 154:4
conclusion 34:2,15
  86:22 91:23
conclusions 35:16
condition 39:15,23
  53:4,6 172:21
conditions 39:22
conference 136:17
  137:23

conferences 135:24
confidential 35:9,14
  76:7 78:2 103:10,10
  103:15,16 114:20
  151:1,5,10,17
confirmation 150:10
conjunction 16:19
connect 96:4
consider 177:1
considered 57:24
constantly 56:6 83:16
constitutes 180:9
consult 34:22
consumer 64:15,15
  70:20 71:10 80:15
  82:7,14 99:14 122:17
  130:2 151:24 152:1
  152:10,14,17,20
contact 17:21 19:12
  22:22 42:22 43:19
  60:9,10 63:3,4 67:23
  68:1 82:11,12 83:17
  126:11,12,22,24
  127:2 128:6 161:21
contacted 36:19,22
  37:3,4,5,7 42:10,23
  60:13
contacting 21:3,6 84:1
contacts 14:18 17:7
  23:12 24:6
contain 78:1 121:9
contained 39:22 133:22
  150:24 151:10
  163:24 164:4,12,16
  164:19,22 165:2,6,9
  165:12,16,20,23
  166:2,6,10,13,16,20
  166:24 167:6,10,14
  167:17,20,24 168:4,7
  168:10 169:6,11,14
  169:18,21 170:1,5,8
  170:11,15,19,22
  171:1
containing 95:11
contains 105:5 116:2
  151:24 173:22
contemporaneous 86:3
  86:12
content 47:5 68:12,14
  146:7
continue 13:18,24
  135:8 159:7
continued 31:17,20
  75:2 84:20 85:8
contract 32:8 38:7,21
  38:23 40:21 73:10

77:24 99:11 127:13
control 93:13
conversation 44:10,24
  45:12 47:8,17 142:1
  161:17 162:5 177:21
conversations 43:23
  44:3 47:6,9,13
  141:23 146:17
  178:18
Cook 1:18 181:5
  182:20
Cooper 141:11 142:3
  142:11
Cooper's 141:15
copies 40:23
copy 20:3 41:4,11,13
  42:13 47:23 48:6,7
  51:20 65:6 78:4,8
  93:24 163:19 169:17
corporation 1:5
correct 8:6,7 20:11
  24:10,21 25:18 26:11
  38:9 41:6 43:21
  73:20 92:4 100:20
  112:19 116:7 117:21
  120:1,14 122:20
  123:6 135:17 136:18
  138:1,9,19 142:16
  143:10 149:5 150:18
  154:10,18 155:5,16
  158:17,18 159:16,17
  163:5 168:21 169:7
  171:3,17,23 180:10
  181:23
corrections 180:16
correctly 43:20 72:18
cost 35:23 36:5 121:6
  121:10
costing 109:6,7
costs 109:14
counsel 32:15,16 46:3,7
  47:6,7 48:20 51:4
  66:18,22 92:4,21,24
  93:14 119:4 146:5
  147:24 148:14
  150:24 182:2,8
counsel's 148:2 156:23
countries 9:3
County 1:18 181:3,5,5
  182:20
couple 8:23 40:13
  56:17 59:12 147:23
  158:24
course 132:13
courses 11:12
court 1:1 4:9,23 6:6,16

46:20 47:14 146:18
  180:2 181:11
courtesy 6:10,12
Courts 1:15
cousin 30:17
CPG 22:17 53:17 64:15
  126:22 127:1,20
created 168:20
CRM 14:18 23:14,19
  23:22
CSR 1:17,23
cup 13:8
current 69:13
currently 7:17 96:22
  97:17 98:2 141:6
  157:3
customer 17:23 35:8,14
  35:21 36:4 115:20,24
  116:13 117:3,13
  118:8,16 152:21
customers 115:12
  116:3,7 118:15
CV 1:7 4:6 180:5

                D

D 1:17,23 3:1 181:4
daily 23:6 90:14,17
dash 104:20
data 35:23 36:5 96:15
  98:2,19,20 105:1
  109:6,7 145:15 146:2
  147:4 150:5,6,16
database 14:17 15:17
  15:18,19,24 16:2,4
  23:23 24:7,16,21
databases 17:8 169:5
Datamonitor 35:2
  40:17 41:4,8 42:6
  43:14 47:10,14 49:3
  49:4,11,14 51:12,17
  51:21 52:1,7,15 58:1
  58:4,6,9,18,22 59:21
  59:23 60:9 62:10
  63:3 65:13,16,24
  66:8,18,23 67:24
  69:5,14,22,24 70:17
  71:7 72:4,9,15 74:5,7
  74:23 75:6,16,19,21
  76:1,2,14,21 77:10
  78:1,5,8,16,22 79:23
  80:8,11,19 81:2
  82:10 85:12,21 87:22
  88:5,10,24 89:9 90:2
  90:11,14,21,24 91:3
  102:1 103:1,4 105:10
  107:1,3,8,12 110:4

110:10 111:15
  113:19 117:1 121:1
  122:4 123:6,19 125:2
  125:11 126:5 127:14
  127:17,19 130:1,6
  138:4,8,16 139:5,8
  140:18,24 141:3,6,16
  141:24 142:5,12
  150:17 152:2,21
  153:3 154:18 155:5
  158:22 162:13
  163:11 164:1,13
  165:3,17 166:7,21
  167:11 168:1 169:12
  170:2,16 172:1,11
Datamonitor's 44:17
  87:15 152:16
date 46:8 72:8,13 74:7
  74:20 85:13,17 89:1
  89:2 92:7,18 122:23
  125:15
day 1:20 7:3 21:5 70:1
  70:3,4,5 71:20
  132:13 137:17 180:9
  180:20 181:7 182:13
days 59:12 60:16 92:20
  102:10 105:18 156:5
  161:6,7 177:22,24
  178:13
day-to-day 22:21,22
  80:17
deal 19:9 118:15 126:6
dealings 153:1,3
deals 36:15
dealt 15:14 19:11
  140:13,23
December 56:2 134:6
decided 14:15 74:13
decision 175:4
defendant 1:10 2:18
  4:22 180:6 181:14
define 35:18 142:1
definite 85:13,17
definitely 93:1
defrag 144:1,4,11,14
degree 10:9,10 10:9,10
  10:11
delegate 23:13 136:14
delegates 23:18
delete 48:17 123:10,14
  145:14,18 146:2
  147:4 149:22 155:18
  155:22 156:1,2
deleted 121:23 143:5
  145:22 147:5 149:3
  149:19,24 155:13,16

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

156:4,6,14 162:3,3
178:12,22
deletion 147:24 149:8
delivered 48:8
Dell 28:14 29:21 94:6
95:20
delve 61:19 152:19
department 15:5,6
16:24 21:10 24:4
25:4 118:6 160:19,21
161:19,20 162:8
departments 153:24
154:1,2
dependent 132:24
depending 55:11
132:22
depends 35:18
DEPONENT 179:13
DEPONENT'S 180:1
deposed 5:24 146:21
deposition 1:12 4:2
84:18 179:10 180:9
180:10 182:2,5,6
depositions 1:16
designate 76:6
designation 84:12
103:14,17 114:21
desktop 26:6,7,10,16
95:21
details 58:12 59:16
determine 74:20
developing 118:16
developments 56:9
device 162:23 163:21
164:9,23 165:13
166:3,17 167:7,21
169:22 170:12
devices 96:3 150:5
de-designate 76:9
difference 84:1,3
different 54:13 55:5
79:10,22 80:2,10,17
differently 15:9
direct 32:23
direction 18:4
directly 24:3 33:1
director 21:17 66:16
directs 112:17
disc 11:24
discard 130:10
discern 98:6
disciplinary 13:20
disclosure 78:2
discount 20:7
discovered 13:7
discuss 45:10 51:24

55:6 61:1 64:22
66:11 67:2,4
discussed 51:15,16
61:7 64:18 66:6
discussing 160:3
discussion 28:9 119:14
135:2 147:18 148:21
160:1 171:7
discussions 51:11 66:7
66:18,22 142:10
displeased 45:19
displeasure 45:5
distributed 24:1,3
District 1:1,2,15 180:2
180:2 181:11
division 1:3 15:11
180:3
divisions 15:10,15 33:3
document 24:20 31:6,8
31:12,16,23 32:12,14
38:6,12,14 39:6,8,11
39:16,23 41:4 42:21
43:2,8 73:4 77:15,16
77:18 99:2 101:5,12
104:5,19,23 105:2
108:2,18,21 109:13
110:4,16 111:2,21
112:1,4,13 113:2,9
113:13,15 114:4,14
114:24 115:8,11
117:19 118:1 119:19
119:23 120:13,16,19
120:23 121:4,9,12,21
122:14,18,22 123:2,4
123:8,16,18,21 124:6
124:8,13,14,18
127:20 131:17
133:17 134:5,18
136:12,16 138:8,18
138:24 139:3 153:11
153:18 155:3 158:5
174:9
documents 24:15 25:1
25:9,18 40:13 41:18
48:6,17 95:8,12
97:12 104:9 106:17
109:2,24 113:20
118:3 131:8,24
150:16 151:1,8 156:8
157:2
doing 14:17 16:11,11
16:12,14,15,19 17:4
21:1 37:18 61:5
69:22,23 79:16 83:3
83:10 95:16 99:19
103:2 105:19 112:21

130:17 135:9
done 6:13 50:13,13
102:12 105:17 106:1
106:19 147:15
155:22,23
down 6:7,8,17 29:4
131:15
draft 123:2
drive 12:2,6 25:5 96:1
96:2,10,21 142:15,18
142:24 146:7,14
162:22 163:20
drives 25:6 96:7,14,22
97:5 98:1,6 143:4
150:3
dropped 59:17
due 42:2
duly 5:5 85:6 180:8
181:16
Dunn 169:2
during 7:3 16:6 33:4
35:12 44:20,23 45:11
61:1,8 63:6 64:23
65:2 67:16 69:10
75:3 91:6 95:22
96:13 113:9 132:13
160:14 161:16 162:5
duties 30:11,14
duty 144:21,24 145:10
Dylan 66:13
Dyson 56:23 57:12,16
57:21 175:15,18

E

E 3:1,8
each 115:24 116:7
154:1
earlier 121:5 135:13
150:4 155:10
early 56:2
easier 159:11
EASTERN 1:3 180:3
edit 15:23
edited 16:1
editing 16:3,13
editor 15:23 16:1,17,20
16:21
education 9:11 12:14
12:15
effort 36:21
efforts 18:5
eight 27:11 44:11,13
either 12:6 33:1 47:2
58:15 64:5 67:2
93:14 131:24 162:22
electronic 162:22

163:20 164:9,22
165:12 166:2,16
167:6,20 169:21
170:11
electronics 10:16
eliminated 40:6
eliminating 33:13
employed 34:22 72:15
124:16
employee 32:24 34:21
35:5,7 118:7
employees 24:2 36:16
36:19 108:4,6 141:6
employee's 33:4
employment 27:5
31:17,20,24 33:5,6
33:17 35:12 38:7
39:15,23 40:21 41:1
56:15 64:19 72:5
75:18 76:22 77:9,24
78:13 85:12 86:4,13
87:15,22 88:5 89:8
89:13 95:23 97:21
99:8 102:1 121:1,21
122:3 125:2,11
127:14 135:8 138:8
138:15 139:4 140:12
151:4,18 154:17
155:4 172:1 173:16
encompassed 10:14
end 38:19 50:4 54:15
54:16 58:16 62:16
72:12 73:10 91:4
99:10 157:22 179:9
179:12
ended 32:9
ends 73:10 77:10
engineering 10:12,13
10:15,16,17 11:1
English 175:16,19
176:3,15,18
English-based 175:18
175:22
enjoying 14:5 90:8
enough 14:7 96:20
entailed 16:14
enter 145:23
entered 66:3 71:14
85:1 120:5 145:14
146:1
enthusiasm 14:7
entire 8:14 56:6
entirely 48:12
equally 84:6
errata 180:11,17
especially 105:24

