**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MINTEL INTERNATIONAL GROUP, LTD., a United Kingdom corporation, | ) ) ) | |
| Plaintiff/Counter-Defendant, | ) ) | Civil Action No. 08-cv-3939 |
| v. | ) ) | Hon. Robert M. Dow, Jr. |
| MEESHAM NEERGHEEN, an individual, | ) ) | Magistrate Judge Maria Valdez |
| Defendant/Counter-Plaintiff | ) ) ) | |

## DEFENDANT'S MOTION FOR RULE TO SHOW CAUSE AND SANCTIONS

Defendant, Meesham Neergheen ("Neergheen"), by his attorneys and pursuant to Rule 37(b)(2) of the Federal Rules of Civil Procedure, respectfully moves for an Order for a Rule to Show Cause why Plaintiff, Mintel International Group, Ltd. ("Mintel", and Scott Jones of Forensicon, Inc. should not be held in contempt for violating the Court's Order, dated July 25, 2008, and for the entry of sanctions.

1.      On July 25, 2008, the Court entered an Order governing the discovery procedures for examination of Neergheen's computer hard drive. A copy of the Order, dated July 25, 2008, is attached hereto as Exhibit A. The Order, in pertinent part, provides as follows:

> 3.      Defendant shall provide to Plaintiff's expert on or before July 25, 2008, a forensic copy of Defendant's hard drive(s).
>
> *                *                *
>
> 4.      Plaintiff's expert may conduct an inspection of the forensic copy, which may include the performance of any and all searches desired by the Plaintiff. **Plaintiff's expert shall not provide or reveal to Plaintiff or Plaintiff's counsel any content of defendant generated documents obtained from the inspection of Defendant's hard drive.**

\*          \*          \*

5.       On a rolling basis as discovered, Plaintiff's expert shall provide to Defendant's counsel all defendant generated documents responsive to any searches performed. … All defendant generated documents will be produced **only to Defendant's counsel**. Defendant's counsel will then have the opportunity to review the results and, thereafter, shall produce the results to Plaintiff, to the extent they are not privileged or subject to objection.

Ex. A (emphasis added).

2.       On July 24, 2008, during the hearing regarding the matter, the following exchange took place regarding the discovery procedures for examination of Neergheen's computer hard drive as follows:

Mr. Roache (Neergheen's counsel):   The search terms where they're looking for actual content the experts would do together. Whatever application search he is looking for for traffic of e-mails and other things, he would do, **but he would be under court order not to disclose that to anyone until we have a chance to review it to see if it somehow can show either privilege or personal information that's unrelated to this matter.**  Are those the parameters?

Mr. Marconi (Plaintiff's counsel):  **The second part is correct**; the first part is not. … We don't know what search terms are for things that he took that we don't know what he took.

The Court:  I'm not sure if it matters who does the search terms and whether they do them together.  **What matters, at least as I'm conceiving this, is you, the defendants, have an opportunity to look at every document before it's turned over** to decide whether you've got a basis for privilege. …

A copy of the Transcript of Proceedings, dated July 24, 2008, is attached hereto as Exhibit B (emphasis added).

3.       Rule 34(a)(1)(A) of the Federal Rules of Civil Procedure defines "documents" as including "writings … images, and other data or data compilations – stored in any medium from

which information can be obtained either directly or, if necessary after translation by the responding party into a reasonably usable form." Fed. R. Civ. P. 34(a)(1)(A). Indeed, as the Seventh Circuit has recognized, "computer data is included in Rule 34's description of documents." *Crown Life Insurance Co. v. Craig*, 995 F.2d 1376, 1383 (7th Cir. 1993)(entering sanctions against plaintiff for failing to produce computer data because such data was a "document").

4.      On or about July 25, 2008, Neergheen provided a forensic copy of his computer hard drive.

5.      On August 28, 2008, Plaintiff filed a Motion to Compel to which it attached the Affidavit of Plaintiff's expert, Scott R. Jones of Forensicon, Inc. [Doc. 53]

6.      In Plaintiff's Motion and Mr. Jones' supporting Affidavit, it is clear that Mr. Jones revealed the content of defendant generated documents obtained from the inspection of Defendant's hard drive, in violation of Paragraphs 4 and 5 of the Court's Order, dated July 25, 2008. Specifically, but not exclusively, Mr. Jones revealed to Plaintiff: "text that Neergheen typed into Microsoft's search bar while he visited Microsoft's support website," "queries that Neergheen entered" in Internet Explorer, "registry data," "Windows operating system artifacts," "Internet history data," and "file entries of various types." [Doc. 53 at Exhibit 1 (Jones Affidavit), ¶¶20-22; *see also*, *e.g.*, ¶¶14 ("subset of the Item 004 All Files Present information"), 19 ("data within the original Item 004 Internet History"), 20 ("query text"), 27 ("Internet history data"), 37 ("Item 004 USBSTOR data"), 43 ("internet usage data")]. All of this "writing" and "data" was generated by Neergheen and, accordingly, Mr. Jones was prohibited from providing such to Plaintiff or Plaintiff's counsel and required to provide such documents to "only" to Neergheen's counsel for their review.

