**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MINTEL INTERNATIONAL GROUP, LTD., a United Kingdom corporation, | ) ) ) ) | |
| Plaintiff/Counter-Defendant, | ) ) | Case No. 08-cv-3939 |
| | ) | Judge Robert Dow, Jr. |
| v. | ) | Magistrate Judge Maria Valdez |
| MEESHAM NEERGHEEN, an individual | ) ) | |
| Defendant/Counter-Plaintiff. | ) ) | |
| _____ | ) | |

**OPPOSITION TO MINTEL'S MOTION TO COMPEL THIRD-PARTY COMPUTERS**
**AND MOTIONS FOR A PROTECTIVE ORDER AND TO QUASH**

Datamonitor ("Datamonitor"), a non-party to this litigation, by counsel, submits this Opposition to Mintel's Motion to Compel the computers of Datamonitor and respectfully submits its Motions for a Protective Order and to Quash.

## INTRODUCTION

In its Motion to Compel ("the Motion"), Mintel makes serious accusations toward Meesham Neergheen ("Neergheen"). Those accusations are based entirely upon a single affidavit of Mintel's computer "expert", Mr. Scott Jones (the "Jones Affidavit"), and his unreliable and inaccurate conclusions. The Jones Affidavit makes misstatements, miscalculations, omissions, and leaps in logic that cannot possibly support Mintel's Motion.

This Motion makes it clear that the present lawsuit is not about Neergheen. As early as April 2007, Mintel was aware that Neergheen had sent e-mails from his work to his personal e-mail account that contained the documents Mintel now claims are trade secrets. (Ex. A). But at the time, Mintel was unconcerned and simply told Neergheen to "not use them." (Ex. B). Even earlier in the year, following Neergheen's termination, Mintel was aware Neergheen was interviewing with companies Mintel considered to be competitors of the company. Now, over six weeks after filing an emergency motion (and four months after knowing of the acts alleged in its Complaint) Mintel exposes its real target — non-party Datamonitor.

Now Mintel attempts to acquire the computers and e-mail of non-party Datamonitor. Mintel bases its entire reasoning that Neergheen is "untrustworthy" on the inaccurate and unreliable affidavit. This "reasoning" did not exist at the time Mintel made its request for Datamonitor's computers and, prior to filing of the present motion, was not conveyed to counsel. All of these factors demonstrate the improper purpose of Mintel's Motion and why its subpoena should be quashed.

1

<u>**BACKGROUND**</u>

In its Motion, Mintel states that Neergheen provided his computer to counsel on or about July 18, 2008.  However, whether, when, and how the laptop would be produced in this matter were the subject of multiple hearings before Judge Dow and went unresolved until July 25, 2008.  On that same date, immediately following Judge Dow's signing of an Agreed Order overseeing the process, Neergheen's expert, Mr. Andrew Reisman, provided to Mintel's expert a forensic copy of the laptop.

As part of the Agreed Order, Mintel agreed that its expert would provide any content found on Neergheen's computer to Neergheen's counsel for review. [D.I. 28].  Neergheen's counsel would then have three (3) days to review the content before producing it to Mintel.  *Id*.  Following transfer of the forensic copy, Neergheen heard nothing on the topic of when Neergheen's counsel would receive content from Mintel.  Despite several requests as to when Neergheen could expect the findings, Mintel's counsel indicated there was nothing yet to provide.  Yet on August 13, 2008, during the deposition of Neergheen, Mintel attempted to question Neergheen about content found by Mintel's expert.[1]  Mintel asked, and Neergheen denied, whether Neergheen had taken any of the actions of which it now accuses him.  (Ex. C, p. 144).  Moreover, during the deposition, counsel implied that  Jones had found information other than what he did.  In particular, counsel asked:

> Q.  Isn't it true, sir, that on July 17th you accessed the Microsoft help and support website and entered queries about how to delete data from your computer?
>   A.  Oh, I know exactly.  Yes.
>
> Q.  Why did you --
>   A.  It wasn't how to delete.  I was trying to look for the files that I had sent over to my -- from my Mintel account, and I was trying to find out how to retrieve files from my Hotmail that had been deleted.

---

[1]  Mintel's, and Mintel's expert's, violation of the Court's Order is the subject of a currently-pending Motion for Rule to Show Cause, at [D.I. 63].

(Ex. C, p. 145). At the time the question was asked, counsel for Mintel was aware that, as discussed below, the search Neergheen ran was how to *retrieve* deleted files.

Despite the circumstances, Neergheen's testimony has remained consistent throughout this litigation. Neergheen never opened the e-mails in question, and, following his conversation with Mintel asking that he not do anything with the e-mail contents, he deleted all of them, apart from one that accidentally remained.[2] Moreover, Neergheen testified that he had, in fact, attempted to *recover* the deleted e-mails that are the subject of Mintel's lawsuit, to demonstrate that he never used their content. (Ex. C, p.148). This testimony is supported by the actual findings on his laptop, as discussed below.

In the meantime, Mintel served upon non-party Datamonitor two subpoenas — one for documents and another for deposition testimony. (Ex. D). These subpoenas were provided to an individual working in Datamonitor's Chicago office, but were addressed to a UK company. Despite the insufficiency of the subpoenas, Datamonitor provided Mintel with documents responsive to the requests[3] and provided a witness (Jeff Howard) to testify as to many of the topics in the subpoena. Following Mr. Howard's deposition, Mintel attempted to compel another witness, Dylan Grey, to sit for deposition while counsel for Mintel was to be in London. Citing the Court's inability to compel a witness overseas, Judge Valdez denied the motion.[4] Subsequently, on August 4, 2008, Datamonitor served Mintel with objections to its subpoena for documents. (Ex. E). Apart from a general request that Datamonitor "reconsider" its objections,

---

[2] Mintel had been on notice of this fact since July 24, 2008, when it received Neergheen's Responses to Mintel's First Set Interrogatories.

[3] Because it was a matter of hours between when the subpoenas were provided to Datamonitor and Mr. Howard's deposition, the Datamonitor documents were not Bates labeled separately. Counsel was notified of this, and of the fact that the documents were produced from Datamonitor, during Mr. Howard's deposition. Accordingly, Mintel's contention in its Motion that Datamonitor has produced no documents in this case is mistaken.

[4] Of note, despite the urgency with which Mintel sought Mr. Grey's deposition, and despite several offers as to his availability, Mintel has not further requested the deposition.

Mintel did not discuss the objections with counsel prior to filing its Motion.

<u>**A**RGUMENT</u>

Mintel attempts to use Jones' highly questionable affidavit as a red herring as to why it should be entitled unfettered access to the computer system of a company that Mintel claims is its competitor. However, Mintel cannot fulfill the requirements that would result in it being allowed such access — namely, Mintel cannot demonstrate a need for information that it cannot (and has not already) obtained from less obtrusive sources.

Mintel's efforts to compel the computers of its self-proclaimed competitor are improper for a number of reasons. First, Mintel's reasoning is flawed. Mintel claims that it needs forensic copies of non-party Datamonitor's computer and e-mail because it does not trust Neergheen's testimony that he has not passed along information from e-mails he sent to himself. However, (a) Mintel has discovered other information corroborating Neergheen's testimony, (b) Mintel, should it seek even further confirmation, can obtain the information from less obtrusive sources than from the computers of its competitor, (c) the affidavit upon which it bases its "mistrust" is fatally flawed, and (d) the information in question was so unimportant to Mintel months before it filed suit, that it simply told Neergheen to ignore its existence. Accordingly, Mintel cannot demonstrate that it should be entitled to a non-party's information.

I.     **M**INTEL **B**ASES ITS **M**OTION **U**PON AN, AT **B**EST, **I**NACCURATE **D**ECLARATION

As its *sole* basis for filing a motion to compel a non-party to provide access to its computers, Mintel asserts that Neergheen has engaged in actions rendering him untrustworthy. However, the only support for this serious allegation is the inaccurate and unreliable Jones Affidavit. Jones fails immediately by making legal conclusions and jumping to factual suppositions that are easily demonstrated as false. More troubling, when viewed through the

eyes of an expert, the Jones Affidavit is wholly inaccurate.

### A.     Neergheen Did Not Tamper With Files from His Computer

As an initial matter, cursory review of the Jones' Affidavit demonstrates its impropriety.
Jones extends his opinion beyond the scope of scientific basis and delves into legal argument and
supposition. Such is improper, *per se*. *Good Shepard Manor Found., Inc. v. City of Momence*,
323 F.3d 557, 564 (7th Cir. 2003). An expert cannot testify as to legal conclusions, and such
testimony is often found to be inadmissible. *Id.* (finding "the proffered testimony was largely on
purely legal matters and made up solely of legal conclusions," and thus excluding the expert's
testimony); *see also Perez v. Radioshack Corp.*, 2005 U.S. Dist. LEXIS 36292 at *5-10 (N.D. Ill.
Dec. 13, 2005). Accordingly, on its face, the Jones Affidavit is improper and inadmissible.

Moreover, the "basis" for the conclusions reached in the affidavit are simply wrong.
Jones' affidavit has been examined by Andrew Reisman, as set forth in his affidavit attached
herein as Exhibit F. After fully examining Jones' allegations Reisman found that the affidavit
"…suffers from numerous defects that call into question virtually every conclusion reached
therein." (Ex. F, ¶ 2). More particularly,. Reisman found that the Jones Affidavit:

> ...reaches erroneous conclusions regarding alleged spoliation of evidence that in
> some instances are contradicted by the very facts the Affidavit cites, makes
> sweeping claims about matters beyond the scope of the available data, draws legal
> conclusions beyond the purview of a forensic examiner, and fails in any fashion to
> connect the activity cited to loss of any potentially relevant data.

(Ex. F, ¶2). The Jones Affidavit's mistakes and unsupported conclusions are so egregious that
they cannot be relied upon.

More than simply a matter of "competing experts," Reisman's findings regarding
the Jones Affidavit show the research conducted therein, as well as its conclusions, are patently
wrong. As an initial matter, the entirety of the Jones Affidavit is based upon the presumption

that a party is not entitled to use its computer *at all* following commencement of litigation. Based on this erroneous assumption, Jones concludes that ***any*** activity on the computer was done with the intent to destroy evidence. Not only is this not legally accurate (as discussed below), it is not a determination to be made by Jones. If Jones' presumption was correct, then "many companies with regular litigation likely would find [it] challenging meeting that requirement while still performing their normal business functions." (Ex. F, ¶7). Reisman inquires whether Mintel held itself to that same standard. *Id.* The deposition of Mintel's affiant Richard Carr revealed that it did not. (Ex. G, p. 109).[5]

Jones further assumes that Neergheen's purported "wrongful intent" is aided by an excellent knowledge of computers. First, Jones supports this conclusion with the statements that Neergheen had previously engaged in "database work" and was able to send himself e-mails. The "database work" Jones refers to was typing names into a database and Neergheen does not deny that he is able to send e-mails. (Ex. C, p. 14). He does, however, deny that either skill give rise to an above-average knowledge of computers. Second, Jones cites "proof" of Neergheen's computer skills that lies in his "ability" to access data not generally available to a novice computer user. Reisman found that the supposedly "expertly-deleted" registries are duplicated elsewhere on the computer. This logically begs the question why Neergheen, in his purported expertise, would delete files but leave their identical active registries on the computer. (Ex. F, ¶14). Not surprisingly, the Jones Affidavit neglects to mention the identical registries. Jones' assumptions as to Neergheen's "computer savvy," therefore are equally unsupportable.

Both of these unsupported suppositions directly affect Jones' analysis of the computer in

_____

[5] Mr. Carr testified that he continued utilizing his work computer after commencement of the present action. He further testified that he had not been asked to produce various e-mails relevant to the present action, which, subsequently, have not been turned over to Neergheen. To-date, counsel for Mintel has failed to respond to Neergheen's request for the documents.

question.  Some of his analyses use these suppositions to leap to false conclusions, while others are simply poorly conducted analyses.  All are refuted by Reisman in his affidavit, Exhibit F.

1.  The Jones Affidavit Wrongly Concludes Information is Missing from Neergheen's Computer

First, the Jones Affidavit alarmingly concludes at two points that information is missing from Neergheen's computer, when it is not.   Jones improperly and fallaciously states that Neergheen must have deleted Internet history from his computer, and that, in allowing automatic antivirus software to run, Neergheen engaged in intentional destruction of evidence.  However, textbook analysis of Neergheen's computer shows that no such files or information were deleted.

