**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MINTEL INTERNATIONAL GROUP, LTD, a United Kingdom corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No.: 08CV3939 |
| v. | ) ) | |
| MEESHAM NEERGHEEN, an individual, | ) ) | Judge Richard M. Dow |
| Defendant. | ) ) | |

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF LAW**
**IN SUPPORT OF PRELIMINARY INJUNCTION**

Plaintiff MINTEL INTERNATIONAL GROUP, LTD. ("Mintel") hereby submits the following Supplemental Memorandum in Support of Preliminary Injunction:

**INTRODUCTION**

This is an action brought against Defendant Meesham Neergheen ("Neergheen") for violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1330, *et seq.*, the Illinois Trade Secret Act ("ITSA"), 765 ILCS 1065/1, *et seq.*, and breach of contract. Neergheen worked for Mintel's marketing department from June 30, 1997 until April 30, 2008. In order to allow Neergheen to effectively carry out his employment duties, Mintel entrusted Neergheen with client and marketing files and materials. Since Neergheen's resignation on April 30, 2008, Mintel has discovered that Neergheen e-mailed, copied and/or printed Mintel's confidential and proprietary trade secrets without a business reason prior to his resignation. Much of the information was taken after he had agreed to work for Mintel's competitor.

Neergheen is currently working for Datamonitor, Inc., a direct competitor of Mintel, which is in violation of the terms of Neergheen's Contract of Employment and Employee Non-Compete/Non-Solicitation Agreement ("Non-Compete Agreement"). Although Neergheen accepted an employment offer from Datamonitor in March 2008, Neergheen never communicated this fact to Mintel, most likely because Neergheen knew he was violating his Contract of Employment and Non-Compete Agreement. Neergheen's employment with a competitor and the actual and inevitable disclosure of Mintel's confidential and proprietary trade secrets will have devastating and irreparable consequences to Mintel.

1

This Court should not permit Neergheen to flagrantly violate the CFAA, ITSA, and the terms of the Non-Compete Agreement and should grant the injunctive relief requested herein by Mintel.

## FACTUAL BACKGROUND

Mintel is a leading supplier of consumer, product and competitive medial intelligence with offices in Chicago, London, Belfast, Sydney, Tokyo and Shanghai. *See* Butcher Affdt., ¶¶ 2-3, attached hereto as "Exhibit 1." Mintel has tens of thousands of clients throughout the world. Mintel services its clients in North America and South America out of Mintel's Chicago office. Butcher Affdt., ¶ 4. Mintel's London office cater to clients in the United Kingdom, the rest of Europe, Africa, the Middle East and Russia. Butcher Affdt., ¶ 4. Mintel's Sydney, Tokyo and Shanghai offices provide services to the Asia-Pacific region. Butcher Affdt., ¶ 4.

Mintel's five different product offerings to its clients have a global reach. The ***Global New Products Database*** ("GNPD") monitors worldwide product innovation in consumer packaged goods markets, providing coverage of new product activity for competitor monitoring, category awareness and new product idea generation. Butcher Affdt., ¶ 7(a). The GNPD covers 39 categories across 50 countries and reports on 12,000 new products every month. Butcher Affdt., ¶ 7(a). Datamonitor produces the Productscan database, which is directly competitive with Mintel's GNPD. Butcher Affdt., ¶ 7(a). ***Mintel Reports/Snapshots/MBD*** are global research reports covering a number of different consumer and business sectors, including, for example, automotive, beauty, financial services, health, personal goods, pharmaceuticals, technology and travel. Butcher Affdt., ¶ 7(b). All reports contain market data, unique analyst commentary, and insight and forecasting on how consumer attitudes will change. Butcher Affdt., ¶ 7(b). Datamonitor produces a similar range of reports that are in direct competition with Mintel's offerings. Butcher Affdt., ¶ 7(b). ***Mintel Comperemedia*** provides competitive intelligence on direct mail, email marketing, broker agency marketing, and print advertising in the United States and Canada. Butcher Affdt., ¶ 7(c). This service focuses on financial, insurance, telecommunications, technology and travel sectors, providing detailed information on competitive offers, incentives and pricing with scanned images of every marketing piece. Butcher Affdt., ¶ 7(c). Datamonitor's interest in the financial services industry provides a competitive threat to the Comperemedia business. Butcher Affdt., ¶ 7(c). ***Mintel Menu Insights*** profiles emerging trends from approximately 580 restaurants across the United States. Butcher Affdt., ¶ 7(d). This product covers changes in price, menu items, ingredients and preparations as well as entirely new menus. Butcher Affdt., ¶ 7(d). Datamonitor's interest in the food and services sectors provides a competitive threat to the Menu Insights business. Butcher Affdt., ¶ 7(d). ***Mintel's Research Consultancy*** is a

dedicated consultancy team with a wealth of global experience. Butcher Affdt., ¶ 7(e). Research Consultancy combines an immense network of associates and in-house databases to deliver programs such as ongoing research analysis, in-store audits, new product trend analysis, market and consumer studies, and leadership initiatives. Butcher Affdt., ¶ 7(e). Datamonitor provides a similar consultancy service to existing and prospective clients that is in direct competition with Mintel. Butcher Affdt., ¶ 7(e).

Mintel provides opportunities to its employees to transfer between offices and territories, taking their knowledge and experience with them. Butcher Affdt., ¶ 6. As an employee of Mintel's marketing team in London, Neergheen negotiated and sustained relationships with international trade associations. Popp Affdt., ¶ 4, attached hereto as "Exhibit 2." Neergheen transferred from Mintel's London office to Mintel's Chicago office in 2001. Butcher Affdt., ¶ 18. As an employee of Mintel's marketing department in Chicago, Neergheen covered third party relationships with a focus on trade associations across North America and South America. Popp Affdt., ¶ 10. Mintel's trade association relationships are an integral part of Mintel's business strategy because these organizations are influential in policy matters and as providers of market data. Butcher Affdt., ¶ 18. Consequently, as a result of working for Mintel in two different office locations, Neergheen's knowledge of third party associations, client decision makers, and levels of account use in various territories is significant. Butcher Affdt., ¶ 6.

As a long-time member of Mintel's marketing team, Neergheen interacted most frequently with third party trade associations. Popp Affdt., ¶ 4. Mintel has a working relationship with approximately 80 trade associations, including, for example, Institution for International Research, Association for Car and Truck Rental Independent Franchies, International Dairy Foods Association, Electronic Retailing Association, International Housewares Association, Mortgage Bankers Association, National Association of Variable Annuities, and World Grain Council. Popp Affdt., ¶ 4. Accordingly, Mintel has relationships with trade associations throughout numerous different sectors, including, for example, automotive, finance and electrical. These trade associations are an important part of Mintel's international business strategy and provide Mintel access to their members as potential clients. Popp Affdt., ¶ 4.

As a member of Mintel's marketing department, Neergheen's main job responsibilities for Mintel included: (1) assessing and establishing partnership agreements with professional associations; (2) achieving agreements for trade presentations by Mintel's analysts in exchange for promotional consideration for Mintel; (3) sustaining existing partnerships to create ongoing promotional

opportunities for Mintel; (4) supporting opportunities opened up by sales managers to conduct presentations at current or prospective companies; (5) partnering with Mintel's analysts and vendors to develop and deliver presentations at conferences, events and webinars for current and prospective clients; (6) identifying qualified prospects for sales and direct marketing campaigns; (7) coordinating direct marketing and online marketing activities; and (8) representing Mintel at trade shows and targeted and prospective client events. Popp Affdt., ¶ 5.

The majority of Mintel's group activities are directly competitive with Datamonitor. Butcher Affdt., ¶ 9. Mintel and Datamonitor generally target the same: (1) corporate agency and academic clients; (2) industry bodies/associations; (3) industry suppliers/partners; (4) events, exhibitions, trade shows and speaker slots; and (5) media. Butcher Affdt., ¶ 9. Every client of Mintel is a target for Datamonitor. Butcher Affdt., ¶ 10. Every trade association with whom Mintel has a relationship is a potential target for Datamonitor, and every trade show Mintel attends is a potential target for Datamonitor. Butcher Affdt., ¶ 10.

On or about October 1, 2007, Mintel decided to restructure the marketing department in Mintel's Chicago office. Popp Affdt., ¶ 6. As a result, Neergheen's position as Marketing Operations Manager was eliminated. Popp Affdt., ¶ 6. Neergheen was informed on December 7, 2007 that his position would be eliminated at the end of January 2008. Popp Affdt., ¶ 7. Neergheen met with Mintel's executives, including the Global GEO, on numerous occasions to discuss other possible opportunities within the company. Popp Affdt., ¶ 8. On or about December 20, 2007, Neergheen was offered a services position in the Custom Solutions department that he did not accept. Popp Affdt., ¶ 10. On or about January 16, 2008, Neergheen was offered a position in Mintel's public relations department, which provided Neergheen with additional time to apply for employment positions both inside and outside of Mintel. Popp Affdt., ¶ 11. This role was created specifically for and only offered to Neergheen. Popp Affdt., ¶ 11. Furthermore, this position provided an identical base salary with an additional discretionary performance bonus. Popp Affdt., ¶ 11. Neergheen's position in the public relations department extended from February 1, 2008 until April 30, 2008. Popp Affdt., ¶ 11. On April 23, 2008, Mintel received written notification that Neergheen would be resigning from Mintel effective April 30, 2008. Popp Affdt., ¶ 12.

After receiving Neergheen's written notification of resignation on April 23, 2008, Mintel executives asked Mintel's IT Director to start saving Neergheen's e-mails. Butcher Affdt., ¶ 21. After Mintel learned on or about June 26, 2008 that Neergheen was working for a competitor, Mintel's IT Director started reviewing Neergheen's outbound emails. Butcher Affdt., ¶¶ 21-24. On or about July

9, 2008, Mintel learned that Neergheen had emailed Mintel's confidential and proprietary trade secret information to his personal email address on April 29, 2008. Butcher Affdt., ¶ 25. On or about July 9, 2008, Mintel further discovered e-mail discussions on Mintel's e-mail servers relating to Neergheen's attempts to find employment with competitors during the months preceding his departure from Mintel. Butcher Affdt., ¶ 26.

Neergheen first sought out possible employment with Datamonitor toward the middle or end of January. Neergheen Dep. 58:3-16, attached hereto as "Exhibit 3." Datamonitor extended an employment offer to Neergheen in early to mid March 2008, which Neergheen accepted within one or two days. Howard Dep. 62:8-21, attached hereto as "Exhibit 4"; 65:11-20. Neergheen started his employment with Datamonitor in late May. Howard Dep. 68:2-3. Neergheen is Partners and Alliances Manager at Datamonitor. Howard Dep. 42:1-2. Neergheen's position at Datamonitor is global in nature, and Neergheen is again working with trade associations. Howard Dep. 91:5-16; Neergheen Dep. 79:2-4. Like at Mintel, Neergheen is responsible for setting up strategically and commercially beneficial relations with third party organizations and works within the technology, pharmaceutical, financial services, automotive and energy markets. Howard Dep. 97:2-9; Neergheen Dep. 70:7-12.

## LEGAL STANDARD

The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. *Abbott Labs. v. Meade Johnson Co.*, 971 F.2d 6, 11 (7th Cir. 1992). Because the purpose of a preliminary injunction is limited, a party is not required to prove its case in full at the preliminary injunction hearing. *Id.*

To obtain a preliminary injunction, Mintel must demonstrate: (1) a reasonable likelihood of success on the merits; (2) that there exists no adequate remedy at law and that Mintel will be irreparably harmed if the injunction is not issued; (3) that the threatened injury to Mintel outweighs the threatened harm the injunction may inflict on Neergheen; and (4) that the granting of the preliminary injunction will not disserve the public interest. *Advent Elec., Inc. v. Buckman*, 112 F.3d 267, 274 (7th Cir. 1997).

## ARGUMENT

**AN INJUNCTION SHOULD BE ISSUED TO PREVENT NEERGHEEN FROM USING AND DISCLOSING MINTEL'S CONFIDENTIAL, PROPRIETARY AND TRADE SECRET INFORMATION AND TO PREVENT NEERGHEEN FROM WORKING FOR DATAMONITOR.**

**1.      Mintel Has a Likelihood of Success on the Merits**

At the threshold, "a party seeking a preliminary injunction must demonstrate some likelihood of succeeding on the merits." *Id.* (citing *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986)). This requirement can be satisfied by proof that the chance of prevailing at trial is better than negligible. *Kinney v. Intl. Union of Operating Engineers*, 994 F.2d 1271, 1275 (7th Cir. 1993). Under the "better than negligible" standard, the "threshold is low" for establishing likelihood of success. *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). In the present case, Mintel has a likelihood of success on its claim for relief against Neergheen.

### Violation of the Computer Fraud and Abuse Act

The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, provides for the entry of civil injunctive relief as well as the recovery of money damages for a violation of its provisions. *See* 18 U.S.C. § 1030(g) (providing that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief").

Neergheen violated the CFAA. Neergheen's actions in e-mailing Mintel's confidential and proprietary trade secret information to his personal e-mail address in the days leading up to his resignation clearly "exceeded authorized access" as that term is defined in 18 U.S.C. § 1030(e)(6). Furthermore, Neergheen e-mailed countless additional documents to his personal e-mail address during the approximately five-month time period from when he learned his position was being eliminated at Mintel until his resignation date. In *George S. May Intl. Co. v. Hostetler*, 2004 U.S. Dist. LEXIS 9740, * 9 (N.D. Ill. May 28, 2004), the court engaged in a thorough analysis of the CFAA and its application to a scenario in which an employee uses his or her access to an employer's computer system to appropriate the employer's intellectual property. The court concluded that in such a situation, a cause of action is available under the CFAA. *Id.* More specifically, the court stated as follows:

> [Plaintiff's] argument that the conduct attributed to him within the complaint did not exceed his authorized access falls flat. While [plaintiff] may very well be correct that he was entitled to access the information when he was employed by [defendant], it is no stretch of the imagination to conclude that his authorization did not extend to removing copyrighted material from the computer system for his personal benefit or that of a competitor.

*Id.* at ** 9-10 (citing *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1125 (W.D. Wash. 2000)).

The court went on to explain that for purposes of the CFAA, "damage" means any impairment to the integrity or availability of data, a program, a system or information. *Id.* at * 10; *see also* 18 U.S.C. § 1030(e)(8). The court stated it could see no principled reason why infringement of copyrighted material taken from a protected computer system would not qualify as impairment of the integrity of the copyrighted information. *Id.* Accordingly, the court determined that the plaintiff clearly stated a claim for relief under the CFAA.

A like outcome is warranted in the present case. Neergheen has conceded to e-mailing Mintel's confidential and proprietary trade secret information to his personal e-mail address. Neergheen Dep. 101:12-19; 108:18-24; 109:1-5. Neergheen clearly exceeded his authorized use of Mintel's computer system when Neergheen engaged in such conduct. As a result of Neergheen's unlawful behavior, Mintel has sustained a loss in the value of its trade secrets and other proprietary and confidential information, which was not previously published or known to the public. The CFAA permits Mintel to successfully sue Neergheen and any third party companies who seek a competitive edge through the wrongful use of the information from Mintel's computer system. *See Robinson Worldwide, Inc. v. Command Transportation, LLC*, 2005 U.S. Dist. LEXIS 28063, * 9 (N.D. Ill. Nov. 16, 2005); *see also YourNetDating, LLC v. Mitchell*, 88 F. Supp. 870, 872 (granting TRO under CFAA claim against former employee); *Charles Schwab & Co., Inc. v. Carter*, 2005 U.S. Dist. LEXIS 5611, at *3 (N.D. Ill. Feb. 11, 2005) (denying motion to dismiss claim under CFAA).

### *Violation of the Illinois Trade Secret Act*

The Illinois Trade Secret Act, 765 ILCS 1065/1, *et seq.*, defines a "trade secret" as information that:

> (i) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

*See* 765 ILCS 1065/2(d). Therefore, in order for Mintel to show the misappropriated information is a trade secret under the ITSA, Mintel must show the information was sufficiently secret to give Mintel a competitive advantage, 765 ILCA 1065/2(d)(1); *Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265, 276 (2005), and affirmative measures were taken to prevent others from acquiring or using the information. 765 ILCA 1065/2(d)(2); *Liebert*, 357 Ill. App. 3d at 276.

The eight files e-mailed by Neergheen to his personal e-mail address contained highly sensitive information, including, but not limited to, Mintel's client lists and client budgets, trade show lists, budget information, Mintel's marketing strategies, marketing costs and overall objectives for various Mintel clients. Neergheen Dep. 100:22-124:24. An explicit explanation of the confidential trade secret information contained within each of the eight files is included within Mintel's Memorandum of Law Supporting the TRO.[1] Mintel takes great care to acquire and retain information related to its specific clients, including trade associations. Mintel invests significant time and effort to learn about each client's specific market environment, business situation, business plans, product plans, product/service portfolio, competition and customers. Butcher Affdt., ¶ 13. This information is not widely known or disseminated into the public domain. Carr Affdt., ¶ 3, attached hereto as "Exhibit 5." Accordingly, the documents and information taken by Neergheen are sufficiently secret to give Mintel a competitive advantage. In fact, Neergheen conceded during his deposition that it would be harmful to Mintel if one of Mintel's competitors saw the documents Neergheen misappropriated. Neergheen Dep. 107:18-23. Neergheen also conceded that Mintel would not want Datamonitor to see the misappropriated information. Neergheen Dep. 107:8-10; 111:7-19.

In addition, Mintel exercises diligent efforts to safeguard its proprietary and confidential information. Carr Affdt., ¶ 4. Mintel has imposed significant computer security measures. Mintel has a secure computer network and secure server system that is carefully configured and managed to prevent unauthorized access. Thomson Affdt., ¶ 3, attached hereto as "Exhibit 6." Files containing confidential, proprietary and trade secret information are stored on file servers with restricted access right. Thomson Affdt., ¶ 3. Very limited access is entrusted to employees, who are only given access to such information on a "need to know" limited basis. Carr Affdt., ¶ 4. All employees are issued their own personal computer username and password, which only allow the user access to the information needed to perform all job functions. Thomson Affdt., ¶ 3. Furthermore, Mintel requires its employees, including Neergheen, to sign confidentiality

---

[1] However, it is important to note that Neergheen's misappropriation of Mintel's trade secrets does not end with the eight files Neergheen e-mailed to his personal e-mail account in the days leading up to his resignation. Instead, Neergheen sent approximately fifty e-mails to his personal e-mail address during the approximately five-month time period between the date Neergheen was informed his position was being eliminated and his resignation date. Although the e-mails did not all contain information that would be classified as confidential or trade secrets, some of the documents would be, including, for example, a Mintel Reports powerpoint presentation Neergheen e-mailed on April 11, 2008; a GNPD new business documents e-mailed on 2/12/08; a document entitled "Why Clients Buy" e-mailed on February 27, 2008; and a marketing plan outline e-mailed on January 15, 2008. MN0000189, MN0000190, MN0000499, MN0000500, MN0000698, MN0000699, MN0000700, MN0000874, MN0000875-MN0000882, attached hereto as "Exhibit 7."

agreements, which clearly state that such information is not to be disseminated. Carr Affdt., ¶¶ 8, 9. That Mintel advises its employees about the information's confidentiality is a factor considered by the court in determining whether reasonable efforts have been made to safeguard the confidential information. *see e.g.*, *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 875 (N.D. Ill. 2001) (focusing upon the confidentiality agreements and employee handbooks advising of the confidential nature of the plaintiff's information); *see also Stampede Tool Warehouse, Inc. v. May*, 272 Ill. App. 3d 580, 588 (1995) (emphasizing that the employees signed confidentiality agreements).

Neergheen confirmed during his deposition that Mintel has computer security measures in place that restrict access to Mintel's confidential, proprietary and trade secret information. Neergheen conceded that only employees in the marketing department had access to the documents misappropriated by Neergheen.    Neergheen Dep. 108:8-10;  110:13-19;  112:4-6;  113:15-18. Furthermore, Neergheen conceded that he signed Mintel's confidentiality clause and, therefore, knew that when he was given access to customer lists, pricing information and cost data, Mintel did not want him to share that information with others. Neergheen Dep. 35:4-36:12.

Next, Mintel must show that the trade secrets were misappropriated by Neergheen. Misappropriation can be shown one of three ways – by improper acquisition, unauthorized disclosure or unauthorized use.  765 ILCS 1065/2(b).  Misappropriation by "improper means" includes, for example, theft, inducement of a breach of a confidential relationship, and breach of a duty to maintain secrecy or limit use. 765 ILCS 1065/2(a).

The present case is analogous to *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 875 (N.D. Ill. 2001).  Like Neergheen, the defendant in *RKI* agreed to work for the plaintiff's competitor before resigning from plaintiff.  *Id.* at 868.  Also, like Neergheen, the defendant downloaded plaintiff's confidential information to his home computer in violation of the confidentiality clauses included within the plaintiff's employment agreement and employee handbook.  *Id.* at 866-867.  The United States District Court for the Northern District of Illinois found that the plaintiff improperly acquired the trade secrets by downloading and copying the data for purposes other than serving his employer. *Id.* at 875.  The court determined that the plaintiff misappropriated the trade secrets under the ITSA by improper acquisition.  *Id.*; *see also LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 313-315 (2004) (explaining that misappropriation by "improper means" occurred where employee copied his employer's computer files to a CD for personal use before resigning).

The evidence presented by Mintel clearly shows that Neergheen acquired Mintel's trade secrets by improper means.  In the days leading up to his resignation, Neergheen e-mailed eight of

Mintel's confidential files to his personal e-mail address. Thomson Affdt., ¶ 7. Neergheen conceded doing so during his recent deposition. Neergheen Dep. 100:18-139:6. Furthermore, during the five-month time period between the date Neergheen was informed his position was being eliminated and his resignation date, Neergheen sent approximately fifty additional e-mails to his personal e-mail address, some containing Mintel's confidential and proprietary trade secret information. Neergheen's conduct clearly constitutes improper acquisition under the ITSA, and preliminary injunctive relief is appropriate.

In actions under the ITSA, the statute specifies that "actual or threatened misappropriation may be enjoined." 765 ILCS 1065/3. However, under Illinois law, courts may also grant injunctive relief to prevent the inevitable use or disclosure of misappropriated trade secrets. *Pepsico, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995). Therefore, Mintel seeks a preliminary injunction to prevent inevitable disclosure or use of the trade secrets Neergheen misappropriated. There is a real threat Neergheen has used Mintel's trade secrets since his employment with Mintel ended and his employment with Datamonitor commenced. This is supported by Neergheen's d willful destruction of the evidence on his home computer. Neergheen's spoliation of evidence leads to the inescapable conclusion that Neergheen has been using Mintel's trade secrets. Indeed, Neergheen felt so compelled to cover his tracks that he blatantly violated this Court's July 16, 2008 Order that specifically directed him to preserve his computer.

In the interest of brevity, Mintel directs the Court to Mintel's Motion to Compel Datamonitor's Compliance with Subpoena for a complete overview of Neergheen's spoliation of evidence and his violation of the express terms of the Temporary Restraining Order. It is important to note that "[s]anctions for spoliation of evidence include ... barring evidence or arguments, ***permitting adverse inferences***, and dismissing claims. *Krumwiede v. Brighton Assocs., LLC*, 2006 U.S. Dist. LEXIS, at * 24 (N.D. Ill. May 8, 2006) (citing Fed. R. Civ. Pro 37(b)(2)(A)-(D)) (emphasis added). Accordingly, the Court should infer from Neergheen's blatant and willful destruction of evidence that Neergheen has been using Mintel's confidential information to Mintel's detriment.

Under the theory of inevitable disclosure, "a plaintiff may prove trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *Pepsico, Inc.*, 54 F.3d at 1269. "If a former employee fulfills a substantially similar position with the plaintiff's competitor, the plaintiff has a better chance of succeeding under this theory." *Strata Marketing, Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1068

(2000). While an employee of Mintel, Neergheen worked primarily with trade associations. Popp Affdt., ¶ 4. Similarly, as an employee of Datamonitor, Neergheen is responsible for setting up beneficial relations with third party organizations, including trade associations. Neergheen Dep. 79:2-4. It is not surprising then that Neergheen e-mailed to his personal e-mail address a Mintel document containing a complete overview of all trade associations Mintel has developed a relationship with and the main contact for each. Neergheen Dep. 124:8-12.

Furthermore, despite Datamonitor's allegations that Neergheen is not contacting any prior clients or contacts from Mintel, Neergheen stated as follows in a correspondence to Datamonitor: "[I]deally [I] want to remain in marketing as a marketing manager, with a strong focus on relationship building with clients, trade show management, campaign management and analysis, *leveraging all contacts I have with the current trade associations to secure free booth presence, speaker opportunities, complimentary sponsorships/advertising.*" MN0000046 (emphasis added). Furthermore, when discussing Neergheen's expected role at Datamonitor, Jeff Howard explained as follows: "I think that this guy would be good for Distributors but, as importantly, excellent for CG. *I would expect him to go after existing Mintel partnerships initially.*" MN0000045 (emphasis added). Therefore, Neergheen is clearly fulfilling a substantially similar position at Datamonitor, which supports Mintel's inevitable disclosure argument. Indeed, Jeff Howard's expectation was that Neergheen would solicit Mintel's trade association partnerships to Datamonitor.

