IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MINTEL INTERNATIONAL GROUP, LTD, a United Kingdom corporation, | )<br>)<br>) |
| Plaintiff/Counterdefendant, | ) Case No. 08 CV 3939<br>) |
| v. | ) Hon. Robert M. Dow, Jr.<br>) |
| MEESHAM NEERGHEEN, an individual, | )<br>) |
| Defendant/Counterplaintiff. | )<br>)<br>) |

## MINTEL INTERNATIONAL GROUP, LTD.'S ANSWER TO DEFENDANT'S COUNTERCLAIMS

Plaintiff/Counterdefendant, Mintel International Group, Ltd., (hereinafter "Mintel") answers the counterclaim of Defendant/Counterplaintiff, Meesham Neergheen (hereinafter "Neergheen"), as follows:

## ANSWER TO COUNTERCLAIMS

1. Neergheen is an individual currently residing in Cook County, Illinois. Neergheen is a citizen of the United Kingdom, and is residing and working in the United States by virtue of a U.S. visa.

**Answer:** Mintel admits that Neergheen is currently residing in Cook County, Illinois and is a citizen of the United Kingdom. Mintel has insufficient information to either admit or deny the remaining allegations and, therefore, denies the remaining allegations in paragraph 1.

2. Upon information and belief, Mintel is a United Kingdom company that conducts business and maintains an office in the state of Illinois.

1

**Answer:**    Mintel admits the allegations within paragraph 2.

3.    The counterclaims arise in part under 28 U.S.C. §1928 and Illinois common law.

**Answer:**    Mintel denies the allegations within paragraph 3.

4.    This Court has jurisdiction over the counterclaims pursuant to 28 U.S.C. §1332. This Court also has supplemental jurisdiction over the counterclaims pursuant to 28 U.S.C. §1367.

**Answer:**    Mintel admits the allegations within paragraph 4.

5.    Venue and personal jurisdiction are proper in this District pursuant to 28 U.S.C. §1391(b) in that a substantial part of the activities giving rise to the counterclaims alleged herein occurred in this District and Mintel can be found in this district.

**Answer:**    Mintel admits the allegations within paragraph 5.

**Neergheen's Career with Mintel**

6.    In June 1997, Neergheen began working for Mintel International's main office in London, United Kingdom.

**Answer:**    Mintel admits the allegations within paragraph 6.

7.    Upon commencing employment with Mintel, Neergheen signed a contract of employment. This contract was made between a United Kingdom company and a resident and citizen of the United Kingdom. The contract failed to provide a choice of law provision and further failed to otherwise indicate the laws under which it was to be interpreted.

2

**Answer:** Mintel admits that Neergheen's employment contract was made between a United Kingdom company and a resident and citizen of the United Kingdom. Mintel denies the remaining allegations in paragraph 7.

8. In approximately August 2003, Neergheen transferred from Mintel's UK office to its Chicago, Illinois branch.

**Answer:** Mintel admits the allegations within paragraph 8.

9. Neergheen's transfer to the U.S. arm of Mintel was simply a transfer. His duties at the time remained the same, and he did not sign a new employment contract with the company. Mintel did require, however, that Neergheen sign what it titled a "non-compete agreement." Neergheen was not provided any additional compensation or other consideration for signing a new document.

**Answer:** Mintel denies that it required Neergheen to sign the "non-compete" agreement. Mintel also denies that Neergheen was not provided consideration for signing the document. Mintel admits the remaining allegations of paragraph 9.

10. Over the course of his employment with Mintel, Neergheen held several positions with the company. During the decade-long employment, Neergheen worked his way from data-input type positions to a member of the marketing team.

**Answer:** Mintel admits that over the course of his employment with Mintel, Neergheen held several positions within the company. Mintel denies the remaining allegations of paragraph 10.

11. Ultimately, Neergheen was given the position of leveraging trade organizations for Mintel. Neergheen's duties included setting up sponsorships at trade shows, providing

3

speakers, and organizing lists of associations in particular fields. Neergheen was slated with the task of working with organizations in the consumer packaged goods ("CPG") area.

