# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MINTEL INTERNATIONAL GROUP, LTD., a United Kingdom corporation, | ) ) ) | |
| Plaintiff/Counter-Defendant, | ) | Civil Action No. 08-cv-3939 |
| | ) | |
| v. | ) ) | Hon. Robert M. Dow, Jr. Magistrate Judge Maria Valdez |
| MEESHAM NEERGHEEN, an individual, | ) ) ) | |
| Defendant/Counter-Plaintiff | ) ) | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

456896/E/8

Defendant, Meesham Neergheen ("Neergheen"), by his attorneys, respectfully submits this memorandum in opposition to the Emergency Motion for Temporary Restraining Order and Injunctive Relief filed by Plaintiff, Mintel International Group, Ltd. ("Mintel").

<u>FACTS</u>

In early 1997, shortly after graduating from college, Neergheen began a voluntary internship with Mintel. (Ex. A, p. 14). Three months later, Neergheen was given a full-time job with Mintel at its main offices in London. (*Id.*, p. 15). Neergheen began a decade-long career with Mintel that would ultimately take him around the world to Chicago.

In June 1998, approximately a year after beginning full-time employment with Mintel, Neergheen was asked to sign an Employment Contract. (*Id.*, pp. 38-39). The Employment Contract contains a provision that states, "You will not for the first twelve months at the end of your employment with us… in competition with the Company… directly or indirectly engage in, or be connected with, trade or business carried on by us or any of our associates at the end of your employment." (Ex. B).

By 2003, Neergheen had identified a niche within the Consumer Product Goods ("CPG") industry relating to various trade associations with whom he could leverage the Mintel brand and promote reports to the associations' membership base. (Ex. A, p. 18). Mintel had never previously exploited the avenue which allowed Mintel "to gain further exposure, so from a branding perspective, exposure in magazines, exposure in newsletters, the acquisition of membership lists that get passed on to sales, to our sales team for follow up." (*Id.*, p. 19-20). In fact, using publicly available information, Neergheen created a contact list for trade associations. (*Id.*, 168-169)

In July 2003, Neergheen was transferred from London to Chicago. After the transfer, Neegheen continued to focus on identification of trade associations partners for Mintel, working almost exclusively in the CPG industry. (Ex. C). Neergheen was first informed that he would be required to sign a "Non-Competition Agreement" with Mintel only after he had already relocated to the United States. (Ex. A, p. 157). The "Non-Competition Agreement" provided that "The undersigned Employee hereby agrees not to compete, either directly or indirectly, with the business of Mintel … at any location **worldwide** … for a period of one (1) year following his termination of employment with Mintel, **regardless of the reason or cause for such termination**." (Ex. D)(emphasis added). Neergheen was given the document by the then HR manager and was allowed approximately five minutes to review the document. (Ex. A, p. 158). Neergheen was not given any compensation in return for signing the document. *Id.* Neergheen's understanding was that his failure to sign the agreement would result in his termination. *Id.*

The Non-Compete Agreement was signed by Maggie Cahm, Mintel's HR Director in London, on behalf of Mintel. (Ex. E, p. 54). Mintel's employee handbook, however, provides that "[a]ny contract concerning the employment of any employee must be in a separate document signed by the US General Manager or CEO of Mintel, in which case the provisions of the written contract will control the extent that they are inconsistent with the terms of the Employee Handbook." (Ex. F).

In late 2007, Sabine Popp, head of Mintel's Marketing Department, decided to restructure the marketing department and eliminate Neergheen's position, requiring Neergheen to move his life back to England. (Ex. E, p. 50). On January 10, 2008, Neergheen wrote to Peter Haigh, Mintel's CEO, "I am a little perplexed that I have suddenly been placed in this rather awkward situation. I am sure that you would be the first to admit that the situation I have been placed in is

not fault of my own but to be very honest it's not easy for me [to] comprehend that my life has suddenly and somewhat turned upside down over the past few weeks.  I have been attempting to get this figured out for over a month and a half but still have no resolution."  (Ex. G).

In January 2008, Neergheen accepted a temporary role in Mintel's public relations department, with a firm ending date of April 30, 2008.  On January 16, 2008, Steve Charlton, Mintel's Head of HR, provided Neergheen a letter that provides "We have had many conversations about the pending changes in the Marketing Department and the fact that Mintel has made the business decision to eliminate your position within the company. . . . [W]e hope that you will accept a Temporary role as a PR Executive, reporting to Sabine Popp.  It is important to note that this position will end effective April 30, 2008."  (Ex. H).

Over the course of his three month temporary period, Neergheen grew more and more worried about his employment status.  (Ex. A, p.56).  He began sending out resumes and applying to placement firms.  Id.  In fact, over a several week time period, Neergheen applied to placement firms, joined agencies, sent out applications, and searched company websites.  (Id., pp. 56-57, 159).  Mintel was aware of Neergheen's job search.  (Ex. O).  However, in addition to the strain of finding a job in an area in which he was qualified, Neergheen had the added challenge of finding a company that would allow him to remain in the country on a particular type of visa.  (Id., p.159).  It was Neergheen's understanding that, in order to do so, he would have to find new employment with a UK-based company, thus further limiting his options.  Id.

Mintel was fully aware of that limitation.  On November 22, 2007, Mintel's immigration lawyer notified Maggie Cahm, Mintel's HR Manager in Lonon, that "[s]ince Meesham is in E-2 status, the only way he can continue working in the US is if he were offered a job with a US subsidiary or affiliate of another British company who is E-2 qualified.  Unfortunately, he cannot

work for any other company on his existing E-2 visa and it will be difficult for him to change status to another type of visa which would permit employment in the US." (Ex. I).

In early to mid January 2008, Neergheen sent his resume to Datamonitor, Inc. (Ex. J, p. 38). Over the next few months, Datamonitor interviewed Neergheen to determine whether his skills sets matched Datamonitor's needs, an individual who could identify potential "channel partners." (Ex. K). Recognizing that Neergheen had been a Mintel employee, Datamonitor immediately took care not to discuss any aspects of Mintel's business with Neergheen. *Id.* Instead, interviews were based on hypothetical scenarios, designed to test Neergheen's commercial astuteness to understand new industry sectors that he had not worked in previously and designed to avoid disclosure of any Mintel information. (Ex. J, p. 56). Jeff Howard, Datamonitor's Head of Content Licensing and Business Development, found that Neergheen had a strong understanding of the conceptual fundamentals of partnerships. *Id.* As Howard believes that direct industry sector knowledge is significantly less important than understanding the conceptual fundamentals of partnerships, Neergheen seemed a perfect fit. *Id.*

Datamonitor instituted additional safeguards in order to ensure that Neergheen's employment would not encroach on his previous employment at Mintel. In particular, Datamonitor provided that Neergheen's role at the company would entail industries in which he was not involved at Mintel (in fact, in which Mintel does not even have a presence). (Ex. K). Moreover, Datamonitor had Neergheen sign a certification that provided he was prohibited from disclosing any Mintel trade secrets or confidential information to Datamonitor. (Ex. L). Neergheen has complied with the terms of that agreement. (Ex. J, pp. 84-85). Neergheen also was provided with a spreadsheet created by Datamonitor containing the names of trade associations. (Ex. K). Neergheen was instructed to review the spreadsheet and delete any and

all CPG-related associations, or any other associations, with whom he dealt with while at Mintel. *Id.* Neergheen did so, and has been working for Datamonitor in the Pharmaceutical and Technology industries. Mintel admits that it does not have a presence in either the Pharmaceutical or Technology Industries. (Ex. E, p. 33).

During his employment with Mintel, Neergheen would on occasion email from his Mintel account to his personal email account to work on matters at home. Mintel has no prohibition against employees doing so. (Ex. F). Not only is there no policy in the company against such actions, Mintel was aware Neergheen had done so prior to his termination by Mintel. (Exs. O, Q) During his final week at Mintel, Neergheen sent an additional round of emails to his personal account. Neergheen testified that he had no purpose, design or intent in doing so and is unsure why he sent those files to his personal email account. These emails are now at-issue in the present action. Neergheen has not used any of the information contained in those emails for his own personal benefit. Moreover, Neergheen has not disclosed any of the information contained in those emails to any third party.

As early as April 2008, Steve Charlton and Sabine Popp, both executives of Mintel, knew that Neergheen had emailed Mintel information to is personal email account during his last week of employment with Mintel. Mintel began monitoring Neergheen's email account on April 23, 2008.[1] For example, on April 30, 2008, Jon Butcher sent an email to Charlton stating "[d]id Sabine [Popp] tell you he has been sending things to his personal email. I think you should flat out ask him what his intentions are." (Ex. N, at MNTL 281). As a result, Mintel found that Neergheen had sent emails containing Mintel information during the last week of his employment. In response to that action, and around late April or early May, Mintel instructed

---

[1] Although the Affidavit of Richard Carr stated that Mr. Carr asked that Neergheen's email account be searched, Mr. Carr testified that this paragraph of his account was untrue.

456896/E/8

Paul Phillips to contact Neergheen and inform Neergheen that he should do nothing with the emails. (Ex. P, pp. 24-29).

In 2007, Neergheen was provided with a laptop computer by Mintel. (Ex. A, p. 27). The laptop was checked out to Neergheen, but not for a set period of time. *Id.* Ultimately, Mintel failed to ever ask for the return of the laptop and, as he had used it as his home computer for several months, Neergheen never thought to return it. *Id.* Mintel was unconcerned about the laptop, and neither objected to it being gone. Mintel's Human Resources is responsible for scheduling an exit interview with a terminating employee on the employee's last day of employment and for arranging the return of Company property, including: Company Security Fob, Office keys, Company manuals or other proprietary information, and any additional Company-owned or issued property. (Ex. R).

On April 28, 2008, Charlton sent an email to Popp stating "May need to remind him about the non-compete, however weak it is. . . . Severance may be good idea after all as we can tie down non compete and stop any future legal action he might chose to take . . . ." (Ex. Q). On that same date, Popp sent an email to Charlton stating "Spoke to Amy. We'd have a very hard time to reinforce the old non-compete that he signed when he started with Mintel. My gut says that we should offer him severance and make him sign a new non-compete. That'll help us all to sleep better. I'll speak to Jon." (*Id.* at MNTL 527). Mintel offered Neergheen a severance payment of $2,000 in exchange for his signature on a new non-compete agreement. (Ex. A, p. 172). Neergheen refused the offer and to sign the new non-compete agreement.

On April 29, 2008, Charlton sent an email to Jon Butcher stating "I'm not as concerned about the [trade associations], he had been transitioning out of that role over the last 6 months anyway." (Ex. N at MNTL 283).

<u>**ARGUMENT**</u>

**I.    STANDARD**

As an initial issue, in its motion Mintel seeks both a preliminary and a permanent injunction as relief, but only cites the standard for preliminary injunction.  To obtain a preliminary injunction, the movant must show that: (1) the case has a likelihood of success on the merits and (2) no adequate remedy at law exists.  *Graham v. Medical Mutual of Ohio*, 130 F.3d. 293, 295 (7th Cir. 1997) (citations omitted).  To obtain a permanent injunction, the standard is essentially the same, except that the movant must prove ***actual*** success on the merits rather than a likelihood of success.  *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp.2d 866, 872 (N.D. Ill. 2006)(distinguishable on other grounds).  If the moving party cannot establish either of these prerequisites, a court's inquiry is over or the court must deny the injunction.  *Curtis 1000 v. Suess*, 843 F. Supp. 441, 446 (C.D. Ill. 1994).  If, however, the moving party clears both thresholds, the court must <u>still</u> consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties.  *Id.* This examination by the court involves a "sliding scale" analysis: the greater the movant's chance of success on the merits, the less strong a showing the movant must make that the balance of harms is in movant's favor.  *Storck USA L.P. v. Farley Candy Co.*, 14 F.3d 311, 313 (7th Cir. 1994)(balance of hardships militated against issuance of injunction).

**II.    MINTEL CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS**

In the present case, Mintel certainly cannot demonstrate actual success on the merits and cannot even demonstrate a reasonable likelihood of success.  "[I]f a plaintiff seeking a

7

preliminary injunction cannot show that the chance of prevailing on the merits is "better than negligible," a court must deny the injunction regardless of how heavily any other equities may weigh in the plaintiff's favor. *Applied Industrial Materials Corp. v. Brantjes*, 891 F.Supp. 432, 436 (N.D. Ill. 1994)(J. Holderman).

### A.    Mintel Does Not Allege A Violation Of The CFAA (Count I)

A civil action pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. §1030, *et seq.* ("CFAA") "may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B)." 18 U.S.C. § 1030(g) (emphasis added). Mintel alleges that Neergheen's conduct constitutes a "violation of 18 § 1030(a)(4), §1030(a)(2)(C), 1030 (a)(5)(A)(iii) and 1030(a)(5)(B)(i)." (Compl. at ¶10). The CFAA, in pertinent part, provides for civil liability only when one: (1) "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage...;" and (2) "by conduct described [above], caused ...loss to 1 or more persons during any 1-year period ... aggregating at least $5,000 in value." 18 U.S.C. §1030(a)(5)(A)(iii); 18 U.S.C. § 1030(a)(5)(B)(i). Accordingly, "it is necessary for a plaintiff to plead both damage and loss in order to properly allege a civil CFAA violation." *Garelli Wong*, 551 F.Supp.2d at 708.

### 1.    Mintel Does Not Allege That Neergheen Accessed A "Protected Computer"

Mintel does not state a claim under the CFAA, because Plaintiff does not allege that Neergheen accessed a "protected computer" within the meaning of the CFAA. Under the CFAA, the term "protected computer" is defined as a computer:

> (A) exclusively for the use of a financial institution or the United States Government, or, in the case of a computer not exclusively for such use, used by or for a financial institution or the United States Government and the conduct constituting the offense affects that use by or for the financial institution or the Government; or

(B) which is used in interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States.

18 U.S.C. § 1030(e)(2).  Mintel does not allege that Neergheen accessed a computer that satisfied either of the categories enumerated in the CFAA, *i.e.* that the computer at issue was "for the use of a financial institution or the United States Government" or which "is used in interstate or foreign commerce."  (Compl.) (*in seriatim*).  Mintel alleges only that Neergheen "accessed a protected computer without authorization and as a result has obtained Mintel's valuable confidential and proprietary trade secret information."  (Compl. at ¶24).  Such "labels and conclusions, and a formulaic recitation of a cause of action's elements will not do."  *Twombly*, 127 S.Ct. at 1965.

2.    <u>Mintel Does Not Allege That Neergheen's Conduct Caused "Damage"</u>

Mintel does not state a claim under the CFAA, because Mintel does not allege that Neergheen's conduct caused "damage" within the meaning of the CFAA.  *Garelli Wong v. Nichols*, 551 F.Supp.2d 704, 708 (N.D. Ill. 2008)(granting motion to dismiss); *see also* 18 U.S.C. § 1030(a)(5)(A).  Under the CFAA, "damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8).  In its Complaint, Mintel alleges that "Neergheen had copied, e-mailed to his personal e-mail address and/or printed confidential and proprietary trade secret information from his work computer ..." (Compl. at ¶21).  Mintel, however, does not allege that any such conduct caused "any impairment to the integrity or availability of data, a program, a system, or information." (Compl.)(*in seriatim*).  Indeed, Mintel did not prohibit such conduct.  (Ex. F)  But, even if such conduct was prohibited, the Seventh Circuit has found that unauthorized copying and e-mailing

9

of files from a computer is not enough to form the basis of a civil action under the CFAA. *Airport Centers, LLC v. Citrin*, 440 F.3d 418 (7th Cir. 2006).

      3.    <u>Mintel</u> <u>Does Not Allege That Neergheen's Conduct Caused "Loss"</u>

Mintel does not state a claim under the CFAA, because Mintel does not allege that Neergheen's conduct caused "loss" within the meaning of the CFAA. *Garelli Wong*, 551 F.Supp.2d at710; 18 U.S.C. § 1030(a)(5)(B)(i). Under the CFAA, "loss" is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

Plaintiff does not allege that Neergheen's conduct caused a "loss." (Compl.)(*in seriatim*). Plaintiff alleges only that "[a]s a direct and proximate result of Neergheen's unlawful taking of Mintel's confidential, proprietary and trade secret information, Mintel has suffered damages in an amount yet to be determined but certainly in excess of $5,000 …" (Compl. at ¶30). Such "a formulaic recitation" of "loss" does not state a successful claim. *Twombly*, 127 S.Ct. at 1965.

    **B.**    **Plaintiff Cannot Succeed On Its Claims For Breach Of The Restrictive Covenants in the Non-Compete Agreement (Counts II and V) and the Employment Contract (Counts III and VI) Because The Restrictive Covenants Are Unenforceable As A Matter Of Law**

"In Illinois, restrictive covenants are disfavored in the law and closely scrutinized because they are repugnant to the public policy encouraging an open and competitive marketplace." *Roberge v. Qualitek Int'l, Inc.*, 2002 U.S. Dist. LEXIS 1217 at *11 (N.D. Ill. January 25, 2002), *citing Bishop v. Lakeland Animal Hosp.*, 268 Ill. App. 3d 114, 644 N.E.2d 33, 36, 205 Ill. Dec. 817 (Ill. App. Ct. 1994). Restrictive covenants in general are disfavored methods of doing business. This is particularly true regarding non-competition agreements

(which usually contain restrictive covenants). As noted by Judge Andersen, "[t]his is especially true in the case of covenants not to compete, which Illinois courts have held to be restraints on trade. As a result, courts will only enforce the provisions of a restrictive covenant if the time and geographical limitations are reasonably necessary to protect a legitimate business interest of the employer. *Id.* (internal citations omitted); *see also YCA, LLC v. Berry,* 2004 U.S. Dist. LEXIS 8129 (N.D. Ill. May 7, 2004). The reasonableness of a non-competition agreement is measured by its hardship to the employee, its effect upon the general public, and the reasonableness of the time, territory and activity restrictions. *See Abbott-Interfast Corp. v. Harkabus*, 619 N.E.2d 1337, 1341 (Ill. App. Ct. 1993).

Here, the Non-Competition Agreement upon which Mintel bases its claims is invalid because it is overly broad in scope and duration. Similarly, the restrictive covenant of the Employment Agreement is invalid as a result of its overly broad scope, both under the law in which it was created (UK), as well as U.S. law. Indeed, Mintel <u>knew</u> before filing the present lawsuit that its restrictive covenants were of questionable validity and enforceability. (Ex. O, Q). Accordingly, it has no likelihood of success on its cause of action.

     1.    <u>The Restrictive Covenants Are Unenforceable In That They Are Not Reasonable In Scope Or Purpose</u>

The two restrictive covenants at-issue are similar. The restrictive covenant of the Employment Agreement states that Neergheen may not "…for the first twelve months at the end of your employment with us…in competition with the Company…engage in, or be connected with, trade or business carried on by us." (Ex. B). Similarly (but even more broadly) the Non-Competition Agreement provides that Neergheen agree "not to compete, either directly or indirectly, with the business of Mintel…at any location worldwide…for a period of one (1) year following his termination of employment with Mintel." (Ex. D). The only significant difference

between the two restrictive covenants is the addition in the Non-Competition Agreement that Neergheen be prohibited from working *world wide* and its applicability when Mintel terminated Neergheen ("regardless of the reason for termination").  Neither covenant is valid.

> A.    *Both restrictive covenants are overly broad in that they are not restricted as to activity.*

Under Illinois law, Mintel's blanket prohibition of Neergheen's employment with <u>any</u> "competitor" in <u>any</u> activity is improper.  In both the Employment Agreement and the Non-Competition Agreement, Mintel attempts to prevent Neergheen from working in any capacity with any entity Mintel may consider a "competitor."  Such, however, is improper.  The court in *Roberge* examined an agreement that stated that "upon termination of . . . employment for any cause whatsoever, [Roberge] will not either directly or indirectly . . . engage in competition with [Qualitek]."  2002 U.S. Dist. LEXIS at *15.  The court found that:

> The covenant not to compete is so broad that…it is conceivable that Roberge would be prohibited from working as a janitor for a company that, either directly or indirectly, competed with Qualitek in the solder products industry. There is simply no legitimate business interest of Qualitek that can justify such a ridiculous result.

*Id.*  By way of further example, in *Hay Group, Inc. v. Bassick*, the court addressed a restrictive covenant that contained no geographic limitation.  2005 U.S. Dist. LEXIS 22095 at *11 (N.D. Ill. Sept. 29, 2005).  The court found that such restrictions were unreasonable in scope.  The court stated:

> This noncompete effectively precludes Bassick from engaging in his occupation of providing executive compensation consulting (which both parties agree is an aspect of Hay's business) in any part of the world (because the Bassick Noncompete does not contain a geographic limitation). For this reason, the Bassick Noncompete is an unreasonable restraint on trade and is invalid.

*Id.*;  *see also, Dryvit System, Inc. v. Rushing*, 132 Ill. App. 3d 9 (Ill. App. Ct. 1985)(non-competition agreement prohibiting employee from competing in any manner, without geographic

456896/E/8

limitation, ruled unreasonable); *Lee/O'Keefe Ins. Agency, Inc. v. Ferega*, 163 Ill. App. 3d 997

(Ill. App. Ct. 1987)(non-competition agreement effectively prohibiting former employee from

practicing his occupation unreasonable as a matter of law).

Here, the restrictive covenants contain almost exactly the same language as that in

*Roberge*.  Mintel attempts to prohibit Neergheen from working for any company that is a direct

or indirect competitor of Mintel, regardless of the type of business or the type of activity in

which Neergheen is engaged.  The unfettered restraint on trade found in both the Employment

Agreement and the Non-Competition Agreement is overly broad and therefore unenforceable.

       B.     *Additionally, the non-competition agreement is not restricted as to geographical area.*

In Illinois, while not *per se* unenforceable, geographic limitations on the scope of a

restrictive covenant are significant because courts "will not enforce agreements that restrict an

employee's ability to work for a competitor in any manner whatsoever."  *Roberge*, 2002 U.S.

Dist. LEXIS at *11; *see Telxon Corp. v. Hoffman*, 720 F. Supp. 657, 665 (N.D. Ill. 1989);  *North*

*Am. Paper Co. v. Unterberger*, 172 Ill. App. 3d 410 (Ill. App. Ct. 1988).