Essentially 153:20
establish 126:8
established 98:22
Euromonitor 159:21
159:22
Europe 84:6
even 27:19 55:1 67:10
69:4 87:14,21 148:5
152:12
eventually 60:17 61:21
ever 5:23 7:15 12:3
29:8 66:11 95:16
97:11 113:12 117:1
123:8,17 127:7
134:15 145:9 177:19
every 118:7
everyone 23:9 158:9
everything 6:8,17
10:15
evidence 144:22 145:1
145:10
exact 72:13 89:1 92:7
92:18 125:15
exactly 77:6 145:16
154:19
examination 1:13 3:2
5:7 85:8 157:8
173:13
examined 5:5 85:6
example 80:4
except 180:10
exchange 31:16
Excuse 113:17 174:18
exec 22:10
execs 112:16,22
executive 17:11,14,17
17:19,20 18:7,13
22:17
executives 17:22
112:16,18
exhibit 3:10 30:24 31:1
37:22 38:1 41:5
100:24 101:1 103:8
104:1,19 108:2,12,14
108:19 110:21,22
111:3 112:7,12,14
114:15,16 115:1
118:9,14,24 119:1,20
119:22 121:5 122:7
122:12,15 124:1,7,9
127:21 131:17
133:11,13,18 136:6
136:11,13 137:21
153:12,14,19 157:11
158:3 163:2,23,24
164:4,11,12,16,19,22

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

165:1,2,6,9,12,15,16
165:20,23 166:2,5,6
166:10,13,16,19,20
166:24 167:3,6,9,10
167:14,17,20,23,24
168:4,7,10,17 169:6
169:9,11,15,18,21,24
170:1,5,8,11,14,15
170:19,22 171:1,22
173:16 174:8
exhibits 114:19
exit 54:1,9 160:8
exited 68:4 76:12
119:13
expect 113:3
expense 158:12
expenses 108:20
158:15
expenses.xls 108:22
experience 65:15
116:24 139:15
experienced 117:2
experiences 61:8
expert 146:6,14
expire 91:17
explain 145:2
explanation 142:23
143:3 144:7 149:8
exposure 19:18,19,19
23:1 65:23
express 45:5
extend 6:9,12
extended 71:21 72:3
extent 34:2,14 35:16
86:21 91:22 141:10
159:14
eyes 76:7 84:12 114:20
e-mail 42:15 48:23
53:22 58:12,14,21
59:4,6,10,17,19
60:12,18 95:11
100:19 101:9,14,14
101:17 102:4,24
103:20 120:3 122:17
123:10 127:12
130:15,21 131:6,7,8
131:16,23 133:5,19
133:20 134:9 136:15
136:21 137:22,24
143:22 154:9 163:3,4
163:8 178:13,19,22
e-mailed 42:18 58:8,9
109:3 115:8 119:24
120:8 122:19 124:19
134:5,10 151:8 172:3
172:6,10

e-mailing 106:16 134:7
e-mails 29:15 48:13,14
50:15 95:3 132:14
149:18,22 155:12,15
155:19 156:6,9,11,15
162:10,12

**F**

face-to-face 37:19
facilities 7:5
fact 13:10 57:11 64:22
72:18,24 85:11
149:14
factors 140:6
familiar 96:3 152:13,15
far 24:19 68:6
father 28:23
favors 135:16,16,22
fax 42:13
feature 61:21
February 60:24 63:17
63:17 120:1,4 125:24
feel 6:23 7:4,6 73:19
fees 49:8,14,18 50:12
50:21 51:6,12 52:8
52:17,23 53:3 158:21
few 6:3 29:19 30:1
40:15 50:14 56:24
99:13,19 102:10
105:18 156:4 157:6
171:4 173:12
figure 146:23
file 96:20 134:19
filed 26:22 27:1 120:21
143:9,18,21
files 42:3 97:18 102:4
144:19 145:19,21
147:24 155:24
161:22 162:3 163:7
163:11 171:16
filing 171:11
fill 99:21
filling 100:6,10,11
Finally 7:3
finance 11:17 115:5
financial 70:13 99:24
128:13,20,23 129:6
129:11,14,17
find 53:15,19,21
145:21 149:21
fine 5:21 76:11
finish 6:10 28:3
finished 54:16
firm 4:10
first 5:4,13 8:22 10:9
17:22 22:9 38:20

42:17 46:7,14 47:19
54:4 59:3 68:20,23
69:21 90:1 119:22
122:18 124:18
136:15 158:1 180:7
181:16
five 8:13 26:7 32:22
33:12,19 58:7 134:22
flash 96:10,14,21,22
97:5 98:1 150:3
162:22 163:20
flight 158:14
focus 16:17
focused 64:4
focusing 18:5
follow 19:22 23:19
following 12:18 15:2
16:16 20:13 30:1
33:6 61:24 63:2 65:8
67:16,22 158:9
173:24
follows 5:6 85:7
follow-up 157:6 173:12
force 174:16
forced 174:8
foregoing 180:8 181:22
182:2
forgotten 27:8,24
form 12:8 21:22 31:18
32:2 34:1 35:15
39:17 40:1 45:7 50:6
50:22 61:9 65:17
66:1 70:22 72:21
73:16 79:7,19 80:20
83:6,19 84:7 87:16
88:6,11 89:18 90:6
99:1,16 101:8 102:17
104:12 106:4,10
109:8 110:6 111:10
113:5,22 116:8,20
117:5,14 118:18
121:7,11 123:12
125:6 127:23 130:23
131:10 132:7,16
135:18 137:3 138:10
139:9,16,24 140:19
145:6 151:12 152:22
155:6 164:9 172:14
173:4 174:10,21
176:20 177:13 179:2
format 11:22,24 12:2
former 141:5
forward 104:23
forwarded 42:15
104:10 137:22 154:7
156:12

forwarding 105:12
found 158:1
foundation 40:2 104:13
117:6,14 118:19
137:3 138:11 139:24
four 60:16 93:10 161:7
fourth 36:14
frame 75:3
free 6:23 7:6 20:3,4
23:3 40:7 73:20
79:12,13,13,14
Friday 43:20 137:24
friend 54:22 58:5,6
friendly 37:17
friends 37:2,15
from 4:10 9:10,23,24
10:15 12:13,18 16:3
17:16,19 18:3 19:7
19:11,18 22:10,14
23:6 25:15 26:16
28:14 29:12 36:24
43:2 46:14 47:4
48:17,18,22 50:13
51:3 60:15 61:22
63:5 66:5 68:2 70:16
71:4,6 77:8 80:16
84:2 85:12 87:22
88:5 89:8,11,20 90:2
93:11,23 94:6 95:17
97:3,12 100:19
101:14 105:3 111:4,4
118:6 121:23 123:10
126:14 128:22 129:6
129:13,17 133:23
135:6 136:14 145:15
145:20,21 146:6,14
149:24 150:3 153:20
154:8 156:7 157:1
160:9,18,21 161:2,19
163:3 164:1,13 165:3
165:17 166:7,21
167:3,11 168:1
169:11 170:2,16
171:12 173:24
175:10 178:21
front 105:3
fulfill 81:24
fulfilled 91:13
functions 81:24
furnish 40:23
further 19:18 45:4 85:7
173:10,13 179:7,13
181:15 182:1,4,8

**G**

gain 19:18

gained 118:5
gathered 65:22 139:22
gave 26:9 51:20 64:8
176:5
geared 112:16
general 95:4
generated 23:24
generating 16:14
gentleman 58:17
getting 56:11 57:7
gift 28:17,23 94:23
gigabytes 142:21 143:1
143:5
give 27:2,22 28:19
41:10 52:7,15 64:6
72:12 73:1,24 74:7
78:8 135:23 136:23
147:14 176:1
given 8:18 15:14 18:24
26:2,4 27:19 35:12
35:13,21,23 36:1,4
39:12 51:4 53:2
55:19 64:3 146:15
180:8,10 181:18,23
go 6:3 46:11 57:5 62:12
64:7 79:23 84:15
90:16 112:1 113:24
117:7,16 126:2 127:4
131:20 132:17
141:20 146:24
147:13 148:4,17
152:8,24 171:3 175:7
175:11
goes 110:13 111:21
168:15
going 4:14 6:2,4,5,6,8
28:7,23 30:23,24
37:22 49:14,17,21
50:1,3,11,20 51:5
62:15 69:22 74:12
75:23 76:6 84:16
100:22,23 103:7,8,9
103:13 108:11,11
110:20,21 112:11,18
114:13 118:14 119:7
119:10 122:11 124:5
133:10,12 134:24
136:10 146:3,16,22
147:7,16 148:2
153:11,12 157:16
171:5 175:6,11
179:10
gone 115:16 122:6
good 5:9 28:2 46:16
87:10 156:17
goods 64:15,16 70:20

Marlo Reporting & Video Services, Inc.
(312) 578-0041

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

71:10 82:7,15
**Google** 169:1
**gotten** 50:10
**graduation** 12:18
**granted** 21:19 22:7
**great** 8:10 18:17
   118:15
**Greenwich** 10:19,22
   11:2,10
**Grey** 66:11,12,13,15
**group** 1:4 4:20 5:11
   15:22 16:5 17:2 25:2
   99:14 108:9 112:5
   113:17 114:4 117:21
   180:4 181:12
**growing** 21:8
**guess** 14:6 16:6 18:11
   27:6,7 29:14 30:19
   34:17 35:24 39:12
   44:11 45:18 46:17
   49:11 62:6 68:1
   71:24 74:17 96:19,19
   100:5 102:6 105:21
   105:22 107:16 111:6
   118:6 120:12 126:14
   132:9 146:19 179:4
**guidelines** 6:3
**Gururaj** 100:6
**guy** 58:11

**H**

**H** 3:8
**Haigh** 56:8
**half** 8:4
**hand** 112:11 122:11
   124:12 150:12
   153:11 182:13
**handed** 72:19 94:23
   150:23
**handle** 82:14
**handled** 49:21
**hands** 27:1,20
**happened** 15:2 59:1
   60:8,14 62:1 160:11
**happening** 151:23
**happens** 34:9
**hard** 12:2,6 142:15,18
   142:24 143:4 146:7
   146:14
**harmful** 107:18 117:11
**harming** 106:3
**having** 5:4 85:6 88:4
   105:23 180:7
**head** 6:20 114:3
**health** 70:11 129:9,20
   129:23 130:4

**health-care-based**
   78:21
**hear** 46:14 60:15
   103:11
**hearing** 46:20 47:14
   92:8
**heat** 102:12 105:17,19
   106:1,19
**heed** 148:2 156:23
**held** 69:18
**Heller** 175:15
**hello** 142:8
**help** 107:3 145:13
   149:12 155:11
**helped** 23:8,9,10
**helpful** 128:8
**helping** 122:24
**hereinbefore** 182:7
**heretofore** 181:6
**hereunto** 182:12
**hey** 37:18 58:10
**hi** 142:8
**high** 12:15
**higher** 21:11
**highest** 9:11
**highly** 103:10,15
   114:20
**him** 42:13,17,18,19,22
   42:23 43:1,3,7,11
   44:2,3,7 45:10 47:20
   58:7,10,12 59:4,6
   60:11,12,13,13 64:1
   64:14 65:2,8 71:19
   101:5 127:9 141:23
   146:10,23 148:6
   156:19 161:2,14,20
   161:24 162:1
**hired** 51:16 52:6,15
   66:20,24 67:6 69:1
   70:1,4 139:7
**hold** 20:14 22:15 150:6
**home** 46:1,11 78:11
   90:16,20 94:22 95:8
   97:23 120:11 134:20
   137:23
**honest** 101:7
**Hoovers** 169:2
**hope** 110:15 112:3
**Hotmail** 50:15 100:20
   101:15 119:24 120:8
   121:18,23 122:19
   124:20 145:21
   149:24 155:24 163:4
**hour** 1:21
**hours** 21:5
**Howard** 42:9,10,24