7. By providing and/or revealing to Plaintiff and/or Plaintiff's counsel documents generated by Neergheen, Mr. Jones willfully and in bad faith engaged in contumacious conduct that violated the Court's Order, dated July 25, 2008. *See* Ex. A at ¶¶4, 5. Moreover, Plaintiff and its counsel were complicit in Mr. Jones' violation of the Court's Order. Instead of advising the Court and parties that Mr. Jones violated the Court's Order or attempting to mitigate the violation of the Court Order, Plaintiff is attempting to capitalize on their own expert's contemptuous behavior. Indeed, "litigants are presumed to know that deceptive conduct is unacceptable, and parties should know that they 'must not engage in such abusive litigation practices as … tampering with the integrity of the judicial system.'" *Rhodes v. LaSalle Bank, N.A.*, 2005 U.S. Dist. LEXIS 43505 at *5 (N.D. Ill. Feb. 1, 2005).

8. Rule 37 of the Federal Rules of Civil Procedure, in pertinent part, provides that if a party or its agent fails to obey a discovery order, the court where the action is pending "may issue further just orders," including:

> **(ii)** prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
>
> **(v)** dismissing the action or proceeding in whole or in part;
>
> **(vii)** treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.
>
> **(C)** *Payment of Expenses.* Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(b)(2).

9.      In light of Plaintiff's Neergheen respectfully requests that the Court enter an Order: (1) dismissing Plaintiff's Complaint with prejudice, (2) awarding Neergheen reasonable costs and fees from Mr. Jones, Plaintiff, or Plaintiff's counsel incurred in relation to this Motion, and (3) for such other and further relief as the Court deems appropriate. *See Crown Life Insurance Co.*, 995 F.2d at 1383-1384 (entering judgment for defendant on counterclaim against plaintiff).

10.     In the alternative, Neergheen respectfully requests that the Court enter an Order: (1) precluding Plaintiff from introducing any evidence relating to the inspection of Defendant's hard drive, including, but not limited to precluding Plaintiff's expert's report and testimony; (2) striking Plaintiff's Motion to Compel [Doc. 53] and Motion for Rule to Show Cause for Discovery Sanctions and for Sanctions Because of Evidence Spoliation [Doc. 61], (3) awarding Neergheen reasonable costs and fees from Mr. Jones, Plaintiff, or Plaintiff's counsel incurred in relation to this Motion, and (4) for such other and further relief as the Court deems appropriate.

WHEREFORE, Defendant, Meesham Neergheen, respectfully requests that the Court enter and Order:

(1) dismissing Plaintiff's Complaint with prejudice,

(2) awarding Neergheen reasonable costs and fees, and

(3) for such other and further relief as the Court deems appropriate.

<u>or, in the alternative,</u>

(1) precluding Plaintiff from introducing any evidence relating to the inspection of Defendant's hard drive, including, but not limited to precluding Plaintiff's expert's report and testimony;

(2) striking Plaintiff's Motion to Compel [Doc. 53] and Motion for Rule to Show Cause for Discovery Sanctions and for Sanctions Because of Evidence Spoliation [Doc. 61],

(3) awarding Neergheen reasonable costs and fees from Mr. Jones, Plaintiff, or Plaintiff's counsel incurred in relation to this Motion, and

(4) for such other and further relief as the Court deems appropriate.

Dated: August 29, 2008                    Respectfully submitted,

                                          MEESHAM NEERGHEEN

                                          By  /s/ Joel C. Griswold
                                              One of His Attorneys

John T. Roache
Jeana R. Lervick
Joel C. Griswold
BELL, BOYD & LLOYD LLP
70 West Madison Street, Suite 3100
Chicago, Illinois  60602
(312) 372-1121

457103/E/1

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned counsel hereby certifies that a true and correct copy of **DEFENDANT'S MOTION FOR RULE TO SHOW CAUSE AND FOR SANCTIONS**, and accompanying documents, have been served this 29th day of August, 2008 via ECF filing to:

> Joseph Marconi
> Victor Pioli
> Katherine J. Pronk
> JOHNSON & BELL, LTD.
> 33 West Monroe Street, Suite 2700
> Chicago, Illinois 60603

<u>/s/</u> Joel C. Griswold

# EXHIBIT A

#20
MHN

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MINTEL INTERNATIONAL GROUP, LTD., a United Kingdom corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No.: 08CV3939 |
| v. | ) ) | Judge Robert Dow, Jr. |
| MEESHAM NEERGHEEN, an individual, | ) ) ) | |
| Defendant. | ) ) | |

## AGREED ORDER

This cause having been heard before the Court during the hearing taking place Thursday July 24, 2008, the parties seeking clarification of the terms of the temporary restraining order entered by the Court on July 16, 2008, IT IS HEREBY ORDERED:

1. Per agreement of the parties, the temporary restraining order entered by the Court on July 16, 2008 is hereby extended until the date the Court renders a ruling following the preliminary injunction hearing.