At paragraphs 25-28, the Jones Affidavit claims that Neergheen must have deleted Internet history because of "gaps" in daily and weekly entries.  However, such entries are not created for every day that a person uses the Internet.  (Ex. F, ¶22).  By way of example,  Reisman demonstrated this on his own computer.  (*Id.*, ¶¶24-25).  While  Reisman noted that he has used the Internet regularly, a screenshot of his computer shows a total of eight (8) entries—five (5) from August 2006 and one from July 2007.  *Id.*  By  Jones' logic in his affidavit "these pronounced gaps are the result of a clever attempt to destroy Internet history."  (*Id.*, ¶24).  Yet Reisman noted he has never taken any steps to delete the files, has used the Internet regularly on the computer, and yet the "gaps" are still present.  *Id.*  Accordingly, the nefariously missing files on Neergheen's computer are not missing at all.

Similarly,  Jones deduces that Neergheen attempted to delete information relating to which USB devices had been inserted into the computer.  This is a very large part of Mintel's cited basis for desiring the computers of Datamonitor.  However, this premise is simply inaccurate.  For each of the USB entries listed in the Jones Affidavit at Table Five, there is a corresponding entry with the same date, time and device that is an active, non-deleted entry.

(Ex. F, ¶27).  The information in question was not deleted at all.  Moreover, "Mr. Jones does not explain how the registry data was spoiled given that he could fully view and analyze it."  (*Id.* at ¶30).  Again, the Jones Affidavit cites to "missing" evidence that is simply not missing.

Accordingly,  Jones' serious accusation that Neergheen has taken steps to destroy information on his computer is flawed in light of the fact that the information is not actually missing or destroyed.

2.  The Jones Affidavit Wrongly Concludes Neergheen Attempted Acts Designed to Destroy Evidence

Next, the Jones Affidavit concludes wrongdoing on the part of Neergheen in the form of evidence tampering.  However, those conclusions are inaccurate and unreliable.

The Jones Affidavit claims that, allowing antivirus software to run on the computer demonstrates intentional destruction of evidence.  However, not only is allowing an automatic routine function of most computers to run *not* destruction of evidence in violation of a duty to preserve, ***the evidence was not actually destroyed***.  The Jones Affidavit states that intentional use of the software obscured date and time metadata.  However, the evidence Jones claims is missing is readily available from the reports prepared by Jones.  (Ex. F, ¶17).  Jones should have been able to confirm "that the McAfee antivirus software scan does not in fact update last access dates (or upon scanning immediately resets them to their previous state).  The only files that would have their last access dates updated are the few files associated with the McAfee program itself…."  *Id.*  Accordingly, Jones' conclusion that Neergheen destroyed evidence by allowing the virus scan software to run is simply false.

The Jones Affidavit incorrectly states that over 3900 file entries were created on or after July 13, 2008 thereby attempting to overwrite files on the computer.  Yet, contrary to the Jones Affidavit, Neergheen did not generate anything.  Nearly all of the files were related to Internet

8

browsing activity and were thus created by the computer, without aid from Neergheen. *Id.* This is wholly inconsistent with a deliberate attempt to overwrite the hard drive's unallocated space. *Id.* Instead, the "newly created" files were a result of simple browsing of the Internet. Had Neergheen wanted to engage in the acts of which he is accused by Jones, he could have done so relatively easily. But he did not. Accordingly, Jones cannot claim that Neergheen's actions had any more intent than simply browsing the Internet as we all do on a daily basis.

Finally, the Jones Affidavit accuses Neergheen of intentionally running a defrag process deliberately in an effort to obscure evidence. To the contrary, however, "it is clear that defrag was run on that date as an automated system process rather than the deliberate act of Neergheen, and the very proof of that fact is contained in the Table 7 of the Jones Affidavit two pages later." (Ex. F, ¶33). In his affidavit, Reisman discusses at-length how the Jones Affidavit is inaccurate. (*Id.*, ¶¶33-43). Reisman concludes that the actions were automatically taken by the computer and would "have had no impact" on the computer for purposes here. Moreover, Reisman found that the actions of which Jones accuses Neergheen would not have resulted in overwriting space as described in Jones' report. Jones' "support" is, again, inaccurate.

3. The Jones Affidavit Supports Neergheen's Testimony that He Attempted to Recover the Deleted Files, in an Effort to Support His Case

"The section of the Jones Affidavit entitled 'Spoliation Noted Within Item 004 Internet History' establishes what Neergheen already has admitted—that he ran a search in Microsoft's online support site for 'how do i access deleted' files." (Ex. F, ¶20). During his deposition, Neergheen testified that he had attempted to retrieve the e-mails he deleted when contacted by Mintel. (Ex. C, p. 145). Neergheen testified as such, even though Mintel counsel misrepresented that the search term found was simply "how to delete." *Id.* Jones concludes that, because of the other possible topics Neergheen *could* have searched, he *must* have read one

related to how to delete items.  Had Neergheen viewed such help files, it likely would have shown up on the drive.  (Ex. F, ¶21).  It did not.

> Instead, the Jones Affidavit ignores the nature of the search—how to access deleted files, not how to delete files—and cherry picks from the associated hits in the Microsoft Knowledge Base the article that most supports his client's motion and posits that Mr. Neergheen reviewed that article.  That is advocacy, not forensic analysis.

(*Id.*, ¶21).  In fact, the computer demonstrates precisely what Neergheen testified to — that he had attempted to recover the e-mails he deleted months prior to the present lawsuit.  Once again, the Jones Affidavit is wrong.

### B.     Leaving His Computer Turned on is Not a Violation of Neergheen's Duty to Preserve Evidence

Moreover, Mintel's conclusion that Neergheen's continued use of his laptop is in violation of a duty to preserve evidence is simply inaccurate.  While a duty to preserve evidence triggers at the outset of a lawsuit, a party has no duty to preserve information that is not discoverable, and the judgment about what information should be preserved is to be made by the party in possession of the information.  *Paul v. USIS Commer. Servs.,* 2007 U.S. Dist. LEXIS 68474 at *3 (D. Col. Sept. 17, 2007).  Moreover, to generate an adverse inference as a result of purported failure to preserve, "plaintiffs must demonstrate that defendants (1) had an obligation to preserve the evidence and had control over it when it was destroyed; (2) destruction resulted from defendants' culpable state of mind; and, (3) the destroyed evidence was relevant to plaintiffs' case."  *Hamre v. Miza*, 2005 U.S. Dist. LEXIS 8460 at *8 (S.D.N.Y. May 6, 2005). Here, as discussed above, Mintel can show none of these points.

Moreover, Mintel cannot demonstrate how Neergheen's actions violate his obligations under the Temporary Restraining Order *that Mintel drafted*.  Pursuant to that Order, in relevant part, Neergheen was prohibited from using, copying or distributing Mintel documents and was

further prohibited from deleting any documents "related to or taken from Mintel."  [D.I. 14].

Neergheen did neither, and neither Mintel nor the Jones Affidavit can demonstrate that he did.

Neergheen testified that he did continue to use his computer, but only for email and Internet browsing.  When asked whether he used his computer, Neergheen stated, "Well, I was checking e-mails, yes, but -- I was using the internet to check e-mails because we -- I was liaisoning with -- I was liaisoning with my attorneys."  (Ex. C, p. 48).  When asked explicitly whether any documents were deleted or any other programs were intentionally run, Neergheen answered "No."  *Id.*  As discussed above, Neergheen did not destroy evidence.  And as he testified he had no intent to do so.

Moreover, even under the Jones Affidavit's theories, notably, ***nowhere*** in the Jones Affidavit is it demonstrated that any of the allegedly tampered with files, documents, or information have anything to do with the alleged trade secrets at issue.  The affidavit does not reference a single file or data artifact that it attempts to show evidences transmission of Mintel trade secrets.  At no place beyond bald conclusions of wrongdoing does the Jones Affidavit point to any relevant information being intentionally destroyed.  Mintel's use of a such a flawed document demonstrates its desperation.

## II.    Mintel Cannot Show Substantial Need for the Information it Seeks, and There are Less Obtrusive Methods of Obtaining the Information

The scope of discovery under Rule 26 governs the proper scope of requests under Rule 45.  The rules, however, protect individuals subject to subpoenas from undue burden or expense.  Fed. R. Civ. P. 45(c)(1); *see also Guy Chemical Co., Inc. v. Romaco AG*, 243 F.R.D. 310, 313 (N.D. Ind. 2007). In particular, where, as here, the information sought is already in the possession of the moving party or where the information can be obtained from less obtrusive sources, compelling production is improper.

Moreover, "courts have been cautious in requiring the mirror imaging of computers where the request is extremely broad in nature and the connection between the computers and the claims in the lawsuit are unduly vague or unsubstantiated in nature." *Balboa Threadworks, Inc. v. Stucky*, 2006 U.S. Dist. LEXIS 29265 at *9 (D. Kan. March 24, 2006).  This is particularly true where the requesting party has no substantial explanation as to why it needs the information.  For example, as noted by the 10th Circuit:

> ABGI has never explained…why it should be allowed to conduct a physical inspection of MG's computer hard drive(s).  *Although ABGI was apparently skeptical that MG produced copies of all relevant and nonprivileged documents from the hard drive(s), that reason alone is not sufficient to warrant such a drastic discovery measure*….

*McCurdy Corp. v. Am. Biomedical Group, Inc.*, 9 Fed. Appx. 822 (10th Cir. 2001)(emphasis in original).  Particularly where a non-party is involved, the moving party must show that its need for the information is great, and cannot be obtained elsewhere.

Particularly in light of its lack of basis for wanting Datamonitor's computers, Mintel cannot compel them as it already has in its possession the information it seeks.  Where there is a more convenient, less burdensome source of the information, that must be used.  Fed.R.Civ.P. 26(b)(2).  Moreover, non-party status is a significant factor to be considered in determining whether the burden imposed by a subpoena is undue. *United States v. Amerigroup Ill., Inc.,* 2005 U.S. Dist. LEXIS 24929 at *4 (N. D. Ill. Oct. 21, 2005).  Here, not only is Datamonitor a non-party, the *only* basis Mintel cites in its Motion for wanting Datamonitor's computers is to see whether Neergheen has transferred information in the e-mails in question to Datamonitor.  Neergheen testified as to *each* of the documents in question and unequivocally stated that he never forwarded the information to anyone, let alone to Datamonitor.  (Ex. C, pp. 162-170).  Moreover, ignoring the fact that Mintel's questioning of Neergheen's veracity is improper as

described above, Mintel *still* has obtained confirmation that Datamonitor did not receive the information, through other methods.

First, Mintel has obtained confirmation that the information was not passed on to Datamonitor, through Datamonitor itself. Mintel has no cause for questioning the veracity of non-party Datamonitor. Mintel deposed Jeff Howard, Neergheen's immediate supervisor. Howard testified as to the significant safeguards that have been put into place at Datamonitor to ensure precisely that which Mintel seeks — that Neergheen not forward any Mintel information to Datamonitor. In addition to asking Neergheen to sign a declaration that he has not, and will never, forward such information to Datamonitor, Neergheen works in a wholly different industry sector than that to which the information pertains. Moreover, Howard testified that neither he, nor anyone at Datamonitor to his knowledge, has ever received any such information from Neergheen. And finally, Datamonitor has produced documents and things in its possession that support the position that Neergheen has never provided the information to Datamonitor.

Second, Neergheen has testified, and has responded to Interrogatories that the documents were never opened. If Mintel is unsatisfied with these assertions, logically it could request a forensic image of Neergheen's personal e-mail account or could submit Requests for Admission. Tellingly, it has not, but has instead attempted to get access to Neergheen's work e-mail at Datamonitor. Moreover, it could have properly subpoenaed third-party Hotmail, and obtain records of Neergheen's e-mail activity.[6] But Mintel has not done either, again demonstrating that its true goal is access to its competitor's information.

As Mintel knew the information was e-mailed by Neergheen shortly after he left Mintel

---

[6] Apparently, however, Mintel has considered this but has not done so. In an e-mail produced by Mintel sent from its expert on August 14, 2008, Jones informs Mintel counsel how to subpoena Hotmail. Apparently, Mintel has chosen not to do so.

and had no objection, the information sought is already in Mintel's possession and/or could be obtained from more convenient sources, and the hardship and burden to non-party Datamonitor would heavily outweigh any benefit derived from the computers and e-mail, Mintel should not be allowed access to its competitor's computers and e-mail.  Mintel's Motion should be denied.

### III.    The Visa Information Sought by Mintel is Irrelevant

As a side-argument in its Motion, Mintel claims that it is entitled to documents and things related to Neergheen's visa status.  Mintel fails, however, to demonstrate how such documents are possibly relevant to the present matter.[7]  Mintel claims that it has a need for the documents in order to demonstrate its theory that Neergheen began work with Datamonitor prior to receiving a work visa.  However, Mintel does not explain how this (a) is relevant to its Complaint, nor (b) is supported by any evidence.  Neergheen testified that he was unemployed for a month following his termination from Mintel, so that visa issues could be worked out at Datamonitor.  (Ex. C, p. 74).  He also testified that the visa *did* come in prior to working at Datamonitor.  *Id.*  Howard, Neergheen's supervisor at Datamonitor, corroborated these statements.  (Ex. H, p. 66).  Mintel has cited no authority even suggesting otherwise.