In *Pepsico*, the district court found defendant had learned plaintiff's secret pricing, distribution, packaging, and marketing strategies while working as its employee. 54 F.3d at 1269-1271. The defendant began working for a competitor, and the court found he would inevitably use his knowledge of the plaintiff's strategies to make decisions at his new job. *Id.* On appeal, the Seventh Circuit concluded the trial court's findings were supported by the evidence. *Id.* Although the defendant asserted he did not intend to use the knowledge he acquired while working for the plaintiff, the court was not convinced, in part because the defendant had demonstrated a lack of candor when he failed to tell his employer he had been hired to work for a competitor. *Id.* The court determined the "defendant could not be trusted to act with the necessary sensitivity and good faith under the circumstances in which the only practical verification that he was not using plaintiff's secrets would be [defendant's] word to that effect." *Pepsico*, 54 F.3d at 1270. Therefore, the court held that plaintiff's allegations supported the theory of inevitable disclosure under the ITSA. *Id.* at 1262.

Like the defendant in *Pepsico*, Neergheen is working for a direct competitor of Mintel. Furthermore, like the defendant in *Pepsico*, Neergheen never communicated to Mintel that Neergheen had been hired by Datamonitor.  In fact, Neergheen never disclosed this to Mintel despite the fact Neergheen continued working for Mintel for over one month after his verbal acceptance of Datamonitor's employment offer.  This Court should similarly determine that based upon Neergheen's conduct, Neergheen is not credible and should not be trusted to act with the necessary sensitivity to refrain from disclosing Mintel's trade secrets.  *See id.* at 1270.  The theory of inevitable disclosure similarly applies based on the facts and circumstances of the present case. In addition, Neergheen willfully and purposefully destroyed evidence and violated the Court's Temporary Restraining Order by deleting files from his personal computer.  This further supports Mintel's contention that Neergheen has used and disclosed Mintel's confidential and trade secret information, for Neergheen's spoliation of the evidence permits the Court to draw an adverse inference.  *See* Fed. R. Civ. Pro. 37(b)(2)(A)-(D).  Accordingly, Mintel has sufficiently shown a likelihood of success in proving a violation of the ITSA by Neergheen.

### *Violation of Non-Compete, Nondisclosure and Non-Solicitation Covenants within Non-Compete Agreement and Contract of Employment*
**a.      Non-Compete**

"The basic test applied by Illinois courts in determining the enforceability of restrictive covenants is 'whether the terms of the agreement are reasonable and necessary to protect a legitimate business interest of the employer.'" *Outsource Int'l, Inc. v. Barton*, 192 F.3d 662, 666 (7th Cir. 1999) (citing *Office Mates 5, North Shores, Inc. v. Hazen*, 234 Ill. App. 3d 557, 599 (1992)).  Illinois courts have long recognized two situations in which an employer has a legitimate business interest to justify enforcement of a covenant not to compete: (1) where the former employee acquired trade secret or other confidential information through his employment and subsequently tried to use it for his own benefit; and (2) where the customer relationships are near-permanent and but for the employee's association with the employer the employee would not have had contact with the customers.  *Outsource Int'l, Inc.*, 192 F.3d at 666.  Mintel's covenant not to compete is enforceable because Neergheen acquired Mintel's confidential information through his employment position and, despite his testimony to the contrary, has subsequently used such information for his own benefit.

Neergheen commenced employment with Mintel in its London office on or about June 30, 1997.  Butcher Affdt., ¶ 15.  As a condition of his continued employment, Neergheen signed and

executed a Contract of Employment with Mintel on or about June 24, 1998. Carr Affdt., ¶ 8. The Contract of Employment included the following restrictive covenant:

> You will not for the first twelve months at the end of your employment with us, either on your own account or on behalf of any other legal person and in competition with the Company, or any subsidiary directly or indirectly engage in, or be connected with, trade or business carried on by us or any of our associates at the end of your employment. ... You will not, for the first twelve months after the end of your employment with us, solicit away from us or our associates any person who is and was, when your employment ended, employed by us or an associate as a director, senior manager or sales person for whom you were responsible, or who was a member of any department/project/team in which you worked during the last twelve months of your employment.

Contract of Employment, attached hereto as "Exhibit 8."

On or about August 1, 2003, Neergheen transferred to Mintel's Chicago office. Carr Affdt., ¶ 6. As a condition of his continued employment with Mintel, Neergheen agreed to and signed an Employee Non-Compete/Non-Solicitation Agreement ("Non-Compete Agreement") on August 4, 2003. Carr Affdt., ¶ 9. The Non-Compete Agreement signed by Neergheen stated as follows:

> The undersigned Employee hereby agrees not to compete, either directly or indirectly, with the business of Mintel or any of its subsidiaries, branches or divisions, at any location worldwide at any time during the Employee's term of employment, and for a period of one (1) year following his termination of employment with Mintel, regardless of the reason or cause for such termination.

Non-Compete Agreement, attached hereto as "Exhibit 9."

Illinois courts will only enforce the provisions of a restrictive covenant if the time and geographical limitations are reasonably necessary to protect a legitimate business interest of the employer. *Trailer Leasing Co. v. Associates Commercial Corp.*, 1996 U.S. Dist. LEXIS 9654, at * 1 (N.D. Ill. July 10, 1996). Mintel and its competitors compete for a worldwide market. Mintel is an international business with a global presence. Mintel services its clients in North America and South America out of Mintel's Chicago office. Butcher Affdt., ¶ 4. Mintel's London office caters to clients in the United Kingdom, the rest of Europe, Africa, the Middle East and Russia. Butcher Affdt., ¶ 4. And, Mintel's Sydney, Tokyo and Shanghai offices provide services to the Asia-Pacific region. Butcher Affdt., ¶ 4. All of Neergheen's expertise in the area of third party organizations was obtained while he worked for Mintel. Neergheen's knowledge of Mintel's business and client and trade association contacts was further increased when Neergheen transferred from Mintel's London office to Chicago office. Accordingly, the worldwide geographical limitation is clearly

reasonable in the present case, for Neergheen could live and work anywhere in the world and compete with Mintel.

Although there are no Illinois cases directly on point, the present case is completely analogous to *Quaker Chemical Corp. v. Varga*, 509 F. Supp. 469 (E.D. Penn. 2007). As a condition of his employment with Quaker, defendant, like Neergheen, signed a restrictive covenant that included a one-year time limit but no geographical limitation. *Id.* at 472-473. After defendant accepted a job offer from Stuart, defendant copied countless files containing Quaker's confidential information onto a USB storage device. *Id.* at 474. Quaker had defendant's computer laptop examined by a computer forensic analyst, who informed Quaker that defendant had copied Quaker's files. *Id.* After defendant learned about the lawsuit against him, defendant, like Neergheen, deleted the files and folders that contained Quaker's confidential information. *Id.* Although defendant argued that the non-compete covenant was unenforceable because of its lack of geographical restriction, the court determined the restrictive covenant was enforceable, explaining as follows:

> [T]he Third Circuit recently noted that the notion of a too-broad geographic scope has become "antiquated" in light of the increasingly global economy. *Victualic*, 2007 U.S. App. LEXIS 20077, at * 8. "In this Information Age, a *per se* rule against broad geographic restrictions would seem hopelessly antiquated, and, indeed, Pennsylvania courts (and federal district courts applying Pennsylvania law) have found broad geographic restrictions reasonable so long as they are roughly consonant with the scope of the employee's duties." *Id.* ... [Defendant] is prohibited from working for a Quaker competitor anywhere in the world. Quaker has only a handful of direct competitors, and these companies, regardless of the physical location of their headquarters, offices, manufacturing plants, or employees, compete for customers on a worldwide basis. Indeed, in the parlance of the Third Circuit, "[t]hese competitors might be able to use a former [Quaker] employee's specialized knowledge of [Quaker's] product lines and sales strategies anywhere in the world that the two compete." *Id.* ... Both Quaker and Stuart admit that they are head-to-head competitors in markets for specialty oils for both steel and aluminum in both the United States and abroad. They have many of the same customers and they compete for many of the same customers. Quaker, headquartered in Pennsylvania, and Stuart, headquartered in Illinois, are worldwide companies with offices and clients on every continent save Antarctica. Moreover, [defendant] proposes to work for Stuart *in Illinois*. He was working for Quaker for the past five years *in Illinois*. There is simply no dispute that the covenant's restriction on him working for Stuart is reasonable in spite of the covenant's lack of a geographic limitation.

*Id.* at 476-477 (emphasis in original). Accordingly, the court determined the non-compete was reasonable and enforceable. *Id.*

Based upon the present facts, Neergheen's restrictive covenants are reasonable as to time and geography. Mintel has taken appropriate measures to ensure that it will not lose its employees or its confidential information to its competitors. Although the geographical area of the restrictive covenant is worldwide, the field of restriction is nonetheless narrow because Mintel has a limited number of competitors. Like in *Quaker Chemical*, Mintel and Datamonitor have offices across the globe but have only a limited number of competitors. Furthermore, like in *Quaker Chemical*, Mintel and Datamonitor are direct competitors and compete for customers on a worldwide scale.

As a member of Mintel's marketing team, Neergheen interacted most frequently with third party trade associations, which are an important part of Mintel's international business strategy. Popp Affdt., ¶ 4. Mintel has a working relationship with approximately 80 trade associations, many of such organizations being international in nature, including, for example, Institution for International Research, International Dairy Foods Associations, and World Grain Council. Popp Affdt., ¶ 4. Neergheen's position at Datamonitor is virtually the same as Neergheen's position at Mintel. Neergheen's position at Datamonitor is global in nature, and Neergheen is again working to establish relationships with trade associations. Howard Dep. 91:5-16; Neergheen Dep. 79:2-4. In fact, Howard has admitted that Neergheen was hired "to go after existing Mintel partnerships initially." MN0000045. As such, it is certainly not surprising that one of the documents Neergheen misappropriated from Mintel was a trade association master spreadsheet. Neergheen Dep. 124:8-12. Neergheen e-mailed this document to himself after accepting an employment offer from Datamonitor and approximately five days prior to his last day of employment with Mintel. Neergheen Dep. 124:15-125:4. Therefore, the consequence of Neergheen's continued employment with Datamonitor is a potentially disastrous effect on Mintel's business and competitive position in the marketplace. Carr Affdt., ¶ 16. Neergheen must be enjoined from his continued employment with Datamonitor and from exploiting Mintel's confidential and proprietary trade secrets for his own advantage and the benefit of Mintel's competitors.

Furthermore, for the sake of argument alone, should the Court determine the covenant not to compete is unreasonable as to geography, the Court has the discretion to modify the territorial limit of the covenant. "It has long been recognized by the courts of Illinois that if the area covered by a restrictive covenant is found to be unreasonable as to area, it may be limited to an area which is reasonable in order to protect the proper interests of the employer and accomplish the purpose of the covenant." *Total Health Physicians, S.C. v. Barrientos*, 151 Ill. App. 3d 726 (1986). Accordingly, should the Court determine the covenant is valid and enforceable but overbroad as to the territorial

limitation, the Court should "blue-pencil" the agreement and enforce a modified covenant instead of deeming the covenant unenforceable as written.

### b.    Nondisclosure Covenant

The Contract of Employment and Non-Compete Agreement signed by Neergheen both contain valid nondisclosure covenants. More specifically, the Non-Compete Agreement states as follows:

> [Neergheen] acknowledges that Mintel may ... provide [him] with access to Mintel's trade secrets, customer lists or other information of a confidential or proprietary nature. In consideration for his employment with Mintel, [Neergheen] agrees to keep confidential all such information, and not to use such information for his own benefit or to disclose same to any third party.

*See* Non-Compete Agreement. In addition, the Contract of Employment states, in pertinent part, as follows:

> You agree that all such records, methods, lists, materials, names and information, as well as any information and documents provided to, generated by or received by you in the course of your employment and the contents thereof, is confidential and is and will remain the sole property of Mintel. Such confidential information will not be used or disclosed by you other than in connection with your performance of services for Mintel or such confidential information shall be returned to Mintel upon the cessation of your employment.

*See* Contract of Employment.

As explained above, Neergheen violated the nondisclosure covenants when he copied and e-mailed Mintel's confidential information and trade secrets after his resignation from Mintel. In fact, during his deposition, Neergheen conceded to retaining Mintel's confidential information upon the cessation of his employment with Mintel. Neergheen Dep. 137:21-139:6. In fact, Neergheen admitted he still had possession of the information on the date this litigation commenced on July 11, 2008. Neergheen Dep. 138:18-139:2. Furthermore, Neergheen's willful and blatant destruction of evidence on his personal computer supports an inference that Mintel's confidential information has been used by Neergheen and disclosed by him to others. *See S.C. Johnson & Sons, Inc.*, 695 F.2d 253, 258-259 (7th Cir. 1982) (stating that evidence of bad faith destruction supports the court's presumption that the content of the destroyed documents were unfavorable to the destroying party). Consequently, Neergheen has clearly breached the covenants of nondisclosure. *See PepsiCo, Inc.*, 54 F.3d at 1271-1272 (determining injunction warranted for breach of nondisclosure agreement signed by former employee).

### c.    Non-Solicitation Covenant

Within the Non-Compete Agreement, Neergheen agreed "not [to] solicit any of Mintel's customers for a period of one (1) year after the undersigned Employee's termination date with Mintel." *See* Non-Compete Agreement.    The Contract of Employment further specifies that Neergheen was not to "solicit or accept orders for products, services, competitive with [Mintel] from any of [Mintel's] customers with whom [Neergheen] dealt during the last twelve months of employment." *See* Contract of Employment.

A covenant not to solicit customers is enforceable if the employer has a near-permanent relationship with its customers or clients. *Outsource International, Inc.*, 192 F.3d at 667.    Mintel has a near-permanent relationship with many of its customers, for Mintel's client retention rate is approximately 85 percent. Butcher Affdt., ¶ 14.    Mintel provides specialized marketing research for its clients and, consequently, takes great care to acquire and retain information related to its specific clients. Butcher Affdt., ¶ 13.    Mintel has invested significant time and effort to learn about each and every client's specific market environment, business situation, business plans, product plans, product/service portfolio, competition and customers.    Butcher Affdt., ¶ 13.    Furthermore, Mintel significantly values its relationships with third party trade associations, which are an important part of Mintel's international business strategy.    Popp Affdt., ¶ 4.    As an employee of Mintel's marketing department, Neergheen covered third party relationships with a focus on trade associations. Popp Affdt., ¶ 4.    During the ten years Neergheen worked for Mintel, Mintel provided him with extensive training and access to clients and trade associations, for Neergheen did not bring any customers or trade association contacts with him when he joined Mintel.    But for Neergheen's association with Mintel, he would not have had contact with Mintel's clients and trade associations in question.

The non-solicitation covenants in Neergheen's agreements are reasonable and enforceable. The non-solicitation covenant in *Medtronic, Inc. v. Benda*, 689 F.2d 645, 652 (7th Cir. 1982), like Neergheen's, prevented the defendant from soliciting any former customers for a period of 360 days and did not contain any geographical limitations.    The court determined as follows: "Where the covenant's restriction relates to the solicitation of customers, the absence of a geographical limitation is not unreasonable.    The decisions of the Illinois Appellate Courts in *Donald McElroy, Inc. v. Delaney*, 72 Ill. App. 3d 285 (1979) and *Wolf & Co. v. Waldron*, 51 Ill. App. 3d 239 (1977), are squarely on point." *Id.* at 648.    The court further made clear that "[t]he one year limitation, in light of the amount of time needed to adequately retrain another salesperson" was also reasonable to

17

protect the plaintiff's interest. *Id.* Accordingly, the non-solicitation clauses included within Neergheen's Non-Compete Agreement and Contract of Employment are reasonable and should be enforced by the Court.

**2.    Mintel Does Not Have an Adequate Remedy at Law and Will Suffer Irreparable Harm Should an Injunction Not be Issued**

Irreparable harm occurs when a party cannot be made whole by a damage award or other relief at the conclusion of trial. *Vogel v. American Society of Appraisers*, 744 F.2d 598, 599 (7th Cir. 1984). Mintel will be irreparably harmed by Neergheen's actions in a loss of Mintel's goodwill, competitive position and continuity of its business relationships, and such harm cannot be readily calculated or cured by monetary damages. The patronage of Mintel's clients and the development of its confidential information have been secured since Mintel's inception in 1972 through the expenditure of enormous financial resources and tremendous amounts of time. The degree of difficulty in acquiring clients is high. Butcher Affdt., ¶ 11. A substantial amount of time and effort is invested in each client in order to develop and sustain the relationship, for Mintel immerses itself into its client's businesses and processes in order to serve them to the best of Mintel's ability. This means that Mintel invests significant time and effort to learn about every client's: specific market environment, business situation, business plan, product plan, product/service portfolio, competition and customers. Butcher Affdt., ¶ 13. Mintel is facing the threat of lost clients, sales and its competitive advantage as long as Neergheen is not enjoined from engaging in his wrongful conduct. *See Loewen Group International, Inc. v. Haberichter*, 1997 U.S. Dist. LEXIS 15678, at * 29 (N.D. Ill. Oct. 1, 1997) (holding that the employer's "loss of competitive advantage, customers, goodwill and profits is intangible and that money damages are not possible to assess in this case with any degree of accuracy").

Furthermore, it is impossible to ascertain the extent of Mintel's loss due to Neergheen's spoliation of the evidence and willful violation of the Temporary Restraining Order. Despite Neergheen's testimony during his deposition that he has not used any of Mintel's confidential information that he misappropriated, it is clear that based upon Neergheen's alteration and deletion of files on his computer from the date he received notice of the litigation up until two days after the Court entered the Temporary Restraining Order, Neergheen is not a credible or trustworthy individual. Neergheen has clearly demonstrated a lack of candor and, therefore, the Court cannot rely upon Neergheen's mere assertion that he has not used any of Mintel's confidential information to date. Neergheen's spoliation of evidence clearly infers otherwise. As such, in order to prevent

any further harm to Mintel, Neergheen must be enjoined from working for any of Mintel's competitors, including Datamonitor.

This Court "must also consider the potential for irreparable harm based on the impact [Neergheen's] actions could have in encouraging other [Mintel] employees, as well as the competitors who are tempted to employ them, to engage in similar behavior." *See Credit Suisse First Boston, LLC v. Vender*, 2004 U.S. Dist. LEXIS 24525, * 10 (N.D. Ill. Dec. 2, 2004) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Patinkin*, 1991 U.S. Dist. LEXIS 6210 (N.D. Ill. May 9, 1991)). Mintel has made its threshold showing of irreparable harm and inadequate remedy at law.

It is important to note that under Illinois law, a party seeking an injunction need not prove actual losses of customers to obtain relief. *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632-633 (7th Cir. 2005). Indeed, "[i]f proof of particular injuries could be supplied, then the injury would be reparable by damages; it is precisely the difficulty of pinning down what business has been or will be lost that makes an injury irreparable." *Id.* at 623; *see also Gold v. Ziff Comm. Co.*, 196 Ill. App. 3d 425, 434 (1989) (stating that "the failure of plaintiff to show an actual loss is not dispositive"); *U-Haul Co. v. Hindahl*, 90 Ill. App. 3d 572, 577 (1980) (stating that "it is not necessary that a party seeking an injunction show an actual loss of sales before relief will be granted").

**3.    The Irreparable Harm Mintel Will Suffer Should An Injunction Not Be Issued is Greater than Any Potential Injury To Others Should an Injunction Be Granted**

Balancing the irreparable harm to the moving party if an injunction is not entered against the harm to the non-moving party if an injunction is granted requires the court to use a "sliding-scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *In re Aimster Copyright Litigation*, 252 F. Supp. 2d 634, 648 (N.D. Ill. 2002).

The injunctive relief sought by Mintel will only prohibit Neergheen from using and exploiting the illegally obtained information from Mintel and require him to return all such information. In addition, Mintel seeks to have Neergheen alone abide by the terms of the restrictive covenants he agreed to and signed. The requested injunctive relief merely seeks to ensure that Neergheen abides by what he is already legally obligated to do. Neergheen's potential interest in skirting his legal obligations pales in comparison to Mintel's interests in preserving its customer relations and the confidentiality of its trade secret information.

**4.      The Public Interest Will Be Served By Issuing the Injunctive Relief Mintel Seeks**

The public's interest in preventing unfair competition and the destruction of confidential business information and trade secrets is unparalleled. There is no public interest in rewarding theft and encouraging unethical business behavior. *IDS Life Ins. Co. v. SunAmerica, Inc.*, 958 F. Supp. 1258, 1281 (N.D. Ill. 1997). Furthermore, "there is a strong public interest to be served by enforcing contracts." *Kempner Mobile Electronics, Inc. v. Southwestern Bell Mobile Systems, Inc.*, 2003 U.S. Dist. LEXIS 3512, at * 100 (N.D. Ill. Mar. 7, 2003) (citing *Cook, Inc. v. Boston Scientific Corp.*, 2002 U.S. Dist. LEXIS 19223, at * 6 (N.D. Ill. Oct. 1, 2002)).

Furthermore, there is a public interest in requiring compliance with court orders and the punishment of those who do not. Neergheen continued to destruct evidence in direct violation of the express terms of the Temporary Restraining Order. Because Neergheen was represented by counsel at the hearing, Neergheen cannot claim that he was unaware of the content and restrictions of the Temporary Restraining Order. "It is well settled that one who has actual notice of a TRO or injunction and what it prohibits must abide by it or risk being held in contempt." *People v. Maslowsky*, 34 Ill. App. 2d 456, 466 (1966). Neergheen has a duty to abide by the Court's orders. Therefore, the public interest will clearly best be served by granting the preliminary injunctive relief Mintel seeks.

**CONCLUSION**

WHEREFORE Plaintiff MINTEL INTERNATIONAL GROUP, LTD. respectfully requests that its Preliminary Injunction be granted in its entirety and for any further relief deemed appropriate.

Respectfully submitted,

MINTEL INTENTIONAL GROUP, LTD.

By:      /s/ Joseph R. Marconi
         One of Their Attorneys

Joseph R. Marconi
Victor Pioli
Katherine J. Pronk
JOHNSON & BELL, LTD.
Attorneys for Plaintiff
33 W. Monroe Street, Suite 2700
Chicago, Illinois  60603
(312) 372-0770
Doc. No.: 1903393

## CERTIFICATE OF SERVICE

The undersigned, an attorney of record, upon oath states that a true and complete copy of the foregoing **Plaintiff's Supplemental Memorandum of Law in Support of Preliminary Injunction** was filed and served electronically on the 2nd day of September, 2008.

/s/ *Joseph R. Marconi*
One of Their Attorneys

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MINTEL INTERNATIONAL GROUP, )
LTD., a United Kingdom corporation, )
                             )
      Plaintiff, )
                             )
v. )
                             )
MEESHAM NEERGHEEN, an individual, )
                             )
      Defendant. )
                             )

Case No.:08 CV 3939

Judge Richard M. Dow

## AFFIDAVIT OF JON BUTCHER

I, Jon Butcher, declare under penalty of perjury that the following is true, accurate and within my personal knowledge, and I will competently testify to the statements contained herein if called to do so:

1.     I am CEO, Americas for Mintel International Group, Ltd. ("Mintel").

2.     Mintel is a leading supplier of consumer, product and competitive media intelligence, operating throughout North America, Latin America, Europe and Asia. Mintel services many of its clients on a global basis.

3.     Mintel has offices in Chicago, London, Belfast, Sydney, Tokyo and Shanghai and continues to grow on an international scale.

4.     Mintel services its clients in North America and South America out of Mintel's Chicago office. Mintel's London office caters to clients in the United Kingdom, the rest of Europe, Africa, the Middle East and Russia. Mintel's Sydney, Tokyo and Shanghai offices provide services to the Asia-Pacific region.

5.     Based upon our records, the top countries that visitors to Mintel's website come from (as of June 2008) include the United Kingdom, the United States, China, India, Germany, France, Canada, Ireland, the Netherlands and Spain.

6.     Mintel provides opportunities to its employees to transfer between offices and territories, taking their knowledge and experience with them. From a client



perspective, Mintel's employees in one territory are able to know details of the client decision makers and the levels of account use in other territories. This client knowledge is even greater when an employee transfers offices.