**Answer:** Mintel denies that Neergheen was slated with the task of working with organizations in the consumer package goods ("CPG") area. Mintel admits the remaining allegations of paragraph 11.

12. As part of the regular course of business, Neergheen frequently brought his work home. This included e-mailing projects to his personal email account from his work account.

**Answer:** Mintel has insufficient information to either admit or deny the allegations of paragraph 12 and, therefore, denies the allegations.

**Mintel's Termination of Neergheen**

13. In late 2007, Neergheen interviewed for the Product Marketing Manager position at Mintel. Not only was he not selected for the position, Neergheen was informed that the position he did hold would be made redundant by the company. Neergheen was told her would have to find another job.

**Answer:** Mintel denies that Neergheen was told he would have to find another job. Mintel admits the remaining allegations of paragraph 13.

14. Because Neergheen had made his life in the United States, he wanted to stay in Chicago. He first attempted to find another position within Mintel that would allow him to do so. Mintel's only offer was a data-input job – a large step down from his then-position with the company. Neergheen chose to turn down the position.

**Answer:** Mintel admits that Neergheen was offered a data-input job at Mintel that Neergheen chose to turn down. Mintel has insufficient information to either admit or deny the remaining allegations and, therefore, denies the remaining allegations of paragraph 14.

15. Growing increasingly concerned about the deadlines that would require him to return to the United Kingdom, Neergheen requested of Mintel the ability to stay on with the company until he found a new position elsewhere. Mintel worked with Mr. Neergheen to create a temporary role that would end April 30, 2008. This role was created in order to allow Neergheen to remain in the United States while he found a new job.

**Answer:** Mintel admits that it created a position for Neergheen that was to end on April 30, 2008. Mintel denies the remaining allegations of paragraph 15.

16. Starting in approximately mid-December 2007, Neergheen began looking for a new job. Because of his citizenship, Neergheen sought work with companies based in the United Kingdom, but which had branches in Chicago. These companies would allow Neergheen to remain by virtue of a particular type of U.S. visa.

**Answer:** Mintel has insufficient information to either admit or deny the allegations in paragraph 16 and, therefore, denies paragraph 16.

17. Neergheen sought employment through placement agencies, Internet postings, friends and colleagues, and cold-calls.

**Answer:** Mintel has insufficient information to either admit or deny the allegations in paragraph 17 and, therefore, denies paragraph 17.

18. As part of his efforts to find a new position, Neergheen communicated via his Mintel-issued e-mail account. As Mintel had made Neergheen's position redundant and left him without a job, the company was aware Neergheen would be seeking employment elsewhere.

**Answer:** Mintel admits that Neergheen's position was made redundant. Mintel denies the remaining allegations within paragraph 18.

19. Neergheen began interviews with United Kingdom-based companies with Chicago offices. In early spring 2008 Neergheen accepted employment with Datamonitor Inc. Datamonitor is a United Kingdom company that was seeking a U.S.-based employee to fill a recently open position. Datamonitor's U.S. employee had decided to return to Europe and the company needed someone with experience working with trade associations. When Neergheen's personal friend notified Neergheen of the position, Neergheen sought – and obtained – an interview with the company. Several weeks later, Neergheen was offered the position.

**Answer:** Mintel has insufficient information to either admit or deny the allegations in paragraph 19 and, therefore, denies paragraph 19.

20. Although Datamonitor and Mintel both collect public information and provide services marketing to and with trade associations, they work in primarily different industries. Nonetheless, Mintel considers Datamonitor to be a competitor. As a result, Datamonitor carefully screened the position Neergheen was seeking to ensure there was no conflict with his new job.

**Answer:** Mintel admits that it considers Datamonitor to be a competitor. Mintel denies the remaining allegations in paragraph 20.

**Mintel's Change-of-Mind**

21. Mintel was aware of, and encouraged, Neergheen's attempts to find employment elsewhere. Nonetheless, in approximately March 2008, months after informing Neergheen that it would be making his position redundant, Mintel suddenly became concerned that Neergheen would have a basis for challenging the termination of his employment.

**Answer:** Mintel admits that it was aware of, and encouraged, Neergheen's attempts to find employment elsewhere but affirmatively states that it was not aware nor did it encourage Neergheen to interview with competitors. Mintel denies the remaining allegations in paragraph 21.