The Non-Competition Agreement is additionally unenforceable in that bears no

geographical restrictions, particularly in light of activity restrictions discussed above.  Such is

highly disfavored in Illinois.  As found by Judge Andersen, "[u]nlimited geographic constraints

in an employment contract's non-compete clause are patently beyond the needs of the employer

to protect his interest and are unduly harsh on the employee."  *Roberge*, 2002 U.S. Dist. LEXIS

at *11.  The court further stated:

> Even granting this language the most generous interpretation, there is no way it
> can be read other than to constitute a blanket prohibition on competition. The
> restrictive covenant is not limited to a particular type of activity, such as the
> solicitation of customers Roberge had contact with while at Qualitek, nor does it
> contain any other activity restraint.  Rather, it unequivocally states that Roberge

cannot work for any company that is a direct or indirect competitor of Qualitek's, regardless of where that competitor operates.

*Id.*

Moreover, such is the case regardless of where the former employer conducts business. In addressing the argument that a world-wide covenant is necessary due to a company's global presence, the *Roberge* court stated "[w]hile this is perhaps the most logical argument the defendant could make in response to the plaintiffs' motion, it is a position that has been rejected countless times by both state and federal courts in Illinois."  2002 U.S. Dist. LEXIS at *16, *citing*, *Telxon*, 720 F. Supp. at 664-65; *Dryvit Sys.*, 477 N.E.2d at 38 ("the unlimited geographic constraints on competitive activities . . . and the further restriction from association with a corporation whose activities are competitive in the continental United States are patently beyond the needs of the employer to protect his interest and are unduly harsh on the employee"); *Egnell, Inc. v. Weniger*, 94 Ill. App. 3d 325 (Ill. App. Ct. 1981)(pursuant to restrictive covenant which contained no actual geographic limitation, employee would not have been permitted to work anywhere in the world for a firm that competed with employer somewhere in the U.S. "The burden placed on [employee] far exceeds what would have been necessary for the protection of plaintiff's interest.").

Mintel attempts to prevent any of its employees from working anywhere in the world, in any capacity, for any company Mintel considers to be a competitor.  Accordingly, Mintel cannot claim that its Non-Competition Agreement is reasonable.

   C. *The employment agreement is unenforceable under the law of the United Kingdom.*

Illinois has adopted the Restatement (Second), Conflict of Laws approach to resolving conflict of laws.  In short, under the Illinois rule, to decide which forum's law to apply, a court

must consider: "(1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, place of incorporation, and place of business of the parties." *Watters v. Check Cashiers, Inc.*, 2000 U.S. App. LEXIS 415 at *8 (7th Cir. May 11, 1999), *quoting Gramercy Mills v. Wolens*, 63 F.3d 569, 572 (N.D. Ill. 1995). In viewing these factors, a court must consider which are important to the particular case. *Id.*; *Leane v. Joseph Entertainment Group, Inc.*, 642 N.E.2d 852, 856 (Ill. App. Ct. 1994). "[A] court should not refuse to apply the law of a foreign State … unless it is contrary to pure morals or abstract justice, or unless the enforcement would be of evil example and harmful to its own people." *Champagnie v. W.E. O'Neil Constr. Co.*, 77 Ill.App.3d 136, 139 (1979) (citing 16 Am.Jur.2d Conflict of Laws § 6 at 16; 17 C.J.S. Contracts § 16 at 619).

Under the law of the UK, when an employment contract is silent as to the law in accordance with which it is to be construed, Article 6 of the Rome Convention provides that the applicable law will be that of the country in which the employee is to carry out the employment. Here, the Employment Agreement is silent as to applicable law. However, at the time it was entered into (and for several years after), Neergheen resided in London and was to work at Mintel's UK office. The Employment Agreement was entered into in London, and Mintel is centered there. Moreover, page 12 of the Employment Agreement refers to the "United Kingdom Contract of Employment." (Ex. B). Accordingly, it is clear that the Employment Agreement is governed by UK law.

Under UK law, as *prima facie* restraints of trade, restrictive covenants are notoriously difficult to enforce. *Nordenfelt v. Maxim Nordenfelt Guns and Ammunition Co., Ltd.* [1894] AC 565. Like U.S. courts, UK courts often look to what is reasonable in addressing restrictive

covenants. *Id.* However, unlike in U.S. courts, in the UK it is critical that restrictive covenants be tailored to the specific circumstances of individual employees. Standard-form covenants are rarely enforceable. *Wincanton Ltd. v. (1) Cranny and (2) SDM European Transport Limited* [2000] IRLR 716 at 718. Here, the restrictive covenant of the Employment Agreement is a standard-form covenant. As discussed above, it is neither limited in activity nor geographic area. And as the restrictive covenant of the Employment Agreement is overly broad under U.S. law, it is particularly so under the more restrictive laws of the UK.

3.   <u>The Present Case is Not Appropriate for Modification of the Agreements' Unreasonable Terms</u>

While it may be in a court's power to modify restrictive covenants, such is disfavored in Illinois. Moreover, so-called "blue pencil" modification of restrictive covenants is forbidden under the law of the UK.

A.   *Blue pencil modification of restrictive covenants is disfavored in Illinois.*

In determining whether to modify a restrictive covenant, the fairness of the restraints imposed in the written agreement is a relevant consideration to the application of such equity principles. *See, N. American Paper*, 526 N.E.2d at 625; *House of Vinson, Inc. v. Hiyane*, 37 Ill. 2d 32, 225 N.E.2d 21, 25 (1967). Looking at this factor, the court in *Roberge* found:

> In this case, we will not exercise our discretion to "blue-pencil" the contract, but rather we hold that the covenant not to compete as executed is unenforceable as a matter of law. In so doing, we hope to encourage employers to write contracts that are more narrowly tailored to meet their individual needs, rather than overly broad covenants which restrict competition in the marketplace for qualified employees.

*Roberge*, 2002 U.S. Dist. LEXIS at *11. Judge Andersen found, as a matter of equity, that revision of an overly broad restrictive covenant was not proper. *Id.*, *see also, Nobel Biocare, Inc. v. Lynch*, 1999 WL 958501 (N.D. Ill. Sept. 15, 1999); *Pactiv Corp. v. Menasha*, 261 F.Supp.2d

1009 (N.D. Ill. 2003) (J. Holderman); *Lee/O'Keefe,* 163 Ill.App.3d at 1007 (court should consider that the "modification could have the potential effect of discouraging the narrow and precise draftsmanship which should be reflected in written agreements.")

A court should refuse to modify an unreasonable restrictive covenant "where the *degree* of unreasonableness renders it unfair." *Eichmann v. National Hospital and Health Care Svcs. Inc.,* 308 Ill. App.3d 337, 347-48 (1st Dist. 1999). Particularly where a revision of the covenant would require adjustments in length, geography and duties, the "blue pencil" approach has been rejected. *Nobel,* 1999 U.S. Dist. LEXIS 23252 at *6.

### B. Under UK law, modifying the restrictive covenant is not permissible.

Moreover, should UK law govern, modification of the restrictive covenant is not permissible. UK courts will not re-write a covenant that is too wide, so as to render it enforceable. Put another way, a UK court will not narrow a covenant that has deliberately been drafted in wider terms. *Mason v. Provident Clothing and Supply Co., Ltd.* [1911-1913] All ER Rep 400 at 411. As found by Lord Moulton "It would, in my opinion, be [of the worst example] if, when an employer had exacted a covenant deliberately framed in unreasonably wide terms, the courts were to come to his assistance, and, by applying their ingenuity and knowledge of the law, carve out of this void covenant the maximum of what he might validly have been required." *Id.* Accordingly, under UK law, as well, revising restrictive covenants is, as a matter of equity, not conducted.

### D. Plaintiff Cannot Succeed On Its Claim Under The ITSA (Count IV)

To set forth a cause of action for violation of the ITSA, a plaintiff must allege and prove facts that the information at issue was: (1) a trade secret; (2) misappropriated; and (3) used in the defendant's business. *Magellan International Corp. v. Salzgitter Handel GmbH*, 76 F.Supp.2d

456896/E/8

919, 927 (N.D. Ill. 1999).  Mintel cannot succeed in showing any of these factors.

        1.     The Documents Are Not "Trade Secrets"

"In order to satisfy the first element of there being a trade secret, it must be shown both that the information was sufficiently secret to give it a competitive advantage and that affirmative measures were taken to prevent others from acquiring or using the information." *United States Gypsum Company v. LaFarge North America, Inc.*, 508 F.Supp.2d 601, 623 (N.D. Ill. 2007); *see also* 765 ILCS 1065/2(d).  "Illinois case law holds that six common law factors may also be considered in determining whether information is a trade secret: (1) the extent to which the information is known outside of [the employer's] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the employer] to guard the secrecy of the information; (4) the value of the information to [the employer] and to his [or her] competitors; (5) the amount of effort or money expended by [the employer] in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."  *Id.*

"Information that is generally known or understood within an industry, even if not known to the public at large, does not qualify as a trade secret."  *Id.*  "A corollary to this is that there generally can be no trade secret protection for a product that is available in the market."  *Id.* Moreover, "[g]eneral knowledge, skill, and experience gained by an employee during employment cannot be claimed as a trade secret."  *Id.*

Here, the documents attached to the E-Mails at issue in Mintel's Complaint are not trade secrets.  Most notably, they are not trade secrets as demonstrated by the fact that Mintel knew Neergheen had emailed the documents, and did nothing.  (Ex. N, Q).  Even Mintel's policies surrounding information it deems proprietary demonstrate a lack of consideration as to where the

information ends up.  Mintel chooses to mark some of its information "confidential," while neglecting to do so to on others.  (Ex. E, p. 57).  Employees at Mintel are asked to "use judgment" in determining which is which.  *Id.*  Mintel's lack of restraint over the information demonstrates that the information and documents in the E-Mails are clearly not a trade secret.

Moreover, the information in the documents relating to compilation of trade associations is information readily available from other sources.  (Ex. A, pp. 168-169)(Q: Where did you obtain the information to put in to this trade association list?  A: Just researching Google and also utilizing websites such as Hoovers and Dunn and Bradstreet); *see also,* Kristy A. Swartout, *Encyclopedia of Associations* (Gale Cengage Learning, 46th ed.)(2008).  As noted above, such publicly available information cannot be considered a trade secret.

### 2.    The Documents Were Not "Misappropriated"

Even if the E-Mails involved "trade secrets," Plaintiff cannot show that such "trade secrets" were "misappropriated."  *See* 765 ILCS 1065/2(a), (b).  In its Complaint, Plaintiff ostensibly contends that Neergheen misappropriated trade secrets because he allegedly "copied, e-mailed to his personal address and/or printed confidential and proprietary trade secret information from his work computer on April 29, 2008."[2]  (Compl. at ¶21).  Mintel, however, does not prohibit its employees from copying, e-mailing to their personal e-mail accounts, or printing documents that contain purported trade secrets.  (Ex. F).  Neergheen was an employee at the time that he allegedly copied, e-mailed to his personal address and/or printed the documents in question.  Moreover, Mintel was aware of the exact E-Mails in question, yet found that it was unconcerned about Neergheen's actions.  (Ex. N, Q).  Accordingly, the sending of e-mails from his work to his home e-mail account is not misappropriation.

---

[2] Mintel does not contend that Neergheen disclosed the information.

3.      The Documents Were Not Used Nor Would They Inevitably Be Used In Neergheen's Business

The undisputed facts show that Neergheen has not and will not use any of the E-Mails. As a term of his employment with Datamonitor, Neergheen was required to enter into an agreement that restricted him from providing Datamonitor with confidential information or trade secrets from Plaintiff.  (Ex. L) (noting that "[f]ailure to adhere to these conditions may result in your disciplinary action being taken or termination.")

Moreover, in his employment with Datamonitor, Neergheen is working in an industry sector in which he did not work while employed with Plaintiff.  *See, e.g.* (Ex. K).  During his deposition, Datamonitor's Content Licensing Business Development Director, Jeffrey Howard, testified as follows:

> I made it and Datamonitor made it abundantly clear to Mr. Neergheen that his employment with Datamonitor was related to sectors and clients that he previously not dealt with.  And that under no circumstances was he to bring in any information whatsoever from his previous employer.

(Ex. J, p. 69).  Moreover, Howard testified as follows regarding the scope of Neergheen's employment with Datamonitor:

> Mr. Neergheen's agreement was technology, pharmaceuticals, financial services, automotive, and energy with the stipulation that he must not, under any circumstances, have any contact or dealings with any organization that he previously dealt with whilst at his previous employer.

(*Id.*, p. 97).

Datamonitor does not even compete with Mintel in the areas of which the e-mails are concerned.  Datamonitor does business in the following industry sectors: pharmaceuticals, technology, financial services, automotive, energy, consumer package goods, and retail.  (*Id.*, p. 18).  Mintel does not do business in the following industry sectors: pharmaceuticals, technology,

456896/E/8

automotive, and energy. (Ex. E, pp. 33-34). Moreover, as testified to by Richard Carr, Mintel's primary financial sector, Comperemedia, is an area for which Datamonitor has no comparison. (*Id.*, p. 18, 20). Comperemedia documents primarily comprise the information found in the E-Mails. *Id.* In light of the above, Mintel cannot demonstrate that Neergheen used or would inevitably use the E-Mail information.

Tellingly, in its Complaint, Plaintiff does not allege that Neergheen used or would inevitably use the E-Mail information. In *Teradyne, Inc. v. Clear Communications Corp.*, 707 F.Supp. 353 (N.D. Ill. 1989), the Court granted defendant's motion to dismiss because plaintiff failed to plead that the defendant used, or inevitably would use, the trade secret material in its business. The court explained that there was not even a proper allegation of use or intended use. *Teradyne, Inc..*, 707 F.Supp. at 356. The court further stated:

> The defendants' claimed acts, working for Teradyne, knowing its business, leaving its business, hiring employees from Teradyne and entering the same field …do not state a claim of threatened misappropriation. All that is alleged, at bottom, is that defendants could misuse plaintiff's secrets, and plaintiffs fear they will. This is not enough.

*Id.* Plaintiff does not allege Datamonitor could not operate without the information in the E-mails or that the information in the E-mails is the only information that would allow Datamonitor to function. (Compl.)(*in seriatim*). Instead, Mintel alleges that, unless Neergheen is enjoined under the ITSA, he "will continue to have access and the ability to make use of Mintel's trade secrets." Compl. at ¶66. Such allegations of the mere potential for use of Mintel's trade secrets are "not enough" to state a claim under the ITSA.

### 3. MINTEL HAS AN ADEQUATE REMEDY AT LAW AND WILL NOT SUFFER IRREPARABLE HARM THROUGH DENIAL OF AN INJUNCTION

In order to prevail on a motion for injunction, Mintel must show that it has no adequate remedy at law for the potential harm that may incur by denial of its motion. *Electro-Motive*

456896/E/8

*Diesel, Inc. v. Wi-Tronix, LLC*, 2006 U.S. Dist. LEXIS 37260 at *16 (N.D. Ill. June 7, 2006). In short, Mintel must demonstrate that any harm coming to it should an injunction not be entered would be irreparable by monetary damages. *Id.* Mintel contends that money damages are inadequate because Plaintiff allegedly faces the "threat of lost sales" and damages allegedly are "impossible, at this time, to ascertain with any certainty." (Mot. at 14.) However, not only did Mintel fail to be concerned about its "irreparable harm" when it first knew of the acts it now alleges against Neergheen, it cannot demonstrate any potential irreparable harm.

In addition to being unable to demonstrate a likelihood of success on the merits of any of its claims, Mintel cannot demonstrate how it will suffer irreparable harm if an injunction is not entered. Mintel cannot demonstrate how Neergheen's emails — most of which were destroyed without even being opened — have caused it harm. Mintel cannot demonstrate how Neergheen's working for Datamonitor has harmed Mintel. Particularly in light of the extensive steps that have been put into place by Datamonitor to ensure that Neergheen is not violating any agreements or laws, Mintel cannot show that it has been or will be harmed. The Northern District of Illinois has made clear that, absent a demonstration of intent to cause harm through impending use of trade secrets, "irreparable harm" cannot be shown. *Electro-Motive Diesel*, 2006 U.S. Dist. LEXIS at *16. Here, Neergheen had no intent to use Mintel's alleged trade secrets and Mintel cannot demonstrate otherwise.

Moreover, none of Mintel's concerns requires the issuance of injunctive relief because it is undisputed that Neergheen: (1) did not circulate any of the Mintel documents to persons outside of Mintel, and (2) has not and will not use any Mintel documents in his employment with Datamonitor. Accordingly, to the extent that Neergheen's actions harmed (which Mintel

concedes they have not) or are likely to harm Mintel, any such alleged harm is not irreparable and an injunction is improper.

**4.    THE BALANCE OF THE HARMS WEIGHS HEAVILY AGAINST PRELIMINARILY ENJOINING NEERGHEEN FROM HIS CONTINUED EMPLOYMENT**

"The protection afforded trade secrets reflects a balancing of conflicting social and economic interests. Where an employer has invested substantial time, money, and effort to obtain a secret advantage, the secret should be protected from an employee who obtains it through improper means.  Nevertheless, in a competitive market, an employee must be entitled to utilize the general knowledge and skills acquired through experience in pursuing his chosen occupation."  *United States Gypsum Company*, 508 F.Supp.2d at 623.

Prohibiting Mr. Neergheen from working not only prevents him from practicing a trade he has spent years perfecting, it precludes him from remaining in the country.  Neergheen's visa status is dependent upon working for a UK-based company and, given the industry, his choices are therefore limited.  Given Mintel's knowledge and acquiescence in the facts it now calls damaging, and the many safeguards put into place by Neergheen's new employer, Datamonitor, a balancing of equities weighs heavily in favor of denying Mintel's Motion.

Dated: September 3, 2008

John T. Roache
Jeana R. Lervick
Joel C. Griswold
BELL, BOYD & LLOYD LLP
70 West Madison Street, Suite 3100
Chicago, Illinois  60602
(312) 372-1121

Respectfully submitted,

MEESHAM NEERGHEEN

By  /s/ Joel C. Griswold
    One of His Attorneys

23

456896/E/8

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that a true and correct copy of **Defendant's Response in Opposition to Emergency Motion for Temporary Restraining Order and Preliminary Injunction** has been served this 3rd day of September, 2008 via ECF filing to:

> Joseph Marconi
> Victor Pioli
> Katherine J. Pronk
> JOHNSON & BELL, LTD.
> 33 West Monroe Street, Suite 2700
> Chicago, Illinois  60603

<u>/s/ Joel C. Griswold</u>

# EXHIBIT A

Neergheen, Meesham  8/13/2008  9:44:00 AM

1        IN THE DISTRICT COURT OF THE UNITED STATES

2         FOR THE NORTHERN DISTRICT OF ILLINOIS

3              EASTERN DIVISION

4

    MINTEL INTERNATIONAL GROUP,  )

5    LTD., a United Kingdom      )

    corporation,              )

6                              )

          Plaintiff,        )

7                              )

      -vs -             ) No. 08 CV 3939

8                              )

    MEESHAM NEERGHEEN, an      )

9    individual              )

                            )

10        Defendant.      )

11

12        The videotaped deposition of

13    MEESHAM NEERGHEEN, called for examination

14    pursuant to notice and the Rules of Civil

15    Procedure for the United States District Courts

16    pertaining to the taking of depositions, taken

17    before Allison D. Weber, CSR, a notary public

18    within and for the County of Cook and State of

19    Illinois, at 33 West Monroe Street, Suite 2700,

20    Chicago, Illinois, on the 13th day of August,

21    2008, at the hour of 9:44 o'clock a.m.

22

23

    Reported by:  Allison D. Weber, CSR

24    License No.:  084-002238

Neergheen, Meesham  8/13/2008  9:44:00 AM

1     MR. ROACHE:  Objection, calls for

2   speculation.

3        You can answer.

4     THE WITNESS:  I can't recall at this stage.

5   It was probably because I wasn't enjoying it and

6   I didn't like it, I guess.  I wasn't showing

7   enough enthusiasm.

8   BY MR. PIOLI:

9     Q.  How did you come to get an internship

10   at Mintel?

11     A.  I went through a program.  It was a

12   program that was looking specifically after

13   people that were unemployed for six months and

14   beyond, and I went for that program, and Mintel

15   decided to take me on as a -- on a voluntary

16   basis, so I went there for three months

17   specifically just doing database work, just

18   inputting contacts into the then CRM system that

19   Mintel had.

20     Q.  You said that was for three months?

21     A.  I did that voluntarily for three months,

22   yes.

23     Q.  Were you paid for your work there?

24     A.  No.  I was compensated.  My travel was

1    paid.

2        Q.   And what happened following the three

3    months?

4        A.   I was given a job within the

5    international department of Mintel.

6        Q.   What does the international department

7    do at Mintel?

8        A.   Well, it has since become -- it was

9    structured differently back then.  It was

10   structured into two separate divisions.

11       The division that I worked for was an

12   organization called IIS, it is still part of

13   Mintel, I think it stands for international

14   information services, and they dealt

15   predominantly with the services divisions and

16   also the production of the then international new

17   products database, the North American new

18   products database and also the Japanese new

19   products database.

20   BY MR. PIOLI:

21       Q.   What was your position in the

22   international group?

23       A.   Just a junior editor.  I used to edit

24   the Japanese new products database.  I was a

1    clients.

2        I was also tracking sales activities

3    from a single-copy perspective and providing

4    analysis and direction where we should be

5    focusing marketing efforts on.

6        Q.   And how long were you a senior marketing

7    executive for?

8        A.   I believe it was about a year.

9        Q.   Does that take us to about the year

10    2000?

11        A.   Yeah, I guess so, yeah.

12        Q.   And what did you do after you were

13    senior marketing executive?

14        A.   I started -- I identified a niche within

15    the company -- I'm sorry, I identified a niche

16    within marketing as a whole and identified

17    associations -- trade associations as being great

18    organizations to actually leverage the Mintel

19    brand and promote reports to them to their

20    membership base.

21        Q.   Did you assume a new title at that

22    point?

23        A.   I don't know whether or not the title

24    was given to me then and there, but I know before

1    coming out to the States in 2003 I had the

2    marketing operations manager title.

3        Q.   Did you say you had that position until

4    2003?

5        A.   Before I came out here, so I can't

6    remember when I received that title between --

7    from 2000 and 2003.

8        Q.   Prior to your identifying trade

9    associations as a niche market, did Mintel deal

10   with trade associations at all?

11       A.   They dealt with them from a research

12   perspective.  The analysts would usually contact

13   trade associations to bet (Sic.) the reports that

14   they were working on.

15       Q.   And what new role did you see for trade

16   associations?

17       A.   Well, it's a perfect channel for Mintel

18   to gain further exposure, so from a branding

19   perspective, exposure in magazines, exposure in

20   newsletters, the acquisition of membership lists

21   that get passed on to sales, to our sales team

22   for follow up.