43:6,15,24 44:23
   45:1,16 47:9,18 62:6
   62:7 63:14,19,24
   64:11,18 65:6 66:7
   67:4,17,23 69:7 71:6
   71:16 72:4 81:3,6,12
   90:16 126:19,20
   127:7
**Howard's** 81:4
**HR** 66:16 73:5,24
   158:7 160:9
**Hughes** 37:10
**hurt** 106:9
**Hussain** 58:19,21 59:3
   59:11,20 60:2
**hypotheticals** 64:9
**H-u-s-s-a-i-n** 58:19

**I**

**ID** 3:9 9:1
**idea** 69:2 78:22 103:4
   106:21 130:19
   132:15,18 133:7,9
   156:17
**identification** 31:3 38:3
   101:3 104:3 108:16
   110:24 112:9 114:18
   119:3 122:9 124:3
   133:15 136:8 153:16
**identified** 18:14,15,16
   171:22
**identify** 31:5 38:6
   104:5 108:18 111:2
   112:13 114:23
   119:18 122:14 124:8
   133:17 136:12
   153:18
**identifying** 19:8
**IIS** 15:12 17:1
**Illinois** 1:2,19,20 2:8
   2:16 4:7,13 7:19 8:2
   180:2 181:1,6,9
   182:20
**immediately** 21:19
   71:17
**impose** 31:24
**impression** 33:13 40:5
**Inc** 4:11
**incidentally** 55:10
**include** 34:12
**included** 133:24
**including** 123:18
**incoming** 178:10,11
**increasing** 79:15
**indefinitely** 74:13
**indemnify** 52:8,16

**indicate** 73:6 119:23
   122:2 124:19
**indicated** 149:13
   180:10
**indicates** 122:19
**indirectly** 33:2
**individual** 1:9
**industries** 64:12
**industry** 151:23
**industry-based** 80:14
**inform** 42:6,8 43:15
   64:11 67:18
**information** 15:14 35:9
   35:14 36:2,5,6 65:22
   78:2 94:14 97:18
   98:3,20,20 101:24
   102:15 105:5 107:4,9
   110:11 116:3,14
   117:3,12 121:6,10
   128:7 139:21 146:14
   150:6 151:1,6,11,17
   162:12,15,19,21
   163:10,13,17,19,24
   164:3,6,8,12,15,18
   164:21 165:2,5,8,11
   165:16,19,22 166:1,6
   166:9,12,15,20,23
   167:2,5,10,13,16,19
   167:24 168:3,6,9,23
   169:10,14,18,20
   170:1,4,7,10,15,18
   170:21,24 172:2,6,9
   172:9
**informed** 42:9 45:1
   53:12,13 145:9
**informing** 53:23 135:7
**initial** 109:4 180:16
**initiated** 17:23
**inputting** 14:18 17:7
**INS** 150:14
**instance** 25:2
**instantly** 59:13
**instituted** 138:21
**instruct** 146:3,22 147:7
   147:10 156:19
**instructed** 90:16 148:1
   148:6
**instruction** 176:5
**instructions** 176:1
**Insurance** 136:17
**intend** 73:12,14 172:5
   172:8
**intent** 106:2
**intention** 102:15
   177:19
**intentional** 5:22

**intentions** 105:14,15
**interested** 182:10
**international** 1:4 4:19
   5:11 15:5,6,13,16,22
   16:5 180:4 181:12
**internet** 48:14,22,23
   143:23
**internship** 13:15 14:9
   38:18,24 39:2
**interpretation** 41:9
**interview** 53:18 60:21
   61:2,8,24 62:7,7,22
   63:2,9,13,23 64:24
   64:24 65:3,9 66:5
   67:17,22 68:7 159:23
   160:9,14 176:16
**interviewed** 40:16 54:6
   62:2,8 63:19 141:3
   159:20
**interviewing** 63:20
   68:21,24
**interviews** 57:8,9,17
**issue** 159:1
**issued** 24:9 26:9 38:22
**issues** 85:18
**itemized** 178:11

**J**

**J** 2:4,6,13
**January** 29:21 54:17
   56:2 58:16 122:20
**Japanese** 15:18,24 16:1
**Jeana** 2:14 4:21
**Jeff** 42:9 62:6,7 63:14
   68:2,14 81:3 126:19
**job** 15:4 38:19 53:21
   53:24 54:10 56:20
   69:5 74:4 84:5 91:13
   159:13 175:7,11
**jobs** 177:10
**John** 2:13,22 4:21
**Johnson** 2:3 4:3,18
   joined 39:3 56:16,17
**Jon** 56:8
**JOSEPH** 2:5
**Josh** 37:5
**judgment** 52:20 102:7
   162:2
**July** 41:14 42:16,17
   43:20 90:15,20 91:6
   92:9 93:12 138:22
   139:1 144:5,9,13,16
   145:12 147:4 156:15
   157:22
**June** 38:15,20 39:4
   90:3

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

**junior** 15:23 16:1,13,17
16:20,21 17:9 54:18
55:1
**just** 6:2 10:9 11:3 14:17
14:17 15:23 17:4,8
29:12 31:5 37:17
43:7 47:17 48:6
50:16 55:7 59:6 61:3
71:9 74:12 95:2,3
103:18,19,20,21
106:8 111:4 115:11
115:16 118:11 127:1
127:9 130:10,18
136:22 137:8 152:5
154:13,14 155:22
156:1 157:6 158:24
169:1 171:4,19
176:14,16,18 178:24

---
**K**
---

**K** 181:3
**KATHERINE** 2:6
**keep** 48:10 134:18
**Kevin** 37:12
**Kingdom** 1:5 8:10 9:4
9:6 159:5,10,15
172:15
**knew** 21:7 27:15 58:8
58:17,21 68:21,23
88:16 110:3 118:3
156:3
**know** 11:18,21,22,24
12:5 18:23,24 23:1
24:19 25:3,7,13,22
27:6,6,11 29:14,19
30:5,11 32:5 33:16
34:4 39:12 41:10
46:11,20 47:5 53:8
56:18,19 59:20 61:4
61:20 63:12,22 65:5
65:18,19 66:2,14,15
66:21 68:8,9,11
69:18 71:1 73:8,17
73:23 74:3,3,17 75:9
75:13 77:13 78:3
79:13 81:9,11 82:4,9
82:16 83:13 84:9
85:20,24 86:2,15
87:18 88:1,7 89:6
91:15,24 92:17,17,22
93:9 95:3 96:1,17
98:4,8,21 100:14,21
101:19 102:6,7,9,23
103:19 104:15,24
105:21 106:6,18,18
106:19 107:7 108:6,8

108:23 109:10,21
110:9 111:15,23
113:7,11,14,21 114:1
114:9,12 115:15
116:4,15 117:24
118:10,21 121:17,24
122:24 123:13,13,20
123:23 124:24 125:4
125:8,20,23 126:3
127:8,11,15,18 128:2
128:11 129:3,5,15
130:16,20 131:1,3,13
131:21 132:3,6,12,24
134:2,11,21 137:6,11
139:12,19 140:3,9
141:2,4,5,10,21
142:15,18,20,22
143:2,6 144:1,6,10
144:14,17,20 145:7
145:11,16 146:12
147:9 149:4,6,10
150:15 151:2,14
152:5,9 154:19 155:1
155:21 160:24
161:18,20,21 162:7
175:20 177:5,24
178:1,9,10,17,20
**knowledge** 24:18 25:16
59:23 67:1 103:5
113:12 116:16,18
118:7,11,13 123:17
152:4,6
**Kristen** 160:13

---
**L**
---

**label** 103:9,13
**labelled** 108:19 118:9
119:19 127:20
**language** 11:8
**languages** 11:4
**laptop** 26:2,4,13,17,23
27:1,2,3 28:1 47:22
48:3 92:3 95:17,18
95:21 96:15,17 97:13
149:4 150:23
**large** 96:20
**last** 5:17 22:16 54:4
99:13,19 100:3
105:21 119:5 137:17
156:12,12,13
**late** 42:22 74:22
**later** 76:10 102:10
105:18
**lawsuit** 26:22,24 47:10
93:12 120:20 143:9
143:18,21 145:4

156:3 171:11
**lawyers** 41:11 43:2
46:15,24
**lays** 112:23
**leads** 17:8
**learn** 69:21
**learned** 11:4
**leave** 13:6,16 43:7,11
45:3,21 74:12
**leaving** 13:12 23:7 42:3
99:8,9,9 149:23
160:5,10 161:23
**left** 27:4,23 32:1 33:22
36:18 37:13 48:8
60:13,16 62:21 97:22
121:20 140:11
155:16,19 156:5,13
160:11 161:3,7
162:11 172:13
177:23 178:1
**legal** 34:2,15 35:16
50:1,4,11 52:23
86:22 91:23 158:21
**Lervick** 2:14 4:21
75:23 76:2,4,9 119:4
119:12 120:5 146:20
146:22
**less** 93:1,7,9 178:2
**let** 26:1 37:21 39:9 59:2
75:19 82:20 85:20
87:20 89:11 161:21
**letter** 13:1 72:19,23
73:1,7,8,21,24 98:23
99:4 135:7 137:16,18
**let's** 25:1,7 54:16
103:22 142:2 148:17
**level** 9:11
**levels** 79:15
**leverage** 18:18 22:23
**leveraging** 79:11,12
**liaisoning** 48:15,16
**License** 1:24
**Life** 136:17
**like** 13:9 14:6 49:1 61:5
102:9 113:1,13,20
118:23 121:12
148:12 175:1
**likes** 56:7 78:19
**limited** 4:4 159:13
176:14,18
**line** 28:4 75:24
**list** 23:17,18 104:8
105:4 109:4 115:2,3
115:10 117:13 118:8
119:21 128:6 129:22
130:4 135:23 136:14

136:18,20 137:11,22
146:15 168:14,21,24
**lists** 16:14 19:20 20:5,6
23:4,13,14,16,17,24
24:1 35:8,14,21 36:5
115:19,23 116:13
117:3 118:5,16
136:21 137:8,13
163:7
**litigation** 5:12 49:8
51:14,15 101:6
120:14,17 122:2
138:19,21
**little** 154:1
**live** 87:3
**lived** 8:1
**living** 89:22
**Lloyd** 2:12 46:15 49:5
**Lloyd's** 49:7
**LLP** 2:12
**loaded** 97:15
**loaner** 95:17,18
**locate** 156:14
**located** 4:11 159:14
161:9,10
**location** 33:4
**log** 93:16
**logged** 29:14
**London** 10:1,20 25:8
157:14,15
**long** 7:20 8:3,11 17:13
18:6 29:16 39:13
68:6 174:2,5
**longer** 73:12,14
**look** 30:23 37:21 38:5
45:2,21 54:1,9 56:14
100:22 103:7 108:13
110:20 114:13
115:18 122:13 124:5
124:7 133:10,12
136:10 145:19 148:5
153:13
**looked** 98:7 105:23
151:4 156:8
**looking** 14:12 56:18,20
95:3 155:12
**looks** 113:1 121:12
**lose** 175:6,11
**lost** 23:15,21
**lot** 21:1,3 132:5 159:11
**loved** 174:24
**LTD** 1:5 2:3
**lunch** 85:11
**Lynn** 100:12