2. The preliminary injunction hearing currently scheduled for August 4, 2008 is hereby continued until September 4, 2008 at 1:30 p.m. Accordingly, Plaintiff's supplemental brief and Defendant's initial brief are extended to be due on August 21, 2008. Both parties' reply briefs are extended to be due on August 28, 2008.

3. Defendant shall provide to Plaintiff's expert on or before July 25, 2008 a forensic copy of Defendant's hard drive(s). Defendant's expert shall certify that the forensic copy given is an exact copy of Defendant's hard drive(s) and shall provide a copy of the intake documentation including the hash verification.

4. Plaintiff's expert may conduct an inspection of the forensic copy, which may include the performance of any and all searches desired by the Plaintiff. Plaintiff's expert shall not provide or reveal to Plaintiff or Plaintiff's counsel any content of defendant generated documents obtained from the inspection of Defendant's hard drive. This shall not preclude Plaintiff's expert from discussing anything not directly related to the content of the defendant

1

generated documents. The Plaintiff's expert will release to both parties simultaneously a round one activity listing report that details the universe of file and folder names on the computer as well as other system activity events, subject to the requirements of Paragraph 7. This round one listing shall not include any contents of defendant generated documents that are subject to the agreed privilege review protocol. Plaintiff's expert may retain a copy of the forensic image and the results of the inspection until such time that the Court may order them produced (in whole or in part) or destroyed.

5.    On a rolling basis as discovered, Plaintiff's expert shall provide to Defendant's counsel all defendant generated documents responsive to any searches performed. Plaintiff's expert will create an index listing of any items produced and will release such index to both parties simultaneously, subject to the requirements of Paragraph 7. All defendant generated documents will be produced only to Defendant's counsel. Defendant's counsel will then have the opportunity to review the results and, thereafter, shall produce the results to Plaintiff, to the extent they are not privileged or subject to objection. Within three (3) business days of receiving the documents, Defendant will produce a privilege log and all non-privileged documents.

6.    Defendant shall take no action to delete, modify, scrub or otherwise alter or diminish any data related to or contained on the hard drive(s), including metadata.

7.    Any index described above will not reveal the subject line of e-mails and will not reveal the preview field or any other information that reveals the content of the documents.

Dated: July 25, 2008

Hon. Robert M. Dow

2

# EXHIBIT B

1

1             IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3  MINTEL INTERNATIONAL GROUP,   )
    LTD.,a United Kingdom       )  Docket No. 08 C 3939
4  corporation,              )
                      )  Chicago, Illinois
5           Plaintiff,   )  July 24, 2008
                      )  9:30 a.m.
6       v              )
                      )
7  MEESHAM NEERGHEEN,        )
                      )
8           Defendant    )

9              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE ROBERT M. DOW, JR.
10

PRESENT:
11

For the Plaintiff:     JOSEPH R. MARCONI
12                    KATHERINE PRONK
                    Johnson & Bell, Ltd.
13                  33 West Monroe Street
                    Suite 2700
14                  Chicago, Illinois  60603

15

For the Defendant:     JOHN T. ROACHE
16                    McGuire Woods LLP
                    77 West Wacker Drive
17                  Suite 4100
                    Chicago, Illinois  60602
18

                    JEANA R. LERVICK
19                  Bell, Boyd & Lloyd LLC
                    70 West Madison Street
20                  Suite 3100
                    Chicago, Illinois  60602
21

22

Court Reporter:        Lois A. LaCorte
23                  219 South Dearborn  Room 1918
                    Chicago, Illinois 60604
24                  (312) 435-5558

25

1          THE CLERK:  08 C 3939, Mintel v Neergheen.

2          MR. MARCONI:  Good morning, Judge, Joe Marconi and Katie

3   Pronk for the plaintiff.

4          THE COURT:  Good morning.

5          MR. ROACHE:  Good morning, your Honor, John Roache and

6   Jeana Lervick on behalf of the defendant.

7          THE COURT:  Good morning. Are these your experts?

8          MR. ROACHE:  Yes.

9          THE COURT:  That's what I wanted to see, okay,

10  excellent. I know Mr. Reisman.  Very good.

11         Okay, I have two issues here.  One is the lap top, and

12  the other is the schedule, based on what I have seen here, and

13  the lap top one, having looked -- what I was hoping was to get,

14  if we got the two experts together, they ran the searches

15  together, they decide the universe, each side has their person

16  there to make sure everything is being done operatically.