Moreover, there are other, far less burdensome methods of obtaining the same information.  As noted by the Court, Mintel has not issued any Interrogatories on the subject.  Similarly, Mintel could have issued Requests for Admission on the topic.  But it did not.  Accordingly, Mintel is not entitled to the documents.

### IV.    In Light of the Above, Quashing of Mintel's Subpoena, Requests 5-9, and Granting of a Protective Order Is Proper

Rule 45 of the Federal Rules of Civil Procedure provides that a court shall quash a

---

[7] When asked of counsel for Mintel during the meet and confer on this issue, counsel, too, was unable to indicate how the documents are relevant or likely to lead to the discovery of admissible evidence. Accordingly, Mintel's request for them is improper.

subpoena if it subjects the subpoenaed party to undue burden and/or if it requires disclosure of protected matter.[8]  Fed.R.Civ.P. 45(c)(3)(A)(iii) and (iv).  While a court may also modify the subpoena in order to protect the subpoenaed party, it may only do so upon specified conditions and only where the party seeking discovery shows it cannot obtain the information elsewhere without undue hardship.  *Id.* at 45(c)(3)(B)(i).

The potential damage to Datamonitor through allowing Mintel to obtain a copy of Datamonitor's computer system is enormous.  As an initial matter, the expert who would likely be involved in such review is the same as that whose credibility is in question here.  (*See also,* [D.I. 63]).  Accordingly, the presumption that the Protective Order in place in this matter would protect Datamonitor rings hollow.  Moreover, the reason given by Mintel for desiring this information is to see if specific documents are present.  Clearly unfettered access to an entire computer — or an entire system — is inappropriate for such purposes.  At a minimum, specific searches run by Neergheen's expert for the files in question is more appropriate.  Regardless, the potential harm incurred by a non-party is vast.

Here, as described above, Mintel is already in possession of information related to what Neergheen did with the information he e-mailed to himself, and can acquire further information through subpoena of Hotmail.  Moreover, Mintel has no basis for even questioning Neergheen's testimony apart from a faulty affidavit from a witness who, it is Neergheen's position, violated the Court's Order.  Mintel cannot show a substantial need for the information and particularly cannot show that the information cannot be sought elsewhere (let alone that it's not already in possession of the information).  Accordingly, it is proper that the subpoena, as related to Requests No. 5-9, is quashed by the Court and a protective order be entered.

---

[8] Additionally, the Federal Rules and the Court's inherent powers provide that the Court may make any order "which justice requires to protect a party or person from annoyance, embarrassment [or] oppression…." Fed.R.Civ.P. 26(c).

Dated:  September 2, 2008

    __/s/ Jeana R. Lervick_____
John T. Roache
Jeana R. Lervick
Joel C. Griswold
Bell, Boyd & Lloyd LLP
70 West Madison Street
Suite 3100
Chicago, Illinois 60602
312.372.1121
312.827.8000 (facsimile)

# EXHIBIT A

**Sabine Popp**

29/04/2008 19:43

To:    Steve Charlton/MINTEL/GB@MINTEL

cc:
Subject:    Re: Need your advice re. Meesham

Oh right, sorry. Just spoke to Amy. Yes, I think it's a good idea if you deliver this to him since your meeting has been set up for some time. It'll be $2K.

Thanks
Sabine

---

    ----- Original Message -----
From: Steve Charlton
Sent: 29/04/2008 19:23
To: Sabine Popp
Subject: Re: Need your advice re. Meesham

I am seeing him tomorrow not today

Let me know what is happening with severance

Steve

---

    ----- Original Message -----
From: Sabine Popp
Sent: 29/04/2008 19:21
To: Steve Charlton
Subject: Re: Need your advice re. Mcesham


7/30/2008


MNTL 00526

MNTL 00526

Sorry for my late reply, I worked in the apartment this am and didn't touch email
deliberately.
Jon said we should do it. I also think we'd all sleep better.
How did it go?

----- Original Message -----
From: Steve Charlton
Sent: 29/04/2008 07:19
To: Sabine Popp
Subject: Re: Need your advice re. Meesham

What did he say?

I have 10.30am mtg with Meesham tomorrow am before he leaves

Steve

----- Original Message -----
From: Sabine Popp
Sent: 28/04/2008 21:35
To: Steve Charlton
Subject: Re: Need your advice re. Meesham

Spoke to Amy. We'd have a very hard time to reinforce the old non-compete that he signed when he started with
Mintel. My gut says we should offer him severance and make him sign a new non-compete. That'll help us all to
sleep better. I'll speak to Jon.

Thanks again

Sabine
-----Steve Charlton/MINTEL/GB wrote: -----

To: Sabine Popp/MINTEL/GB@MINTEL
From: Steve Charlton/MINTEL/GB
Date: 04/28/2008 09:02PM
Subject: Re: Need your advice re. Meesham

Check with Amy

May need her to remind him about the non-compete, however weak it is

Did you offer the PM role or not in the end? Severance may be good idea after all
as we can tie down non compete and stop any future legal  action he might choose to
take, I'm wondering if that's why he sent the Jon message about investment to claim
unfair treatment, maybe I'm bein paranoid

Again check with Amy

Steve

MNTL 00527

MNTL 00527

```
----- Original Message -----
From: Sabine Popp
Sent: 28/04/2008 20:38
To: Steve Charlton
Subject: Need your advice re. Meesham
```

Viewed some of the emails he's been sending to his private email address. We can only monitor back since the day Jason activated the monitoring tool.

He's sent himself some odd things like the email about the changes that Jon sent to USA last week and the transcript and attendee list of the Claritas webinar. Especially the second thing is obviously proprietary.

What would you advise me to do about this?

Sabine

```
http://www.mintel.com
providing insight + impact

PS Discover and develop genuinely new ideas first with Mintel Inspire -
your global trends resource.

Preview our Trendscape and get on the fast track to productive ideation.
http://www.mintel.com/inspire/

London Office:
Mintel International Group Ltd (Mintel)
18-19 Long Lane
London
EC1A 9PL
UK

Registered in England: Number 1475918.
VAT Number: GB 232 9342 72

Tel: 020 7606 4533
Fax: 020 7606 5932


Chicago Office:
Mintel International Group Ltd (Mintel)
Floor 8
351 West Hubbard Street
Chicago
IL 60610
USA

Tel: 312 932 0400
Fax: 312 932 0469

Notice
*******
This email may contain information that is privileged,
confidential or otherwise protected from disclosure. It
must not be used by, or its contents copied or disclosed
to, persons other than the addressee. If you have received
this email in error please notify the sender immediately
```

and delete the email. Any views or opinions expressed in
this message are solely those of the author, and do not
necessarily reflect those of Mintel.

No Mintel staff are authorised to make purchases using
email or over the internet, and any contracts so performed
are invalid.

Contact: info@mintel.com

Warning
\*\*\*\*\*\*\*\*\*\*
It is the responsibility of the recipient to ensure that
the onward transmission, opening or use of this message
and any attachments will not adversely affect their systems
or data. Please carry out such virus and other checks, as
you consider appropriate.

MNTL 00529

MNTL 00529

"Redacted"

Peter Haigh

04/12/2007 20:42

To:     Steve Charlton/MINTEL/GB@MINTEL
cc:
Subject:    Re: meesham

Good luck with it.

    From: Steve Charlton
    Sent: 04/12/2007 20:10
    To: Peter Haigh
    Subject: Re: meesham

Yep will do

We also have BABC contacts

Thanks
Steve

    From: Peter Haigh
    Sent: 04/12/2007 20:08
    To: Steve Charlton
    Subject: Re: meesham

Outplacement – some one who helps him find a job say 1000 dollars. Richard had an expensive version of this

7/29/2008                                                        MNTL 00279

MNTL 00279

when he left br. Ask him about it.

> **From:** Steve Charlton
> **Sent:** 04/12/2007 18:47
> **To:** Peter Haigh
> **Subject:** Re: meesham

My fault I have said I will call tomorrow

Just tried to call you, if you have any ideas let me know? I'm going to do it gently and give him a few weeks severance but right now there don't seem to be any other options

Steve

> **From:** Peter Haigh
> **Sent:** 04/12/2007 18:07
> **To:** Steve Charlton
> **Subject:** meesham

Hi

he caught me today saying he would like a call from you to explain what's next and explore what other roles there are. he feels he is being blanked and is worrying a lot. Natural reaction. Let's speak Thursday before you speak to him

----- Forwarded by Steve Charlton/MINTEL/GB on 29/07/2008 22:15 -----

**Steve Charlton**

|  |  |  |
|---|---|---|
|  | To: | steve charlton |
| 04/01/2008 16:38 | cc: |  |
|  | Subject: | Meesham file note |

Update on my conversation today with Meesham

I informed him that the visa was B1/B2 and he would have to apply while he was still an employee to US immigration, it would then be activated instantly - but we would get Kehrela's help

I talked about the account management and trends analyst roles, both of which we mutually agreed weren't suitable

Meesh has asked for some time on Monday to speak with agency - I said of course that was fine, in fact I would offer up Kristen to assist if we find nothing internally

I checked that he was keen to remain in the US, which he is, but he said that although he loves Mintel if we can't find something he'll take the severance and the visa and look for something else

MNTL 00280

He said he appreciate the time and focus I was giving

We agreed to talk again on Tuesday at 4pm

Steve

----- Forwarded by Steve Charlton/MINTEL/GB on 04/01/2008 16:31 -----

**Steve Charlton**

|  |  |  |
|---|---|---|
|  | To: | Steve Charlton/MINTEL/GB@MINTEL |
| 04/01/2008 16:48 | cc: | |
|  | Subject: | Meesham file note |

We spoke yesterday as planned about any other roles

He was emphatic (I asked 3 times) that he didn't want the services role in Paul's team as it was too junior, even when I told him to take the compensation off the table he was still not interested, as it was a step down in his opinion

I explained that to make a move into another area or role will more often than not involve starting in a lower role, he said after 10 years with the company he would have hope we could create something for him, similar to when Ros came back (?). I said business conditions and circumstances change

I then asked him whether he had thought any more about other roles, as before Christmas all he had said was Services, he claimed he meant all of Custom Solutions and was more interested in other roles than services in that department

I said there was nothing else available, and asked what else he might be interested in, he said account management. I said I would ask Kristen, the only role possibly coming up would be in the Insurance sector which I'm assuming would require significant experience and industry knowledge.

He also mentioned Product Development, again as promised I checked with Tony and there is obviously nothing available in his team right now. Tony did mention a forthcoming trends analyst role but that is not finalized right now

Meesham then asked what my timeline was for making the role redundant, I said by the end of January

He then wanted to know more about the visa extension and severance package - I said I would need to discuss

We agreed to catch up again today

Steve

----- Forwarded by Steve Charlton/MINTEL/GB on 29/07/2008 22:15 -----

**Jon Butcher**

|  |  |  |
|---|---|---|
|  | To: | Steve Charlton/MINTEL/GB@MINTEL |
| 30/04/2008 12:34 | cc: | |
|  | Subject: | Re: Fw: Info re. Meesham |

Did Sabine tell you he has been sending things to his personal email. I think you should ask him flat out what his intentions are.

7/29/2008

MNTL 00281

MNTL 00281

From: Steve Charlton
Sent: 04/30/2008 06:32 AM
To: Jon Butcher
Subject: Re: Fw: info re. Meesham

will do

strange he hasn't asked for flight home or belongings to be shipped as we probably should honor that


**Jon Butcher**

30/04/2008 12:24

| | |
|---|---|
| To: | scharlto@mintel.com |
| cc: | |
| Subject: | Fw: info re. Meesham |


Its really only if we think he's up to something.  Perhaps you can feel him out
first?


----- Original Message -----
From: Sabine Popp
Sent: 04/29/2008 06:32 PM
To: Joyce Wilkos
Cc: Jon Butcher
Subject: info re. Meesham


Hi Joyce,

Jon and I decided to offer Meesham severance in exchange for his signature under an up-to-date non-compete
agreement. We agreed that the offer will be $2K. Steve had a meeting scheduled with him tomorrow morning
anyways so he'll make it part of his meeting to make it look as casual as possible.

Any questions please let me know.