7.     Mintel provides five main products and services to its clients.

a. **Global New Products Database**: The Global New Products Database ("GNPD") monitors worldwide product innovation in consumer packaged goods markets for purposes such as competitor monitoring, category awareness and new product idea generation. The GNPD focuses upon the areas of ingredients, packaging and nutritional claims in categories encompassing food, beverages, beauty and personal case, household goods, and pet care. Datamonitor produces the Productscan database, which is directly competitive with Mintel's GNPD.

b. **Mintel Reports/Snapshots/MBD**: Mintel publishes research reports in the following consumer and business sectors: Automotive; Beauty; Clothing and Accessories; Consumer Lifestyles; Demographics; DIY & Gardening; Drink; Electrical Goods; Financial Services; Food and Food Service; Footwear; Health & Wellbeing; Household/Home; Industrial; Leisure; Lifestyles; Manufacture; Marketing/Promotions; Media; Personal Goods; Pharmaceuticals; Retail; Stationery & Books; Technology/Telecoms; Toiletries; Transport; and Travel & Tourism. Mintel reports generally contain market data, unique analyst commentary, insight and forecasting on how consumer attitudes will change. Datamonitor produces a similar range of global reports that are in direct competition with Mintel's offerings.

c. **Mintel Comperemedia**: Comperemedia provides competitive intelligence on direct mail, email marketing, broker agency marketing and print advertising in the United States and Canada. This service focuses primarily on the financial services industry encompassing credit cards, banking, mortgages and loans, investment and insurance, as well as the telecommunications, technology and travel sectors, providing detailed information on competitive offers, incentives and pricing with scanned

images of every marketing piece.  Datamonitor's interests in the financial services industry do provide a competitive threat to the Comperemedia business.

d. **Mintel Menu Insights**: Menu Insights profiles emerging trends from approximately 580 restaurants across the United States.  Menu Insights reports changes in price, menu items, ingredients and preparations as well as entirety new menus.  Datamonitor's interests in the food service sector provide a competitive threat to the Menu Insights business.

e. **Mintel's Research Consultancy**: Mintel's Research Consultancy is a dedicated consultancy team with a wealth of global experience.  Research Consultancy implements high quality business-to-business and consumer research programs for individual clients across the world.  Research Consultancy combines an immense network of field associates, in-house databases and capabilities to deliver programs such as ongoing research analysis, in-store audits, new product trend analysis, market and consumer studies, and leadership initiatives.  Datamonitor offers a similar consultancy service to existing and prospective clients that is in direct competition with Mintel.

8.     Salesforce, Mintel's CRM tool, operates globally and is accessible globally by authorized Mintel employees.

9.     The majority of Mintel's group activities are directly competitive with Datamonitor.  Mintel and Datamonitor generally target the same: (1) corporate, agency and academic clients; (2) industry bodies/associations; (3) industry suppliers/partners; (4) events, exhibitions, trade shows and speaker slots; and (5) media.

10.    Every client of Mintel is a potential target for Datamonitor.  Every trade association with whom Mintel has a relationship is a potential target for Datamonitor, and every trade show that Mintel attends is a potential target for Datamonitor.  Every media contact that Mintel has is a potential target for Datamonitor.

11.    The degree of difficulty in acquiring clients is high.  Mintel operates in a highly competitive environment and competes against Datamonitor on a global scale and against a myriad of other competitors in different regions.

3

12.    It typically takes Mintel four to eight weeks between the first contact with a prospective client and the deal closure. A substantial amount of time and effort is invested in each client in order to develop and sustain the relationship.

13.    Mintel takes great care to acquire and retain information related to its specific clients. Mintel immerses itself into its clients' businesses and processes in order to serve them to the best of Mintel's ability, to create the most positive business impact possible, and to become a true business partner. This means that Mintel invests significant time and effort to learn about a client's specific market environment; business situation; business plans; product plans; product/service portfolio; competition; and customers.

14.    Mintel has a client retention rate of approximately 85 percent.

15.    Upon investigation, I have determined that Mr. Neergheen joined Mintel in London in April 1997 on a 20-week Graduates Into Management Programme, which led to a permanent position at Mintel as Assistant Editor of our early GNPD product (known as International New Product Report) in June 1997. Mr. Neergheen's job responsibilities included collecting new product data from consumer packaged goods manufacturers; working with Mintel's global shopper network to ensure the purchase of new products; and compiling editorial material for GNPD.

16.    Upon investigation, I have determined that Mr. Neergheen was appointed to Marketing Executive in November 1998. His job duties included creating, dispatching and analyzing client questionnaires; writing and distributing Mintel's company group newsletter; managing the CRM database; and liaising with list brokers and mailing houses.

17.    Upon investigation, I have determined that Mr. Neergheen was appointed Marketing Operations Manager in 2000. His job responsibilities included creating and executing Mintel's marketing plans; planning and managing trade shows and exhibitions; analyzing sales and marketing performance; negotiating strategic links and sustaining relationships with international trade associations focusing on Europe and the Middle East, conferences and trade show organization; compiling creative briefs; managing and training Mintel's marketing interns; and improving traffic to Mintel's website via strategic relationships.

4

18.    Upon investigation, I have determined that Mr. Neergheen transferred to Mintel's Chicago office on or around November 5, 2001, and he was granted a five year visa in 2003. As an employee in Mintel's marketing department in Chicago, Mr. Neergheen covered third party relationships with a focus on trade associations across North America and South America. Mintel's trade association relationships are an integral part of Mintel's business strategy, because these organizations are influential in policy matters and as providers of market data. Furthermore, a trade association's endorsement generates increased credibility for Mintel. Therefore Mintel strives to establish exclusive trade association relationships and account manage these partnerships to generate as much opportunity for exposure through them as possible.

19.    Upon investigation, I have determined that Mr. Neergheen's role in the Group Marketing Department was focused around relationships with third parties such as Trade Associations and other suppliers/partners. Furthermore, as a member of a small team, Mr. Neergheen was involved and assisted with all other aspects of Mintel's marketing activity.

20.    On April 23, 2008, Mintel received written notification that Mr. Neergheen would be resigning from Mintel effective April 30, 2008.

21.    Upon investigation, I have determined that after Mintel received Meesham Neergheen's written notification of resignation on April 23, 2008, Ms Sabine Popp, Mintel's Global Marketing Director, asked Mintel's IT Director, Jason Thomson, to start saving Mr. Neergheen's emails on April 24, 2008. Mr. Neergheen's last day of employment with Mintel was on April 30, 2008.

22.    Upon investigation, I have determined that on or about April 30, 2008, Amy Mieding, Mintel's VP of HR for US Operations, mailed a letter to Mr. Neergheen's personal residence reminding him of his responsibilities in terms of restrictive covenants and obligations of confidentiality.

23.    On or about June 26, 2008, I learned that Mr. Neergheen was working for Datamonitor. I asked Amy Mieding, our US HR Director, to contact Mr. Neergheen to confirm this. Ms. Mieding telephoned and spoke with Mr Neergheen on his cell phone and he confirmed that he was working with Datamonitor.

24.     The matter was discussed at a meeting of Mintel Directors July 8, 2008. At that time, I asked Mr. Steve Charlton, Mintel's Group HR Director, who in turn worked with Mintel's IT Director, Jason Thomson, to review Mr. Neergheen's outbound emails.

25.  On or about July 9, 2008, Mr. Thomson discovered that Mr. Neergheen had emailed Mintel's confidential and proprietary trade secret information to his personal email address on April 29, 2008.

26.     On or about July 9, 2008, Mr. Thomson further discovered e-mail discussions on Mintel's e-mail servers relating to Mr Neergheen's attempts to find employment with competitors during the months preceding his departure from Mintel.


I, Jon Butcher, under penalties as provided by law pursuant to the Code of Civil Procedure, certify that the statements set forth in the foregoing Affidavit are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes same to be true.

Jon Butcher
CEO, Américas

Doc. No. 1926936

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MINTEL INTERNATIONAL GROUP,                )
LTD., a United Kingdom corporation,         )
                                            )
            Plaintiff,                      )        Case No.:08 CV 3939
                                            )
v.                                          )        Judge Richard M. Dow
                                            )
MEESHAM NEERGHEEN, an individual,           )
                                            )
            Defendant.                      )
                                            )

## AFFIDAVIT OF SABINE POPP

I, Sabine Popp, declare under penalty of perjury that the following is true, accurate and within my personal knowledge, and I will competently testify to the statements contained herein if called to do so:

1.      I am Global Marketing Director for Mintel International Group, Ltd. ("Mintel"). I was Meesham Neergheen's direct supervisor from October 2007 until his resignation on April 30, 2008.

2.      Mintel's core product offerings *Mintel GNPD* and *Mintel Reports* have a global reach. This core portfolio is complemented by the United States/Canada focused *Mintel Comperemedia* and United States coverage of *Mintel Menu Insights*. *Mintel's Research Consultancy* utilizes the insight and data from Mintel's product portfolio and their global expertise to provide clients across the world with customized research, analysis and services.

3.      Mr. Neergheen interacted with the following stakeholders on behalf of Mintel: industry bodies/trade associations; industry partners; industry suppliers; media; and corporate, agency and academic clients. Furthermore, Mr. Neergheen had regular communication with and access to other global peers working on similar projects for Mintel.

4.      On behalf of Mintel, Mr. Neergheen interacted most frequently with third party trade associations. Mintel has a working relationship with approximately 80 trade



1



associations, including, for example, Institution for International Research, Association for Car and Truck Rental Independent Franchises, Consumer Electronics Association, Electronic Retailing Association, Mortgage Bankers Association, LIMRA (association of insurance and financial services companies), National Association of Variable Annuities, and Tire Industry Association. These trade associations are an important part of Mintel's international business strategy and provide Mintel access to their members as potential clients.

5.    Mr. Neergheen's main job responsibilities for Mintel included: (1) assessing and establishing exclusive partnership agreements with industry and professional associations and conference and trade show organizers; (2) achieving agreements for trade presentations by Mintel's analysts and/or product tasting sessions in exchange for a trade show booth, signage, attendee lists for lead generation and other promotional consideration for Mintel; (3) account managing existing partnerships to create ongoing promotional opportunities for Mintel; (4) supporting opportunities opened up by sales managers to conduct presentations at current or prospective companies; (5) partnering with Mintel's analysts, services team, sales team and vendors to develop and deliver presentations at conferences, events and webinars for current and prospective clients; (6) identifying qualified prospects for sales and direct marketing campaigns and uploading leads from events, trade shows, trade associations and sponsorships into Mintel's databases; (7) coordinating direct marketing and online marketing activities; (8) representing Mintel at trade shows, exhibitions and targeted and prospective client events; and (9) acting as backup for other functions in the department, as needed.

6.    On or about October 1, 2007, I decided to restructure the marketing department in Mintel's Chicago office. As a result, Mr. Neergheen's position as a Marketing Operations Manager in the marketing department was eliminated.

7.    Mr. Neergheen was informed on December 7, 2007 that his position would be eliminated at the end of January 2008.

8.    Mintel agreed to assist Mr. Neergheen in looking for alternative roles within the company, because Mr. Neergheen wanted to remain in the United States. Mr. Neergheen met with Mintel's executives, including our Global CEO, on numerous occasions to discuss other possible opportunities for him within the company.

28/08/2008

2

9.    On or about November 8, 2007, Mr. Neergheen interviewed for Product Marketing Manager at Mintel but was ultimately not offered the position because he lacked management capabilities, project management skills and therefore failed to convince his interviewers that he had the potential to fulfill this role.

10.    On or about December 20, 2007, Mr. Neergheen was offered a services position in the Custom Solutions department that he declined to accept on January 3, 2008.    At this time, other roles in account management and trends analysis were discussed and mutually discounted.

11.    On or about January 16, 2008, Mr. Neergheen was offered a public relations position in Mintel's marketing department.  This role was created specifically for and only offered to Mr. Neergheen.  The position provided an identical base salary with an additional discretionary performance bonus and gave Mr. Neergheen additional time to apply for employment positions both inside and outside of Mintel.  Mr. Neergheen's position in the marketing department extended from February 1, 2008 until April 30, 2008. Due to illness within the department, Mr. Neergheen was requested to undertake a broader role encompassing product marketing for Comperemedia, Mintel's main US financial services product. This involvement continued for most of that period, during which he was directly responsible for areas including Comperemedia marketing campaigns (including qualifying the prospect list, messaging, developing, implementing and then following-up the marketing campaign); the promotion of new product functionality both internally and externally; marketing collateral (including client endorsements, internal FAQ documents and brochures); client-specific marketing; financial services trade show presence; and liaison with financial trade associations.

12.    On April 23, 2008, Mintel received written notification that Mr. Neergheen would be resigning from Mintel effective April 30, 2008.

I, Sabine Popp, under penalties as provided by law pursuant to the Code of Civil Procedure, certify that the statements set forth in the foregoing Affidavit are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that she verily believes same to be true

28/08/2008

Sabine Popp
Global Marketing Director

Doc. No. 1924496

3

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


MINTEL INTERNATIONAL GROUP,    )
LTD., a United Kingdom           )
corporation,                   )
                           )
        Plaintiff,        )
                           )
   -vs -               )   No. 08 CV 3939
                           )
MEESHAM NEERGHEEN, an       )
individual                 )
                           )
        Defendant.        )


The videotaped deposition of

MEESHAM NEERGHEEN, called for examination

pursuant to notice and the Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken

before Allison D. Weber, CSR, a notary public

within and for the County of Cook and State of

Illinois, at 33 West Monroe Street, Suite 2700,

Chicago, Illinois, on the 13th day of August,

2008, at the hour of 9:44 o'clock a.m.


Reported by:  Allison D. Weber, CSR
License No.:  084-002238

EXHIBIT

3

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 34

1  MR. ROACHE: I object to the form and to the
2  extent it calls for a legal conclusion.
3       You can answer.
4  THE WITNESS: I don't know.
5  BY MR. PIOLI:
6  Q.  When you read the clause, regardless of
7  the reason or cause for such termination, what
8  does that mean to you?
9  A.  That means whatever happens I'm not
10 supposed to work for any competitors or any
11 competitors for a period of a year.
12 Q.  That would include if your position
13 became redundant; isn't that right?
14 MR. ROACHE: Objection to the extent it calls
15 for a legal conclusion.
16      You can answer.
17 THE WITNESS: I guess so, yes.
18 BY MR. PIOLI:
19 Q.  The second paragraph says the term not
20 to compete as used in this agreement means that
21 the undersigned employee shall not own, manage,
22 operate, consult with or be employed by a
23 business substantially similar to or in
24 competition with the present business of Mintel.

Page 35

1       Is it your understanding that
2  Datamonitor is in competition with Mintel?
3  A.  Yes.
4  Q.  The third paragraph states that the
5  undersigned employee acknowledges that Mintel may
6  in reliance upon the terms of this agreement
7  supply or provide the undersigned employee with
8  access to Mintel's trade secrets, customer lists
9  or other information of a confidential or
10 proprietary nature.
11      Did you understand that you were being
12 given access during your employment with Mintel,
13 you were being given access to trade secrets,
14 customer lists and confidential information?
15 MR. ROACHE: Object to the form and to the
16 extent it calls for legal conclusions.
17      You can answer.
18 THE WITNESS: It all depends what you define
19 to be a trade secret.
20 BY MR. PIOLI:
21 Q.  Were you given access to customer lists?
22 A.  Yes.
23 Q.  Were you given access to cost data?
24 A.  I guess so, yes.

Page 36

1  Q.  Were you given access to pricing
2  information?
3  A.  Yes, pricing of our reports, yes.
4  Q.  When you were given access to customer
5  lists, pricing information and cost data, that
6  was not information that Mintel would want shared
7  with its competitors; is that right?
8  MR. ROACHE: Objection, calls for
9  speculation.
10      You can answer.
11 THE WITNESS: That's right. I haven't
12 shared anything.
13 BY MR. PIOLI:
14 Q.  The fourth paragraph, I won't bother to
15 recite, but it deals with recruiting, soliciting
16 or recruiting any of Mintel's employees to work
17 for a competitor.
18      Have you, since you have left Mintel,
19 have you contacted any of Mintel's employees?
20 A.  Absolutely not.
21 Q.  I don't mean in an effort to solicit,
22 have you contacted any in a social setting or any
23 purpose whatsoever?
24 A.  From a social setting?

Page 37

1  Q.  Sure.
2  A.  Yes, I still have friends at Mintel.
3  Q.  Who have you contacted?
4  A.  I have contacted Paul Phillips.  I
5  contacted Josh Motz.
6  Q.  Anyone else?
7  A.  Well, when you say contacted, I have
8  spoken with them.  I have spoken with Amy Wessel.
9  Who else have I spoken with?  Um, I have spoken
10 with Anthony Hughes.
11 Q.  Is that all?
12 A.  Kevin Maier.
13 Q.  These are all since you left; is that
14 right?
15 A.  Yes.  They're my friends, so I speak
16 with them, yes.
17 Q.  And they're just friendly phone calls,
18 hey, how you doing, that sort of thing?
19 A.  Yeah, and I have had face-to-face
20 meetings with them as well in a social setting.
21 Q.  Let me ask you to take a look at what
22 we're going to mark as Neergheen Exhibit No. 2.
23
24

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 58

1  as Datamonitor and Mintel?
2      A.   No.
3      Q.   How did you come to apply for a position
4  at Datamonitor?
5      A.   I had a -- I have a friend who works at
6  Datamonitor, and I wouldn't say he's a friend, I
7  haven't spoken with him for about six, five or
8  six years, but I e-mailed -- I knew that
9  Datamonitor had a Chicago office, and I e-mailed
10  him and said, "Well, hey could you potentially
11  pass me on the guy who manages the Chicago
12  office's details?  And I will e-mail him."
13      Q.   You don't remember when you sent that
14  e-mail?
15      A.   I think it was either towards the middle
16  or maybe the end of January.
17      Q.   Who was the gentleman that you knew at
18  Datamonitor?
19      A.   Mas, M-a-s, Hussain, H-u-s-s-a-i-n.
20      Q.   And at the time that you sent that
21  e-mail along to Mr. Hussain, you knew that
22  Datamonitor was a competitor of Mintel; is that
23  right?
24      A.   Yes.

Page 59

1      Q.   What happened after you sent the --
2  well, let me backtrack.
3          Did you call Mr. Hussain first before
4  sending the e-mail?
5      A.   (No audible response.)
6      Q.   You just sent him an e-mail?
7      A.   (No audible response.)
8      Q.   You need to answer.
9      A.   Yes.  Sorry.
10      Q.   After you sent the e-mail, did
11  Mr. Hussain respond?
12      A.   He responded after a couple of days,
13  yes.  Not instantly.
14      Q.   What was his response?
15      A.   Yeah, he passed me on the --
16  Richard Watkins' details, and I made -- I sent
17  Richard an e-mail and before I dropped by a
18  phone call.
19      Q.   When you sent the e-mail to
20  Mr. Hussain, did you know that there was an
21  opening at Datamonitor?
22      A.   No.
23      Q.   To your knowledge, did Datamonitor
24  publish that there was an opening?

Page 60

1      A.   No.  It was strictly speculative.
2      Q.   So Mr. Hussain passed your resume
3  on to Mr. Watkins; is that right?
4      A.   Uh-hum.  Yes.
5      Q.   He didn't tell you at that point that
6  yes, there was an opening?
7      A.   No.
8      Q.   And what happened next?  What was your
9  next contact with Datamonitor?
10      A.   Well, I tried to get in contact with
11  Richard Watkins, and I sent him my resume and I
12  sent him -- I sent my resume by e-mail and I
13  contacted him, left him a voicemail message.
14      Q.   And what happened next?
15      A.   I didn't hear back from Richard for
16  three or four days, and I left another voicemail
17  message, and eventually he got back to me by
18  e-mail and we had set up a time for me to come
19  into the office.
20      Q.   And when was that?  I assume then you
21  went in for an interview with Mr. Watkins.
22      A.   Yes, that's right.  I can't remember
23  when it was.  But I think it was most probably
24  towards the beginning of February.

Page 61

1      Q.   And what did you discuss during that
2  interview with Mr. Watkins?
3      A.   Just basically went through my resume
4  and what were my achievements, what I, you know,
5  what I like doing, and, I mean, that was it
6  basically.
7      Q.   I assume that you discussed your
8  experiences at Mintel during the interview?
9          MR. ROACHE:  I object to the form.
10          You can answer.
11          THE WITNESS:  I was told not to talk about
12  Mintel, so...
13  BY MR. PIOLI:
14      Q.   Who told you that?
15      A.   Richard Watkins.
16      Q.   You testified that you talked about your
17  accomplishments.
18      A.   Yeah, my accomplishments, but did
19  not -- he mentioned to me not to delve too much
20  into some proprietary stuff that, you know, that
21  would eventually feature in my achievements, so
22  trying to shy away from talking about certain
23  clients.
24      Q.   Okay.  Following the interview with

16 (Pages 58 to 61)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 70

```
1        Q.   Was it the day you were hired?
2        A.   Yes.
3        Q.   I'm sorry, was it the day you started
4   working there or the day you were hired?
5        A.   Sorry, the day I started working
6   there.
7        Q.   And what do you do as a partnership
8   and alliance manager?
9        A.   I set up strategically and commercially
10  beneficial relationships with organizations,
11  predominantly within pharmaceutical and health
12  care and technology.
13       Q.   Do you work in the financial sector at
14  all?
15       A.   I haven't, no.
16       Q.   Are you prohibited from working in any
17  sector at Datamonitor?
18       A.   Yes.
19       Q.   What sectors are those?
20       A.   Consumer package goods.
21       Q.   Anything else?
22       MR. ROACHE:  Object to the form.
23       You can answer.
24       THE WITNESS:  I don't -- I mean, I don't
```

Page 71

```
1   know.
2   BY MR. PIOLI:
3        Q.   That's the only one that you're aware
4   of that you are prohibited from working on?
5        A.   Yes.
6        Q.   And if I recall from Mr. Howard, there
7   are seven sectors at Datamonitor; is that right?
8        A.   Uh-hum.
9        Q.   And you can work on the other six, just
10  not consumer package goods?
11       A.   Uh-hum.
12       Q.   I'm sorry, is that yes?
13       A.   Yes, sorry, yes.
14            (Mr. Butcher entered.)
15  BY MR. PIOLI:
16       Q.   When Mr. Howard called you to offer
17  you a position did you immediately accept?
18       A.   I can't remember.  I may have called
19  him back.  I'm not too sure.
20       Q.   Did you accept within a day or two after
21  he extended that offer?
22       A.   I can't recall.
23       Q.   Was it within a week?
24       A.   I guess it was probably within a week,
```

Page 72

```
1   yes.
2        Q.   Did you have any other -- strike that.
3        At the time the offer was extended by
4   Mr. Howard on behalf of Datamonitor, did you have
5   any other offers of employment outstanding?
6        A.   No.
7        Q.   Do you recall approximately what the
8   date was that you accepted the position at
9   Datamonitor?
10       A.   I don't -- I can't remember.  It was
11  probably towards the middle -- I'm sorry, towards
12  the end of March.  I'm not too -- I can't give
13  you an exact date.
14       Q.   Now when you accepted the position at
15  Datamonitor, you were still employed by Mintel;
16  is that right?
17       A.   Yes.
18       Q.   And, in fact, if I remember correctly,
19  you handed in your letter of resignation
20  April 23rd; is that right?
21       MR. ROACHE:  Object to the form.
22       You can answer.
23       THE WITNESS:  It wasn't a letter of
24  resignation, it was stating the fact that I was
```

Page 73

```
1   asked to give -- to write that letter as well.
2   BY MR. PIOLI:
3        Q.   You were asked by whom?
4        A.   Sabine Popp to produce a document for
5   HR.
6        Q.   Why -- did Miss Popp indicate why she
7   wanted you to produce that letter?
8        A.   I don't know, but the letter clearly
9   states that I am working through to my -- 'til
10  the end of my temporary contract which ends
11  April the 30th.
12       Q.   Did you intend to stay longer?
13       A.   I'm sorry?
14       Q.   Did you intend to stay at Mintel longer
15  than April 30th, 2008?
16       MR. ROACHE:  Object to the form.
17       THE WITNESS:  I don't -- I don't know.
18  BY MR. PIOLI:
19       Q.   If I understand your testimony -- feel
20  free to correct me if I'm wrong -- but you're
21  saying you would never have sent this letter in
22  unless Miss Popp had asked you to?
23       A.   Yeah, Miss Popp had told me, you know,
24  I was advised to give a letter to HR.
```

19 (Pages 70 to 73)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 78

1  Datamonitor contain a provision regarding the
2  disclosure of confidential information?
3      A.   I don't know.
4      Q.   Do you have a copy of your
5  non-compete agreement with Datamonitor in your
6  possession?
7      A.   No.
8      Q.   Datamonitor didn't give you a copy
9  after you signed it?
10     A.   In -- sorry, in my possession now?
11  Yes, I do.  Not now, but I have it at home, yes.
12     Q.   And the same is true of your
13  employment agreement?
14     A.   Yes.
15     Q.   As a partnerships and alliances manager,
16  what do you do at Datamonitor?  I apologize if
17  that's being redundant here.
18     A.   Okay.  It's a role that is aimed at
19  securing strategic partnerships with the likes of
20  technology-based associations and pharmaceutical
21  and health-care-based associations and basically
22  pitching the idea that we at Datamonitor we sell
23  our reports, we're a reseller program, and try to
24  get them on board as a partner to resell our

Page 79

1  reports.
2      Q.   Are you working with trade associations
3  again?
4      A.   Yes.
5      Q.   And is that similar to what you did at
6  Mintel as well?
7      MR. ROACHE:  Object to the form.
8      THE WITNESS:  Absolutely not.
9  BY MR. PIOLI:
10     Q.   How is it different?
11     A.   I was leveraging at Mintel.  It was
12  strictly leveraging research for free
13  advertising, free booth space, free, you know,
14  pushing -- free -- basically anything to do with
15  increasing brand awareness levels.
16     Q.   Isn't that what you're doing when
17  you're trying to secure strategic alliances as
18  well?
19     MR. ROACHE:  Object to the form and
20  asked and answered.
21         You can answer.
22     THE WITNESS:  Yeah, I have a different
23  offering to go by at Datamonitor.
24

Page 80

1  BY MR. PIOLI:
2      Q.   What do you mean by a different
3  offering?
4      A.   Well, for example, we offer a reseller
5  program which is mutually beneficial to both
6  parties and they can sell our reports; and based
7  off how many reports they sell, they get some
8  revenue and Datamonitor will receive some revenue
9  as well.
10     Q.   So you have a different product with
11  Datamonitor than you did at Mintel; is that
12  right?
13     A.   It's still reports, yeah, but they
14  are -- they are more industry-based reports as
15  opposed to consumer, market research reports.
16     Q.   But aside from the offerings being
17  different, I mean your day-to-day activities are
18  similar between what you did at Mintel and what
19  you do at Datamonitor; isn't that right?
20     MR. ROACHE:  Object to the form and asked
21  and answered.
22         You can answer.
23     THE WITNESS:  I don't think so.
24

Page 81

1  BY MR. PIOLI:
2      Q.   Who do you report to at Datamonitor?
3      A.   I report to Jeff Howard.
4      Q.   What's Mr. Howard's title?
5      A.   I'm not sure.
6      Q.   Who does Mr. Howard report to?
7      MR. ROACHE:  Objection, calls for
8  speculation.
9      THE WITNESS:  I have -- I -- I don't know.
10  BY MR. PIOLI:
11     Q.   Do you know anyone else that reports to
12  Mr. Howard besides you?
13     MR. ROACHE:  Objection, calls for
14  speculation.
15         You can answer.
16     THE WITNESS:  I believe so, yes.
17  BY MR. PIOLI:
18     Q.   And who are those people?
19     MR. ROACHE:  Same objection.
20         You can answer.
21     THE WITNESS:  They're based out of the
22  Manchester office, I believe.
23  BY MR. PIOLI:
24     Q.   And do they fulfill similar functions to

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 98

1    Q.    What about the two flash drives that
2  you currently own, do those have any Mintel data
3  or information on them?
4    A.    I don't know.
5    Q.    Have you made a search of those thumb
6  drives to discern that?
7    A.    I don't -- I -- I haven't looked, no.
8    Q.    Do you know what Skype is?
9    A.    Yes.
10   Q.    What is Skype?
11   A.    Skype is office communicator.
12   Q.    What does that mean?
13   A.    It allows you to communicate with other
14 colleagues within a company and also anywhere
15 around the world.
16   Q.    Do you use Skype?
17   A.    I used it when I was at Mintel, but I
18 don't use it now.
19   Q.    Is it possible to retrieve data
20 information -- data and information using Skype?
21   A.    I don't know.
22   Q.    Now we had previously established that
23 you submitted I call it a letter of resignation
24 on April 23rd; is that right?