22. The company began formally monitoring Neergheen's e-mail account and began having internal communications about the fastest way to return Neergheen to the United Kingdom.

**Answer:** Mintel admits that it began monitoring Neergheen's e-mail account on April 23, 2008, but affirmatively states that Neergheen's e-mails were not reviewed until July 2008. Mintel denies the remaining allegations of paragraph 22.

23. Knowing that the non-compete clauses of the documents signed by Neergheen would not be valid, Mintel asked Neergheen to sign a new non-compete agreement. This new agreement provided that United States law would govern the document and more narrowly restricted Neergheen's ability to work. Additionally, Mintel offered a $2,000 (two thousand dollar) severance in exchange for signing a new agreement and to thank him for his ten years of service to the company. Neergheen refused the new agreement and the $2,000.

**Answer:** Mintel admits that it offered Neergheen a $2,000 severance in exchange for signing a non-compete agreement and to thank him for his ten years of service to the company. Mintel also admits that Neergheen refused to sign the new agreement. Mintel denies all remaining allegations within paragraph 23.

**The Present Lawsuit**

24. In late July 2008, Mintel brought the present lawsuit before the Court. At that time, Mintel claimed that the matter was of such urgency, it was entitled to immediately prevent Neergheen from working for Datamonitor. Mintel claimed that it had just discovered that Neergheen had emailed what it deemed "proprietary and trade secret" information from his work to his email account and, as a result, it would suffer irreparable damage unless Neergheen were required to cease working immediately.

**Answer:** Mintel admits that it brought the present lawsuit before the court because the matter was of urgency but affirmatively states that the lawsuit was filed on July 11, 2008. Mintel denies the remaining allegations in paragraph 24 and affirmatively states that it discovered on July 9, 2008 that Neergheen had e-mailed Mintel's proprietary and trade secret information from his work e-mail account to his personal e-mail account.

25. However, nearly three months prior to filing the present "emergency" action, Mintel was aware of the e-mails and was unconcerned about them.

**Answer:** Mintel denies the allegations of paragraph 25.

26. Moreover, as Mintel is now aware, Neergheen had no bad intent in emailing the documents to himself. He was employed by Mintel at the time, deleted a number of the

8

documents without even opening the emails, and never opened the one email that remained. Nonetheless, Mintel pressed forward with the present lawsuit.

**Answer:** Mintel denies the allegations of paragraph 26.

## COUNT I
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

27. Neergheen reasserts and realleges the allegations made in paragraphs 1-26 above as if fully set forth herein.

**Answer:** Mintel restates its answers to paragraphs 1 through 26 as though stated herein.

28. Neergheen had valid business expectancies with Datamonitor.

**Answer:** Mintel denies the allegations of paragraph 28.

29. Mintel's attempts to entice Datamonitor to terminate Neergheen's employment including but not limited to the filing of the present lawsuit and its maintenance without basis, constitutes a knowing, intentional interference with Neergheen's business relations.

**Answer:** Mintel denies the allegations of paragraph 29.

30. Mintel required Neergheen to enter into two documents purporting to restrict his ability to seek employment outside of Mintel. Mintel did so knowing that the documents were invalid and improperly and unreasonably attempted to prevent Neergheen from practicing his trade.

**Answer:** Mintel denies the allegations of paragraph 30.

31. These acts constitute restraint of trade and are against public policy, making the documents legally unenforceable.

**Answer:** Mintel denies the allegations of paragraph 31.

32. Mintel has acted with malice in interfering with this relationship and lacks any legally cognizable justification for this interference.

**Answer:** Mintel denies the allegations of paragraph 32.

33. As a direct and proximate result of Mintel's misconduct, Neergheen is being irreparably injured and will continue to be irreparably injured in his business and reputation, resulting in loss of goodwill. Unless restrained by the Court, Mintel will continue its misconduct.

**Answer:** Mintel denies the allegations of paragraph 33.

34. Neergheen has no adequate remedy at law which will afford him complete relief and will be irreparably harmed unless Mintel's wrongful conduct is enjoined by the Court, in that monetary damages alone cannot fully compensate Neergheen for injuries caused by Mintel's misconduct.