23       Q.   Did you see it more as a situation

24   where Mintel could advertise with the trade

Neergheen, Meesham  8/13/2008  9:44:00 AM

1    associations?

2        A.   Yes.  The way I would do that was I

3    would offer a free copy of a Mintel report and we

4    would barter and receive free promotions, we

5    would get access to their membership lists, we

6    could do mailings to their membership lists,

7    offer their members a discount on the one

8    particular report that was being promoted.

9        Q.   Okay.  You stated that you had the

10   position of marketing operations manager until

11   2003; is that correct?

12       A.   Yes.

13       Q.   And following that what position did you

14   hold?

15       A.   I moved out to Chicago, the Chicago

16   office, and I still maintained that title.

17       Q.   What was your title in the Chicago

18   office?

19       A.   To start off with, marketing operations

20   manager.

21       Q.   Why did you move to Chicago?

22       A.   Why?

23       Q.   Yes.

24       A.   Because I was actually working -- I

Neergheen, Meesham  8/13/2008  9:44:00 AM

1    filed.  That laptop now is in the hands of --

2    obviously I had to give that laptop back in.

3        Q.   Was there any reason why that laptop

4    wasn't returned to Mintel when you left

5    employment?

6        A.   I don't know.  I don't know.  I guess

7    I had it for the -- I guess I must have had it

8    for the past year and completely forgotten to

9    take it back and I was using it as a personal

10   computer for the past -- for the past, I don't

11   know, seven, eight months.

12       Q.   Did you believe it was your own

13   computer?

14       A.   No.

15       Q.   So you knew that it belonged to Mintel;

16   is that right?

17       A.   Yes.

18       Q.   Is there any reason why you haven't

19   given that computer back even now to Mintel?

20       A.   Because it's in the hands -- it's

21   with -- it's with my attorneys.

22       Q.   You didn't think to give the computer

23   back at the time that you left Mintel?

24       A.   I had completely forgotten that the

Neergheen, Meesham  8/13/2008  9:44:00 AM

1          (Whereupon, Neergheen Exhibit

2            No. 2 was marked for

3            identification.)

4    BY MR. PIOLI:

5      Q.  I ask you to take a look at that.  Can

6    you identify what that document is?

7      A.  It's a contract of employment.

8      Q.  Between yourself and Mintel; is that

9    correct?

10     A.  Yes.

11     Q.  And is that your signature on Page 11 of

12   that document?

13     A.  Yes.

14     Q.  And did you sign this document on or

15   about June 24, 1998?

16     A.  Yes.

17     Q.  And was this signed after your

18   internship with Mintel?

19     A.  I started my job towards the end of

20   June, '97, so that this is my first -- so I

21   worked without a contract at Mintel for a year

22   before I was issued this.

23     Q.  Okay.  You worked without a contract

24   after your internship and before signing this; is

1   that right?

2       A.   My internship was only for three months.

3   I joined Mintel permanently as a paid staff in

4   June, '97.

5       Q.   Okay.  So you worked approximately a

6   year before this document was signed?

7       A.   Yes.

8       Q.   Turning to Page 8 of that document --

9   let me backtrack.

10          Did you have an opportunity to review

11  this document before you signed it?

12      A.   I guess I was given, you know, 10, 15

13  minutes.  It was a long time ago.

14      Q.   Did you understand that you -- a

15  condition of your employment was signing this

16  document?

17      MR. ROACHE:  Object to the form.

18      THE WITNESS:  Yes.

19  BY MR. PIOLI:

20      Q.   Turning to Paragraph 15, did you

21  understand that your agreement to abide by

22  the terms and conditions contained in this

23  document were a condition of your employment

24  with Mintel?

1    A.  I believe it may have been towards the

2    middle of December or maybe early January.  I'm

3    not too sure.

4    Q.  And did you ask Mintel if there were any

5    other positions that you may be suitable for?

6    A.  Constantly, yes.  I spent the entire

7    three months speaking with the likes of

8    Jon Butcher, Peter Haigh, Steve about any

9    potential developments within the company.

10    But at the time there weren't that

11    many new roles, and I was getting really, really

12    worried, so I had to -- that's when I started

13    seeking alternative routes.

14    Q.  Okay.  What did you do to look for

15    employment outside of Mintel?

16    A.  I joined CareerBuilder,

17    MetroChicagoJobs.  I joined a couple of agencies.

18    I sent out applications by looking at, you know,

19    websites and, you know, company websites as well,

20    looking at their job sections.

21    Q.  What companies did you send applications

22    to?

23    A.  Oh, a number, Dyson, Mellon Publishing,

24    SPSS.  There were a few other companies as well

Neergheen, Meesham  8/13/2008  9:44:00 AM

1    that I really can't remember at this time.

2        Q.   When you say said you went to agencies,

3    are these placement agencies?

4        A.   Yes.

5        Q.   And how many of those did you go to?

6        A.   I went to two.

7        Q.   Were they successful in getting you

8    interviews?

9        A.   They got me interviews, but I'd always

10   walked into a brick wall when I mentioned the

11   fact that I would need a visa to work for them.

12       Q.   Were those the same companies, Dyson,

13   Mellon and SPSS?

14       A.   I'm sorry?

15       Q.   I'll backtrack.

16           Dyson, Mellon Publishing, SPSS, were

17   those interviews that you got through the

18   agencies?

19       A.   No, those were -- SPSS was through --

20   was through -- it was through CareerBuilder, and

21   -- but Mellon was through CareerBuilder.  Dyson

22   was through CareerBuilder as well.

23       Q.   Those two companies, are they -- would

24   they be considered competitors in the same market

1    Q.   Aside from what you have produced in

2    this case, are there any other Mintel documents

3    that are currently in your possession?

4    A.   No.

5    MR. PIOLI:  That's all I have.  Thank you.

6    MR. ROACHE:  I have just a few follow-up

7    questions.

8                   EXAMINATION

9    BY MR. ROACHE:

10    Q.   Mr. Neergheen, if you would turn back to

11    what was marked as Exhibit No. 1?

12        Prior to August of 2003, where were you

13    working for Mintel?

14    A.   I was in the London office.

15    Q.   While you were in the London office,

16    did anyone tell you that you were going to need

17    to sign a non-compete agreement when you

18    relocated to the United States?

19    A.   No.

20    Q.   When did you relocate to the United

21    States?

22    A.   The end of July, 2003.

23    Q.   After you relocated to the United States

24    and started working at the Chicago office for

Neergheen, Meesham  8/13/2008  9:44:00 AM

1 Mintel, is that the first time you found out

2 about what has been marked as Neergheen

3 Exhibit No. 1?

4  A. Yes.

5  Q. How was that document presented to

6 you?

7  A. It was presented to me by the then HR

8 manager, and it was presented as -- in the

9 following manner, everyone that commands a senior

10 role within the company is asked to sign one of

11 these.

12  Q. Did Mintel pay you a relocation expense

13 to come to the United States?

14  A. They paid for my flight, but there

15 wasn't any relocation expenses.

16  Q. There was no bonus for relocating to the

17 United States; is that correct?

18  A. No.  Correct.

19  Q. Has anyone told you that you had to

20 testify in a certain manner in this case in order

21 for your legal fees to be paid or reimbursed by

22 Datamonitor?

23  A. No.

24  Q. And I want to ask you just a couple of

1    questions on the visa issue because I'm not real

2    clear on it.

3        But in order to remain in the United

4    States, are you required to work for a company

5    that is based in the United Kingdom?

6    A.   Not necessarily.

7    Q.   Okay.  In order for you to continue to

8    work in the United States, is it beneficial for

9    you to work for a company that's based in the

10   United Kingdom?

11   A.   Yes.  It's a lot easier to get a visa, a

12   work visa?

13   Q.   So your job search was limited to some

14   extent to companies that were located in the

15   United Kingdom but had offices in the Chicago

16   area; is that correct?

17   A.   That's correct.

18   Q.   And you mentioned the name of a number

19   of companies that you had sent applications to or

20   interviewed.

21       Did you also send one to Euromonitor?

22   A.   Yes.  I applied at Euromonitor.

23   Q.   Did you interview with them as well?

24   A.   Yes.

Neergheen, Meesham  8/13/2008  9:44:00 AM

1    anyone from Datamonitor?

2    A.  No.

3    Q.  Did you share any of the information

4    contained in Exhibit 11 with anyone else?

5    A.  No.

6    Q.  Did you print out any of the information

7    contained in Exhibit No. 11?

8    A.  No.

9    Q.  Did you transfer any of the information

10    contained in Exhibit No. 11 with anyone else?

11    A.  No.

12    Q.  And there's an attachment to -- I'm

13    sorry, strike that.

14        There's a list called trade

15    associations that starts at MN 675 and goes

16    through MN 690.

17        Do you see that portion of that exhibit

18    I'm referring to?

19    A.  Yes.

20    Q.  And I believe you said you created this

21    list; is that correct?

22    A.  Yes.

23    Q.  Where did you obtain the information to

24    put in to this trade association list?

1       A.   Just researching Google and also

2    utilizing websites such as Hoovers and Dunn and

3    Bradstreet.

4       Q.   Based on your research of those public

5    databases is how you compiled the name of these

6    associations contained in this exhibit; is that

7    correct?

8       A.   Yes.

9       Q.   If you would turn to Neergheen Exhibit

10   No. 12, did you share any of the information

11   contained in Exhibit No. 12 with anyone from

12   Datamonitor?

13      A.   No.

14      Q.   Did you share the information contained

15   in Exhibit 12 with anyone else?

16      A.   No.

17      Q.   Did you print out a copy of the

18   information contained in Exhibit No. 12?

19      A.   No.

20      Q.   Did you transfer any of the information

21   contained in Exhibit No. 12 to an electronic

22   recording device?

23      A.   No.

24      Q.   Exhibit No. 13, did you share any of

Neergheen, Meesham  8/13/2008  9:44:00 AM

1      Q.  In your employment with Datamonitor,

2   have you used any of the Mintel information that

3   you e-mailed to yourself?

4      A.  No.

5      Q.  Do you intend to use any of the

6   information that you e-mailed the Mintel --

7   strike it.

8         Do you intend to use any of the

9   information, the Mintel information that you

10   e-mailed to yourself in your position at

11   Datamonitor?

12      A.  No.

13      Q.  When you left Mintel, did Mintel offer

14   you any form of reimbursement for a return trip

15   to the United Kingdom?

16      A.  No.  They offered me a severance

17   package.

18      Q.  How much did they offer you?

19      A.  $2,000.

20      Q.  As part of that offer, was there a

21   condition that you had to sign an agreement?

22      A.  Yes.

23      Q.  Was that another non-compete

24   agreement?

# EXHIBIT B

# CONTRACT OF EMPLOYMENT

1. **INTRODUCTION**

   From:   Mintel International Group Limited

   To:        Meesham Neergham ~~Neergheen~~

   The following particulars are given to you in accordance with the terms of the Employments Rights Act 1996.

   Your period of continuous employment with us began on the 30 June 1997.

   No employment with a previous employer counts as part of your period of continuous employment.  In accepting your appointment it shall be deemed that you have accepted all the terms and conditions set up in these Particulars of Employment.

   These Particulars of Appointment annul any previous agreement whether verbal or written given to you at any time.

   Your place of work will be Mintel International Group Ltd, 18-19 Long Lane, London EC1A 9HE.

   You are employed as a NPD Assistant / Marketing Executive and will be responsible to the Publications Manager.

   You will be paid monthly by credit transfer to your bank account in arrears at the rate of £14,000 gross per annum.  Commission for some sales functions is payable and where payable, is discretionary, non-contractual and details are made available as and when appropriate by your line manager.

   Your normal working hours are between 9.00am and 5.30pm Mondays to Thursday and between 9.00am and 5.00pm Fridays inclusive with one hour for lunch.

   In certain circumstances it may be necessary to adjust or exceed the hours in order to ensure that your duties in accordance with the Terms of Employment are properly performed.  Overtime is not payable.

2. **SICK LEAVE AND SICK PAY**

2.1 **Notification and Certification**

   Absence occasioned by sickness must be notified by telephone to the Chief Executive on the first morning of your absence (if you are unable to contact the Chief Executive you must contact a member of the Executive, failing that, your line manager).

   Your first day of sickness must be confirmed so that your eligibility to statutory sick pay can be calculated.

   During your illness, you should keep in regular contact with, in the first instance, your Head of Department, another member of the Executive or lastly, your line manager by telephone.  You must not leave a message with reception.  It is your responsibility to ensure that your current telephone number is kept by personnel.

-1-

EXHIBIT
1-B

You should observe the following procedures during any illnesses:

(i)     A company sickness form must be completed for any period of sickness. This should be handed to your Head of Department for signature.

(ii)    For absences lasting between four and seven days (including Saturdays, Sundays and Public Holidays), a Self Certification Form (SC2) should be completed and handed to the Office Manager. These are available from the Head of Personnel only.

(iii)   Sickness which continues for eight days or more (including Saturdays, Sundays and Public Holidays), must be covered by a doctor's Certificate. When sickness continues beyond the span of the first Certificate issued, it is the individual's responsibility to ensure that subsequent Certificates are forwarded by post to the Head of Department.

(iv)    After three separate episodes of sickness in any 12 month period, the Company has the right to ask you to provide a full doctor's Certificate for any further period of sickness taken. As doctors do not issue full Certificates before seven days of sickness, there may be a charge for periods less than this and it will be the individual's responsibility to pay any fee levied.

(v)     If any employee is absent due to sickness for more than five days during any 12 months period, the Company may at its own expense, ask the employee to attend the Company's doctor.

After incapacity of six months in any continuous period of 365 days duration Mintel shall be entitled, entirely at the discretion of Mintel, to treat this contract as having been terminated forthwith on the grounds that you shall be incapable of performing the employee's obligations hereunder. Any delay by Mintel in exercising its discretion shall not be deemed a waiver of Mintel's entitlement to termination under this paragraph.

2.2     <u>Sick Pay</u>

(i)     **Occupational Sick Pay**

There is no entitlement to Occupational Sick Pay. In the event that you are incapacitated through illness or injury from performing your duties any payment made by the Company to you during such absence shall be determined by the Company in its absolute discretion.

(ii)    **Statutory Sick Pay**

(a)     The company is responsible for paying Statutory Sick Pay to its employees for up to 28 weeks in any one "linked" period of incapacity to work.

(b)     Statutory Sick Pay becomes payable when there is a spell of four or more days sickness in a row and is payable for qualifying days only. Qualifying days are Monday to Friday inclusive. There is a waiting period of three qualifying days in each period of incapacity to work before Statutory Sick Pay is payable, except where there are two or more periods of incapacity separated by fewer than 57 calendar days.

(c)    In certain circumstances you may be excluded from Statutory Sick Pay.  In those cases, the Company will give you an "exclusion form" explaining the reasons why SSP cannot be paid.  You should then claim for State Sickness Benefit by completing the claim section of the form and sending it to your local DSS office.

(d)    Before the Company's liability for Statutory Sick Pay ends (ie 28 weeks), you will be given a "transfer form" which will enable you to continue claiming benefit from your local DSS.

## 3.    COMPASSIONATE LEAVE

In the event of the Employee suffering a bereavement, compassionate leave will be granted as follows:

Up to ten working days for the death of a partner/husband/wife/child.

Up to five working days for the death of a parent.

Time granted for the death of other relations will be at the discretion of Departmental Heads.

## 4.    MATERNITY LEAVE AND PAY

The Company follows statutory guidelines with regard to Maternity Leave and Pay.

(i)    Confirming your Pregnancy

As soon as you can (usually at least 21 week before the commencement of maternity leave) you must obtain a Maternity Certificate (MAT B1) from your GP (not a midwife), which will confirm your pregnancy, state your expected week of confinement (EWC) and allow us to pay your statutory maternity pay.   Without your Certificate we cannot pay you.

You must also give written notice at least 21 days before your maternity leave commences, of the date of which you intend to commence your leave.  If you cannot practicably give 21 days notice then you must give the notice "as soon as is reasonably practicable".

If you are absent from work wholly or partly because of your pregnancy/childbirth before your maternity leave date has been notified/reached but after the beginning of the sixth week before the EWC, you must notify us of absence as soon as is reasonably practicable.  If you have the baby before you have had an opportunity to give the required notice then you must inform us of the date the baby was born.

Maternity leave may not be commenced more than 11 weeks before the EWC.

(ii)  Maternity Leave

**Employees with Less than Two Years Continuous Service**

You have the right to fourteen weeks maternity leave or until the child's birth if later.

If you wish to return from maternity leave early you must give us at least one week's notice.

**Employees with Two or More Years Continuous Service**

There is a separate right to return to work for those employees who have the right of maternity leave and who also have continuous employment of at least two years at the beginning of the 11th week before EWC. You are entitled to a extended leave period which goes up to the end of the 29th week after the beginning of the week in which you child is born.

You may lose the right to return to work after your extended maternity leave unless you give written intention to return to work at the same time as giving the notices mentioned above.

It may be that due to unforseen circumstances the Company needs to know your anticipated date of return (or your intention not to return) sooner than expected and we may write to you no more than 21 days before the end of your 14 week period of maternity leave, asking for written confirmation or whether or not you intend to return to work. You may lose the right to return if you do not respond if you do not respond to such a request within 14 days or, if this is not reasonably practicable, as soon as is reasonably practicable.

Once you have decided when you are going to return to work, you must notify us in writing of the day you will return, 21 days in advance. This is obviously a minimum requirement if you let us know your plans any sooner this would be appreciated.

We may extend your return date by four weeks by giving written notice of this postponement.

You may postpone your notified date of return by up to four weeks, providing you give us a full doctors certificate before the notified day, stating that you unfit.

Only one postponement is allowed, and if you are still unfit after four weeks, you lose the right to return.

iii)  Statutory Maternity Pay

To be eligible for SMP, an employee must have been continuously employed for at least 26 weeks ending with the week immediately preceding the 14th week before the expected week when the baby is due. This week is known as the qualifying week. SMP is paid at two rates and eligibility to either rate is based on length of service. All SMP will be paid into your bank account in the normal way on a monthly basis, on the last Thursday of each month.

*Employees with 2 or more years continuous service:*

The Company will pay you SMP for a maximum of 18 weeks. The first 6 weeks are at 90% of your salary and the remaining 12 weeks are at £54.55.

*Employees with less than 2 years continuous service, but more than 26 weeks:*

The Company will pay you SMP for a maximum of 18 weeks.

**5.      PATERNITY LEAVE**

The Company does not grant Paternity Leave.

**6.      LIFE ASSURANCE**

Free life assurance cover commences immediately upon permanent employment with Mintel and is a benefit enjoyed by all staff.

Cover is as follows:
Up to age 25            2 x annual salary
Age 25-34              3 x annual salary
Age 35 and over  4 x annual salary

**7.      SEASON TICKET LOAN**

Following the satisfactory completion of your probationary period, you will become eligible to apply for a Season Ticket Loan. Such a loan would be interest free and deducted from your salary in twelve monthly instalments. Application forms are available from the Accounts Department.

**8.      EXPENSES**

The Company will reimburse you for all reasonable expenses incurred wholly, necessarily and exclusively on Company business. Such expenses should be supported by receipts, included on the monthly expense forms and authorised by your Head of Department.

**9.      COMPANY CARS**

If you need a company vehicle in furtherance of being able to perform your duties as an employee, then this will be arranged directly with your Line Manager/Head of Department. A separate list outlining responsibilities will be issued to each employee who uses a company vehicle.

**10.      TERMINATION OF EMPLOYMENT**

The Company can terminate your employment at any time by giving you, in writing, the following periods of notice:

i)      If you have less than two years continuous employment : one week, or else the period stated in your offer letter, whichever is the greatest.

ii)      If you have more than two years continuous employment: one week for every year of such continuous employment up to a maximum of 12 weeks, or else the period stated in your offer letter, whichever is the greatest.

iii)    You may terminate your employment by giving the Company, in writing, four weeks notice or your current notice period, whichever is the greater.

iv)    The Company's ability to terminate your employment by service of notice at any time is not fettered by the Company's disciplinary procedure which is a policy document only and does not have a contractual effect.

## 11.   IMMEDIATE TERMINATION

The Company is entitled to terminate your employment with immediate effect and without service of any notice in the following circumstances;

i)    You are guilty of gross misconduct.

ii)    You are convicted of a criminal offence other than a road traffic offence for which you are not sentenced to a term of imprisonment whether immediate or suspended.

iii)    You commit any serious breach or persistent breach of the terms of your contract of employment.

iv)    You become bankrupt or make any arrangement or composition with or for the benefit of your creditors.

## 12.   HOLIDAY ENTITLEMENT

Our holiday year is the calendar year from January to December. Your annual holiday entitlement will be 25 working days in addition to the normal English bank and public holidays. Your holiday must be taken during the holiday year and your holiday dates agreed in advance. Employees who start during the calendar year will be entitled to two days holiday for each complete month left in the holiday year.

If you leave during your holiday year, your holiday entitlement will be re-calculated as two days holiday for each compete month worked in the year. If you have taken less holiday than this you will be paid in lieu. If you have taken more holiday than this you will have to repay the excess holiday pay.

Any money which you owe the Company on account of having taken more than your holiday entitlement may be deducted from your final payment from the Company.

## 13.   DISCIPLINARY PROCEDURE

Disciplinary procedures are essential to protect the interests of both the Employee and the Company. The procedures are designed to ensure that arrangements for dealing with disciplinary matters are fair, simple and effective. (The procedure is not contractual.)

The procedure is as follows:

i) Minor matters will be dealt with by means of a verbal warning, a note of which will be kept on your file for a specified period of time.

ii) Matters of a more serious nature will merit one or more written warnings, which if not complied with may result in dismissal. For each warning a specified period of time will be given for behaviour to improve. Under these circumstances, the Company reserves the right to suspend you whilst the matter is investigated further.

iii) Matters which are considered to be gross misconduct will result in instant dismissal.

In matters of serious misconduct, it may be appropriate for an impartial third party to be present during the disciplinary interview to make notes and ensure that an accurate record of proceedings is kept. During your interview you may make a statement, either verbally or in writing, in your defence. You may also make reasonable requests for witnesses or for evidence to be produced, such requests not to be unreasonably denied.

If you wish to appeal against any disciplinary action taken against you, you may do so in writing to a member of the Executive Committee nominated by you.

If dismissed, in compliance with the law, the Company will issue you with a written statement detailing the reasons for your dismissal.