---
**M**
---

**made** 22:11 23:12 32:8
40:6 53:20 54:10
59:16 98:5 102:7
162:2 176:24
**Madison** 2:15 4:12
**magazines** 19:19
**Maier** 37:12
**mailings** 20:6
**maintained** 20:16
**make** 21:20 24:6 76:21
77:1 152:12 171:19
**making** 33:14
**manage** 34:21
**management** 9:17,22
10:12 23:23
**manager** 19:2 20:10,20
22:15,20 53:17,24
54:7 69:15,17 70:8
78:15 99:22 100:16
158:8
**manages** 58:11
**Manchester** 81:22
**manner** 158:9,20
**many** 21:4 25:24 56:11
57:5 80:7 82:22
96:22 100:3 132:13
143:4 156:9 177:24
**March** 72:12 74:22
124:20,22 125:3,22
131:18 139:5
**Marcomm** 108:21,24
109:1
**Marconi** 2:5 66:3 68:3
**mark** 30:24 37:22
100:23 103:8 108:12
110:21 118:23
153:12
**marked** 3:9 31:2 38:2
41:5 101:2 104:2
108:15 110:23 111:3
112:8,12,14 114:17
114:24 119:2 122:8
122:12,15 124:2,6,9
133:14,18 136:7,11
136:13 153:15,19
157:11 158:2
**market** 19:9 57:24
80:15 151:24
**marketing** 9:17,22
11:16 16:12,18,24
17:4,6,9,11,13,17,19
17:20 18:5,6,13,16
19:2 20:10,19 21:9
21:17 22:14,20 24:4
24:5 25:2,4,5 53:16
53:24 99:22 100:16

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

108:9,20 109:14
110:18 111:5,5,8,15
112:5,21,24 113:16
113:17 114:4 117:21
marketing's 24:5
marking 114:14 133:11
Marlo 4:11
married 7:13,15
Mas 58:19
master 122:16 124:10
matter 46:7 53:4 92:20
136:17 171:12
Mauritius 9:5,9,10
28:23 29:5,18 30:18
94:10,15
maximum 76:19
may 25:17 35:5 48:5
52:21 56:1,5 71:18
75:17 82:12 89:3,16
90:5,12,15 138:16
147:14 154:14
maybe 16:7 40:15 47:3
55:20 56:2 58:16
68:9 156:5 161:7
mean 29:10,15 30:17
33:9 34:8 36:21
52:18 61:5 68:1
70:24 80:2,17 98:12
116:4
means 30:14 33:24
34:9,20
meant 119:5
mechanical 10:16
Meesham 1:8,13 3:3
4:3,22 5:3,16 85:5
180:5,7,14 181:10,13
meet 13:11
meeting 161:11
meetings 37:20 160:8
Mellon 56:23 57:13,16
57:21 175:19
members 20:7
membership 18:20
19:20 20:5,6 23:4
memory 96:3
mentioned 40:4 57:10
61:19 83:24 159:18
171:20 182:7
message 60:13,17
messenger 48:8
met 43:10
MetroChicagoJobs
56:17
Microsoft 145:13
149:12 155:11
middle 53:14 56:2

58:15 63:16 72:11
Middlesex 9:24 10:5
12:19
might 46:18 52:1 67:5
127:12
Mintel 1:4 4:5,19 5:11
13:15 14:10,14,19
15:5,7,13 16:24 17:2
17:22,24 18:18 19:9
19:17,24 20:3 22:15
23:7 24:2,8,16,20
25:17 26:1,3,9,9,19
26:23 27:4,15,19,23
28:14 31:17,21 32:1
32:7 33:2,7,13 34:24
35:2,5,12 36:6,18
37:2 38:8,18,21 39:3
39:24 40:18,21 41:20
50:19 51:16 52:1,9
52:17,24 53:10 54:8
54:14,24 55:9 56:4
56:15 58:1,22 61:8
61:12 64:3,12,19,23
65:12,16,23 66:9
67:5 72:15 73:14
74:1 75:3,5 79:6,11
80:11,18 82:13 87:10
87:11,14,21 88:4,10
89:13 91:16,19,21
92:3 94:7,14 95:11
95:17,18,22,23 96:14
97:12,21 98:2,17
99:13,20 100:19
101:14 105:22 106:3
106:16 107:8 108:4,6
109:16 110:1,3,13
111:14,21 112:1
113:3,10,12 115:6,14
115:24 116:6,12,13
116:24 118:8,14
121:16 123:17,21
124:16 126:12 133:2
134:3 135:7,9,20
136:3,23 137:2,10,12
137:17 139:22
140:14,24 141:5
142:11 145:20
149:23 150:6,16
151:4,18,20,22 153:2
153:24 154:4,8
155:16,19 156:5,7
157:2,13 158:1,12
160:2,5,10,15,18,22
161:3,23 162:8,11
163:4 171:12 172:2,6
172:9,13,13 173:4,17

173:24 175:6,10
177:23 178:1,21
180:4 181:12
Mintel's 24:21 28:1
35:8 36:16,19 43:2
97:4,18 107:4 109:7
114:3 115:12 116:2
121:5,9,21 140:11
151:1 152:13,15
minutes 32:22 39:13
134:22 147:14 171:4
mischaracterizes 83:20
97:6 99:2 106:11
128:15,24 130:24
131:11 143:11
154:22 176:9
mispronounce 5:20
Miss 73:6,22,23 100:13
100:15
missed 154:13
MN 168:15,16
moment 23:9 102:12
105:17,19 106:1,19
129:7
Monday 43:8,10 44:7
46:9 47:3,19
money 118:15
moniker 96:11
Monroe 1:19 2:7 4:7
181:8
month 91:6 92:23 93:2
months 8:23 12:22 13:2
14:13,16,20,21 15:3
16:7,16,23 17:15
22:16 23:7 27:11
29:19 30:1,3,4,6 39:2
40:15 56:7 99:13,19
100:4,5
more 19:23 30:3,6
68:10 80:14 91:8,11
92:11 93:3,5 97:1
morning 5:9 44:12,13
44:14
most 60:23 93:1
Motz 37:5
move 17:16 20:21
21:12,20 22:8,11
moved 8:23 20:15
much 17:9 55:18 61:19
152:18 172:18
must 27:7 120:6 122:24
130:19
mutually 80:5
myself 42:3 109:5
156:13
M-a-s 58:19

M-e-e-s-h-a-m 5:17
M.A 9:22

## N

N 3:1
name 5:9,14,16,17,20
12:23 43:9 54:2,4,5
93:17,23 115:19
159:18 169:5
names 115:12,20
140:16,22
nature 35:10
necessarily 159:6
necessary 76:9
need 6:18 7:4 24:12
53:19 54:10 57:11
59:8 62:12 87:4
150:11 157:16
needed 23:9 54:8
Neergheen 1:8,13 3:3
3:10 4:3,6,22 5:3,9
5:13,16,23 7:11
28:13 30:24 31:1
37:22 38:1 62:21
85:5,10 100:23 101:1
103:8 104:1 108:2,12
108:14,19 110:21,22
111:3 112:7,12,14
114:14,16,23,24
118:9,24 119:1,18,19
122:7,12,15 124:1,6
124:9 127:21 131:17
133:11,13,18 135:6
136:6,11,13 137:21
147:22 149:2 153:12
153:14,19 157:10
158:2 163:1 169:9
180:5,7,14 181:10,13
network 24:23
never 73:21 95:5,8,11
122:6 123:8
new 15:16,17,18,24
16:1,3 18:21 19:15
53:21 56:11 102:1
150:14
news 123:7
newsletter 17:23
newsletters 19:20
next 6:13,22 44:6 60:8
60:9,14 62:1 63:3,4
67:23 68:1 146:24
niche 18:14,15 19:9
Nobody 145:9 174:24
nod 6:20
none 82:24
non-compete 31:7

40:18,24 41:5,9
51:20 64:23 65:3
66:6,8,19 67:11 77:1
77:5,21 78:5 127:16
157:17 171:21
172:23 173:23
non-English 176:7,24
non-solicitation 31:7
North 8:1 15:17
NORTHERN 1:2
180:2
notarial 182:13
notary 1:17 180:23
181:4 182:20
nothing 50:14 129:16
129:16 175:1 181:17
notice 1:14 45:4 145:3
182:5
notification 99:7
November 53:14 54:15
number 3:9 56:23
150:14 159:18 163:7
180:17
numbers 13:11 101:6
N-e-e-r-g-h-e-e-n 5:18

## O

O 181:3,3
oath 180:8
object 12:8 21:22 31:18
32:2 34:1 35:15
39:17 40:1 45:7 50:6
50:22 61:9 65:17
66:11 70:22 72:21
73:16 79:7,19 80:20
83:6,19 84:7 86:21
87:16 88:6,11 89:18
90:6 99:1,16 102:17
104:12 106:4,10
109:8 110:6 111:10
113:5,22 116:8,20
117:5,14 118:18
121:7,11 123:12
125:6 127:23 130:23
131:10 132:7,16
135:18 137:3 138:10
139:9,16,24 140:19
145:6 146:3 147:7
151:12 152:22 155:6
174:10,21 176:20
177:13 179:2
objection 14:1 25:10
25:19 34:14 36:8
49:9 51:7 67:7,12
74:15 75:10 77:11
81:7,13,19 82:2 86:5

Marlo Reporting & Video Services, Inc.
(312) 578-0041

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 9

87:6,23 88:18 91:22
92:14 94:16 97:6
107:13,20 109:18
114:6 117:22 125:12
125:18 126:1 128:9
128:15,24 131:19
132:2 141:9,17
143:11 152:7 154:22
176:9 177:3
**objections** 86:14
111:17 140:7
**objectives** 111:8,15
**obtain** 23:1 88:23 89:7
168:23
**obtained** 9:12
**obtaining** 118:15
**obviously** 27:2
**occasional** 26:17
**occurred** 149:9 177:22
**off** 20:19 28:7,9,18
55:15 62:12,15,21
80:7 84:15,16 89:22
119:6,10,14 134:24
135:2 147:16,18
148:18,19,21 153:5
171:3,5,7 179:10
**offer** 20:3,7 54:13,17
54:24 68:16 71:16,21
72:3 80:4 85:12 86:4
86:13 87:15,21 88:5
89:8 125:2,10 154:17
172:13,18,20 173:4,7
177:1
**offered** 69:4 172:16
**offering** 68:15 79:23
80:3
**offerings** 80:16
**offers** 72:5
**offhand** 28:21
**office** 20:16,18 21:7
25:8 43:14 45:3,21
46:13 48:8 58:9
60:19 81:22 82:18,20
82:21 97:4 98:11
157:14,15,24 161:10
**offices** 44:17 159:15
**office's** 58:12
**often** 123:14 132:5,20
134:12
**oh** 11:15 29:19 46:16
47:19 56:23 145:16
**okay** 9:2 20:9 22:4 28:6
38:23 39:5 47:2
56:14 61:24 67:22
78:18 96:6 119:9
129:22 146:9 147:12