17         It does seem reasonable to me that the defendants can

18  withhold things on the basis of privilege.  They just have to

19  tell you what they're withholding and you have an opportunity to

20  object to it if you think there are things on their privilege log

21  that are unreasonable.

22         So what I was hoping, and I don't know whether you guys

23  have maybe discussed this since you got your two experts here

24  today, is that you get the experts together to produce a forensic

25  copy.  I'm not sure what that involves, I'm the least e savvy

1  person around, but when we were here before, no one objected to
2  whatever that was.  I couldn't define it for you, but I know that
3  it's basically an opportunity for the plaintiff to find out what
4  the defendant has.

5       On the other hand, if there are things that the
6  defendant has -- if he has downloaded music, I don't think you
7  need that, if he has got things that are personal and don't have
8  any relevance to the litigation.  Now, relevance is a pretty
9  broad term, so if it has any relevance, I think they have a right
10 to it unless you got a privilege ground, and so you need to
11 produce a privilege log as well.

12      If we proceed on that basis with the two experts, how
13 fast can they get that done?

14      MR. MARCONI:   Just so we are clear, I don't have a
15 problem with that and I have a suggested solution, but we
16 actually need the hard drive.

17      THE COURT:  Okay.

18      MR. MARCONI:  And the reason we need the hard drive is
19 because -- two reasons.  We don't know what he possibly took
20 before April 29th.  We learned in a deposition that he orally
21 agreed to the job in March, he signed a contract April 9th, and
22 it was only when he gave notice that we saved his e-mails from
23 April 23rd to April 29th.  It was only months later when we
24 learned he went to Datamonitor that we even looked at those
25 because that was the red flag.

4

1    So we don't know what he took, we don't know what search
2    terms to give to them to look for.  It could be anything.
3    That's reason number one we actually need it.
4    Reason number two is the pattern of activity, you know,
5    was there cluster activity where he had a lot of activity on a
6    certain day and then that's scrubbed.  Was there a large amount
7    of information moved to a thumb drive file or to a file that
8    could create a CD.  Those are the kind of things that create
9    inferences as to what he was doing that are all relevant.
10    THE COURT:  And that doesn't turn up in a forensic copy
11    of the --
12    MR. MARCONI:  Yes, it does.
13    THE COURT:  Okay.
14    MR. MARCONI:  But they don't want to give us that, and
15    so my solution after talking to Mr. Neubecker is have them give
16    us a privilege log search, a log of search terms that they think
17    will pull out the privilege and then one or both of them can then
18    put everything that's pulled up off of that search term, maybe
19    the lawyers' names, maybe, you know, whatever they decide, that
20    goes into a separate CD and everything else goes into a CD that
21    goes to both sides.  This way we don't see it, and as long as the
22    experts agree to be bound by the court's order --
23    THE COURT:  You mean by the protective order.
24    MR. MARCONI:  By the protective order, then their
25    privilege is protected.  They have a right to do that.  We don't

5

1  dispute that.  But we do need the disc, and we need the hard

2  drive.  That's the issue.

3          THE COURT:  What's the difference between the hard

4  drive and a forensic copy of it?

5          MR. MARCONI:  There is none.

6          THE COURT:  Okay.  Is that right?

7          MR. NEUBECKER:  Essentially, what Mr. Marconi is

8  requesting is the forensic image so that we do not just document

9  production and searches, but also we have some proprietary

10 techniques we do to identify misappropriation.  So as much as we

11 can do the search together, both Mr. Reisman's firm as well as my

12 own, we would make more money if we were sitting in a room doing

13 a search together, but it's more efficient and less costly to be

14 able to do so subject to some type of protocol but in our office

15 so that people aren't sitting around --

16         MR. MARCONI:  This is Lee Neubecker of Forensicon.

17         THE COURT:  Okay, very good.  I knew you guys each had

18 an expert, and I saw Mr. Reisman's affidavit so I knew that he

19 was in fact your expert.

20         So now I guess -- what's the problem with that?

21         MR. ROACHE:  If I can address, and I will defer to Mr.

22 Reisman, I'll do my best because I'm not computer savvy as well,

23 but he has already made a forensic copy on to a CD of the entire

24 hard drive that I believe has all the information.

25         The concern is if we turn over the whole thing and

6

1  they're running whatever searches, you can't just search for my

2  name or Ms. Lervick's name because there could be e-mails that

3  contain information that is repeating attorney-client advice.

4        There also, as we have said, there could be endless

5  personal material that's completely irrelevant to this, and what

6  Mr. Reisman tells me is when this issue has come up in other

7  cases, what they have done is the plaintiffs will give the search

8  terms and they can be as broad as they want.  It could be Mintel

9  and just down the list of whatever they want.  You search for all

10 those on both the active files as well as the -- and this is

11 where I will trip up a little bit.  There is unallocated space

12 that they can look for metadata that may have these terms as

13 well, but rather than just turning it over, and to the extent

14 they come across attorney-client privilege, they then turn it

15 back, well, they have already seen what the attorney-client

16 privilege is.  There could very well be strategy in there and

17 other things.