Thanks
Sabine


----- Forwarded by Steve Charlton/MINTEL/GB on 29/07/2008 22:15 -----

**Steve Charlton**

30/04/2008 18:59

| | |
|---|---|
| To: | Jon Butcher/MINTEL/GB@MINTEL, Amy Mieding/MINTEL/GB |
| cc: | |
| Subject: | Re: Meesham - where we stand |


7/29/2008

MNTL 00282

MNTL 00282

Amy can you check the global application with the lawyers please?

We've certainly used that wording in previous severances

I'm not as concerned about the TAs, he had been transitioning out of that role over the last 6 months anyhow

Ron Tanner at Nasft will be more worried about consistency and quality of data than Meesham I suspect

So Amy once you've drafted after comments we can decide who and how to deliver?

Thanks
Steve

> From: Jon Butcher
> Sent: 30/04/2008 17:49
> To: Amy Mieding
> Cc: Steve Charlton
> Subject: Re: Meesham - where we stand

Yes, I suppose what I am most sensitive to are the contacts with trade associations.

We will need the lawyers to advise us as to how we can get global non-compete protection - whether the agreement references the UK agreement or replaces it and as such whether it is then enforceable. Because he may after all return to the UK and we need to be protected there.

**Amy Mieding**

|  |  |  |
|---|---|---|
|  | To: | Steve Charlton/MINTEL/GB@MINTEL |
| 04/30/2008 11:40 AM | cc: | Jon Butcher/MINTEL/GB@MINTEL |
|  | Subject: | Re: Meesham - where we stand Link |

He does have a week to consider signing the agreement. Were you able to give him a copy of the severance agreement? Should I get a copy to him?

Thanks! Amy

**Steve Charlton**

|  |  |  |
|---|---|---|
|  | To: | Jon Butcher/MINTEL/GB@MINTEL |
| 04/30/2008 11:33 AM | cc: | Amy Mieding/MINTEL/GB@MINTEL |
|  | Subject: | Meesham - where we stand |

I don't think he has role lined up but once he leaves there's not much we can do

MNTL 00283

MNTL 00283

Have checked and technically the last contract he signed was in the UK, which has good restrictive convenants

although our lawyer here believes as he has received pay and benefits in the US he would be considered under US law

there has been nothing signed since then, there was no relocation letter nor confirmation that we would help him get back to the UK

I say we issue US severance in return for $2K - he may sign it

he leaves in 30 minutes though

Steve

http://www.mintel.com
providing insight + impact

Chicago Office:
Mintel International Group Ltd (Mintel)
351 Hubbard Street, Floor 8
Chicago, IL 60610
USA

Tel: 312 932 0400
Fax: 312 932 0469

London Office:
Mintel International Group Ltd (Mintel)
18-19 Long Lane
London
EC1A 9PL
UK

Tel: 020 7606 4533
Fax: 020 7606 5932

Notice
********
This email may contain information that is privileged,
confidential or otherwise protected from disclosure. It
must not be used by, or its contents copied or disclosed
to, persons other than the addressee. If you have received
this email in error please notify the sender immediately
and delete the email. Any views or opinions expressed in
this message are solely those of the author, and do not
necessarily reflect those of Mintel.

No Mintel staff are authorised to make purchases using
email or over the internet, and any contracts so performed
are invalid.

7/29/2008

MNTL 00284

MNTL 00284

Warning
**********
It is the responsibility of the recipient to ensure that
the onward transmission, opening or use of this message
and any attachments will not adversely affect their systems
or data. Please carry out such virus and other checks, as
you consider appropriate.

# EXHIBIT B

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4

5     MINTEL INTERNATIONAL GROUP, )

6     LTD., a United Kingdom      )

7     Corporation,            )

8          Plaintiff,       )

9          vs.          ) No. 08 CV 3939

10    MEESHAM NEERGHEEN, an       )

11    individual,             )

12          Defendant.       )

13

14          Videotaped Deposition of PAUL PHILLIPS,

15    taken before GREG S. WEILAND, CSR, pursuant to the

16    Federal Rules of Civil Procedure for the United

17    States District Court pertaining to the taking of

18    depositions, at Suite 2900, 70 West Madison Street,

19    in the City of Chicago, Cook County, Illinois,

20    commencing at 1:07 o'clock p.m., on the 25th day of

21    August, 2008.

22

23

24

1      A.   No.

2      Q.   What did you say to him and what did he

3   say to you during this phone conversation?

4      A.   He asked me if I still saw Mr. Neergheen

5   on a social level.  I said yes.  He said, well, he

6   sent some files to himself, can you call him and

7   tell him not to use them.

8      Q.   And did you follow that instruction?

9      A.   Yes.

10      Q.   When did you contact Mr. Neergheen?

11      A.   That same day.

12      Q.   And that would have been the first week

13   after he left?

14      A.   Yes.

15      Q.   So the first week of May 2008?

16      A.   I couldn't be exact, but --

17      Q.   Around then?

18      A.   Around then, yeah.

19      Q.   And how did you contact him?

20      A.   I used my cell phone outside the office.

21      Q.   And you called him right away within --

22   during the working day also?

23      A.   Yes, that same day.

24      Q.   And which number did you call

# EXHIBIT C

1     IN THE DISTRICT COURT OF THE UNITED STATES

2       FOR THE NORTHERN DISTRICT OF ILLINOIS

3         EASTERN DIVISION

4

     MINTEL INTERNATIONAL GROUP,  )

5     LTD., a United Kingdom    )

     corporation,       )

6             )

        Plaintiff,    )

7             )

     -vs -       ) No. 08 CV 3939

8             )

     MEESHAM NEERGHEEN, an    )

9     individual      )

             )

10      Defendant.    )

11

12     The videotaped deposition of

13   MEESHAM NEERGHEEN, called for examination

14   pursuant to notice and the Rules of Civil

15   Procedure for the United States District Courts

16   pertaining to the taking of depositions, taken

17   before Allison D. Weber, CSR, a notary public

18   within and for the County of Cook and State of

19   Illinois, at 33 West Monroe Street, Suite 2700,

20   Chicago, Illinois, on the 13th day of August,

21   2008, at the hour of 9:44 o'clock a.m.

22

23

     Reported by:  Allison D. Weber, CSR

24   License No.:  084-002238

1      MR. ROACHE:  Objection, calls for

2    speculation.

3        You can answer.

4    THE WITNESS:  I can't recall at this stage.

5    It was probably because I wasn't enjoying it and

6    I didn't like it, I guess.  I wasn't showing

7    enough enthusiasm.

8    BY MR. PIOLI:

9      Q.  How did you come to get an internship

10   at Mintel?

11     A.  I went through a program.  It was a

12   program that was looking specifically after

13   people that were unemployed for six months and

14   beyond, and I went for that program, and Mintel

15   decided to take me on as a -- on a voluntary

16   basis, so I went there for three months

17   specifically just doing database work, just

18   inputting contacts into the then CRM system that

19   Mintel had.

20     Q.  You said that was for three months?

21     A.  I did that voluntarily for three months,

22   yes.

23     Q.  Were you paid for your work there?

24     A.  No.  I was compensated.  My travel was

1    A.  Did I do anything?

2    Q.  Did you stop using it?

3    A.  My laptop?

4    Q.  Yes.

5    A.  I think I may have printed out the

6    documents just so that I could have a copy,

7    because when I brought the copy that was

8    delivered by messenger into the office, I left it

9    with Richard Watkins.

10    Q.  Did you keep using your computer?

11    A.  No.  No.

12    Q.  You stopped using it entirely after --

13    A.  Well, I was checking e-mails, yes,

14    but -- I was using the internet to check e-mails

15    because we -- I was liaisoning with -- I was

16    liaisoning with my attorneys.

17    Q.  Did you delete any documents from

18    your computer from the time you received the

19    complaint until the time you turned it over to

20    counsel?

21    A.  No.

22    Q.  Aside from accessing the internet --

23    using the internet to access your e-mail, did you

24    do anything else with the computer, run any other

1      Q.  Did you want to stay at Mintel after

2    April 30th?

3      A.  I don't know.  I really don't know.

4      Q.  Well, you had already accepted the job

5    at Datamonitor; isn't that right?

6      A.  Yes.

7      Q.  Did you give Datamonitor a date when

8    you would start?

9      A.  No.

10     Q.  They didn't ask for one?

11     A.  No.

12     Q.  Were they just going to leave your

13   position open indefinitely until you decided to

14   start?

15     MR. ROACHE:  Objection, calls for

16   speculation.

17     THE WITNESS:  I don't know.  I guess it

18   was probably because I was -- they had applied

19   for a visa for me, and I had to wait upon that

20   coming through to determine the start date.

21   BY MR. PIOLI:

22     Q.  So as of late March you had accepted

23   the position at Datamonitor and they had applied

24   for a work visa for you; is that right?

1     A.   Yes.

2     Q.   And you still continued to work at

3    Mintel during that time frame; is that right?

4     A.   Yes.

5     Q.   Did you tell anyone at Mintel that you

6    had accepted a position with Datamonitor?

7     A.   No.

8     Q.   Did you think that would be something

9    they would want to know?

10    MR. ROACHE:  Objection, calls for

11   speculation.

12       You can answer.

13    THE WITNESS:  I don't know.

14   BY MR. PIOLI:

15    Q.   When did the -- when did you begin

16   work at Datamonitor?

17    A.   I believe it was May the 27th.

18    Q.   What were the terms of your employment

19   with Datamonitor -- let me clarify.

20       What was your salary?  What is your

21   salary at Datamonitor?

22    THE WITNESS:  Can I answer that?

23    MS. LERVICK:  Are you going to have a whole

24   line of questions?

1    Q.  Do you know what a defrag program

2  is?

3    A.  No.

4    Q.  Are you aware that a defrag program was

5  run on your computer on July 14th?

6    A.  I don't know.

7    Q.  Do you have any explanation as to why it

8  would have been run on your computer on

9  July 14th?

10    A.  I don't know.

11    Q.  Would it surprise you if a defrag

12  program had been run on your computer on

13  July 14th?

14    A.  I don't know what a defrag program is.

15    Q.  You're aware that an antivirus program

16  ran on your computer on July 17th?

17    A.  I don't know.

18    Q.  You're aware that that would write over

19  files?

20    A.  I don't know.

21    Q.  Are you aware of your duty to preserve

22  evidence in this case?

23    A.  I'm sorry?

24    Q.  Are you aware of your duty to preserve

1    evidence in this case?

2      A.  Can you explain that?

3      Q.  You're aware that once you had notice of

4    this lawsuit you weren't supposed to be using

5    your computer?

6      MR. ROACHE:  Object to the form.

7      THE WITNESS:  Um, I don't know.

8    BY MR. PIOLI:

9      Q.  Nobody ever informed you about a

10    duty to preserve evidence in this case?

11      A.  I don't know.

12      Q.  Isn't it true, sir, that on July 17th

13    you accessed the Microsoft help and support

14    website and entered queries about how to delete

15    data from your computer?

16      A.  Oh, I know exactly.  Yes.

17      Q.  Why did you --

18      A.  It wasn't how to delete.  I was trying

19    to look for the files that I had sent over to

20    my -- from my Mintel account, and I was trying to

21    find out how to retrieve files from my Hotmail

22    that had been deleted.

23      Q.  What searches did you enter?

24      A.  I can't remember.

1      A.  I didn't tell him anything.  I -- that's

2    when I made my own judgment and that's when I

3    deleted it.  I deleted those files.

4      Q.  Do you recall anything else being said

5    during that conversation?

6      A.  No.

7      Q.  Do you know who he said he talked to in

8    the IT department at Mintel?

9      A.  I can't remember.

10     Q.  The e-mails that you sent to yourself

11   before you left Mintel, have you shared any of

12   the information in those e-mails with anyone at

13   Datamonitor?

14     A.  No.

15     Q.  Have you shared that information with

16   anyone else?

17     A.  No.

18     Q.  Did you print out any of that

19   information?

20     A.  No.

21     Q.  Did you transfer any of that information

22   to either a flash drive or any other electronic

23   recording device?

24     A.  No.

1       Q.  If you would turn to Neergheen

2    Exhibit No. 3?

3           That's an e-mail you sent from your

4    work e-mail address at Mintel to your Hotmail

5    address on April 29th of 2008; is that correct?

6       A.  Yes.

7       Q.  It lists a number of files that were

8    attached to that e-mail.

9       A.  Yes.

10      Q.  Did you share any of the information in

11   any of those files with anyone at Datamonitor?

12      A.  No.

13      Q.  Did you share that information with

14   anyone else?

15      A.  No.

16      Q.  Did you print out any of that

17   information?

18      A.  No.

19      Q.  Did you copy any of that information on

20   to a flash drive or any other electronic

21   recording device?

22      A.  No.

23      Q.  For Exhibit No. 4 did you share any

24   information contained in Exhibit 4 with anyone

1    from Datamonitor?