Page 99

1    MR. ROACHE:  Object to the form,
2  mischaracterizes the document.
3         You can answer.
4    THE WITNESS:  It wasn't a letter of
5  resignation.
6  BY MR. PIOLI:
7    Q.    Well, a notification that you were
8  leaving employment as of April 30th.
9    A.    I was leaving, and I was leaving and I
10 was working 'til the end of my temporary
11 contract.
12   Q.    You previously testified that your role
13 over the last few months you were at Mintel was
14 working in the consumer products group; is that
15 right?
16   MR. ROACHE:  Object to the form.
17   THE WITNESS:  No.
18 BY MR. PIOLI:
19   Q.    What were you doing the last few months
20 you were at Mintel?
21   A.    I was asked to fill in for a position, a
22 product marketing manager position for
23 Comperemedia.
24   Q.    And that's in the financial sector;

Page 100

1  isn't that right?
2    A.    Yes.
3    Q.    You did that for the last how many
4  months that you were there?
5    A.    I guess two-and-a-half months.
6    Q.    And were you filling in for Sri Gururaj?
7    A.    No.  No.
8    Q.    Why were you working on the
9  Comperemedia sector or business?
10   A.    I was filling in for someone else.
11   Q.    Who were you filling in for?
12   A.    Lynn Olson.
13   Q.    What position did -- is it Miss Olson?
14   A.    I believe so.  I don't know.
15   Q.    What position did Miss Olson have?
16   A.    Product marketing manager for
17 Comperemedia.
18   Q.    Now on April 29th, 2008 you sent an
19 e-mail from your Mintel work account to your
20 personal Hotmail account; is that correct?
21   A.    I don't know which -- what I sent.
22   Q.    I'm going to ask you to take a look at
23 what we're going to mark as Neergheen
24 Exhibit No. 3.

Page 101

1         (Whereupon, Neergheen Exhibit
2          No. 3 was marked for
3          identification.)
4    MR. ROACHE:  One question before you ask
5  him.  Has this document been produced in
6  litigation?  I don't see any Bates numbers on it.
7    MR. PIOLI:  I'm not sure to be honest with
8  you.  I assume it's been produced in some form or
9  another.  It's the e-mail which is referenced in
10 the complaint.
11 BY MR. PIOLI:
12   Q.    Does that document refresh your
13 recollection as to whether or not you sent an
14 e-mail from your Mintel e-mail account to your
15 personal Hotmail account?
16   A.    Yes.
17   Q.    Why did you send this e-mail to
18 yourself?
19   A.    I don't know.  I regret it now.
20   Q.    You didn't have any purpose in sending
21 it to yourself?
22   A.    Right.
23   Q.    You didn't think that this was
24 information that would benefit you within your

26 (Pages 98 to 101)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 106

1  it was done in the heat of a moment.
2      Q.   Well, you took it with the intent of
3  harming Mintel; is that right?
4      MR. ROACHE:  Object to the form.
5          You can answer.
6      THE WITNESS:  I don't know.
7  BY MR. PIOLI:
8      Q.   Well, you just said you were angry with
9  them. Did you want to hurt them?
10     MR. ROACHE:  Object to the form,
11 mischaracterizes his testimony.
12         You can answer.
13     THE WITNESS:  No.
14 BY MR. PIOLI:
15     Q.   Well, what does your being angry with
16 Mintel have to do with your e-mailing these
17 documents to yourself?
18     A.   I don't know. I don't know. It was
19 done in the heat of a moment, and I don't know
20 why I did it.
21     Q.   Your testimony is you have no idea why
22 you did it?
23     A.   No.
24     Q.   You didn't think this was something that

Page 107

1  would be beneficial to Datamonitor?
2      A.   Absolutely not.
3      Q.   It wouldn't help Datamonitor to see all
4  of Mintel's budget information --
5      A.   No.
6      Q.   -- for its trade shows?
7      A.   I don't know.
8      Q.   You think Mintel wants Datamonitor to
9  see this information?
10     A.   No.
11     Q.   Why do you think they don't want
12 Datamonitor to see it?
13     MR. ROACHE:  Objection, calls for
14 speculation.
15         You can answer.
16     THE WITNESS:  I guess competitors.
17 BY MR. PIOLI:
18     Q.   This would be harmful if one of your
19 competitors saw this, wouldn't it?
20     MR. ROACHE:  Objection, calls for
21 speculation.
22         You can answer.
23     THE WITNESS:  Yes.
24

Page 108

1  BY MR. PIOLI:
2      Q.   This document, Neergheen Exhibit 4,
3  this spreadsheet, is this something that was
4  shown to -- that all Mintel employees had access
5  to?
6      A.   I don't know if all Mintel employees had
7  access to it.
8      Q.   Do you know if it was only people in the
9  marketing group that had access to it?
10     A.   I believe so.
11     Q.   I'm going to show you what we're going
12 to mark as Neergheen Exhibit 5 and ask you to
13 take a look at it.
14         (Whereupon, Neergheen Exhibit
15          No. 5 was marked for
16          identification.)
17 BY MR. PIOLI:
18     Q.   Can you identify what the document
19 labelled Neergheen Exhibit 5 is?
20     A.   It's marketing expenses.
21     Q.   Is it the document referenced as Marcomm
22 approved expenses.xls?
23     A.   It could be. I don't know.
24     Q.   What is Marcomm?

Page 109

1      A.   Marcomm Communications.
2      Q.   Is this one of the documents that you
3  e-mailed to yourself on April 29, 2008?
4      A.   If it's on the initial list that I sent
5  to myself, then yes.
6      Q.   And is this, once again, costing data,
7  Mintel's costing data?
8      MR. ROACHE:  Object to the form.
9          You can answer.
10     THE WITNESS:  I don't know.
11 BY MR. PIOLI:
12     Q.   Well, what's reflected on this
13 document?
14     A.   It's marketing costs.
15     Q.   And do you think, once again, this is
16 something Mintel would want its competitors to
17 see?
18     MR. ROACHE:  Objection, calls for
19 speculation.
20         You can answer.
21     THE WITNESS:  I don't know.
22 BY MR. PIOLI:
23     Q.   Was this, once again, one of those
24 documents that you sent to yourself because you

28 (Pages 106 to 109)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 110

1  were angry with Mintel?
2      A.  Yes.
3      Q.  And you knew that Mintel would not
4  want Datamonitor to see this document; isn't that
5  right?
6      MR. ROACHE:  Object to the form,
7  speculation.
8          You can answer.
9      THE WITNESS:  I -- I don't know.
10 Datamonitor has not seen any of this
11 information.
12 BY MR. PIOLI:
13     Q.  This isn't something that Mintel goes
14 around publishing to its competitors, is it?
15     A.  I would hope not.
16     Q.  And is this another document that is
17 not -- that is only available to those on the
18 marketing committee?
19     A.  I believe so.
20     Q.  I'm going to ask you to take a look at
21 what we're going to mark as Neergheen Exhibit 6.
22         (Whereupon, Neergheen Exhibit
23          No. 6 was marked for
24          identification.)

Page 111

1  BY MR. PIOLI:
2      Q.  Can you identify what this document is
3  that we have marked as Neergheen Exhibit 6?
4      A.  It's just from -- from what it's titled,
5  it's marketing activities and marketing schedule,
6  I guess.
7      Q.  Do you think it's common for competitors
8  to share their marketing of their objectives with
9  one another?
10     MR. ROACHE:  Object to the form, speculation.
11         You can answer.
12     THE WITNESS:  No.
13 BY MR. PIOLI:
14     Q.  Do you think Mintel would want
15 Datamonitor to know what its marketing objectives
16 are?
17     MR. ROACHE:  Same objections.
18         You can answer.
19     THE WITNESS:  No.
20 BY MR. PIOLI:
21     Q.  This isn't a document that Mintel goes
22 around publishing to its competitor, is it?
23     A.  No.  I don't know.
24     Q.  Do you have reason to believe that

Page 112

1  Mintel does go around publishing this document to
2  its competitors?
3      A.  I should hope not.
4      Q.  Once again, is this a document that was
5  only available to those in the marketing group?
6      A.  Yes.
7              (Whereupon, Neergheen Exhibit
8               No. 7 was marked for
9               identification.)
10 BY MR. PIOLI:
11     Q.  I'm going to hand you what we have
12 marked as Neergheen Exhibit 7.
13         Can you identify what the document is
14 that we have marked as Neergheen Exhibit 7?
15     A.  Yes, it's a weekly update on tasks
16 specifically geared to the execs, executives.
17     Q.  And it directs the activities of what
18 those executives are going to do; is that
19 correct?
20     A.  No.  It's what, I believe, what the
21 marketing team is doing on behalf of for the
22 execs.
23     Q.  It lays out specific actions for the
24 marketing committee; is that right?

Page 113

1      A.  It looks like it.
2      Q.  Once again, is this a document that you
3  would expect Mintel to share with its
4  competitors?
5      MR. ROACHE:  Object to the form.  It calls
6  for speculation.
7      THE WITNESS:  I don't know.
8  BY MR. PIOLI:
9      Q.  Is this a document that during your time
10 with Mintel they would share with competitors?
11     A.  I don't know.
12     Q.  To your knowledge, did Mintel ever share
13 a document like this with a competitor?
14     A.  I don't know.
15     Q.  Is this a document that was only
16 available to those in the marketing committee --
17 marketing group?  Excuse me.
18     A.  I believe so.
19     Q.  In your work at Datamonitor, do they
20 share documents like this with their competitors?
21     A.  I don't know.
22     MR. ROACHE:  Object to the form.
23     THE WITNESS:  Sorry.
24     MR. ROACHE:  Go ahead.

29 (Pages 110 to 113)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 122

1  Q.  Well, if you produced it in this
2  litigation, doesn't that indicate to you that you
3  had it as of the time you started employment at
4  Datamonitor?
5  A.  Yes, but it's something that I have
6  never gone back to, so...
7          (Whereupon, Neergheen Exhibit
8          No. 10 was marked for
9          identification.)
10  BY MR. PIOLI:
11  Q.  I'm going to hand you what we have
12  marked as Neergheen Exhibit 10 and ask you to
13  take a look at it.
14          Can you identify what the document is
15  that we have marked Neergheen Exhibit 10?
16  A.  It's, as it says, it's a master plan
17  outline for consumer e-mail.
18  Q.  And the first page of this document
19  indicates that you e-mailed it to your Hotmail
20  account on January 15, 2008; is that correct?
21  A.  Yes.
22  Q.  And why did you send this document to
23  yourself on that date?
24  A.  I don't know.  I must have been helping

Page 124

1          (Whereupon, Neergheen Exhibit
2          No. 11 was marked for
3          identification.)
4  BY MR. PIOLI:
5  Q.  I'm going to ask you to take a look at a
6  document that has been marked Neergheen
7  Exhibit 11 and ask you to look at it.
8          Can you identify what that document is
9  that we have marked Neergheen Exhibit 11?
10  A.  Yes.  It's a trade association master
11  spreadsheet.
12  Q.  Did you have any hand in preparing this
13  document?
14  A.  I built this document.
15  Q.  And did you do so while you were
16  employed by Mintel?
17  A.  Yes.
18  Q.  And does the first page of this document
19  indicate that you e-mailed it to your personal
20  Hotmail account on March 25, 2008?
21  A.  Yes.
22  Q.  And why did you do that on March 25th,
23  2008?
24  A.  I don't know.

Page 123

1  out on a specific project.
2  Q.  Did you draft any of this document?
3  A.  Not that I can recall.
4  Q.  Once again, this was a document that
5  was in your possession as of the time that you
6  began work with Datamonitor; is that correct?
7  A.  I have -- this is news to me, and, yes,
8  I have never seen this document ever since I have
9  sent it.
10  Q.  Do you regularly delete e-mail from your
11  account?
12  MR. ROACHE:  Object to the form.
13  THE WITNESS:  I don't know.  I don't know
14  how often I delete.
15  BY MR. PIOLI:
16  Q.  Again, is this a document, to your
17  knowledge, that Mintel ever shared this
18  document with any of its competitors, including
19  Datamonitor?
20  A.  I don't know.
21  Q.  Is this a document you think Mintel
22  would want in the possession of its competitors?
23  A.  I don't know.
24

Page 125

1  Q.  Had you already accepted your -- the
2  offer of employment with Datamonitor on
3  March 25th, 2008?
4  A.  I don't know.
5  Q.  Was it about that time that you did?
6  MR. ROACHE:  I object to the form, asked and
7  answered.
8  THE WITNESS:  I don't know.
9  BY MR. PIOLI:
10  Q.  When did you accept your offer of
11  employment with Datamonitor?
12  MR. ROACHE:  Objection, asked and answered.
13  You can answer.
14  THE WITNESS:  I'm not so sure when.  I
15  can't remember the exact date.
16  BY MR. PIOLI:
17  Q.  Was it before April, 2008?
18  MR. ROACHE:  Same objection.
19  You can answer.
20  THE WITNESS:  I don't know.
21  BY MR. PIOLI:
22  Q.  Was it prior to March, 2008?
23  A.  I don't know.
24  Q.  Was it prior to February, 2008?

32 (Pages 122 to 125)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 134

```
1   spreadsheet?
2        A.   Salespeople.  I don't know.
3        Q.   Mintel salespeople; is that right?
4        A.   Yes.
5        Q.   This is a document that you e-mailed to
6   yourself on December 28, 2007; is that right?
7        A.   Yes.  I don't remember e-mailing it,
8   but I did.
9        Q.   Do you recall why you would e-mail --
10  why you e-mailed this to yourself?
11       A.   I don't know.
12       Q.   Did you often work on these commission
13  spreadsheets?
14       A.   No.
15       Q.   Did you ever work on these commission
16  spreadsheets?
17       A.   No.
18       Q.   This is a document that you would keep
19  in some sort of personal file that you had at
20  home?
21       A.   I don't know.
22       MR. PIOLI:  Could we take five minutes?
23       MR. ROACHE:  Absolutely.
24       THE VIDEOGRAPHER:  Going off the record at
```

Page 135

```
1   2:11 p.m.
2               (Discussion off the record.)
3        THE VIDEOGRAPHER:  Back on the record at
4   2:18 p.m.
5   BY MR. PIOLI:
6        Q.   Mr. Neergheen, from the time you
7   submitted your letter informing Mintel that you
8   would not continue your employment past
9   April 30th, were you doing any work for Mintel
10  between April 23rd and April 30th?
11       A.   Yes, I believe I was.  I can't remember
12  what I was working on.
13       Q.   You testified earlier that you tried to
14  work relationships with trade associations; is
15  that right, and that they would -- you would do
16  favors for them, they would do favors for you; is
17  that correct?
18       MR. ROACHE:  Object to the form.
19            You can answer.
20       THE WITNESS:  Yes, at Mintel, yes.
21  BY MR. PIOLI:
22       Q.   And was one of the favors that the
23  trade association would do would give you a list
24  of attendees at their conferences?
```

Page 136

```
1        A.   Yes.
2        Q.   And that's something that would be
3   beneficial at Mintel that they could use to their
4   advantage?
5        A.   Yes.
6               (Whereupon, Neergheen Exhibit
7                No. 13 was marked for
8                identification.)
9   BY MR. PIOLI:
10       Q.   I'm going to ask you to take a look at
11  what we have marked as Neergheen Exhibit 13.
12            Can you identify what the document is
13  that we have marked Neergheen Exhibit 13?
14       A.   Yes, it's a delegate list from a show?
15       Q.   It's a -- there's an e-mail on the first
16  page of the document, and it states the subject
17  matter is 2008 Life Insurance Conference,
18  Post-Conference Attendee List; is that correct?
19       A.   Yes.
20       Q.   And the list that's attached to this
21  e-mail, is that one of those lists that we were
22  just talking about that the trade association
23  would give to Mintel?
24       A.   That's based on -- yes.  Yes.
```

Page 137

```
1        Q.   And this is something that had value to
2   Mintel; is that right?
3        MR. ROACHE:  Object to the form, foundation,
4   speculation.
5            You can answer.
6        THE WITNESS:  I don't know.
7   BY MR. PIOLI:
8        Q.   Didn't you just testify that these lists
9   that the trade associations would provide had
10  some benefit to Mintel?
11       A.   I don't know if this list had any
12  particular value to Mintel.
13       Q.   But this is one of those lists, is it
14  not?
15       A.   Yes.
16       Q.   And you submitted that letter stating
17  that your last day at Mintel would be April 30th.
18  You submitted that letter on April 23rd; is that
19  right?
20       A.   Yes.
21       Q.   And this, Neergheen Exhibit 13, is
22  an e-mail where you forwarded the list of
23  conference attendees to your home, your personal
24  e-mail address on Friday, April 25th; is that
```

35 (Pages 134 to 137)

Mintel vs. Neergheen (CONFIDENTIAL Deposition of Meesham Neergheen, taken 08-13-08)

Page 138

1  correct?
2      A.  Yes.
3      Q.  And at this time you had already
4  accepted your position with Datamonitor; is that
5  right?
6      A.  Yes.
7      Q.  So at the time that you began your
8  employment with Datamonitor, this was a document
9  that you had in your possession; is that correct?
10      MR. ROACHE:  Object to the form and
11  foundation.
12          You can answer.
13      THE WITNESS:  In my possession at work, no.
14  BY MR. PIOLI:
15      Q.  Well, you began employment with
16  Datamonitor on May 27th, 2008; is that right?
17      A.  Yes.
18      Q.  And this is a document that you turned
19  over in this litigation; is that correct?
20      A.  Yes.
21      Q.  And this litigation was not instituted
22  until July 11, 2008; is that right?
23      A.  Yes.
24      Q.  So you had this document in your

Page 139

1  possession on July 11th, 2008; is that right?
2      A.  Yes.
3      Q.  So you also had this document in your
4  possession when you began employment with
5  Datamonitor on March 27, 2008; is that right?
6      A.  Yes.
7      Q.  Why do you believe you were hired by
8  Datamonitor?
9      MR. ROACHE:  Object to the form,
10  speculation.
11          You can answer.
12      THE WITNESS:  I don't know.
13  BY MR. PIOLI:
14      Q.  Was it because of your previous
15  experience?
16      MR. ROACHE:  Object to the form,
17  speculation.
18          You can answer.
19      THE WITNESS:  I don't know.
20  BY MR. PIOLI:
21      Q.  Was it because of all the information
22  you gathered over your years of working at Mintel
23  regarding trade associations?
24      MR. ROACHE:  Object to the form, foundation,

Page 140

1  speculation.
2          You can answer.
3      THE WITNESS:  I don't know.
4  BY MR. PIOLI:
5      Q.  Do you think that was one of the
6  factors?
7      MR. ROACHE:  Same objections.
8          You can answer.
9      THE WITNESS:  I don't know.
10  BY MR. PIOLI:
11      Q.  Since the time that you left Mintel's
12  employment, have you been in touch with any of
13  the trade associations that you dealt with while
14  you were at Mintel?
15      A.  No.
16      Q.  Have you provided the names of any
17  of the trade associations to anyone at
18  Datamonitor?
19      MR. ROACHE:  Object to the form.
20      THE WITNESS:  No.
21  BY MR. PIOLI:
22      Q.  Did you provide the names of any of
23  the trade associations that you dealt with at
24  Mintel to anyone at Datamonitor?

Page 141

1      A.  No.
2      Q.  Do you know of anybody else that
3  Datamonitor interviewed for your position?
4      A.  I don't know.
5      Q.  Do you know of any other former Mintel
6  employees who currently work for Datamonitor?
7      A.  Yes.
8      Q.  Who would those be?
9      MR. ROACHE:  Objection, relevance.
10          You can answer to the extent you know.
11      THE WITNESS:  Ruon Cooper.
12  BY MR. PIOLI:
13      Q.  Anyone else?
14      A.  That's it now.
15      Q.  What's Mr. Cooper's position at
16  Datamonitor?
17      MR. ROACHE:  Can I have a standing objection
18  to relevance?
19      MR. PIOLI:  Sure.
20      MR. ROACHE:  Go ahead.
21      THE WITNESS:  I don't know.
22  BY MR. PIOLI:
23      Q.  Have you had any conversations with him
24  since you started at Datamonitor?

Marlo Reporting & Video Services, Inc.
(312) 578-0041

Mintel
vs.
Meesham Neergheen

CONFIDENTIAL 30(b) (6) deposition
of Jeffrey Howard

**Taken on: July 22, 2008**

Marlo Reporting & Video Services, Inc.
Phone: (312) 578-0041
Fax: (312) 578-0045
Email: marloreporting@ameritech.net



EXHIBIT

4.

Mintel vs. Meesham (CONFIDENTIAL 30 (b) (6) Deposition of Jeffrey Howard, taken 07-22-08)

Page 42

1    Q.  And what was that position again?
2    A.  Partners and alliances manager.
3    Q.  And this had nothing to do with what
4  Mr. Watkins does; is that correct?
5    A.  I'm sorry.  Could you repeat the
6  question?
7    Q.  Sure.  Partners and alliances, that has
8  nothing to do with what Mr. Watkins does; is that
9  right?
10    A.  Absolutely nothing.
11    Q.  You just wanted Mr. Watkins to meet with
12  Mr. Neergheen to get a general sense of his
13  competency; is that right?
14    A.  To find out whether he was competent and
15  credible, yes.
16    Q.  What happened following Mr. Watkins
17  reporting back to you?
18    A.  Mr. Watkins reported back to me that
19  Mr. Neergheen was competent and credible.  At the
20  back of that, I decided that I wanted to
21  interview Mr. Neergheen myself.  And so a second
22  interview was arranged, which was conducted over
23  the telephone given the distance between London
24  and Chicago.