**Answer:** Mintel denies the allegations of paragraph 34.

35. Neergheen has been damaged in an amount exceeding $75,000 but to be determined at trial.

**Answer:** Mintel denies the allegations of paragraph 35.

36. Additionally, Neergheen is entitled to punitive damages on account of Mintel's egregious conduct, as well as damages under 28 U.S.C. §1927.

**Answer:**　　Mintel denies the allegations of paragraph 36.

## COUNT II
**DECLARATORY JUDGMENT – "NON-COMPETE AGREEMENT"**

37.　Neergheen reasserts and realleges the allegations made in paragraphs 1-36 above as if fully set forth herein.

**Answer:**　　Mintel restates its answers to paragraphs 1 through 36 as if fully set forth herein.

38.　In its Complaint, Mintel asserts counts based on purported violations of the document it terms the "Non-Compete Agreement." This document, attached to Mintel's Complaint at Exhibit 1-A, purports to restrict Neergheen, for a one year time period, from employment with any entity in the world that Mintel considers to directly or indirectly compete with Mintel.

**Answer:**　　Mintel admits the allegations in paragraph 38.

39.　The document referred to by Mintel in its Complaint as the "Non-Compete Agreement" is invalid and/or unenforceable as a matter of law. At a minimum, the document is unreasonable in scope and duration and is against public policy.

**Answer:**　　Mintel denies the allegations in paragraph 39.

40.　Accordingly, Neergheen is entitled to judgment that the "Non-Compete Agreement" is invalid and/or unenforceable.

**Answer:**　　Mintel denies the allegations in paragraph 40.

## COUNT III
## DECLARATORY JUDGMENT – "CONTRACT OF EMPLOYMENT"

41. Neergheen reasserts and realleges the allegations made in paragraphs 1-40 above as if fully set forth herein.

**Answer:** Mintel restates its answers to paragraphs 1 through 40 as if fully set forth herein.

42. In its Complaint, Mintel asserts counts based on purported violations of the restrictive covenant provision of the document it terms the "Contract of Employment." This document, attached to Mintel's Complaint at Exhibit 1-B, purports to restrict Neergheen, for a one year time period, from employment with any entity in the world that Mintel considers to directly or indirectly compete with Mintel.

**Answer:** Mintel admits the allegations of paragraph 42.

43. The restrictive covenant provision of the document referred to by Mintel in its Complaint as the "Contract of Employment" is invalid and/or unenforceable as a matter of law. At a minimum, the provision is unreasonable in scope and duration and is against public policy.

**Answer:** Mintel denies the allegations of paragraph 43.

44. Accordingly, Neergheen is entitled to judgment that the "Non-Compete Agreement" is invalid and/or unenforceable.

**Answer:** Mintel denies the allegations of paragraph 44.

## AFFIRMATIVE DEFENSES

1. One or more claims of the Counterclaim fails to state a claim upon which relief can be granted.

2. Counterplaintiff is guilty of coming to court with unclean hands.

WHEREFORE Counterdefendant Mintel International Group prays for judgment and its costs so wrongfully sustained.

> Respectfully submitted,
>
> Plaintiff, MINTEL INTERNATIONAL GROUP, LTD.
>
> By: ___/s/ Joseph R. Marconi___
>       One of Its Attorneys

Joseph R. Marconi
Victor J. Pioli
Katherine J. Pronk
Johnson & Bell, Ltd.
33 W. Monroe, Suite 2700
Chicago, IL 60603
(312) 372-0770
Doc. No. 1918806

## CERTIFICATE OF SERVICE

    The undersigned, an attorney of record, upon oath states that a true and complete copy of the foregoing **Mintel International Group, LTD's Answer to Defendant's Counterclaims** was filed and served electronically on this 2nd day of September, 2008 via ECF filing to:

John Roache
Jeana R. Lervick
Joel C. Griswold
Bell, Boyd & Lloyd, LLP
70 West Madison Street
Suite 3100
Chicago, IL 60602

                              By:   /s/ Joseph R. Marconi
                                      One of Its Attorneys