The disciplinary procedure will be instigated for certain actions. The list below, which is not exhaustive, gives an indication of such offences:

- unreasonable and unruly behaviour
- conduct or actions likely to endanger people or property
- persistent poor attendance/time keeping
- abuse of the sickness rules/procedures
- drunkenness, drug taking, gambling on company premises
- refusal or failure to obey reasonable instructions
- unauthorised possession of company property
- disregard of office rules
- persistent failure to achieve adequate work standards
- disregard of technical rules and procedures
- conduct likely to discredit the Company or damage its reputation
- breach of professional confidence or professional ethics
- commercial indiscretion

Any other act of behaviour which, by custom and practice is considered to be highly undesirable and socially unacceptable will, if persistent, result in disciplinary proceedings.

Any two employees who are in a reporting line within the company must avoid romantic involvement with each other in the interests of efficient and harmonious working relationships.

Failure to comply with this will lead to disciplinary action being taken.



## GRIEVANCE AND DISPUTES PROCEDURE

The size and structure of the Company prevents adherence to a detailed grievance/disputes procedure such as would be found in larger organisations. However, the Company acknowledges the need for a formal system within which employees can raise any grievances or disputes arising from their own position or the Company in general, and as such has laid down the following guidelines.

If you have a grievance arising from your work, it should in the first instance be addressed to your Line Manager or Head of Department. If no satisfactory conclusion is reached, the matter may then be passed to a member of the Executive Committee nominated by the Employee who will seek to investigate the matter further and offer advice to the Line Manager/Head of Department on possible solutions.

## 15. RESTRICTIVE COVENANTS

You will not for the first twelve months at the end of your employment with us, either on your own account or on behalf of any other legal person and in competition with the Company, or any subsidiary directly or indirectly engage in, or be connected with, trade or business carried on by us or any of our associates at the end of your employment.

You will not for the first twelve months after at the end of your employment with us solicit or accept orders for products, services, competitive with ours from any of our customers with whom you dealt during the last twelve months of your employment with us.

You will not, for the first twelve months after the end of your employment with us, solicit away from us or our associates any person who is and was, when your employment ended, employed by us or an associate as a director, senior manager or sales person for whom you were responsible, or who was a member of any department/project/team in which you worked during the last twelve months of your employment.

Each of the above restrictions is separate and severable from the other if one is unenforceable for any reason, but would be enforceable if some of its wording were deleted, it shall apply with such deletions as are necessary to make it enforceable. Any period of notice served by you in accordance with clause 16 below, shall reduce the period of each of the above restrictions.

## 16. PLACE OF WORK HAVING GIVEN NOTICE

If either you or the Company serves notice on the other to terminate your Contract of Employment the Company may require you to work away from the office for all or part of the remaining period of your employment. If you are asked to do this:

i)      You may not attend your place of work or any other premises of the Company or any associated company;

ii)      You may be asked to resign immediately from any offices you hold in the company or any associated company;

iii)      You may not be required to carry out duties during the remaining period of your employment;

iv)  You must return to the Company all documents and other materials (including copies) belonging to the Company or associated companies containing confidential information;

v)  You may not without the written permission of the Company contact or attempt to contact any client, customer, supplier, agent, professional advisor, broker or banker of the Company or any associated company or any employee of the company or any associated company;

During any such period you would continue to receive your full salary and benefits.

## 17.  **CONFIDENTIALITY**

Mintel has expended and will continue to expend substantial effort and monies in acquiring knowledge and expertise in developing goodwill in the business of Mintel. In the course of your employment you will have access to certain of Mintel's trade secrets and other proprietary or confidential information of Mintel, including without limitation, procedures, processes, information related to design, production, marketing or distribution, data, databases, computer software, source codes, all methods and means of design, drawing, recording, reproducing information or storing information (including but not limited to electronic or computerised methods or means), supply sources or potential supply sources, customer lists or potential customer lists, bidding policies or procedures or any information concerning pricing or financing policies or procedures, including without limitation:

a)  Information regarding contracts with clients of Mintel, design, pricing, methods of operation, financial conditions, market plans and master plans;

and

b)  Information relating to Mintel's clients and concerning their financial condition, construction or planned development, product results and methods, master plans and business strategies.

You agree that all such records, methods, lists, materials, names and information, as well as any information and documents provided to, generated by or received by you in the course of your employment and the contents thereof, is confidential and is and will remain the sole property of Mintel. Such confidential information will not be used or disclosed by you other than in connection with your performance of services for Mintel or such confidential information shall be returned to Mintel upon the cessation of your employment.

All work on clients' business is confidential. Information obtained in the course of this work must not be disclosed to any outside party (including the clients' employees), or to fellow members of staff other than is necessary in the course of carrying out the work.

Confidential information about clients' affairs must not be discussed with third parties, relatives, friends or in public places.

### SECURITY

The Company is not responsible for employees' personal belongings.

Individual employees must ensure that personal belongings of value are placed in a drawer or cabinet, preferably locked, especially when the office is unoccupied.

You may need to work in the office outside of normal working hours. On such occasions you should enter the building through the front door using the security cards which are available from your Head of Department. If you do work out of hours, it is your responsibility to ensure that the building is secure upon your departure.

Briefcases and bags are not to be taken into the library under any circumstances. All visitors to the library must leave their briefcases with reception.

### 19. OTHER ETHICAL CONSIDERATIONS

During the continuance of your employment with the company you shall unless prevented by incapacity devote your full time and attention to the business of Mintel and shall not without the prior consent of the company :

(i) Engage in any other business; or

(ii) Be concerned or interested in any other business of a similar nature to or competitive with that carried on by the company or any of its associated companies provided that nothing shall preclude you from undertaking work in respect of a recognised charity or from holding or being otherwise interested in any shares or other securities of any company which are for the time being quoted on any recognised Stock Exchange so as long your interest in such shares or other securities does not extend to more than 5% of the total amount of such shares or securities.

If consent is granted the work must be done out of working hours and you must not use company facilities or offices.

Such work must not be carried out in the name of the Company or its subsidiaries.

If consent is granted, it must be made clear that you are acting in a private capacity and that you are not representing or acting on behalf of the Company or its subsidiaries.

If involved in any outside professional activity which might result in the Company's name being mentioned in the press or other media you should obtain the prior approval of a Director or the Chief Executive of Mintel International Group Limited.

### 20. HEALTH AND SAFETY AT WORK

In compliance with the Health and Safety at Work Act 1974, the Company endeavours to provide a safe working environment for all employees.

The Company has produced a General Policy Statement on Health and Safety at Work. You are advised to read this document which is available from the Head of Production.

In accordance with the Company's statutory obligations, there are two trained First Aiders in the building:

Emma Stocker - Reception
Michelle Strutton - MIC

A full first aid box is located in MIC.

21. **NOTE**

Notwithstanding the above, any statutory minimum requirement provided by law is deemed to be included in your contract of employment.

Signed for and on behalf of the Employer
**MINTEL INTERNATIONAL GROUP LIMITED**

..................................................

Signed for and on behalf of the Employee
**Meesham Neergham Neergheen**

..................................................

Date: ..... 24/66/98 .........................

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MINTEL INTERNATIONAL GROUP, LTD., a United Kingdom corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No.: 08CV3939 |
| v. | ) ) | Judge Robert Dow, Jr. |
| MEESHAM NEERGHEEN, an individual, | ) ) | |
| Defendant. | ) ) ) | |

**NEERGHEEN'S RESPONSE TO PLAINTIFF'S FIRST SET OF
INTERROGATORIES TO NEERGHEEN**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Neergheen Meesham Neergheen ("Neergheen"), by and through his attorneys, hereby responds to Plaintiff Mintel International Group's ("Mintel") First Set of Interrogatories to Neergheen.

**PRELIMINARY STATEMENT**

Neergheen has not yet completed his investigation of the facts pertaining to this action, discovery is ongoing, and Neergheen is continuing his preparation for trial. All responses to the following interrogatories are based on information presently available and specifically known to Neergheen after a reasonable effort to locate information called for by these interrogatories. Accordingly, all responses are given without prejudice to Neergheen's right to produce evidence based on any additional information that may develop or come to Neergheen's attention at a later time. In addition, Neergheen's objections herein are made without prejudice to Neergheen's right to assert any additional or supplemental objections should Neergheen discover additional grounds for such objections. Finally, Neergheen's agreement to respond to any interrogatory does not constitute an admission that any responsive information in fact exist or is in

Neergheen's possession, custody or control or that Neergheen is not prohibited from disclosing it under confidentiality agreements with third parties.

Neergheen makes the objections and responses set forth below without in any manner waiving: (1) the right to object to the use of any response for any purpose in this action or any other actions on grounds of privilege, relevancy, materiality, or any other appropriate basis; (2) the right to object to any other interrogatories or requests involving or relating to the subject matter of the responses herein; and (3) the right to revise, correct, supplement, or clarify any of the responses provided below at any time. Neergheen expressly reserves the right to supplement his responses.

## **GENERAL OBJECTIONS**

1.      Neergheen objects generally to Mintel's interrogatories as overbroad and unduly burdensome. Neergheen also generally objects to Mintel's interrogatories to the extent they call upon Neergheen to investigate and disclose information that is neither relevant subject matter of this cause of action nor reasonably calculated to lead to the discovery of admissible evidence. Neergheen is willing, however, to confer with Mintel in an effort to resolve any disagreements between the parties relating to the scope, breadth, burden and relevancy of Mintel's interrogatories.

2.      Neergheen objects to Mintel's interrogatories to the extent they call for the disclosure of information protected by the attorney-client privilege, attorney work product doctrine and/or any other applicable privilege.

3.      Neergheen objects generally to Mintel's interrogatories on the grounds they are designed to harass and impose unreasonable costs and burdens upon Neergheen by seeking

2

information already in Mintel's possession, custody or control such that the burden of deriving or ascertaining the answer is substantially the same for Mintel as for Neergheen.

4.    Neergheen objects generally to Mintel's interrogatories as duplicative and as cumulative, to the extent multiple interrogatories seek the same information.

5.    Neergheen objects generally to Mintel's interrogatories to the extent they seek information of an indefinite scope and/or time period.

6.    Neergheen objects generally to Mintel's interrogatories and its definitions and instructions to the extent they purport to place a greater burden upon Neergheen than that required by the Local and Federal Rules.

7.    Neergheen objects generally to Mintel's interrogatories as seeking the disclosure of information subject to confidentiality obligations that Neergheen has with one or more third parties.

8.    Neergheen objects generally to Mintel's interrogatories as improperly containing multiple subparts and exceeding the total number of interrogatories allowed by Rule 33 of the Federal Rules of Civil Procedure.

9.    Neergheen objects to Mintel's definition of "communication" as overly broad and unduly burdensome in that it encompasses materials neither relevant to the present matter nor likely to lead to the discovery of admissible evidence.

10.    Neergheen objects to Mintel's definition of "Complaint" as encompassing other causes of action not relating to or regarding Neergheen.

11.    Neergheen objects to Mintel's definition of "Trade Secrets" and "Confidential Information" as vague and ambiguous and encompassing materials neither relevant to the present matter nor likely to lead to the discovery of admissible evidence.

3

12.     Neergheen incorporates by reference every general objection set forth above into each specific response set forth below.  A specific response may repeat a general objection for emphasis.  The failure to include any general objection in any specific response does not waive any general objection to that request.

## SPECIFIC RESPONSES AND OBJECTIONS

1.     Describe in detail your relationship with Datamonitor, including the date and circumstances of your initial association with Datamonitor; your date of hire; your first date of employment; the position for which you were hired; and your current and/or expected job duties and responsibilities.

**Response:**     In addition to the General Objections set forth above, Neergheen objects to Interrogatory No. 1 as overly broad in that it improperly consists of multiple subparts. Neergheen further objects to the Interrogatory as vague and ambiguous, particularly as to the term "relationship."  Subject to and without waiving its general and specific objections, Neergheen states that he is currently employed by Datamonitor as a Partnerships and Alliances Manager within the Distributors Business Unit of Datamonitor and was hired into this position in approximately March 2008 after approximately two months of discussions.  Neergheen further states that he began working for Datamonitor on or about May 27, 2008 and that his primary duties and responsibilities include working to develop partnerships and alliances within the technology, pharmaceuticals, automotive and energy markets.

2.     Describe each and every communication between you and Datamonitor from January 1, 2003 to the present, including the date, name of each person involved, the form of the communication, and a summary of the substance of each communication.

**Response:**     In addition to the General Objections set forth above, Neergheen objects to Interrogatory No. 2 as overly broad in that it consists of multiple subparts, encompasses each and every contact made with an employer, and further in that it includes communications not relevant

nor likely to lead to the discovery of admissible evidence. Neergheen further objects to the Interrogatory on the grounds that it seeks information that is protected by the attorney-client privilege, attorney work product doctrine and/or other applicable privileges and immunities.

Subject to and without waiving its general and specific objections, Neergheen states that he first contacted Datamonitor in approximately January 2008. Richard Watkins of Datamonitor then contacted Neergheen to speak about an opening at Datamonitor. Another interview was held with Jeff Howard of Datamonitor, and an offer of employment was made in approximately March 2008. In order to be certain that Neergheen's former employment did not affect his position at Datamonitor, Neergheen was required to sign a certification that required Neergheen to not provide to Datamonitor any confidential information or trade secrets from his former employer. Upon joining Datamonitor, Neergheen was specifically instructed that he was not to have any contact with consumer packaged goods ("CPG") trade associations or any other association that he may have directly dealt with at Mintel. Since joining Datamonitor, Neergheen has not had any contact with CPG trade associations or any other associations that he may have directly dealt with at Mintel.

3.    Has any report been prepared concerning any matter relating to this action? If so, for each report, state:

> a.    the name, address and occupation of each person who prepared a report;
> b.    the date and place it was prepared;
> c.    its subject matter; and
> d.    the name and address of the person who has custody of the report.

**Response:**    In addition to the General Objections set forth above, Neergheen objects to Interrogatory No. 3 as overly broad in that it consists of multiple subparts. Neergheen further objects to the Interrogatory as seeking information neither relevant subject matter of this matter nor reasonably calculated to lead to the discovery of admissible evidence and further as

improperly defined as an interrogatory. Neergheen additionally objects to the Interrogatory on the grounds that it seeks information that is protected by the attorney-client privilege, attorney work product doctrine and/or other applicable privileges and immunities. Subject to and without waiving his general and specific objections, Neergheen states that no discoverable report exists.

4.     What is the name, address, occupation and job title of each person who has knowledge of any fact or record relating to this action?

**Response:**    In addition to the General Objections set forth above, Neergheen objects to Interrogatory No. 4 on the grounds it seeks information that is protected by the attorney-client privilege, attorney work product doctrine, and/or other applicable privileges and immunities and seeks information neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence. Neergheen further objects to the Interrogatory as seeking information in the custody or control of Mintel and is therefore unduly burdensome and/or harassing.

Subject to and without waiving its general and specific objections, Neergheen responds that Meesham Neergheen (who may be contacted through counsel) has specific knowledge about the facts alleged in the Complaint. Further answering, Neergheen states that he consulted or reviewed various documents produced by the parties in this action in providing the answers within. Additionally, Neergheen states that Jeff Howard, Richard Watkins and Dylan Grey have knowledge regarding Datamonitor's interviewing and hiring of Neergheen. Additionally, Jeff Howard has knowledge relating to Neergheen's responsibilities at Datamonitor. All of these individuals may be contacted through counsel for Neergheen.

5.    Has any statement been obtained by you, or on your behalf, from any person concerning any matter relating to this action? If so, for each statement, state:

      a.    the name and address of the person who made the statement;
      b.    the name and address of the person who obtained it;
      c.    the date it was obtained;
      d.    whether the statement is written or oral; and
      e.    the name and address of the person who has custody or a copy of the statement.

**Response:**    In addition to the General Objections set forth above, Neergheen objects to Interrogatory No. 5 as overly broad in that it consists of multiple subparts.  Neergheen further objects to the Interrogatory as seeking information neither relevant subject matter of this matter nor reasonably calculated to lead to the discovery of admissible evidence and further as improperly defined as an interrogatory.  Neergheen additionally objects to the Interrogatory on the grounds that it seeks information that is protected by the attorney-client privilege, attorney work product doctrine and/or other applicable privileges and immunities.  Subject to and without waiving his general and specific objections, Neergheen states that an affidavit of Jeff Howard has been produced.

6.    Do you deny that you have acquired, exchanged and/or utilized Mintel's Trade Secrets and/or Confidential Information? If so, state all facts to support your position.

**Response:**    In addition to the General Objections stated above, Neergheen objects to Interrogatory No. 6 as overly broad, vague and ambiguous.  Neergheen further objects to the request as calling for a legal conclusion.

7.    Do you contend that Mintel's Confidential Information is not a "trade secret" as defined by the Illinois Trade Secrets Act? If so, state all facts to support your position that the Confidential Information is not a "trade secret" as defined by the Illinois Trade Secrets Act.

7

**Response:**     In addition to the General Objections stated above, Neergheen objects to Interrogatory No. 7 as overly broad, vague and ambiguous.  Neergheen further objects to the request as calling for a legal conclusion.

8.     State all of Mintel's customers or clients you have had any communication or other contact with since your last day of employment with Mintel to the present date. Identify when the communication and/or contact took place, the form of the communication and/or contact, and the substance of each such communication and/or contact.

**Response:**     In addition to the General Objections set forth above, Neergheen objects to Interrogatory No. 8 as vague and as  overly broad  in that it encompasses any and all communications of any sort in any capacity.  Subject to and without waiving its general and specific objections, Neergheen states that no such customer or client communication exists.

9.     Describe in detail your job duties and responsibilities during your employment with Mintel.

**Response:**     In addition to the General Objections set forth above, Neergheen objects to Interrogatory No. 9 to the interrogatory to the extent it seeks information that is already in the possession of Mintel and/or is public knowledge and as vague and ambiguous.  Subject to and without waiving its general and specific objections, Neergheen states that he held multiple titles at Mintel and that his duties and responsibilities at Mintel included marketing to trade associations in the consumer packaged goods market.

10.     Describe in detail your current and/or expected job duties and responsibilities at Datamonitor.

**Response:**     In addition to the General Objections set forth above, Neergheen objects to

Interrogatory No. 10 as duplicative of Interrogatory No. 1. Accordingly, Neergheen incorporates

by reference his objections and response to Interrogatory No. 1.

11.    Identify by name, address and business title any and all persons that have knowledge of the facts and circumstances surrounding the allegations contained in the Complaint.

**Response:**    In addition to the General Objections set forth above, Neergheen objects to

Interrogatory No. 11 as duplicative of Interrogatory No. 4. Accordingly, Neergheen incorporates

by reference his objections and response to Interrogatory No. 4.

12.    Identify any and all business or personal desktop and/or laptop computers utilized by you from January 1, 2003 through the present date.

**Response:**    In addition to the General Objections stated above, Neergheen objects to

Interrogatory No. 12 as overly broad, vague and ambiguous. Neergheen further objects as the

request seeks information neither relevant to this matter nor reasonably calculated to lead to the

discovery of admissible evidence.

13.    Identify the dates, parties to and form of any communication you had with any person, including but not limited to current or former Mintel employees or clients, prior to your departure at which you advised such person that you would be working for Datamonitor subsequent to April 30, 2008.

**Response:**    In addition to the General Objections set forth above, Neergheen objects to

Interrogatory No. 13 as overly broad and vague and as requesting information that is neither

relevant subject matter of this matter nor reasonably calculated to lead to the discovery of

admissible evidence.

14.    Identify any opinion witness or expert witness who will offer any opinion testimony or expert testimony on your behalf at trial, and identify the subject matter upon which the witness is expected to testify, the conclusions and opinions of the witness and bases therefore, and the qualifications of the witness.  In addition, please provide copies of all reports.

**Response:**    In addition to the General Objections stated above, Neergheen objects to

Interrogatory No. 14 as premature in that discovery on these issues has yet to take place.

Subject to and without waiving his general and specific objections, Neergheen states that Andy

Reisman of Elijah Technologies, Ltd. has provided an affidavit in this case.

15.    List each and every Trade Secret and/or Confidential Information you misappropriated from Mintel and/or failed to return to Mintel upon your departure from Mintel's employ.

**Response:**    In addition to the General Objections stated above, Neergheen objects to

Interrogatory No. 15 as overly broad, vague and ambiguous.  Neergheen further objects to the

request as calling for a legal conclusion.

16.    Please state exactly what Trade Secrets and/or Confidential Information of Mintel you have disclosed and/or presented to any third parties, including the name of each person to whom you disclosed the information and the date of each such disclosure.

**Response:**    In addition to the General Objections stated above, Neergheen objects to

Interrogatory No. 16 as overly broad, vague and ambiguous.  Neergheen further objects to the

request as calling for a legal conclusion.

17.    Please state exactly what Trade Secrets and/or Confidential Information you have utilized to date, including the date and a summary of each such use.

**Response:**    In addition to the General Objections stated above, Neergheen objects to

Interrogatory No. 17 as overly broad, vague and ambiguous. Neergheen further objects to the request as calling for a legal conclusion.

18.    Identify in detail all communications you have had with any third party relating to any Confidential Information and/or Trade Secrets of Mintel, including the name of the third party and the date and form of the communication.

**Response:**    In addition to the General Objections stated above, Neergheen objects to Interrogatory No. 18 as overly broad, vague and ambiguous. Neergheen further objects to the request as calling for a legal conclusion.

19.    Identify the date, location and attendees of your first discussion or communication with Datamonitor prior to your resignation at Mintel regarding the possibility of employment.

**Response:**    In addition to the General Objections set forth above, Neergheen objects to Interrogatory No. 19 as overly broad and unduly burdensome, particularly as to the term "resignation," as Neergheen's position at Mintel was eliminated. Neergheen further objects to the request as vague and ambiguous. Subject to and without waiving his general and specific objections, Neergheen states that he first contacted Mas Hussain at Datamonitor regarding the possibility of employment in January 2008 via email.

20.    Identify the date, location and attendees of any discussions or communications between you and any other Mintel competitor, including but not necessarily limited to Synovate/BAI Global; Competiscan; Competitrack; Market IQ; Who's Mailing What; Paradyszmatera; Telephia; LIMRA; Lightspeed; Euromonitor; Iconoculture; Culture Waves; TrendSpotting; and Innova, prior to your resignation at Mintel regarding the possibility of employment.

**Response:**    In addition to the General Objections set forth above, Neergheen objects to

Interrogatory No. 20 as overly broad and unduly burdensome, particularly as to the term "resignation," as Neergheen's position with Mintel was eliminated. Neergheen further objects to the request as vague and ambiguous. Subject to and without waiving his general and specific objections, Neergheen states that he first contacted Euromonitor regarding the possibility of employment in mid-December 2007.