156:24 159:7 160:5
**old** 7:11
**Olson** 100:12,13,15
**once** 17:3 54:6 96:19
109:6,15,23 112:4
113:2 114:19 117:19
121:4,15 123:4
130:17 145:3
**one** 5:10 20:7 33:5
47:17 49:4 65:4,4
71:3 74:10 88:17
101:4 103:4 104:9,15
107:18 109:2,23
111:9 118:4 135:22
136:21 137:13 140:5
158:10 159:21
171:12,20 174:8
175:10 176:7
**ones** 127:4 174:24
**only** 7:7 8:20 24:16
25:1 39:2 55:7 71:3
76:7 84:12 86:18,19
87:10 88:16 97:5
108:8 110:17 112:5
113:15 114:21
117:20 143:1,7,16,21
143:22 156:2 176:2
**open** 62:9 63:11 67:19
69:7 74:13 161:22
**opening** 59:21,24 60:6
62:4
**operate** 34:22
**operations** 19:2 20:10
20:19 22:14,20
**opinion** 114:11
**opportunities** 23:2
**opportunity** 21:9 32:11
39:10
**opposed** 6:19 80:15
**options** 32:1
**oral** 127:10 142:3
**order** 87:3 103:15
146:19 158:20 159:3
159:7
**ordered** 29:21
**organization** 15:12
175:21,24
**organizational** 11:16
**organizations** 18:18
33:18 40:7 70:10
175:22
**other** 7:5 9:3 11:9,12
12:14,16 22:15 25:6
29:13 33:17 35:9
48:24 56:5,24 71:9
72:2,5 82:11 93:14

95:20,22 98:13 118:3
127:4 133:7 141:5
146:15 150:4,20
157:2 162:22 163:20
164:9 173:4 178:18
**otherwise** 117:1
**out** 17:24 19:1,5 20:15
23:8,10 48:5 53:15
56:18 81:21 85:18
91:9,14 112:23 123:1
127:13,16 129:24
130:6 145:21 146:23
149:21 158:1 162:18
163:16 164:6,18
165:8,22 166:12
167:2,16 168:6
169:17 170:7,21
**outcome** 182:11
**outline** 122:17
**outside** 56:15
**outstanding** 72:5
**over** 6:3 8:23 9:14
40:13 43:24 48:19
92:3,21,23 93:13
94:23 99:13 105:9
120:14,16 138:19
139:22 144:18
145:19 150:23
161:11,13,23
**own** 13:17 27:12 34:21
96:23 97:1 98:2
162:2 174:20
**o'clock** 1:21 44:11
84:21

_____
**P**
**package** 64:16 70:20
71:10 82:7,14 172:17
**page** 38:11 39:8 115:19
119:5,22 121:3
122:18 124:18
136:16
**paid** 14:23 15:1 28:17
39:3 158:14,21
**paper** 129:7
**paragraph** 32:24 34:19
35:4 36:14 39:20
40:10,11 173:22
**parents** 9:10
**part** 15:12 17:1 24:22
115:5 172:20
**particular** 20:8 104:22
118:1 121:19 137:23
**parties** 80:6 150:21
182:3,9
**partition** 12:5 142:15

**partitioned** 142:24
143:4
**partner** 78:24
**partnership** 70:7
69:15,17 78:15,19
126:8 128:5
**pass** 43:3 58:11
**passed** 19:21 28:24
29:1 59:15 60:2
**password** 24:12,20
93:19,23
**passwords** 24:17
**past** 26:7 27:8,10,10
40:13 126:24 135:8
**Paul** 37:4 54:20 55:22
160:24 177:22
**pay** 49:14,17 50:11,20
51:5 52:20,23 53:3
158:12
**paycheck** 90:2
**paying** 49:7
**payment** 173:5
**pending** 7:8 181:10
**people** 14:13 24:16
81:18 82:22,23 83:17
103:1 108:8 178:9
**per** 55:13,14,14 76:15
**perfect** 19:17
**perform** 84:5
**performed** 23:5 149:14
155:11
**period** 33:5 34:11
**permanently** 39:3
**person** 12:11 161:11
**personal** 26:18 27:9
100:20 101:15
119:24 124:19
134:19 137:23 154:8
**personally** 29:17
130:14 181:8
**person's** 54:2
**perspective** 18:3 19:12
19:19
**pertaining** 1:16
**Peter** 56:8
**pgs** 180:17
**pharmaceutical** 70:11
78:20 129:9,20
**pharmaceuticals** 64:6
**Phillips** 37:4 54:20
55:22 160:24 161:8
171:15 177:22
178:14,16,19
**phone** 37:17 44:20
59:18 62:7 68:12

69:10 178:3,4,5,7
**physical** 174:15
**pick** 150:11
**Pioli** 2:4 3:4 4:18,18
5:8,10 12:12 14:8
15:20 22:6 25:14,23
28:5,12 31:4,22
32:10 34:5,18 35:20
36:13 38:4 39:19
40:8 45:9 49:12 50:9
50:17 51:2,10 61:13
62:14,20 65:20 66:4
67:9,15 68:5 71:2,15
73:2,18 74:21 75:14
76:3,5,8,11,13 77:14
79:9 80:1 81:1,10,17
81:23 82:5 83:9 84:4
84:10,15 85:9 86:10
86:16 87:2,8,19 88:2
88:8,15,22 89:19
90:9 92:1,19 94:20
97:10 99:6,18 101:7
101:11 102:20
103:13,19 104:4,17
106:7,14 107:17
108:1,17 109:11,22
110:12 111:1,13,20
112:10 113:8 114:2
114:10,19,22 116:11
116:23 117:9,18
118:2,22 119:6,9,17
120:9 121:8,14
122:10 123:15 124:4
125:9,16,21 126:4
128:3,12,19 129:4
131:4,14,22 132:4,10
132:19 133:16
134:22 135:5,21
136:9 137:7 138:14
139:13,20 140:4,10
140:21 141:12,19,22
143:15 145:8 146:8
146:16,21 147:2,14
147:21 148:7,10,12
148:17 149:1 151:15
152:11 153:4,10,17
155:2,9 156:22 157:5
173:12,14 174:14,23
176:13,23 177:6,17
179:5
**pitching** 78:22
**placed** 25:17
**placement** 57:3 176:2
**plaintiff** 1:6 2:10 4:19
180:4 181:13
**plan** 122:16

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 10

play 21:5 33:16
please 4:16,24 5:2,14
　6:23 177:16 180:16
point 5:20 7:3 12:20
　16:8,10,22 17:5
　18:22 28:15 41:22
　42:1,6 60:5 67:19
　68:17,20 69:4 84:13
　89:23 102:16 160:14
Popp 53:22 54:3 73:4,6
　73:22,23
port 96:4
portion 168:17
position 15:21 16:13
　17:10 19:3 20:10,13
　21:16 22:18 34:12
　40:5 53:9,17 54:7,14
　54:18,18 55:2,21
　58:3 62:9 63:11,21
　67:18,21 68:15,16,18
　68:21,24 69:18 71:17
　72:8,14 74:13,23
　75:6 87:14 99:21,22
　100:13,15 138:4
　141:3,15 172:10
positions 16:10 56:5
possess 97:17
possession 78:6,10
　93:13 120:20,24
　121:22 123:5,22
　138:9,13 139:1,4
　150:13 155:4 157:3
possibility 51:14 52:1
　67:5
possible 94:13,21 96:18
　98:19 152:20
Possibly 30:7
posterity 102:22
postgraduate 9:15,19
Post-Conference
　136:18
post-grad 9:13
potential 56:9 62:4
potentially 58:10
　156:18
PR 22:16
practice 176:17
predominantly 13:5
　15:15 21:2 70:11
preparing 124:12
presence 181:20
present 2:20 23:11
　34:24 47:7 182:6
presentation 153:20
　154:4,7,13,15
presentations 97:15

presented 158:5,7,8
preserve 144:21,24
　145:10
pretty 117:10 127:21
previous 126:12,24
　139:14
previously 51:19 82:6
　83:3 85:6 92:2 94:24
　97:1 98:22 99:12
　127:2 142:14 143:7
　143:20
price 115:21
pricing 36:1,3,5 116:2
　116:4,13 117:3,12
print 162:18 163:16
　164:6,18 165:8,22
　166:12 167:2,16
　168:6 169:17 170:7
　170:21
printed 48:5
prior 7:23 10:4,7 19:8
　23:7 26:24 32:15,19
　40:24 42:3 47:14
　51:15,16 52:6,10,14
　66:19,23 67:5 89:2
　92:8 125:22,24
　154:20 157:12
　161:23 171:11,19
privilege 148:7
probably 14:17 15:15
　26:6,6 46:17 60:23
　63:4 71:24 72:11
　74:18 96:11 161:6
problem 88:3
Procedure 1:15
proceed 5:2 6:4
produce 73:4,7
produced 17:22 101:5
　101:8 122:1 157:1
product 53:16,24 54:6
　80:10 99:22 100:16
　152:3
production 15:16
products 15:17,18,19
　15:24 16:2,3 99:14
　152:13,16,19,20
program 11:18,20,21
　14:11,12,14 78:23
　80:5 144:1,4,12,14
　144:15
programming 11:3,5
　11:14
programs 49:1
prohibit 77:8 129:13
prohibited 70:16 71:4
　128:22 129:6,16

prohibiting 129:16
project 120:7 121:19
　123:1 132:23 133:4
projects 133:2
promote 18:19 153:24
promoted 20:8
promotion 16:8
promotions 20:4
Pronk 2:6 85:1 119:12
properly 105:23
proprietary 35:10
　61:20
protect 52:18
protective 103:15
provide 35:7 65:8
　137:9 140:22
provided 140:16
　180:11
provides 121:11
providing 18:3
provision 78:1 151:5
public 1:17 169:4
　180:23 181:4 182:20
publish 59:24
publishing 56:23 57:16
　110:14 111:22 112:1
　175:15
purchased 28:14,16
　29:6 94:6
purpose 29:13 36:23
　101:20
pursuant 1:14 182:5
pushing 9:14
put 16:23 23:14,18
　24:6,24 29:10 49:4
　53:4 164:8 168:24
P-o-p-p 54:4
p.m 28:8 42:22 84:17
　84:21 85:3 119:11,16
　135:1,4 147:17,20
　148:20,23 153:6,9
　171:6,9 179:11

Q

queries 145:14
question 6:10,13 7:1,8
　22:5 46:17 51:18
　52:12 83:23 87:1
　101:4 146:5,10 147:1
questioning 28:4
questionnaire 17:24
questions 6:6,7,19,22
　50:16 75:24 147:23
　148:1,3,12,13 157:7
　159:1 173:11,12
　179:7

quick 151:22 153:4
quickly 115:16
quit 87:13
quite 132:20

R

R 2:5,14
ran 144:16
random 102:8
reach 13:10 152:21
read 32:21,21 33:9,12
　34:6 41:18 146:10
　180:8
real 159:1
realized 155:20
really 25:3 30:7 50:24
　56:11,11 57:1 64:20
　65:5,18 68:9,11 74:3
　77:13 83:22 91:5
　105:22
reason 7:5 27:3,18 33:7
　34:7 83:23 85:16
　105:12,20 111:24
　130:17 131:5,6,7,16
　131:23
rebuilt 26:8
recall 11:17 12:24 14:4
　28:21 29:4,7 30:3
　43:19 45:8 46:8
　49:16 51:9 53:5
　62:24 66:10,14 71:6
　71:22 72:7 77:6
　85:14 94:7 123:3
　134:9 151:6 154:12
　160:3 161:5,16 162:4
receipt 30:1
receive 20:4 80:8 89:17
　90:1 94:10 161:2
received 19:6 29:20
　42:15,21 43:1 48:18
　51:3 146:6,13 150:8
receiving 41:17 42:4
　47:23
recite 36:15
recollection 101:13
record 4:14,17 5:15
　28:7,9,10 62:13,15
　62:18 84:15,16 85:2
　119:6,10,14,15
　134:24 135:2,3
　147:16,18,19 148:18
　148:19,21,22 153:5,8
　171:3,5,7,8 179:10
　180:10
recording 162:23
　163:21 164:9,23