18        We believe your proposal where the experts work together

19 on whatever the searches are going to be, subject to the court's

20 order that none of it is turned over until we can assure there

21 are no privileged materials, and to the extent we have

22 disagreements on any personal information, we can address it with

23 the court, we think if the two of them work together and come

24 back with their report, we very well may be done and not have any

25 issues, but to the extent we do, we would rather it be at that

7

1 point rather than they have got the entire hard drive and
2 whatever else may be on there that's completely unrelated to this
3 case.

4           THE COURT:   I guess my concern with handing the entire
5 computer over essentially is that how is it that you would
6 avoid -- you could easily stumble on to things that are
7 privileged and they can't wipe those privileged things out.

8           MR. MARCONI:   Well, two comments, Judge. Number one, we
9 have a callback provision in the agreed order.

10           THE COURT:  Right.

11           MR. MARCONI:  If that happens, they can get it back and
12 we can't use it.

13           THE COURT:   Right, but you know it.

14           MR. MARCONI:   To the extent that they say well, you
15 have unrung the bell, then I'll have another suggestion.  My
16 suggestion would be they have the hard drive.  Look at it.
17 Identify what they are concerned about and create search terms
18 that pull those out.  They have it.  They can be doing that right
19 now. They should have been doing it for the last week.  But the
20 pattern of activity is critical.

21           THE COURT:   Okay, I see your point, sir, and that is a
22 suggestion that -- I guess what I'm trying to accomplish here,
23 and knowing nothing about how all this works, I know the experts
24 could figure this out, though, if we told them what we wanted
25 them to do, what I had in mind was getting the experts together

8

1  and creating or giving the defendants an opportunity to assert

2  whatever privileges they have and to keep that information from

3  getting into the plaintiff's hands because they're not supposed

4  to have it, it's privileged. Anything beyond that the plaintiffs

5  get and as quickly as possible. That will get us to the

6  scheduling issue.

7         But is that something -- Mr. Marconi's suggestion, is

8  that something that the experts can accomplish?

9         MR. NEUBECKER: Certainly, it is, but to the extent that

10  you were to order us to produce all the documents first to

11  opposing and order us not to release the content of the documents

12  to counsel, that would make things move a lot faster and it would

13  clear up the issue. We are not going to break an order. Mr.

14  Reisman and myself have been opposing on many cases where we have

15  done just that, and it serves the purposes of controlling costs

16  and protects privilege because opposing gets to look at the

17  documents before our client does, and we are not going to break

18  your order because we will be out of business.

19         THE COURT:  Well, here is the thing. The only thing I

20  want the defendants to be able to do before the contents of this

21  computer are released is examine for privilege, and if there is

22  ways to run searches that could eliminate the -- you got to put

23  everything on a log, obviously, so they can check you, but at

24  least you can have an opportunity to assert the privilege before

25  you hand the information over. That's what I'm trying to

9

1  accomplish.

2          MR. MARCONI:   Judge, if you look at it -- let's look at

3  it as a typical document case, and let's say they had boxes of

4  documents.  It's the same thing, only the documents are

5  electronic.  You would say to them well, go through the boxes and

6  identify the privileged materials.

7          THE COURT:   Yes, and that's what I'm trying to

8  accomplish right now.

9          MR. MARCONI:   Well, they can do that and they can

10  create a search term for each of those documents, and then they

11  can give that privileged search terms to Mr. Neubecker and he can

12  create a disc just with that, excise it from our disc, and give

13  us everything else.  I mean, they can do that now and they can

14  even do that as to relevancy.  They might have, you know, he

15  might be involved with activity that he doesn't want anybody to

16  know about that has nothing to do with this lawsuit and we don't

17  care about anyway.

18          THE COURT:   Right.  I mean, that's what I would like to

19  see happen.

20          MR. ROACHE:   What search term would they recommend we

21  run?

22          MR. MARCONI:   You have to go through it.

23          THE COURT:   I was hoping the experts could -- I don't

24  know anything about running search terms.  I can find cases on

25  Westlaw, that's about all I can do with a computer.

10

1        MR. REISMAN:  The challenge, your Honor, is that if the
2  search terms are run through the unallocated space, meaning the
3  area -- it's basically like a semi trailer full of loose paper,
4  and so you're looking for snippets here and there, and if we are
5  dealing with simply pull out the privileged information from
6  that, it's a significant challenge to go in, find that privileged
7  information, find the irrelevant information.  It could be a
8  grossly onerous process to go through and try to manually redact
9  that information out of the unallocated space as opposed to
10  identifying a list of what is responsive and then providing that
11  and that only to the other side.  It's a simpler endeavor to do
12  that.