2    A.  No.

3    Q.  Did you share any of the information

4    contained in Exhibit 4 with anyone else?

5    A.  No.

6    Q.  Did you print out that information?

7    A.  No.

8    Q.  Did you put that information on any

9    other form of electronic recording device?

10    A.  No.

11    Q.  Exhibit No. 5, did you share any of the

12    information contained in Exhibit No. 5 with

13    anyone from Datamonitor?

14    A.  No.

15    Q.  Did you share any of the information

16    contained in Exhibit 5 with anyone else?

17    A.  No.

18    Q.  Did you print out the information

19    contained in Exhibit No. 5?

20    A.  No.

21    Q.  Did you transfer any of the information

22    contained in Exhibit No. 5 to an electronic

23    recording device?

24    A.  No.

1      Q.   Exhibit No. 6, did you share any of the

2    information contained in Exhibit No. 6 with

3    anyone from Datamonitor?

4      A.   No.

5      Q.   Did you share any of the information

6    contained in Exhibit 6 with anyone else?

7      A.   No.

8      Q.   Did you print out the information

9    contained in Exhibit 6?

10     A.   No.

11     Q.   Did you transfer any of the information

12   contained in Exhibit 6 to an electronic recording

13   device?

14     A.   No.

15     Q.   Exhibit No. 7, did you share any of the

16   information contained in Exhibit No. 7 with

17   anyone from Datamonitor?

18     A.   No.

19     Q.   Did you share any of the information

20   contained in Exhibit No. 7 with anyone else?

21     A.   No.

22     Q.   Did you print out the information

23   contained in Exhibit No. 7?

24     A.   No.

1      Q.   Did you transfer any of the information

2      contained on Exhibit 7 to an electronic recording

3      device?

4      A.   No.

5      Q.   Exhibit No. 8, did you share any of the

6      information contained in Exhibit No. 8 with

7      anyone from Datamonitor?

8      A.   No.

9      Q.   Did you share any of the information

10     contained in Exhibit No. 8 with anyone else?

11     A.   No.

12     Q.   Did you print out the information

13     contained in Exhibit No. 8?

14     A.   No.

15     Q.   Did you transfer any of the information

16     contained in Exhibit 8 to an electronic recording

17     device?

18     A.   No.

19     Q.   Exhibit No. 9, do you share any of the

20     information contained in Exhibit 9 with anyone

21     from Datamonitor?

22     A.   No.

23     Q.   Did you share any of the information

24     contained in Exhibit 9 with anyone else?

1      A.  No.

2      Q.  Did you print out any of the information

3   from Exhibit No. 9?

4      A.  No.

5      Q.  Did you transfer any of the information

6   contained in Exhibit 9 to an electronic recording

7   device?

8      A.  No.

9      Q.  Exhibit No. 10, did you share any of the

10  information contained in Exhibit No. 10 with

11  anyone from Datamonitor?

12     A.  No.

13     Q.  Did you share any of the information

14  contained in Exhibit 10 with anyone else?

15     A.  No.

16     Q.  Did you print out any of the information

17  contained in Exhibit No. 10?

18     A.  No.

19     Q.  Did you transfer any of the information

20  contained in Exhibit No. 10 to an electronic

21  recording device?

22     A.  No.

23     Q.  Exhibit No. 11, did you share any of the

24  information contained in Exhibit No. 11 with

1    anyone from Datamonitor?

2    A.  No.

3    Q.  Did you share any of the information

4    contained in Exhibit 11 with anyone else?

5    A.  No.

6    Q.  Did you print out any of the information

7    contained in Exhibit No. 11?

8    A.  No.

9    Q.  Did you transfer any of the information

10   contained in Exhibit No. 11 with anyone else?

11   A.  No.

12   Q.  And there's an attachment to -- I'm

13   sorry, strike that.

14       There's a list called trade

15   associations that starts at MN 675 and goes

16   through MN 690.

17       Do you see that portion of that exhibit

18   I'm referring to?

19   A.  Yes.

20   Q.  And I believe you said you created this

21   list; is that correct?

22   A.  Yes.

23   Q.  Where did you obtain the information to

24   put in to this trade association list?

1      A.   Just researching Google and also

2   utilizing websites such as Hoovers and Dunn and

3   Bradstreet.

4      Q.   Based on your research of those public

5   databases is how you compiled the name of these

6   associations contained in this exhibit; is that

7   correct?

8      A.   Yes.

9      Q.   If you would turn to Neergheen Exhibit

10   No. 12, did you share any of the information

11   contained in Exhibit No. 12 with anyone from

12   Datamonitor?

13      A.   No.

14      Q.   Did you share the information contained

15   in Exhibit 12 with anyone else?

16      A.   No.

17      Q.   Did you print out a copy of the

18   information contained in Exhibit No. 12?

19      A.   No.

20      Q.   Did you transfer any of the information

21   contained in Exhibit No. 12 to an electronic

22   recording device?

23      A.   No.

24      Q.   Exhibit No. 13, did you share any of

1    the information contained in Exhibit No. 13 with

2    anyone from Datamonitor?

3       A.   No.

4       Q.   Did you share any of the information

5    contained in Exhibit 13 with anyone else?

6       A.   No.

7       Q.   Did you print out any of the information

8    contained in Exhibit No. 13?

9       A.   No.

10      Q.   Did you transfer any of the information

11   contained in Exhibit 13 to an electronic

12   recording device?

13      A.   No.

14      Q.   Exhibit No. 14, did you share any of the

15   information contained in Exhibit No. 14 with

16   anyone from Datamonitor?

17      A.   No.

18      Q.   Did you share any of the information

19   contained in Exhibit No. 14 with anyone else?

20      A.   No.

21      Q.   Did you print out any of the information

22   contained in Exhibit No. 14?

23      A.   No.

24      Q.   Did you transfer any of the information

# EXHIBIT D

JUL-21-2008  16:33    JOHNSON AND BELL                                    17039    P.03/06

SAO88 (Rev. 12/05) Subpoena in a Civil Case

## Issued by the
## UNITED STATES DISTRICT COURT

| NORTHERN | DISTRICT OF | ILLINOIS |

MINTEL INTERNATIONAL GROUP, LTD

V.

**SUBPOENA IN A CIVIL CASE**

MEESHAM NEERGHEEN

Case Number:[1]  08 CV 3939

TO:  Richard Watkins
     Datamonitor
     200 West Monroe Street
     Chicago, IL  60606

[ ]  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below m testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| | |
| | DATE AND TIME |

[ ]  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |

[☑]  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects)

SEE ATTACHED RIDER

| PLACE  Katherine J.Pronk, JOHNSON & BELL, LTD. 33 W. Monroe St., Suite 2700, Chicago, IL 60603 | DATE AND TIME 7/23/2008 5:00 pm |

[ ]  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) (by:KJP) | DATE 7/21/08 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Joseph R. Marconi, JOHNSON & BELL, LTD.
33 W. Monroe St., Suite 2700, Chicago, IL 60603            312/984-0211

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1]  If action is pending in district other than district of issuance, state district under case number.

## RIDER

Plaintiff Mintel International Group, Ltd. ("Mintel"), pursuant to Federal Rule of Civil Procedure 45, hereby requests that Datamonitor produce the following documents in its possession, custody or control, in accordance with the terms of the attached subpoena.

### Definitions and Instructions

1.    As used herein, "document" means any writing, graphic matter or other tangible thing, whether printed, electronically stored, recorded, produced by any process, or written or produced by hand, including, but not limited to checks, drawings, invoices, letters, reports, other written communications, correspondence, e mails, telegrams, internal and external memoranda, summaries, records or oral conversations, original or preliminary notes, diaries, calendars, analyses, projections, ledgers, work papers, photographs, tape recordings, video tapes, computer hard drivers or disks, statistical statements, logs, graphs, charts, schedules, notebooks, minutes or records of meetings, minutes or records of conferences, lists of persons attending meetings or conferences, reports and/or summaries of investigations, opinions or reports of investigators, accountants or consultants, studies, appraisals, evaluations, or copies of any of the foregoing if the copy is in any way different from the original now in your possession, custody or control, or the possession, custody or control of your counsel, evaluation consultants, agents, employees and/or persons acting on your behalf.

2.    If information or a document is withheld for any reason, identify the information or document and the reason for withholding the responsive information or document as follows:

   (a)    The reason for withholding the document, including an explanation of any privilege which is claimed;

   (b)    The date(s) of the document(s);

   (c)    The name and address of the author(s) of the document(s);

   (d)    The name and address of each person to whom a copy of the document(s) was sent and each person known to have seen or participated in communication about the document(s);

   (e)    The title, nature and subject matter of the information or document(s);

   (f)    The name, address and job title of each person who has possession, custody or control of such information or document(s);

1

      (g)     The present or last known location and custodian of the document(s); and

      (h)     All other information necessary to assess a claim of privilege.

3.    In construing these requests:

      (a)     The singular form of a word includes the plural form and vice versa; and

      (b)     "And" and "or" are to be construed either disjunctively or conjunctively as is necessary to bring within the scope of each request any matter, information or document that might otherwise be construed as outside its scope.

    4.    As used herein, "Datamonitor" shall include all employees, directors, officers, agents, and individuals subject to Datamonitor's direction and control.  In addition, "Datamonitor" shall include all parents companies, affiliates and subsidiaries.

## Documents and Objects

    1.    Produce all documents representing, containing, reflecting or referencing any oral or written communications and/or correspondence between Datamonitor and Meesham Neergheen.

    2.    Produce all documents representing, containing, reflecting or referencing Meesham Neergheen's interview(s) with Datamonitor prior to Datamonitor's offer of employment.

    3.    Produce Meesham Neergheen's entire personnel file.

    4.    Produce any and all documents within Datamonitor's possession pertaining or relating to or otherwise referencing in any manner Meesham Neergheen.

    5.    Produce all documents, including correspondence, that refer to, relate to or otherwise constitute Meesham Neergheen's authorization to work in the United States of America.

    6.    Produce all documents, including correspondence, that refer to Meesham Neergheen's status as an immigrant in the United State of America.

    7.    Produce all documents, including correspondence, that refer to, relate to or constitute the means of Meesham Neergheen's entry into the United States of America.

    8.    Permit the forensic imaging and/or copying of all of Datamonitor's desktop and/or laptop computers used at any time by Meesham Neergheen.

2

9.    Permit the forensic imaging and/or copying of Meesham Neergheen's electronic mail account at Datamonitor.

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| MINTEL INTERNATIONAL GROUP, LTD., a United Kingdom corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 08-cv-3939 |
| v. | ) ) | Hon. Robert M. Dow, Jr. |
| MEESHAM NEERGHEEN, an individual, | ) ) ) | |
| Defendant. | ) ) ) | |

## THIRD-PARTY DATAMONITOR'S
## OBJECTIONS TO SUBPOENA FOR TESTIMONY

Pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, third-party Datamonitor ("Datamonitor") hereby responds and objects to Plaintiff Mintel International Group, Ltd.'s ("Mintel") July 21, 2008 Subpoena for Documents to Datamonitor ("Subpoena").

### PRELIMINARY STATEMENT

The Subpoena is improper to the extent it seeks documents that are subject to attorney-client and/or work product privileges. As a third-party, Datamonitor has not yet completed its investigation of the facts pertaining to this action. All objections and responses are based on information presently known to Datamonitor after a reasonable effort to investigate. Accordingly, Datamonitor's objections and responses as set forth herein are made without prejudice to Datamonitor's right to assert any additional or supplemental objections and responses should Datamonitor discover additional grounds for such objections and responses. Datamonitor expressly reserves the right to supplement its objections and responses.

Datamonitor makes the objections and responses set forth below without, in any manner, waiving: (1) the right to object to the use of any response for any purpose in this action or any other actions on grounds of privilege, relevancy, materiality, or any other appropriate basis; (2) the right to object to any other requests involving or relating to the subject matter of the responses herein; and (3) the right to revise, correct, supplement, or clarify any of the responses provided below at any time.

## GENERAL OBJECTIONS

1. Datamonitor objects to the Subpoena to the extent it seeks documents and things that are already in the possession of Mintel or that could more easily be obtained from other sources.

2. Datamonitor objects to the Subpoena's requests, definitions and categories to the extent they seek or call for production of documents and things that are not in Datamonitor's possession, custody or control.

3. Datamonitor objects to the Subpoena to the extent it calls upon Datamonitor to investigate, collect and produce documents and things that are neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

4. Datamonitor objects to the Subpoena's definitions, requests and categories to the extent it places a greater burden upon Datamonitor than that required by the Federal Rules of Civil Procedure.

5. Datamonitor further objects to the Subpoena to the extent it seeks documents and information that are confidential and proprietary and/or subject to a confidentiality agreement or protective order.