Page 43

1    Q.  Do you know when that interview
2  occurred?
3    A.  Again, the specifics I don't know off
4  the top of my head.  But I would guess sometime
5  around late February or early March.
6    Q.  Was it within a week of Mr. Watkins
7  reporting back to you?
8    A.  I'm not sure.  It could have been within
9  a week.  It could have been a couple of weeks.  I
10  don't know without going back and having a look
11  in my agenda.
12    Q.  To your knowledge did Mr. Neergheen have
13  any contact with anyone at Datamonitor from the
14  time Mr. Watkins met with him until the time you
15  had your phone interview with him?
16    A.  To the best of my knowledge, no.
17    Q.  How long was your interview, your phone
18  interview with Mr. Neergheen?
19    A.  Approximately one hour.
20    Q.  What topics did you cover during that
21  hour?
22    A.  I was very conscious of not wanting to
23  ask anything commercially sensitive with regards
24  to Mr. Neergheen's then current employment.  So

Page 44

1  everything was based upon hypotheses,
2  hypothetical scenarios relating to two industry
3  sectors, pharmaceuticals and technology only.
4    Q.  Why was it pharmaceuticals and
5  technology only?
6    A.  For two reasons; one, because I wanted
7  to identify how sharp Mr. Neergheen was by giving
8  him two industry sectors that, to the best of my
9  knowledge, he had no prior expertise in.  It
10  allowed me to deduce whether he was, as I wanted
11  him to be, commercially sharp.  And secondly,
12  because to the best of my knowledge there was
13  absolutely no opportunity for crossover between
14  Datamonitor and Mintel using those two verticals.
15    Q.  Did you understand he had experience in
16  the other sectors, financial services for
17  instance?
18    A.  No.  The only two sectors I understood
19  he had any prior experience in was consumer
20  packaged goods and retail.
21    Q.  Is that what Mr. Neergheen represented
22  to you during his interview?
23    A.  I can't remember the specifics, but
24  that's absolutely my inference.

Page 45

1    Q.  Based on what he told you?
2    A.  I can't remember the specifics.
3    Q.  How else would you get that impression?
4    A.  Perhaps it was assumption on my part,
5  making assumption that Mintel had consumer
6  packaged goods and retail.  But regardless,
7  that's the situation, and as a result I clearly
8  focused on pharmaceuticals and technology.
9    Q.  Do you understand Mintel's business,
10  the scope of Mintel's business, to just be
11  consumer and retail?
12    A.  That would be my assumption, yes.
13    Q.  But you can't tell me if that's based on
14  what Mr. Neergheen told you; is that right?
15    MR. ROACHE:  Objection, asked and answered.
16  You can answer again.
17    THE WITNESS:  No, I can't.
18  BY MR. PIOLI:
19    Q.  Was that based on what Mr. Neergheen
20  told you?
21    MR. ROACHE:  Objection, asked and answered.
22  You can answer again.
23    THE WITNESS:  I previously mentioned I can't
24  recall.

12  (Pages 42 to 45)

Mintel vs. Meesham (CONFIDENTIAL 30 (b) (6) Deposition of Jeffrey Howard, taken 07-22-08)

Page 62

1    MR. ROACHE:  I'll object to the form and ask
2  if you can rephrase the question.
3  BY MR. PIOLI:
4    Q.  Let's see if I can do a little better.
5       Did you, following the second interview,
6  did you make an offer of employment to
7  Mr. Neergheen?
8    A.  Datamonitor did make an offer of
9  employment.  It was a little while after the
10  interview.
11    Q.  About how long after the interview?
12    A.  I don't know.  I can't recall the exact
13  time frame.  I would imagine one to two weeks.
14    Q.  So if my notes are correct, the second
15  interview was in late February, early March; is
16  that correct?
17    A.  To the best of my knowledge, yes.
18    Q.  And then the offer was made one to two
19  weeks after that; is that right?
20    A.  Yes.  But again, the specific dates I'm
21  not clear on off the top of my head.
22    Q.  Would these dates be reflected in your
23  written diary?
24    A.  I would expect so.  But the date that

Page 63

1  the offer went out wouldn't.
2    Q.  Did you call him to extend the offer, or
3  did you submit something written to him?
4    A.  I believe that our human resources
5  department sent a written offer to Mr. Neergheen.
6    Q.  And obviously there would be a record of
7  that somewhere?
8    A.  I would expect so, yes.
9    Q.  Was the extending of the offer the next
10  contact that Datamonitor had with Mr. Neergheen
11  following the second interview?
12    A.  I'm sorry, the line was bad.  Can you
13  repeat?
14    Q.  Sure.  Was the extending of the offer
15  the next contact that Datamonitor had with
16  Mr. Neergheen following the your interview with
17  him?
18    A.  Yes, I believe so.
19    Q.  Now, did you or anyone else at
20  Datamonitor discuss the fact that Mr. Neergheen
21  had a covenant not to compete with Mintel?
22    A.  I believe that it was something that he
23  raised with our human resources department.
24    Q.  Would that be with Mr. Grey, do you

Page 64

1  know?
2    A.  I would expect so, yes.
3    Q.  Did you have any conversations with
4  Mr. Grey about that?
5    A.  To the best of my knowledge, no.
6    Q.  But you were aware that he had a
7  covenant not to compete?
8    A.  I've mentioned it as being mentioned.
9  But that is not an area that I'm involved in.
10    Q.  Would the answer be the same with regard
11  to Mr. Neergheen's employment agreement with
12  Mintel, that he would have had discussions with
13  that with HR if they happened?
14    A.  It would gone through HR, yes.
15    Q.  Once again that's Mr. Grey?
16    A.  Yes.
17    Q.  Did you have any belief as to whether or
18  not Mintel would sue if you hired Mr. Neergheen?
19    MR. ROACHE:  Object to the form,
20  speculation.  You can answer.
21    THE WITNESS:  No.
22  BY MR. PIOLI:
23    Q.  That's something that never crossed your
24  mind?

Page 65

1    MR. ROACHE:  Same objections.  You can
2  answer.
3    THE WITNESS:  No.
4  BY MR. PIOLI:
5    Q.  Am I right to assume that you have never
6  seen Mr. Neergheen's covenant not to compete with
7  Mintel?
8    A.  In terms of the full agreement,
9  absolutely not.  I can't remember whether lines
10  of it were quoted to me, but I have no idea.
11    Q.  So you extended the offer to
12  Mr. Neergheen one to two weeks after your
13  interview with him; is that correct?
14    A.  To the best of my knowledge, yes.
15    Q.  And how long did it take him to accept
16  the offer?
17    A.  Speedily.
18    Q.  Say within one day, two days?
19    A.  Something like that.  But again, I'm not
20  clear on the exact timing.
21    Q.  Did he tell you that he was going to
22  quit Mintel at that point?
23    A.  I don't believe that was discussed.
24    Q.  Did you discuss when he was going to

17 (Pages 62 to 65)

## Page 66

1  start at Datamonitor?
2     A.  We talked about the date from the end of
3  April onwards.
4     Q.  And this was a discussion that you had
5  with Mr. Neergheen when he accepted your offer of
6  employment; is that right?
7     A.  I believe so.
8     Q.  And this would have been one to two
9  weeks after your interview with him in late
10  February or early March; is that right?
11    A.  Yes.  But again, subject to specifics.
12    Q.  But at that point he had accepted your
13  offer of employment with Datamonitor?
14    A.  I believe so.
15    Q.  But he didn't give you any indication
16  that he was going to quit Mintel?
17    MR. ROACHE:  Objection, asked and answered.
18  You can answer again.
19    THE WITNESS:  We talked about a start date in
20  late April or after, subject to visa
21  availability.
22  BY MR. PIOLI:
23    Q.  Did you give him any advice that he
24  should quit Mintel at that point?

## Page 67

1     A.  Absolutely not.
2     Q.  Do you know if anyone in the HR
3  department spoke to him about that?
4     A.  To the best of my knowledge, no.
5     Q.  So you contemplated a start date of late
6  April, correct?
7     A.  Late April, I think, approximately, yes.
8     Q.  And did Mr. Neergheen start working in
9  late April?
10    A.  No.
11    Q.  Why not?
12    A.  Because the visa application was going
13  through.
14    Q.  Who handled the visa application?
15    A.  Datamonitor's human resources
16  department.
17    Q.  Would Mr. Grey be the person most
18  knowledgeable about that?
19    A.  I would expect so, yes.
20    Q.  Has Mr. Neergheen started working yet?
21    A.  Sorry?
22    Q.  Has Mr. Neergheen started working yet?
23    A.  Has he?
24    Q.  Yes.

## Page 68

1     A.  Yes.
2     Q.  When did he start?
3     A.  To the best of my knowledge, late May.
4     Q.  And you are his direct supervisor; is
5  that right?
6     A.  Yes.
7     Q.  Did you, from the time he accepted your
8  offer until the time he started, did you know
9  what he was doing work-wise?
10    A.  Absolutely not.
11    Q.  Did he inform you when he quit Mintel?
12    A.  No.
13    Q.  Do you know whether or not he had any
14  conversations with human resources regarding his
15  employment at Mintel following his acceptance of
16  the offer?
17    A.  I'm not sure.
18    Q.  You previously indicated that you made
19  it abundantly clear to Mr. Neergheen that you
20  didn't want him to bring any of Mintel's
21  information with him to Datamonitor; is that
22  right?
23    A.  Absolutely.
24    Q.  What if you found out that he did do

## Page 69

1  that?  What would your reaction be?
2     MR. ROACHE:  Object to the form.
3     THE WITNESS:  That it would be in
4  contravention of what we discussed, and in
5  contravention of the agreement that he signed
6  prior to joining Datamonitor.
7  BY MR. PIOLI:
8     Q.  Would it be grounds for dismissal?
9     A.  If he brought the contents to
10  Datamonitor, absolutely.
11    Q.  What about if he copied it and just
12  accessed it from home, would that be grounds for
13  dismissal?
14    MR. ROACHE:  Object to the form, foundation,
15  speculation.  You can answer.
16    THE WITNESS:  I made it and Datamonitor made
17  it abundantly clear to Mr. Neergheen that his
18  employment with Datamonitor was related to
19  sectors and clients that he previously not dealt
20  with.  And that under no circumstances was he to
21  bring in any information whatsoever from his
22  previous employer.
23  BY MR. PIOLI:
24    Q.  Well, if it turned out that he

18 (Pages 66 to 69)

Mintel vs. Meesham (CONFIDENTIAL 30 (b) (6) Deposition of Jeffrey Howard, taken 07-22-08)

Page 90

1  I believe we spoke about her earlier, and was
2  that Miss Mookerjee?
3      A.  Yes.
4      Q.  Now Mr. Neergheen, he's based in
5  Chicago; is that correct?
6      A.  That's correct.
7      Q.  And he was to take Miss Mookerjee's
8  place; is that right?
9      A.  In performing the same function that she
10 previously performed between 2005 and 2007,
11 that's correct.
12     Q.  And Miss Mookerjee, she was in New York;
13 is that right?
14     A.  She was.
15     Q.  There any advantage to being in New York
16 or Chicago for that position?
17     A.  None whatsoever.  It doesn't make any
18 difference.
19     Q.  And why is that?
20     A.  Because it's all the USA.
21     Q.  Do you find a concentration of the trade
22 associations and media companies in New York?
23     A.  No.  Given the diversity of the industry
24 sectors that we cover at Datamonitor, there isn't

Page 91

1  one single hub.  The core of communication is
2  done over the telephone.  So long as you're in
3  the same geography, which to me means the
4  United States, it's city neutral.
5      Q.  You indicate further down in that
6  paragraph that:  Whilst the role is global -- and
7  there you're referring to Mr. Neergheen's
8  position; is that right?
9      A.  Potentially.  It could be global.  But
10 its focus is, and will be until further notice,
11 US specific.  Because that's the single largest
12 market opportunity.
13     Q.  But he could potentially be reaching out
14 to people all around the world; is that right?
15     A.  Theoretically.  But practically at the
16 moment, no.
17     Q.  In Paragraph 4 you indicate:  Finally,
18 in late January 2008 I was given the C.V. of
19 Meesham Neergheen.  The C.V. indicated that
20 Mr. Neergheen had experience identifying
21 commercial partnerships with the media, public
22 companies, and trade associations.
23     First of all, Counsel has produced a
24 number of documents to me.  And I quickly scanned

Page 92

1  through them.  Do you still have a copy of
2  Mr. Neergheen's resume or C.V.?
3      A.  With me, no.  I haven't searched for
4  one.  So I don't know.
5      Q.  So that's probably maintained somewhere
6  in a personnel file or something?
7      A.  I would expect so, yes.
8      Q.  You stated that:  The C.V. indicated
9  that Mr. Neergheen had experienced identifying
10 commercial partnerships with the media, public
11 companies, and trade associations.  Was that his
12 experience at Mintel?
13     A.  I believe so, yes.
14     Q.  In the next sentence you indicated:  His
15 experience in setting up relationships and
16 brokering deals with outside organizations was
17 ideal for our vacant position.
18     Was that also his experience with
19 Mintel?
20     A.  I believe that's what the C.V. or
21 resume, as you said, indicated, yes.
22     Q.  In Paragraph 5 you indicate:  Whilst the
23 small part of Datamonitor's business is focused
24 with the CPG which is consumer packaged goods and

Page 93

1  retail markets, these are just two out of a total
2  of seven sectors that Datamonitor publishes
3  content on, and which we sell into.
4      A.  Yes.
5      Q.  And I do apologize if I've asked this
6  already.  What percentage would the consumer
7  packaged goods sector comprise of Datamonitor's
8  business?
9      A.  I'm afraid I don't know the answer to
10 that question.
11     Q.  I'm just -- what did you mean by small
12 part?
13     A.  It is with CPG and retail are two out of
14 seven sectors, and therefore they are in the
15 minority.  Furthermore, our biggest sectors are
16 known to be pharmaceuticals and technology by a
17 sizable distance.  And so it's fair to assume
18 that CPG and retail are a small part of our
19 business.
20     Q.  Is there any document you can think of
21 which would break down the percentages of
22 Datamonitor's business that are allocated to each
23 of the seven sectors?
24     A.  Not to the best of my knowledge.

24  (Pages 90 to 93)

Mintel vs. Meesham (CONFIDENTIAL 30 (b) (6) Deposition of Jeffrey Howard, taken 07-22-08)

Page 94

1    Q.  Is there a person I would talk to who
2  would be most knowledgeable about that that you
3  know of?
4    A.  I would expect it would be Dylan Grey.
5    Q.  You can't give me an approximate
6  percentage that CPG and retail markets comprise
7  of Datamonitor's business?
8    A.  I cannot. I'm responsible for channel
9  partnerships. I'm not responsible for our global
10  business.
11    Q.  How big a component of -- if you know,
12  how big a component of Datamonitor's business is
13  the financial services sector?
14    A.  I don't know the answer to that
15  question.
16    Q.  Mr. Grey would be better suited to
17  answer that question?
18    A.  He would.
19    Q.  You stated also in Paragraph 5:
20  Datamonitor therefore decided to approach
21  Mr. Neergheen about utilizing his skills only
22  within the five sectors that do not compete with
23  Mintel.
24    I think I asked you this previously, but

Page 95

1  I just want to make sure.
2    Your understanding is that Mintel does
3  not compete in technology, pharmaceuticals,
4  financial services, automotive, and the energy
5  markets; is that right?
6    A.  That is correct.
7    Q.  If Mintel did compete in one of those
8  sectors, would having Mintel's client and revenue
9  data in one of those sectors be beneficial to
10  Datamonitor?
11    MR. ROACHE:  Object to the form.
12    THE WITNESS:  Can you repeat the question?
13  BY MR. PIOLI:
14    Q.  Sure. If it turned out that Mintel did
15  compete in one of those five sectors, would
16  having Mintel's client and revenue information be
17  a benefit to Datamonitor?
18    MR. ROACHE:  Object to the form, foundation,
19  speculation, and assumes facts not in evidence.
20  You can answer.
21    THE WITNESS:  I've listed in Section 9 of the
22  affidavit whilst I ensured that Mr. Neergheen was
23  not focussed on CPG or retail sectors, there was
24  an additional explicit instruction which was that

Page 96

1  if there were any other organizations in any
2  other sectors, as unlikely as that might be that
3  he previously had any contact with, that he was
4  not to have any dealings with them while employed
5  by Datamonitor.
6    Q.  Are you familiar with the content of the
7  documentation that Mr. Neergheen Emailed to
8  himself from Mintel?
9    A.  Absolutely not.
10    Q.  Once again, I apologize for being
11  repetitive. But your understanding that Mintel
12  does not compete in those five markets, is that
13  based upon what Mr. Neergheen told you?
14    MR. ROACHE:  Objection, asked and answered.
15  And I believe it mischaracterizes his testimony.
16  You can answer.
17    THE WITNESS:  That's why I asked again.
18    MR. ROACHE:  You can answer, Mr. Howard.
19    THE WITNESS:  I really don't know the answer
20  to that question. I don't believe that that was
21  covered explicitly in the interview process. But
22  it's certainly my understanding.
23  BY MR. PIOLI:
24    Q.  In Paragraph 7 you indicated --

Page 97

1  actually, let's backtrack.
2    Paragraph 6 you indicated that:
3  Mr. Neergheen was offered employment as a
4  partnerships and alliance manager within the
5  distributors business unit of Datamonitor and
6  working within the technology, pharmaceuticals,
7  financial services, automotive, and energy
8  markets; do you see that?
9    A.  Yep.
10    Q.  So just so I understand, Mr. Neergheen
11  was, in fact, working with the financial services
12  market; is that right?
13    A.  Mr. Neergheen's agreement was
14  technology, pharmaceuticals, financial services,
15  automotive, and energy with the stipulation that
16  he must not, under any circumstances, have any
17  contact or dealings with any organization that he
18  previously dealt with whilst at his previous
19  employer.
20    Q.  I understand that, and I appreciate
21  that. But he was working in the financial
22  services industry; is that right?
23    A.  Technically. Although since his joining
24  of Datamonitor, his focus has been on

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MINTEL INTERNATIONAL GROUP, LTD., a United Kingdom corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No.:_____ |
| v. | ) ) ) | |
| MEESHAM NEERGHEEN, an individual, | ) ) | |
| Defendant, | ) ) ) | |

## AFFIDAVIT OF RICHARD CARR

I, Richard Carr, declare under penalty of perjury that the following is true, accurate and within my personal knowledge and I will competently testify to the statements contained herein if called to do so:

1.     I am Finance Director for Mintel International Group, Ltd. ("Mintel"). My job duties and responsibilities include oversight of the Finance and Accounting functions and of the Company as a whole from a financial perspective.

2.     Since its inception in the year 1972, Mintel has collected and developed, at its own expense, significant and critical information on marketing strategies, project forecasts, pricing, costs, customer needs, vendor lists, client contacts and budgets, and other data.

3.     Specifically, Mintel's confidential and proprietary trade secret information contains highly sensitive information related to the names of clients and Mintel's marketing strategies and overall objectives for each such client. This information is not widely known and is not disseminated into the public domain. This information is kept in the ordinary course of Mintel's business, is highly specialized and cannot be easily duplicated.

EXHIBIT

5

4.    Mintel exercises diligent and reasonable efforts to safeguard and keep Mintel's confidential, proprietary and trade secret information confidential.  Very limited access to Mintel's confidential, proprietary and trade secret information is entrusted to employees, who are only given access to such information on a "need to know" limited basis.

5.    Mintel has a secure computer network and secure server system that is carefully configured and managed to prevent unauthorized access.

6.    Meesham Neergheen ("Neergheen") commenced employment with Mintel in its London office on or about June 30, 1997.  Neergheen transferred to Mintel's Chicago office on or about August 1, 2003.

7.    By reason of Neergheen's employment position with Mintel in the marketing department, Neergheen had access to and became familiar with Mintel's computer system, which contained confidential, proprietary and trade secret information.  But for Neergheen's position at Mintel, Neergheen would not have come into contact with the subject confidential and proprietary trade secret information.

8.    Neergheen signed and executed a Contract of Employment with Mintel on or about June 24, 1998, which included a one-year restrictive covenant and a confidentiality clause.

9.    Neergheen signed and executed an Employee Non-Compete/Non-Solicitation Agreement on or about August 4, 2003, which also included a one-year restrictive covenant and a confidentiality clause.

10.    On April 23, 2008, Mintel received written notification from Neergheen that he was resigning from Mintel effective April 30, 2008.

11.    After receiving Neergheen's written notice, I asked Jason Thomson, Mintel's Director of Information Technologies, to search and monitor Neergheen's activity to determine

2

whether Neergheen had copied, e-mailed and/or printed any confidential or proprietary trade secrets of Mintel.

12.     Thomson informed me that Neergheen copied, e-mailed to his personal e-mail address and/or printed confidential and proprietary trade secret information from his work computer in the days leading up to his resignation.  These files included the following: (1) 2008_04_07_Mintel project priorities; (2) marketing activities – current, future direction – for SP; (3) 2008_04_18_Marketing_Exec_Update; (4) Marcomm Approved Expenses; (5) 2008 shows- Apr 8; (6) Final Attendee list.csv; (7) Claritas Comperemedia Web-Seminar.pdf; and (8) COMPEREMEDIA – Revenue by Client and Product.xls.

13.     The files downloaded by Neergheen contained the following confidential and proprietary trade secrets:

A.     **2008_04_07_Mintel project priorities:** This file contains information about Mintel's group projects, the priority of each from a strategic perspective, and the priority for Mintel's departments working on these core initiatives.  This file was provided to members of the marketing team only in order to provide each member with an overview of the project focus from a general business perspective.

B.     **marketing activities – current, future direction – for SP:** This file was created for exclusive use by the marketing team to help the members understand the emphasis Mintel's marketing department puts on the listed marketing channels and means.  This internal file represents an important part of Mintel's marketing strategy, outlining Mintel's overall marketing objectives.  This file was provided to Mintel's marketing team only.

3

C.   **2008_04_18_Marketing_Exec Update:** This file represents a complete overview of all marketing projects and initiatives and was distributed to a distinct group of Mintel's executives and marketing team.  All such individuals were required to feed their input into the file data.

D.   **Marcomm Approved Expenses:** This file contains a list of key vendors Mintel uses for different business purposes, such as public relations tracking, public relations distribution, printing, market data providers and merchandise.  Only the marketing team and a select group of others, as determined by the Global Marketing Director, have access to this file.

E.   **2008 shows-Apr 8:** This file contains a complete overview of all trade shows Mintel has had a presence at between October 2007 and April 8, 2008, including budgeted and detailed actual costs.  This file displays important information about Mintel's marketing strategy and activity and shows the exclusively agreed upon price with trade show partners.  Only the marketing team and a select group of others, as determined by the Global Marketing Director, have access to this file.

F.   **Final Attendee list.csv:** This file contains address data of prospective clients created from a co-produced and promoted webinar of Mintel Comperemedia and Mintel's partner Claritas, Inc. held on April 22, 2008.  The potential clients listed within this file have provided their address data to Mintel Comperemedia and Claritas, establishing a business relationship to obtain access to the webinar. Claritas and Mintel agreed only to share the prospective client list with each other. Neergheen obtained access to this file because he was working on the project with Mintel's Claritas contact.

4

G.    **Claritas Comperemedia Web-Seminar.pdf:** This file contains the actual content of the webinar and, therefore, is marked as confidential. This information was only made available to potential clients in exchange for their address details and to employees of Claritas and Mintel who worked on the project.

H.    **COMPEREMEDIA – Revenue by Client and Product.xls:** The data in this file was created by Mintel's sales manager and marked as confidential. The file contains analysis done by the marketing manager to show the revenue ranking of Mintel's product Comperemedia by client sector. This file also lists Mintel's specific clients and the individually agreed upon price each client made with Mintel for a Comperemedia subscription. The clients and information listed within this file total over fifteen (15) pages in length. This file was provided to some of Mintel's marketing team.

14.    Upon information and belief, Neergheen commenced employment with Datamonitor, Inc., a direct competitor of Mintel, immediately after his resignation from Mintel and is currently still employed by Datamonitor.

15.    Thomson also informed me that he uncovered e-mail discussions on Mintel's e-mail servers relating to Neergheen's attempts to find employment with competitors during the months preceding his departure from Mintel.

16.    As a result of Neergheen's purloining Mintel's trade secrets and working for a competitor, Mintel will suffer loss of current and potential business, loss of profit revenue, and unfair competitive and sales advantage at the hands of competitors.

17.    I certify that the statements set forth in the Complaint for Injunctive and Other Relief are true and correct to the best of my knowledge and belief, except as to matters therein

5

stated to be on information and belief, and as to such matters I certify as aforesaid that I verily believe same to be true.

I, Richard Carr, under penalties as provided by law pursuant to the Code of Civil Procedure, certify that the statements set forth in the foregoing Affidavit are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes same to be true.

Richard Carr
Finance Director

6

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MINTEL INTERNATIONAL GROUP,  )
LTD., a United Kingdom corporation,  )
)
     Plaintiff,  )    Case No.:_____
)
v.  )
)
MEESHAM NEERGHEEN, an individual,  )
)
     Defendant,  )
)

## AFFIDAVIT OF JASON THOMSON

    I, Jason Thomson, declare under penalty of perjury that the following is true, accurate and within my personal knowledge, and that I will competently testify to the statements contained herein if called to do so:

    1.    At all times relevant hereto, I have been the Director of the Information Technology Department for Mintel International Group, Ltd. ("Mintel"). My job duties include oversight of Mintel's IT activities globally, including ultimate responsibility for IT security, business continuity and policies.