21.     Describe all instances in which you copied, e-mailed to your personal e-mail address and/or deleted any electronically stored information from any desktop and/or laptop computer of Mintel, including a summary of the electronically stored information that was copied, e-mailed and/or deleted and the date of each such occurrence.

**Response:**     In addition to the General Objections stated above, Neergheen objects to Interrogatory No. 21 as overly broad and unduly burdensome. Neergheen further objects to the request as seeking information that is neither relevant subject matter of this matter nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving his general and specific objections, Neergheen states that he emailed from his Mintel computer to his personal email account approximately eight items on or about April 29, 2008. Neergheen does not recall specifically the exact content of the items and the emails containing the items were never opened. Moreover, all emails and items, save one, were deleted within a matter of days of when the emails were sent.

22.     Describe by category and location all documents, including electronically stored information, that are in your possession, custody and/or control that relate to any of the parties' claims or defenses.

**Response:**     In addition to the General Objections stated above, Neergheen objects to Interrogatory No. 22 as overly broad, unduly burdensome, and vague and ambiguous.

Neergheen further objects to the request as seeking information that is neither relevant subject matter of this matter nor reasonably calculated to lead to the discovery of admissible evidence. Additionally Neergheen objects to the request to the extent it calls information that is protected by the attorney-client privilege, attorney work product doctrine and/or other applicable privileges and immunities.

23.    Are you currently employed? If so, please state the name of your employer, date of hire, job position and job responsibilities.

**Response:**    In addition to the General Objections set forth above, Neergheen objects to Interrogatory No. 23 as duplicative of Interrogatory Nos. 1 and 10.  Accordingly, Neergheen incorporates by reference his objections and response to Interrogatory Nos. 1 and 10.

Respectfully submitted,
MEESHAM NEERGHEEN, an individual,

Neergheen,
By:
One of Its Attorneys

John T. Roache
Jeana R. Lervick
Bell, Boyd & Lloyd LLP
Three First National Plaza
70 West Madison Street
Suite 3100
Chicago, Illinois  60602
312.807.4339
312.827.1266 (facsimile)

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that a true and correct copy of **Defendant's Response to First Set Interrogatories** have been served this 24th day of July, 2008 via messenger to:

> Joseph Marconi
> Victor Pioli
> Katherine J. Pronk
> JOHNSON & BELL, LTD.
> 33 West Monroe Street
> Suite 2700
> Chicago, Illinois 60603

> Jeana R. Lervick
> BELL, BOYD & LLOYD LLP
> 70 West Madison Street
> Suite 3100
> Chicago, IL 60602
> (312) 373-1121

## VERIFICATION

I, Meesham Neergheen, pursuant to 28 U.S.C. § 1746 and the laws of the United States, declare under penalty of perjury that according to my knowledge, information and belief, the contents of the foregoing are true and correct.

_____

# EXHIBIT D

## Employee Non-Compete/Non-Solicitation Agreement

For good and valuable consideration, and as an inducement for Mintel International Group, Ltd. or any of its U.S. subsidiaries (hereinafter collectively referred to as "Mintel") to either employ or to continue the present employment of Meesham Neergheen ("Employee"), the undersigned Employee hereby agrees not to compete, either directly or indirectly, with the business of Mintel or any of its subsidiaries, branches or divisions, at any location worldwide at any time during the Employee's term of employment, and for a period of one (1) year following his termination of employment with Mintel, regardless of the reason or cause for such termination.

The term "not to compete" as used in this Agreement means that the undersigned Employee shall not own, manage, operate, consult with or be employed by a business substantially similar to, or in competition with, the present business of Mintel or such other business activities in which Mintel may hereafter substantially engage during the term of the undersigned Employee's employment with Mintel.

The undersigned Employee acknowledges that Mintel may, in reliance upon the terms of this Agreement, supply or provide the undersigned Employee with access to Mintel's trade secrets, customer lists or other information of a confidential or proprietary nature. In consideration for his employment with Mintel, the undersigned Employee agrees to keep confidential all such information, and not to use such information for his own benefit or to disclose same to any third party.

In further consideration of the undersigned Employee's employment with Mintel, the undersigned Employee further agrees that in the event of his termination of employment with Mintel, regardless of the reason or cause for such termination, he will not solicit or recruit any of Mintel's employees to undertake alternative employment, including any competitive employment, for a period of one (1) year after the undersigned Employee's termination date with Mintel without the express written consent of Mintel's CEO or U.S. General Manager.

The undersigned Employee further agrees that in the event of his termination of employment with Mintel, regardless of the reason or cause for such termination, he will not solicit any of Mintel's customers for a period of one (1) year after the undersigned Employee's termination date with Mintel.

It is agreed and understood that any claims or controversies relative to the enforcement of this employee non-compete/non-solicitation agreement will be governed by the laws of the State of Illinois.

Signed this ___4th___ day of _August_, 20 03

_____          _____
Employee                                For Mintel

**EXHIBIT**
1-A

# EXHIBIT E

Carr, Richard  8/27/2008  9:26:00 AM

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF ILLINOIS

3    EASTERN DIVISION

4

5  MINTEL INTERNATIONAL GROUP, )

6  LTD., a United Kingdom    )

7  Corporation,           )

8        Plaintiff,     )

9        vs.        ) No. 08 CV 3939

10  MEESHAM NEERGHEEN, an     )

11  individual,          )

12        Defendant.     )

13

14        Videotaped Deposition of RICHARD CARR,

15  taken before GREG S. WEILAND, CSR, pursuant to the

16  Federal Rules of Civil Procedure for the United

17  States District Court pertaining to the taking of

18  depositions, at Suite 2800, 70 West Madison Street,

19  in the City of Chicago, Cook County, Illinois,

20  commencing at 9:26 o'clock a.m., on the 27th day of

21  August, 2008.

22

23

24

Carr, Richard  8/27/2008  9:26:00 AM

1    that, but ...

2        Q.   Who would have knowledge of that?

3        A.   The salespeople.

4        Q.   Who's head of the sales group?

5        A.   You can look at -- for Comperemedia, it is

6    Heather Thomson.

7        Q.   Do you know how that sales group compiles

8    its customer list?

9        A.   Not in detail, no.

10       Q.   Do you know how much the Comperemedia

11   group expends in attracting clients?

12       A.   I would estimate it at $750,000 a year.

13       Q.   What comprises that 750,000?

14       A.   Sorry?

15       Q.   What makes up that 750,000?  What's that

16   spent on?

17       A.   Marketing expenditure.

18       Q.   Is that just the marketing expenditure for

19   the entire Comperemedia group on an annual basis?

20       A.   Yeah.  There will be some other bits in

21   there.  There will be, you know, there will be some

22   entertainment in there.

23       Q.   Do you know specifically what that money

24   is used on?

Carr, Richard  8/27/2008  9:26:00 AM

1    but ...

2        Q.   Is it depending on the size of the

3    institution or the size of the report they're asking

4    for?

5        A.   Yeah.  I mean, it will be -- the more

6    they're going to use it, the more we will ask them

7    to pay for it.

8        Q.   And this is a database that you

9    continually update; is that correct?

10       A.   Yes.

11       Q.   Do you know if Datamonitor offers a

12   similar product to your Comperemedia?

13       A.   I don't believe they do.

14       Q.   Who are your competitors in the

15   Comperemedia area?

16       A.   There's two.  There's Synovate.

17       Q.   Could you spell that for us?

18       A.   I'll try.  S-y-n-o-v-a-t-e, I think.  And

19   the other one is called Competitrack.

20       Q.   Where are they located?

21       A.   I have no idea where Synovate is.

22   Competitrack is located here in Chicago.

23       Q.   Do you know if lists of financial

24   institutions are publicly available?

1    business -- strike that.

2         What percentage of Mintel's revenue on an

3    annual basis comes from the financial institution

4    area together with the food and drink area?

5         A.  I'd say it's about one-third financial

6    institutions, two-thirds food and drink.

7         Q.  Do you offer any products in the

8    pharmaceutical area?

9         A.  No, we don't.

10        Q.  Do you offer any products in the

11   technology area?

12        A.  We do have a limited amount in Compere.

13   Technology is one of the sectors that you can buy.

14        Q.  One of the databases?

15        A.  Yeah, there's a small -- there's a sector

16   that you can buy that comprises technology

17   offerings.

18        Q.  And just so I understand that, that would

19   be a database of junk mail received by individuals

20   relating to the technology sector?

21        A.  Yeah.

22        Q.  What percentage of the Comperemedia

23   revenue comes from that?

24        A.  It's small.  I couldn't give you an exact

Carr, Richard  8/27/2008  9:26:00 AM

1    figure.

2        Q.   Less than 5 percent?

3        A.   Probably.

4        Q.   Are your clients the same in that area,

5    other financial institutions?

6        A.   I'm not -- I don't actually know who buys

7    it, but I know one or two of the technology

8    companies buy it, Dell for example.

9        Q.   Do you know of any other technology

10   companies that --

11       A.   I don't know of any others, no, but there

12   could be others.

13       Q.   Do you know how Mintel identifies

14   potential customers in the technology area?

15       A.   No, I don't.

16       Q.   Do you know who Steve Charlton is?

17       A.   Yes, I do.

18       Q.   Who is he?

19       A.   He was responsible for our HR department,

20   and he's working on a new project at the moment, and

21   he has been with the company since before I started.

22       Q.   What project is he working on now?

23       A.   It's -- I don't know actually what we're

24   calling it now, but we purchased a company called

Carr, Richard  8/27/2008  9:26:00 AM

1    identifying potential clients?

2        A.   No, I don't.

3        Q.   In the finance area, do you know if they

4    would look at lists of banks, financial institutions

5    and similar things?

6        A.   I imagine they probably would.

7        Q.   Do you know if that information is

8    publicly available?

9        A.   I don't know.

10       Q.   Who told you about the restructuring of

11   the U.S. marketing team in the fall of 2007?

12       A.   It was part of our budget discussions in

13   August-September 2007.

14       Q.   Who was in attendance for that meeting?

15       A.   It was various meetings, so the directors

16   and other senior managers.

17       Q.   Who made the ultimate decision to

18   restructure the U.S. team?

19       A.   Sabine Popp.

20       Q.   Who made the decision that Mr. Neergheen's

21   position was redundant?

22       A.   I have no idea.

23       Q.   Do you know who notified Mr. Neergheen

24   that his position was redundant?

Carr, Richard  8/27/2008  9:26:00 AM

1          (Exhibit 1 was marked for

2              identification.)

3    BY MR. ROACHE:

4       Q.   Mr. Carr, I've handed you what's been

5    marked as Carr Exhibit 1.

6          Have you seen this document before?

7       A.   No.

8       Q.   At the bottom, it says "For Mintel."

9          Do you know whose signature that is?

10      A.   Yes, it's Maggie Cahm.

11      Q.   Maggie Cahm?

12      A.   Yeah.

13      Q.   What's her title?

14      A.   She's the HR manager in London.

15      Q.   Do you know what consideration, if any,

16   was given to Mr. Neergheen for signing this

17   agreement?

18      A.   No, I don't.

19      Q.   Do you know if he had refused to sign this

20   agreement if Mintel would have terminated him?

21      A.   No, I don't.

22      Q.   Do you know why this agreement was signed

23   by Ms. Cahm?

24      A.   No, I don't.

Carr, Richard  8/27/2008  9:26:00 AM

1      A.  Payroll documents.

2      Q.  Payroll documents.  Customer contacts,

3   customer lists, customer information?

4      A.  Yeah.

5      Q.  Any others come to mind?

6      A.  There will be vendor information, vendor

7   contracts, customer contracts.

8      Q.  How do you know what documents Mintel

9   considers to be confidential?

10     A.  Because I would as a reasonable person as

11  a director consider those to be confidential.

12     Q.  How would an employee at Mintel know what

13  documents Mintel considers to be confidential?

14     A.  I think we'd expect them to have some

15  reasonable idea of what is and what isn't.  We mark

16  some documents confidential from time to time.  We

17  do tell people that certain things are confidential.

18     Q.  Well, what documents do you mark

19  confidential that you're aware of?

20     A.  Hard to say.  We certainly marked some of

21  the HR documents as confidential and things like

22  that.

23     Q.  Any others you can think of?

24     A.  Not at the moment, no.

# EXHIBIT F

# MINTEL INTERNATIONAL GROUP LTD
# AND ALL US SUBSIDIARIES

## EMPLOYEE HANDBOOK

MNTL 00001

# TABLE OF CONTENTS

WELCOME LETTER FROM THE US GENERAL MANAGER ................................................................1

DISCLAIMER ................................................................................................................................2

THE WORKPLACE .......................................................................................................................3

    EQUAL EMPLOYMENT OPPORTUNITY POLICY .........................................................................4
    HARASSMENT POLICY ...........................................................................................................5

PAY AND PERSONAL INFORMATION ..........................................................................................7

    WORKDAY AND WORK WEEK ...............................................................................................8
    TIME RECORDS ....................................................................................................................9
    SALARY ADMINISTRATION ..................................................................................................10
    OVERTIME AND OVERTIME PAY ..........................................................................................11
    PERSONNEL FILES ..............................................................................................................12

EMPLOYEE RESPONSIBILITY ....................................................................................................13

    ALCOHOL AND DRUG USE POLICY .....................................................................................14
        *Purpose* ..........................................................................................................*14*
        *Definitions* .....................................................................................................*14*
        *Use of Legal Drugs* .........................................................................................*17*
        *Testing of Applicants and Employees* ...............................................................*17*
        *Discipline* .......................................................................................................*17*
    ATTENDANCE ....................................................................................................................19
    STANDARD OF CONDUCT ...................................................................................................20
    CONFLICT OF INTEREST .....................................................................................................23
    CONFIDENTIALITY .............................................................................................................24
    SMOKING POLICY ..............................................................................................................25

TIME OFF ..................................................................................................................................26

    FAMILY AND MEDICAL LEAVE POLICY .................................................................................27
        *General* ..........................................................................................................*27*
        *Reasons for Leave* ...........................................................................................*27*
        *Serious Health Condition* .................................................................................*28*
        *Maintenance of Health Benefits* ........................................................................*30*
        *Job Restoration* ...............................................................................................*30*

MNTL 00002

MNTL 00002

*Procedure for Requesting Leave* ............................................................................. *30*

HOLIDAYS/VACATION ............................................................................................... 32

SICK PAY POLICY ........................................................................................................ 34

**OTHER** ............................................................................................................................... **35**

INTRODUCTORY PERIOD – NEW EMPLOYEES .................................................... 36

PERSONNEL BACKGROUND INFORMATION ........................................................ 37

*Background Checks* ....................................................................................................... *37*

*Criminal Convictions* .................................................................................................... *37*

*Driving Convictions* ...................................................................................................... *37*

RESIGNATION ............................................................................................................... 38

SAFETY POLICY ........................................................................................................... 39

INFORMATION AND ELECTRONIC COMMUNICATION POLICY ...................... 40

*Unacceptable Uses of Company Systems* ...................................................................... *40*

*Communications* ............................................................................................................ *41*

*Installation of Software* ................................................................................................. *41*

*Transmission of Copyrighted Materials Over Company Systems* .................................. *41*

*Protection of Company Systems Security* ...................................................................... *42*

*Violations* ...................................................................................................................... *42*

PERSONAL TELEPHONE CALLS ............................................................................... 43

BUILDING SECURITY AND LOSS PREVENTION .................................................... 44

*Building access times* .................................................................................................... *44*

*Key holders* .................................................................................................................... *44*

*Alarm system* ................................................................................................................. *44*

*After hours access* ......................................................................................................... *44*

ILLNESS/INJURY DURING WORK HOURS .............................................................. 45

PERFORMANCE APPRAISALS .................................................................................... 46

TRAINING AND DEVELOPMENT .............................................................................. 47

DEATH IN THE IMMEDIATE FAMILY ...................................................................... 48

JURY DUTY .................................................................................................................... 49

REFERRALS ................................................................................................................... 50

*Introducing Successful Candidates to Mintel* .............................................................. *50*

ARBITRATION AND LIMITATION OF CLAIMS ....................................................... 51

MNTL 00003

MNTL 00003

# WELCOME LETTER FROM THE US GENERAL MANAGER

I take great pleasure in welcoming you to Mintel International Group Ltd. We take significant pride in our employees and the services we provide, and we know that our success is based largely on the combined efforts of all of our employees working together.

It is our goal to provide maximum opportunity and incentive for the growth and well being of all our employees. At the same time, an organization needs rules and guidelines to govern its operation. This Employee Handbook is designed to furnish information about our policies and to answer questions concerning everyday operations. This Employee Handbook is not a contract and does not create a contractual relationship of any nature between Mintel and its employees.

Mintel's environment is one in which change is inevitable. It may be necessary to change policies and guidelines contained in this Employee Handbook to accommodate the rapidly changing environment. Your cooperation is vital to ensure that Mintel is able to provide the outstanding quality of service our clients have come to expect.

Sincerely,

MNTL 00004

MNTL 00004

# DISCLAIMER

This Employee Handbook is intended to be a guide to the practices and procedures of Mintel. This Employee Handbook and the practices and procedures described in it do not create any contractual or other legal commitment by Mintel or by any of its directors, shareholders, officers, employees, or agents.

With the exception of its "at-will" employment policy (which is described in the next paragraph), the policies and procedures described in this Employee Handbook may be amended, revoked, or suspended at any time without notice at Mintel's sole and exclusive discretion.

All Mintel employees are employed at-will, meaning that Mintel may terminate the employment relationship at any time without notice, with or without cause. Likewise, each employee of Mintel may terminate the employment relationship at any time and for any reason. Nothing contained in this Employee Handbook is intended to or should be construed as altering the employment-at-will relationship. Any contract concerning the employment of any employee must be in a separate document signed by the US General Manager or CEO of Mintel, in which case the provisions of the written contract will control the extent that they are inconsistent with the terms of this Employee Handbook.

This Employee Handbook does not address all issues which may be of concern to employees. Employees who seek additional information or guidance should contact their supervisor or the US General Manager.

This Employee Handbook supercedes all other previous employee handbooks and personnel manuals issued by Mintel.

MNTL 00005

MNTL 00005

# THE WORKPLACE

MNTL 00006

MNTL 00006

## EQUAL EMPLOYMENT OPPORTUNITY POLICY

It is the policy of Mintel to provide equal employment opportunity to all employees and applicants for employment. No applicant or employee of Mintel shall be discriminated against in employment because of race, color, religion, sex, age, national origin, ancestry, sexual orientation, marital status, parental status, source of income, disability or military discharge status. This policy applies to all terms, conditions and privileges of employment, including but not limited to, hiring, compensation, benefits, promotion and termination.

The term "disability" for purposes of this Equal Employment Opportunity Policy shall mean a qualified individual with a disability as defined in the Americans With Disabilities Act or as otherwise defined by applicable law. Mintel shall make every effort to accommodate the known physical or mental limitations of applicants and employees with a disability as required by the Americans with Disabilities Act and other applicable law.

If any employee experiences discrimination or believes that he or she has been treated in an unlawful, discriminatory manner, such employee should immediately report the incident directly to the Office/HR Manager, their Supervisor or the US General Manager.

MNTL 00007

MNTL 00007

# HARASSMENT POLICY

Mintel is committed to maintaining a work environment that encourages and fosters appropriate conduct among employees and respect for individual values and sensibilities. Mintel prohibits any form of unlawful harassment, including harassment based upon race, color, religion, sex, age, national origin, ancestry, sexual orientation, marital status, parental status, source of income, disability or military discharge status.

In addition, it is a violation of Mintel's policy for any employee, male or female, to harass another employee by making unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature where:

1.   submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; or

2.   an employment decision affecting an employee is based on that individual's acceptance or rejection of such conduct; or

3.   such conduct interferes with an individual's work performance or creates an intimidating, hostile, or offensive working environment.

Mintel affirms its commitment to complying fully with both the letter and spirit of state and federal legislation relating to harassment in the workplace. In order to fulfill this commitment, Mintel has established a policy for handling harassment complaints. Any employee who believes that he or she has been subject to any unlawful harassment should immediately file a complaint directly with the Office/HR Manager. However, where a conflict of interest exists with respect to the Office/HR Manager, the reporting employee should immediately file a complaint directly with the US General Manager or Group HR Manager.

Mintel will conduct an investigation of the complaint. In all cases, personnel not involved in the alleged unlawful harassment will conduct the investigation. Every effort will be made to keep all matters relating to the investigation and claim report confidential to the extent feasible.

MNTL 00008

MNTL 00008

Following the investigation, the US General Manager or Group HR Manager will evaluate the facts and evidence. If the complaint is substantiated, appropriate corrective action will be taken. If the complaint is not substantiated, the matter will be closed. In either event, however, the complaining employee, as well as the person who purportedly violated the policy, will be advised of the results of the investigation, the determination made and the action taken. It is Mintel's sincere desire that there be an open line of communication between management and employees to solve any problems that may exist.

Any employee found in violation of this policy or whose conduct is found to be contrary to the objectives of this policy shall be subject to disciplinary action, up to and including termination. Likewise, any employee who deliberately and falsely accuses another employee of discrimination or harassment will also be subject to disciplinary action, up to and including termination.

Mintel prohibits any form of retaliation against any employee for filing a bona fide complaint under this policy or for assisting in a complaint investigation.

MNTL 00009

MNTL 00009

# PAY AND PERSONAL INFORMATION

MNTL 00010

MNTL 00010

## WORKDAY AND WORK WEEK

The regular hours of Mintel are Monday through Friday from 8:30 a.m. to 5:00 p.m. Mintel will establish all work hours based upon its needs. Daily and weekly work schedules may be changed periodically to meet varying needs. One hour is available for lunch, the timing of which should be agreed with your Supervisor.

Employees are expected to work additional hours to meet the varying needs of the company as determined by the employee's manager/supervisor. However, the employee's manager/supervisor must approve in advance all overtime for hourly employees.

MNTL 00011

MNTL 00011

## TIME RECORDS

It is the policy of Mintel to comply with all applicable federal and state laws that require records to be maintained of the hours worked by employees. Every employee is required to complete daily time sheets. In this way, each hourly paid employee must report the number of hours worked each day to his or her supervisor. Failure to report correct hours worked to your supervisor may result in disciplinary action, up to and including termination.

MNTL 00012

MNTL 00012

## **SALARY ADMINISTRATION**

The US Financial Analyst administers salaries at Mintel.  Any queries should be addressed to the supervisor in the first instance, however if the query is related to deductions from pay or a miscalculation, please contact the US Financial Analyst.