165:12 166:2,16
　167:6,21 169:22
　170:12
records 178:7
recruiting 36:15,16
reduce 127:7
reduced 181:21
redundant 32:8 33:10
　33:14 34:13 40:6
　53:10,20 54:11 78:17
referenced 101:9
　108:21
referred 151:17
referring 168:18
reflect 105:1
reflected 109:12
reflects 121:5
refresh 101:12
refuse 148:15
refused 148:13
regard 94:5 148:8
regarding 25:16 33:16
　43:16,24 47:10 51:12
　64:11,18 66:8,19
　78:1 117:24 139:23
　147:24 151:5 177:21
　178:19
regardless 33:7 34:6
registry 147:5 149:3
regret 101:19 102:11
regretted 102:10
　105:18 155:23
regularly 23:16 123:10
reimbursed 158:21
reimbursement 172:14
rejected 55:21
relate 63:23
related 130:2 182:9
relationships 55:16
　70:10 135:14
relative 28:20,21 29:1
　30:18,20 94:9
relevance 49:9 51:7
　141:9,18
reliance 35:6
relocate 157:20
relocated 157:18,23
　175:3
relocating 158:16
relocation 158:12,15
　171:20
remain 159:3
remember 8:24 19:6
　28:22 30:7,20 46:17
　57:1 58:13 60:22
　64:4,20 68:8 69:12

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

| | | | | |
|---|---|---|---|---|
| 71:18 72:10,18 91:4 91:5 92:10 125:15 134:7 135:11 145:24 151:3,19 162:9 | revenue 80:8,8 review 32:11,14,19 39:10 | 101:4 102:17 103:11 103:17 104:12 106:4 106:10 107:13,20 109:8,18 110:6 | Saturday 44:2 47:20 savings 89:22 savvy 12:10 saw 107:19 121:5 | 65:10,10 73:21 94:9 94:14 100:18,21 101:13 102:14,24 109:4,24 121:17 |
| rendered 52:21 repeat 68:22 69:16 86:8 177:15 repetitive 95:19 reply 176:7 | reviewed 77:15,18,20 77:21 reviewing 42:4 Richard 2:21 4:8 43:9 43:10,13 48:9 59:16 59:17 60:11,15 61:15 62:2,3,3 63:5 65:11 | 111:10,17 113:5,22 113:24 114:6 116:8 116:20 117:5,14,22 118:18 121:7,11 123:12 125:6,12,18 126:1 127:23 128:9 128:15,24 130:23 | saying 73:21 says 32:23 34:19 49:17 77:6 122:16 129:7,8 scenario 64:3 schedule 111:5 school 10:6,18 12:15,15 seal 182:13 | 123:9 133:5,8 145:19 156:7,9 159:19 161:23 162:10 163:3 separate 15:10 series 6:5 serve 82:1 served 41:13 92:12 93:11,23 |
| report 20:3,8 55:15 81:2,3,6 146:6 154:5 reported 1:23 181:19 reporter 4:9,24 6:6,16 Reporting 4:11 reports 18:19 19:13 36:3 78:23 79:1 80:6 80:7,13,14,15 81:11 151:20,22 | rid 130:11 right 22:12 27:16 28:5 29:22,23 31:13 32:12 34:13 36:7,11 37:14 39:1 41:15 44:8 46:4 46:22 47:18 49:5 51:22 53:10 54:9,22 55:22 58:23 60:3,22 62:10 71:7 72:16,20 | 131:2,10,19 132:2,7 132:16 134:23 135:18 137:3 138:10 139:9,16,24 140:7,19 141:9,17,20 143:11 145:6 146:3,9,13,18 146:24 147:7,10,13 148:4,9,11,15,18 | search 98:5 155:11 159:13 searched 147:3 149:12 searches 145:23 146:1 149:14,17 second 34:19 63:8,13 64:24 66:5 67:16 115:19 119:6 | services 4:11 15:14,15 54:19 115:13 129:17 SESSION 85:4 set 23:10 55:16 60:18 63:8,15 70:9 182:12 setting 36:22,24 37:20 64:7 seven 27:11 71:7 several 26:8 |
| represented 46:3,7 representing 2:10,18 5:11 request 22:8 required 159:4 171:21 research 16:14 19:11 22:23 79:12 80:15 152:1 169:4 | 74:5,24 75:3 80:12 80:19 82:8 83:5,12 84:6,11 88:17 89:14 93:17 94:24 98:24 99:15 100:1 101:22 104:11 105:3 106:3 110:5 112:24 115:6,9 | 151:12 152:7,22 154:22 155:6 156:19 157:6,9 171:3,10 173:10 174:10,21 176:9,20 177:3,13 179:2,7 | secondary 12:15 secret 35:19 secretary 25:8 secrets 35:8,13 sections 56:20 sector 70:13,17 82:7,15 99:24 100:9 115:5 | severance 172:16 173:5 share 111:8 113:3,10 113:12,20 116:13 163:10,13,23 164:3 164:11,15 165:1,5,15 165:19 166:5,9,19,23 167:9,13,23 168:3 |
| researching 169:1 resell 78:24 reseller 78:23 80:4 reserve 179:8 reserved 182:2 reside 7:17,18,23 8:22 resided 8:17,21,23 resignation 72:19,24 98:23 99:5 | 115:14,20,24 116:3 118:12,17 120:17,21 121:1,22 126:6,7 127:2,10 129:19 131:9,18 132:1,21 133:5 134:3,6 135:15 137:2,19 138:5,16,22 139:1,5 142:21 143:23 149:14 | RODRIGUEZ 2:21 Rodriquez 4:8 role 13:5 17:9 19:15 24:5 32:5,7,8 33:10 33:14,14 40:6 53:20 54:16 69:2,7 76:1,3 78:18 99:12 158:10 roles 56:11 82:1 routes 56:13 Rules 1:14 | 127:20 128:14 129:6 129:11,14,17,18,23 130:5 sectors 70:19 71:7 secure 79:17 securing 78:19 see 19:15,23 22:24 23:2 26:1 29:10 101:6 104:7 105:3 107:3,9 107:12 109:17 110:4 | 169:10,14,24 170:4 170:14,18 shared 36:6,12 121:16 123:17 150:16,20 162:11,15 sharing 117:4 sheets 180:11,17 shocked 45:18 short 28:3 62:17 84:14 153:7 |
| respect 84:1 respective 182:3 respond 6:18 43:6 59:11 responded 59:12 150:17 | 154:21 155:13 156:3 173:20 175:8 176:19 177:8,12 178:14 179:1 Roache 2:13 3:5 4:21 | run 48:24 144:5,8,12 runs 43:13 Ruon 141:11 | 133:23 168:17 seek 22:9 23:1 126:8 seeking 33:17 56:13 Seeley 8:1 | shortly 29:6 86:11 149:23 161:2 178:13 shoulders 6:19 show 26:14 104:7 |
| response 45:16 59:5,7 59:14 responsibilities 17:18 91:13 | 4:21 12:8 14:1 21:22 22:1,3 25:10,19 28:2 28:6 31:18 32:2 34:1 34:14 35:15 36:8 | **S** S 3:8 Sabine 53:22 54:3 73:4 | seems 119:21 seen 40:13 110:10 123:8 152:18 sell 78:22 80:6,7 | 105:4 108:11 118:23 119:21 136:14 showing 14:6 shown 108:4 |
| restrictions 24:24 25:17 31:24 resume 60:2,11,12 61:3 91:2 | 39:17 40:1 45:7 49:9 50:6,16,22 51:7 61:9 65:17 66:1 67:7,12 70:22 72:21 73:16 | safe 103:19,22 SAITH 179:13 salary 55:9 75:20,21 76:14 173:8 sales 13:5,7,9 18:2 | send 56:21 101:17 102:21 105:16 122:22 132:14 159:21 | shows 23:10,11,11,17 26:5 104:19 107:6 shrug 6:19 shy 61:22 |
| resumed 90:23 retrieve 98:19 145:21 149:18 return 160:6,15,22 171:13,16 172:14 returned 27:4 46:1 Reuters 175:19 | 74:15 75:10 76:1,6 77:11 79:7,19 80:20 81:7,13,19 82:2 83:6 83:19 84:7,11 86:5 86:14,21 87:6,16,23 88:6,11,18 89:18 90:6 91:22 92:14 94:16 97:6 99:1,16 | 19:21,21 23:23 55:15 salespeople 23:16 134:2,3 same 6:12 25:9 26:7 54:24 55:3 57:12,24 68:18 78:12 81:19 86:14 87:6 111:17 125:18 126:1 128:9 140:7 | sending 59:4 101:20 155:23 senior 17:17,19 18:6,13 158:9 sent 29:4,17 30:21 42:3 50:14 53:22 56:18 58:13,20 59:1,6,10 59:16,19 60:11,12,12 | Sic 19:13 28:8 84:17 175:15 side 16:12 152:10,12,14 152:17 sifted 154:15 sign 38:14 76:21 77:1 |

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 12

77:16 157:17 158:10 171:21 172:21 173:2 174:9,18 175:1
**signature** 31:9 38:11 179:8 182:1
**signed** 31:12 32:12,22 38:17 39:6,11 65:4 77:16,19,22 78:9 173:19 174:2,5,16,20 174:22
**signing** 31:16 32:15,20 38:24 39:15 49:16 89:7
**similar** 34:23 79:5 80:18 81:24 121:4
**simplify** 52:12
**simultaneously** 88:10
**since** 15:8 36:18 37:13 123:8 140:11 141:24 142:5,11 143:9,17,21
**single** 7:13,14
**single-copy** 18:3
**sir** 145:12
**sit** 95:14
**situation** 19:23
**six** 14:13 30:3,4,6 58:7 58:8 71:9
**Skype** 98:8,10,11,16,20
**small** 23:9
**snapshots** 151:22
**social** 36:22,24 37:20 142:8
**solicit** 36:21
**soliciting** 36:15
**some** 13:14 16:11,14,15 28:15 61:20 64:8 80:7,8 82:12 95:1,2 101:8 102:16 134:19 137:10 149:14 159:13 160:1 176:16
**someone** 28:17,24 29:2 49:3 100:10 127:19 161:19
**something** 17:12 75:8 102:10 105:8 106:24 108:3 109:16 110:13 117:10 121:15 122:5 130:10,20,21 136:2 137:1
**sometime** 63:16 90:3
**Somewhat** 151:7
**Sony** 92:3,3 95:20 142:19 160:2,15,22 171:13
**sorry** 18:15 21:21 22:5 23:15 50:2 51:1

52:13 55:13 57:14 59:9 65:14 68:22 69:16 70:3,5 71:12 71:13 72:11 73:13 77:20 78:10 83:8,14 86:8 103:11 113:23 116:17 120:15 129:8 142:7 144:23 152:16 168:13 174:4 175:9 177:9
**sort** 37:18 134:19
**sound** 29:22 142:21
**sounds** 29:23
**source** 89:20
**space** 23:3 32:22 79:13 143:5
**speak** 37:15 40:7 42:19 43:8
**speaking** 23:2 56:7 161:18
**special** 176:1
**specific** 10:13 63:21 112:23 120:7 123:1
**specifically** 14:12,17 102:3 112:16 115:3 126:21 156:11
**speculation** 14:2 25:11 25:20 36:9 74:16 75:11 81:8,14 82:3 84:8 86:5 88:12 94:17 107:14,21 109:19 110:7 111:10 113:6 114:7 117:15 117:22 118:19 127:24 137:4 139:10 139:17 140:1 152:23 177:3
**speculative** 60:1 69:3
**spell** 5:14 54:2
**spelled** 5:17 127:13,16
**spend** 115:13
**spending** 21:3
**spends** 118:14
**spent** 8:14 13:14 56:6 115:24
**spoke** 42:17 44:6 46:24 47:19 62:5,6 171:15 181:9
**spoken** 37:8,8,9,9 58:7 142:4,6
**spreadsheet** 108:3 124:11 133:21,22 134:1
**spreadsheets** 134:13,16
**SPSS** 56:24 57:13,16 57:19 175:16,23,24