13        THE COURT:  Go ahead.

14        MR. NEUBECKER:  If I may, as much as it would be great
15  for them to be able to redact the hard drive and only give us the
16  unredacted portions, you really can't do a complete forensic
17  analysis without having the entirety of the image.  It would be
18  similar if you were testing for diabetes on a blood test, you
19  would need to give your blood.  It's possible that they could
20  choose to do an HIV test, other tests, and what not, but they're
21  not doing that test if it's not ordered.  But the possibility
22  certainly does exist that other documents are there, but there is
23  no way to effectively know were a thousand files copied on a
24  date, what was the pattern of activity.  You can't do the pattern
25  analysis by relying on a document production.  It doesn't allow

11

1 you to detect misappropriation.

2         THE COURT:   Is it possible for the experts to do the
3 pattern analysis and the experts to -- I guess what I had in mind
4 was the experts would do together the analysis that counsel all
5 collectively, all four of you, told them to run.  They would do
6 it together.  Each side has got a representative at that
7 endeavor, and then once the universe was known, then the
8 defendants get an opportunity to assert privilege as to what the
9 universe is, and they tell -- then they give the plaintiffs,
10 "Here are the documents that we are going to give you now that
11 are not privileged.  Here is our privilege log.  You can check us
12 on that."  That's kind of what I had in mind, and I don't know
13 what I'm missing about what can't be accomplished there.

14         MR. NEUBECKER:   I think for the key word search that's
15 fine, but for the pattern analysis we would have to be disclosing
16 to Mr. Reisman our trade secrets of how we detect patterns and
17 misappropriation, so I have a concern about that, and to the
18 extent I'm not releasing a document, I don't know why Mr. Reisman
19 would have to observe how I'm detecting fraud.  If I'm reporting
20 something and I'm giving him and his counsel the chance to review
21 it before my client knows, then I think we serve all parties'
22 interests and we don't have the cost of having us both have to
23 sit in a room.

24         THE COURT:   Whether you guys are physically present, I
25 don't know that that's -- I don't understand how these things

12

1  even take place and how long they take to run and what kind of,

2  you know -- you put something in, then you've got to respond to

3  whatever the computer gives you.  I don't understand how long

4  that takes.

5          I guess what I'm trying to figure out here, though, is

6  whether there is some way to give the defendants a shot at

7  asserting privileges, even -- you're running a secondary test

8  here, you want to run this test for pattern and practice.  After

9  you run the test, before you give any information to the people

10 who hired you, are you proposing to give it to the defendants

11 then and let them figure out whether it's privileged?

12         MR. NEUBECKER:    Exactly.    That's how we handle things

13 on many cases where we are neutral, where we're opposing, all

14 production sets go to the producing party, they get a limited

15 time to review it, after which it has got to be released.  And

16 that allows us to cull the data too, so instead of giving

17 thousand of hits we can zoom in because we know we're looking for

18 stuff.  He will trust us more to exclude documents than he will

19 trust an opposing expert, and what happens is when you have the

20 opposing expert doing it, you get much larger production sets,

21 really, all of us make more money, but the clients end up paying

22 for it.

23         THE COURT:    The other thing is in looking at the other

24 cases you guys have cited to me, some of them are enormous dollar

25 amounts, and that's fine, people don't mind -- somebody suggested

1  a third-party expert.  You guys already have people you're paying
2  here.  I don't want to put another burden on you of a third-party
3  expert, but I guess my principle is give the defendants a shot at
4  asserting privileges and the reasons therefor before the
5  information is turned over, and it sounds like we can get there.
6  It sounds like what he just suggested gives you a shot at looking
7  at anything before it's turned over, and that's what I'm trying
8  to protect for your client.

9        MR. ROACHE:  I think we are agreeable to the proposal,
10  but let me just make sure I understand it.  The so search terms
11  where they're looking for actual content the experts would do
12  together.  Whatever application search he is looking for for
13  traffic of e-mails or other things, he would do, but he would be
14  under court order not to disclose that to anyone until we have a
15  chance to review it to see if it somehow can show either
16  privilege or personal information that's unrelated to this
17  matter.  Are those the parameters?

18        MR. MARCONI:  The second part is correct; the first
19  part is not.  The search terms -- we don't know --

20        THE COURT:  Yes, I see what you're saying.

21        MR. MARCONI:  We don't know what the search terms are
22  for things that he took that we don't know what he took.