6.    Datamonitor objects to the Subpoena to the extent it calls for production of documents and things subject to the attorney-client and/or work product privileges and/or any other applicable privilege or immunity. In the event that privileged information is inadvertently produced by Datamonitor, such production shall not constitute a waiver of any applicable privilege.

7.    Datamonitor objects to the Subpoena to as failing to comply with Rule 45 of the Federal Rules of Civil Procedure.

8.    Datamonitor incorporates these general objections into each and every one of its responses and objections as if the general objections were fully stated therein. A specific response or objection may repeat a general objection for emphasis. The failure to include any general objection in any specific response does not waive any general objection to that request.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.    Datamonitor objects to the instruction that any document withheld for any reason should be identified as unduly burdensome. The instruction encompasses all non-relevant and non-responsive documents and places a greater burden upon third-party Datamonitor than provided b the Federal Rules.

2.    Datamonitor objects to the definition of "Document" on the grounds that it is overbroad, unduly burdensome, and oppressive to the extent it places upon Datamonitor a greater burden than the Federal Rules of Civil Procedure require. Datamonitor further objects to the definition of "Document" as calling for information subject to privilege and/or immunity to the extent it includes drafts.

3.    Datamonitor incorporates these objections into each and every one of the responses to the Subpoenas as if these objections were fully stated therein.

## SPECIFIC OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS

Subject to and without waiving any of the objections stated above, Datamonitor responds to the specific Document Requests as follows:

**Document Request No. 1:** Produce all documents representing, containing, reflecting or referencing any oral or written communications and/or correspondence between Datamonitor and Meesham Neergheen.

**Response:**    In addition to the objections noted above, Datamonitor objects to the Request as overbroad, vague and ambiguous, unduly burdensome, not relevant to the action and not reasonably calculated to lead to the discovery of admissible evidence. Datamonitor further objects to the Request as calling for the production of documents and testimony subject to the attorney-client and/or work product privileges. Datamonitor objects to the Request to the extent any responsive information, including documents, is already in Mintel's possession. Subject to and without waiving its General and Specific objections, Datamonitor has produced and/or will produce non-privileged responsive documents, if any, reflecting or relating to communications between Datamonitor and Meesham Neergheen regarding the hiring of Mr. Neergheen and/or Mr. Neergheen's former employment by Mintel.

**Document Request No. 2:** Produce all documents representing, containing, reflecting or referencing Meesham Neergheen's interview(s) with Datamonitor prior to Datamonitor's offer of employment.

**Response:**    In addition to the objections noted above, Datamonitor objects to the Request as overbroad, unduly burdensome, and to the extent any responsive information, including documents, is already in Mintel's possession. Subject to and without waiving its

4

General and Specific objections, Datamonitor has produced and/or will produce non-privileged, responsive documents, if any.

**Document Request No. 3:** Produce Meesham Neergheen's entire personnel file.

**Response:** In addition to the objections noted above, Datamonitor objects to the Request as overbroad, vague and ambiguous, and unduly burdensome. Datamonitor further objects to the Request as not reasonably calculated to lead to the discovery of admissible evidence. Datamonitor objects to the Request to the extent any responsive information is already in Mintel's possession and to the extent the Request is duplicative of additional requests herein.

**Document Request No. 4:** Produce any and all documents within Datamonitor's possession pertaining or relating to or otherwise referencing in any manner Meesham Neergheen.

**Response:** In addition to the objections noted above, Datamonitor objects to the Request as overbroad, vague and ambiguous, and unduly burdensome. Datamonitor further objects to the Request as not reasonably calculated to lead to the discovery of admissible evidence. Datamonitor objects to the Request as calling for the production of documents and testimony subject to the attorney-client and/or work product privileges, as well as to the extent any responsive information is already in Mintel's possession and to the extent the Request is duplicative of additional requests herein. Subject to and without waiving its General and Specific objections, Datamonitor will produce non-privileged responsive documents, if any, reflecting or relating to communications between Datamonitor and Meesham Neergheen regarding the hiring of Mr. Neergheen and/or Mr. Neergheen's former employment by Mintel.

**Document Request No. 5:** Produce all documents, including correspondence, that refer to, relate to or otherwise constitute Meesham Neergheen's authorization to work in the United States of America.

**Response:**    In addition to the objections noted above, Datamonitor objects to the Request as overbroad, vague and ambiguous, unduly burdensome, and as not relevant to the action and not reasonably calculated to lead to the discovery of admissible evidence.

**Document Request No. 6:** Produce all documents, including correspondence, that refer to Meesham Neergheen's status as an immigrant in the United States of America.

**Response:**    In addition to the objections noted above, Datamonitor objects to the Request as overbroad, vague and ambiguous, unduly burdensome, and as not relevant to the action and not reasonably calculated to lead to the discovery of admissible evidence.

**Document Request No. 7:** Produce all documents, including correspondence, that refer to, relate to or constitute the means of Meesham Neergheen's entry into the United States of America.

**Response:**    In addition to the objections noted above, Datamonitor objects to the Request as overbroad, vague and ambiguous, unduly burdensome, and as not relevant to the action and not reasonably calculated to lead to the discovery of admissible evidence.

**Document Request No. 8:**    Permit the forensic imaging and/or copying of all of Datamonitor's desktop and/or laptop computers used at any time by Meesham Neergheen.

**Response:**    In addition to the objections noted above, Datamonitor objects to the Request as overbroad, vague and ambiguous, unduly burdensome, not relevant to the action and not reasonably calculated to lead to the discovery of admissible evidence. Datamonitor further objects to the Request as calling for the production of documents and testimony subject to the

attorney-client and/or work product privileges.  Additionally, Datamonitor objects to the Request as exceeding the scope of Rule 45 of the Federal Rules of Civil Procedure and therefore improper under the Rules.

**Document Request No. 9:**  Permit the forensic imaging and/or copying of Meesham Neergheen's electronic mail account at Datamonitor.

**Response:**    In addition to the objections noted above, Datamonitor objects to the Request as overbroad, vague and ambiguous, unduly burdensome, not relevant to the action and not reasonably calculated to lead to the discovery of admissible evidence.  Datamonitor further objects to the Request as calling for the production of documents and testimony subject to the attorney-client and/or work product privileges.  Additionally, Datamonitor objects to the Request as exceeding the scope of Rule 45 of the Federal Rules of Civil Procedure and therefore improper under the Rules.

Dated: August 4, 2008

Respectfully submitted,

By: _____

John T. Roache
Jeana R. Lervick
Joel C. Griswold
BELL, BOYD & LLOYD LLP
70 West Madison Street
Suite 3100
Chicago, Illinois 60602
312.372.1121
312.827.8000 (facsimile)

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that a true and correct copy of **Third-Party Datamonitor's Objections to Subpoena for Documents** has been served this 4th day of August, 2008 via U.S. mail, courtesy copy via e-mail, to:

> Joseph Marconi
> Victor Pioli
> Katherine J. Pronk
> JOHNSON & BELL, LTD.
> 33 West Monroe Street
> Suite 2700
> Chicago, Illinois 60603

> Jeana R. Lervick
> BELL, BOYD & LLOYD LLP
> 70 West Madison Street
> Suite 3100
> Chicago, IL 60602
> (312) 807-4339
> (312) 827-1266 (facsimile)

# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MINTEL INTERNATIONAL GROUP, LTD., a United Kingdom corporation, | ) ) ) ) | |
| Plaintiff/Counter-Defendant, | ) ) | Case No. 08-cv-3939 Judge Robert Dow, Jr. |
| v. | ) | Magistrate Judge Maria Valdez |
| MEESHAM NEERGHEEN, an individual | ) ) | |
| Defendant/Counter-Plaintiff. | ) ) | |
| _____ | ) | |

## <u>DECLARATION OF ANDREW REISMAN</u>

I, Andrew Reisman, swear as follows:

1.      I am over the age of eighteen, have personal knowledge of the facts described in this declaration, and if called as a witness would testify to the same.

2.      As more fully set forth herein, I have reviewed the Affidavit of Scott R. Jones (the "Jones Affidavit") as well as the hard drive Mr. Jones identified as "Item 004," and in my opinion the Affidavit suffers from numerous defects that call into question virtually every conclusion reached therein.  The Jones Affidavit reaches erroneous conclusions regarding alleged spoliation of evidence that in some instances are contradicted by the very facts the Affidavit cites, makes sweeping claims about matters beyond the scope of the available data, draws legal conclusions beyond the purview of a forensic examiner, and fails in any fashion to connect the activity cited to loss of any potentially relevant data.  These inaccuracies, omissions

and overreaching, although presumably not a deliberate effort to mislead the Court, nevertheless culminate in conclusions that are divorced from the forensic evidence available for examination.

3.      I am the President of Elijah Technologies, a company specializing in computer forensic investigations, electronic discovery and litigation support.  I am based out of Elijah Technologies' Chicago headquarters, and my company also has offices nationally.  Prior to founding Elijah Technologies in 2003, I was a partner practicing in litigation and technology law at Foley & Lardner in Chicago.

4.      I am an expert in the fields of computer forensics and electronic discovery.  As president of Elijah Technologies, I have supervised the harvesting and production of electronic discovery databases in well over 100 engagements, and routinely provide consulting services relating to electronic discovery production and data retention issues.  I also have had primary responsibility for well over 100 computer forensic engagements involving well over 1000 computers and other forms of electronic media.  I have earned certifications in the field including as an EnCase Certified Examiner (EnCE), and have been qualified as an expert in computer forensics and electronic discovery in Illinois, Florida and Michigan courts.  I have served on the Board of Directors of the International Information Systems Forensics Association and have lectured on computer forensics at accredited CLE programs and as a guest speaker at Northwestern University, Illinois State University and the DePaul University School of Law. My CV is attached as Exhibit A.


**The Jones Affidavit's Conclusions Regarding File Entry Activity After July 11, 2008 And Destruction Of Evidence Are Based On Legal Argument And Incomplete Forensic Evidence (Jones Aff. ¶¶ 7-11)**

5.      The Jones Affidavit posits that because Mr. Neergheen was served with notice of this litigation on July 11, 2008, he had a legal duty to immediately cease using the Item 004

2

computer because any activity thereon could change or overwrite data that theoretically could be relevant to the litigation. In fact, a significant portion of the Jones Affidavit is premised on a failure to adhere to that supposed legal duty.

6.      The function of a computer forensic examiner is not to opine on what legal duties the parties to litigation have, but rather to examine and explain computerized data and describe how computers function in order to assist the finder of fact. Whether Mr. Neergheen legally was required to immediately cease using his computer is a determination more appropriately evaluated by the Court.

7.      As pointed out in the Jones Affidavit, normal computer usage, even leaving a computer on without actively using it, potentially can result in the changing or overwriting of data on a computer. Although I express no opinion regarding what the legal standard for preservation is or should be, if all litigants were held to the legal standard the Jones Affidavit posits – that "the computer [should have been] turned off and left alone starting on July 11, 2008 … following receipt of notice of active litigation" – many companies with regular litigation likely would find challenging meeting that requirement while still performing their normal business functions. I also am interested to learn whether Mintel immediately ceased using all of its computers on which potentially relevant data resides.

8.      Additionally, this and the other sections of the Jones Affidavit fail to make the critical distinction between data and evidence. It is undisputed that routine computer usage changes data, but whether such data is potentially relevant to particular litigation – i.e. constitutes evidence – requires a higher level of computer forensic analysis.

9.      Here, the Jones Affidavit does not reference a single file or data artifact that he attempts to show evidences transmission of Mintel trade secrets. Nor does the Jones Affidavit,

which points to updating of file Last Accessed dates as evidence spoliation, attempt to show that any of the updated files contains relevant evidence for which it would have been important to know when such files previously had been accessed. Rather, the only evidence that the Jones Affidavit presents directly relating to alleged Mintel trade secrets are Mr. Neergheen's own statements in that regard.

10. Accordingly, although certainly routine usage of Item 004 affected data contained on the drive, the assertion of the Jones Affidavit that such usage constitutes spoliation of evidence is unsupported by the forensic evidence presented therein.

11. The Jones Affidavit also points out that over 3900 file entries were created on or after July 13, 2008, but does not make any effort to describe the character of those files or their relative impact on the drive. This data was readily available for review by Mr. Jones, and in fact is incorporated into his "Item 004_AllFilesPresent" reports.

12. I have reviewed those files and found that nearly 3800 of them were associated with Internet browsing activity, such as temporary picture files and cookies. This is inconsistent with a deliberate attempt to overwrite the drive's unallocated space, and would have occurred without the user knowing those files were being written to the drive. Collectively the new data represented only approximately 223 megabytes of data, a small fraction of the amount of free space on the drive. Had Mr. Neergheen wanted to overwrite the unallocated space on the drive, he easily could have downloaded a few movies or other large files to the drive on or after July 11, 2008, but he did not do so. Rather, the available evidence is fully consistent with routine computer usage and not deliberate destruction of data.