    2.    Mintel exercises diligent and reasonable efforts to safeguard and keep Mintel's confidential, proprietary and trade secret information confidential. Very limited access to Mintel's confidential, proprietary and trade secret information is entrusted to employees, who are only given access to such information on a "need to know" limited basis.

    3.    Mintel has a secure computer network and secure server system that is carefully configured and managed to prevent unauthorized access. Files containing confidential, proprietary and trade secret information are stored on file servers with restricted access rights.



EXHIBIT

6

Individual users are issued their own personal username and password. This username and password only allow the user access to the information they require to perform their job functions.

4.    Users are informed of and required to sign security policies outlining their responsibilities with respect to the use of their passwords, Mintel's systems and proprietary information. Each time a user logs on, they are reminded that their use of Mintel's systems is subject to these policies. These policies clearly state that Mintel's computer equipment and services are provided for business purposes only and may be monitored for business or legal purposes.

5.    Because Meesham Neergheen ("Neergheen") was employed in the marketing department of Mintel, Neegheen was provided with access to Mintel's confidential and proprietary trade secret information so that Neergheen could effectively execute his necessary job duties and responsibilities.

6.    On or about April, 23 2008, I was asked by Mintel executives to search and monitor Neergheen's activity to determine whether Neergheen had copied, e-mailed and/or printed any confidential or proprietary trade secrets of Mintel. I set up appropriate rules on Mintel's e-mail filtering system to monitor and preserve e-mail sent by Neergheen from his Mintel e-mail account to external e-mail addresses.

7.    During the course of monitoring Neergheen's activity, I discovered that Neergheen had e-mailed the following Mintel files from his work e-mail address to his personal e-mail address: (1) 2008_04_07_Mintel project priorities; (2) marketing activities – current, future direction – for SP; (3) 2008_04_18_Marketing_Exec_Update; (4) Marcomm Approved Expenses;

(5) 2008 shows- Apr 8; (6) Final Attendee list.csv; (7) Claritas Comperemedia Web-Seminar.pds; (8) COMPEREMEDIA – Revenue by Client and Product.xls.

8.  Neergheen accessed and e-mailed the above-listed files to his personal e-mail address on the April 29, 2008.

9.  All of the above files are confidential and are provided to a limited number of employees on a "need to know" basis only. Mintel safeguards these files by only providing access to authorized employees via their personal username and password, limiting the group of employees authorized to access such information and informing and reminding employees of their responsibilities to keep Mintel's information secure.

10.  During subsequent investigations, I discovered e-mail discussions on Mintel's e-mail servers relating to Neergheen's attempts to find employment with competitors during the months preceding his departure from Mintel. Specifically, there is an e-mail dated March 20, 2008 sent by Alex Demetriou, another Mintel employee, discussing Neergheen's attempt to find employment at Euromonitor.

11.  A discussion on another e-mail sent by Alex Demetriou dated June 5, 2008 confirmed that Neergheen was hired by Datamonitor, Inc.

I, Jason Thomson, under penalties as provided by law pursuant to the Code of Civil Procedure, certify that the statements set forth in the foregoing Affidavit are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes same to be true.

Jason Thomson
Director of Information Technologies

3

## Employee Non-Compete/Non-Solicitation Agreement

For good and valuable consideration, and as an inducement for Mintel International Group, Ltd. or any of its U.S. subsidiaries (hereinafter collectively referred to as "Mintel") to either employ or to continue the present employment of Meesham Neergheen ("Employee"), the undersigned Employee hereby agrees not to compete, either directly or indirectly, with the business of Mintel or any of its subsidiaries, branches or divisions, at any location worldwide at any time during the Employee's term of employment, and for a period of one (1) year following his termination of employment with Mintel, regardless of the reason or cause for such termination.

The term "not to compete" as used in this Agreement means that the undersigned Employee shall not own, manage, operate, consult with or be employed by a business substantially similar to, or in competition with, the present business of Mintel or such other business activities in which Mintel may hereafter substantially engage during the term of the undersigned Employee's employment with Mintel.

The undersigned Employee acknowledges that Mintel may, in reliance upon the terms of this Agreement, supply or provide the undersigned Employee with access to Mintel's trade secrets, customer lists or other information of a confidential or proprietary nature. In consideration for his employment with Mintel, the undersigned Employee agrees to keep confidential all such information, and not to use such information for his own benefit or to disclose same to any third party.

In further consideration of the undersigned Employee's employment with Mintel, the undersigned Employee further agrees that in the event of his termination of employment with Mintel, regardless of the reason or cause for such termination, he will not solicit or recruit any of Mintel's employees to undertake alternative employment, including any competitive employment, for a period of one (1) year after the undersigned Employee's termination date with Mintel without the express written consent of Mintel's CEO or U.S. General Manager.

The undersigned Employee further agrees that in the event of his termination of employment with Mintel, regardless of the reason or cause for such termination, he will not solicit any of Mintel's customers for a period of one (1) year after the undersigned Employee's termination date with Mintel.

It is agreed and understood that any claims or controversies relative to the enforcement of this employee non-compete/non-solicitation agreement will be governed by the laws of the State of Illinois.

Signed this ____4^{TH}____ day of __August__ , 20_03_

Employee _____          For Mintel _____

# CONTRACT OF EMPLOYMENT

### 1.   INTRODUCTION

From:   Mintel International Group Limited

To:        Meesham Neergham Neergheen

The following particulars are given to you in accordance with the terms of the Employments Rights Act 1996.

Your period of continuous employment with us began on the 30 June 1997.

No employment with a previous employer counts as part of your period of continuous employment. In accepting your appointment it shall be deemed that you have accepted all the terms and conditions set up in these Particulars of Employment.

These Particulars of Appointment annul any previous agreement whether verbal or written given to you at any time.

Your place of work will be Mintel International Group Ltd, 18-19 Long Lane, London EC1A 9HE.

You are employed as a NPD Assistant / Marketing Executive and will be responsible to the Publications Manager.

You will be paid monthly by credit transfer to your bank account in arrears at the rate of £14,000 gross per annum. Commission for some sales functions is payable and where payable, is discretionary, non-contractual and details are made available as and when appropriate by your line manager.

Your normal working hours are between 9.00am and 5.30pm Mondays to Thursday and between 9.00am and 5.00pm Fridays inclusive with one hour for lunch.

In certain circumstances it may be necessary to adjust or exceed the hours in order to ensure that your duties in accordance with the Terms of Employment are properly performed. Overtime is not payable.

### 2.   SICK LEAVE AND SICK PAY

#### 2.1   Notification and Certification

Absence occasioned by sickness must be notified by telephone to the Chief Executive on the first morning of your absence (if you are unable to contact the Chief Executive you must contact a member of the Executive, failing that, your line manager).

Your first day of sickness must be confirmed so that your eligibility to statutory sick pay can be calculated.

During your illness, you should keep in regular contact with, in the first instance, your Head of Department, another member of the Executive or lastly, your line manager by telephone. You must not leave a message with reception. It is your responsibility to ensure that your current telephone number is kept by personnel.

You should observe the following procedures during any illnesses:

(i)     A company sickness form must be completed for any period of sickness. This should be handed to your Head of Department for signature.

(ii)    For absences lasting between four and seven days (including Saturdays, Sundays and Public Holidays), a Self Certification Form (SC2) should be completed and handed to the Office Manager. These are available from the Head of Personnel only.

(iii)   Sickness which continues for eight days or more (including Saturdays, Sundays and Public Holidays), must be covered by a doctor's Certificate. When sickness continues beyond the span of the first Certificate issued, it is the individual's responsibility to ensure that subsequent Certificates are forwarded by post to the Head of Department.

(iv)    After three separate episodes of sickness in any 12 month period, the Company has the right to ask you to provide a full doctor's Certificate for any further period of sickness taken. As doctors do not issue full Certificates before seven days of sickness, there may be a charge for periods less than this and it will be the individual's responsibility to pay any fee levied.

(v)     If any employee is absent due to sickness for more than five days during any 12 months period, the Company may at its own expense, ask the employee to attend the Company's doctor.

After incapacity of six months in any continuous period of 365 days duration Mintel shall be entitled, entirely at the discretion of Mintel, to treat this contract as having been terminated forthwith on the grounds that you shall be incapable of performing the employee's obligations hereunder. Any delay by Mintel in exercising its discretion shall not be deemed a waiver of Mintel's entitlement to termination under this paragraph.

2.2     **Sick Pay**

(i)     **Occupational Sick Pay**

There is no entitlement to Occupational Sick Pay. In the event that you are incapacitated through illness or injury from performing your duties any payment made by the Company to you during such absence shall be determined by the Company in its absolute discretion.

(ii)    **Statutory Sick Pay**

(a)     The company is responsible for paying Statutory Sick Pay to its employees for up to 28 weeks in any one "linked" period of incapacity to work.

(b)     Statutory Sick Pay becomes payable when there is a spell of four or more days sickness in a row and is payable for qualifying days only. Qualifying days are Monday to Friday inclusive. There is a waiting period of three qualifying days in each period of incapacity to work before Statutory Sick Pay is payable, except where there are two or more periods of incapacity separated by fewer than 57 calendar days.

(c)     In certain circumstances you may be excluded from Statutory Sick Pay. In those cases, the Company will give you an "exclusion form" explaining the reasons why SSP cannot be paid. You should then claim for State Sickness Benefit by completing the claim section of the form and sending it to your local DSS office.

(d)     Before the Company's liability for Statutory Sick Pay ends (ie 28 weeks), you will be given a "transfer form" which will enable you to continue claiming benefit from your local DSS.

### 3.   COMPASSIONATE LEAVE

In the event of the Employee suffering a bereavement, compassionate leave will be granted as follows:

Up to ten working days for the death of a partner/husband/wife/child.

Up to five working days for the death of a parent.

Time granted for the death of other relations will be at the discretion of Departmental Heads.

### 4.   MATERNITY LEAVE AND PAY

The Company follows statutory guidelines with regard to Maternity Leave and Pay.

(i)     <u>Confirming your Pregnancy</u>

As soon as you can (usually at least 21 week before the commencement of maternity leave) you must obtain a Maternity Certificate (MAT B1) from your GP (not a midwife), which will confirm your pregnancy, state your expected week of confinement (EWC) and allow us to pay your statutory maternity pay. Without your Certificate we cannot pay you.

You must also give written notice at least 21 days before your maternity leave commences, of the date of which you intend to commence your leave. If you cannot practicably give 21 days notice then you must give the notice "as soon as is reasonably practicable".

If you are absent from work wholly or partly because of your pregnancy/childbirth before your maternity leave date has been notified/reached but after the beginning of the sixth week before the EWC, you must notify us of absence as soon as is reasonably practicable. If you have the baby before you have had an opportunity to give the required notice then you must inform us of the date the baby was born.

Maternity leave may not be commenced more than 11 weeks before the EWC.



(ii)    Maternity Leave

<u>Employees with Less than Two Years Continuous Service</u>

You have the right to fourteen weeks maternity leave or until the child's birth if later.

If you wish to return from maternity leave early you must give us at least one week's notice.

<u>Employees with Two or More Years Continuous Service</u>

There is a separate right to return to work for those employees who have the right of maternity leave and who also have continuous employment of at least two years at the beginning of the 11th week before EWC. You are entitled to a extended leave period which goes up to the end of the 29th week after the beginning of the week in which you child is born.

You may lose the right to return to work after your extended maternity leave unless you give written intention to return to work at the same time as giving the notices mentioned above.

It may be that due to unforseen circumstances the Company needs to know your anticipated date of return (or your intention not to return) sooner than expected and we may write to you no more than 21 days before the end of your 14 week period of maternity leave, asking for written confirmation or whether or not you intend to return to work. You may lose the right to return if you do not respond if you do not respond to such a request within 14 days or, if this is not reasonably practicable, as soon as is reasonably practicable.

Once you have decided when you are going to return to work, you must notify us in writing of the day you will return, 21 days in advance. This is obviously a minimum requirement if you let us know your plans any sooner this would be appreciated.

We may extend your return date by four weeks by giving written notice of this postponement.

You may postpone your notified date of return by up to four weeks, providing you give us a full doctors certificate before the notified day, stating that you unfit.

Only one postponement is allowed, and if you are still unfit after four weeks, you lose the right to return.

iii)    Statutory Maternity Pay

To be eligible for SMP, an employee must have been continuously employed for at least 26 weeks ending with the week immediately preceding the 14th week before the expected week when the baby is due. This week is known as the qualifying week. SMP is paid at two rates and eligibility to either rate is based on length of service. All SMP will be paid into your bank account in the normal way on a monthly basis, on the last Thursday of each month.



*Employees with 2 or more years continuous service:*

The Company will pay you SMP for a maximum of 18 weeks. The first 6 weeks are at 90% of your salary and the remaining 12 weeks are at £54.55.

*Employees with less than 2 years continuous service, but more than 26 weeks:*

The Company will pay you SMP for a maximum of 18 weeks.

**5.    PATERNITY LEAVE**

The Company does not grant Paternity Leave.

**6.    LIFE ASSURANCE**

Free life assurance cover commences immediately upon permanent employment with Mintel and is a benefit enjoyed by all staff.

Cover is as follows:
Up to age 25          2 x annual salary
Age 25-34             3 x annual salary
Age 35 and over  4 x annual salary

**7.    SEASON TICKET LOAN**

Following the satisfactory completion of your probationary period, you will become eligible to apply for a Season Ticket Loan. Such a loan would be interest free and deducted from your salary in twelve monthly instalments. Application forms are available from the Accounts Department.

**8.    EXPENSES**

The Company will reimburse you for all reasonable expenses incurred wholly, necessarily and exclusively on Company business. Such expenses should be supported by receipts, included on the monthly expense forms and authorised by your Head of Department.

**9.    COMPANY CARS**

If you need a company vehicle in furtherance of being able to perform your duties as an employee, then this will be arranged directly with your Line Manager/Head of Department. A separate list outlining responsibilities will be issued to each employee who uses a company vehicle.

**10.    TERMINATION OF EMPLOYMENT**

The Company can terminate your employment at any time by giving you, in writing, the following periods of notice:

i)       If you have less than two years continuous employment : one week, or else the period stated in your offer letter, whichever is the greatest.

ii)      If you have more than two years continuous employment: one week for every year of such continuous employment up to a maximum of 12 weeks, or else the period stated in your offer letter, whichever is the greatest.

iii)    You may terminate your employment by giving the Company, in writing, four weeks notice or your current notice period, whichever is the greater.

iv)    The Company's ability to terminate your employment by service of notice at any time is not fettered by the Company's disciplinary procedure which is a policy document only and does not have a contractual effect.

## 11.    IMMEDIATE TERMINATION

The Company is entitled to terminate your employment with immediate effect and without service of any notice in the following circumstances;

i)    You are guilty of gross misconduct.

ii)    You are convicted of a criminal offence other than a road traffic offence for which you are not sentenced to a term of imprisonment whether immediate or suspended.

iii)    You commit any serious breach or persistent breach of the terms of your contract of employment.

iv)    You become bankrupt or make any arrangement or composition with or for the benefit of your creditors.

## 12.    HOLIDAY ENTITLEMENT

Our holiday year is the calendar year from January to December.  Your annual holiday entitlement will be 25 working days in addition to the normal English bank and public holidays.  Your holiday must be taken during the holiday year and your holiday dates agreed in advance.  Employees who start during the calendar year will be entitled to two days holiday for each complete month left in the holiday year.

If you leave during your holiday year, your holiday entitlement will be re-calculated as two days holiday for each compete month worked in the year.  If you have taken less holiday than this you will be paid in lieu.  If you have taken more holiday than this you will have to repay the excess holiday pay.

Any money which you owe the Company on account of having taken more than your holiday entitlement may be deducted from your final payment from the Company.

## 13.    DISCIPLINARY PROCEDURE

Disciplinary procedures are essential to protect the interests of both the Employee and the Company. The procedures are designed to ensure that arrangements for dealing with disciplinary matters are fair, simple and effective.  (The procedure is not contractual.)

The procedure is as follows:

i)    Minor matters will be dealt with by means of a verbal warning, a note of which will be kept on your file for a specified period of time.

ii)    Matters of a more serious nature will merit one or more written warnings, which if not complied with may result in dismissal. For each warning a specified period of time will be given for behaviour to improve. Under these circumstances, the Company reserves the right to suspend you whilst the matter is investigated further.

iii)    Matters which are considered to be gross misconduct will result in instant dismissal.

In matters of serious misconduct, it may be appropriate for an impartial third party to be present during the disciplinary interview to make notes and ensure that an accurate record of proceedings is kept. During your interview you may make a statement, either verbally or in writing, in your defence. You may also make reasonable requests for witnesses or for evidence to be produced, such requests not to be unreasonably denied.

If you wish to appeal against any disciplinary action taken against you, you may do so in writing to a member of the Executive Committee nominated by you.

If dismissed, in compliance with the law, the Company will issue you with a written statement detailing the reasons for your dismissal.

The disciplinary procedure will be instigated for certain actions. The list below, which is not exhaustive, gives an indication of such offences:

- unreasonable and unruly behaviour
- conduct or actions likely to endanger people or property
- persistent poor attendance/time keeping
- abuse of the sickness rules/procedures
- drunkenness, drug taking, gambling on company premises
- refusal or failure to obey reasonable instructions
- unauthorised possession of company property
- disregard of office rules
- persistent failure to achieve adequate work standards
- disregard of technical rules and procedures
- conduct likely to discredit the Company or damage its reputation
- breach of professional confidence or professional ethics
- commercial indiscretion

Any other act of behaviour which, by custom and practice is considered to be highly undesirable and socially unacceptable will, if persistent, result in disciplinary proceedings.

Any two employees who are in a reporting line within the company must avoid romantic involvement with each other in the interests of efficient and harmonious working relationships.

Failure to comply with this will lead to disciplinary action being taken.

**GRIEVANCE AND DISPUTES PROCEDURE**

The size and structure of the Company prevents adherence to a detailed grievance/disputes procedure such as would be found in larger organisations. However, the Company acknowledges the need for a formal system within which employees can raise any grievances or disputes arising from their own position or the Company in general, and as such has laid down the following guidelines.

If you have a grievance arising from your work, it should in the first instance be addressed to your Line Manager or Head of Department. If no satisfactory conclusion is reached, the matter may then be passed to a member of the Executive Committee nominated by the Employee who will seek to investigate the matter further and offer advice to the Line Manager/Head of Department on possible solutions.

## 15.    RESTRICTIVE COVENANTS

You will not for the first twelve months at the end of your employment with us, either on your own account or on behalf of any other legal person and in competition with the Company, or any subsidiary directly or indirectly engage in, or be connected with, trade or business carried on by us or any of our associates at the end of your employment.

You will not for the first twelve months after at the end of your employment with us solicit or accept orders for products, services, competitive with ours from any of our customers with whom you dealt during the last twelve months of your employment with us.

You will not, for the first twelve months after the end of your employment with us, solicit away from us or our associates any person who is and was, when your employment ended, employed by us or an associate as a director, senior manager or sales person for whom you were responsible, or who was a member of any department/project/team in which you worked during the last twelve months of your employment.

Each of the above restrictions is separate and severable from the other if one is unenforceable for any reason, but would be enforceable if some of its wording were deleted, it shall apply with such deletions as are necessary to make it enforceable. Any period of notice served by you in accordance with clause 16 below, shall reduce the period of each of the above restrictions.

## 16.    PLACE OF WORK HAVING GIVEN NOTICE

If either you or the Company serves notice on the other to terminate your Contract of Employment the Company may require you to work away from the office for all or part of the remaining period of your employment. If you are asked to do this:

i)      You may not attend your place of work or any other premises of the Company or any associated company;

ii)     You may be asked to resign immediately from any offices you hold in the company or any associated company;

iii)    You may not be required to carry out duties during the remaining period of your employment;

iv)    You must return to the Company all documents and other materials (including copies) belonging to the Company or associated companies containing confidential information;

v)    You may not without the written permission of the Company contact or attempt to contact any client, customer, supplier, agent, professional advisor, broker or banker of the Company or any associated company or any employee of the company or any associated company;

During any such period you would continue to receive your full salary and benefits.

## 17.    CONFIDENTIALITY

Mintel has expended and will continue to expend substantial effort and monies in acquiring knowledge and expertise in developing goodwill in the business of Mintel. In the course of your employment you will have access to certain of Mintel's trade secrets and other proprietary or confidential information of Mintel, including without limitation, procedures, processes, information related to design, production, marketing or distribution, data, databases, computer software, source codes, all methods and means of design, drawing, recording, reproducing information or storing information (including but not limited to electronic or computerised methods or means), supply sources or potential supply sources, customer lists or potential customer lists, bidding policies or procedures or any information concerning pricing or financing policies or procedures, including without limitation:

a)    Information regarding contracts with clients of Mintel, design, pricing, methods of operation, financial conditions, market plans and master plans;

and

b)    Information relating to Mintel's clients and concerning their financial condition, construction or planned development, product results and methods, master plans and business strategies.

You agree that all such records, methods, lists, materials, names and information, as well as any information and documents provided to, generated by or received by you in the course of your employment and the contents thereof, is confidential and is and will remain the sole property of Mintel. Such confidential information will not be used or disclosed by you other than in connection with your performance of services for Mintel or such confidential information shall be returned to Mintel upon the cessation of your employment.

All work on clients' business is confidential. Information obtained in the course of this work must not be disclosed to any outside party (including the clients' employees), or to fellow members of staff other than is necessary in the course of carrying out the work.

Confidential information about clients' affairs must not be discussed with third parties, relatives, friends or in public places.

## SECURITY

The Company is not responsible for employees' personal belongings.

Individual employees must ensure that personal belongings of value are placed in a drawer or cabinet, preferably locked, especially when the office is unoccupied.

You may need to work in the office outside of normal working hours. On such occasions you should enter the building through the front door using the security cards which are available from your Head of Department. If you do work out of hours, it is your responsibility to ensure that the building is secure upon your departure.

Briefcases and bags are not to be taken into the library under any circumstances. All visitors to the library must leave their briefcases with reception.

## 19.  OTHER ETHICAL CONSIDERATIONS

During the continuance of your employment with the company you shall unless prevented by incapacity devote your full time and attention to the business of Mintel and shall not without the prior consent of the company :

(i)    Engage in any other business; or

(ii)   Be concerned or interested in any other business of a similar nature to or competitive with that carried on by the company or any of its associated companies provided that nothing shall preclude you from undertaking work in respect of a recognised charity or from holding or being otherwise interested in any shares or other securities of any company which are for the time being quoted on any recognised Stock Exchange so as long your interest in such shares or other securities does not extend to more than 5% of the total amount of such shares or securities.

If consent is granted the work must be done out of working hours and you must not use company facilities or offices.

Such work must not be carried out in the name of the Company or its subsidiaries.

If consent is granted, it must be made clear that you are acting in a private capacity and that you are not representing or acting on behalf of the Company or its subsidiaries.

If involved in any outside professional activity which might result in the Company's name being mentioned in the press or other media you should obtain the prior approval of a Director or the Chief Executive of Mintel International Group Limited.

## 20.  HEALTH AND SAFETY AT WORK

In compliance with the Health and Safety at Work Act 1974, the Company endeavours to provide a safe working environment for all employees.

The Company has produced a General Policy Statement on Health and Safety at Work. You are advised to read this document which is available from the Head of Production.

In accordance with the Company's statutory obligations, there are two trained First Aiders in the building:

Emma Stocker - Reception
Michelle Strutton - MIC

A full first aid box is located in MIC.

21.   **NOTE**

Notwithstanding the above, any statutory minimum requirement provided by law is deemed to be included in your contract of employment.

Signed for and on behalf of the Employer
**MINTEL INTERNATIONAL GROUP LIMITED**

........................................

Signed for and on behalf of the Employee
Meesham ~~Neorgham~~ Neergheen

........................................

Date: .......24/06/98........

- 11 -

**Amy Mieding**
**HR Director**
**Mintel**
**351 W Hubbard Street, Floor 8**
**Chicago, IL 60610**

Wednesday, April 23rd 2008

Re: Leaving Mintel

Amy,

This is to inform you that I shall be leaving the employment of Mintel at the conclusion of my temporary contract, effective Wednesday, April 30th, 2008.

Regards,

Meesham Neergheen

REDACTED

**From:** Jeff Howard

EXHIBIT

tabbies

7

Highly Confidential Attorneys' Eyes Only

**Sent:** 26 February 2008 16:55
**To:** Richard Watkins
**Cc:** Mark Meek; Giles Watts; Dylan Grey
**Subject:** RE: Refer a friend - Mintel employee

Rich - as discussed earlier today, I would like you to invite Meesham back for an interview but, given the non-compete agreement that is in place with Mintel, I realize that I cannot ask for him to present anything that relates to historic deals that he has done whilst at Mintel nor, if I were to employ him, could I have him targeting in any way any of the clients that he has worked with whilst at Mintel.