MNTL 00013

MNTL 00013

## OVERTIME AND OVERTIME PAY

Employees may be required to work overtime hours.

**Hourly-paid** employees only will be paid at the rate of one and one-half times their regular hourly rate for all hours worked in a workweek in excess of forty hours. All overtime work must be authorized in advance by the employee's immediate supervisor.

MNTL 00014

MNTL 00014

## PERSONNEL FILES

Employees should notify the Office/HR Manager in writing of changes to the employee's personal history and payroll records to keep the employee's employment profile up to date. Changes may include:

- Name

- Address or telephone number

- Number of dependants

- Beneficiary (or beneficiary's name)

- Personal history, educational status

- Emergency contact information

- Medical conditions

It is the employee's responsibility at all times to keep their personal information up to date on the HR Database.

Please note that as with the employee's initial employment application, it is very important that the information furnished by the employee be accurate. Inaccurate profile information may be grounds for termination of employment.

MNTL 00015

MNTL 00015

# **EMPLOYEE RESPONSIBILITY**

MNTL 00016

MNTL 00016

## ALCOHOL AND DRUG USE POLICY

### Purpose

Mintel is committed to providing a safe, alcohol and drug-free working environment for its staff and to protecting its business from unnecessary financial loss due to drug and alcohol use among its employees. Therefore, it is a serious violation of Mintel's policy for any employee of Mintel in any of its locations or on Mintel business anywhere:

1. to possess, use, sell, offer to sell or distribute alcoholic beverages; unless alcoholic beverages are consumed during a special event operated by Mintel or for approved business entertainment purposes only

2. to possess, use, sell, offer to sell or distribute illegal drugs;

3. to be under the influence of alcohol or illegal drugs; or

4. to misuse, abuse or use excessively any drug, whether legal or illegal.

It is the employee's responsibility to seek diagnosis and treatment for alcohol/drug use before it becomes a disciplinary matter. This policy is subject to additions, modifications, or deletions from time to time upon notice to employees.

This alcohol and drug policy applies to all applicants and employees of Mintel.

### Definitions

Definitions of terms used in the Alcohol and Drug Use Policy:

A. "Drugs" means Legal and Illegal Drugs.

B. "Illegal Drugs" means any Drug:

MNTL 00017

MNTL 00017

> (a)   which is not legally obtainable,
>
> (b)   which is legally obtainable but has not been legally obtained, or
>
> (c)   which has been legally obtained but not used in the manner and for the purpose for which they were prescribed or manufactured.

C.   "Legal Drugs" mean prescription drugs and over-the-counter drugs, which have been obtained legally and are being used in the manner and for the purpose for which they were prescribed or manufactured.

D.   "Medical Facility" means any physician, laboratory, clinic, hospital or other similar entity.

E.   "Possess" means to have either in or on an employee's person, personal effects, desk, files or similar area.

F.   "Location" and "Property" mean any building, office, company apartment, common area, vehicle, parking lot or similar area owned, leased, managed, used

G.   or controlled by Mintel or by a client for whom Mintel provides services.

H.   "Mintel Business" means all time in which employees are engaged in work duties or subject to the control of Mintel, and also includes scheduled breaks and travel from one workplace to another and time spent at a client's location.

MNTL 00018

MNTL 00018

I.    "Under the Influence":

    i.    when used in connection with Drugs means that the employee is affected by a drug(s) in any determinable manner or has any trace of a drug in his or her body.

    ii.    when used in connection with alcohol or alcoholic beverages means that the employee is affected by alcohol in any determinable manner or has any detectable amount of alcohol in his or her body.

J.    "Reasonable Suspicion" means any set of facts and circumstances that would lead a reasonable person to believe that an employee is in violation of this policy, and may be based upon one or more of the following factors: first-hand observation of a violation; possession of alcohol or Illegal Drugs or related paraphernalia; information from public record or court proceedings; statements by the employee or witnesses; or the employee's appearance, behavior, speech or body odor that are manifested by factors including, but not limited to, bloodshot eyes, slurred speech, alcohol on the breath, inability to walk a straight line or perform simple acts of physical dexterity, poor coordination, accidents, odors in the employees immediate area, physical or verbal altercation, unexplained absence from work area, unusual behavior; or any other reliable information or physical evidence of alcohol or drug use.

K.    "Work Related Cause" means the employee has incurred a work-related injury requiring medical attention at a medical facility; caused the injury of another person on Mintel premises or during Mintel time; caused damage to any Mintel owned or leased property; or commits repeated and/or flagrant violations of safety standards.    MNTL 00019

MNTL 00019

## Use of Legal Drugs

An employee who is Under the Influence of a Legal Drug must report its use to his or her supervisor if the Legal Drug is likely to interfere with the employee's ability to do his or her job. The burden is on the employee to determine by, for example, asking his or her doctor whether the Legal Drug is likely to have a detrimental effect on job performance. Failure to declare the use of such Legal Drugs may result in discipline, up to and including termination.

## Testing of Applicants and Employees

For the safety of its employees, its clients, and the public, Mintel may require an applicant or employee to submit to alcohol/drug testing upon reasonable suspicion or with work related cause, with or without prior notice. The testing will be conducted at a medical facility selected by Mintel and at its expense. The applicant or employee will be required to sign a consent form authorizing testing and to submit a suitable blood, urine, breath or other sample.

## Discipline

Employees will be subject to disciplinary action which may include termination if they:

1. possess, use, sell, offer to sell, dispense or distribute alcoholic beverages or Illegal Drugs in any of Mintel's locations or on Mintel business anywhere;

2. refuse to sign the consent form;

3. refuse to submit to testing;

4. refuse to cooperate with personnel conducting the test; or

5. violate the "Under the Influence" of alcohol or Drugs provisions of this policy.

MNTL 00020

MNTL 00020

A violation of any of the foregoing may result in rejection of the applicant or discharge of the employee without regard to whether the applicant or employee complies with any other condition of this policy.

MNTL 00021

MNTL 00021

# ATTENDANCE

Timely, regular, dependable attendance by employees is essential to Mintel's success. Employees who are going to be late or absent must talk with their supervisor or the Office/HR Manager within thirty minutes of the employee's regular start time – the working day officially begins no later than 8:30 a.m. on each day of their absence. The employee must not leave a voicemail message or a message with a colleague. If the supervisor or the Office/HR Manager is not available, the employee must call back later to speak in person at that time. If the employee is absent for two or more consecutive working days, verification of illness will be required upon the employee's return to work, including the nature and duration of the illness. For illnesses of three days or more, Mintel will ask for supplementary reports from the employee's physician. In addition, in the case of prolonged illness or in the case of frequent short illnesses, Mintel may request that a physician of Mintel's choice at Mintel's expense examine the employee.

All employees should be at their desk ready to work at their regular starting time. Should an employee fail to report to work without notifying the supervisor or Office/HR Manager on a daily basis as to the reason for the employee's absence, this may result in disciplinary action, up to and including termination. Excessive absence and/or lateness may result in termination.

MNTL 00022

MNTL 00022

## STANDARD OF CONDUCT

Mintel expects every employee to conduct him or herself in a professional manner and to comply with the policies and procedures of Mintel.  To ensure the unity of the entire work force, the following activities and/or conduct shall not be tolerated by any employee of Mintel and may result in immediate termination:

1.      Violation of **any** Mintel rule, policy, procedure or practice;

2.      Any action by any employee that is extreme in nature and contrary to the best interests of Mintel;

3.      Insubordination or refusing to obey reasonable instructions or refusal to assist in special assignments;

4.      Threatening, intimidating or coercing fellow employees or Mintel's clients or visitors on or off Mintel's premises at any time or for any purpose;

5.      Any action which impairs or threatens the reputation of Mintel;

6.      Engaging in an act of sabotage; failing to use reasonable care that results in the destruction or damage of Mintel's property or the property of fellow employees, client, suppliers or visitors in any manner;

7.      Theft of Mintel property or the property of fellow employees; unauthorized possession or removal of any Mintel property, including documents from the premises without prior permission from management; unauthorized use of Mintel equipment or property for personal reasons; use of Mintel equipment for profit;

MNTL 00023

MNTL 00023

8.    Engaging in any act of disloyalty;

9.    Malicious gossip and/or spreading rumors; engaging in behavior designed to create discord and lack of harmony; interfering with another employee on the job; restricting work output or encouraging others to do the same;

10.   Immoral conduct or indecency on Mintel's premises;

11.   Obscene or abusive language toward any officer, manager/supervisor, employee or client of Mintel; indifference or rudeness towards a client or fellow employee; any disorderly/antagonistic conduct on Mintel's premises;

12.   Failing to treat all co-workers, clients and visitors with courtesy and respect.

13.   Use of, possession or threats concerning knives, guns, explosives or other weapons on Mintel premises, in company vehicles or while performing Mintel business.

14.   Reckless use of Mintel equipment.

15.   The unauthorized use for non-business purposes of e-mail or the internet.

16.   The use of Mintel property, credit, services in a manner other than prescribed by Mintel policy or practice, or federal, state or local law.  This includes, but is not limited to, manipulation, falsification of or omission of information in any Mintel document, including the job application and time records; misappropriation of Mintel, vendor or customer property, services or personal phone calls; violation of Mintel conflict of interest policies; unauthorized possession and disclosure of

MNTL 00024

MNTL 00024

confidential information; video recording another employee by means of a personal surveillance camera or tape recording an employee's conversation without their express knowledge and consent.

17.    Failing to satisfy Mintel's performance expectations.

18.    Failing to follow work schedules, including absence from work, lateness, failure to timely report an absence, long breaks and meal periods, leaving early or other violations of Mintel's work schedules without proper supervisor authorization.

MNTL 00025

MNTL 00025

## **CONFLICT OF INTEREST**

No employee shall maintain an outside business or financial interest, or engage in any outside business or financial activity, which conflicts with the purpose, interests, goals or programs of Mintel, or which interferes with the employee's ability to fully perform his or her responsibilities. Questions of potential conflicts of interest are to be first directed to the employee's immediate supervisor.  Outside employment must be reported in writing to the US General Manager thirty days prior to commencing the activity.  If the employee's activity is determined by Mintel to be in conflict or competition with the purpose, interests, goals or programs of Mintel, the employee immediately must cease such activity or be subject to disciplinary action, up to and including termination.

MNTL 00026

MNTL 00026

# CONFIDENTIALITY

Employees are required to safeguard sensitive information. The nature of Mintel's business and its economic well being is dependent upon protecting and maintaining its proprietary information. Employees are required to hold in strict confidence all sensitive information. Sensitive information includes, but shall not be limited to, procedures, processes, information related to design, production, marketing or distribution, data, databases, computer software, source codes, all methods and means of design, drawing, recording, reproducing information or storing information (including but not limited to electronic or computerized methods or means), supply sources or potential supply sources, customer lists or potential customer lists, bidding policies or procedures or any information concerning pricing or financing policies or procedures, including without limitation:

    (a)    Information regarding contracts with clients of Mintel, design, pricing, methods of operation, financial conditions, market plans and master plans; and

    (b)    Information relating to Mintel's clients and concerning their financial condition, construction or planned development, product results and methods, master plans and business strategies.

Employees are expected to return all of Mintel's property, including confidential information, upon the cessation of the employee's employment.

All work on clients' business is confidential. Information obtained in the course of this work must not be disclosed at any time to any outside party (including the clients' employees), or to fellow members of staff other than is necessary in the course of carrying out the work.

MNTL 00027

MNTL 00027

## **SMOKING POLICY**

In keeping with Mintel's intent to provide a safe and healthy work environment, smoking in the workplace, including bathrooms, is strictly prohibited at all times.

MNTL 00028

MNTL 00028

# **TIME OFF**

MNTL 00029

MNTL 00029

# FAMILY AND MEDICAL LEAVE POLICY

## General

Employees who have been employed with Mintel for at least one year, and for at least 1,250 hours during the preceding 12-month period are eligible for family and medical leave. For employees not eligible for family and medical leave, the Company will review business considerations and the individual circumstances involved.

Family or medical leave will consist of appropriate accrued paid leave and unpaid leave. If leave is requested for any of the reasons listed below, an employee must first use all of his or her accrued paid vacation time. The remainder of any leave period will then consist of unpaid leave.

## Reasons for Leave

All employees who meet the applicable time of service requirements may be granted family or medical leave consisting of appropriate accrued paid leave and unpaid leave, for a period of up to twelve weeks in any rolling twelve month period, measured backward from the date an employee uses any FMLA leave, for the following reasons:

- the birth of the employee's child in order to care for the child;

- the placement of a child with the employee for adoption or foster care;

- to care for a spouse, child or parent who has a serious health condition; or

- a serious health condition that renders the employee incapable of performing the functions of his or her job.

The entitlement to leave for the birth or placement of a child for adoption or foster care will expire twelve months from the date of the birth or placement.

MNTL 00030

MNTL 00030

Under certain circumstances, employees may take FMLA leave intermittently. Intermittent leave means taking leave in blocks of time, or by reducing their normal weekly or daily work schedule. If FMLA leave is for the birth and care or placement for adoption or foster care, use of intermittent leave is subject to the Company's prior approval. FMLA leave may be taken intermittently whenever medically necessary to care for a seriously ill immediate family member, or because the employee is seriously ill and unable to work. When intermittent leave is needed to care for an immediate family member or the employee's own illness, and is for planned medical treatment, the employee must attempt to schedule the treatment so as not to unduly disrupt the Company's operation.

**Serious Health Condition**

For purposes of this policy, the term "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves either:

- any period of incapacity or treatment connected with inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical-care facility, and any period of incapacity or subsequent treatment in connection with such inpatient care;

or

- continuing treatment by a health care provider which includes any period of incapacity (i.e., inability to work, attend school or perform other regular daily activities)

due to:

1. A health condition (including treatment for, or recovery from) lasting more than three consecutive days, and any subsequent treatment or period of incapacity relating to the same condition, that also includes:

MNTL 00031

MNTL 00031

- treatment two or more times by or under the supervision of a health care provider; or

- one treatment by a health care provider with a continuing regimen of treatment or

2.　Pregnancy or prenatal care. A visit to the health care provider is not necessary for each absence; or

3.　A chronic serious health condition, which continues over an extended period of time, requires periodic visits to a health care provider, and may involve occasional episodes of incapacity (e.g., asthma, diabetes). A visit to a health care provider is required, rather than active treatment; or

4.　Any absences to receive multiple treatments for restorative surgery or for a condition which would likely result in a period of incapacity of more than three days if not treated (e.g. chemotherapy or radiation treatments for cancer).

MNTL 00032

MNTL 00032

**Maintenance of Health Benefits**

The Company will maintain group health insurance coverage for an employee on FMLA leave whenever such insurance was provided before the leave was taken and on the same terms as if the employee had continued to work. If applicable, arrangements will be made for the employee to pay his or her share of health insurance premiums while on leave. In certain instances, the Company may recover premiums it paid to maintain health coverage for an employee who fails to return to work from FMLA leave.

**Job Restoration**

Upon return from FMLA leave, an employee will be restored to the employee's original job, or to an equivalent job with equivalent pay, benefits, and other terms and conditions of employment as required by law.

**Procedure for Requesting Leave**

Employees who believe they are eligible and are seeking to use FMLA leave are required, when the need is foreseeable and such notice is practicable, to provide 30-day advance notice of the need to take FMLA leave on the Application for Family or Medical Leave form, obtainable from the Office/HR Manager.

The employer will provide the employee, within one week of any application for FMLA leave, with a formal written response on whether FMLA leave is to be granted or not. This response will be completed only if the employer receives sufficient information from the employee to determine whether the leave is covered under FMLA.

Employees are required to provide the Company with a medical certification from his or her health care provider, or the health care provider of the employee's immediate family member, on the relevant form which is obtainable from the Office/HR Manager, supporting the need for leave due to a serious health condition affecting the employee or an immediate family member.

MNTL 00033

The Company may require second or third medical opinions with practitioners of the company's choosing and at their expense. Periodic reports during the FMLA leave regarding the employee's status and intent to return to work may be required as may a fitness for duty certification from the employee's health care provider prior to the employee's return to work.

MNTL 00034

MNTL 00034

## HOLIDAYS/VACATION

Employees are entitled to 13 paid vacation days each year based upon accrual (unless agreed otherwise under separate cover), to be scheduled with due regard to the needs of the office. Vacation time should be scheduled with the employee's supervisor as far in advance as possible. Last minute requests may not be approved if they create unacceptable staffing or other business problems. A week's notice is required for one day's leave. Two weeks notice is required for longer periods.

Vacation days are earned at the rate of 1 day per calendar month in arrears, plus one extra day in December, if the employee had joined the company prior to October 1st of that year. If an employee has unused accrued vacation, with the prior approval of the employee's supervisor they may carry over up to 2.5 days to the following year but these must be used by 31st March of that year, which must be scheduled in keeping with company vacation policy. Unused accrued, vacation days in excess of 2.5 days at the end of December will be lost to the employee and no payment will be made in lieu.

Vacation should be requested through the HR Database. This must be completed in advance for each set of holiday requested and authorized by the employee's supervisor. In addition to the above, full-time employees are eligible for paid time off on the following holidays:

- New Years Day

- Martin Luther King Day

- Presidents Day (decision on date of observance to be taken at January 1st of each year)

- Memorial Day

- Independence Day

- Labor Day

- Thanksgiving Day

MNTL 00035

MNTL 00035

- Thanksgiving Friday (in lieu of Veteran's Day)

- Christmas Day

Note: The above holidays change date yearly, actual dates each year are available from the Office/HR Manager

Employees may also request 2 paid personal days each year, for such activities as religious observance and personal business which cannot be dealt with out of working hours. These days must be agreed in advance with the employee's supervisor, with a minimum of one week's notice under normal circumstances.

MNTL 00036

MNTL 00036

## SICK PAY POLICY

Payment for sick days is strictly discretionary on the part of Mintel and may be granted at the sole option of the Company.

In order to qualify for consideration for sick pay, an employee absent from work by reason of illness or injury must notify the US General Manager or their line manager by 8:30 a.m. on each day on which the employee is absent due to illness or injury.

For illnesses or injuries which result in the absence of an employee from the office for three or more consecutive days, in order for the employee to qualify for consideration for sick pay, the employee must provide a note from his or her treating physician, or other attending health care provider, stating the nature of the illness or injury, as well as the expected duration of the absence from the office due to such illness or injury. This doctor's note must be provided to the Company as soon as is practical under the circumstances.

Employees are expected to use Personal Days or parts thereof for health (medical, dental etc.) visits, where these are scheduled during office hours.

Any other absence from the office which is not vacation or for other reasons permitted in the Employee Handbook, is regarded as Personal or Vacation days. *An example would be absence due to sickness in the family.*

MNTL 00037

MNTL 00037

## **<u>OTHER</u>**

MNTL 00038

MNTL 00038

## <u>INTRODUCTORY PERIOD – NEW EMPLOYEES</u>

Employment is considered to be on a trial basis for the first ninety days of employment. This gives the employee an opportunity to get to know Mintel and the details of his or her responsibilities. With this additional information and experience, the employee can more effectively evaluate Mintel and his or her position. It also gives management an opportunity to observe and evaluate the individual. The introductory period does not alter the at-will employment relationship between Mintel and its employees. Successful completion of the ninety-day trial period is not a guarantee of continued employment.

MNTL 00039

MNTL 00039

# PERSONNEL BACKGROUND INFORMATION

## Background Checks

Background Checks, as appropriate, will be undertaken on all candidates prior to any offer of employment with the Company. If the Background Check is unsatisfactory, we will not employ the individual. The results of the Background Check will be shared with the candidate.

Background checks on employees will from time to time be undertaken, as the requirements of the business demand. They will always be carried out within the laws of the State and with the prior written knowledge of the employee.

## Criminal Convictions

It is the employee's responsibility immediately to inform the General Manager US, or the Global HR Manager if they have been convicted of a Criminal offense. An internal review of the information on the offense will then take place. Each case will be looked at individually to consider the appropriate course of action. Failure to report any conviction of a Criminal Offense is a disciplinary matter and may result in termination of employment.

## Driving Convictions

Any employee who is required or likely to drive a car at any time for business purposes, is required formally to inform the General Manager US or HR immediately in the case of any conviction for any driving offence or the imposition of any restriction on driving privileges. Failure to report any such driving offenses or restrictions is a disciplinary matter and may result in termination of employment. Employees new to the Company or to a position which requires driving, are required to report any driving conviction or outstanding investigation.

MNTL 00040

MNTL 00040

# **RESIGNATION**

Should an employee decide to resign, they should provide their supervisor/manager with at least a two-week written notice.

MNTL 00041

MNTL 00041

## SAFETY POLICY

Employees are required to follow all safety and housekeeping rules of Mintel and to guard against and prevent injury at work.  In addition, if an employee sees or knows of anything which could create a potential accident or hazard, the employee must report it immediately to the employee's supervisor or Office/HR Manager, regardless of how insignificant it may appear.

MNTL 00042

MNTL 00042

# INFORMATION AND ELECTRONIC COMMUNICATION POLICY

This policy addresses the use of Mintel's information and electronic communications system including but not limited to e-mail, voice mail, telephone, Internet and computers.  Mintel encourages its employees to use its information and electronic communications system provided that they exercise good judgment and use it only for business purposes.

All computers, computer system networks, telephone equipment and other electronic communication systems, and all communications and information transmitted, received or stored on Mintel's information systems are Mintel's property.  Mintel may monitor such use or stored information, as it deems necessary to determine that such equipment is used in accordance with this policy or to retrieve information from electronic storage.  Additionally, Mintel routinely reviews telephone usage records, information and electronic communications system usage patterns.  Thus, employees should be aware that they have no privacy rights in any information, communications or stored information transmitted, received or contained in Mintel's information systems even if they have been issued with pass codes.

## Unacceptable Uses of Company Systems

Prohibited Access:  An employee may not use an access code other than the access code that Mintel issued to him or her, nor may an employee access any computer files other than those that the employee has a right and need to access.

**Prohibited Use**: Employees may not use e-mail or voice-mail to solicit for outside business ventures, political campaigning, lobbying or other personal causes.

Under no circumstance may an employee transmit, distribute or store offensive materials or messages on Mintel information and electronic communication systems.  Offensive messages include but are not limited to materials or messages that are obscene, profane or sexual in nature or that disparage any person or entity based upon race, color, religion, sex, age, national origin, ancestry, sexual orientation, marital status, parental status, source of income, disability or military discharge status or in regard to any other subject matter protected by law.  Likewise, an

MNTL 00043

employee may not use Mintel's information and electronic communications system for the purpose of harassing any other person or for any other purpose which is illegal, against company policy or contrary to Mintel's best interest.