**Sri** 100:6
**SS** 181:2
**staff** 39:3
**stage** 14:4
**standing** 141:17
**stands** 15:13
**start** 20:19 74:8,14,20 85:13,17 89:2 142:2
**started** 6:2 18:14 38:19 51:21 56:12 70:3,5 76:22 77:2 82:10 122:3 141:24 142:5 142:11 157:24
**starting** 6:11 40:24 52:10
**starts** 168:15
**state** 1:18 4:16 5:14 180:8 181:1,5
**stated** 20:9
**states** 1:1,15 8:6,12,21 9:14 19:1 21:2,4 35:4 73:9 83:5,11,15,17 83:24 87:4 136:16 157:18,21,23 158:13 158:17 159:4,8 174:3 174:6 175:3,7,12 180:2 181:11
**stating** 72:24 137:16
**statistics** 11:15
**stay** 73:12,14 74:1 86:19 87:20
**stenographically** 181:19
**Steve** 21:15 56:8
**still** 15:12 16:13 20:16 26:24 33:21 37:2 72:15 75:2 80:13 91:18,19,19 121:22 150:11
**stop** 16:21 48:2 84:11
**stopped** 48:12
**storage** 150:5
**Storey** 160:13
**strategic** 78:19 79:17
**strategically** 70:9
**strategies** 54:1,9
**Street** 1:19 2:7,15 181:9
**strictly** 60:1 69:3 79:12 95:2
**strike** 67:3 72:2 168:13 172:7
**structure** 55:4,6
**structured** 15:9,10
**stuck** 50:1,4
**studies** 9:19 10:4

**study** 9:15
**stuff** 61:20
**stupid** 155:21
**subject** 136:18 146:18
**submit** 85:21 86:11
**submitted** 85:24 98:23 135:7 137:16,18 175:14 180:17
**SUBSCRIBED** 180:19
**subsidiaries** 33:3
**substantially** 34:23
**successful** 50:19 53:19 53:23 54:7 57:7 154:3
**sue** 52:2 67:5
**suit** 52:9,17,24 182:10
**suitable** 56:5
**Suite** 1:19 2:7,15 4:12 181:9
**summer** 90:8
**summons** 41:14,17 42:5,14 47:23 92:12 93:24
**Sunday** 44:4
**superiors** 126:17,18
**supply** 35:7
**support** 145:13 149:13 155:12
**Suppose** 129:22
**supposed** 34:10 145:4
**sure** 6:15 23:12 24:6 37:1 50:14 51:19 52:14 56:3 62:3,4,14 63:18 71:19 76:8 81:5 83:22 86:24 89:1,6 92:7 93:9 101:7 103:14,20 125:14 127:12 141:19 142:2 152:5 178:11
**Surf** 7:18
**surprise** 144:11
**suspected** 69:7
**swear** 4:24
**switch** 16:10
**sworn** 5:1,5 85:6 180:8 180:19 181:16
**system** 14:18 23:14,19 23:22 24:16
**S-a-b-i-n-e** 54:4

---

**T**

**T** 3:8 13:1
**take** 7:4,6,7 14:15 18:9 27:9 28:3,5 37:21 38:5 45:2 64:6 84:14

95:17 100:22 103:7 108:13 110:20 114:13 122:13 124:5 133:10 134:22 136:10 153:13 178:24
**taken** 1:16 4:3 13:20 62:17 153:7
**taking** 1:16 6:7,8,17 117:2 182:4
**talk** 41:11 61:11 64:3 154:1
**talked** 12:14 55:8 61:16 94:5 162:7
**talking** 61:22 62:22 85:11 136:22
**Tape** 62:16 179:12
**tapes** 62:13 119:7
**targets** 13:10
**tasks** 112:15
**tea** 13:8
**team** 19:21 23:9 54:19 68:19 112:21
**technology** 64:5 70:12 129:8,21
**technology-based** 78:20
**telecommunications** 12:22 13:4,13,16,21
**telephone** 42:11 161:12 161:13
**tell** 6:24 7:6 41:8 42:24 52:7 60:5 63:6,10 64:14 65:2 69:9,10 75:5 126:20 151:20 157:16 161:24 162:1 178:16,21
**temporary** 22:17 32:8 73:10 99:10
**ten** 105:24
**term** 33:5 34:19
**terminated** 32:6,7
**termination** 33:6,8 34:7 173:24
**terms** 21:5 35:6 39:22 75:18 77:4
**testified** 5:5 51:19 53:9 61:16 82:6 83:3,14 85:7 92:2 95:1 99:12 135:13 142:14 143:7 143:20 155:10 178:12
**testify** 53:6 137:8 158:20 181:16
**testimony** 25:15 29:24 73:19 83:20 97:3,7

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 13

106:11,21 128:16
129:1 130:24 131:11
143:12 154:23
176:10 180:8,10
181:18,23 182:12
**Thank** 157:5 179:6
**their** 4:16 18:19 20:5,6
20:7 41:8,11 56:20
86:4,12 111:8,8
113:20 118:15,16
128:6 135:24 136:3
153:24 154:2
**thereof** 182:11
**thing** 37:18 55:8
155:21
**things** 6:4 132:5
**think** 11:6 12:3,24
15:13 17:11,15 27:22
30:9 48:5 58:15
60:23 75:8 80:23
88:3,9 91:18 93:6
101:23 103:20,21
105:8 106:24 107:8
107:11 109:15 111:7
111:14 118:5 119:4
123:21 128:7 140:5
148:5 150:24 151:9
**third** 35:4 63:17 121:3
150:20
**Thompson** 175:20,20
**though** 55:1 148:6
152:12
**thought** 53:17 83:14
94:24 156:17
**threaten** 174:15
**threatened** 174:24
**three** 12:21 14:16,20
14:21 15:2 22:16
23:6 39:2 40:15 56:7
60:16 93:3,10 161:6
**three-and-a-half** 7:22
**through** 14:11 57:17
57:19,20,20,21,22
61:3 73:9 74:20
87:10 88:24 96:4
102:3 115:16,18
154:15 168:16
**throughout** 24:1
**thumb** 96:1,2,7 98:5
**time** 5:19 8:14 11:7
13:14 17:1,9 21:3,7
21:18 24:4 26:21
27:23 28:2 33:4
39:13 40:16 44:6,10
44:14,18 48:18,19
52:14 56:10 57:1

58:20 60:18 62:8
63:11 68:23 69:6
72:3 75:3 83:24 84:3
88:17 89:11 93:11,23
95:1,2 96:13 97:4
113:9 116:12 120:7
120:20,24 121:20
122:3 123:5 125:5
132:11 135:6 138:3,7
140:11 143:9,21
150:5 158:1
**times** 26:8 97:14
**title** 17:10 18:21,23
19:2,6 20:16,17
69:10,13 81:4
**titled** 111:4
**titles** 22:15
**today** 4:1 6:4,9 30:12
30:15 33:23 46:4
93:12 94:1 95:15
97:5 156:8
**told** 32:21 43:1 45:20
45:21 46:11 49:20,22
53:18 54:8 61:11,14
73:23 82:10 126:15
126:16 129:10
158:19 161:20
175:10
**total** 115:13,21
**totally** 105:18
**touch** 46:12 49:4 127:5
140:12
**towards** 38:19 53:13
56:1 58:15 60:24
63:16 72:11,11 91:4
156:11
**to-wit** 181:7
**tracking** 18:2 30:14
**trade** 18:17 19:8,10,13
19:15,24 22:23 23:10
23:11,11,17 26:5,14
35:8,13,19 55:16
79:2 104:7 105:4
107:6 119:21 124:10
126:6 128:5,6 129:22
130:4 135:14,23
136:22 137:9 139:23
140:13,17,23 168:14
168:24
**transcript** 180:8,9
181:23
**Transcription** 181:22
**transfer** 96:21 162:21
164:21 165:11 166:1
166:15 167:5,19
168:9 169:20 170:10

170:24
**transferable** 91:21
**transferred** 21:9
**transmittal** 103:20
**transport** 96:14 97:11
**travel** 14:24
**travelling** 26:5
**tried** 60:10 135:13
**trip** 172:14
**TRO** 92:8
**true** 26:21 45:11 78:12
142:17 143:16
145:12 146:1 147:3
171:24 180:9 181:22
**truth** 181:16,17,17
**try** 6:11,24 22:24 78:23
**trying** 61:22 79:17
83:17 85:18 128:4
145:18,20 149:16,18
**Tuesday** 46:18 47:3
**turn** 97:20 104:18
157:10 163:1 169:9
174:8
**turned** 48:19 92:3,21
92:23 120:13,16
138:18
**turning** 29:12 39:8,20
121:3 173:15
**two** 8:17,20 13:1 15:10
57:6,23 71:20 91:11
93:5,10 96:24 97:5
98:1 147:14 148:13
148:15 150:3 161:6
177:22 178:13
**two-and-a-half** 100:5
**type** 10:13,24 82:24
83:10 89:7 93:19
**types** 33:17
**typewriting** 181:21

**U**

**Uh-hum** 6:21 60:4 71:8
71:11 89:15 120:2
**UK** 9:5 21:2 84:2
**Um** 37:9 145:7 150:10
**under** 33:13 40:5 55:22
176:17
**undersigned** 32:24
34:21 35:5,7
**understand** 6:23 8:5
31:15,23 35:11 39:14
39:21 41:20 50:18,23
50:24 51:18 54:12
63:20 73:19 83:23
86:24 102:11 130:3
**understanding** 33:19

33:21,23 35:1 40:10
40:12,14 41:22 42:1
42:2 49:19 86:17
87:4,9 91:20 151:16
**understood** 6:14,20 7:9
47:21
**undetermined** 181:11
**unemployed** 13:14
14:13
**unique** 151:24
**United** 1:1,5,15 8:6,10
8:11 9:4,6 83:5,11,15
87:3 157:18,20,23
158:13,17 159:3,5,8
159:10,15 172:15
174:3,6 175:3,7,12
180:2 181:11
**university** 9:24 10:4,19
10:21 11:1,10 12:16
12:19
**unless** 73:22
**until** 19:3 20:10 23:6
26:21 33:21 40:12,14
45:3 48:19 74:13
93:12,24 97:5 138:22
146:23
**unused** 143:5
**update** 112:15
**ups** 21:11
**upset** 105:22
**USB** 96:4 147:5,6
149:3
**use** 7:4 25:24 26:10,17
29:8,13,17 65:23
95:4,22 96:14 97:11
98:16,18 102:15
105:15 136:3 172:5,8
**used** 15:23 26:13,18
29:24 34:20 95:1,21
97:5 98:17 143:1,22
150:6 172:2
**user** 93:17,22
**using** 27:9 48:2,10,12
48:14,23 94:22 95:12
95:18 98:20 145:4
**usually** 19:12
**utilizing** 169:2
**U.S** 21:6,10 84:1 86:19
86:19 175:24

**V**

**vague** 6:22
**valid** 91:18,19
**value** 76:18 130:13,22
137:1,12
**various** 115:23

**versus** 4:5
**vertical** 64:5
**very** 11:6,6,7,8,8,8
12:21 17:8 32:13,13
46:16 83:4 152:18
**via** 143:22
**Victor** 2:4 4:18 5:10
**video** 4:11 28:10
**videographer** 2:21 4:1
4:9,23 5:2 28:7,10
62:12,15,18 84:16
85:2 119:7,10,15
134:24 135:3 147:16
147:19 148:19,22
153:5,8 171:5,8
179:9
**videotaped** 1:12 4:2
**visa** 57:11 74:19,24
85:18,22 86:20 87:5
87:10 88:23 91:16,21
150:9,11 159:1,11,12
**voicemail** 60:13,16
**volition** 13:17 174:20
**voluntarily** 14:21
**voluntary** 14:15
**vs** 1:7 180:5