23        THE COURT:  I'm not sure if it matters who does the
24  search terms and whether they do them together.  What matters, at
25  least as I'm conceiving this, is you, the defendants, have an

1  opportunity to look at every document before it's turned over to
2  decide whether you've got a basis for privilege.  I guess that's
3  the principle, and what I would ask you to do rather than put us
4  all on the spot here is sit down for five minutes and see if you
5  can write out what you will agree to, and I'll enter it as an
6  agreed order to move this along, with the principle being
7  plaintiffs get the information, defendants get a shot --
8  plaintiffs get relevant information, that's a basic discovery
9  rule, defendants get to assert privilege before they get it.
10  That's also a basic discovery rule.

11          I think we can work it out based on what I'm hearing
12  from the experts, but I want to give you guys a shot to sit down
13  and talk it through and make sure you get something that's
14  agreeable, understandable that everybody in this room can live
15  with and that I can enforce if I have to.  That's what I'm after
16  here.

17          MR. ROACHE:  I just have one question.  Will he be
18  producing a report to us as to what he is saying should be turned
19  over?  Again, my computer savvy is not the best.  How will he
20  tell us what it is that he has found and is going to turn over to
21  the other side so we can then review it for privilege?

22          MR. NEUBECKER:  Typically, what will happen is we will
23  create CDs, we will produce a CD of the documents to the
24  producing party, and we will produce the index to both parties,
25  and the index is here are the listings of the files that were

1  responsive.  So everyone is aware of the quantity and volume, but
2  only the producing party has the content of the documents.

3       MR. ROACHE:   So before anything was produced, he would
4  give us both of those and we would have a certain amount of time
5  to review it to determine if there are any privileged or what we
6  considered to be personal, completely irrelevant matters.

7       THE COURT:   Yes, as Mr. Marconi said, you can do it
8  both as to privilege and relevance if you want, but you would
9  have an opportunity to look at that and then you would have to
10 make your list of things that you think should be withheld and
11 they would have the list and they would be able to challenge it
12 if they see fit.

13      MR. ROACHE:   And he can do this from the forensic CD as
14 opposed to the actual lap top, is that correct?

15      MR. NEUBECKER:   As long as we have a valid forensic
16 image, if Mr. Reisman asserts he created a valid forensic image,
17 we can receive that on CD and do our work and be able to produce
18 -- we can produce our stuff directly to Elijah, directly to
19 opposing, whatever you instruct, but the index, the listing
20 typically gets produced to both parties simultaneously so that
21 everyone has an understanding of how long it should take to
22 review, how many Excel spreadsheets, what not..

23      THE COURT:   Maybe you guys can sit down for a few
24 minutes and write this out in a way that everybody understands it
25 and I'll have to understand it too, but I'm confident if you guys

1  all do, I'll be able to understand it as well.

2         And then let me talk about timing for a minute here too

3  because that's obviously an important part of this.   It looks

4  like you guys are amenable to pushing this out some more, and I

5  think it will be difficult to do this on the schedule we

6  previously set, just the timing hasn't worked out that way.

7         The date I gave you guys for a hearing is the last time

8  I know that I'm going to be in town between now and the 25th of

9  August.   That just happens to be my one hit for a vacation all

10  year.   And the issue then is when to have the hearing and who to

11  have the hearing with.

12         As soon as I get back, I have a trial starting the

13  Tuesday of that week, and obviously, that's going to be a major

14  time crunch for me as well.   If you agree to extend the TRO just

15  by 10 days, that will get you to August 13th.   I would have to

16  send this to Magistrate Judge Valdez for either, if you consent

17  for purposes of the preliminary injunction, you have the

18  preliminary injunction hearing with her and then whatever she

19  does, you can appeal that.   If you don't consent, then I would

20  send to her for report and recommendation, it would then come to

21  me for review, then you could appeal.

22         So I guess I throw out for you if you want to have a

23  preliminary injunction hearing between now and the end of August,

24  but after August 4th, and even if you have it the first day I

25  come back, because I've got a trial starting the next day I can't

1  promise you a decision any time before the trial is done at

2  least.

3            MR. MARCONI:    How long is that trial?

4            THE COURT:    They told me three days when I set it, they

5  told me five days in the pretrial order I got last week, so I'm

6  going to guess five days. So it will go into after Labor Day.

7  It will go to the week after Labor Day and probably be done the

8  middle of that week would be my guess..

9            MR. MARCONI:    If they're willing to extend the TRO, we

10  are willing to wait until then.

11            THE COURT:    You would have to be willing to extend it

12  really until I get a decision. The issue is how quickly can I

13  write an opinion, and I don't know that until I see the evidence.

14  So that's the question, I guess, and really a question for

15  defense counsel because the rule says that I can extend it, you

16  get one 10 and then you get another bite of 10, which turns out

17  to be 14 because of weekends, and anything after that has to be

18  consented by the opposing, party which would be defendant in this

19  case. So that's a question that I put in your court, but if you

20  can't, really if you won't agree to extend the TRO until I can

21  get you a preliminary injunction opinion, then I'm going to refer

22  this to the magistrate judge or you can consent to the magistrate

23  judge because obviously, the TRO will expire, without your

24  consent it will expire on August 13th, even based on the

25  agreements you guys have already put in the paper, and I can't do

1  anything between now and then that wouldn't be started on the 4th

2  with a hearing.