**The Jones Affidavit's Assertions Regarding Mr. Neergheen's Level of Computer Expertise Is Premised On Erroneous Assumptions (Jones Aff. ¶ 12)**

13.    Mr. Jones posits in his affidavit that he is "disinclined to accept at face value Mr. Neergheen's deposition testimony that he is '…not a computer savvy person.'" (Jones Aff., ¶ 12) Mr. Jones bases this conclusion in part on the erroneous assumption that data not generally accessible to a novice computer user was deleted from Item 004 after July 11, 2008 at 6:00 p.m.

14.    As discussed in more detail below, I have reviewed the files deleted after July 11, 2008 at 6:00 p.m., and the vast majority of those deleted files appear to be the result of Internet browsing activity. It takes little computer skill to delete such files, as that is an easily accessible option within Internet Explorer. Additionally, as also set forth in more detail below, for every one of the supposedly "deleted" registry entries the Jones Affidavit cites as evidence of Mr. Neergheen's computer savvy, there is an active (i.e. not deleted) entry in the same location of the registry. The Jones Affidavit posits no explanation for why Mr. Neergheen would delete certain registry entries and leave identical active registry entries, and in fact did not even point out that such identical active registry entries were present.

**The Evidence Is Inconsistent With The Jones Affidavit's Assertion That An Antivirus Scan Obscured Date And Time Metadata On Or After July 17, 2008 (Jones Aff. ¶¶ 13-15)**

15.    The Jones Affidavit asserts that on July 17 and July 18 there was file activity on Item 004 associated with McAfee antivirus software and asserted that "this further destroys evidence related to dates and times which would exist if not for the usage of antivirus software within Item 004." (Jones Aff. ¶ 13) This statement suffers from one particularly significant

defect – the fact that there is no evidence in Item 004 that the McAfee virus scan caused mass updating of last access dates that changed pertinent metadata.

16.    Mr. Jones observed that a file associated with McAfee antivirus software was executed on July 17, stated that running an antivirus program can update Last Accessed dates for files, and concluded that there was "Use of Antivirus Software to Obscure Date and Time Metadata" and that Mr. Neergheen "failed to stop automated system utilities from running that would destroy and/or alter evidence …."  (Jones Aff. ¶¶ 13, 15)  Mr. Jones apparently did not examine the underlying file metadata or test the McAfee antivirus software before making that claim, however, because the McAfee virus scan software in fact did not and does not alter the file metadata of the files being scanned.

17.    If Mr. Jones had analyzed the Last Accessed dates of files in Item 004, he would have seen that no mass updating of last access dates occurred on or after July 17, 2008.  Of the nearly 95,000 files and folders in Item 004, less than 1200 were accessed on or after the activity the Jones Affidavit cites, and the majority of that activity related to new files created from Internet browsing activity rather than existing files having been newly accessed.  This evidence is readily available from the "Item 004_AllFilesPresent" reports that Mr. Jones prepared and provided to the parties, and is inconsistent with his statement that the virus scan destroyed evidence by causing last access dates to update *en masse*.

18.    Additionally, if Mr. Jones had tested the McAfee antivirus software on his own computer, he would have been able to confirm as I did upon testing that the McAfee antivirus software scan does not in fact update last access dates (or upon scanning immediately resets them to their previous state).  The only files that would have their last access dates updated are

the few files associated with the McAfee program itself, such as the files identified in Table One of the Jones Affidavit, rather than substantive documents.

19.     Moreover, even if a virus scan had been run and certain last access dates had been updated, the Jones Affidavit makes no effort to tie any such updated last access dates to documents containing alleged Mintel trade secrets.  Apparently Mr. Jones could identify no potentially relevant files that were last accessed on or after July 17, 2008, as none are listed in his affidavit.  Accordingly, there was no factual basis for the assertion in the Jones Affidavit that antivirus software was used to obscure date and time metadata and to destroy evidence.

### The Jones Affidavit's Section Regarding "Spoliation Noted Within Item 004 Internet History" Does Not Establish Spoliation Of Evidence (Jones Aff. ¶¶ 16-24)

20.     The section of the Jones Affidavit entitled "Spoliation Noted Within Item 004 Internet History" establishes what Mr. Neergheen already has admitted – that he ran a search in Microsoft's online support site for "how do i access deleted" files.  (Jones Aff. ¶ 20)  Mr. Jones testified that in preparing his Affidavit he performed the same search on his computer, found a number of different help articles, and concluded that Mr. Neergheen must have read one of the help files regarding how to delete certain information and subsequently made such deletions.

21.     This leap in logic is not supported by the available forensic evidence.  If just one day before Item 004 was forensically imaged Mr. Neergheen had accessed help files detailing how to delete registry data, evidence of viewing such help files likely would be present on the drive.  The Jones Affidavit presents no such forensic evidence.  Instead, the Jones Affidavit ignores the nature of the search – how to access deleted files, not how to delete files – and cherry picks from the associated hits in the Microsoft Knowledge Base the article title that most

supports his client's motion and posits that Mr. Neergheen reviewed that article.  That is advocacy, not forensic analysis.

**The Jones Affidavit's Allegations Regarding Missing Internet History Data Are Erroneous (Jones Aff. ¶¶ 25-28)**

22.    The Jones Affidavit contends that Mr. Neergheen must have deleted Internet history because there are gaps in the MSHist daily and weekly entries.  Those allegations are based on a fundamental misunderstanding of how the MSHist file entries function.

23.    The Jones Affidavit leaves the incorrect impression that an MSHist file entry is created for every day that a person uses the Internet.  That simply is incorrect.  Rather, MSHist entries are created based on the settings in Internet Explorer for the number of days the user wishes to store Internet history.  If the number is set to 20 (the maximum number), there would be 20 MSHist entries.  If the number is set to zero, there would be none.  Here, there were 11 MSHist entries associated with Mr. Neergheen's user profile.  The fact that there was not an MSHist entry for every day during which Mr. Neergheen used the Internet is normal, rather than evidence of deletion activity.

24.    To test this, I used EnCase to preview the MSHist entries on my own computer.  I have used my computer on a regular basis during the course of the past year, and routinely access the Internet.  The following is a screenshot showing all MSHist entries on my computer:



25.     This screenshot shows a total of eight MSHist entries on my computer.  Five of those entries are from August 2006, one is from July 2007, and two are from August 2008. According to the logic of the Jones Affidavit, these pronounced gaps are the result of a clever attempt to destroy Internet history.  I have never taken any steps to delete MSHist files on my computer, have used the Internet regularly on the computer, and the "gaps" are still present.  This is further proof that the gaps are an artifact of how the software operates, not the product of a sophisticated attempt by Mr. Neergheen to delete Internet history.

26.     Moreover, even if Mr. Neergheen had deleted all MSHist entries (which he did not), those entries do not contain detailed artifacts of which web sites have been visited and when and accordingly are not the best source for analyzing Internet activity.  Rather, the index.dat files contain such data, and my analysis of those files reveals fairly consistent use of the Internet during the period of time during which Mr. Jones claims gaps exist.  In fact, Mr. Jones prepared Internet History reports which he provided to both parties, which reports detail thousands of entries showing dates, times, and web addresses of sites visited on Item 004 during the period of time during which the Jones Affidavit claims gaps exist.  Mr. Jones' claim that "[t]he daily information appears to have been selectively deleted while the weekly information

prior to June 23, 2008 was deleted *en masse*" has absolutely no basis in forensic evidence, and ignores the very evidence presented in his own reports to the contrary.

### The Jones Affidavit's Assertions Regarding Spoliation Within The Registry Reported By The USBSTOR Report Are Inaccurate, As Active Registry Data Is Present For All Listed USB Devices (Jones Aff. ¶¶ 29-39)

27.     The Jones Affidavit asserts that Mr. Neergheen targeted a specific portion of the Windows registry for deletion that contained data regarding which USB devices had been inserted into Item 004, but this simply is inaccurate.  For every one of the USB entries listed in Table Five of the Jones Affidavit as "deleted" there also exists a corresponding entry with the same date, time and device that is an active, non-deleted entry.

28.     As proof of that, I reviewed the Item004_USBSTOR report Mr. Jones created, and confirmed that ID#1 is an identical active registry entry corresponding to ID#2 in Table Five, ID#15 is active and corresponds to ID#11, ID#22 is active and corresponds to ID#21, ID#30 is active and corresponds to ID#29, and ID#65 is active and corresponds to ID#63.

29.     Accordingly, all of the supposedly "deleted" registry entries have equivalent identical active entries in the registry.  The assertion of the Jones Affidavit that this data was spoiled in some fashion is patently erroneous, and other conclusions that Mr. Jones draws from this alleged deletion activity, such as Mr. Neergheen's level of computer savvy, are also called into question.

30.     Moreover, even if identical active entries did not exist, the Jones Affidavit establishes that there was no spoliation of evidence.  All of the registry entries to which Mr. Jones cites were fully viewable using his forensic software, and he was able to identify the

specific USB devices in question and dates of insertion.  Mr. Jones does not explain how the registry data was spoiled given that he could fully view and analyze it.

**The Fact That Link Files Show Access Of Certain Data Adds Nothing Meaningful For Review By The Finder Of Fact (Jones Aff. ¶¶ 40-43)**

31.     The Jones Affidavit cites to link files as evidence that Mr. Neergheen used USB storage devices and accessed files on the Internet, which Mr. Neergheen freely has admitted. Nothing in the Jones Affidavit, however, establishes that the link files relate to alleged Mintel trade secrets.

32.     The link files the Jones Affidavit cites provide the names of the files accessed.  If Mintel recognized those names as containing its trade secrets, presumably it would have brought that to the Court's attention.  I am not aware of Mintel having done so, and it was not done in the Jones Affidavit.

**The Jones Affidavit Erroneously Claims That There Was Spoliation Within The Item 004 Windows Prefetch File Entries (Jones Aff. ¶¶ 44-51)**

33.     The Jones Affidavit asserts that on July 14, 2008 the Item 004 hard drive was defragmented using the Windows defragmentation utility, and that he "found no indication that defrag was run as part of an automated system process, which suggests that someone ran this utility deliberately on July 14, 2008."  (Jones Aff. ¶ 48)  To the contrary, however, the evidence is clear that defrag was run on that date as an automated system process rather than the deliberate act of Mr. Neergheen, and the very proof of that fact is contained in the Table 7 of the Jones Affidavit two pages later.

34.     On a computer running Windows XP and formatted with the NTFS file system, as was Item 004, two files are primarily associated with file defragmentation: dfrgntfs.exe and

defrag.exe.  By default, when Windows XP enters an idle state for a pre-set period of time it will launch the dfrgntfs.exe and defrag.exe files, which begins the automated process of defragmenting the hard drive in order to improve system performance.  When this process is done on an automated basis by the Windows XP operating system, the associated files in the Prefetch directory would have identical Last Written dates and times.

35.     When defragmentation is initiated by a user, as opposed to the automated process initiated by Windows XP, the file in the Prefetch directory associated with dfrgntfs.exe would have a later Last Written date than the file in that directory associated with defrag.exe.  That is because a user directed defragmentation is initiated through the dfrgntfs.exe file alone and does not update the Prefetch file associated with defrag.exe, whereas the automated defragmentation process accesses both files and updates both associated entries in the Prefetch directory.

36.     To test and demonstrate this, on the morning of August 27, 2008 I initiated a defrag process on my home computer.  Using forensic software I then examined the dates and times of the defrag.exe and dfrgntfs.exe entries in the Prefetch directory and confirmed that the dfrgntfs.exe entry was more recent than the defrag.exe entry as shown below:



37.     This screenshot confirms that a deliberate, user initiated defragmentation would result in the dfrgntfs.exe file in the Prefetch directory having a later last access than the associated defrag.exe file, whereas in the case of Item 004, the time entries were the same, proving that the defragmentation was the result of an automated system process.  I can also confirm that it was months before that I previously deliberately had initiated a defrag process on

my personal computer, whereas the last access date for the defrag.exe file in the Prefetch directory showed that defrag had been run on 8/26/2008 at 12:59 a.m. – further demonstrating that Windows XP by default initiates defragmentation processes when the system is idle for a pre-set period of time.