With that in mind, I am interested in seeing if Meesh would be a good candidate for a partnership-related commercial role at Datamonitor, but focussing on <u>non-consumer sectors</u>. Here I would want him to connect with print and online publishers, conference companies and trade associations in the healthcare, tech, FS, energy and auto industries and identify revenue-generating and brand enhancing opportunities.

At the 2nd interview I would like Meesh to talk us through how he would go about identifying the relevant target partners and execs within these organizations and, generically / conceptually, the kinds of deals that he would like to negotiate. I suggest that he talks both you and me through this first and then I have a chat with him afterwards just to find out a bit more about what makes him tick and what his key skills are. Again, I am aware of the non-compete and so I will be careful not to probe in any way into his Mintel experience.

In terms of times for the interview, Monday 3rd March is probably the best day for me - I can do anytime up until noon Chicago time. Alternatively I could do 8.30am or 9.30am Central on Tuesday 4th March.

Thanks,

Jeff

**<u>PS: Dylan - if you have any concerns as to the positioning of this interview and also the structure of the role that I have in mind for Meesh could you please let me know ASAP.</u>**

---

**From:** Giles Watts
**Sent:** Friday, February 15, 2008 5:53 PM
**To:** Jeff Howard; Mark Meek
**Cc:** Richard Watkins
**Subject:** RE: Refer a friend - Mintel employee

Hi

Thanks for this Jeff – Rich sent me his CV after seeing him yesterday. I thought it looked very interesting – let's progress it...

---

**From:** Jeff Howard
**Sent:** 15 February 2008 16:37
**To:** Mark Meek; Giles Watts
**Cc:** Richard Watkins
**Subject:** FW: Refer a friend - Mintel employee
**Importance:** High

Mark / Giles -

Please see attached CV for Meesham Neergheen. He has been with Mintel for 10 years and, more recently, he has been responsible for many of their commercial marketing partnerships. This has included deals with associations such as the NASFT where Mintel write a State of the Industry report for the association annually (and get £60k for a pretty small brief). A lot of what he has been doing has been connecting with the associations

Highly Confidential Attorneys' Eyes Only

MN0000044

and the trade press - essentially a halfway house between some of the things that Distributors do and some of the things that Corporate Marketing do.

Meesh is based in Chicago and so I asked Rich Watkins to bring him in and grill him. The bottom line is that he thought he was very strong.

In terms of why he is leaving, apparently Mintel are restructuring heavily and bringing many of their operations back to the UK.

- o Current salary - $65k.
- o Rich has asked him to check on whether he has a non-compete clause in his contract.
- o Visa - he is on an E2 visa (not sure if this is linked to Mintel; would need to check) and it runs out in November '08.

I have a new Distribution commercial hire in the 2008 plan for mid this year, but not at $65k.

I think that this guy would be good for Distributors but, as importantly, excellent for CG. I would expect him to go after existing Mintel partnerships initially and so it should have a positive impact for both of our businesses.

What do you think?

Next steps - get opinion from the two of you; if you think this is a goer then Rich will bring him in again and I / we can dial in on the 2nd interview.

Let me know your thoughts when you get a chance.

Thanks,

Jeff

---

**From:** Richard Watkins
**Sent:** Friday, February 15, 2008 5:22 PM
**To:** Jeff Howard
**Subject:** FW: Refer a friend - Mintel employee
**Importance:** High

---

**From:** Aaron Gutowski
**Sent:** Friday, January 11, 2008 12:03 PM
**To:** Richard Watkins
**Subject:** FW: Refer a friend - Mintel employee
**Importance:** High

Any interest?  Seems like a marketing guy.

Regards, Aaron

**Aaron Gutowski**
President
Datamonitor Inc.
p. 212.652.2633
e. agutowski@datamonitor.com

---

Highly Confidential Attorneys' Eyes Only

**From:** Mas Hussain
**Sent:** Friday, January 11, 2008 11:27 AM
**To:** Aaron Gutowski
**Cc:** Joanna Bull
**Subject:** Refer a friend - Mintel employee
**Importance:** High

Hi Aaron

Please find attached a CV of a friend of mine that works in the Mintel Chicago office.

Here is a brief synopsis of what he wants to do and what he has been doing. Let me know if you can do anything for him.

ideally i want to remain in marketing as a marketing manager, with a strong focus on relationship building with clients, trade show management, campaign management and analysis, leveraging all contacts I have with the current trade associations to secure free booth presence, speaker opportunities, complimentary sponsorships/advertising.

my role over the years has transpired into more of an account management role with the various organizations that i've dealt with. And I've been able to take this to the next step and having them part with cash to secure new business for custom based work.

I'm sure that your organization would see me as a valuable asset after all I have 10 years' worth of progressive marketing experience.
Regards
Mas

---

**From:** Meesham Neergheen [mailto:meeshamneergheen@hotmail.com]
**Sent:** Fri 1/11/2008 3:21 PM
**To:** Mas Hussain
**Subject:** RE: chicago office

Cheers mate.
Here it is.

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the intended recipient or the person responsible for delivering to the intended recipient, please be advised that it has been sent in error and therefore any use is strictly prohibited. If you are not the intended recipient, or if you are concerned about the content of this email, please notify our IT helpdesk on +44 20 7675 7000.
Datamonitor Limited is a company registered in England and Wales with company number 2306113. The registered office is situated at Mortimer House, 37-41 Mortimer Street, London, W1T 3JH.

Highly Confidential Attorneys' Eyes Only

**From:**
**Sent:**                           meesham@mintel.com
                                    Friday, April 11, 2008 11:34 AM
**Subject:**                        meeshamneergheen@hotmail.com; meeshamneergheen@hotmail.com
**Attachments:**                    Breakfast Club Presentation
                                    Mintel Reports Presentation-.ppt


----- Forwarded by Meesham Neergheen/MINTEL/GB on 04/11/2008 11:34 AM -----

Nim Sharon

To:        US Reports Telesales

04/11/2008 11:22        cc:

AM                      Subject:  Breakfast Club Presentation



Hi Team -

This morning, I had the opportunity to speak today about our team at
Breakfast Club along with David Morris.  If interested, I attached the
PowerPoint presentation for everybody to view.  Enjoy!

Nim Sharon
Inside Sales Manager
Mintel International Group
tel: 312-943-5250

Tired of reading flat text-and-table-focused market research reports?  In a
direct response to our client's needs and wants, Mintel's new platform,
Oxygen, delivers the forward-looking and actionable insight that is
essential to the profitability of your business.  Please visit
www.oxygen.mintel.com

(See attached file: Mintel Reports Presentation-.ppt)


http://www.mintel.com
providing insight + impact

Chicago Office:
Mintel International Group Ltd (Mintel)
351 Hubbard Street, Floor 8
Chicago, IL 60610
USA

Tel: 312 932 0400
Fax: 312 932 0469

London Office:
Mintel International Group Ltd (Mintel)
18-19 Long Lane
London
EC1A 9PL
UK

l: 020 7606 4533
x: 020 7606 5932

MN0000189

Notice
********
This email may contain information that is privileged,
confidential or otherwise protected from disclosure. It
must not be used by, or its contents copied or disclosed
to, persons other than the addressee. If you have received
this email in error please notify the sender immediately
and delete the email. Any views or opinions expressed in
this message are solely those of the author, and do not
necessarily reflect those of Mintel.

No Mintel staff are authorised to make purchases using
email or over the internet, and any contracts so performed
are invalid.

Warning
**********
It is the responsibility of the recipient to ensure that
the onward transmission, opening or use of this message
and any attachments will not adversely affect their systems
or data. Please carry out such virus and other checks, as
you consider appropriate.

MN0000190

**From:**          Meesham Neergheen
**Sent:**          Tuesday, February 12, 2008 09:17 AM
**To:**            meeshamneergheen@hotmail.com; meeshamneergheen@hotmail.com
**Subject:**       please proof
**Attachments:**   GNPD New Business 08 (FINAL).pdf


```
----- Forwarded by Meesham Neergheen/MINTEL/GB on 02/12/2008 09:16 AM -----
|-------+----------------------->
|       |       Jennifer        |
|       |       Chamberlin      |
|       |                       |
|       |       02/12/2008      |
|       |       08:55 AM        |
|-------+----------------------->
>------------------------------------------------------------------|
|                                                                  |
|       To:     Joanna Peot/MINTEL/GB@MINTEL, awessel@mintel.com, Meesham |
|       Neergheen                                                  |
|       cc:                                                        |
|       Subject:     please proof                                  |
>------------------------------------------------------------------|
```


If you have time today, please proof for errors only. Proofreader has already
seen this and edits have been incorporated.

(See attached file: GNPD New Business 08 (FINAL).pdf)

Jennifer Chamberlin
Senior Marketing Manager

Mintel International Group
312.450.6241 Office
312.391.8500 Cell
312.932.0469 Fax
JChamberlin@mintel.com

http://www.mintel.com
        providing insight + impact

Chicago Office:
Mintel International Group Ltd (Mintel)
351 Hubbard Street, Floor 8
Chicago, IL 60610
USA

Tel: 312 932 0400
Fax: 312 932 0469

London Office:
Mintel International Group Ltd (Mintel)
18-19 Long Lane
London
EC1A 9PL
UK

Tel: 020 7606 4533
Fax: 020 7606 5932

MN0000499

Notice
********
This email may contain information that is privileged,
confidential or otherwise protected from disclosure. It
must not be used by, or its contents copied or disclosed
to, persons other than the addressee. If you have received
this email in error please notify the sender immediately
and delete the email. Any views or opinions expressed in
this message are solely those of the author, and do not
necessarily reflect those of Mintel.

No Mintel staff are authorised to make purchases using
email or over the internet, and any contracts so performed
are invalid.

Warning
**********
It is the responsibility of the recipient to ensure that
the onward transmission, opening or use of this message
and any attachments will not adversely affect their systems
or data. Please carry out such virus and other checks, as
you consider appropriate.

MN0000500

**From:**          Meesham Neergheen
**Sent:**          Wednesday, February 27, 2008 11:43 AM
**To:**            meeshamneergheen@hotmail.com; meeshamneergheen@hotmail.com
**Subject:**       Top 5 reasons to buy
**Attachments:**   Why Clients Buy.doc


```
----- Forwarded by Meesham Neergheen/MINTEL/GB on 02/27/2008 11:43 AM -----
|--------+----------------------->
|        |    Sabine Popp        |
|        |                       |
|        |    02/27/2008         |
|        |    11:42 AM           |
|        |                     | |
|--------+----------------------->
>----------------------------------------------------------------------------|
|                                                                            |
|    To:     Jenny Roock/MINTEL/GB@MINTEL                                     |
|    cc:     Meesham Neergheen                                               |
|    Subject:    Top 5 reasons to buy                                        |
>----------------------------------------------------------------------------|
```

Hi Jenny,

I've attached the top 5 reasons to buy for you. I had asked Lynn to work on a reconciled version of this one which seems relevant to users and the list of data applications which seems to be more relevant for the C-Level. You may have had a look at this together with her. However, that's been on hold since Lynn had the accident.

Can you work with the top 5 reasons to buy for your presentation?

Thanks

Sabine

(See attached file: Why Clients Buy.doc)


http://www.mintel.com
         providing insight + impact

Chicago Office:
Mintel International Group Ltd (Mintel)
351 Hubbard Street, Floor 8
Chicago, IL 60610
USA

Tel: 312 932 0400
Fax: 312 932 0469

London Office:
Mintel International Group Ltd (Mintel)
18-19 Long Lane
London
EC1A 9PL
UK

Tel: 020 7606 4533
Fax: 020 7606 5932

MN0000698

Notice
********
This email may contain information that is privileged,
confidential or otherwise protected from disclosure. It
must not be used by, or its contents copied or disclosed
to, persons other than the addressee. If you have received
this email in error please notify the sender immediately
and delete the email. Any views or opinions expressed in
this message are solely those of the author, and do not
necessarily reflect those of Mintel.

No Mintel staff are authorised to make purchases using
email or over the internet, and any contracts so performed
are invalid.

Warning
*********
It is the responsibility of the recipient to ensure that
the onward transmission, opening or use of this message
and any attachments will not adversely affect their systems
or data. Please carry out such virus and other checks, as
you consider appropriate.

# Why Clients Buy

1. _**Improve Response Rates**_
   a. More competitive offers
   b. Identify and mimic best in class
   c. Better targeting
   d. Better design/copy
   e. Improved messaging
   f. More compelling incentives/programs
   g. Being proactive, not reactive

2. _**Competitive Monitoring/Identify Competitive Threats**_
   a. Rates
   b. Fees
   c. Offer
   d. Messaging
   e. Creative
   f. Strategy channel-by-channel
   g. Time strategy
   h. Volume strategy

3. _**New Product or Campaign Development**_
   a. Determining how to enter market
   b. Segmentation
   c. Is product viable?
   d. Going to market competitive, mitigate risk
   e. Innovation- offer, reward, program, creative

4. _**Increase Retention and Cross-Sell**_
   a. Improve existing program
   b. Understand what acquisition offers target your competitors
   c. Learn from best in class competition

5. _**Increase Sales**_
   a. Develop leads
   b. Support account management
   c. Identify new markets/verticals
   d. Educate salespeople
   e. Pitch/support new business calls

MN0000700

| | |
|---|---|
| **From:** | Meesham Neergheen |
| **Sent:** | Tuesday, January 15, 2008 03:20 PM |
| | meeshamneergheen@hotmail.com; meeshamneergheen@hotmail.com |
| **Subject:** | |
| **Attachments:** | 11-07 Marketing Plan Outline Cons Email.doc |

(See attached file: 11-07 Marketing Plan Outline Cons Email.doc)

http://www.mintel.com
        providing insight + impact

Chicago Office:
Mintel International Group Ltd (Mintel)
351 Hubbard Street, Floor 8
Chicago, IL 60610
USA

Tel: 312 932 0400
Fax: 312 932 0469

London Office:
Mintel International Group Ltd (Mintel)
18-19 Long Lane
London
EC1A 9PL
UK

Tel: 020 7606 4533
Fax: 020 7606 5932

Notice
*******
This email may contain information that is privileged,
confidential or otherwise protected from disclosure. It
must not be used by, or its contents copied or disclosed
to, persons other than the addressee. If you have received
this email in error please notify the sender immediately
and delete the email. Any views or opinions expressed in
this message are solely those of the author, and do not
necessarily reflect those of Mintel.

No Mintel staff are authorised to make purchases using
email or over the internet, and any contracts so performed
are invalid.

Warning
********
It is the responsibility of the recipient to ensure that
the onward transmission, opening or use of this message
and any attachments will not adversely affect their systems
or data. Please carry out such virus and other checks, as
you consider appropriate.

MN0000874

MINTEL insight + impact

# Marketing Plan Outline
# Consumer Email Product

## Executive Summary

The scope of this marketing plan is to provide an assessment of Mintel Comperemedia's consumer email product. Areas of concern include the sales pipeline, as well as the actual features and benefits communicated to clients and prospects.

In clarifying key benefits, short-term marketing objectives are identified to increase exposure for the product. Internally, increased communication

## Overview

Current state

Mintel Comperemedia's initial launch of the Email Tool was successful with client sales of more than $950,000 in the first year. Three clients that were up for renewal have already extended their subscription. Now that the initial launch has been completed, we find that the pipeline for sales of the email monitoring tool needs to be filled with new business leads and retention of existing clients needs to be improved.

Product issues

There have been several misconceptions internally regarding what the product can do. We need to realign sales, product development and marketing so that the messages surrounding this product are consistent internally, as well as externally. The short-term priorities are to concentrate on what the product does today and identify short-term wins to fill the pipeline as quickly as possible.

Because of internal communication issues, the product has been sold on features and benefits that do not exist.

| Sold On: | Reality: |
| --- | --- |
| Spam Ranking – How spammy is an email campaign? Let's you know what will make it through the spam filter. | The spam ranking will differ depending on personal filter settings and which ISP is used. |
| Comperemedia receives all emails from panelists. | Comperemedia does not track what is in a panelist's bulk/spam folder. |
| Panelists are recruited based on the number of accounts they manage. | Panelists do not have two separate email accounts (addresses). This refers to online accounts such as phone bill, checking account, credit card. |
| Email Inbox is the same as Email Searching. | Email Inbox allows you to search by panelist. Email searching allows you to search all emails that Comperemedia has received over a specified time frame. |
| Emails are uploaded to the Comperemedia website within 48 hours. | Emails are typically uploaded within 7 – 10 business days. |
| Emails are forwarded to Mintel automatically. | Emails are forwarded to Mintel without the panelist having to forward them. Depending on the ISP, emails are either forwarded every hour or once a panelist logs on to their email account. |
| Clients can use email for true cross-channel analysis between direct mail and email. | The panellists differ between direct mail and email. You can understand what a company is doing within each channel. However, you cannot see how a company is communicating to the same panellist across media channels. |
| The email panel functions the same as the direct mail panel in respect to level of information provided. | Direct mail pieces contain much more information regarding the offer. Email campaigns usually require you to click-thru to a landing page where in-depth product or offer information would be provided. |

MN0000875

MINTeL insight + impact

# Marketing Plan Outline
# Consumer Email Product

The goals of this plan are to dispel all myths surrounding this product, generate passion and build confidence in sales to sell email. This will be accomplished through providing sales with supporting marketing collateral, communicating success stories and generating leads through integrated marketing campaigns.

## Comperemedia – situation analysis
Current clients are:

| | | | | |
|---|---|---|---|---|
| GMAC Financial Services | USAA | Allstate | CharlesSchwab | First Citizens Bank |
| Enterprise | CapitalOne | WellPointe | Verizon Wireless | Bank of America |
| Farmers Insurance | Gerber | Citibank | Visa | Alltel |
| Discover | CompuCredit | ETrade Financial | HSBC | Ameritrade |
| FirstMarketing | | | | |

Etrade, Discover and Bank of America have already renewed. Although Bank of America was a red flag client and not expected to renew, due to great account management, the account was saved by repositioning it as an ideation tool (one of the key benefits of the email tool). In addition, the pricing was made more flexible to include additional sectors.

## Objectives
The major marketing objectives are:

* Lead Generation for new business
* Key account marketing to improve retention rates (client perception of the value of the product and increase usage)
* Generate passion, enthusiasm and confidence internally around email

The major sales objectives are:

* Achieve Email Sales Target for FY08 of $2.1 million
* Achieve a minimum of 90% retention of existing clients
* Grow the business by $1.45 million in new business

## Market
Currently, we are seeing a down turn in the financial industries as whole and many companies budgets have been frozen. Although this makes renewals, regardless of Comperemedia product, more difficult, it may also be an opportunity for Mintel to position itself as confident partners helping our clients increase their ROI (thus unlocking budgets) by addressing their plans with solutions based on Comperemedia and reach out to new markets like Hispanics. We might want to explore some new pricing models – show these institutions that we understand the issues they are facing and we want to help with their marketing-related goals.

MN0000876

MINTεL insight + impact

# Marketing Plan Outline
# Consumer Email Product

The target sectors are identical to the sectors Mintel Comperemedia monitors with direct mail and print advertisement.

The sectors are as follows:

- Banking
- Credit Card
- Investment
- Mortgage and Loan
- Insurance
- Telecom
- Technology
- Travel

In November, Sales implemented a new pricing structure for Consumer Email is special pricing for an "Email Financial Service" package that consists of the Credit Card, Banking, Mortgage and Loan, and Investment sectors. This package was developed because many major financial institutions are active in more than one sector.

Because Travel and Leisure is further advanced in the email life-cycle, short-term this sector is not a priority for selling email as a stand-alone. Special pricing does exist for this sector if Direct Mail and Email are purchased together. In essence, the client would receive the Direct Mail panel at no charge.

New Business has found it much easier to bundle the Email panel with other Comperemedia products primarily because it provides cross-channel market research even if they are not the same panellists. Clients purchasing Direct Mail understand the value of being able to monitor messaging, strategy, creative, etc. of email as well.

**Market Segments, Market Segmentation Strategy, Discussion of Needs and Requirements.**

| Roles | Innovate | Identify | Monitor | React |
|---|---|---|---|---|
| | • Branding<br>• Creative<br>• Messaging<br>• Targeting New Markets | • Cross-Channel Analysis | • Email Strategies<br>• Retention/Acquisition<br>• Affiliate Partnerships | • Early Warning System<br>• New Messaging |
| Emarketing | X | | | |
| Marketing | X | | X | X |
| Product Development | | X | X | X |
| Brand Managers | X | X | X | X |
| Creative Teams | X | | X | X |
| Compliance/Legal | X | X | X | X |
| Ad Agencies | X | X | X | X |

MINTEL insight + impact

# Marketing Plan Outline
## Consumer Email Product

**Comperemedia email – value proposition, USP & key messages**
Value Proposition –The email tool delivers previously unavailable insight into this particular media channel making your campaigns more effective.

Mintel Comperemedia's email monitor is a unique intelligence tool tracking the inboxes of a real panel of real consumers. Use it to generate new ideas for creatives and subject lines, refine your email campaigns and respond quicker to changes in the market. Providing invaluable insight into this fast moving media channel, Mintel Comperemedia helps you make your email marketing strategies more effective. Get the right product, with the right offer and right messaging, to the right target audience at the right time. Only Mintel Comperemedia's email panel enables you to see how your competitors and innovators in email marketing communicate to your target audience throughout the customer lifecycle. Mintel Comperemedia is your total solutions partner. By monitoring the leading media channels, we are the only media intelligence provider offering a holistic view across print, direct mail and email channels.

USP – Comperemedia's Email panel is a unique email intelligence tool monitoring email inboxes of a real panel of real consumers.

The main premise behind Comperemedia Email is that the panel is unique, leading-edge in that the consumers are real people giving us access to their email inboxes. Over a 1000 panelists receiving more than a million emails every month.

**Innovate**
> **Branding**
> **Creative**
> **Messaging**

Use Comperemedia's Email tool for ideation, study best practices. Learn from other sectors to generate ideas for subject lines, creatives and find new platforms/ways of communicating (ex. Positioning marketing messages in email alerts).

**Identify**
> **Cross-Channel Analysis**
> **Channel Strategies**

By comparing the leading media channels – print, direct mail and email – you can:
- See how email marketing compares to and interacts with direct mail and print. (Are your competitors integrating their campaigns?)
- Evaluate if your competitors are integrating their email campaigns with direct mail
- Discover when the competition is launching campaigns and plan your email campaigns accordingly
- Monitor your branding to ensure that it is consistent across channels
- Identify new markets to target with email.

**Monitor**
> **Email Strategies**
> **Retention vs. Acquisition**
> **Affiliate Partnerships**

MINTεL insight + impact

# Marketing Plan Outline
# Consumer Email Product

Understand the email marketing lifecycle and the customer journey by using our static panel.  See how companies are using email to up-sell and cross-sell products and how the messaging changes over time.

**React – Be Proactive**
    **Early Warning System**
    **New Messaging**

Companies regularly test and launch new products on current clients before they are launched to the general public.  Use Mintel Comperemedia to respond quicker to the competition.  See when competitors change their messaging and understand how language is constantly changing.

**Communications Strategy**
Internal Communication:

Our objective is to generate passion and enthusiasm and create confidence in the email product.  Our internal communication will include:

- Newsletter of success stories
  - New Business Wins
  - Renewals/Upsells
- Monthly highlights televised on the plasma screen
- Sales Tool Kit
  - Elevator Pitch
  - Client FAQ's and Objection Handling
  - Competitor Information
  - Case Studies
  - Application Stories
  - Matrix of DM/Email/Print
  - Sales Powerpoint Presentation

External Communication:

Our objective is to position ourselves as confident partners helping our clients increase their ROI (thus unlocking budgets) by addressing their plans with solutions based on Comperemedia and reach out to new markets.