Employees may not use Mintel's information and electronic communications system to access, distribute or publish any of its trade secrets or proprietary information without the express approval of an authorized representative of management.

## Communications

An employee who transmits a communication using Mintel's information and electronic communications system must accurately identify himself or herself. Employees may not publish any information regarding Mintel's operations, services or clients on any bulletin board or chat room without the express approval of an authorized representative of management.

## Installation of Software

To prevent computer viruses from being transmitted through or onto Mintel's information and electronic communications system, employees may not download, load or install any unauthorized software, without prior approval from the IT Manager. All software downloaded or loaded onto a computer must be registered or licensed to Mintel. Employees should contact Mintel's IT Manager if they have any questions.

## Transmission of Copyrighted Materials Over Company Systems

Employees may not transmit, distribute or store copyrighted materials belonging to companies other than Mintel, using its information and electronic communications system without the express approval of the owner of the copyright.

MNTL 00044

MNTL 00044

## Protection of Company Systems Security

Mintel periodically backs-up and archives data and information contained on its computers and electronic communications system. Features such as passwords and message delete functions do not necessary eliminate the ability to access and retrieve information. Therefore, do not transmit, distribute or store information or communications that would cause harm or embarrassment to Mintel or to you in the event that it is reviewed or disclosed.

## Violations

Employees who violate this policy are subject to discipline up to and including termination from employment, depending upon the seriousness of the offense in the judgment of management. Mintel also reserves the right to advise appropriate legal officials of any illegal conduct.

MNTL 00045

MNTL 00045

## <u>PERSONAL TELEPHONE CALLS</u>

Personal telephone calls (incoming and outgoing) are only permitted when of an urgent nature.

MNTL 00046

MNTL 00046

# BUILDING SECURITY AND LOSS PREVENTION

## Building access times

The office is generally open between the hours of 8 a.m. to 6 p.m.  If an employee expects to be in work outside of these hours, the employee should make prior arrangements with his/her manager.

## Key holders

Managers, or by arrangement with US General Manager.

## Alarm system

All key holders should know their alarm code and how the alarm works.  It is the employee's responsibility to know how to activate and deactivate the alarm system and to ensure that the office is left in a safe and secure manner.

## After hours access

If an employee needs to work outside of the normal working day, the employee must first obtain permission from his/her supervisor and then arrange with their supervisor for either a key holder to be present or to be taken through the security process and given alarm codes and keys by one of the key holders.

MNTL 00047

MNTL 00047

# ILLNESS/INJURY DURING WORK HOURS

The following procedures should be observed if an employee is injured or becomes ill while at work:

1.   The employee should advise his/her supervisor or Office/HR Manager that they are ill or injured.

2.   The employee may lie down in a meeting room if required to see if a resting period will help the employee feel better and return to work.

3.   In an emergency situation requiring an ambulance and/or paramedics, call 911.

4.   If the employee is involved in an accident at work, this must be reported immediately to the Office/HR Manager or first aid representative and the incident recorded in the Accident Record Book.

MNTL 00048

MNTL 00048

# PERFORMANCE APPRAISALS

Formal performance appraisals are one of a number of ways of giving an employee feedback on his/her performance and are available as a forum for employee/employer discussion on goals to be achieved and to be set. They may be done at varying times at the discretion of Mintel.

MNTL 00049

MNTL 00049

## TRAINING AND DEVELOPMENT

Mintel will consider paying a contribution towards employee training which is directly related to the job the person is doing. This is a discretionary decision by Mintel management. The employee's acceptance of Mintel-paid training reflects a mutual commitment between the employee and Mintel, and if the employee leaves employment within six months following such training, the employee may be required to reimburse Mintel for its expense.

MNTL 00050

MNTL 00050

## DEATH IN THE IMMEDIATE FAMILY

In the event of the employee suffering bereavement, paid compassionate leave will be granted as follows:

- Up to ten working days for the death of a partner/husband/wife/child.

- Up to three working days for the death of a parent.

- Time granted for the death of other relations will be at the discretion of Mintel's US General Manager.

MNTL 00051

MNTL 00051

## <u>JURY DUTY</u>

Employees are entitled to time off for jury duty. Mintel will continue the employee's salary for the first week of jury duty, less any jury service payments the employee receives, as permitted by law. The employee must provide proof of jury service in advance of their absence (summons and certification) as a condition to receiving paid time off for jury duty.

MNTL 00052

MNTL 00052

## REFERRALS

### Introducing Successful Candidates to Mintel

If you introduce a successful candidate to Mintel, the company will consider paying you a bonus in return for this, based upon you being an employee at the time when the bonus becomes eligible. HR/Office Manager can supply you with current details.

MNTL 00053

MNTL 00053

## ARBITRATION AND LIMITATION OF CLAIMS

Any claim, dispute or controversy, whether in contract, tort or otherwise, arising out of or pertaining to the employer-employee relationship, or any aspect of any employee's past or present employment with Mintel shall, at either party's election, be resolved by neutral and binding arbitration, and not by court action. The arbitration shall be governed by the commercial arbitration rules of the American Arbitration Association. In the event of any claim, dispute or controversy between any past or present employee and Mintel, including any claims relating to the terms or conditions of an employee's past or present employment with Mintel, or the termination of such employment, either the employer or the employee may initiate arbitration by filing a demand or petition for arbitration with the nearest office of the American Arbitration Association, and by serving a copy of such demand or petition upon the other party.

The parties shall each bear their own attorneys' fees, if any, as well as costs or other expenses associated with the presentation of their respective claims or defenses at arbitration, provided however, that the prevailing party may request recovery of his or her attorney's fees and the costs of the arbitration as part of the arbitration award. As to each such claim, dispute or controversy placed in arbitration, the employee shall pay one-hundred dollars to the American Arbitration Association for the costs of the arbitration. All other fees of the Association or its arbitrator(s), shall be borne by Mintel.

Any claim, demand or action against Mintel by a past or present employee which arises from or pertains to the employee's past or present employment with Mintel, including any claims relating to the terms or conditions of employment, or the termination of such employment, and any claims asserted pursuant to any state or federal civil rights statute, must be commenced within one year of the event giving rise to such a claim, demand or action, or be forever barred.

MNTL 00054

MNTL 00054

# **EMPLOYEE ACKNOWLEDGMENT**

I HEREBY ACKNOWLEDGE RECEIPT OF MINTEL INTERNATIONAL GROUP LIMITED

EMPLOYEE HANDBOOK FOR EMPLOYEES.

_____        _____

Employee's Name (please print)        Employee's Signature

_____

Date

MNTL 00055

MNTL 00055

# EMPLOYEE ACKNOWLEDGMENT

I HEREBY ACKNOWLEDGE RECEIPT OF MINTEL INTERNATIONAL GROUP LIMITED

EMPLOYEE HANDBOOK FOR EMPLOYEES.

_____          _____

Employee's Name (please print)          Employee's Signature

_____

Date

MNTL 00056

MNTL 00056

# EXHIBIT G

extension.  During this period in the United States, he can look for other employment opportunities.

If he is offered a job with a British company that is registered as a treaty investor, he can either apply to change status again (in the US) to E-2, or he can return to the UK and apply for an E-2 visa.

His other option is to seek employment with a U.S. employer and have the prospective employer file a petition for H-1B classification on his behalf.  I explained to Meesham that there are only 65,000 H-1B visas issued each year (US government fiscal year which runs 1st October to 30th September).  The H-1B petition for the forthcoming year (commencing 1st October 2008) must be filed on 1st April 2008 because there are many more petitions filed than can be approved, so this becomes a sort of lottery.

I hope this clarifies yesterday's conversation.  If you have any further questions, please feel free to ring or email me.

Best regards.

Kehrela

----- Forwarded by Peter Haigh/MINTEL/GB on 11/01/2008 07:59 -----

**Meesham Neergheen**

10/01/2008 22:50

To:      Peter Haigh/MINTEL/GB@MINTEL
cc:
Subject:     problem - solution

Peter,

I wanted to alert you of the situation I have suddenly found myself in, in the hope you may be able to find a solution for me.

It has come to my attention today that after liaising with a lawyer in the UK, the  B1 visa that Steve Charlton brought to my attention is nothing more than a status change to my current E2 visa. The process for application takes 3 months to have my visa altered to B1 status, and thus does not allow me stay here in Chicago any longer (Therefore, I am only allowed to stay here until it's being processed). Ultimately, my life is here in Chicago and no US employer is able to file a work visa application for me until April 2008 and I can't commence work for a new company until October 2008 due to visa processing times.

Given the fact that I now only have 3 weeks left in Chicago before I must return home, I wanted to get resolution to the following points

- What happens now?
- How can you help resolve this situation?
- Do you want to keep me as an employee?
- What the redundancy package amounts to and can shipment of personal belongings be covered?
- How do I break my current apartment lease? Will you cover this?

I am a little perplexed that I have suddenly been  placed in this rather awkward situation.  I am sure that you would be first to admit that the situation I have been placed in is no fault of my own but to be very honest it's not easy for me comprehend that my life has suddenly and somewhat turned upside down over the past few weeks. I have been attempting to get this figured out for over a month and a half but still have no resolution.

I have been with Mintel for over 10 years, have been nothing but loyal, and hope that this can be taken into consideration.

I know that you are in the office next week and I would appreciate the opportunity to speak with you.

Regards,

Meesh

7/29/2008

MNTL 00292

MNTL 00292

# EXHIBIT H

Mr. Meesham Neergheen
420 West Surf Street #610
Chicago, IL 60657
312-925-8571

January 16, 2008

Dear Mr. Neergheen,

This letter will discuss your options regarding continued employment with Mintel International. We have had many prior conversations about the upcoming changes in the Marketing Department and the fact that Mintel has made the business decision to eliminate your position with the company. At this point in time, you have two separate options available to you.

1. Accept a Temporary role as a PR Executive, reporting to Sabine Popp. This position will end effective April 30, 2008.
2. Discuss an immediate exit plan.

We will extend a few days for you to consider your answer, but we do expect a decision on or before this Friday, January 18, 2008. The company also expects the terms of this offer, as well as any other communications regarding your employment relationship with Mintel, to be kept confidential.

Regardless of your decision, we would like to thank you for all of your hard work and dedication throughout your tenure and to sincerely wish you the best of luck in all your future endeavors.

Signed,


Steve Charlton

Cc: Human Resources Department

MNTL 00296

# EXHIBIT I

Maggie Cahm                 To: Steve Charlton/MINTEL/GB@MINTEL
22/11/2007 09:54            cc:
                           Subject: Fw: Mintel - question

not the answer you wanted

---- Forwarded by Maggie Cahm/MINTEL/GB on 22/11/2007 09:53 ----



"Kehrela Hodkinson"          To: "Maggie Cahm" <mcahm@mintel.com>
<khodkinson@usvisalg.        cc:
com>                         Subject: RE: Mintel - question
22/11/2007 09:45

Dear Maggie,

I hope unbelievably busy means that the company is doing well and that
it's all good for you.

Since Meesham is in E-2 status, the only way he can continue working in
the US is if he were offered a job with a US subsidiary or affiliate of
another British company who is E-2 qualified.  Unfortunately, he cannot
work for any other company on his existing E-2 visa and it will be
difficult for him to change status to another type of visa which would
permit employment in the US.

If you want to discuss this further, please feel free to ring or email
me.

Best regards.

Kehrela

----------------------------------------------------------------

Kehrela Hodkinson
Principal/Attorney at Law
Hodkinson Law Group
19/20 Grosvenor Street
London W1K 4QH
United Kingdom Office  +44 (0) 20 7493 1595
Fax       +44 (0) 20 7493 7915
Email     khodkinson@usvisalg.com
Web       www.usvisalawgroup.com
          www.investorvisausa.com

This e-mail and any attachments may be confidential and may be protected by
the attorney/client privilege, work product doctrine, or other
nondisclosure protection. If you believe that it has been sent to you in
error, you may not read, disclose, print, copy, store or disseminate the
e-mail or any attachments or the information in them.

Please reply to the sender that you have received the message in error.
Then delete it. Thank you.
-----Original Message-----

MNTL 00269

# EXHIBIT J

Howard, Jeffrey  7/22/2008  10:15:00 AM

1     IN THE UNITED STATES DISTRICT COURT

        NORTHERN DISTRICT OF ILLINOIS

2       EASTERN DIVISION

3

   MINTEL INTERNATIONAL GROUP,  )

4   LTD., a United Kingdom    )

   corporation,        )

5              )

      Plaintiff,    )

6              )

    -vs-       ) No. 08 CV 3939

7              )

   MEESHAM NEERGHEEN, an   )

8   individual,       )

9      Defendant.

10

11     The 30(b)(6) deposition of

   DATAMONITOR, INC., (JEFFREY HOWARD) called for

12  examination via telephone pursuant to Notice and

   the Rules of Civil Procedure for the

13  United States District Courts pertaining to the

   taking of depositions, taken before

14  Karen M. Kaczmarek, Certified Shorthand Reporter,

   Registered Professional Reporter, and a notary

15  public within and for the County of Will and

   State of Illinois, at 33 West Monroe Street,

16  Suite 2700, Chicago, Illinois, on the 22nd day of

   July 2008, at the hour of 10:15 a.m.

17

18

19

20

21

22

23

24  Reported by:  Karen M. Kaczmarek, CSR, RPR

1    foundation.

2        MR. PIOLI:  I asked do you know.

3        THE WITNESS:  Do you want me to answer the

4    question?

5        MR. ROACHE:   You can if you have an answer,

6    go ahead.

7        THE WITNESS:  To the best of my knowledge,

8    no.  Although that's not an area I'm involved in.

9    BY MR. PIOLI:

10       Q.  Would that be Mr. Grey again?

11       A.  Yep.

12       Q.  Does Datamonitor have an employee

13   handbook?

14       A.  I believe we do.

15       Q.  And do you have a copy of that?

16       A.  No, I don't.

17       Q.  Are you familiar with its contents?

18       A.  It's something I looked at in the past,

19   but a long time ago.

20       Q.  Is there a policy contained in the

21   employee handbook that employees not disclose

22   confidential information to third parties?

23       MR. ROACHE:   Objection, foundation.  You can

24   answer.

1    to a Datamonitor employee.

2      Q.   Do you know who that employee was?

3      A.   Sure.  His name is Massoud Hussain.  I

4    know him as Mas Hussain, M-A-S, H-U-S-S-A-I-N.

5    BY MR. PIOLI:

6      Q.   And do you know when that contact

7    occurred?

8      A.   I believe it was in early to

9    mid-January 2008.

10     Q.   What is Mr. Hussain's position at

11   Datamonitor?

12     A.   I'm not clear on his job title.

13     Q.   Does he still work at Datamonitor?

14     A.   He does.

15     Q.   Do you know how Mr. Neergheen knows

16   Mr. Hussain?

17     A.   I believe that they're friends.

18     Q.   Do you know -- following Mr. Neergheen's

19   forwarding his resume to Mr. Hussain, do you know

20   what the next contact Mr. Neergheen had with

21   anyone from Datamonitor was?

22     A.   I believe that he came in for an

23   interview or a meeting with Richard Watkins of

24   the Chicago office upon my request.

1    him to seek employment elsewhere since his

2    position was being made redundant?

3        MR. ROACHE:   Objection to the form,

4    speculation.  You can answer.

5        THE WITNESS:  That's not a question I

6    typically ask in an interview process.

7    BY MR. PIOLI:

8        Q.   My question was a little different.  My

9    question was did he indicate to you?

10       A.   Sorry.  Could you repeat?  Did he

11   indicate to me that --

12       Q.   Whether or not Mintel gave its blessing

13   for him to seek employment elsewhere?

14       A.   It wasn't mentioned.

15       Q.   Did you have any discussions with

16   Mr. Neergheen during your interview regarding his

17   ability to bring in new business to Datamonitor?

18       A.   My discussions with him, as previously

19   referenced, were based on hypothetical scenarios,

20   trying to identify whether he had the commercial

21   astuteness to understand new industry sectors

22   that he had not worked in previously.  And that's

23   how we generate business from new partnerships.

24

1    that?  What would your reaction be?

2    MR. ROACHE:  Object to the form.

3    THE WITNESS:  That it would be in

4    contravention of what we discussed, and in

5    contravention of the agreement that he signed

6    prior to joining Datamonitor.

7    BY MR. PIOLI:

8    Q.  Would it be grounds for dismissal?

9    A.  If he brought the contents to

10   Datamonitor, absolutely.

11   Q.  What about if he copied it and just

12   accessed it from home, would that be grounds for

13   dismissal?

14   MR. ROACHE:  Object to the form, foundation,

15   speculation.  You can answer.

16   THE WITNESS:  I made it and Datamonitor made

17   it abundantly clear to Mr. Neergheen that his

18   employment with Datamonitor was related to

19   sectors and clients that he previously not dealt

20   with.  And that under no circumstances was he to

21   bring in any information whatsoever from his

22   previous employer.

23   BY MR. PIOLI:

24   Q.  Well, if it turned out that he

Howard, Jeffrey  7/22/2008  10:15:00 AM

1    answer if you know.

2        THE WITNESS:  The only sectors that

3    Mr. Neergheen's focused on are the ones that I

4    mentioned previously.

5    BY MR. PIOLI:

6        Q.  I understand that.  But if he -- let's

7    say he brings in an a retail lead and he hands it

8    off to somebody else, will he get credit for that

9    in his bonus?

10       A.  Categorically not.

11       Q.  Why not?

12       A.  Because if he is not passed with working

13   those sectors and the relation for the things we

14   discussed today, I've gone to significant ends to

15   make sure that he adheres to those rules, and

16   those rules have to be adhered to.  So no, he

17   would not, under any circumstances.

18       Q.  I absolutely understand Datamonitor's

19   position that it did not want Mr. Neergheen to

20   bring in any previous business contacts from

21   Mintel.

22           But my question is, suppose he brings in

23   a retail customer that wasn't a Mintel customer

24   and he handed it off to someone else at

1    Datamonitor, would he get credit for that in his

2    bonus?

3        A.  No, he wouldn't.

4        Q.  Would anybody get credit for that?

5        A.  It depends what the end deal was, but

6    no.  It's a scenario that hasn't happened.

7        Q.  Is that specified anywhere in

8    Mr. Neergheen's employment agreement that he

9    won't get credit for that in his bonus?

10       MR. ROACHE:   Objection, foundation.  You can

11   answer.

12       THE WITNESS:  I don't believe it's specified

13   in writing.  But in terms of implementation,

14   absolutely.

15   BY MR. PIOLI:

16       Q.  And who would be in charge of enforcing

17   that?

18       A.  I would.

19       Q.  Are you the one who determines what

20   revenue Mr. Neergheen gets credit for?

21       A.  Yes.

22       Q.  How does that process work?

23       A.  It's based upon revenue generated from

24   any partnership that he sets up obviously within

# EXHIBIT K

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| MINTEL INTERNATIONAL GROUP, LTD., a United Kingdom corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 08-cv-3939 |
| v. | ) ) | Hon. Robert M. Dow, Jr. |
| MEESHAM NEERGHEEN, an individual, | ) ) ) | |
| Defendant. | ) ) ) | |

## <u>AFFIDAVIT OF JEFF HOWARD</u>

I, Jeff Howard, under penalty of perjury, state as follows:

1.      My name is Jeff Howard and I make this affidavit based upon my personal knowledge.

2.      I am Head of Content Licensing and Business Development of Datamonitor, Inc. Datamonitor is a United Kingdom-based publisher.  Datamonitor publishes business information content and the company markets and sells this content both directly and through channel partners. My team is responsible for setting up and managing all of Datamonitor's channel partnerships.

3.      From approximately 2005 until 2007, Datamonitor employed a woman whose role was to set up a range of channel partnerships with trade associations and media companies globally. The woman was based in New York, New York until early fall of 2007, when she returned to the UK to manage my channel partnership marketing support team.  At that time we sought a new employee to take her place in setting up new channel partnerships. Whilst the role

is global, the USA represents the largest potential market and so my preference was to find a replacement to work in the USA.

4.      Finally, in late January 2008 I was given the CV of Meesham Neergheen.  The CV indicated that Mr. Neergheen had experience identifying commercial partnerships with the media, public companies and trade associations.  His experience in setting up relationships and brokering deals with outside organizations was ideal for our vacant position.

5.      Mr. Neergheen's CV indicated that he had approximately 10 years' experience working at Mintel. Mintel's primary business is focused on creating and selling products to organizations operating in the consumer packaged goods ("CPG") and retail sectors and these are the sectors that Mr Neergheen worked within whilst at Mintel. Whilst a small part of Datamonitor's business is focused with the CPG and retail markets, these are just two out of a total of seven sectors that Datamonitor publishes content on and which we sell into. The other five sectors are technology, pharmaceuticals, financial services, automotive and energy markets. Datamonitor therefore decided to approach Mr. Neergheen about utilizing his skills only within the five sectors that do not compete with Mintel.

6.      With extreme care as to alleviate any concerns regarding Mr. Neergheen's former employment, we created a role for him at Datamonitor that would not conflict in any way with his previous role at Mintel.  Mr. Neergheen was offered employment as a Partnerships and Alliances Manager within the Distributors Business Unit of Datamonitor and working within the technology, pharmaceuticals, financial services, automotive and energy markets.

7.      In order to be certain that Mr. Neergheen's former employment did not affect his position at Datamonitor, Mr. Neergheen was required to sign a certification regarding his former employment.  The certification required that Mr. Neergheen not provide to Datamonitor any

confidential information or trade secrets from his former employer. Mr. Neergheen signed the document and, to the best of my knowledge, has complied with its terms in their entirety.

8.      The certification was merely precautionary, as, given his new position, Mr. Neergheen would not have use for such information in his role at Datamonitor.

9.      Additionally, upon joining Datamonitor, I specifically instructed Mr. Neergheen that he was not to have any contact with CPG-related trade associations or any other association that he may have directly dealt with while at Mintel. This was yet another precautionary safeguard put into place in order to prevent any conflict with Mr. Neergheen's former employment at Mintel.

10.     Mr. Neergheen began working for Datamonitor at the end of May 2008. He has been an exceptional employee and his position has, to my knowledge, at no time conflicted with his previous employment.

I declare, under 28 U.S.C. § 1746 and under penalty of perjury pursuant to the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge.

Dated: July 22ND , 2008

_J. Howard_

Jeff Howard

# EXHIBIT L

**<u>Strictly Private and Confidential</u>**
Meesham Neergheen

Tuesday, 08 April 2008

Dear Meesham,

We are delighted to offer you a position at Datamonitor.