**W**

**wait** 74:19
**walked** 57:10
**wall** 57:10
**want** 21:12 28:3 36:6
47:5 74:1 75:9 84:14
103:17 106:9 107:11
109:16 110:4 111:14
114:4 123:22 131:15
156:14 158:24
171:19 177:8,11
**wanted** 13:18,23 73:7
154:14,14 155:22
156:1,2 176:16
**wants** 107:8
**wasn't** 13:7 14:5,6 27:4
32:4 53:18 62:3,3
64:2 72:23 94:22
99:4 102:15 145:18
149:21 158:15 175:4
176:14
**Watkins** 43:12,13 48:9
59:16 60:3,11,21
61:2,15 62:1,9,23
63:6 65:11
**Watkin's** 43:9
**way** 20:2 53:7 151:3
153:23 182:9,10
**Weber** 1:17,23 4:10

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

181:4
**website** 145:14 149:13
**websites** 56:19,19
169:2
**Wednesday** 46:19,21
**week** 63:17 68:10
71:23,24 89:5 91:8
92:11 93:7,8,9
105:22 156:5,12,13
160:11 161:23 178:2
**weekend** 43:24
**weekly** 112:15
**weeks** 40:14,15 91:11
92:20 93:3,5,10
173:7
**well** 11:22 15:8 16:23
17:1 19:17 21:21
22:9 25:6 33:12 37:7
37:20 40:15 43:10
48:13 53:18 56:19,24
57:22 58:10 59:2
60:10 64:15 69:6
73:1 74:4 77:16 79:6
79:18 80:4,9 84:6
87:20 93:20 99:7
102:13 103:18
104:18 106:2,8,15
109:12 116:6 122:1
128:4,13 129:7,18
130:21 133:1 138:15
146:18 159:23
**went** 14:11,14,16 17:24
26:14 53:18 57:2,6
60:21 61:3 65:24
90:20 102:3
**were** 8:3 9:6 10:5,5
14:13,23 17:3,13
18:6,12 19:14 22:19
22:20,22 23:5,8,8,14
24:1,1,3,6,8,15,22
26:1,2,3,10,18 31:15
35:11,13,21,23 36:1
36:4 39:23 41:13
43:17 44:16,16 45:11
46:6 52:14 53:2,12
56:4,24 57:7,12,16
57:19 61:4 62:22
63:20 68:21,24 69:22
70:1,4 72:15 73:3
74:12 75:18 83:16
84:6 85:11,17 87:11
89:22 91:8,14 92:12
93:11,23 97:14,22
99:7,13,19,20 100:4
100:6,8,11 102:6
103:1 106:8 110:1

114:3 116:12 120:10
124:15 127:19 133:1
135:9 136:21 139:7
140:14 147:22
149:16 155:12,15,18
156:9 157:12,15,16
159:14 160:5,9,15
163:7 175:6,11 182:6
**weren't** 24:24 53:23
54:7 56:10 145:4
176:18
**Wessel** 37:8
**West** 1:19 2:7,15 4:7
4:12 7:18 181:8
**we'll** 46:12 53:24 76:9
84:11 118:23 178:24
179:8
**we're** 30:24 37:22 76:6
78:23 100:23 103:8
108:11 110:21
114:14 119:15
133:11 146:22
153:11
**whatsoever** 36:23
**whereabouts** 30:11
**WHEREOF** 182:12
**while** 7:8 8:21 16:13
22:19 24:8 25:24
26:3,10,18 87:10
91:14 124:15 140:13
157:15
**whilst** 16:12 21:2
**whole** 18:16 75:23
181:16
**witness** 3:2 4:24 5:1,4
12:10 14:4 21:24
22:2,4 25:13,22
31:20 32:4 34:4,17
35:18 36:11 39:18
40:4 45:8 49:11 50:8
50:24 51:9 61:11
65:18 66:2 67:8,14
70:24 72:23 73:17
74:17 75:13,22 77:13
79:8,22 80:23 81:9
81:16,21 82:4 83:8
83:22 84:9 86:8,15
86:24 87:7,18 88:1,7
88:14,21 90:8 91:24
92:17 94:19 97:9
99:4,17 102:19
104:15 106:6,13
107:16,23 109:10,21
110:9 111:12,19
113:7,23 114:1,9
116:10,22 117:8,17

117:24 118:21 120:6
121:12 123:13 125:8
125:14,20 126:3
128:2,11,18 129:3
131:1,3,13,21 132:3
132:9,18 135:20
137:6 138:13 139:12
139:19 140:3,9,20
141:11,21 143:14
145:7 146:4,12 147:8
147:9,12 151:14
152:9 153:1 155:1,8
174:13,22 176:12,22
177:5,15 179:4
181:15,19,20,24
**word** 178:24
**work** 9:16 10:24 11:9
11:11 12:16,19 14:17
14:23 16:12,18,20
17:4 21:1 26:2 34:10
36:16 41:3 44:16
57:11 65:12,24 68:18
69:5 70:13 71:9
74:24 75:2,16 82:7
82:17,22,24 83:4,10
85:18 86:18,19 87:5
87:9 88:9,23 90:10
90:14,17,21,23 91:9
91:14,16,21 95:5,8
95:17,18 96:15,16
97:4,12,22 100:19
105:9 113:19 123:6
126:5 129:10 134:12
134:15 135:9,14
138:13 141:6 150:8
152:9,12 154:8 159:4
159:8,9,12 163:4
176:2 177:8,11
**worked** 12:21 15:11
25:4 38:21,23 39:5
64:12 96:13
**working** 8:16 10:5
19:14 20:24 24:8
26:10,19 29:11 51:21
55:22 70:4,5,16 71:4
73:9 76:22 77:2,8
79:2 87:11 88:4,16
91:2 99:10,14 100:8
120:6 121:18 127:19
128:13,20,22 129:6
129:13,17,18 130:20
132:23,24 133:2
135:12 139:22
157:13,24 177:19
**works** 58:5
**world** 98:15

**worldwide** 33:4
**worried** 49:24 50:3,8
56:12
**wouldn't** 11:20 53:3
58:6 107:3,19 117:11
127:22 177:1
**write** 73:1 144:18
**writing** 127:7
**wrong** 41:21 50:14
73:20

_____

**X**

**X** 3:1,8

_____

**Y**

**yeah** 5:16 11:6,13 17:6
18:11,11 21:13 37:19
44:19 45:18 59:15
61:18 73:23 79:22
80:13 83:18 87:12
146:20
**year** 8:4 10:2 16:7,16
18:8,9 27:8 30:8,10
33:5 34:11 38:21
39:6 55:14,14,19
76:15
**years** 7:22 8:13 10:21
26:7 33:12,19 58:8
105:24 116:24
139:22

_____

**$**

**$18,000** 76:18
**$2,000** 172:19
**$65,000** 76:15

_____

**0**

**06** 29:21
**08** 1:7 4:6 180:5
**084-002238** 1:24

_____

**1**

**1** 3:11 30:24 31:2 32:24
41:5 62:16 157:11
158:3 171:22 174:8
**1:02** 84:21 85:3
**1:48** 119:11
**1:50** 119:16
**10** 3:20 39:12 122:8,12
122:15 167:9,10,14
167:17,20
**10.3** 143:1
**10:14** 28:8
**10:20** 28:11
**101** 3:13
**104** 3:14

**105** 4:12
**108** 3:15
**11** 3:21 38:11 124:2,7,9
127:21 131:17
138:22 167:23,24
168:4,7,10 173:7
**11th** 41:14 42:16,19
43:20 93:12 139:1
154:9,16
**11:09** 62:16
**11:19** 62:19
**11:49** 84:17
**110** 3:16
**1101** 4:12
**112** 3:17
**114** 3:18
**119** 3:19
**12** 3:22 133:11,14,18
169:10,11,15,18,21
**12th** 42:17,20,21,23
43:16
**12-month** 173:23
**122** 3:20
**124** 3:21
**13** 3:23 4:1 84:20 136:7
136:11,13 137:21
169:24 170:1,5,8,11
**13th** 1:20 180:9 181:7
**133** 3:22
**136** 3:23
**14** 3:24 153:12,15,19
170:14,15,19,22
171:1
**14th** 44:4,7,24 46:10
47:11,18 90:15,20
144:5,9,13
**15** 16:7,16 39:12,20
40:10,11 82:23
122:20 173:22
**15th** 47:11 182:13
**153** 3:24
**157** 3:5
**16** 14th 46:21 47:15 92:9
**17** 143:5
**17th** 144:16 145:12
147:4 156:15
**173** 3:4
**18** 16:23 17:15
**1998** 38:15 173:19

_____

**2**

**2** 3:12 8:2 37:22 38:2
173:16
**2:11** 135:1
**2:18** 135:4
**2:34** 147:17

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

**2:44** 147:20
**2:45** 148:20
**2:46** 148:23
**2:52** 153:6
**2:54** 153:9
**20** 55:20 82:23
**2000** 18:10 19:7
**2003** 19:1,4,7 20:11
   22:12 23:6 31:13
   83:16 157:12,22
**2007** 53:14 134:6
**2008** 1:21 4:1 73:15
   84:20 89:14,16,17
   90:11,12,15,15,20
   100:18 104:19 109:3
   115:9 120:1,4 122:20
   124:20,23 125:3,17
   125:22,24 131:8,18
   131:24 133:1 136:17
   138:16,22 139:1,5
   151:9 154:9,16,20
   163:5 180:9,20 181:7
   182:14
**23rd** 72:20 98:24
   135:10 137:18
**24** 38:15
**25** 55:20 124:20
**25th** 124:22 125:3
   137:24
**27** 89:16 139:5
**27th** 75:17 89:3 90:5
   90:12,15 138:16
**2700** 1:19 2:7 181:9
**28** 134:6
**28th** 131:18
**29** 109:3 131:24
**29th** 100:18 104:10,23
   105:13 115:9 131:7
   133:1 151:9 163:5

—————————————
             **3**
—————————————
**3** 3:13 100:24 101:2
   103:18 104:19 163:2
   179:12,12
**3:13** 171:6
**3:16** 171:9
**3:25** 179:11
**30** 142:21
**30th** 73:11,15 74:2
   89:14,16 90:4,11
   99:8 121:21 135:9,10
   137:17
**31** 3:11
**31st** 54:17
**3100** 2:15
**312** 2:9,17

**33** 1:19 2:7 4:7 181:8
**34** 7:12
**3515** 8:1
**372-0770** 2:9
**372-1121** 2:17
**38** 3:12
**3939** 1:7 4:6 180:5

—————————————
             **4**
—————————————
**4** 3:14 103:8,18 104:2
   108:2 163:23,24
   164:4
**4th** 31:13
**40,800** 55:14
**420** 7:18
**4800** 55:11,13

—————————————
             **5**
—————————————
**5** 3:4,15 108:12,15,19
   164:11,12,16,19,22

—————————————
             **6**
—————————————
**6** 3:16 110:21,23 111:3
   120:1,4 165:1,2,6,9
   165:12
**6:00** 42:22
**60602** 2:16
**60603** 2:8
**60618** 8:2
**60657** 7:19
**610** 7:19
**64** 11:7
**675** 168:15
**690** 168:16

—————————————
             **7**
—————————————
**7** 3:17 112:8,12,14
   165:15,16,20,23
   166:2
**70** 2:15

—————————————
             **8**
—————————————
**8** 3:18 39:8 114:15,17
   115:1 118:9,14 166:5
   166:6,10,13,16
**8.xls** 104:20

—————————————
             **9**
—————————————
**9** 3:19 118:24 119:2,20
   119:22 166:19,20,24
   167:3,6
**9:44** 1:21 4:15
**92** 10:23
**95** 10:23
**97** 10:3 38:20 39:4
**98** 17:2