3         MR. ROACHE:  Your Honor, we are willing to extend it

4  until your calendar frees up.

5         THE COURT:   Okay.  Well, I would prefer to do that

6  because that's where I am, but I can't reset that trial either.

7  So it may be realistically -- I may be in position to give you a

8  ruling pretty quickly, I have excellent law clerks, but it may be

9  mid September before I can give you a preliminary injunction

10  ruling, and because that's final and appealable, I've got to do

11  it A plus as opposed to a TRO where you don't, you know, a lot of

12  judges said "why are you writing an opinion on a TRO?"  And I

13  said well, I feel like I have to explain myself, but a lot of

14  judges wouldn't at the TRO stage.

15         So if you all are comfortable with that, then --

16         MR. ROACHE:   We are, your Honor.

17         THE COURT:   Then why don't you include that in whatever

18  you draft up in the next few minutes too, and I'll be here to

19  referee if I need to.

20         MR. MARCONI:   Handwritten?

21         THE COURT:   If you want to hand write it, that's fine.

22         MR. MARCONI:   Do you want us to go back to the office

23  and draft something and just --

24         THE COURT:   Given that we have an agreement on the

25  timing here, which is really the other issue that was driving

19

1   this, if you guys -- it would be obviously easier if you

2   submitted something that you had time to look over and typed up,

3   so why -- do you guys have time to do that today and you can get

4   it back to me?

5           MR. MARCONI:   We will draft something and send it over

6   this morning.

7           THE COURT:   Okay, that would be great.  Let's do it that

8   way then.

9           MR. MARCONI:   We'll draft something and send it over

10  this morning, and hopefully we will come to agreement and send it

11  to you.

12          THE COURT:   And if you don't come to agreement on it, I

13  can see you tomorrow and we can work it through.  But as long as

14  we've got some time now where we're not under the same time

15  pressures as if we were trying to have a hearing on the 4th or

16  before the 13th, that would be a different issue.

17          MS. LERVICK:   Did you want us to drop it off with your

18  clerk or e-mail it to the proposed order --

19          THE COURT:   You can just e-mail it to the proposed

20  order box, but if you would call, we don't check that every hour

21  and for some reason I don't get a notice of, you know, or a ping

22  or whatever I used to get in the good old days when the

23  government wasn't running my e-mails.   Maybe Andy can set me up

24  with that, with a ping there.  I don't know it's in there until I

25  check it.  So if you could call Terry and let her know that you

1  have e-mailed it, then I'll look at it right away, and if it's

2  agreed, I'm 99.9 percent sure I'll enter it as you guys agree to

3  it.

4      MR. MARCONI:   Do you want to give us a date now for the

5  hearing?

6      THE COURT:   Yes, we can do that.  Let me look at the

7  calendar.   Do you guys anticipate a lot of affidavits and a few

8  live witnesses or mostly live witnesses?

9      MR. MARCONI:   Mostly affidavits, I would think, and

10  deposition transcripts.

11      THE COURT:  Let's do it for Thursday, September 4th,

12  then in the afternoon if you guys can do that.

13      MR. MARCONI:  1:00, 2:00?

14      THE COURT:  Let's do 1:30.  Is that okay for everybody?

15      If you can include that in the order too, that will be

16  great.  Thanks everybody, I appreciate it.

17      MR. MARCONI:   And then the briefs, we will just work

18  out a schedule?

19      THE COURT:   If you work out a proposed schedule on the

20  briefs.

21      MR. MARCONI:   Do you want them the week before.

22      THE COURT:   Let me just tell you what would be good for

23  me would be to have the final brief at least a week before would

24  be great.

25      THE CLERK:   The 28th.

21

1          THE COURT:    The 28th, and give me the first brief at
2   least a week before that so you guys have time to chew on it.
3   Earlier is better, obviously, because to be honest with you,
4   because of the way I am, I would be inclined, if you sent me
5   something while I was on vacation, I would read it.   If you send
6   me something while I'm on trial, it's harder to promise I would
7   read it because it depends on what happens.
8          MR. MARCONI:    I think we all have that same disease,
9   Judge.
10          THE COURT:    That's how we get to be lawyers.
11          Thank you, I appreciate everybody's cooperation on this.
12   Whenever you call me, I'll look at it right away and if for any
13   reason you need to see me tomorrow, I'll be here.
14          MR. MARCONI:   Thank you, your Honor.
15          THE COURT:   Thanks, everybody.
16                *             *             *
17      I certify that the above is a true and correct
18      transcript of proceedings had in the above matter.
19
20      _____ *Lois A. LaCorte*
21                    Lois A. LaCorte
22
23
24
25