38.    Here, the evidence in Item 004, and set forth in Table 7 of the Jones Affidavit, clearly shows that both files in the Prefetch directory (here DEFRAG.EXE-273F131E.pf and DFRGNTFS.EXE-269967DF.pf) have identical dates and times, July 14, 2008 at 6:39:05 p.m. This establishes that the file defragmentation of that date was the result of an automated process common to the millions of computers configured similarly to Item 004, and does not evidence a deliberate attempt by Mr. Neergheen to defragment his hard drive as suggested by the Jones Affidavit.

39.    The functions of the defrag.exe and dfrgntfs.exe files and their associated Prefetch directory entries, and how to interpret them in determining whether defragmentation was deliberate versus an automated system function, are well known to experienced computer forensic investigators and the analysis I have performed in that regard is widely accepted in the field as a method for making such a determination.

40.    In addition to his opinions relating to defragmentation, Mr. Jones opines that "other prefetch file entries report creation and/or being last written on July 17, 2008 … [which] necessarily overwrites previously unallocated space which contained evidence."  (Jones Aff. ¶ 49)  This statement is inaccurate on multiple levels.

41.    *First*, updating of existing prefetch file entries would merely change dates associated with those file entries, and would have absolutely no effect on the unallocated space of the drive.  Every one of the prefetch file entries in Table Seven of the Jones Affidavit

constituted updating of an existing entry, and would have had no impact on the drive's unallocated space.

42.    *Second*, I reviewed the Item004_AllFilesPresent report Mr. Jones prepared, and confirmed that only three new prefetch entries were created on or after July 11, 2008, comprising only 51 kilobytes of data. The creation of those 51 new kilobytes of data – the size of a small word processing document – had a negligible impact relative to the amount of data in the unallocated space. It would have taken approximately 150,000 such new file entries to overwrite the Item 004 unallocated space, not the three entries that actually were new. Again, this information was readily available in the reports Mr. Jones prepared for the parties.

43.    *Third*, it is a substantial leap in logic that the tiny amount of data written to the drive actually overwrote evidence. A forensic examiner could attempt to prove evidence was lost by looking at the slack space of those files – residue from data previously occupying the same drive space – and showing that it contained a fragment of relevant evidence of which the new file overwrote surrounding data. Mr. Jones did not present such evidence, presumably because there was no evidence that the new files overwrote a portion of any relevant evidence.

**The Jones Affidavit's Conclusions Are Based On Flawed Premises And Are Accordingly Unreliable (Jones Aff. ¶¶ 52-58)**

44.    The Jones Affidavit draws numerous conclusions about Mr. Neergheen's intentions, but those conclusions are based on the erroneous premises Mr. Jones reached as demonstrated above. Moreover, Mr. Jones' supposition that Mr. Neergheen intended to hide data, copied the data to USB devices that Mr. Jones has not yet examined, moved the data to other locations that he also has not yet examined, and that the data he has not examined actually

contained Mintel trade secrets (Jones Aff. ¶¶ 39, 53-54), collectively are well beyond the range of what Mr. Jones has data to support.  These conclusions are advocacy, not forensic analysis.

45.    In my opinion the forensic evidence presented in the Jones Affidavit does not support his conclusions that Mr. Neergheen deliberately destroyed data or that any relevant evidence was lost.


I declare, pursuant to 28 U.S.C. 1746 and under penalty of perjury that the foregoing is true and correct.

Executed on August 29, 2008

_____
Andrew Reisman

15

# Andrew Reisman, EnCE CFE JD

Andrew Reisman

Elijah Technologies, Ltd.
866-354-5240 x101
andy@elijahtechnologies.com
www.elijahtechnologies.com

**Professional History**

*Current* Employment
➤ President, Elijah Technologies
➤ President, LITIGEX

*Previous Employment*
➤ Partner, Enterprise Law Group
➤ Partner, Foley & Lardner
➤ General Counsel, International
  Save the Children Alliance
➤ Associate, Mayer, Brown & Platt
➤ Judicial Clerk, Hon. Harlington
  Wood, Jr., U.S. Court of Appeals

**Educational History**

University of Illinois College of
Law, J.D. *Summa Cum Laude*
➤ Class Valedictorian
➤ Editor-in-Chief, Law Review
➤ Order of the Coif

Illinois State University, B.S.,
*Magna Cum Laude*
➤ University Honors Scholar
➤ President, Forensics Union

**Training & Associations**

➤ EnCase Certified Examiner
  (EnCE)
➤ Certified Fraud Examiner (CFE)
➤ Electronic Evidence Specialist
  (EES)
➤ Executive Committee & Board of
  Directors, International
  Information Systems Forensics
  Association (IISFA)
➤ Past President, Chicago Chapter,
  IISFA
➤ Board of Directors, Illinois State
  University Attorneys Advisory
  Board
➤ Member, GLG Councils
➤ Marquis' Who'sWho in America,
  2006
➤ Certificate, EnCase Advanced
  Computer Forensics

**Publications & Speeches**
➤ *Electronic Evidence And
  Computer Forensics: A Brief
  Primer*, IICLE Law Office
  Technology Flash Points
➤ Guest Lecturer on Topics in
  Computer Forensics & E-
  Discovery, Chicago Bar
  Association, DePaul University,
  Northwestern University, Illinois
  State University and various
  firms and corporations
➤ CBA Commercial Litigation
  Mock Trial Expert Witness,
  Computer Forensics, 2007

Andrew Reisman is President of Elijah Technologies, a legal technology company specializing in computer forensic investigations, e-discovery, and litigation support. Andrew has had primary responsibility for hundreds of investigations and has testified and lectured on numerous occasions regarding computer forensics and electronic discovery. As a litigation consultant, Andrew frequently is called upon to manage sophisticated document intensive projects on a turnkey basis, harvest or oversee the harvesting of electronic data, provide advice regarding e-discovery best practices, and manage vendor qualification and bidding. Drawing upon his extensive computing, forensic investigation, and legal backgrounds, Andrew is uniquely qualified to bridge the communication gaps that so frequently arise between inside and outside counsel, IT/IS departments, and finders of fact, and to most efficiently and expeditiously identify key case evidence.

## Computer Forensic Experience

➤ Led investigations for Fortune 500 institutions and a variety of corporate and law firm clients. Engagements included devising investigation parameters, imaging hundreds of drives and other electronic media, identifying potential sources of evidence, reviewing collected data for responsive and deleted files, preparing reports, and testifying regarding findings.

➤ Recent Testimony: *Smith v. Effective Teleservices, Inc.*, 15th Judicial Circuit, Palm Beach County, Florida (2008) – In a matter on behalf of a telecommunications company, provided testimony regarding alleged spoliation of computerized evidence and analysis of report prepared by opposing computer forensics expert.

➤ Recent Testimony: *Dematic Corp. v. Tubman*, Kent County Circuit Court, Grand Rapids, Michigan (2008) – In a matter on behalf of an automation company, identified electronic evidence of trade secret misappropriation and provided related testimony on which the Court relied in enjoining the former employee from competing against the employer.

➤ Recent Testimony: *AD Acquisition, LLC v. Lyon*, Circuit Court of Cook County, Chicago, Illinois (2007) - In a matter on behalf of an auto transport company in a trade secret misappropriation dispute, provided testimony regarding spoliation of computerized evidence on which the Court relied in entering a default judgment in favor of client.

➤ Recent Testimony: *MEPCO, L.L.C. v. MC Squared of Michigan, L.L.C.*, Kent County Circuit Court, Grand Rapids, Michigan (2007) – In a matter on behalf of a manufacturing company, investigated computer media for evidence of breach of fiduciary duty. Located evidence of deleted emails and testified at preliminary injunction hearing regarding findings.

➤ Recent Testimony: *Peter Gombrich v. Molecular Diagnostics, Inc.*, ADR Systems of America, Chicago, Illinois (2006) - In a matter on behalf of a technology company, investigated computer media for destruction of data. After locating evidence of same and testifying at arbitration hearing, client secured favorable spoliation finding.

## Litigation Consulting Experience

➤ Provided consulting services relating to large document review projects, including overseeing data harvesting, vendor qualification, proposal drafting and evaluation, database consulting and overall project management.

➤ Designed and implemented data filtering and collection programs to efficiently search and collect terabytes of data for export to e-discovery platforms.

➤ Case Highlight: Turnkey Consulting – In a matter on behalf of a large consumer product company provided client with advice regarding restoration of thirty terabytes of data, document retention and litigation hold policies, and data hosting platforms.

## E-Discovery Experience

➤ Leads the Elijah Technologies team recognized by the 2006 Socha-Gelbmann Electronic Discovery Survey as a top-20 provider nationally in e-discovery capacity.

➤ Oversees filtering, processing and hosting of multi-terabyte collections of data.

# EXHIBIT G

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ILLINOIS

3                 EASTERN DIVISION

4

5     MINTEL INTERNATIONAL GROUP, )

6     LTD., a United Kingdom      )

7     Corporation,            )

8          Plaintiff,      )

9          vs.         ) No. 08 CV 3939

10    MEESHAM NEERGHEEN, an      )

11    individual,           )

12         Defendant.      )

13

14         Videotaped Deposition of RICHARD CARR,

15    taken before GREG S. WEILAND, CSR, pursuant to the

16    Federal Rules of Civil Procedure for the United

17    States District Court pertaining to the taking of

18    depositions, at Suite 2800, 70 West Madison Street,

19    in the City of Chicago, Cook County, Illinois,

20    commencing at 9:26 o'clock a.m., on the 27th day of

21    August, 2008.

22

23

24

1    so ...

2      Q.  Did anyone instruct you not to delete any

3    e-mails relating to this litigation?

4      A.  No.

5      Q.  Have you made a forensic copy of your hard

6    drive?

7      A.  No.

8      Q.  Do you use a laptop or --

9      A.  No, I use a --

10     Q.  -- desktop?

11     A.  -- desktop.

12     Q.  Have you continued to use that since this

13   litigation began?

14     A.  Yes.

15     Q.  Have you printed out copies of any e-mails

16   you have relating to this litigation?

17     A.  I don't know.  I might have done the odd

18   one, but don't normally do, so ...

19     Q.  Did you have any e-mail communications

20   with Mr. Weeks regarding this litigation?

21     A.  There might be.

22     Q.  Did you have any e-mail communications

23   with Mr. Butcher regarding this litigation?

24     A.  Possibly.  Probably.

# EXHIBIT H

```
 1        IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                 EASTERN DIVISION
 3

        MINTEL INTERNATIONAL GROUP,  )
 4      LTD., a United Kingdom        )
        corporation,                  )
 5                          )
            Plaintiff,       )
 6                          )
          -vs-              ) No. 08 CV 3939
 7                          )
        MEESHAM NEERGHEEN, an        )
 8      individual,                  )
 9          Defendant.
10
11        The 30(b)(6) deposition of
        DATAMONITOR, INC., (JEFFREY HOWARD) called for
12      examination via telephone pursuant to Notice and
        the Rules of Civil Procedure for the
13      United States District Courts pertaining to the
        taking of depositions, taken before
14      Karen M. Kaczmarek, Certified Shorthand Reporter,
        Registered Professional Reporter, and a notary
15      public within and for the County of Will and
        State of Illinois, at 33 West Monroe Street,
16      Suite 2700, Chicago, Illinois, on the 22nd day of
        July 2008, at the hour of 10:15 a.m.
17
18
19
20
21
22
23
24      Reported by:  Karen M. Kaczmarek, CSR, RPR
```

1    start at Datamonitor?

2        A.   We talked about the date from the end of

3    April onwards.

4        Q.   And this was a discussion that you had

5    with Mr. Neergheen when he accepted your offer of

6    employment; is that right?

7        A.   I believe so.

8        Q.   And this would have been one to two

9    weeks after your interview with him in late

10    February or early March; is that right?

11        A.   Yes.  But again, subject to specifics.

12        Q.   But at that point he had accepted your

13    offer of employment with Datamonitor?

14        A.   I believe so.

15        Q.   But he didn't give you any indication

16    that he was going to quit Mintel?

17        MR. ROACHE:   Objection, asked and answered.

18    You can answer again.

19        THE WITNESS:  We talked about a start date in

20    late April or after, subject to visa

21    availability.

22    BY MR. PIOLI:

23        Q.   Did you give him any advice that he

24    should quit Mintel at that point?

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that a true and correct copy of **Opposition to Mintel's Motion to Compel Third-Party Computers and Motions for a Protective Order and to Quash**, and accompanying documents, have been served this 2nd day of September, 2008 via ECF filing to:

> Joseph Marconi
> Victor Pioli
> Katherine J. Pronk
> JOHNSON & BELL, LTD.
> 33 West Monroe Street
> Suite 2700
> Chicago, Illinois 60603

> */s/ Jeana R. Lervick*
> Jeana R. Lervick
> BELL, BOYD & LLOYD LLP
> 70 West Madison Street
> Suite 3100
> Chicago, IL 60602
> (312) 373-1121

1