- Create themes and stories surrounding consumer behaviour for Comperemedia
- Stress that we understand our clients challenges
- Highlight one key message per campaign

  - Integrated Campaigns
  - Targeting Financial Services allowing us to reach the majority of sectors covered
  - Language to resonate with specific market segments

MN0000879

MINT*e*L insight + impact

Marketing Plan Outline
Consumer Email Product

**Competitive Analysis**
The main competitor in the email arena is Email Data Source.

| | Mintel: | Email Data Source: |
|---|---|---|
| **Cost** | $5,000 - $60,000 | Unknown |
| **Data** | • Real Panel of Real Consumers<br>• Panel of 1,000 panelists<br>• Launched in 4th Qtr 2006<br>• 500,000 emails of which 186,000 are unique campaigns | • 18,000 advertisers sent from 6,000 senders<br>• Data is received from the brand owner and not the consumer, emails have been signed up for.<br>• Over 9,100 email senders<br>• Emails date back to 2003<br>• 4,500,000 emails in the database |
| **Key Features & Benefits** | • Generate new ideas for creatives and subject lines by studying Best in Class<br>• See how email marketing compares to and interacts with direct mail and print<br>• Evaluate if your competitors are integrating their email campaigns with direct mail<br>• Discover when the competition is launching campaigns and plan your email campaigns accordingly<br>• Monitor your branding to ensure that it is consistent across channels<br>• Identify new markets to target with email<br>• Understand the email marketing lifecycle and the customer journey by using our static panel<br>• Use Mintel Comperemedia to respond more effectively to the competition | • Monitor competitors, partners and service providers<br>• Build larger, stranger affiliate networks<br>• Discover new markets and verticals<br>• Find new and more effective lists and service providers<br>• Monitor lists for Spam compliance<br>• Perform research for unapproved usage of trademarks<br>• Improve ROI on your email programs |
| **Monitors** | Consumer | Unknown |
| **Industries** | • Personal Finance<br>• Telecom/Technology<br>• Insurance<br>• Travel | Focuses heavily on Retail Industry |
| **Database Functionality** | • OCR function availability<br>• Search email activity by date range<br>• Keyword search | • Keyword search by subject line or body of text<br>• Search email activity by date range |
| **Support** | • Team of Research Analysts<br>• Technical Support Team<br>• Experienced Competitive Account Management | • Unknown |
| **Company History** | • Well-known, established company with successful reputation<br>• Quality Data<br>• First class production, collection and delivery for 8 years<br>• Solid corporate parent<br>• Monitors direct mail and print advertisement as well | • Established in 2005<br>• Only reviews email and not any of the other medias |

MN0000880

MINTeL insight + impact

# Marketing Plan Outline
## Consumer Email Product

Email Data Source focuses heavily on the Retail Industry, of which Mintel Comperemedia is not active. Their target audience tends to be Email Marketing Providers and List Owners and position themselves as helping companies generate new leads. Although they also target ad agencies, it is worth noting that they none of their messaging revolves around using their tool for ideation, the number one key benefit of Mintel Comperemedia's email panel. It is also key to remember that Comperemedia monitors more than one media channel (unique).

**Communication Plan**
Please see Gantt Chart Spreadsheet

**Expense Budget**
Short-term the costs for these activities in dollars spent will be minimal. Email campaigns to existing clients, lapsed clients and prospects will cost approximately $500. Incremental costs will be incurred for any direct marketing campaigns ($2500). Mid-term there would be incremental costs for events ($15,000). The budget is still being developed.

**Discussion of Sales & Marketing Resources Available**
This is a cross-departmental effort. Resources from sales, marketing, product development, IT and research are required to implement this plan.

Marketing requires dedicated individuals for copy development and graphic design as well as for coordinating the implementation, analysis (learn and improve) and follow-up of each email and direct mail campaign. Marketing will also need to allocate time to communicate completely the reason behind any campaign, as well as what is expected of Sales to do with that information.

Sales will need to allocate time to sign-off on and follow-up on marketing campaigns.

Product development will need to work with marketing to ensure that the messaging meets agreed requirements.

IT will need to allocate resources for uploading webinars and creating HTML's for any email campaigns. In addition, the help desk will need to assist with any online registration issues.

Research will need to allocate time to create the webinar. In addition, they could facilitate developing the case studies to take them to the next step. Instead of the case study ending with "Result" or "ROI," Comperemedia can provide "Next Steps" or "What Else."

**Measurement/Evaluation**

Press Releases – Press Mentions
Email Campaigns – Open Rates/Click Thru Rates
Direct Mail Campaigns – Leads Generated
Events & Speaking Engagements – Leads Generated
Partnership Marketing – Leads Generated

MN0000881

MINTeL insight + impact

# Marketing Plan Outline
# Consumer Email Product

Webinars – Registrations
Microsite – Leads Generated
Product Website - Traffic

After each marketing campaign, feedback from sales will also be requested, especially when follow-up on the leads.  Based on feedback, we will be in a better position moving forward to adjust messaging for target audience, timing of campaign, etc. Additionally, we learn if we are targeting the right profile or we need to re-evaluate the audiences.

**Keys to Success/Critical Issues**
Foremost, we need to eliminate any and all myths surrounding the email tool and provide sales with an all inclusive sales kit to generate confidence and passion for the product they are selling.

Sales needs a story to tell for revisiting clients and prospects who they have already pitched using features and capabilities of the email product that are incorrect.  The overall umbrella theme of the stories will be consumer behavior and email marketing.

Although subjective in nature, the keys to success are ongoing communication, constructive feedback and renewed passion.

**Strategic Opportunities**
Additional sales channels could include list owners and email service providers.  Email Data Source already sells into these channels.  However, since they focus mainly on retail there could be potential growth for Mintel Comperemedia as well.

# CONTRACT OF EMPLOYMENT

1.    ## INTRODUCTION

From:    Mintel International Group Limited

To:        Meesham Neergham *Neergheen*

The following particulars are given to you in accordance with the terms of the Employments Rights Act 1996.

Your period of continuous employment with us began on the 30 June 1997.

No employment with a previous employer counts as part of your period of continuous employment. In accepting your appointment it shall be deemed that you have accepted all the terms and conditions set up in these Particulars of Employment.

These Particulars of Appointment annul any previous agreement whether verbal or written given to you at any time.

Your place of work will be Mintel International Group Ltd, 18-19 Long Lane, London EC1A 9HE.

You are employed as a NPD Assistant / Marketing Executive and will be responsible to the Publications Manager.

You will be paid monthly by credit transfer to your bank account in arrears at the rate of £14,000 gross per annum. Commission for some sales functions is payable and where payable, is discretionary, non-contractual and details are made available as and when appropriate by your line manager.

Your normal working hours are between 9.00am and 5.30pm Mondays to Thursday and between 9.00am and 5.00pm Fridays inclusive with one hour for lunch.

In certain circumstances it may be necessary to adjust or exceed the hours in order to ensure that your duties in accordance with the Terms of Employment are properly performed. Overtime is not payable.

2.    ## SICK LEAVE AND SICK PAY

2.1.    ### Notification and Certification

Absence occasioned by sickness must be notified by telephone to the Chief Executive on the first morning of your absence (if you are unable to contact the Chief Executive you must contact a member of the Executive, failing that, your line manager).

Your first day of sickness must be confirmed so that your eligibility to statutory sick pay can be calculated.

During your illness, you should keep in regular contact with, in the first instance, your Head of Department, another member of the Executive or lastly, your line manager by telephone. You must not leave a message with reception. It is your responsibility to ensure that your current telephone number is kept by personnel.

EXHIBIT
8



You should observe the following procedures during any illnesses:

(i)   A company sickness form must be completed for any period of sickness. This should be handed to your Head of Department for signature.

(ii)  For absences lasting between four and seven days (including Saturdays, Sundays and Public Holidays), a Self Certification Form (SC2) should be completed and handed to the Office Manager. These are available from the Head of Personnel only.

(iii) Sickness which continues for eight days or more (including Saturdays, Sundays and Public Holidays), must be covered by a doctor's Certificate. When sickness continues beyond the span of the first Certificate issued, it is the individual's responsibility to ensure that subsequent Certificates are forwarded by post to the Head of Department.

(iv)  After three separate episodes of sickness in any 12 month period, the Company has the right to ask you to provide a full doctor's Certificate for any further period of sickness taken. As doctors do not issue full Certificates before seven days of sickness, there may be a charge for periods less than this and it will be the individual's responsibility to pay any fee levied.

(v)   If any employee is absent due to sickness for more than five days during any 12 months period, the Company may at its own expense, ask the employee to attend the Company's doctor.

After incapacity of six months in any continuous period of 365 days duration Mintel shall be entitled, entirely at the discretion of Mintel, to treat this contract as having been terminated forthwith on the grounds that you shall be incapable of performing the employee's obligations hereunder. Any delay by Mintel in exercising its discretion shall not be deemed a waiver of Mintel's entitlement to termination under this paragraph.

2.2   **Sick Pay**

(i)   **Occupational Sick Pay**

There is no entitlement to Occupational Sick Pay. In the event that you are incapacitated through illness or injury from performing your duties any payment made by the Company to you during such absence shall be determined by the Company in its absolute discretion.

(ii)  **Statutory Sick Pay**

(a)   The company is responsible for paying Statutory Sick Pay to its employees for up to 28 weeks in any one "linked" period of incapacity to work.

(b)   Statutory Sick Pay becomes payable when there is a spell of four or more days sickness in a row and is payable for qualifying days only. Qualifying days are Monday to Friday inclusive. There is a waiting period of three qualifying days in each period of incapacity to work before Statutory Sick Pay is payable, except where there are two or more periods of incapacity separated by fewer than 57 calendar days.



(c)   In certain circumstances you may be excluded from Statutory Sick Pay. In those cases, the Company will give you an "exclusion form" explaining the reasons why SSP cannot be paid. You should then claim for State Sickness Benefit by completing the claim section of the form and sending it to your local DSS office.

(d)   Before the Company's liability for Statutory Sick Pay ends (ie 28 weeks), you will be given a "transfer form" which will enable you to continue claiming benefit from your local DSS.

## 3.   COMPASSIONATE LEAVE

In the event of the Employee suffering a bereavement, compassionate leave will be granted as follows:

Up to ten working days for the death of a partner/husband/wife/child.

Up to five working days for the death of a parent.

Time granted for the death of other relations will be at the discretion of Departmental Heads.

## 4.   MATERNITY LEAVE AND PAY

The Company follows statutory guidelines with regard to Maternity Leave and Pay.

(i)   <u>Confirming your Pregnancy</u>

As soon as you can (usually at least 21 week before the commencement of maternity leave) you must obtain a Maternity Certificate (MAT B1) from your GP (not a midwife), which will confirm your pregnancy, state your expected week of confinement (EWC) and allow us to pay your statutory maternity pay. Without your Certificate we cannot pay you.

You must also give written notice at least 21 days before your maternity leave commences, of the date of which you intend to commence your leave. If you cannot practicably give 21 days notice then you must give the notice "as soon as is reasonably practicable".

If you are absent from work wholly or partly because of your pregnancy/childbirth before your maternity leave date has been notified/reached but after the beginning of the sixth week before the EWC, you must notify us of absence as soon as is reasonably practicable. If you have the baby before you have had an opportunity to give the required notice then you must inform us of the date the baby was born.

Maternity leave may not be commenced more than 11 weeks before the EWC.



(ii)    Maternity Leave

### Employees with Less than Two Years Continuous Service

You have the right to fourteen weeks maternity leave or until the child's birth if later.

If you wish to return from maternity leave early you must give us at least one week's notice.

### Employees with Two or More Years Continuous Service

There is a separate right to return to work for those employees who have the right of maternity leave and who also have continuous employment of at least two years at the beginning of the 11th week before EWC. You are entitled to a extended leave period which goes up to the end of the 29th week after the beginning of the week in which you child is born.

You may lose the right to return to work after your extended maternity leave unless you give written intention to return to work at the same time as giving the notices mentioned above.

It may be that due to unforseen circumstances the Company needs to know your anticipated date of return (or your intention not to return) sooner than expected and we may write to you no more than 21 days before the end of your 14 week period of maternity leave, asking for written confirmation or whether or not you intend to return to work. You may lose the right to return if you do not respond if you do not respond to such a request within 14 days or, if this is not reasonably practicable, as soon as is reasonably practicable.

Once you have decided when you are going to return to work, you must notify us in writing of the day you will return, 21 days in advance. This is obviously a minimum requirement if you let us know your plans any sooner this would be appreciated.

We may extend your return date by four weeks by giving written notice of this postponement.

You may postpone your notified date of return by up to four weeks, providing you give us a full doctors certificate before the notified day, stating that you unfit.

Only one postponement is allowed, and if you are still unfit after four weeks, you lose the right to return.

iii)    Statutory Maternity Pay

To be eligible for SMP, an employee must have been continuously employed for at least 26 weeks ending with the week immediately preceding the 14th week before the expected week when the baby is due. This week is known as the qualifying week. SMP is paid at two rates and eligibility to either rate is based on length of service. All SMP will be paid into your bank account in the normal way on a monthly basis, on the last Thursday of each month.



*Employees with 2 or more years continuous service:*

The Company will pay you SMP for a maximum of 18 weeks. The first 6 weeks are at 90% of your salary and the remaining 12 weeks are at £54.55.

*Employees with less than 2 years continuous service, but more than 26 weeks:*

The Company will pay you SMP for a maximum of 18 weeks.

5.   **PATERNITY LEAVE**

The Company does not grant Paternity Leave.

6.   **LIFE ASSURANCE**

Free life assurance cover commences immediately upon permanent employment with Mintel and is a benefit enjoyed by all staff.

Cover is as follows:
Up to age 25              2 x annual salary
Age 25-34              3 x annual salary
Age 35 and over  4 x annual salary

7.   **SEASON TICKET LOAN**

Following the satisfactory completion of your probationary period, you will become eligible to apply for a Season Ticket Loan. Such a loan would be interest free and deducted from your salary in twelve monthly instalments. Application forms are available from the Accounts Department.

8.   **EXPENSES**

The Company will reimburse you for all reasonable expenses incurred wholly, necessarily and exclusively on Company business. Such expenses should be supported by receipts, included on the monthly expense forms and authorised by your Head of Department.

9.   **COMPANY CARS**

If you need a company vehicle in furtherance of being able to perform your duties as an employee, then this will be arranged directly with your Line Manager/Head of Department. A separate list outlining responsibilities will be issued to each employee who uses a company vehicle.

10.   **TERMINATION OF EMPLOYMENT**

The Company can terminate your employment at any time by giving you, in writing, the following periods of notice:

i)      If you have less than two years continuous employment : one week, or else the period stated in your offer letter, whichever is the greatest.

ii)     If you have more than two years continuous employment: one week for every year of such continuous employment up to a maximum of 12 weeks, or else the period stated in your offer letter, whichever is the greatest.




iii)    You may terminate your employment by giving the Company, in writing, four weeks notice or your current notice period, whichever is the greater.

iv)    The Company's ability to terminate your employment by service of notice at any time is not fettered by the Company's disciplinary procedure which is a policy document only and does not have a contractual effect.

## 11.   IMMEDIATE TERMINATION

The Company is entitled to terminate your employment with immediate effect and without service of any notice in the following circumstances;

i)    You are guilty of gross misconduct.

ii)    You are convicted of a criminal offence other than a road traffic offence for which you are not sentenced to a term of imprisonment whether immediate or suspended.

iii)    You commit any serious breach or persistent breach of the terms of your contract of employment.

iv)    You become bankrupt or make any arrangement or composition with or for the benefit of your creditors.

## 12.   HOLIDAY ENTITLEMENT

Our holiday year is the calendar year from January to December. Your annual holiday entitlement will be 25 working days in addition to the normal English bank and public holidays. Your holiday must be taken during the holiday year and your holiday dates agreed in advance. Employees who start during the calendar year will be entitled to two days holiday for each complete month left in the holiday year.

If you leave during your holiday year, your holiday entitlement will be re-calculated as two days holiday for each compete month worked in the year. If you have taken less holiday than this you will be paid in lieu. If you have taken more holiday than this you will have to repay the excess holiday pay.

Any money which you owe the Company on account of having taken more than your holiday entitlement may be deducted from your final payment from the Company.

## 13.   DISCIPLINARY PROCEDURE

Disciplinary procedures are essential to protect the interests of both the Employee and the Company. The procedures are designed to ensure that arrangements for dealing with disciplinary matters are fair, simple and effective. (The procedure is not contractual.)

The procedure is as follows:

i)      Minor matters will be dealt with by means of a verbal warning, a note of which will be kept on your file for a specified period of time.

ii)     Matters of a more serious nature will merit one or more written warnings, which if not complied with may result in dismissal. For each warning a specified period of time will be given for behaviour to improve. Under these circumstances, the Company reserves the right to suspend you whilst the matter is investigated further.

iii)    Matters which are considered to be gross misconduct will result in instant dismissal.

In matters of serious misconduct, it may be appropriate for an impartial third party to be present during the disciplinary interview to make notes and ensure that an accurate record of proceedings is kept. During your interview you may make a statement, either verbally or in writing, in your defence. You may also make reasonable requests for witnesses or for evidence to be produced, such requests not to be unreasonably denied.

If you wish to appeal against any disciplinary action taken against you, you may do so in writing to a member of the Executive Committee nominated by you.

If dismissed, in compliance with the law, the Company will issue you with a written statement detailing the reasons for your dismissal.

The disciplinary procedure will be instigated for certain actions. The list below, which is not exhaustive, gives an indication of such offences:

* .     unreasonable and unruly behaviour
* .     conduct or actions likely to endanger people or property
* .     persistent poor attendance/time keeping
* .     abuse of the sickness rules/procedures
* .     drunkenness, drug taking, gambling on company premises
* .     refusal or failure to obey reasonable instructions
* .     unauthorised possession of company property
* .     disregard of office rules
* .     persistent failure to achieve adequate work standards
* .     disregard of technical rules and procedures
* .     conduct likely to discredit the Company or damage its reputation
* .     breach of professional confidence or professional ethics
* .     commercial indiscretion

Any other act of behaviour which, by custom and practice is considered to be highly undesirable and socially unacceptable will, if persistent, result in disciplinary proceedings.

Any two employees who are in a reporting line within the company must avoid romantic involvement with each other in the interests of efficient and harmonious working relationships.

Failure to comply with this will lead to disciplinary action being taken.



## GRIEVANCE AND DISPUTES PROCEDURE

The size and structure of the Company prevents adherence to a detailed grievance/disputes procedure such as would be found in larger organisations. However, the Company acknowledges the need for a formal system within which employees can raise any grievances or disputes arising from their own position or the Company in general, and as such has laid down the following guidelines.

If you have a grievance arising from your work, it should in the first instance be addressed to your Line Manager or Head of Department. If no satisfactory conclusion is reached, the matter may then be passed to a member of the Executive Committee nominated by the Employee who will seek to investigate the matter further and offer advice to the Line Manager/Head of Department on possible solutions.

### 15.    RESTRICTIVE COVENANTS

You will not for the first twelve months at the end of your employment with us, either on your own account or on behalf of any other legal person and in competition with the Company, or any subsidiary directly or indirectly engage in, or be connected with, trade or business carried on by us or any of our associates at the end of your employment.

You will not for the first twelve months after at the end of your employment with us solicit or accept orders for products, services, competitive with ours from any of our customers with whom you dealt during the last twelve months of your employment with us.

You will not, for the first twelve months after the end of your employment with us, solicit away from us or our associates any person who is and was, when your employment ended, employed by us or an associate as a director, senior manager or sales person for whom you were responsible, or who was a member of any department/project/team in which you worked during the last twelve months of your employment.

Each of the above restrictions is separate and severable from the other if one is unenforceable for any reason, but would be enforceable if some of its wording were deleted, it shall apply with such deletions as are necessary to make it enforceable. Any period of notice served by you in accordance with clause 16 below, shall reduce the period of each of the above restrictions.

### 16.    PLACE OF WORK HAVING GIVEN NOTICE

If either you or the Company serves notice on the other to terminate your Contract of Employment the Company may require you to work away from the office for all or part of the remaining period of your employment. If you are asked to do this:

i)      You may not attend your place of work or any other premises of the Company or any associated company;

ii)     You may be asked to resign immediately from any offices you hold in the company or any associated company;

iii)    You may not be required to carry out duties during the remaining period of your employment;



iv) You must return to the Company all documents and other materials (including copies) belonging to the Company or associated companies containing confidential information;

v) You may not without the written permission of the Company contact or attempt to contact any client, customer, supplier, agent, professional advisor, broker or banker of the Company or any associated company or any employee of the company or any associated company;

During any such period you would continue to receive your full salary and benefits.

**17.** **CONFIDENTIALITY**

Mintel has expended and will continue to expend substantial effort and monies in acquiring knowledge and expertise in developing goodwill in the business of Mintel. In the course of your employment you will have access to certain of Mintel's trade secrets and other proprietary or confidential information of Mintel, including without limitation, procedures, processes, information related to design, production, marketing or distribution, data, databases, computer software, source codes, all methods and means of design, drawing, recording, reproducing information or storing information (including but not limited to electronic or computerised methods or means), supply sources or potential supply sources, customer lists or potential customer lists, bidding policies or procedures or any information concerning pricing or financing policies or procedures, including without limitation:

a) Information regarding contracts with clients of Mintel, design, pricing, methods of operation, financial conditions, market plans and master plans;

and

b) Information relating to Mintel's clients and concerning their financial condition, construction or planned development, product results and methods, master plans and business strategies.

You agree that all such records, methods, lists, materials, names and information, as well as any information and documents provided to, generated by or received by you in the course of your employment and the contents thereof, is confidential and is and will remain the sole property of Mintel. Such confidential information will not be used or disclosed by you other than in connection with your performance of services for Mintel or such confidential information shall be returned to Mintel upon the cessation of your employment.

All work on clients' business is confidential. Information obtained in the course of this work must not be disclosed to any outside party (including the clients' employees), or to fellow members of staff other than is necessary in the course of carrying out the work.

Confidential information about clients' affairs must not be discussed with third parties, relatives, friends or in public places.

## SECURITY

The Company is not responsible for employees' personal belongings.

Individual employees must ensure that personal belongings of value are placed in a drawer or cabinet, preferably locked, especially when the office is unoccupied.

You may need to work in the office outside of normal working hours. On such occasions you should enter the building through the front door using the security cards which are available from your Head of Department. If you do work out of hours, it is your responsibility to ensure that the building is secure upon your departure.

Briefcases and bags are not to be taken into the library under any circumstances. All visitors to the library must leave their briefcases with reception.

19.    **OTHER ETHICAL CONSIDERATIONS**

During the continuance of your employment with the company you shall unless prevented by incapacity devote your full time and attention to the business of Mintel and shall not without the prior consent of the company :

(i)      Engage in any other business; or

(ii)     Be concerned or interested in any other business of a similar nature to or competitive with that carried on by the company or any of its associated companies provided that nothing shall preclude you from undertaking work in respect of a recognised charity or from holding or being otherwise interested in any shares or other securities of any company which are for the time being quoted on any recognised Stock Exchange so as long your interest in such shares or other securities does not extend to more than 5% of the total amount of such shares or securities.

If consent is granted the work must be done out of working hours and you must not use company facilities or offices.

Such work must not be carried out in the name of the Company or its subsidiaries.

If consent is granted, it must be made clear that you are acting in a private capacity and that you are not representing or acting on behalf of the Company or its subsidiaries.

If involved in any outside professional activity which might result in the Company's name being mentioned in the press or other media you should obtain the prior approval of a Director or the Chief Executive of Mintel International Group Limited.

20.    **HEALTH AND SAFETY AT WORK**

In compliance with the Health and Safety at Work Act 1974, the Company endeavours to provide a safe working environment for all employees.

The Company has produced a General Policy Statement on Health and Safety at Work. You are advised to read this document which is available from the Head of Production.

In accordance with the Company's statutory obligations, there are two trained First Aiders in the building:

Emma Stocker - Reception
Michelle Strutton - MIC

A full first aid box is located in MIC.

21.    **NOTE**

Notwithstanding the above, any statutory minimum requirement provided by law is deemed to be included in your contract of employment.

Signed for and on behalf of the Employer
**MINTEL INTERNATIONAL GROUP LIMITED**

........................................................

Signed for and on behalf of the Employee
Meesham ~~Neergham~~ Neergheen

........................................................

Date: ....24/06/98.................................

## Employee Non-Compete/Non-Solicitation Agreement

For good and valuable consideration, and as an inducement for Mintel International Group, Ltd. or any of its U.S. subsidiaries (hereinafter collectively referred to as "Mintel") to either employ or to continue the present employment of Meesham Neergheen ("Employee"), the undersigned Employee hereby agrees not to compete, either directly or indirectly, with the business of Mintel or any of its subsidiaries, branches or divisions, at any location worldwide at any time during the Employee's term of employment, and for a period of one (1) year following his termination of employment with Mintel, regardless of the reason or cause for such termination.

The term "not to compete" as used in this Agreement means that the undersigned Employee shall not own, manage, operate, consult with or be employed by a business substantially similar to, or in competition with, the present business of Mintel or such other business activities in which Mintel may hereafter substantially engage during the term of the undersigned Employee's employment with Mintel.

The undersigned Employee acknowledges that Mintel may, in reliance upon the terms of this Agreement, supply or provide the undersigned Employee with access to Mintel's trade secrets, customer lists or other information of a confidential or proprietary nature. In consideration for his employment with Mintel, the undersigned Employee agrees to keep confidential all such information, and not to use such information for his own benefit or to disclose same to any third party.

In further consideration of the undersigned Employee's employment with Mintel, the undersigned Employee further agrees that in the event of his termination of employment with Mintel, regardless of the reason or cause for such termination, he will not solicit or recruit any of Mintel's employees to undertake alternative employment, including any competitive employment, for a period of one (1) year after the undersigned Employee's termination date with Mintel without the express written consent of Mintel's CEO or U.S. General Manager.

The undersigned Employee further agrees that in the event of his termination of employment with Mintel, regardless of the reason or cause for such termination, he will not solicit any of Mintel's customers for a period of one (1) year after the undersigned Employee's termination date with Mintel.

It is agreed and understood that any claims or controversies relative to the enforcement of this employee non-compete/non-solicitation agreement will be governed by the laws of the State of Illinois.

Signed this ____4^{TH}____ day of __August__ , 20_03_

_____            _____
Employee                                                   For Mintel

**EXHIBIT**

9