We would like to confirm that whilst at Datamonitor you will be expected not to discuss your role with your previous employer in any respect. Should someone ask you any such questions please advise me immediately but do not provide them with any information on any grounds.

We ask that you do not turn over any confidential information or trade secrets from your former employer. Should you have any questions regarding whether certain information constitutes confidential information or whether you may have contact with a former client, we ask that you take a conservative approach and immediately contact me to advise me of any potential issues or concerns. Failure to adhere to these conditions may result in your disciplinary action being taken or termination.

Please do not hesitate to contact me if you have any questions or queries.

Regards,

Miranda Hewitt
**<u>Human Resources</u>**

---

I, Meesham Neergheen, agree to and understand the above terms and conditions.

Signed _____        Date  04/09/08

Highly Confidential Attorneys' Eyes Only

MN0000010

MN0000010

# EXHIBIT M

Intentionally Omitted

# EXHIBIT N

**"Redacted"**

Peter Haigh

04/12/2007 20:42

To:      Steve Charlton/MINTEL/GB@MINTEL
cc:
Subject:     Re: meesham

Good luck with it.

From: Steve Charlton
Sent: 04/12/2007 20:10
To: Peter Haigh
Subject: Re: meesham

Yep will do

We also have BABC contacts

Thanks
Steve

From: Peter Haigh
Sent: 04/12/2007 20:08
To: Steve Charlton
Subject: Re: meesham

Outplacement - some one who helps him find a job say 1000 dollars. Richard had an expensive version of this

MNTL 00279

MNTL 00279

when he left br. Ask him about it.

> From: Steve Charlton
> Sent: 04/12/2007 18:47
> To: Peter Haigh
> Subject: Re: meesham

My fault I have said I will call tomorrow

Just tried to call you, if you have any ideas let me know? I'm going to do it gently and give him a few weeks severance but right now there don't seem to be any other options

Steve

> From: Peter Haigh
> Sent: 04/12/2007 18:07
> To: Steve Charlton
> Subject: meesham

Hi

he caught me today saying he would like a call from you to explain what's next and explore what other roles there are. he feels he is being blanked and is worrying a lot. Natural reaction. Let's speak Thursday before you speak to him

----- Forwarded by Steve Charlton/MINTEL/GB on 29/07/2008 22:15 -----

**Steve Charlton**

04/01/2008 16:38

To:     steve charlton

cc:
Subject:     Meesham file note

Update on my conversation today with Meesham

I informed him that the visa was B1/B2 and he would have to apply while he was still an employee to US immigration, it would then be activated instantly - but we would get Kehrela's help

I talked about the account management and trends analyst roles, both of which we mutually agreed weren't suitable

Meesh has asked for some time on Monday to speak with agency - I said of course that was fine, in fact I would offer up Kristen to assist if we find nothing internally

I checked that he was keen to remain in the US, which he is, but he said that although he loves Mintel if we can't find something he'll take the severance and the visa and look for something else

7/29/2008

He said he appreciate the time and focus I was giving

We agreed to talk again on Tuesday at 4pm

Steve

----- Forwarded by Steve Charlton/MINTEL/GB on 04/01/2008 16:31 -----

**Steve Charlton**

To:     Steve Charlton/MINTEL/GB@MINTEL

04/01/2008 15:48

cc:
Subject:     Meesham file note

We spoke yesterday as planned about any other roles

He was emphatic (I asked 3 times) that he didn't want the services role in Paul's team as it was too junior, even when I told him to take the compensation off the table he was still not interested, as it was a step down in his opinion

I explained that to make a move into another area or role will more often than not involve starting in a lower role, he said after 10 years with the company he would have hope we could create something for him, similar to when Ros came back (?). I said business conditions and circumstances change

I then asked him whether he had thought any more about other roles, as before Christmas all he had said was Services, he claimed he meant all of Custom Solutions and was more interested in other roles than services in that department

I said there was nothing else available, and asked what else he might be interested in, he said account management. I said I would ask Kristen, the only role possibly coming up would be in the Insurance sector which I'm assuming would require significant experience and industry knowledge.

He also mentioned Product Development, again as promised I checked with Tony and there is obviously nothing available in his team right now. Tony did mention a forthcoming trends analyst role but that is not finalized right now

Meesham then asked what my timeline was for making the role redundant, I said by the end of January

He then wanted to know more about the visa extension and severance package - I said I would need to discuss

We agreed to catch up again today

Steve

----- Forwarded by Steve Charlton/MINTEL/GB on 29/07/2008 22:15 -----

**Jon Butcher**

To:     Steve Charlton/MINTEL/GB@MINTEL

30/04/2008 12:34

cc:
Subject:     Re: Fw: info re. Meesham

Did Sabine tell you he has been sending things to his personal email.  I think you should ask him flat out what his intentions are.

7/29/2008

MNTL 00281

From: Steve Charlton
Sent: 04/30/2008 06:32 AM
To: Jon Butcher
Subject: Re: Fw: info re. Meesham

will do

strange he hasn't asked for flight home or belongings to be shipped as we probably should honor that

| Jon Butcher | | |
|---|---|---|
| 30/04/2008 12:24 | To: | scharlto@mintel.com |
| | cc: | |
| | Subject: | Fw: info re. Meesham |

Its really only if we think he's up to something.  Perhaps you can feel him out
first?

        ----- Original Message -----
From: Sabine Popp
Sent: 04/29/2008 06:32 PM
To: Joyce Wilkos
Cc: Jon Butcher
Subject: info re. Meesham

Hi Joyce,

Jon and I decided to offer Meesham severance in exchange for his signature under an up-to-date non-compete agreement. We agreed that the offer will be $2K. Steve had a meeting scheduled with him tomorrow morning anyways so he'll make it part of his meeting to make it look as casual as possible.

Any questions please let me know.

Thanks
Sabine

----- Forwarded by Steve Charlton/MINTEL/GB on 29/07/2008 22:15 -----

| Steve Charlton | | |
|---|---|---|
| 30/04/2008 18:59 | To: | Jon Butcher/MINTEL/GB@MINTEL, Amy Mieding/MINTEL/GB |
| | cc: | |
| | Subject: | Re: Meesham - where we stand |

7/29/2008

MNTL 00282

MNTL 00282

Amy can you check the global application with the lawyers please?

We've certainly used that wording in previous severances

I'm not as concerned about the TAs, he had been transitioning out of that role over the last 6 months anyhow

Ron Tanner at Nasft will be more worried about consistency and quality of data than Meesham I suspect

So Amy once you've drafted after comments we can decide who and how to deliver?

Thanks
Steve

> From: Jon Butcher
> Sent: 30/04/2008 17:49
> To: Amy Mieding
> Cc: Steve Charlton
> Subject: Re: Meesham - where we stand

Yes, I suppose what I am most sensitive to are the contacts with trade associations.

We will need the lawyers to advise us as to how we can get global non-compete protection - whether the agreement references the UK agreement or replaces it and as such whether it is then enforceable.  Because he may after all return to the UK and we need to be protected there.

**Amy Mieding**

04/30/2008 11:40 AM

To:      Steve Charlton/MINTEL/GB@MINTEL
cc:      Jon Butcher/MINTEL/GB@MINTEL
Subject:      Re: Meesham - where we stand Link

He does have a week to consider signing the agreement.  Were you able to give him a copy of the severance agreement?  Should I get a copy to him?

Thanks!  Amy

**Steve Charlton**

04/30/2008 11:33 AM

To:      Jon Butcher/MINTEL/GB@MINTEL
cc:      Amy Mieding/MINTEL/GB@MINTEL
Subject:      Meesham - where we stand

I don't think he has role lined up but once he leaves there's not much we can do

7/29/2008

MNTL 00283

MNTL 00283

Have checked and technically the last contract he signed was in the UK, which has good restrictive convenants

although our lawyer here believes as he has received pay and benefits in the US he would be considered under US law

there has been nothing signed since then, there was no relocation letter nor confirmation that we would help him get back to the UK

I say we issue US severance in return for $2K - he may sign it

he leaves in 30 minutes though

Steve

```
http://www.mintel.com
providing insight + impact

Chicago Office:
Mintel International Group Ltd (Mintel)
351 Hubbard Street, Floor 8
Chicago, IL 60610
USA

Tel: 312 932 0400
Fax: 312 932 0469

London Office:
Mintel International Group Ltd (Mintel)
18-19 Long Lane
London
EC1A 9PL
UK

Tel: 020 7606 4533
Fax: 020 7606 5932
```

```
Notice
********
This email may contain information that is privileged,
confidential or otherwise protected from disclosure. It
must not be used by, or its contents copied or disclosed
to, persons other than the addressee. If you have received
this email in error please notify the sender immediately
and delete the email. Any views or opinions expressed in
this message are solely those of the author, and do not
necessarily reflect those of Mintel.

No Mintel staff are authorised to make purchases using
email or over the internet, and any contracts so performed
are invalid.
```

7/29/2008

MNTL 00284

MNTL 00284

Warning
*********
It is the responsibility of the recipient to ensure that
the onward transmission, opening or use of this message
and any attachments will not adversely affect their systems
or data. Please carry out such virus and other checks, as
you consider appropriate.

MNTL 00285

MNTL 00285

# EXHIBIT O



**Amy Mieding**
04/23/2008 02:13 PM

To: Colleen McCarthy/MINTEL/GB@MINTEL, Eric
Kurth/MINTEL/GB@MINTEL, Jen Morajda/MINTEL/GB@MINTEL, Jon
Butcher/MINTEL/GB@MINTEL, Joyce Wilkos/MINTEL/GB@MINTEL,
Keith Thackston/MINTEL/GB@MINTEL, Kristen
Storey/MINTEL/GB@MINTEL, Mahmoud
Jabali/MINTEL/GB@MINTEL, Mary Shea/MINTEL/GB@MINTEL,
Megan Cushing/MINTEL/GB@MINTEL, Noel
Vasquez/MINTEL/GB@MINTEL, Pam McHugh/MINTEL/GB@MINTEL,
Peter Moore/MINTEL/GB@MINTEL, Sue
Burch/MINTEL/GB@MINTEL, Tony Yoxall/MINTEL/GB@MINTEL
cc:
Subject: Meesham Neergheen

Hello everyone,

As you can see, Meesham resigned and his last day will be April 30th.  Please let me know if you have
any questions.  Thanks!  Amy

----- Forwarded by Amy Mieding/MINTEL/GB on 04/23/2008 01:28 PM -----



**Sabine Popp**
04/23/2008 12:11 PM

To: Amy Mieding/MINTEL/GB@MINTEL
cc: Jennifer Chamberlin/MINTEL/GB@MINTEL, Sri
Gururaj/MINTEL/GB@MINTEL
Subject: Meesham Neergheen

Hi Amy,

Meesham told me this morning that he will leave Mintel so next week Wednesday will be his last day. Is
there anything else you need from us or need us to do?

Thanks

Sabine


Sabine Popp
Global Marketing Director
Mintel International Group
tel UK: +44 (0) 20 7606 4533
fax UK: +44 (0) 20 7606 5932
tel US: +1 312 932 0400
fax US: +1 312 932 0469
email:   spopp@mintel.com

MNTL 00409

MNTL 00409

# EXHIBIT P

Phillips, Paul  8/25/2008  1:07:00 PM

1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF ILLINOIS

3                    EASTERN DIVISION

4

5    MINTEL INTERNATIONAL GROUP, )

6    LTD., a United Kingdom       )

7    Corporation,              )

8            Plaintiff,       )

9            vs.          )  No. 08 CV 3939

10   MEESHAM NEERGHEEN, an      )

11   individual,               )

12           Defendant.       )

13

14           Videotaped Deposition of PAUL PHILLIPS,

15   taken before GREG S. WEILAND, CSR, pursuant to the

16   Federal Rules of Civil Procedure for the United

17   States District Court pertaining to the taking of

18   depositions, at Suite 2900, 70 West Madison Street,

19   in the City of Chicago, Cook County, Illinois,

20   commencing at 1:07 o'clock p.m., on the 25th day of

21   August, 2008.

22

23

24

1    Q.   Do you know a Jason Thomson?

2    A.   Yes.

3    Q.   Who is Jason Thomson?

4    A.   He's the global head of our IT department.

5    Q.   On the organization chart, is he someone

6    that you report to or is he someone who reports to

7    you?

8    A.   No, he would be higher up than me.  He's

9    on the executive board in the U.K.

10   Q.   How often do you see him?

11   A.   Once every four, three or four months.

12   Q.   Where do you usually see him?

13   A.   In Chicago.

14   Q.   Do you ever see him socially?

15   A.   The last time I saw him socially was

16   probably 18 months ago.

17   Q.   How often do you speak with him?

18   A.   Only when he comes to Chicago.

19   Q.   So only in person?

20   A.   Yes.  Very rarely we speak of sometimes a

21   work project, but very rarely.

22   Q.   Did Mr. Thomson ever instruct you to

23   contact Mr. Neergheen?

24   A.   Yes.

1      Q.   And this was an in-person conversation?

2      A.   It was over the phone.

3      Q.   Oh, it was an over-the-phone conversation

4   with him?

5      A.   Yes.

6      Q.   Who initiated that phone call?

7      A.   He sent me an e-mail asking me to contact

8   him, and I called him.

9      Q.   And when was this phone conversation?

10      A.   I don't recall exactly, but shortly after

11   Mr. Neergheen left Mintel.

12      Q.   Like the first week in May of '08?

13      A.   Around about then, yes.

14      Q.   Was anybody else on the phone?

15      A.   No.

16      Q.   Was the phone -- did you place the phone

17   call during work hours?

18      A.   Yes.

19      Q.   Where did you place the phone call from?

20      A.   From my desk.

21      Q.   And where was he located when you called

22   him?

23      A.   At his desk in the U.K.

24      Q.   And there was nobody else on the phone?

1      A.  No.

2      Q.  What did you say to him and what did he

3  say to you during this phone conversation?

4      A.  He asked me if I still saw Mr. Neergheen

5  on a social level.  I said yes.  He said, well, he

6  sent some files to himself, can you call him and

7  tell him not to use them.

8      Q.  And did you follow that instruction?

9      A.  Yes.

10      Q.  When did you contact Mr. Neergheen?

11      A.  That same day.

12      Q.  And that would have been the first week

13  after he left?

14      A.  Yes.

15      Q.  So the first week of May 2008?

16      A.  I couldn't be exact, but --

17      Q.  Around then?

18      A.  Around then, yeah.

19      Q.  And how did you contact him?

20      A.  I used my cell phone outside the office.

21      Q.  And you called him right away within --

22  during the working day also?

23      A.  Yes, that same day.

24      Q.  And which number did you call

1    Mr. Neergheen on?

2       A.   On his personal cell phone.

3       Q.   Was anybody else on this phone call?

4       A.   There was Josh Motz was with me.

5       Q.   Josh Marks.

6       A.   Was --

7       Q.   And was he on the phone conversation --

8       A.   No.

9       Q.   -- between you and Thomson?

10      A.   No.

11      Q.   Who is Josh Marks?

12      A.   Josh Motz, M-o-t-z.

13      Q.   Okay.

14      A.   He's another personal friend of

15   Mr. Neergheen.

16      Q.   Does he work at Mintel?

17      A.   Yes.

18      Q.   So when you called Mr. Neergheen, was your

19   phone on speakerphone?

20      A.   No.

21      Q.   So Mr. Motz couldn't hear what

22   Mr. Neergheen was saying?

23      A.   Correct.

24      Q.   Did you ask Mr. Motz to be present during

1    the phone call?

2        A.   No.

3        Q.   Why was he in the room?

4        A.   No, sorry, it was outside.

5        Q.   It was outside?

6        A.   Yes.

7        Q.   Outside the office?

8        A.   Yes.

9        Q.   But on the grounds of Mintel's office?

10       A.   Yes.

11       Q.   So what did you say to Mr. Neergheen

12   during this conversation?

13       A.   I asked Mr. Neergheen if he had sent files

14   to himself.  He replied that yes, but it was back in

15   December that he did it, and then I just replied --

16   I told him my conversation with Jason and that if he

17   was planning to do anything with it he should

18   basically not do anything because it was a serious

19   issue.

20       Q.   And how did he respond to that?

21       A.   He told me he did it in December and it

22   wouldn't be an issue.

23       Q.   Did he say he wasn't going to follow that

24   instruction?

1    A.  He said he was going to delete the file.

2    Q.  Okay.  Did you talk to Mr. Thomson after

3    having this conversation with Mr. Neergheen?

4    A.  I don't recall.

5    Q.  Did Mr. Thomson ever follow up with you,

6    send you an e-mail, anything about whether you had

7    contacted Mr. Neergheen?

8    A.  I don't -- no, I don't believe so, no.

9    Q.  Did anybody at Mintel ever follow up with

10   you about what you talked to Mr. Neergheen on this

11   occasion?

12   A.  Oh, sorry.  No.

13   Q.  Do you ever work from home?

14   A.  Probably twice in the last four years.

15   Q.  Do you have a computer at home?

16   A.  No.

17   Q.  Do you have a laptop issued through

18   Mintel?

19   A.  Yes.

20   Q.  Do you ever take that home with you?

21   A.  Not for the last couple months, no.

22   Q.  Have you ever worked on your Mintel laptop

23   in -- outside the office?

24   A.  Yes.

# EXHIBIT Q

Sabine Popp

To:    Steve Charlton/MINTEL/GB@MINTEL

cc:

29/04/2008 19:43

Subject:    Re: Need your advice re. Meesham

Oh right, sorry. Just spoke to Amy. Yes, I think it's a good idea if you deliver
this to him since your meeting has been set up for some time. It'll be $2K.

Thanks
Sabine

---

  ----- Original Message -----
**From:** Steve Charlton
**Sent:** 29/04/2008 19:23
**To:** Sabine Popp
**Subject:** Re: Need your advice re. Meesham

I am seeing him tomorrow not today

Let me know what is happening with severance

Steve

---

  ----- Original Message -----
**From:** Sabine Popp
**Sent:** 29/04/2008 19:21
**To:** Steve Charlton
**Subject:** Re: Need your advice re. Meesham

7/30/2008

MNTL 00526

MNTL 00526

Sorry for my late reply, I worked in the apartment this am and didn't touch email deliberately.
Jon said we should do it. I also think we'd all sleep better.
How did it go?

----- Original Message -----
**From:** Steve Charlton
**Sent:** 29/04/2008 07:19
**To:** Sabine Popp
**Subject:** Re: Need your advice re. Meesham

What did he say?

I have 10.30am mtg with Meesham tomorrow am before he leaves

Steve

----- Original Message -----
**From:** Sabine Popp
**Sent:** 28/04/2008 21:35
**To:** Steve Charlton
**Subject:** Re: Need your advice re. Meesham

Spoke to Amy. We'd have a very hard time to reinforce the old non-compete that he signed when he started with Mintel. My gut says we should offer him severance and make him sign a new non-compete. That'll help us all to sleep better. I'll speak to Jon.

Thanks again

Sabine
-----Steve Charlton/MINTEL/GB wrote: -----

To: Sabine Popp/MINTEL/GB@MINTEL
From: Steve Charlton/MINTEL/GB
Date: 04/28/2008 09:02PM
Subject: Re: Need your advice re. Meesham

Check with Amy

May need her to remind him about the non-compete, however weak it is

Did you offer the PM role or not in the end? Severance may be good idea after all as we can tie down non compete and stop any future legal action he might choose to take, I'm wondering if that's why he sent the Jon message about investment to claim unfair treatment, maybe I'm bein paranoid

Again check with Amy

Steve

MNTL 00527

MNTL 00527

----- Original Message -----
From: Sabine Popp
Sent: 28/04/2008 20:38
To: Steve Charlton
Subject: Need your advice re. Meesham

Viewed some of the emails he's been sending to his private email address. We can only monitor back since the day Jason activated the monitoring tool.

He's sent himself some odd things like the email about the changes that Jon sent to USA last week and the transcript and attendee list of the Claritas webinar. Especially the second thing is obviously proprietary.

What would you advise me to do about this?

Sabine

http://www.mintel.com
providing insight + impact

PS Discover and develop genuinely new ideas first with Mintel Inspire -
your global trends resource.

Preview our Trendscape and get on the fast track to productive ideation.
http://www.mintel.com/inspire/

London Office:
Mintel International Group Ltd (Mintel)
18-19 Long Lane
London
EC1A 9PL
UK

Registered in England: Number 1475918.
VAT Number: GB 232 9342 72

Tel: 020 7606 4533
Fax: 020 7606 5932


Chicago Office:
Mintel International Group Ltd (Mintel)
Floor 8
351 West Hubbard Street
Chicago
IL 60610
USA

Tel: 312 932 0400
Fax: 312 932 0469

Notice
********
This email may contain information that is privileged,
confidential or otherwise protected from disclosure. It
must not be used by, or its contents copied or disclosed
to, persons other than the addressee. If you have received
this email in error please notify the sender immediately

MNTL 00528

MNTL 00528

and delete the email. Any views or opinions expressed in
this message are solely those of the author, and do not
necessarily reflect those of Mintel.

No Mintel staff are authorised to make purchases using
email or over the internet, and any contracts so performed
are invalid.

Contact: info@mintel.com

Warning
*********
It is the responsibility of the recipient to ensure that
the onward transmission, opening or use of this message
and any attachments will not adversely affect their systems
or data. Please carry out such virus and other checks, as
you consider appropriate.

MNTL 00529

MNTL 00529

# EXHIBIT R

## LEAVING MINTEL POLICY

RESIGNATION

When an employee decides to leave for any reason, his/her supervisor and the Human Resources Department would like the opportunity to discuss the resignation before final action is taken. Mintel often finds during this conversation that another alternative may be better. If, however, after full consideration the employee decides to leave, it is requested that the employee provide Mintel with a written two-week advance notice period (bear in mind that vacation days or personal days may not be included in the two-week notice period). The Company will only compensate employees for unused accrued vacation when the employee works throughout the notice period, and is not terminated for gross misconduct or cause; otherwise, unused accrued vacation will be forfeited where applicable by federal, state and local laws. If, as sometimes happens, the employee's supervisor wishes for the employee to leave prior to the end of the employee's two-weeks notice, the employee may be paid for the remainder of that period.

POST RESIGNATION/TERMINATION PROCEDURES

Exit Interview

Human Resources is responsible for scheduling an exit interview with a terminating employee on the employee's last day of employment and for arranging the return of Company property including:

    Company Security Fob
    Office keys
    Company manuals or other proprietary information
    Any additional Company-owned or issued property

MNTL 00220

95

Mintel Employee Handbook

MNTL 00220